**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO. PX-19-348** |
| | * | |
| **ALAKOM-ZED CRAYNE POBRE,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| ******* | | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO COMPEL DISCOVERY**

The United States of America, by and through its attorneys, respectfully submits this response in opposition to Defendant Alakom-Zed Pobre's Motion to Compel Discovery (ECF Nos. 31 and 32). As explained below, the requested source code is not material to Pobre's defense and is otherwise protected by law enforcement privilege. For these reasons, the Motion should be denied.

**I.      FACTUAL BACKGROUND**

**A.      Freenet Overview**

1.     Freenet is a peer to peer network that enables each user to download or share files at the risk of other users being able to obtain their IP address.

The following description of Freenet was provided by its developers in an abstract titled,

*Freenet: A Distributed Anonymous Information Storage and Retrieval System*:

> Freenet is implemented as an adaptive peer-to-peer network of nodes that query one another to store and retrieve data files, which are named by location-independent keys. Each node maintains its own local datastore which it makes available to the network for reading and writing, as well as a dynamic routing table containing addresses of other nodes and the keys that they are thought to hold. It is intended that most users of the system will run nodes, both to provide security guarantees against inadvertently using a hostile foreign node and to increase the storage capacity available to the network as a whole.

> The system can be regarded as a cooperative distributed filesystem incorporating location independence and transparent lazy replication. Just as systems such as distributed.net enable ordinary users to share unused CPU cycles on their machines, Freenet enables users to share unused disk space. However, where distributed.net uses those CPU cycles for its own purposes, Freenet is directly useful to users themselves, acting as an extension to their own hard drives.
>
> The basic model is that requests for keys are passed along from node to node through a chain of proxy requests in which each node makes a local decision about where to send the request next, in the style of IP (Internet Protocol) routing. Depending on the key requested, routes will vary. The routing algorithms for storing and retrieving data are designed to adaptively adjust routes over time to provide efficient performance while using only local, rather than global, knowledge. This is necessary since nodes only have knowledge of their immediate upstream and downstream neighbors in the proxy chain, to maintain privacy.
>
> Each request is given a *hops-to-live* limit, which is decremented at each node to prevent infinite chains. Each request is also assigned a pseudo-unique random identifier, so that nodes can prevent loops by rejecting requests they have seen before. When this happens, the immediately preceding node simply chooses a different node to forward to. This process continues until the request is either satisfied or exceeds its hops-to-live limit. Then the success or failure result is passed back up the chain to the sending node.
>
> No node is privileged over any other node, so no hierarchy or central point of failure exists. Joining the network is simply a matter of first discovering the address of one or more existing nodes through out-of-band means, then starting to send messages.

Ian Clarke, et al., Freenet: A Distributed Anonymous Information Storage and Retrieval System (2000), https://www.cs.cornell.edu/people/egs/615/freenet.pdf (last visited February 22, 2020); *see also United States v. Dickerman*, No. 4:16-CR-00258-HEA-NAB-1, 2017 U.S. Dist. LEXIS 226787, at *5–7 (E.D. Mo. Sept. 26, 2017) (quoting the same source).

In order to access Freenet, a user must first download the Freenet software, which is free and publicly available. Anyone running the Freenet software may join and access the Freenet network. Each computer running Freenet connects directly to other computers running Freenet, which are called its "peers."

When installing Freenet, each user agrees to provide to the network a portion of the storage space on the user's computer hard drive, so that files uploaded by Freenet users can be distributed and stored across the network. Freenet users can upload files into the Freenet network and download files from the Freenet network.

When a user uploads a file into Freenet, the software breaks the file into pieces (called "blocks") and encrypts each piece. The encrypted pieces of the file are then distributed randomly and stored throughout the Freenet network of peers. The software also creates an index piece that contains a list of all of the pieces of the file and a "manifest key"– a series of letters, numbers and special characters – that is used to download the file. In order to download a file on Freenet, a user must have the manifest key for the file.

