1

```
                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MARYLAND
                            NORTHERN DIVISION




       UNITED STATES OF AMERICA

                 v.                           CRIMINAL CASE NO.
                                                  JFM-16-469
       MARTIN ROBERT HALL,

                 Defendant
       _____/



                            (Motions Hearing)
                       Wednesday, August 30, 2017
                          Baltimore, Maryland


       Before:  Honorable J. Frederick Motz, Judge



       Appearances:

              On Behalf of the Government:
                Paul E. Budlow, Esquire
                Kaylynn Shoop, Esquire

              On Behalf of the Defendant:
                Adam D. Fein, Esquire
                Marc Johnson, Esquire




       Reported by:
       Mary M. Zajac, RPR, FCRR
       Fourth Floor, U.S. Courthouse
       101 West Lombard Street
       Baltimore, Maryland 21201
```

1    you need it.
2                    DIRECT EXAMINATION
3    BY MS. SHOOP:
4    Q    Good morning, Dr. Levine.
5    A    Good morning.
6    Q    Where do you currently work?
7    A    Currently I'm a professor of, I'm a professor in the College
8    of Information and Computer Sciences at the University of
9    Massachusetts Amherst.
10   Q    And how long have you been a professor?
11   A    I've been a professor there since 1999.  So I'll start my
12   19th year in a couple days.
13   Q    And are you tenured at the university?
14   A    Yes.  I received tenure in 2005.  At that time, I was also
15   promoted to associate professor.  Then in 2010, I was promoted to
16   full professor.
17   Q    And you mentioned you were a member of the College of
18   Information and Computer Sciences.  What is that?
19   A    It's a collection of faculty at the university that
20   specialize in information and computer sciences.
21   Q    Dr. Levine, what type of classes do you teach at the
22   university?
23   A    I teach a variety of classes over the years.  They are, they
24   are largely focused on networking the internet, peer-to-peer
25   networks, and computer network security.

1  Q     And do you have any publications?

2  A     Yes.  One of my main jobs at the university is to produce

3  peer-reviewed public research.  So since before then, while I was

4  a graduate student, I've been producing those publications.

5  Currently, I have somewhere north of 80 or 90 peer-reviewed

6  publications.

7  Q     And how about publications specifically regarding

8  peer-to-peer networks?

9  A     That is one of my main, that's probably the main focus of my

10 research.  So the majority, if not the vast majority, of those

11 publications are on peer-to-peer networks.

12 Q     And the peer-to-peer network that we're going to discuss

13 today is called Freenet.  Have you published anything in

14 particular regarding Freenet?

15 A     Yes.  Earlier this year, I published a paper in a

16 peer-reviewed workshop on Freenet, including a method of

17 investigating child pornography trafficking on Freenet.

18 Q     I have Government Exhibit Number M-2, which was also

19 attached to the government's motion response.  I'm going to put

20 it on the ELMO.  Can you see that, Dr. Levine?

21 A     I can.

22 Q     This is an eight-page document.  I can briefly go through

23 the pages.  Do you recognize this?

24 A     Yes.  That's the article I just referred to.

25 Q     Is that the entire article?

1  date.  Those are the essential bits of information that are
2  included with the request.
3  Q    Now, when a user tries to retrieve all of these little
4  pieces, are there times where that, that's not possible?
5  A    Yes.  Your computer is sending a signal to the stranger next
6  to you saying do you have this piece?  Again, no typing.  It's
7  just a computer signal.  If they don't have it, they'll ask their
8  stranger peers, and so on.  And eventually, no one might have it,
9  at which point a not-found message would be sent back to the
10 original requester.
11 Q    So now let's turn our attention from the process to the law
12 enforcement investigation into this peer-to-peer software.  While
13 studying Freenet, did you become aware that people were using
14 Freenet to trade child pornography?
15 A    Yes.
16 Q    How did you become aware of that, Dr. Levine?
17 A    I believe law enforcement first told me about it.  But it's,
18 I've been studying peer-to-peer file sharing networks for over a
19 decade, and they all contain child pornography trafficking.  So
20 it was of no surprise to me.
21 Q    And when law enforcement reached out to you, did you attempt
22 to assist them in any way?
23 A    Yes.
24 Q    Can you tell us what you did to assist law enforcement?
25 A    So in summary, there were two outcomes of our, of our

Case 8:19-cr-00348-PX   Document 45-3   Filed 08/17/20   Page 5 of 15
Case 1:16-cr-00469-ELH   Document 61   Filed 09/21/17   Page 55 of 242
DIRECT EXAMINATION OF DR. LEVINE BY MS. SHOOP                    55

