**THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | Case No.   8:19-cr-00348-PX |
| ALAKOM-ZED CRAYNE POBRE | : | |
| Defendant | : | |

**DEFENDANT'S CONSOLIDATED MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS PHYSICAL EVIDENCE AND IN REPLY TO THE GOVERNMENT'S RESPONSE TO MOTION TO COMPEL DISCOVERY**

**I.      INTRODUCTION**

Defendant is charged in a single count Indictment with Possession of Child Pornography in violation of 18 U.S.C. §2256 (8)(A). The Indictment generally alleges that on August 14, 2018, Child Pornography was found on a computer in Defendant's home as a result of the execution of a Search Warrant issued by a Maryland state District Court Judge authorizing Maryland State Troopers from the Computer Crimes Unit and embedded Homeland Security Investigators to conduct a search. *See Exhibit 1 – Search and Seizure Warrant and Exhibit 2 – Application and Affidavit for Search and Seizure Warrant to the Motion to Suppress Physical Evidence filed contemporaneously herewith.*

The search warrant was based upon an underlying warrantless surveillance program of the *Freenet* network, an open source platform "designed to ensure true freedom of communication over the Internet…by allow[ing] anybody to publish and read information with complete anonymity." http://freenetproject.org/pages/help.html. Using secretly modified and *Freenet* software developed for law enforcement by a team of computer scientists at the University of Massachusetts, this software allowed Maryland State Police investigators to track encrypted content which moves over *Freenet* in the same manner as email, and to intercept and log the data or hash

Page **1** of **18**

values being transmitted. The law enforcement modified *Freenet* source code then purports to calculate the "likely" requestor of the encrypted content and generates a report for law enforcement usage. That report, entitled *Freenet* Target Summary then became the basis for the Search Warrant in this case. <u>See</u> Exhibit 3 – *Freenet Target Summary Report*.

The Government has disclosed a likely expert witness, the leader of the team of computer scientists who created the Law Enforcement modified *Freenet* source code and have provided his testimony from a prior case litigated in this District. In that case, heard in 2017 by Judge Motz, the Government argued that the Defendant did not have a reasonable expectation of privacy in his transmissions over the *Freenet* and, therefore, investigators did not need a search warrant to conduct *Freenet* surveillance of him. Thus, it is apparent that the Government will make the same argument in the case *sub judice*.

In this Memorandum, Defendant will address the expectation of privacy issue, as further advanced by the Supreme Court in *Carpenter v. United States*, 585 U.S. _, 138 S.Ct. 2206 (2018) after the case before Judge Motz. The Defendant will also address the Government's claim of law enforcement privilege in response to the Defendant's Motion to Compel Discovery which seeks disclosure under Rule 16 of the law enforcement source code as material to the defense.

**II.    STATEMENT OF FACTS**

Defendant adopts and incorporates the Statement of Facts and Relevant Background Part II of his Memorandum in Support of Motion to Compel Discovery as set forth below:

> Defendant was charged after a Search Warrant was executed on his home computer network and 3 alleged child pornography videos were found on the random access memory (RAM) of his computer system. According to the Discovery received to date, a Search Warrant was obtained after warrantless surveillance of a computer network known as "Freenet" allegedly revealed that Defendant's Freenet "node" may have requested certain child pornography videos. Additionally, Discovery revealed that the Maryland State Police Computer Crimes Section regularly conducted surveillance of this Freenet network using a special software

hack created to automatically surveil network content without a warrant for the purpose of searching among network users for the requestors of child pornography.

[The Freenet network]…is a network of linked computers designed to ensure freedom of communication over the internet. Freenet hosts websites, filesharing, forums, chat, microblogging, email etc, all anonymous and hosted within the Freenet network.

Rather than rely on central servers like many networks, Freenet stores data in fragments distributed among its users. Each file is segmented into encrypted blocks and, through an automated process, randomly and anonymously distributed and stored among the many linked computers also called "nodes". Requests to retrieve the data are designed to maintain requestor anonymity as well. A request for data is routed through neighboring nodes and passed on to successive neighboring nodes until all of the blocks of a file are found and transmitted back through each computer and ultimately back to the requestor where the blocks are reassembled and decrypted. All types of content can be and are stored on Freenet from personal e-mails, to family videos to personal medical files, political tracts, books, movies, religious material, etc.

