**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PX-19-348** |
| | * | |
| **ALAKOM-ZED CRAYNE POBRE,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S OMNIBUS RESPONSE**
**IN OPPOSITION TO DEFENDANT'S MOTIONS**

The United States of America, by and through its attorneys, respectfully submits this response in opposition to Defendant Alakom-Zed Pobre's motion to review release order (ECF No. 44), motion for a *Franks* Hearing (ECF No. 45), motion to suppress physical evidence (ECF Nos. 46 & 47), and motion to supress statements (ECF No. 48). For the reasons stated below, the motions should be denied.

## I.     STATEMENT OF FACTS

### A.  Freenet and Law enforcement software

For a summary of Freenet and how law enforcement determines the IP address of a particular user, please see the Government's memorandum opposing Pobre's motion to compel, which is docketed as ECF No. 35.

In their paper entitled, *Statistical Detection of Downloaders in Freenet*, Dr. Brian Levine, Dr. Marc Liberatore, Brian Lynn, and Dr. Matthew Wright analyzed the software used to detect those who download child pornography using Freenet. *See* ECF No. 45-2. In that paper, which explains that 35% of Freenet traffic was for child pornography manifest keys, the authors found that law enforcement Freenet software had a false positive rate of about 2%. *Id.*

In August 2020, Levine, Liberatore, Lynn, and Wright finalized a follow-up peer-reviewed paper entitled, *A Forensically Sound Method of Identifying Downloaders and Uploaders in Freenet*, *see* ECF No. 49-1, which will be presented at the ACM Conference on Computer & Communications Security in November 2020. This paper updated the false positive rate from about 2% to a significantly lower value of 0.2%. *Id.* at 1, 7. The paper does not reflect any changes to the method or software used by law enforcement to identify IP addresses suspected of downloading child pornography. Instead, it updates the false positive rate and the methodology used for analyzing the results.

**B. The search and seizure warrant affidavit**

In the application and affidavit for the search and seizure warrant for Pobre's residence, the affiant, Trooper First Class C. Mills, introduced himself as a criminal investigator assigned to the Criminal Enforcement Division, Computer Crimes Section, in Howard County, Maryland. *See* ECF No. 47-2. Trooper Mills listed his qualifications, including specialized training in Internet-Related Investigations, a Dark Web Course, Internet Crimes Against Children ("ICAC") Information Technology ("IT"), ICAC GigaTribe Investigations, ICAC Freenet Investigations, and Child Protection System Investigations. He explained how internet services providers assign IP addresses to their subscribers and that these IP addresses can be assigned to a subscriber for an extended period of time.

Based on Trooper Mills's training and experience, as well as information received from computer forensic examiners, Trooper Mills explained at length how computers and the Internet have facilitated the spread of sexually explicit images of children. *Id.* at 3–5. Trooper Mills described how information related to child pornography is recorded on permanent and/or transient storage devices, as well as why the seizure of computing or data processing devices and associated

peripheral equipment is necessary for searching computerized information. He also detailed the

common characteristics of individuals involved in the receipt and collection of child pornography.

*Id.* at 7–8.

Trooper Mills described Freenet as "a peer-to-peer platform intended for censorship-

resistant, secure, and anonymous communication and file sharing on the Internet." *Id.* at 8. He

explained that Freenet operates "by storing small encrypted blocks of content distributed on the

computers of its users and connecting through intermediate (peers) computers which pass on

requests for content and send them back without knowing the contents of the complete file." *Id.* at

8–9. In order to download a file, the user "must first locate the file's manifest key, typically on a

message board or a Freesite with material of interest." *Id.* at 9. In addition to detailing how a file

is transferred from one computer to another, Trooper Mills stated the following regarding how law

enforcement is able to investigate requests for access to child pornography:

> Law enforcement has collected the manifests to suspected child
> pornography files that are publicly shared and created a database of
> the associated keys to the blocks of a file. Law enforcement Freenet
> nodes record requests that are sent to them and they are compared
> against these known keys to identify child pornography files being
> downloaded. The original requestor node can be determined, with a
> fair probability, because the number of requests received is reduced
> significantly as each node forwards them. Using the number of
> requests received, the number of peers a requester has and the
> number of blocks the file contains we can calculate if the volume of
> requests received is significantly more likely than not from the
> original requester.

*Id.*

When addressing the basis for probable cause, Trooper Mills stated that, when using the

law enforcement Freenet software, he observed an IP address request blocks of suspected child

pornography files when he reviewed data received by law enforcement Freenet nodes. *Id.* He

explained that while he "cannot state with absolute certainty the user was the original requestor,

3

based on a review of those requests it is significantly more probable than not that the user of" the IP address was the original requestor of the files. *Id.* The three requested file names and their descriptions are explicitly referring to children engaged in sexual acts. *Id.* at 9–10.

After issuing a subpoena to Verizon Fios Business, the affiant discovered that the IP address was assigned to a customer named "Resonant Information" and that the account address listed was 13504 Briarcroft Ct., Laurel, MD 20708. *Id.* at 11. After conducting a check through law enforcement databases, the affiant ascertained that the owners of the residence are the Defendant, Alakom-zed Crayne Pobre, and spouse, Lynne Angela Valencic. *Id.*

Trooper Mills also provided a spreadsheet of the searches that he observed on June 25, 2018. ECF No. 47-3. The spreadsheet included the three files names and manifest keys, Pobre's IP address, and whether the results passed the parameters[1] created for the program.

The Honorable Wayne A. Brooks of the District Court of Maryland for Howard County signed the search and seizure warrant on August 13, 2018. ECF No. 47-1. A summary of the child pornography recovered from Pobre's residence pursuant to this search warrant is included in the Government's memorandum opposing Pobre's motion to compel. ECF No. 35 at 6.

### C.  Statements by Pobre

At 5:44 a.m. on August 14, 2018, Trooper Mills began the interview by requesting identifying information from Pobre, including his full name and birthdate. Ex. 1. at 0:01–1:00. Trooper Mills advised Pobre of his *Miranda* rights and asked him to initial an acknowledgement form. Ex. 1 at 1:01–1:45. After Pobre initialed the acknowledgment form, Trooper Mills read aloud a waiver form and requested that Pobre sign the document. Ex. 1 at 1:45–2:30. Pobre stated that he was feeling intimidated by the number of armed law enforcement officers at his house and asked

---

[1] These parameters are protected by law enforcement privilege. *See* ECF No. 35 at 9–13.