When a user attempts to download a file via Freenet, Freenet downloads the piece of the file containing the index, which provides the information required to retrieve the individual pieces of the file. The Freenet software then requests all of the pieces of the file from the user's peers. Rather than request all of the file pieces from a single peer, requests for file pieces are divided up in roughly equal amounts among the user's peers. If a user's peer does not have the particular requested pieces in its storage, that peer will then divide up and ask its peers for the pieces, and so on. This design can help law enforcement distinguish between a Freenet user that is the original requestor of a file, and one that is merely forwarding the request of another user.

Freenet has two primary operational modes, "high security" and "low security."[1] On the high security mode, a computer connects only to peers whom the user has specifically selected. On the low security mode, a computer may connect to peers unknown to the user. A Freenet

---

[1] There is also a "custom security" setting available that allows users to set up Freenet according to their preferences.

user may choose which mode to use. This investigation involves a user who chose to use the low security operational mode.

Freenet warns its users in multiple ways that it does not guarantee anonymity: when Freenet software is initially installed; within the log file each time Freenet is started; and via Freenet's publicly accessible website. For example, when choosing low security, a user is advised that the low security version "is much safer than traditional P2P software like BitTorrent or Gnutella, but an attacker with moderate resources may be able to trace your activity on Freenet back to you." Ex. 1 at 8. Low security users are also warned that it "may be quite easy for others to discover your identity!" Ex. 1 at 10. Freenet software does not mask a computer's IP address — the IP addresses of each Freenet user's peers are observable to the user. The IP address of the requestor of a file on Freenet is not anonymous. For example, if a user is connected to 10 peers on Freenet, all 10 of those peers' IP addresses will be observable to the user. The fact that Freenet does not mask IP addresses is explained on its publicly accessible website. Freenet also acknowledges on its publicly accessible website that, for users who use the low security mode, it can be statistically shown that a particular user more likely than not requested a file (as opposed to having merely forwarded the request of another peer) based on factors including the proportion of the pieces of a file requested by a user and the number of nearby peers.

        2.    <u>Law enforcement can determine the IP address of particular user in the same manner in which a non-law enforcement user could.</u>

Since approximately 2011, law enforcement has been investigating the trafficking of child pornography on Freenet. A modified version of the Freenet software is available to sworn and trained law enforcement officers to assist in conducting Freenet investigations. This law enforcement version is nearly identical to Freenet, except that it allows a computer operated by a

4

law enforcement officer to automatically log information about requests for pieces of files received directly from its peers. The types of information logged by a law enforcement computer are available to all standard Freenet users as part of Freenet's normal operation. This information includes, but is not limited to, the IP addresses of the user and the user's peers. The law enforcement version of Freenet does not have a way to retrieve the IP address of a user unless the address is available to all peers that the user connects with on Freenet.

Law enforcement computers do not target specific peers on Freenet nor do law enforcement computers solicit requests from any peers. Law enforcement officers collect manifest keys associated with suspected child pornography files that are being publicly shared and advertised on Freenet. Law enforcement only investigates Freenet users who request pieces of files associated with such keys collected by law enforcement. By viewing the documented activity of a peer that sends a request to a law enforcement computer, it is possible to determine whether it is significantly more probable than not that the peer is the original requestor of a file of interest. Critically, law enforcement's version of Freenet can access only what Freenet users have made publicly available on the network through client software programs; it does not have the ability to override users' sharing preferences or access private folders on users' devices.

### B. Pobre's Freenet Activity Resulted in a State Search Warrant

As part of a Freenet investigation, Maryland State Police ("MSP") identified Pobre when three files with unique Freenet identifiers were identified with a high level of probability to have originated from an IP address assigned to a corporation located at the residence of Pobre and his wife. On August 13, 2018, after being informed of the account address by the internet provider, MSP obtained a state search warrant to search Pobre's residence and any electronic devices.

5

### C. Law Enforcement Recovered Child Pornography from Pobre's Computer, Resulting in the Instant Charge

A Maryland state search warrant was executed by MSP, Homeland Security Investigations ("HSI"), and other law enforcement at Pobre's residence on August 14, 2018. Pobre and his wife were both present and made statements to law enforcement. HSI examined six devices in Pobre's residence, including a desktop computer that had a VeraCrypt shortcut that led to a folder labeled "Freenet." Upon review of Pobre's desktop, law enforcement located child pornography in the RAM.[2] HSI was able to recover the RAM content of the generic desktop that was running at the time of the search warrant execution. The user account was logged in and HSI photographed the desktop display.