1  assistance to law enforcement.  I say "our."  As I said, I'm a
2  professor and I have research staff that work with me.
3          The first outcome was a tool to be used by law
4  enforcement for the forensically sound investigation of child
5  pornography trafficking on Freenet.  This tool has a number of
6  important characteristics.  It's a simple modification of the
7  Freenet software, which, as I mentioned before, is open source,
8  freely available for anyone to read and modify and make changes,
9  assuming they know Java.
10         The changes we made were limited in a very particular
11 way.  The changes essentially write down for an investigator the
12 information that the software already has in its normal
13 execution.  So there is no extra messages.  There's no extra
14 signaling.  There's no, there's no probing of the network.
15 There's no special features.  It's just information that anyone
16 running the Freenet software has already, their computer has
17 already, and we simply write it down.
18         We only write down information that's contained in
19 messages for which we are the intended recipients.
20 Q    So let's talk about that.  So let's say, for example, I am
21 on Freenet and I'm connected to 10 strangers.  One of those
22 strangers happened to be a law enforcement computer that's
23 running this modified version of Freenet.  And I want to download
24 a file.  And I send a signal from my computer to their computer.
25 What information does this acquire?

Case 8:19-cr-00348-PX   Document 45-3   Filed 08/17/20   Page 6 of 15
Case 1:16-cr-00469-ELH   Document 61   Filed 09/21/17   Page 56 of 242
DIRECT EXAMINATION OF DR. LEVINE BY MS. SHOOP                        56

1    A    So since you're connected to a stranger who happens to be
2    law enforcement, you, in the process of requesting, taking a
3    password and then the software you're running requests the pieces
4    that are associated with that password, some of the requests will
5    go to each of the strangers you're connected to.  And so,
6    therefore, some of the requests will go to law enforcement.  And
7    what they'll contain is the exact piece that you're looking
8    for -- uniquely identifiable, better than DNA -- the exact piece
9    you're looking for, the current date and time, of course, your
10   current IP address, and this notion of about how far you've,
11   about how many hops of strangers you've traveled to locate this
12   information.  That information's required because at some point
13   we want to stop looking.  But that's the information that would
14   be there.

15             Another critical part of this law enforcement tool is
16   that it has already a list of blocks that are of interest to law
17   enforcement.  So at some point law enforcement visited, say, one
18   of the bulletin boards on Freenet that are, that are labeled as
19   discussing child pornography, toddlers and infants, Lolitas and
20   so on, named Lolitas and so on.  So they'll visit these boards.
21   They'll see publicly, just like anyone else, these passwords.  We
22   saw an example of that in the exhibit.

23             What they can do ahead of time is learn the exact
24   pieces that are associated with that password that are on the
25   network.  And so with that in hand, running the software as each

Case 8:19-cr-00348-PX   Document 45-3   Filed 08/17/20   Page 7 of 15
Case 1:16-cr-00469-ELH   Document 61   Filed 09/21/17   Page 57 of 242
DIRECT EXAMINATION OF DR. LEVINE BY MS. SHOOP                    57

1  request comes from you as a requester of the pieces for this
2  password of interest, the software can say, aha, that's a piece
3  that I can uniquely identify as being part of this list of files
4  of interest that I'm aware of previously as being associated with
5  child pornography trafficking.
6          At that point, the software would record the
7  information that I mentioned before. And, essentially, at the
8  end of the day, the investigator is left with a nice record of
9  the requests that, since you said "you" before, you as the
10 requester have sent to me, the law enforcement known.
11         I know that they're associated with the particular
12 password. I know that these blocks are -- I mean, I know that
13 for sure. I know the number that I've received. I know the time
14 frame start and last time that these requests were sent. I know
15 that they're intended only for me.
16         And then the next stage of the investigative process
17 would be for law enforcement to then retrieve that file
18 themselves because they should visually confirm that, in fact,
19 it's not only a file of interest, it's, it is child pornography
20 that was requested by the stranger next to me.
21         And then using an algorithm, they can determine next
22 stops.
23 Q   Before we talk about the algorithm, let me ask you this, Dr.
24 Levine. You mentioned that, in the beginning of your testimony,
25 this is open source software so anyone can modify it, is that

Case 8:19-cr-00348-PX   Document 45-3   Filed 08/17/20   Page 8 of 15
Case 1:16-cr-00469-ELH   Document 61   Filed 09/21/17   Page 58 of 242
DIRECT EXAMINATION OF DR. LEVINE BY MS. SHOOP       58

1   correct?

2   A    That's correct.

3   Q    It's all publicly available?

4   A    I'm publicly available and intended for volunteers to join

5   and modify. It's a volunteer project.

6   Q    And let's say I sent a request to a peer that was not

7   running this modified version. The information that you just

8   described, would that same information go to that individual as

9   well?