Freenet is open source software, freely available to anyone who wishes to use it. Those who choose to use it give up some of the benefits of using central servers. For example, Freenet runs very slowly and one cannot connect to services like Google or Facebook operating Freenet on their systems. But Freenet bills itself as a platform for censorship-resistant communication and publishing, designed to ensure true freedom of communication over the Internet. At least up until recently, users could be comfortable that they were not being spied upon and that their computer systems were secure from Government surveillance.

Discovery provided by the Government exposed that computer software experts have created a hack to the standard Freenet open source software which law enforcement used to surveil internet traffic over the Freenet. Using this hack, law enforcement had established its own Freenet nodes[1] and began monitoring traffic passing through its nodes. The hack included a massive list of the "hashes'- long lines of numbers and letters - identifying blocks of child pornography files. When a request for a block with a hash value associated with child pornography was detected, law enforcement using a separate algorithm would attempt to calculate which Freenet user among the many mostly innocent users had requested the block. Using the raw computing power of its automated system, the law enforcement software would then calculate the probability that a particular Freenet user at a particular IP address had originated the request for the encrypted blocks of a known child pornography file. By this method, law enforcement surveilled Freenet user activity without a warrant and monitored the content of communications passing over the Freenet.

The first 7 pages of the 10 page Application and Affidavit in Support of Search and

---

[1] A node is a computer that is running the Freenet program. *United States v. Dickerman*, No. 4:16-CR-00258-HEA-NAB-1, 2017 U.S. Dist. LEXIS 226787, at *5 n.2 (E.D. Mo. Sep. 26, 2017).

Seizure Warrant herein (excluding the final 4 pages which describe the actions investigators requested to be authorized and the items to be seized) consists of general content describing the affiants training and experience, defining some general computer investigation terms and common characteristics among individuals involved in the receipt and collection of child pornography. On the eighth page (the Application is not paginated), the Affiant mentions the *Freenet* for the first time, describing it as a peer to peer network. [2] The Affiant goes onto give a cursory explanation of the workings of the Freenet network, makes a passing reference to Law Enforcement Freenet nodes and provides a conclusory reference to how the conclusion is reached that a particular Freenet user is the requester of a particular encrypted block of files rather than merely a relayer of such a request:

> Freenet Peer-to-Peer Network:
>
> Freenet is a peer-to-peer platform intended for censorship-resistant, secure, and anonymous communication and file sharing on the Internet. Freenet works by storing small encrypted blocks of content distributed on the computers of its users and connecting through intermediate (peers) computers which pass on requests for content and send them back without knowing the contents of the complete file. A Freenet user wishing to download a file must first locate the file's manifest key, typically on a message board or a Freesite with material of interest. The Freenet software then retrieves this manifest and uses the list of keys it contains to request from other users of the network the blocks needed to recreate a file. Freenet stores two blocks for each one required to re-build the file. If one block cannot be found, another can be requested. Law enforcement has collected the manifests to suspected child pornography files that are publicly shared and created a database of the associated keys to the blocks of a file. Law enforcement Freenet nodes record requests that are sent to them and they are compared against these known keys to identify child pornography files being downloaded. The original requester node can be determined, with a fair probability, because the number of requests received is reduced significantly as each node forwards them. Using the number of requests received, the number of peers a requester has and the

---

[2] Freenet is not a peer-to-peer network such as Lime Wire where complete files are stored on a user's hard drive and others can search for them. Each independent Freenet user is connected to a group of other Freenet users for the purpose of storing encrypted blocks of files among the group. Thus, the complete file is not accessible on a user's hard drive by other users. Freenet is not comparable to Lime Wire or other peer-to peer networks as are described in case law such as e.g., *United States v. Stults*, 575 F.3d 834,841-2 (2009).

number of blocks the file contains we can calculate if the volume of requests received is significantly more likely than not from the original requester. That a Freenet user requested blocks associated with a particular file on Freenet indicates that the user attempted to download the file's contents from Freenet. It does not indicate whether or not the user successfully downloaded the file.