Trooper Mills whether he was under investigation. Ex. 1 at 2:30–3:00. Trooper Mills responded that everyone in the residence was part of the investigation. Ex. 1 at 3:00–3:05. Pobre asked Trooper Mills what he was investigating. Trooper Mills said that before he could do that, he needed to be able to talk to Pobre. Ex. 1 at 3:05–3:10. Trooper Mills asked Pobre whether Pobre wanted to continue the conversation. Ex. 1 at 3:10–3:13. Pobre responded that he wanted to listen. Ex. 1 at 3:13–3:15. Trooper Mills said that he had questions first and again asked Pobre whether he wanted to continue the interview. Ex. 1 at 3:15–3:23. Pobre requested to know more about the investigation, and Trooper Mills responded that Pobre would need to sign the waiver form in order to discuss it with him any further. Ex. 1 at 3:24–3:47. Trooper Mills again advised Pobre that he could refuse to answer questions at any point. Ex. 1 at 3:47–4:16. Pobre then signed the waiver form. Ex. 1 at 4:16–4:30.

Pobre stated that he and his wife were the only ones who lived in the residence. Ex. 1 at 4:37–4:45. He also said that he runs a server called Resonant.org. Ex. 1 at 4:45–4:51. He explained that it was a hobby domain and that he had given people access to it over various points in time for email and local cloud storage. Ex. 1 at 4:51–5:12. He said that, in the past, he had offered people access to his storage for books and gaming information. Ex. 1 at 5:12–5:42. He said that there are proxies, Tor nodes, and Freenet nodes. Ex. 1 at 5:42–5:54. He also is able to communicate with NASA servers and he owns a great deal of hardware. Ex. 1 at 5:55–6:07. Regarding Freenet, Pobre stated that he has been a user since its inception, but that he used it for very little. Ex. 1 at 6:08–7:10.

At this point, Trooper Mills disclosed that his investigation involved child pornography. Ex. 1 at 7:17–7:30. Pobre then said, "so I am a suspect in a child pornography investigation. Wow. I need a lawyer." Ex. 1 at 7:30–7:43. After Pobre appeared to be faint, Homeland Security

Investigations Special Agent DiAntonio informed Pobre that the interview was over and asked if Pobre was alright. Ex. 1 at 7:44–7:54. Pobre responded that he is clearly not okay and that he will not be able to get his work done while the investigation is ongoing because they will seize his equipment. Ex. 1 at 7:55–8:05. Pobre asked if he was under arrest, and Trooper Mills told Pobre that he was not under arrest at this time, but that the interview was over because Pobre asked for a lawyer. Ex. 1 at 8:05–8:17. Pobre asked if Trooper Mills could answer why this is happening and whether he is being accused of distributing child pornography. Ex. 1 at 8:22–8:44. The officers responded that that is what they were there to find out and that they could not ask Pobre whether he is distributing child pornography because he requested a lawyer. Ex. 1 at 8:44–8:52. Trooper Mills explained that he was conducting a Freenet investigation and that files containing child pornography were requested through Freenet from an IP address registered to Pobre's residence. Ex. 1 at 8:55–9:15. Pobre asked for the IP address. Ex. 1 at 9:15–9:16. Trooper Mills provided the IP address. Ex. 1 at 9:17–9:30. Pobre immediately said that is "Blackbody" and provided the officers with its location in the basement. Ex. 1 at 9:30–9:53. Trooper Mills again informed Pobre that because he requested a lawyer, the interview needed to end. Ex. 1 at 9:54–10:04. Special Agent DiAntonio asked Pobre if he wanted some water. *Id.*

At 6:50 a.m., approximately one hour after Pobre requested a lawyer, Pobre said that he would "freely and voluntarily speak to [Trooper Mills] for the purpose of getting you in to the server referenced in the search warrant, the 59, plus the laptops." Ex. 2 at 0:01–0:25. Trooper Mills again read Pobre his *Miranda* rights, Pobre signed the acknowledgment form, Trooper Mills read the waiver form, and Pobre signed the waiver form. Ex. 2 at 0:25–2:11. Notably, this included an affirmation that Pobre has not been threatened or intimidated. *Id.*

Sergeant Bedell was introduced as a forensic examiner. Ex. 2 at 2:12–2:16. Pobre said that he would "help your imaging people *possibly* leave some hardware behind so we're not completely crippled. I will happily log into the laptops. I will happily log into the server out there, which you probably don't want to move anyway because it probably weighs like a quarter ton." Ex. 2 at 2:16– 2:35. Pobre provided law enforcement with the credentials to gain access to his equipment and spoke at length about that equipment. Ex. 2 at 3:01–12:41. Sergeant Bedell inquired about his wife's research. Pobre explained that she worked on a satellite and did data analysis and signals analysis. He simply provided the software for her, so he could not elaborate further. Ex. 2 at 12:42– 15:05.

Sergeant Bedell asked whether Pobre does hosting and he responded that he does lots of experimental things, including through the use of VPNs. Ex. 2 at 15:05–16:00. Pobre explained that anyone who accessed Resonant.org would enter through Blackbody, but that he had not checked to see who had logged in recently. Ex. 2 at 16:01–16:50. Pobre also said that investigators would find pornography on Blackbody, but that none of it contained child pornography to the best of his knowledge. Ex. 2 at 16:51–17:42. Further, Pobre asked Sergeant Bedell, that if Blackbody is left behind, would he prefer Pobre to shut down the Freenet node or to leave it up as a "honey pot." Sergeant Bedell advised Pobre that he could not act as an agent of the state and that he should not keep it as a honey pot. Sergeant Bedell further advised that he could not tell Pobre whether to shut down his nodes or not – it was within Pobre's discretion. Ex. 2 at 19:58–22:35.

At 4:20 p.m., Trooper Mills reminded Pobre that he waived his *Miranda* rights at 6:50 a.m., and Pobre said, "yes." Ex. 3 at 0:01–0:20. Trooper Mills then asked Pobre if he was still willing to freely and voluntarily speak with him, and Pobre said, "let's see what you have to say. Ex. 3 at 0:21–0:24. Trooper Mills again informed Pobre that he could choose not to answer at any point.