Limited by technical issues, HSI exported a representative sample of the VeraCrypt volume contents instead of a complete image. A quick search for the term "PTHC "[3] in the exported Veracrypt volume returned over 800 results. Based on some of the file paths, MSP exported three folders which appeared to contain suspected child exploitation content. The RAM contained child pornography images including prepubescent children, infants, and toddlers engaged in sexual acts or being used for sexual acts by adults. The images and videos recovered included depictions of bestiality and bondage.

---

[2] In Pobre's Motion, he argued that the Government will need to persuade a jury of the source code's accuracy and reliability because the child pornography in this case was found on Pobre's RAM instead of his computer. ECF No. 32 at 7. A "RAM," or random access memory, is a temporary storage component of a computer that quickly loses its information when electrical power is removed. *Advance Comput. Servs. of Mich. v. MAI Sys.*, 845 F. Supp. 356, 363 (E.D. Va. 1994); *see also Columbia Pictures Indus. v. Fung*, No. CV 06-5578 SVW(JCx), 2007 U.S. Dist. LEXIS 97576, at *10–11 (C.D. Cali. June 8, 2007) ("Such data passes fleetingly through the random access memory ("RAM") and is written to temporary files on defendants' hard disks in the transient disk space. By virtue of being written to temporary files on defendants' transient disk space, such data is deleted continually and overwritten in the ordinary course of business.").

[3] "PTHC" stands for preteen hardcore.

On July 22, 2019, a Grand Jury for the District of Maryland charged Pobre with Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(5)(B) and (b)(2). The charge was not based on Pobre's suspected Freenet activity. Instead, it was based on evidence derived from the residential and electronic device searches, statements made by Pobre and his wife, and other pertinent investigation.

## II.     ARGUMENT

### A.     The requested source code is not material.

Under Federal Rule of Criminal Procedure 16(a)(1)(E)(i), the government must permit a defendant "to inspect and copy" papers, documents, data, or copies thereof "if the item is within the government's possession, custody, or control" and the item is "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).

It is a defendant's must show that the sought-after discovery is "material" within the meaning of Rule 16(a)(1)(E)(i) by giving "some indication that the pretrial disclosure of the disputed evidence would [enable him] significantly to alter the quantum of proof in his favor." *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010) (quoting *United States v. Ross*, 511 F.3d 757, 763 (5th Cir. 1975)). In other words, there must be a "strong indication" that the disputed evidence "will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Id.* (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)).

A defendant seeking discovery under Rule 16(a)(1)(E)(i) "must present facts which would tend to show that the Government is in possession of information helpful to the defense." *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990); *accord Caro*, 597 F.3d at 621. But the disputed evidence must bear more than "some abstract logical relationship to the issues

7

in the case." *Ross*, 511 F.2d at 762; *see also Caro*, 597 F.3d at 621 (affirming district court's refusal to order disclosure when defendant "presented no facts whatsoever indicating that the information would have actually helped prove his defense"). And, a defendant cannot meet his burden by asserting merely "conclusory allegations of materiality." *Mandel*, 914 F.2d at 1219; *accord Caro*, 597 F.3d at 621. "In the context of Rule 16 the defendant's defense means the defendant's response to the Government's case in chief, not pretrial motions." *United States v. Popa*, 369 F. Supp. 3d 833, 837 (N.D. Ohio 2019) (quoting *United States v. Armstrong*, 517 U.S. 456, 463 (1996)) (internal quotation marks omitted).

The most instructive case on this matter is *United States v. Popa*, 369 F. Supp. 3d 833 (N.D. Ohio 2019). There, Popa filed a motion to compel production of "Law Enforcement Freenet" based on the argument that "the inner workings of the software are material to preparing his defense." *Id.* At 836. As in the instant case, law enforcement "observed that a user with a given IP address had requested pieces of child pornography files," obtained subscriber information for the IP address, and executed a search warrant at Popa's residence. *Id.* at 835.