10  A    Yes. This is only information that is already sent to every

11  peer all running Freenet. Some of it we saw is displayed in the

12  previous exhibit. Some of it is displayed already to the user.

13  Others is not displayed, but is held and used by the software.

14  Our version for law enforcement simply writes it down,

15  essentially.

16  Q    And let me ask you this. You originally, you had stated

17  that when you connect to these strangers as a user, that's

18  random, and the software does that automatically?

19  A    That's correct.

20  Q    Does the modified version also do that the same exact way?

21  A    It does not modify the existing process that Freenet has for

22  connecting to strangers. So the software doesn't, it's not an

23  option in the software to target a particular individual.

24  Whoever the -- for law enforcement, when they're running that

25  software, whoever the software happens to connect to, what

1   other -- sorry -- whatever remote strangers the software happens
2   to connect to, whatever remote strangers happen to connect to law
3   enforcement, that's whose information is recorded, is logged
4   about.
5   Q    Now, which -- we had talked about two operational modes:
6   The open net, which is low security; the darknet, which is high
7   security.  Which mode --
8            MR. FEIN:  I'm going to object, Your Honor.  That
9   wasn't quite the evidence.  There are various security methods
10  for open net and there are various security settings for darknet.
11  Darknet is generally more secure.  But the evidence wasn't that
12  one is low and one is high.
13           THE COURT:  Overruled.
14           THE WITNESS:  Can you rephrase the question, please?
15  BY MS. SHOOP:
16  Q    Yes, sir. We talked about, there's two operational modes,
17  open net, darknet, which I believe is labeled low security, high
18  security.  Which one of those modes do you run this modified
19  version on?
20  A    The modified version recording this information that's
21  available, anyway?  Our modified version runs only on the low
22  security, open net mode.
23  Q    Now, with that information that you just described that the
24  modified version is collecting, does Freenet warn its users that
25  someone may do that?

Case 8:19-cr-00348-PX   Document 45-3   Filed 08/17/20   Page 10 of 15
Case 1:16-cr-00469-ELH   Document 61   Filed 09/21/17   Page 60 of 242
DIRECT EXAMINATION OF DR. LEVINE BY MS. SHOOP                    60

1  A    Yes.  There's several examples of that.  We saw already in
2  the exhibits that were put on the screen previously, that upon
3  install, there's the warning.  We saw that the bottom of the
4  browser screen, it reminds the user that they're low security
5  mode.  The Freenet website has a lot of documentation.  There's a
6  help page available for users that contains an enormous amount of
7  information.  There's a large and detailed section on
8  vulnerabilities to Freenet.  In particular, one of the paragraphs
9  is labeled correlation techniques.  And what it says is that if
10 you're connected to a stranger, if that stranger knows ahead of
11 time the password, the file, the password that you're requesting,
12 if they receive, just by being your stranger, by recording the
13 proportion of requests, the number of requests you receive, and
14 they know which key you're looking for and how many, how many
15 hops, which Freenet tells you, anyway, how many hops the messages
16 have traveled, then that third party can detect that you are the
17 requester of these files.
18          It's been up there for at least three years.  It
19 exactly describes the technique that we've been doing.
20 Q    And is that publicly available?
21 A    That's publicly available on the website.  As I said, been
22 available for at least three years.  In fact, that's not the only
23 vulnerability they list.  I mean, it goes on for a while.
24 Q    So let's talk about the next step that you mentioned, an
25 algorithm.  So you said that you assisted law enforcement in two

Case 8:19-cr-00348-PX   Document 45-3   Filed 08/17/20   Page 11 of 15
Case 1:16-cr-00469-ELH   Document 61   Filed 09/21/17   Page 61 of 242
DIRECT EXAMINATION OF DR. LEVINE BY MS. SHOOP                      61

1  ways.  We talked about the first one.  Let's talk about the
2  second one.
3         When law enforcement has that information, what can
4  they do with it?
5  A    Okay.  So as I mentioned, there were two outcomes of our
6  participation with law enforcement.  The first was this law
7  enforcement version of Freenet.  The second was a paper that I
8  mentioned before that was peer-reviewed and is now publicly
9  available, that describes a method for taking that information
10 that the software writes down and then using it to determine
11 whether the stranger next to you is indeed the requester of a
12 particular file or -- there's only one other option -- they're
13 merely relaying the request of some other user.
14        And just as the Freenet website describes, with the
15 information in hand it can make that determination.
16        A really critical part of that peer-reviewed
17 publication is that there's an evaluation of the technique.  So
18 we evaluate both its true positive rate and it's false positive
19 rate.  It is, it has a very high true positive rate, as we found
20 in simulations of Freenet.  And we found it has a very low false
21 positive rate in an evaluation of using six weeks of real Freenet
22 traffic.
23 Q    And so this method that you've assisted law enforcement
24 with, is it, is it a way for law enforcement to take that
25 information and determine if somebody is likely that original