The Affidavit then goes on to aver that the law enforcement Freenet node observed that the Freenet node operating at a certain IP address had requested a number of blocks of three suspected child pornography files between June 23 and June 25, 2018.[3]

While the Affiant indicated that he "could not state with absolute certainty the user was the original requestor, based on a review of those requests it is significantly more probable than not that the user of IP address…was the original requestor of the files descried below…." the Affiant provided no basis for this conclusion, instead merely declaring the fact at the heart of the issue as true. The Affidavit contains no information about the underlying surveillance of *Freenet* users encrypted content, about the algorithm upon which the alleged likelihood of who is the requestor is calculated, no mention of the underlying concept of "even share" upon which the algorithm is based, and no mention of the statistical formula which are unable to differentiate between requestors and relayers of requests for the file blocks in question.

**III. THE SEARCH OF DEFENDANT'S HOME AND SEIZURE OF HIS COMPUTER SYSTEM VIOLATED HIS FOURTH AMENDMENT RIGHTS TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES.**

**The Defendant had a Legitimate expectation of Privacy in Transmissions Routed from his Computer Using *Freenet*, and the Warrantless Interception and Logging of the Data and Content of These Transmissions Constituted an Unlawful Search and Seizure**

The Fourth Amendment provides that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

---

[3] It is important to note here that none of those 3 files were found on Defendant's computer upon execution of the Search Warrant.

> particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "The Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). "But **what he seeks to preserve as private**, even in an area accessible to the public, may be constitutionally protected." *Id*. (emphasis added). See also *United States v. Jones*, 565 U.S. 400, 403 (2012) (excluding GPS evidence recording publicly observable information about vehicle location on Fourth Amendment grounds) & *Carpenter v. United States*, 585 U.S. _, 138 S. Ct. 2206 (2018)(excluding cell-site location information obtained without a search warrant).

"[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001), citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring), *Carpenter*, Id. at _, 138 S. Ct. at 2213. In determining whether an individual has a legitimate expectation of privacy, courts consider: (1) whether the individual, by his conduct has subjectively exhibited an actual subjective expectation of privacy; and (2) whether that subjective expectation is "one that society is prepared to recognize as 'reasonable.'"*Kyllo*, 533 U.S. at 33 ("As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."). See also *Katz*, 389 U.S. at 351-53.

The use of technology to conduct a search implicates different considerations than an investigation relying only on ordinary human observation. "Where... the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively

unreasonable without a warrant." *Kyllo*, 533 U.S. at 40. In *Kyllo*, the Court held that the use of thermal imaging to obtain information from the interior of a home "that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area,'...constitutes a search -- at least where...the technology in question is not in general public use." *Id.* (internal citations and quotations omitted). See also *Florida v. Jardines*, 133 S. Ct. 1409, 1411-12 (2013) (holding that an unlicensed physical intrusion upon property by using a drug sniffing dog at the front door of a home constitutes a search under the Fourth Amendment).

In *Jones*, the Government "installed a GPS tracking device on the undercarriage of the [defendant's] Jeep while it was parked in a public parking lot." *Jones*, 565 U.S. at 403. "Over the next 28 days, the Government used the device to track the vehicle's movements, and once had to replace the device's battery when the vehicle was parked in a different public lot in Maryland." *Id.* "By means of signals from multiple satellites, the device established the vehicle's location within 50 to 100 feet, and communicated that location by cellular phone to a Government computer." *Id.* "It relayed more than 2,000 pages of data over the 4-week period." *Id.*

Most recently, the Supreme Court held in *Carpenter*, *supra*, that individuals have a legitimate expectation of privacy in their cell site location information (hereafter CSLI), historical records of which therefore may not be constitutionally obtained by the Government without a search warrant. The Court dismissed the Government's argument that no legitimate expectation of privacy over the CSLI under the third-party doctrine as well as the Government's assertion that the "voluntary exposure" of the person to public eyes while a person is out and about using their cell phone. Importantly, the Court ruling was not based on the historical trespassory history of 4th Amendment search doctrine but rather based its ruling upon the individual's effort to "'preserve something as private'" versus "official intrusion into an individual's private sphere" as it's basis

for 4th Amendment protection. As long as the individual seeks to preserve something as private and society is prepared to recognize that expectation as reasonable, the 4th Amendment protects that expectation regardless of the lack of any property interest at issue in the matter. Id. (*citing Smith v. Maryland*, 442 U.S. 735, 740 (1979)). The Court ultimately held that an "individual retains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." Id at _, 138 S. Ct at 2217.