Ex. 3 at 0:25–0:35. Trooper Mills informed Pobre that they were finding images of child pornography on his RAM. Trooper Mills described an image and asked whether Pobre was familiar with it. Pobre responded with "doubtful." Ex. 3 at 0:35–0:53. Trooper Mills asked how these images would be on his RAM. Ex. 3 at 1:11–1:14. Pobre acknowledged that law enforcement had enough information to charge him and he asked whether images were found on his other systems. Ex. 3 at 1:15–1:45. Trooper Mills responded that they had not found anything at that point but they were still searching his other devices. Ex. 3 at 1:45–55. Pobre asked if his devices would be seized and Trooper Mills said, yes. Ex. 3 at 1:55–2:28. Pobre then said that he is "pretty much screwed" and requested a lawyer, which resulted in the end of the interview. Ex. 3 at 2:28–3:16. Trooper Mills explained that he was still not under arrest. *Id.*

On October 2, 2018, TFC Mueller transferred Pobre from the Maryland State Police College Park Barrack to the Prince George's County Detention Center after Pobre turned himself into law enforcement. Ex. 4. During the transport to the detention center, TFC Mueller advised Pobre of the booking process. *Id.* Pobre then asked TFC Mueller how much he knew about the "dark web" and advised TFC Mueller not to go on the dark web. *Id.* Pobre stated that he believed his "collection" was one of the largest collections in the United States. *Id.*

## II.   THE COURT SHOULD DENY POBRE'S MOTION TO REVIEW JUDGE SIMMS'S DENIAL OF POBRE'S SECOND MOTION TO MODIFY RELEASE CONDITIONS (ECF NO. 44 ) BECAUSE HIS DANGER TO THE COMMUNITY OUTWEIGHS ANY NEED TO ACCESS A COMPUTER

On July 25, 2019, the Honorable Gina L. Simms released Pobre with conditions, including the requirements that Pobre refrain from the use of computer systems and internet-capable devices and that Pobre not acquire any smart TVs or any other internet-capable devices. ECF No. 10 at 2.

On December 16, 2019, Pobre filed a motion to modify conditions of release based on the desire to access computers while preparing for his defense. ECF No. 22. The Court held a hearing

on December 18, 2019, ECF No. 24, and modified Pobre's conditions of release, ECF No. 25. The

Court restricted Pobre's computer access to a device without internet capabilities in defense

counsel's office. Notably, the Court also required that defense counsel and his staff "verify each

time that the defendant is in the office that he has no internet-capable devices." ECF No. 25 at 3.

On March 25, 2020, Pobre filed a second motion to modify conditions of release. ECF No.

38. Judge Simms denied Pobre's motion. ECF No. 41. Five months later, Pobre filed a motion for

review of Judge Simms's release order. ECF No. 44. For the reasons outlined in Judge Simms's

order and below, Pobre's motion for review of Judge Simms's release order should be denied.

### A.  Allowing Pobre to access a computer at home would create a danger to the community

Pobre should not be allowed to access a computer in his residence because he is a self-

described computer expert who is charged with committing a computer crime in his residence. As

noted in Pobre's motion, he has a "highly advanced level of knowledge of the underlying network

operating software system and network understanding in general." ECF No. 38 ¶ 3; *see also* ECF

No. 44 ("Defendant is a very high-level expert in computer network technologies . . . ."). This was

and has been the primary motivation for the Government and this Court seeking to limit Pobre's

access to computers. *See* ECF No. 41 ("It was because of the Defendant's professed computer

sophistication and expertise that the undersigned required the Defendant's computer access to be

only at defense counsel's office under the above-listed stringent conditions."). As Judge Simms's

noted,

> One key condition was the verification of defense counsel or his staff that the
> Defendant was not improperly accessing the internet. If the Court were to allow
> any computer into the Defendant's home under the current COVID-19 lockdown,
> there is simply no way to effectively ensure that the Defendant, with his expertise,
> could not make it internet capable.

ECF No. 51 at 3. This necessary step cannot be done in Pobre's home without the presence of

defense counsel or his staff. U.S. Probation and Pretrial Services is unable to ensure that Pobre

does not have internet-capable devices in his home, especially in light of the circumstances caused by the current COVID-19 pandemic. And Pobre's spouse cannot be tasked with ensuring that Pobre does not have internet-capable devices because Pobre is charged with a computer-based crime that likely occurred with his spouse present. While Judge Simms noted COVID-19 as new information that the Court could consider when evaluating release conditions, the Court ultimately decided that the new information did not change "the Court's concerns, particularly about the dangerousness of this Defendant and the need to protect the community." ECF No. 41 at 2.

**B. Pobre and defense counsel have had adequate time to prepare Pobre's defense with the conditions set by Judge Simms**

The Court should also deny Pobre's motion because of the amount of time that Pobre has had to review a manageable amount of discovery.

Most of the discovery in this matter was provided in August 2019, which is now more than a year ago. Pobre was able to access a computer in his counsel's office from December 2019 until March 2020 without limitations created by COVID-19. As noted by Judge Simms in her order filed March 31, 2020, "the Defendant and his counsel have had approximately ninety days between the December 2019 release order and the date that the Second Motion was filed for the Defendant to use the computer at his counsel's office." ECF No. 41 at 3.

Discovery in this matter consists of a 245-page PDF, less than 60 minutes of audio-recorded interviews, a 242-page transcript from a prior matter that Dr. Levine testified in, and an image of the LDAP user directory from the HP server.[2] Considering that most of the discovery has been available for over a year and Pobre had approximately 90 days to access a computer to prepare

---

[2] The 245-page PDF and audio files were produced in August 2019, Dr. Levine's prior testimony was provided on November 5, 2019, and the LDAP user directory produced in February 2020.

his defense, the Court should not now endanger the community by giving Pobre access to a computer at home.

**C.  There are practical alternatives to giving Pobre home access to a computer**

Given that there is a manageable amount of discovery, that Pobre's motions have been filed, and that Pobre had months before and after the changes created by the COVID-19 pandemic, there is little reason to risk endangering the community by giving Pobre access to a computer at home. Additionally, there are several options available to Pobre if he wants to review the discovery and prepare for his defense. As a preliminary matter, defense counsel could print the discovery and provide it to Pobre, either by dropping it off or mailing it. To the extent that Pobre and defense counsel want to have Pobre access to a computer, defense counsel could arrange for time over the weekend or allow a staff member to telework to provide space for Pobre in defense counsel's office.