*Budziak*, which does not control this court, was summarized and distinguished in *United States v. Popa*. *Id.* at 837–38. Budziak was charged with knowingly distributing child pornography, which required the government to show that Budziak shared the files with others. *United States v. Budziak*, 697 F.3d 1105, 1112 (9th Cir. 2012). In order for the government in *Budziak* to prove its case in chief, it had to show, *inter alia*, that the files on Budziak's computer were complete, which made the government's software material to the government's case in chief and Budziak's defense. *Id.* at 1109. The *Popa* court ultimately determined that the *Budziak* line of questioning was not relevant to Popa's defense because Popa made "no real suggestion that the Government will rely on evidence derived directly from the software, nor that

8

it will try to persuade the jury of the software's accuracy and reliability." *Popa*, 369 F. Supp. 3d at 838.

Here, Pobre has argued that the Government will rely on evidence derived from the software for its case in chief. That is incorrect. The Government did not charge Pobre with distributing child pornography,[4] and will likely present evidence gathered from the search of Pobre's residence, the search of Pobre's computer, and the statements made by Pobre to law enforcement. The charged conduct is based on the child pornography found on Pobre's computer, and not on Pobre's activity on Freenet. Accordingly, there is no basis in which Pobre can argue that the source code is material, and his motion to compel must be denied.

### B.     Even if the requested source code was material, it would be protected by law enforcement privilege.

Even if Pobre had been able to meet his burden to show the requested items were material to his defense under Fed. R. Crim. P. 16(a)(1)(E)(i), he still would not be entitled to disclosure of the evidence because it is protected from discovery by the law enforcement privilege. *See Roviaro v. United States*, 353 U.S. 53, 59 (1957) (holding that government had privilege to withhold identities of confidential informants).

The law enforcement privilege serves "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation of N.Y.C. v. Myerson*, 856 F.2d 481, 484 (2d Cir. 1988); *accord Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 64 (1st Cir. 2007). Accordingly, federal courts have extended the privilege from

---

[4] The cases cited by Pobre in support of his Motion involve distribution charges and are not factually analogous. *See generally Budziak*, 697 F.3d 1105; *United States v. Gonzales*, No. CR-18-00539-001-PHX-DGC, 2019 WL 669813 (D. Ariz. Feb. 19, 2019).

9

*Roviaro* to protect many types of sensitive investigative techniques from disclosure. *See, e.g.*, *Myerson*, 856 F.2d at 928–29 (reports by undercover agents); *United States v. Cintolo*, 818 F.2d 980, 1002 (1st Cir. 1987) (type and precise location of equipment used in electronic surveillance); *United States v. Van Horn*, 789 F.2d 1492, 1507–08 (11th Cir. 1986) (same); *United States v. Harley*, 682 F.2d 1018, 1020–21 (D.C. Cir. 1982) (information concerning location of posts used by surveillance agents).

More recently, federal courts have found the law enforcement privilege to bar production of sensitive peer-to-peer investigative software like the law enforcement version of Freenet. *See United States v. Jean*, 891 F.3d 712, 715 (8th Cir. 2018) (affirming district court's application of privilege to source code of investigative software because "any need [for defendant to examine the Network Investigative Technique exploit] is greatly outweighed by the public's interest in keeping the exploit secret"); *United States v. Pirosko*, 787 F.3d 358, 366 (6th Cir. 2015) (applying privilege to Shareaza LE); *see also United States v. Chiaradio*, 684 F.3d 265, 278 (1st Cir. 2012) (implying that privilege would bar discovery of EP2P "because the government reasonably fears that traders of child pornography (a notoriously computer-literate group) otherwise would be able to use the source code to develop ways either to evade apprehension or to mislead the authorities"); *Gonzales*, 2019 WL 669813, at *8 (concluding that "substantial government interest" outweighed defendant's need for copy of Torrential Downpour); *United States v. Hoeffener*, No. 4:16CR00374 JAR/PLC, 2017 WL 3676141, at *18–19 (E.D. Mo. Aug. 25, 2017) (report and recommendation) (finding that defendant had not established sufficient need to overcome privilege protecting disclosure of Torrential Downpour and user manuals). This Court should reach the same conclusion here. *See Roviaro*, 353 U.S. at 62 (indicating that privilege should be applied on case-by-case basis).