1  requester versus the person passing on the request?
2  A    Yes.
3  Q    Did you have this technique evaluated?
4  A    Yes.  I mean, we evaluated it.  That's the main point of the
5  paper, is to provide publicly our method of evaluation for others
6  to view.
7  Q    And how do you know that the method works?
8  A    Well, so we, as I said, we used two different methods to
9  evaluate our investigative approach.  We constructed a simulation
10 of Freenet, recreating its routing algorithm and other aspects of
11 how Freenet works.  This is very standard in my field.  It's how
12 I've been doing things, and everyone else in my field, for
13 decades.
14          Then we used that to evaluate its true positive rate.
15 Then we took actual traffic from Freenet, as I said, for six
16 weeks, and we evaluated its false positive rate.  And so, and so
17 that's what the paper details.
18 Q    And, Dr. Levine, you said that that's a very standard method
19 of evaluating techniques in your field?
20 A    Both are standard methods I've used for decades, as have
21 other people in my field.
22          MS. SHOOP:  Your Honor, may I have one moment?
23          THE COURT:  Yes.
24          MS. SHOOP:  Your Honor, that is all we have at this
25 time.

1   you about assistance that you might be able to provide in terms
2   of Freenet investigations, is that correct?
3   A   That's correct.
4   Q   When was that?
5   A   I believe that was 2014.
6   Q   And you indicated that you made a patch or a modification to
7   existing Freenet, correct?
8   A   Not me. Someone who works for me. But my research group.
9   Q   Okay. Do you prefer me to refer to them as your research
10  group or the University of Massachusetts?
11  A   If you say University of Massachusetts, I'll understand that
12  you mean my research group.
13  Q   So the University of Massachusetts created a patch or a
14  modification for the existing Freenet software that's available
15  publicly on the internet, correct?
16  A   That's correct.
17  Q   And this particular patch or modification was created to be
18  open source code that's available to the public?
19  A   Yes.
20  Q   And it was created using Java language, correct?
21  A   Yes.
22  Q   And the patch allowed for recordation of certain
23  information, correct?
24  A   Information received as the intended recipient, yes.
25  Q   So the patch or the modification allows a recipient of a

1   communication to record, for example, the IP address of a relayer
2   of information?
3   A    The sender of that signal that was received, yes.
4   Q    Is it wrong to call that person a relayer?
5   A    You don't know if they're the originator or a relayer.
6   Q    Correct.  You have no idea, right?
7   A    That's correct.  So they might be, they might not be.
8   Q    Precisely.  So the IP address of that -- and I should stop
9   referring to -- they're not individuals.  These are all
10  computers.  It's all a computerized system.
11  A    Computers run by individuals.
12  Q    Right.  Well, but as you said, it's an automated process.
13  An individual doesn't have to be sitting there, doing anything,
14  other than request to upload a file, correct?
15  A    That's true.
16  Q    So this patch, this modification will record for a recipient
17  of the communication the IP address of the computer that sent the
18  communication, correct?
19  A    Correct.
20  Q    The hash, and in our, with respect to what we're concerned
21  about today, the hash value of a block that's requested, correct?
22  A    Correct.
23  Q    The hops to live that remain in the communication, correct?
24  A    Correct.
25  Q    And the date and time of the communication?

1  A    Correct.
2  Q    Ordinarily, as constructed, Freenet doesn't do that?
3  A    Well, as we showed before, it does display the IP address of
4  the strangers you're connected to.  Ordinarily, even though this
5  information was received by your computer, it's not displayed to
6  the user.
7  Q    Okay.  So I'm assuming the work you did wasn't for no
8  reason.  It was gathering information that makes it possible for
9  you to do this.  So if ordinary Freenet did exactly what you did,
10 your work would be fairly valueless, correct?
11 A    It would be redundant.
12 Q    My point is simply, my point is simply you modified Freenet
13 to do something it ordinarily doesn't do, correct?
14 A    Correct.
15 Q    All right.  And you have an advanced degree, correct?
16 A    I do.
17 Q    You've been doing this for, I think you said now you've been
18 a professor for 19 years?
19 A    That's correct.
20 Q    So you have a --
21 A    Start of my 19th year.
22 Q    I'm sorry?
23 A    Start of my 19th year.  So 18 years.
24 Q    You have a fairly high degree of sophistication with respect
25 to computer matters and software engineering, I would imagine?