Under the theory that one has no legitimate expectation of privacy in information turned over to third parties, "[t]he Supreme Court has held that addressing and other routing information on paper letters, like pen-register and trap-and-trace information (including the date and time of listed calls) regarding telephone calls, is accessible to the government without a warrant." However, courts have recognized that the communication's **contents** are still protected. *United States v. Davis*, 785 F.3d 498, 529 n.5 (11th Cir. 2015) (Rosenbaum, J., concurring), citing *Ex parte Jackson*, 96 U.S. 727, 736 (1877), *Smith*, 442 U.S. at 735; see also *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) ("we hold that a subscriber enjoys a reasonable expectation of privacy in the contents of emails that are stored with, or sent or received through, a commercial ISP.") (internal quotation omitted); *Smith*, 442 U.S. at 741-43 (the warrantless use of a "pen register" at the telephone company to determine the telephone numbers dialed from a particular home was permissible under the Fourth Amendment because defendant did not have a "legitimate expectation of privacy" in the numbers dialed, where the ***contents*** of the communication were not determinable from the pen register).

In the instant case, law enforcement's interception and logging of data and content through the use of modified *Freenet* software constituted an unlawful search. Law enforcement was not merely penning or trapping and tracing IP addresses through its use of the secretly

modified *Freenet* software. Officers were intercepting and logging the **content** of the electronic communications in the form of the hash values known to correspond to certain content allegedly being requested and routed from Defendant's computer. The content being intercepted is analogous to many other electronic communications, including the content of an email, except that substantially more secure protections of content and anonymity are intentionally applied in the case of *Freenet* communications. In fact, such protections are the fundamental purpose for the use of Freenet software rather than Internet Service Providers as in the case of standard email. Defendant had a reasonable expectation of privacy in electronic communications both originating and forwarded from his computer using *Freenet*, and law enforcement intercepted, logged, and tracked these communications without a search warrant using secret software not in general, public use which to this day the Government seeks to kept secret.

Defendant had the requisite actual and subjective belief that the communications and content sent from and routed through his computer would be private. He intentionally used the *Freenet* service to maintain that anonymity and privacy. In so doing, he manifested a subjective expectation of privacy. Defendant's subjective expectation of privacy in *Freenet* communications and content is, moreover, one that society recognizes as objectively reasonable.

In fact, internet users often seek anonymity and privacy for free speech purposes and the existence and popularity of the *Freenet* service and others like it is evidence that this expectation of privacy is one that society both values and recognizes as reasonable. The electronic communications and content sent through *Freenet* are functionally indistinguishable from that sent through an email. Courts have recognized that email users have a legitimate expectation of privacy in the content of their emails, just as they have in the content of communications sent by postal mail, and Congress has made interception of those messages a

felony criminal offense. *Warshak*, 631 F.3d at 288; *Forrester*, 512 F.3d at 511; *United States v. Councilman*, 418 F.3d 67, 79 (1st Cir. 2005) (holding that the interception of e-mail messages that had already been sent and were in "transient electronic storage," such as on a hard drive or in RAM, constitutes an "interception" under the Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, and a criminal offense). There is no logical basis for distinguishing the contents of email communications from the contents of *Freenet* communications, which are also "electronic communications" under ECPA/Wiretap Act standards. In fact, *Freenet* users have expressed and sought a heightened expectation of privacy in light of the affirmative steps they take to ensure the anonymity and privacy of their communications, steps which are much more stringent than those taken by typical email users.