**III.  THE COURT SHOULD DENY POBRE'S MOTION FOR A *FRANKS* HEARING (ECF NO. 45) BECAUSE THERE ARE NO OMISSIONS BY TROOPER MILLS THAT WERE DESIGNED TO MISLEAD OR RECKLESSLY DISREGARDED WHETHER THEY WOULD MISLED THE JUDGE BEFORE WHOM HE SWORE OUT THE SEARCH WARRANT**

Pobre argues that Trooper Mills omitted material facts when he "omitted" that: the identification of his IP address "was based upon the systematic warrantless surveillance of encrypted content passing over the *Freenet* network"; "one of the *Freenet* Target summary reports was logged over a period of nearly 48 hours"; "the Affiant utilized secretly modified *Freenet* software"; "the high, minimum false positive rate of 15 per day and that the detection of false positive results based on the undisclosed purpose and meaning of "hops to live" value of 16, is not included in the Freenet Target Summary report"'; "5 separate IP addresses were associated with the Defendant's home." *See* ECF No. 45. Pobre also claims that Trooper Mills misleadingly "represented himself as an expert that could certify the techniques used in this case" and asserted

that a "Freenet user wishing to download a file must first locate the file's manifest key." *Id.* Pobre's

motion for a Frank's hearing should be denied because he does not meet the requirements to be

entitled to a hearing, both because his assertions are factually wrong and would not be enough to

establish that Trooper Mills made material omissions to mislead the signing judge.

### A. To be entitled to a *Franks* hearing, a defendant must make a substantial preliminary showing that a materially false statement or omission was made knowingly and intentionally, or with reckless disregard for the truth

The Supreme Court of the United States has recognized a "strong presumption of validity

with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154,

171 (1978). As such, *Franks* provides for a rule of "limited scope." *Id.* at 167. To be entitled to a

*Franks* hearing, a defendant must make two significant showings.

First, a defendant must "make a substantial preliminary showing that a false statement

knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant

in the warrant affidavit." *Franks*, 438 U.S. at 155–56; *see also United States v. Colkley*, 899 F.2d

297, 300–01 (4th Cir. 1990) ("*Franks* protects against omissions that are *designed to mislead*, or

that are made in *reckless disregard of whether they would mislead*, the magistrate," not just

knowing or intentional omissions without the requisite intent to mislead). The defendant must

support that showing with an "offer of proof," such as "affidavits or sworn or otherwise reliable

statements of witnesses" or satisfactorily explain the absence of such proof. *Franks*, 438 U.S. at

171. "Allegations of negligence or innocent mistake are insufficient." *Id.* The burden of making

the necessary showing is "a heavy one to bear." *United States v. Tate*, 524 F.3d 449, 454 (4th Cir.

2008). Any allegation of a *Franks* violation must be viewed with the narrow purposes of *Franks*

in mind and the realities of the warrant process. Affidavits "are normally drafted by nonlawyers in

the midst and haste of criminal investigation." *Colkley*, 899 F.2d at 300 (citing *United States v.*

*Ventresca*, 380 U.S. 102, 108 (1965)). Mistakes are bound to happen under such circumstances. A

false or omitted statement alone is not sufficient to justify a *Franks* hearing. *See United States v. White*, 850 F.3d 667, 673 (4th Cir. 2017). A defendant must also show the requisite scienter under *Franks* from the perspective of the affiant. *Id.* at 674. The defendant must show that the affiant "'knowingly and intentionally, or with reckless disregard for the truth' included those statements in the affidavit," *id.* (quoting *Franks*, 438 U.S at 155), or omitted statements with the intent to mislead or recklessly disregarding that they would mislead the judge. *Colkley*, 899 F.2d. at 301.

Even if a defendant can overcome the high burden of showing a deliberate intent to mislead or reckless disregarding for the misleading nature of the information, to get a *Franks* hearing, the defendant still must also show that the offending information was essential to the probable cause determination. *See Franks*, 438 U.S. at 155–56; *McKenzie-Gude*, 671 F.3d 452, 462 (4th Cir. 2011). If the offending information is excluded and probable cause still remains, the Court must deny a hearing. *Franks*, 438 U.S. 171–72 ("If, when material [in the warrant affidavit] that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.").

In the case of omitted information, the defendant is not entitled to a *Franks* hearing unless the inclusion of the omitted information in the affidavit was material to a determination of probable cause. *See Colkley*, 899 F.2d at 301. "Omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing." *Id.* To assess materiality the court should "insert the facts recklessly [or intentionally] omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause." *United States v. Wharton*, 840 F.3d 163, 169 (4th Cir. 2016).

**B. Pobre's assertions are false and, even if true, fail to establish that Trooper Mills knowingly and intentionally made any material omissions or false statements**

Here, the Defendant fails to make a substantial preliminary showing of false statements or omissions by Trooper Mills that were designed to mislead or recklessly disregarded whether they would misled the judge before whom he swore out the search warrant. The assertions made in his motion are incorrect. Even if there were correct, there is no basis to believe the affiant was aware of these technical nuances. And these omissions would not have affected the probable cause demonstrated in the search and seizure warrant affidavit.

As discussed in Section IV below, and previously explained in the Government's opposition to Pobre's motion to compel discovery, law enforcement nodes on Freenet do not surveil content passing over Freenet and there is no warrantless encroachment on anyone's expected privacy. Law enforcement nodes simply record requests directed at them; the law enforcement nodes are passive and do not seek out content to intercept and decrypt.

With regard to the 48-hour window noted by Pobre, there is no basis to believe that law enforcement would know what the set window of time is because that information is not disseminated in order to preserve the integrity of the software. Pobre certainly has no basis to believe that the 48-hour window would be too long to rely upon when identifying a downloader. Furthermore, the highlighted Freenet Target Summary is one of 3 recorded and had four logs for that particular Freenet Target Summary. *See* ECF No. 45-1. Freenet Target Summary 1 had a runtime of approximately 16 minutes and Freenet Target Summary 3 had a runtime of approximately 28 minutes. Freenet Target Summary 2, which was approximately 48 hours of runtime, had one log of approximately 43 and half hours, one log of approximately 24 minutes, and two logs with no runtime. Notably, all three Freenet Target Summaries indicate that they passed the Stat Test. Even if there was a reason to question the reliability of the 48 hour runtime,

there is no reason to believe that Trooper Mills knowingly omitted this to mislead the judge and no reason to think that the questionable result would alter the probable cause.

Pobre also argues that Trooper Mills should have made note of a higher false positive rate for Hops to Live of 16. While the Government avers that Pobre is misunderstanding the analysis of this issue in the paper, the issue is a red herring. Pobre's IP address was not identified based on a Hops to Live of 16. In fact, law enforcement does not identify any IP addresses based on a Hops to Live of 16. Accordingly, any discussion of Hops to Live of 16 would be irrelevant and would not alter the probable cause analysis. And, there is no basis to believe that Trooper Mills knowingly and intentionally omitted Hops to Live of 16 to mislead the judge.