While it is initially the government's responsibility to assert the applicability of the law enforcement privilege to the evidence at issue, *Myerson*, 607 F.3d at 944; *United States v. Matish*, 193 F. Supp. 3d 585, 597 (E.D. Va. 2016), once the privilege is properly invoked, courts have conducted balancing tests to determine whether the privilege operates to bar disclosure. In conducting this analysis, courts weigh the defendant's particular need for the information against the government's investigative concerns and the concomitant public interest in protecting the information. *See Roviaro*, 353 U.S. at 62 ("balancing the public interest and protecting the flow of information against the individual's right to prepare his defense"); *Pirosko*, 787 F.3d at 365 ("weighing the government's concerns against the needs articulated by [the defendant]"). The Court should, therefore, consider the Defendant's "need [for] the evidence to conduct his defense and [whether] there are . . . adequate alternatives means of getting at the same point. The degree of handicap [to the defendant] must then be weighed by the trial judge against the policies underlying the privilege." *Cintolo*, 818 F.2d at 1002; *Harley*, 682 F.2d at 1020. In the specific context of defense requests for production of peer-to-peer investigative software, the government's assertion of the privilege will prevail unless the defendant can produce "some evidence of government wrongdoing." *Pirosko*, 787 F.3d at 366. The Defendant here has not produced any evidence of government wrongdoing.

The Government's numerous compelling interests in protecting its version of Freenet from disclosure carry far more substantial weight than Pobre's unsupported reason for seeking the evidence. As an initial matter, the software represents a sensitive law enforcement technique that was created exclusively for use during investigations of child pornography trafficking on peer-to-peer networks. Although it has been made available for use by federal, state, and local law enforcement agencies, its developers have taken multiple steps to protect and maintain the

11

sensitive nature of the software, including ensuring that: (1) only duly appointed law enforcement officers can access the program; (2) the program's source code is locked to prevent anyone—including law enforcement—from examining the software; and (3) law enforcement officers are prohibited from making or sharing copies of the program.

Any disclosure of these sensitive materials threatens multiple harms. First, the investigative software contains sensitive details regarding hundreds—if not thousands—of active investigations around the United States and the rest of the world, including information about IP addresses under investigation and suspected physical addresses. Exposure of this information could jeopardize each of these investigations and potentially destroy the integrity of the program in future investigations. *See Pirosko*, 787 F.3d at 365. Second, disclosure of sensitive details about these investigative tools could permit offenders to identify law enforcement officers operating the program and thereby evade detection. *Cf., e.g.*, *Van Horn*, 789 F.2d at 1057 (reasoning that "identification of a hidden observation post will likely destroy the future value of that location for police surveillance"); *Harley*, 682 F.2d at 1018 (noting that disclosure of listening post would jeopardize public safety even after post is used). Third, providing the defense with access to the investigative software would expose the full universe of child exploitation materials (designated by manifest key) that have previously been identified by law enforcement officers using the tool. Such exposure would essentially provide offenders with a guide book for more efficiently obtaining child exploitation materials identified by law enforcement.

The foregoing concerns, moreover, would not be alleviated by a protective order that, for example, permitted only defense counsel and a defense expert to access the investigative software. "The risk that the information might inadvertently be leaked or otherwise used by third

parties is too great." *Jean*, 891 F.3d at 715. Since it is easy to inadvertently copy files onto a computer that is running forensic software, no intentional conduct is necessary for the above-described risks to manifest themselves. *Cf., e.g.*, *United States v. Harney*, No. 16-38-DLB-CJS, 2018 WL 1145957, at *11 (E.D. Ky. Mar. 1, 2018) (underscoring risk of inadvertent leaks in denying production of sensitive network investigation technique).

Because the potential harm to the public vastly outweighs Pobre's particular need for the information, the Court should deny the Defendant's Motion to Compel Discovery on the ground that law enforcement source codes are protected from disclosure by the law enforcement privilege.

### C.    CONCLUSION

For the reasons set forth above, the Government requests that the Court deny Defendant Pobre's Motion to Compel Discovery.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:    /s/
Dwight J. Draughon Jr.
Assistant United States Attorney

Dated:  February 26, 2020

## CERTIFICATE OF SERVICE

   I HEREBY CERTIFY that on February 26, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                  /s/
               Dwight J. Draughon Jr.
               Assistant United States Attorney