The Government will almost certainly argue that warnings and security settings inherently included with the *Freenet* software when downloaded somehow obviate the legitimacy of Defendant's expectation of privacy. This argument simply flies in the face of the fact that *Freenet* is software that intentionally obscures the communications transmitted by its users by encrypting the information and decentralizing the system of delivery, ensuring that the content of the communications are not identified or observed by other users. Appellant and other users of *Freenet,* by their mere choice to utilize this network, have taken decisive, intentional steps to protect the privacy of their communications, and have gone to greater lengths to protect their privacy. Courts have recognized a legitimate, protected privacy interest in the content of communications such as e-mail and text messages, and even in non-electronic communications such as postal mail and landline telephone conversations, where users have taken only the minimum steps required to maintain their privacy. See *Katz*, 389 U.S. at 352 (closing the door of a public telephone booth is sufficient

to protect the privacy interest in the communication); *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970), citing *Ex parte Jackson*, 96 U.S. at 733 (a sealed letter or package sent through the postal mail is protected from search by the Fourth Amendment); *Warshak*, 490 F.3d at 470 (finding a protected privacy interest in emails generally, and noting that simply because an email is routed through third parties or intermediaries does not affect the privacy of the communication, just as routing a non-electronic communication through the phone company or the post office does not alter the privacy of those communications).

Defendant submits that a communication sent through *Freenet*, software specifically engineered to maintain an extremely protective level of anonymity and privacy, must at least be granted the same Fourth Amendment protection as a telephone conversation in a public telephone booth, a letter, or an email sent through a basic Gmail or Hotmail account. If a *Freenet* communication is not recognized as private in transit, it is difficult to imagine that *any* form of electronic communication could enjoy Fourth Amendment protection. The courts, through decisions like *Katz* and *Warshak*, and Congress, through ECPA, have strongly suggested there is a legitimate right to privacy in electronic communications in appropriate circumstances. *Freenet* communications represent heavily encrypted and protected electronic communications intentionally aimed at "closing the door" on outside interference and monitoring. Defendant had a legitimate expectation of privacy in the content of his *Freenet* communications, and law enforcement's warrantless surveillance of his private *Freenet* transmissions constituted an unreasonable search under the Fourth Amendment.

The remedy for the violation of Defendant's 4th Amendment rights in the context of this case is for the Court to redact all evidence derived from this unconstitutional surveillance, review the search warrant and determine if probable cause exists in the absence of this evidence. *Franks*

*v. Delaware*, 438 U.S. 154, 171-2 (1978) & *United States v. Karo*, 468 U.S. 705,719 (1984) Defendant submits that the search warrant lacks any basis for a finding of probable cause in the absence of the redacted content.

**IV.     THE GOVERNMENT'S CLAIM OF LAW ENFORCEMENT PRIVILEGE IS OUTWEIGHED BY THE DEFENDANT'S NEED FOR THE MODIFIED *FREENET* SOFTWARE**

The Government now claims that the modified *Freenet* software, the so-called Law Enforcement Source Code, which it used to conduct the investigation in this matter is protected by Law Enforcement privilege and that it should not be required to provide this otherwise discoverable material for that reason. The Government claims that the software used to investigate the Defendant is "'sensitive' peer-to-peer investigative software…" similar to software found to be protected in other cases around the country. At the outset, the Court should note that there are no cases cited, and Defendant believes that none exist, which hold that the modified *Freenet* software used by the police in this case is protected by Law Enforcement privilege.

The modified *Freenet* source code requested in this case was the subject of a published, peer reviewed technical article entitled Statistical Detection of Downloaders in *Freenet*. <u>See *Exhibit 4 – Levine Paper*</u>. This article, written by the creators of the source code which Defendant seeks in his Motion to Compel, describes in great detail how the source code works, contains illustrations of the formulas upon which the source code is founded, reveals the elements deemed necessary to validate a particular positive finding, describes the frequency and cause of false positive findings and even contains a section entitled "avoiding detection" which starts with the sentence "a significant redesign of *Freenet* is required to prevent detection of downloaders." Defendant is unaware of any similarly detailed and publicly available peer reviewed paper describing the investigative software deemed privileged in cases such as *United States v. Jean*, 891 F.

3d 712 (8th Cir., 2018) or the multiple other cases cited by the Government in the first full paragraph of Page 10 in its Memorandum. The Government's claim of secrecy as to this software rings hollow in light of this published paper.