Pobre then notes that he had five separate IP addresses and argues that having five IP addresses multiplies the chance of false positives. This is incorrect. Regardless of how many IP addresses were associated with Pobre's residence, there was one IP address that requested child pornography files on three different occasions. Since the number of IP addresses is irrelevant to the analysis of probable cause, Trooper Mills had no reason to include that information because it was not material. As with the other assertions, there is no basis to believe that Trooper Mills knowingly and intentionally omitted the amount of IP addresses to mislead the judge.

Pobre next challenges the assertions that Freenet user wishing to download a file must first locate the file's manifest key. The assertion by Trooper Mills is correct; a Freenet user who wants to download a file needs to locate the key. While it is possible that manifest keys can be embedded in unsolicited emails on web pages running Freenet and cause an involuntary request for child pornography, Trooper Mills is not required to parse out every possibility. As noted by the Fourth Circuit in affirming a ruling by this Court, "[p]robable cause is 'not a high bar,' and officers 'need not rule out a suspect's innocent explanation' in order to obtain a warrant." *United States v.*

*Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (*quoting United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019)). And, as similarly noted in the *Bosyk* opinion that Pobre cites to, there is ample probable cause to believe that someone used Pobre's IP address to download child pornography even if a "single click" argument is accepted:

> They argue that the government obtained its warrant based on a 'single click' of a URL, which, they say, cannot support a search of somebody's home. We disagree. The facts in the affidavit support a reasonable inference that someone using Bosyk's IP address clicked the link knowing that it contained child pornography. This in turn makes it fairly probable that criminal evidence would have been found at Bosyk's address.

*Bosyk*, 933 F.3d at 325.

Pobre fails to meet his heavy burden of showing that Trooper Mills knowingly, intentionally, or recklessly made omissions to mislead the judge. He does not present an "offer of proof" such as "affidavits or sworn or otherwise reliable statements of witnesses" or satisfactorily explain the absence of such proof. *Franks*, 438 U.S. at 171. And, he does not establish that any of the omissions would have altered the judge's finding that there was probable cause in the search and seizure warrant affidavit. Accordingly, the motion for a *Franks* hearing should be denied.

## IV. THE COURT SHOULD DENY POBRE'S MOTION TO SUPPRESS PHYSICAL EVIDENCE (ECF NOS. 46 AND 47) BECAUSE THERE IS NO BASIS TO EXCISE THE SOFTWARE RESULTS, AND THE GOOD FAITH EXCEPTION WOULD APPLY IF THERE WAS A BASIS TO DO SO

In his motion to suppress physical evidence, Pobre claims that law enforcement's identification of his IP address was based on an illegal warrantless surveillance of the Freenet network and that Pobre had a legitimate expectation of privacy. Based on this, Pobre says that the results from the software should be excised from the affidavit. ECF No. 46 ¶¶ 3–5. Alternatively, Pobre argues that the affidavit does not have probable cause because the methodology is fundamentally flawed, the identified child pornography was not found on Pobre's devices, and the affidavit does not establish that the target intentionally sought the detected videos. ECF No. 46 ¶

6. Finally, Pobre asserts that the good faith exception does not apply because Trooper Mills knowingly "omitted material information about the warrantless nature of the Freenet surveillance." ECF No. 46 ¶ 8.

Pobre's reliance on privacy and warrantless searches is misplaced and his alternative arguments do not alter the probable cause in Trooper Mills's affidavit. And, as discussed in Section III above, there is no basis to believe that Trooper Mills knowingly omitted material information. Especially when, like here, the alleged material information (i.e., "the warrantless nature of the Freenet surveillance") does not exists because the assertion is not true.

## A. Trooper Mills's affidavit established probable cause to execute a search and seizure warrant at Pobre's residence

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. A search warrant is valid if there was probable cause to support its issuance. Fed. R. Crim. P. 41(d)(1). Probable cause is not subject to precise articulation, but is instead a "'commonsense, nontechnical' conception dealing with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Bosyk*, 933 F.3d at 326 n.5 (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)). A judge evaluating an application for a search warrant must examine the totality of the circumstances to determine the existence of probable cause. *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011). The judge's task "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The duty of a court reviewing a judge's probable cause determination is to ensure that the judge had a substantial basis for concluding that probable cause existed. *Gates*, 462 U.S. at 238–

39. The reviewing court "must accord great deference to the magistrate's assessment of the facts presented to him." *Montieth*, 662 F.3d at 664 (citations omitted); *see also United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) ("In reviewing the magistrate's probable cause determination, we must accord 'great deference' to the magistrate's assessment of the facts presented to him. We may ask only whether the magistrate had a 'substantial basis . . . for concluding' that probable cause existed."). "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant[s]." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984); *see also Bosyk*, 933 F.3d at 325 (*quoting Gates*, 462 U.S. at 326) ("Since a magistrate judge issued the challenged warrant, our task isn't to assess probable cause de novo. Instead, we apply a deferential and pragmatic standard to determine whether the judge 'had a substantial basis for concluding that a search would uncover evidence of wrongdoing.").

1. Pobre had no expectation of privacy when he shared his IP address on Freenet.

Pobre voluntarily shared requests for child pornography files with an unknown collection of strangers on Freenet. He lacked any reasonable expectation of privacy in such communications. Simply because some of those strangers with whom he communicated turned out to be law enforcement officers who observed and analyzed those communications in order to identify his location does not render that activity a search. As detailed in the Government's opposition to Pobre's motion to compel, law enforcement nodes on Freenet determine the IP address of a particular user in the same manner in which a non-law enforcement user could. *See* ECF No. 35 at 4–5.

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. A Fourth Amendment analysis begins with analyzing whether the defendant

possessed a reasonable expectation of privacy in the object being searched. *Katz v. United States*, 389 U.S. 347, 353 (1967). "In order to demonstrate a legitimate expectation of privacy, [Pobre] must have a subjective expectation of privacy," *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010), and that subjective expectation of privacy must be "objectively reasonable; in other words, it must be an expectation that society is willing to recognize as reasonable," *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011). The burden of showing a legitimate expectation of privacy in the area searched rests with the defendant. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). The Supreme Court has repeatedly explained that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979); *Katz*, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection"). When a user on Freenet sends requests for pieces of files directly to its peers, the user is voluntarily turning over information regarding their request to third parties and as such, they have no legitimate expectation of privacy regarding that information.