The Government further claims that the source code's sensitive nature is illustrated by the rules which have been established to protect and maintain the software. None of the three reasons cited have any relation to the sensitive or secret nature of the software but rather address its efficacy and legality. Only duly appointed law enforcement officers can access the software because it includes extensive references to child pornography files which may not be legally disseminated. The source code is locked because any further modifications to it would destroy the claimed accuracy of the foundational bases upon which the *Freenet* Target Summary results are based. And finally, for the same reason that only law enforcement officers can access the software, so too are they prohibited from copying the software, i.e., it includes extensive child pornography content.

The Government's claim of law enforcement privilege in this case simply does not survive close scrutiny. The Government provides no underlying explanation for the claim that somehow disclosure of the original source code might result in destruction of the integrity of the program in future identification or somehow reveal the identity of investigators. The Government's claim in this regard is devoid of any content or explanation to support its conclusion. Defendant has no interest in obtaining the "full universe of child exploitation materials" but rather the source code which first identifies the encrypted content of files passing over the Freenet and then somehow determines the likely originating requestor of that content through the logging of the data followed by highly technical statistical analysis of "even share."

Furthermore, the grave discrepancies between the Discovery material which has been

provided regarding the law enforcement modified Freenet software and the content of the affidavit as well as the results of the search which failed to locate the target videos require closer examination. There were multiple computer servers searched, behind five IP addresses, only one of which was mentioned in the affidavit for search. No illegal materials were found on the computer behind the IP address in the warrant, nor were any encrypted drives found. On a completely separate computer behind a completely different IP address, the government claims that three completely different illegal files were allegedly found in memory, and that other illegal files may have been on a disk on that computer but could not be copied by their forensic technicians. The files referenced in the affidavit for search were never found at all.

Defendant submits that examination of the law enforcement source code will establish that investigators have misused it to generate broader and less accurate searches than the creator of the modified Freenet software intended, and that therefore, there was never any probable cause for the search in the first place. The good faith exception does not apply because the magistrate was materially misled about the evidence, and in any case served only as a rubber stamp, as the affidavit for search also contained internally contradictory details visible without advanced technical understanding.

Despite the Government's contention to the contrary, the requirement that the government disclose to the defense in a criminal prosecution all evidence "favorable to an accused" and "material either to guilt or to punishment," (*Brady,* 373 U.S. at 87) does apply in a suppression context. Every circuit that has decided the question of whether *Brady* applies in the suppression context has held that it does. See *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence

been disclosed, the result of the proceeding would have been different."); *Smith v. Black,* 904 F.2d 950, 965-66 (5th Cir. 1990) ("The appropriate assessment for Brady purposes, of course, is whether nondisclosure affected the outcome of the suppression hearing."), rev'd on other grounds, 503 U.S. 930 (1992) (vacating judgment in light of *Stringer v. Black,* 503 U.S. 222 (1992*)*, which addressed procedural aspects of habeas petition). In *Nuckols v. Gibson*, 233 F.3d 1261, 1266-67 (10th Cir. 2000), the Tenth Circuit found that Brady's disclosure obligations applied to impeachment evidence material to a pretrial hearing regarding the admissibility of the defendant's confession, which was the only evidence tying the defendant to the crime. The Second Circuit has not yet decided the question of whether Brady applies in the suppression context, but in *United States v. Nelson*, 193 F. App'x 47, 50 (2d Cir. 2006), the court remanded the case for an evidentiary hearing on the suppression issue and noted that the Brady question would "be mooted if the Government, in advance of the hearing, turns over any material not already given to the defense in advance of the trial that may bear on the outcome of the suppression hearing." No circuit[4] has held that Brady does not apply in the suppression context.