Prior courts considering the issue of privacy violations as it relates to the voluntary sharing of IP addresses in Freenet cases have rejected the argument that the identification of an IP address is a warrantless search that violates an expected of privacy. *See, e.g.*, *United States v. Popa*, No. 19-3807, 2020 U.S. App. LEXIS 17212, at *12 (6th Cir. May 29, 2020) ("Unlike in *Carpenter*, Popa voluntarily disclosed the information at issue to Time Warner and lacked a legitimate expectation of privacy in that information. Because the narrow holding in *Carpenter* does not apply in Popa's case and the information obtained from Time Warner through an administrative subpoena did not violate Popa's Fourth Amendment rights, the district court properly denied Popa's motion to suppress evidence." (citation omitted)). This Court has specifically rejected the

argument that the law enforcement software used to record IP addresses that request files constitutes a violation of an expectation of privacy.[3] *See United States v. Hall*, ELH-16-469, ECF No. 61, 154:25–155:4 (D. Md. Sept. 21, 2017) ("To the extent that there's an allegation that the, that the pre-warrant investigation was improper, I credit Dr. Levine's testimony that Freenet, in terms of what it warns, makes, makes the information not private, and there's no expectation of privacy."). There is simply no violation of privacy. Freenet warns its users that it "may be quite easy for others to discover your identity!" ECF No. 35, Ex. 1 at 10. And, the law enforcement software on Freenet passively recorded IP addresses that requested child pornography from the law enforcement node. Contrary to Pobre's assertions, law enforcement software on Freenet does not surveil and intercept private content shared on Freenet.[4]

2. Trooper Mills's affidavit establishes probable cause based upon a reliable methodology and identification of Pobre's IP address.

Pobre's argument that the affidavit does not have probable is similarly unavailing. As noted in Dr. Levine's new paper, every federal court that has considered a motion to suppress challenging

---

[3] Numerous courts have repeatedly held that a defendant does not have a reasonable expectation of privacy in files exchanged over Peer to Peer networks. *See United States v. Norman*, 448 F. App'x 895, 897 (11th Cir. 2011) (finding that the search of defendant's computer did not constitute an unlawful search because information on shared folder was also available to members of the public); *United States v. Borowy*, 595 F.3d 1045, 1048 (9th Cir. 2010) (rejecting the argument that the defendant had a reasonable expectation of privacy in files that were shared on a peer-to-peer file sharing site, regardless of defendant's intent to maintain the files as private); *United States v. Stults*, 575 F.3d 834, 843 (8th Cir. 2009) (holding that defendant had no reasonable expectation of privacy in files that the FBI retrieved from his personal computer where the peer-to-peer program the defendant used made files accessible to other users); *United States v. Perrine*, 518 F.3d 1196, 1205 (10th Cir. 2008) (reasoning that the defendant had no expectation of privacy in his subscriber information because peer-to-peer software permitted anyone else on the internet to access at least certain folders in his computer and such access could expose his subscriber information to outsiders.); *United States v. Baalerud*, 2015 WL 1349821, at *8 (W.D.N.C. 2015) (finding that the defendant had no legitimate expectation of privacy in the files he shared with members of the public through a peer-to-peer network). This court should reach the same conclusion about Pobre's activity on the Freenet network.

[4] Even if law enforcement had unlawfully intercepted Pobre's communications, as incorrectly suggested by Pobre, suppression is not an appropriate remedy. The remedy for a violation of the Electronic Communications Privacy Act is a civil action for damages and criminal punishment under certain circumstances, not suppression of evidence. *United States v. Sherr*, 400 F. Supp. 2d 843, 848 (D. Md. 2005) ("Congress clearly intended for suppression not to be an option for a defendant whose electronic communications have been intercepted in violation of the ECPA."). The statute clearly states that "the remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter." 18 U.S.C. § 2708.

the methodology applied here has denied the motion. *See* ECF No. 49-1 at 11 (listing cases). In

addressing a motion to suppress, the Eastern District of Pennsylvania recently summarized the

methodology used by law enforcement to identify IP addresses that requests child pornography:

> A product of significant research and a deep knowledge of Freenet, the Algorithm is extraordinarily reliable, showing 98 to 100% accuracy in distinguishing between original requesters and relayers of Network files. This degree of accuracy compels the common-sense conclusion that Defendant was an original requester of the files he asks me to suppress. That conclusion is bolstered by the FBI's prudence in seeking a search warrant only after observing four attempted transmissions of child pornography files to the same Freenet user. Surely the likelihood is negligible that the Levine Algorithm failed repeatedly and that the same user happened to relay requests for child pornography files four times in five months (despite request characteristics indicating otherwise). The Agent's actions thus were manifestly reasonable. *See Brigham City v. Stuart*, 573 U.S. 373, 403 (2006) ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'").

Ex. 5, *United States v. Weyerman*, No. 19-88, ECF No. 45, at 12 (E.D. Pa. filed Jan. 3, 2020). As

in *Weyerman*, law enforcement in this matter observed multiple attempted transmissions of child

pornography files before seeking a search warrant.

Additionally, the assertion that the identified child pornography was not found on Pobre's

devices is irrelevant. While technical issues prevented law enforcement from fully searching

Pobre's devices, they did recover over 800 "PTHC" (pre-teen hard-core) results on Pobre's device.

Either way, there are a multitude of reasons why law enforcement did not recover the identified

child pornography, but a lack of recovery during the search does not impact the probable cause for

executing the search, especially when hundreds of child pornography files were recovered.

Lastly, Pobre's argument that the affidavit does not establish that the target intentionally

sought the detected videos applies the wrong standard to probable cause. As noted by the Fourth

Circuit, probable cause is "'not a high bar,' and officers 'need not rule out a suspect's innocent

explanation' in order to obtain a warrant." *Blakeney*, 949 F.3d at 859 (*quoting Bosyk*, 933 F.3d at

325). And, as noted in *Bosyk*, "the likelihood that a specific filesharing page containing child

pornography would find its way to somebody uninterested in such contraband—thereby exposing its distributors to detection, capture, and loss of their materials—is probably quite low." *Bosyk*, 933 F.3d at 327–28 (affirming the district court's finding that the search warrant was supported by probable cause). Trooper Mills's affidavit provided probable cause for the judge to believe that evidence of a crime would be recovered from the residence associated with Pobre's IP address.

**B.  Even if the warrant somehow lacked probable cause, the good faith exception would apply**

Even assuming, for the sake of argument, that Trooper Mills's detailed affidavit was insufficient to establish probable cause, exclusion of the evidence obtained pursuant to the warrant would not be appropriate. The good faith exception to the exclusionary rule precludes suppression when police conduct a search in objectively reasonable reliance on a warrant issued by a neutral magistrate. *United States v. Leon*, 468 U.S. 897, 922 (1984); *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004). The good faith analysis takes the objective perspective: whether a reasonable officer standing in the agent's shoes could be expected to have known that the warrant was invalid. *See United States v. Clutchette*, 24 F.3d 577, 582 (4th Cir. 1994). In "the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921.