Rather than squarely address the issue, the Fourth Circuit has assumed without deciding that Brady applies in the suppression context. See *United States v. Williams*, 10 F.3d 1070, 1077 (4th Cir. 1993) ("we assume arguendo but decline to address definitively on the merits the issue of whether Brady should call for disclosure of material evidence at pre-trial suppression hearings")[5]. But, the Fourth Circuit has long-required that evidence be disclosed at a time when it will

---

[4] In *United States v. Jones*, 725 F. App'x 763, 765-66 (11th Cir. 2018) (finding evidence government failed to disclose not material), the Eleventh Circuit analyzed an alleged Brady violation as if Brady's disclosure obligations applied in the suppression context. See also *United States v. Sigillito*, 759 F.3d 913, 929-30 (8th Cir. 2014) (analyzing an alleged Brady violation as if Brady's disclosure obligations applied in the suppression context); *Murray v. United States*, 704 F.3d 23, 30-32 (1st Cir. 2013) (analyzing an alleged Brady violation as if Brady's disclosure obligations applied in the suppression context).

[5] Four other circuits have also not squarely addressed the issue. See *United States v. Thomas*, 835 F.3d 730, 734 (7th Cir. 2016) (observing that Seventh Circuit has not yet taken a position on whether Brady

be of value to the defense. "If it is incumbent on the State to disclose evidence favorable to an accused, manifestly, that disclosure to be effective must be made at a time when the disclosure would be of value to the accused." *Hamric v. Bailey*, 386 F.2d 390, 393 (4th Cir. 1967); accord *United States v. Elmore*, 423 F.2d 775, 779 (4th Cir. 1970). Even though suppression of incriminating evidence may be unrelated to the actual culpability of an accused person, the rationale behind Brady "applies with equal force" to evidence that is necessary to challenge the constitutionality of a search. *United States v. Barton*, 995 F.2d 931, 935 (9th Cir. 1993). That is particularly so when the ruling at issue is case dispositive. See *Nuckols*, 233 F.3d at 1266-67. To hold that Brady did not apply to case dispositive suppression rulings, "would effectively deprive a criminal defendant of his Fourth Amendment right to challenge the validity of a search []." Id.

Furthermore, as the same investigators were involved both in submitting the affidavit for search and actually searching the computers in question, it will allow defense to prepare a line of questioning for the case in chief regarding the reliability of said investigators in examining systems that they themselves admit are substantially more complex than they were trained for. Beyond proving that the materials allegedly found in RAM were there at the desire of Defendant, the government will need to prove that the files it claims to have found, but were unable to copy, were in fact on the server they claim to have found them on, rather than being attached to the computer by a third party over the internet. This is especially true since investigators have failed to identify any encrypted drives on the system they have been unable to decrypt once Defendant provided passwords during questioning. Lack of expertise by the investigators in preparing the

---

applies in the suppression context); *United States v. Taylor*, 471 F. App'x 499, 520 (6th Cir. 2012) (assuming without deciding that Brady applies in the suppression context); *United States v. Donahue*, 460 F. App'x 141, 143-44 (3d Cir. 2012) (assuming without deciding that Brady applies in the suppression context); *United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999) (declining to decide whether Brady applies in the suppression context).

affidavit for search will be relevant to lack of expertise by the same investigators during the search itself.

Defendant has demonstrated the materiality of the requested source code to his defense and requests that the Court order the disclosure of that source code.

## V.     CONCLUSION

The Defendant respectfully requests the following relief:

1. That Defendant's Motion to Suppress Physical Evidence be granted;

2. That all evidence seized during the Search of Defendant's home and computer systems be suppressed;

3. That the Court grant Defendant's Motion to Compel discovery and direct that the Government produce the materials requested in Defendant's Motion to Compel.

4. That the Court hold a hearing on Defendant's Motion.

5. Such further and additional relief as justice may require.

Respectfully submitted,

/s/
Richard A. Finci, Esquire, Bar #03347
Houlon, Berman, Finci & Levenstein, LLC
7850 Walker Drive, Suite 160
Greenbelt, Maryland 20770
finci@houlonberman.com
Telephone: (301) 459-8200
Facsimile: (301) 459-5721

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of August, 2020, a copy of the foregoing Defendant's Consolidated Memorandum in Support of Defendant's Motion to Suppress Physical Evidence and in Reply to the Government's Response to Motion to Compel Discovery was served via filing in the electronic filing system to Dwight Draughon, Esquire and Joseph Baldwin, Esquire, Office of the United States Attorney, 6500 Cherrywood Lane, Suite 400, Greenbelt, Maryland 20770.

/s/
Richard A. Finci