The Supreme Court has identified circumstances in which officer reliance on a warrant is not objectively reasonable, including when the issuing magistrate was misled by false information in the affidavit, the magistrate wholly abandoned his or her judicial role, or "'an affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Perez*, 393 F.3d at 461 (quoting *Leon*, 468 U.S. at 923). "Exclusion is a last resort, not a 'first impulse.'" *United States v. Kahler*, 236 F. Supp. 3d 1009, 1016 (E.D. Mich. 2017) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

Pobre's conclusory assertions provide no basis to conclude that any of these circumstances is present here. To the contrary, Trooper Mills's affidavit is far from the type of "bare bones" affidavit that renders police reliance objectively unreasonable. As detailed in Section I.B. above, Trooper Mills explained his background and familiarity to computer crimes, described Freenet, and explained the probable cause that resulted in Pobre's residence being identified. Even if there were facts that could have been added to the affidavit, the Fourth Circuit has reasoned that "agents need not include disclaimers specifically pointing out facts absent from the affidavit to obtain a warrant. A warrant application is 'judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added.'" *Bosyk*, 933 F.3d at 332. The *Bosyk* court also explained that "a defendant can't suppress evidence on grounds that the affiant intentionally or recklessly omitted facts without first making 'a substantial preliminary showing' to that effect. And, importantly, that showing requires 'a detailed offer of proof' of the missing information." *United States v. Bosyk*, 933 F.3d at 333 (citations omitted). Pobre does not present a detailed offer of proof because he does not have one available.

Failure to explain the methodology of identifying requesting IP addresses has not resulted in the suppression of evidence recovered based on the search warrant being challenged. Even when an affiant did not include any details about "Dr. Levine, his algorithm, or how officers use the algorithm to determine which Freenet users requested which files," *United States v. Dickerman*, 954 F.3d 1060, 1064 (8th Cir. 2020), the Eighth Circuit upheld the search warrant in a Freenet investigation because the officers' reliance on the warrant was "objectively reasonable. [The affiant] did not make the conclusion that Dickerman was a requester in isolation: he supported it with other detailed facts about the officers' understanding of Freenet's functionality, their qualifications in computer forensics and experience investigating peer-to-peer networks, and

Dickerman's Freenet use," *id.* at 1067 (affirming the district court's denial of the defendant's motion to suppress based on the good-faith exception and not reaching the underlying question of probably cause). The Sixth Circuit has similarly affirmed the district court's denial of a motion to suppression when confronted with this issue, explaining that "the omission of information regarding the reliability of the [law enforcement] software does not call into question the reliability of this software and does not provide grounds for an evidentiary. Furthermore, it is arguable that such information would have only strengthened the affidavit by showing that the software was reliable." *United States v. Dunning*, 857 F.3d 342, 347 (6th Cir. 2017) (citation omitted). This Court has adopted a similar reasoning in a Freenet case:

> In terms of the affidavit, it's fully sufficient to satisfy the elements of probable cause. I will say that even if it weren't, the issuance of the warrant would be sufficient under *Leon*. Pages 7 to 10 of the affidavit are replete with probable cause to believe that child pornography was involved. I am not persuaded that the judge had to understand or get into the number of blocks that were involved. I mean, it's, it's there in the affidavit. And the judge could rely upon it to establish probable cause.

*United States v. Hall*, ELH-16-469, ECF No. 61, 155:5–14 (D. Md. Sept. 21, 2017).

## V.   THE COURT SHOULD DENY POBRE'S MOTION TO SUPRESS STATEMENT (ECF NO. 48) BECAUSE POBRE WAS NOT IN CUSTODY AND LAW ENFORCEMENT ADHERED TO *MIRANDA* OUT OF AN ABUNDANCE OF CAUTION

Despite Pobre's assertion that law enforcement illegally interrogated Pobre after he invoked his right to counsel, the record clearly belies this assertion. Not only was Pobre never in custody and not entitled to a *Miranda* warning, law enforcement diligently observed *Miranda* and ceased questioning whenever Pobre mentioned a lawyer.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court of the United States established a safeguard for this constitutional guarantee, holding that

law enforcement must inform individuals who are in custody of their Fifth Amendment rights prior to interrogation. 384 U.S. at 444; *see United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001). Specifically, in *Miranda*, the Supreme Court held that before conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect, in substance, that he has the right to remain silent, that his statements may be used against him at trial and that he has the right to an attorney during questioning. *Miranda*, 384 U.S. at 479. "[O]nly when there is a custodial interrogation is it necessary for the police to provide the suspect with *Miranda* warnings." *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010).

The "text of the [Fifth] Amendment does not specifically confer any entitlement to legal representation in criminal cases," but rather, the Supreme Court has declared that if a suspect in custody invokes his so-called Fifth Amendment right to counsel, "the interrogation must cease until an attorney is present" or "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). The Supreme Court, however, has also made clear that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 549 (1994).

A. **Pobre was not in custody and therefore not entitled to a Miranda warning**

The test for whether a suspect not under formal arrest is nonetheless in custody, triggering the *Miranda* requirements, is "whether, under the totality of the circumstances, a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Hargrove*, 625 F.3d at 178 (citations omitted). "The operative question is whether, viewed objectively, 'a reasonable man in the suspect's position would have understood his situation' to be one of custody." *Id.* (quoting

*Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). A court must evaluate "all of the circumstances surrounding the interrogation" and determine "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994) (per curiam) (quoting *Berkemer*, 468 U.S. at 440). Relevant factors include "physical restrictions" on the suspect, the suspect's "isolation and separation from family," "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *United States v. Hashime*, 734 F.3d 278, 283 (4th Cir. 2013) (citations omitted).

Despite Pobre's initial statement that he was intimidated by the law enforcement officers in his home and his reaction to first being informed that the officers were conducting a child pornography investigation, Pobre was audibly relaxed throughout the recordings. Pobre had calm, often friendly conversations with the law enforcement officers about computers. There were no physical restrictions on Pobre, who was in his own home with his spouse with present, and the officers were audibly polite and cordial towards Pobre throughout the recordings. Notably, Pobre asked twice if he was under arrest, and Trooper Mills told Pobre that he was not. *See, e.g.*, Ex. 1 at 8:05–8:12; Ex. 3 at 2:28–3:16. Based on the totality of the circumstances, a reasonable person in Pobre's position would have understood that they were not in custody.

B. **Even though Pobre was not in custody, law enforcement diligently advised him of his rights and ceased questioning whenever Pobre mentioned at attorney**

Despite Pobre not being in their custody, law enforcement advised Pobre of his rights pursuant to *Miranda*, which he repeatedly waived. Nevertheless, Pobre conclusively asserts in his

motion that he requested a lawyer and that law enforcement eventually questioned him again without reminding him of his rights. The audio recording of the interview belies this assertion.

At the outset, Trooper Mills advised Pobre of his *Miranda* rights and asked him to initial an acknowledgement form. Ex. 1 at 1:01–1:45. After Pobre signed the waiver form, Trooper Mills again advised Pobre that he could refuse to answer questions at any point. Ex. 1 at 3:47–4:16.

When Trooper Mills informed Pobre that Pobre's residence was being search for child pornography, Pobre said, "so I am a suspect in a child pornography investigation. Wow. I need a lawyer." Ex. 1 at 7:30–7:43. After Pobre appeared to be faint, Trooper Mills informed Pobre that the interview was over and asked if Pobre was alright. Ex. 1 at 7:44–7:54. Despite Trooper Mills ending the discussion, Pobre reengaged and asked if Trooper Mills could answer why this is happening and whether he is being accused of distributing child pornography. Ex. 1 at 8:22–8:44. The officers responded that that is what they were there to find out and that they could not ask Pobre whether he was distributing child pornography because he requested a lawyer. Ex. 1 at 8:44–8:52. Trooper Mills again informed Pobre that because he requested a lawyer, the interview needed to end. Ex. 1 at 9:54–10:04. At 6:50 a.m., approximately one hour after Pobre requested a lawyer, Pobre said that he would "freely and voluntarily speak to [Trooper Mills] for the purpose of getting you in to the server referenced in the search warrant, the 59, plus the laptops." Ex. 2 at 0:01–0:25.

Critically, at 4:20 p.m., Trooper Mills reminded Pobre that he waived his *Miranda* rights at 6:50 a.m., and Pobre said, "yes." Ex. 3 at 0:01–0:20. Finally, when law enforcement informed Pobre that they had recovered files of child pornography from his device, Pobre then said that he is "pretty much screwed" and requested a lawyer, which resulted in the end of the interview. Ex. 3 at 2:28–3:16.

Each time Pobre asserted his right to counsel, law enforcement ceased questioning. Any continuation of the discussion was precipitated by Pobre reengaging law enforcement to either find out more information about the investigation or try to maintain possession of his devices. Pobre acknowledged this on several occasions.

### C. **Pobre's statements were voluntary**

"A statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997). Statements are involuntary under the Due Process Clause if they were "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Id.* (citations omitted). In assessing whether a statement is voluntary, a court must examine the "totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (internal quotations omitted). The test for voluntariness is whether the defendant's will has been "overborne" or her "capacity for self-determination critically impaired." *Id.* While "[t]he requirements that *Miranda* warnings be given does not . . . dispense with the voluntariness inquiry," statements made following a *Miranda* warning will "rare[ly]" be deemed involuntary. *Dickerson v. United States*, 530 U.S. 428, 444 (2000). Furthermore, for a statement to be voluntary, an interrogation need not be entirely void of intimidation. *Braxton*, 112 F.3d at 780–82.

A defendant's statements to the police are inadmissible at trial under the Due Process Clause if the statements were involuntary. *Braxton*, 112 F.3d at 780. "A statement is involuntary within the meaning of the Due Process Clause when it is 'extracted by . . . threats or violence' or 'obtained by . . . direct or implied promises' or 'the exertion of . . . improper influence.'" *United*

*States v. Ayesh*, 702 F.3d 162, 168 (4th Cir. 2012) (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976)); *see United States v. Williamson*, 706 F.3d 405, 413 (4th Cir. 2013) (finding that the defendant's statements were voluntary). A court evaluating whether a statement was voluntary "must examine the totality of the circumstances, including the nature of the police activity, as well as the defendant's situation." *Ayesh*, 702 F.3d at 168. Relevant factors include "the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, and bathroom breaks) imposed upon the defendant," as well as the suspect's "age, education, intelligence, and mental state." *Id.*

Pobre's statements were made after he was advised of his *Miranda* rights, and were devoid of any "threats or violence, [or] obtained by any direct or implied promises, however, slight, [or] by the exertion of any improper influence." *Braxton*, 112 F.3d at 780. At 6:50 a.m., Pobre said that he would "freely and voluntarily speak to [Trooper Mills] for the purpose of getting you in to the server referenced in the search warrant, the 59, plus the laptops. Ex. 2 at 0:01–0:25. A few minutes later, Pobre said that he would "help your imaging people *possibly* leave some hardware behind so we're not completely crippled. I will happily log into the laptops. I will happily log into the server out there, which you probably don't want to move anyway because it probably weighs like a quarter ton." Ex. 2 at 2:16–2:35. Pobre's will clearly was not "overborne" nor was his "capacity for self-determination critically impaired." *Pelton*, 835 F.3d at 1071–72. As such, Pobre's statements were voluntary.[5]

---

[5] Moreover, even *assuming arguendo* that the defendant unequivocally represented counsel, his statements were nevertheless voluntary under the Due Process Clause and thus may be used, for example, on cross-examination or at sentencing. *See Oregon v. Elstad*, 470 U.S. 298, 307 (1985) ("[T]he *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted."); *United States v. Nichols*, 438 F.3d 437, 442 (4th Cir. 2006) (finding that "[t]he Supreme Court has repeatedly held that although statements obtained in violation of *Miranda* are inadmissible in the government's case-in-chief at trial, such statements, if reliable, may be used for other purposes

## VI.     Conclusion

For the reasons set forth above, the Government requests that the Court deny Defendant Pobre's motion to review release order (ECF No. 44), motion for a *Franks* Hearing (ECF No. 45), motion to suppress physical evidence (ECF Nos. 46 & 47), and motion to suppress statements (ECF No. 48).

Respectfully submitted,

Robert K. Hur
United States Attorney

By: _____

Dwight J. Draughon, Jr.
Joseph R. Baldwin
Assistant United States Attorneys

Dated: September 12, 2020

---

and in other ways," and citing cases regarding same); *United States v. Gullett*, 75 F.3d 941, 946 (4th Cir. 1996) ("[S]tatements obtained in violation of *Miranda* may be used on cross-examination to impeach the defendant who made them . . . [T]he shield provided by *Miranda* cannot be perverted into a license to use perjury and avoid the traditional truth-testing devices of the adversary process.").

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 12, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dwight J. Draughon, Jr.
Assistant United States Attorney