**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND | : |
| vs. | : Case No.   8:19-cr-00348-PX |
| ALAKOM-ZED CRAYNE POBRE | : |
| Defendant | : |

**DEFENDANT'S REPLY TO GOVERNMENT'S OMNIBUS
RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS**

Comes now the Defendant, Alakom-Zed Crayne Pobre, by and through counsel, Richard A. Finci, Esquire and the Law Offices of Houlon, Berman, Finci & Levenstein, LLC, G Arthur Robbins, Esquire, and Chesapeake Meridian, co-counsel, in reply to the Government's Omnibus Response and Opposition to Defendant's Motion (ECF 50) respectfully states as follows:

**Introduction**

This case is about an extensive Government surveillance system, of unproven reliability, deployed against our citizens without judicial supervision or probable cause. In an attempt to evade judicial supervision, the Government has developed a technology to continuously surveil an internet overlay known as *Freenet*.

The *Freenet* has been discussed in prior pleadings. In short form, the Freenet employs a distributed file system in which files are broken into blocks and spread across the system for storage. The blocks are identified by Block keys that are collected into "Manifests". To compile a file, a network member computer ["Node"] requests the various blocks by Manifest. The request contains both the Manifest and the IP address of the Requestor Node.

The Government has provided two White Papers authored by Brian N. Levine, PhD, and designated him as an expert on the technology. For brevity, we have referred to the program as

the Levine Network Investigative Technique ["LNIT"]. The Government's application for Warrant in this case is wholly reliant upon the LNIT. Without the LNIT based allegations, there was no probable cause even arguably stated.

LNIT uses an unknown number, but apparently extensive network, of Law Enforcement computers ["LENodes"] to surveil, collect and coordinate requests by other Nodes on the Freenet. Through the application of Government designed filters to focus on target Block Keys, the Government asserts that it can calculate probable cause to support derivative search warrants for physical addresses where Requestor Nodes are located.

The issues before the Court are the illegality of the LNIT in the first instance – rendering it violative of both the Fourth Amendment and 18 U.S. Code §§ 2510-2523 (Electronic Communications) prohibitions against extra-judicial government surveillance; and, secondarily, that even if legally permissible, the LNIT's lack of reliability for the establishment of probable cause renders deficient any warrant dependent upon the LNIT as its primary basis.

This case does not involve national security. However, even in the case of National Security matters, the Foreign Intelligence Security Act, 50 U.S. Code § 1801, requires certification by the Attorney General to the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence that the proposed surveillance meets the requirements of the Act and a copy of the certification must be immediately transmitted to the Court of Title III Judges established to provide judicial supervision. 50 U.S. Code § 1802(a) and (3), 50 U.S. Code § 1803. Electronic Surveillance includes "the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States, …." 50 U.S. Code § 1801(f)(2). Just as in the case of domestic law

enforcement investigations, even pen registers and trap and trace devices are subject to judicial oversight. Compare 50 U.S. Code § 1805(j) and 18 U.S. Code § 3121, et seq.

Here, the Government asserts that no judicial oversight is required to surveil and intercept electronic communications by United States Citizens. The Government is mistaken.

I.  **DEFENDANT HAD A REASONABLE EXPECTATION OF PRIVACY IN ENCRYPTED REQUESTS FOR FILES SENT OVER THE *FREENET* NETWORK**

   A.  **The LNIT intercepts and screens protected communications before identifying and logging the Requestor Node's IP Address**

The first 4th Amendment issue in this case is whether the Defendant had a reasonable expectation of privacy that his encrypted communications sent out over the *Freenet* would not be intercepted by the Government without a search warrant. The Government's argument that there is no reasonable expectation of privacy in *Freenet* communications is constructed upon appellate holdings involving law enforcement investigative software used against peer-to-peer file sharing networks such as *BitTorrent* and *Limewire*. The Government's argument is simply that "law enforcement software used to record IP addresses that request files [do not] constitute a violation of an expectation of privacy" in essential reliance upon the "third-party" doctrine as it applied prior to the *Carpenter, supra,* decision. (*See* Government's Response @ 20) (Citations and footnote omitted).

The Government's reliance on these cases is misplaced. The LNIT does not merely intercept IP addresses as the Government asserts. It first intercepts outgoing communications, identifies the content of that communication and only after the communication is determined to be the targeted content does it record an IP address. Defendant's expectation of privacy in his transmissions over the *Freenet* was at least as reasonable as the expectation of privacy an individual is now acknowledged to possess as to GPS tracker transmissions (*United States v.*

*Jones*, 565 U.S. 400 (2012)) and cell-site tower records emitted by a cell phone. (*Carpenter v. United States*, 585 U.S. ___ (2018)).

    In any event, it is not the logging of the Defendant's IP address that violates his legitimate expectation of privacy but rather the identification of the content of his *Freenet* communications which does. Before logging the IP address of a targeted requestor, the LNIT identifies the encrypted content being requested. It does this by comparing the encrypted content to its massive database of Manifest keys. That database is claimed and may well be presently restricted to child pornography keys but the LNIT could be applied to Manifest keys identifying any sort of content being stored by a user of the *Freenet*, including political, religious or personal content, and thus identify the IP address of the requestor of any kind of content.

    The investigative software used to detect child pornography downloaders and distributors on peer-to-peer file sharing systems utilizes very different techniques. For example, *Torrential Downpour*, which is used to investigate the *BitTorrent* peer-to-peer network, actively seeks out child pornography files being knowingly offered to other users, then downloads the entire file from the single IP address offering the file, identifying the IP address in the process. *See United States v. Gonzales*, 2019 U.S. Dist. Lexis 26061 (USDC Arizona, 2019). Similarly, the *EP2P* investigative software, which is used in investigations of *LimeWire* users, enables law enforcement to search for and download files stored on a users' computer, which have been made available for download by the user, and then to download the entire file from that specific user. *See United States v. Budziak*, 697 F 3d 1105, 1107 (9th Cir., 2012).

    In both cases, the user is voluntarily offering the files to third parties i.e. other users of the system. The law enforcement software poses as a user of the system, accepts the offer to download, identifies the offeror's IP address and confirms that the offeror possesses the entire

file in question. In these investigations, law enforcement is simply downloading what is being broadly offered to users of the file sharing system and identifying the IP address of the source.

The LNIT does not identify files that are knowingly being offered for download. Rather, it identifies and intercepts the content of an encrypted communication request being sent out over the *Freenet* from neighboring node to neighboring node. The format of the communicating requests is very similar to the format used by email programs, clearly a form of "communication". The requests are compared by hash value to the law enforcement data base of manifest key hash values in order to identify the content of the request or, in other words, the content of the communication. [1] Moreover, the encrypted nature of all communications on the *Freenet* is a strong factor in establishing the reasonable expectation of privacy for *Freenet* users. Nevertheless, the communication is intercepted, read by the software, screened for content of interest to the Government, and then subjected to the Levine algorithm to determine the IP address of the probable original requestor.

### B.    The LNIT provides massive surveillance coverage of the *Freenet*

The Defendant does not know how many LENodes are deployed in the LNIT because the Government has declined to produce any information about the LNIT, as deployed, in discovery. However, the Defendant does know from the Government provided "Freenet Target Summary" [Document 45-1] that there are enough LENodes that at least four (LE# 2145, LE# 1921, LE# 2161 and LE# 1809) were "neighbors"[2] of the Node attributed to Defendant. According to the 2020 Levine White Paper, at least 30 Nodes were simultaneously run for test purposes [See § 3

---

[1] For an excellent description of how hash values are calculated and then compared, *See U.S. v. Reddick*, 900 F. 3d 636 (5th Cir., 2018).
[2] Being a "neighbor" on *Freenet* is unrelated to geographic location, so it is not clear where the LENodes may be located, or where the data got compiled, or how it was relayed to the affiant for the search warrant at issue in this case.

of "A Forensically Sound Method of Identifying Downloaders and Uploaders in *Freenet* 2020 ("FSMID2020") (Attached as Exhibit 1)] and that those Nodes could see an average of more than 4,600 distinct locations per day and almost 17,000 distinct locations over the month of March, 2020. The earlier Levine White paper reported that in January 2017, the LNIT Nodes could see an average of 4,200 distinct Node locations per day and almost 42,000 distinct locations over that month. "Statistical Detection of Downloaders in *Freenet*" (2017) ECF Paper No. 47-4. The Government's numerical evidence suggests that the LNIT was achieving greater numerical penetration on a shrinking universe of surveilled Nodes (4600 per day/17,000 per month vs. 4200 per day/42,000 month). Nodes can be set up and configured to accommodate up to 100 "neighbors" (i.e. user Nodes). The physical location of the LENodes is distributed among multiple agencies and each LENode can monitor user Nodes throughout the country (and world). See "Black Ice: The Law Enforcement FreeNet Project" at page 17, https://retro64xyz.gitlab.io/assets/pdf/blackice_project.pdf, (copy attached as Exhibit 2) (Though not provided as Government Discovery, Black Ice seems to be the same NIT as purportedly validated in the Levine White papers.)

      **C.**      **The LNIT collects, screens and collates protected communications**

      The information collected, screened and collated by the LNIT are communications, between and among user Nodes, fully protected by the Fourth Amendment. Even at the theoretic level of the white papers, the functionality of the LNIT is revealed. The title of the white paper itself is somewhat revealing: "A Forensically Sound Method of Identifying Downloaders and Uploaders" The LNIT can be configured to target any type of information that might be shared on the Freenet, whether it be religious, political, or, as alleged in this case, contraband. The specific deployment of the LNIT can be tuned to target content communications through the

application of filters; that ability to target information differentiates the LNIT search from the pen register number dialed analogy relied upon by the Government. But even a pen register would require Judicial Approval through an authorizing order prior to deployment. See 18 U.S. Code §§ 3121-3127.

*Freenet* communications are achieved through the transmission of files and manifests. The 2020 Levine white paper explains:

> **Uploading Files and Manifests**. For a file to become available to *Freenet* nodes, it must first be uploaded (or inserted) by a node into the network. Nodes do not explicitly share files; files must be retrieved from the network's distributed data store. When a file is inserted into the network, *Freenet* divides it into encrypted 32KB content blocks (or simply blocks). The inserting node (or requester) distributes the blocks to its peers. A peer may place the block in its own storage, and it may also send the block to its own peers. After the requester distributes the content blocks, it inserts a separately encrypted 32KB manifest block. The manifest block holds the SHA256 hash and decryption key of each of the file's content blocks. For large files with many blocks, the manifest block cannot reference all of the content blocks and will instead reference another level of manifest blocks. Finally, *Freenet* returns a human-readable manifest key to the user. The manifest key is a URI, consisting of the manifest block's SHA256 hash and decryption key. *Freenet* allows a user to decide between two primary types of manifest key: content hash key (CHK) or signed subspace key (SSK). CHK blocks will be identical for multiple copies of the same file. SSKs generate a unique encryption key per upload, and thus the blocks would be distinct per manifest and uploader. Anyone with knowledge of the manifest key can retrieve the file.
>
> **Downloading**. Retrieving a file from the network is the inverse of inserting it. The downloading node—also known as the requester— first retrieves and decrypts the manifest block(s) to get the hash and encryption keys of the content blocks. The requester then retrieves and decrypts the content blocks, and finally reconstructs the file data. Downloading a file does not result in the file's blocks being placed into the node's local storage.
>
> In requesting blocks, a simple process is followed. If a node receiving a request has the block in its *Freenet* storage, it returns the block. Otherwise, it relays the request to one of its peers. The process continues from peer to peer. When found, the block is returned in reverse order through the chain of peers, and cached by each for faster replies to future requests. If a node in the chain fails to find the block, it may relay the request to other peers before returning a not-found result.

A Forensically Sound Method of Identifying Downloaders and Uploaders in Freenet, Levine, et al. 2020. ["FSMIDU2020"] at pp2-3. Attached as Exhibit 1.

In fact, Dr. Levine has previously testified in this District [*U.S. v. Hall*, 1:16-cr-00469-ELH, document 61, page 29] that "files" transmitted on the Freenet can be "anything that can be stored on a computer." It is the requests for content blocks of files that the LNIT intercepts. It then screens the intercepted requests for blocks associated with "files of interest". The ability of the Government to use LNIT to continuously surveil the requests of user Nodes on the Freenet for requests for content blocks of any type of file and then develop the identity of the requestor, makes the LNIT a Fourth Amendment search. See Transcript Attached as Exhibit 3

In this case, the Government search was apparently focused upon identifying Freenet manifest requests for blocks associated with known files containing images of child exploitation. The LNIT has a filter containing more than 300 million distinct block keys. FSMIDU at p.3. However, the subject matter of the file blocks sought cannot and does not alter the nature of the search itself.

In *Carpenter*, *supra,* Chief Justice Roberts acknowledged that "when confronting new concerns wrought by digital technology, this court has been careful not to uncritically extend existing precedents…' (*citing Riley v. California*, 573 U.S. 373 (2014)). The application of the digital investigative technology in this case to read the content of encrypted messages over the *Freenet* is not at all similar to the technology used in the precedent's relied upon by the Government in its opposition. The Levine Investigative technique is unique in its methodology, utilizing application of broad network surveillance of communications as a law enforcement tool.

Users of *Freenet* have consciously undertaken to use a network that was designed to ensure true freedom of communication over the Internet…by allow[ing] anybody to publish and read information with complete anonymity." http://freenetproject.org/pages/help.html. This

expectation of privacy is both subjectively reasonable and one that society is prepared to recognize as reasonable. A government breach of that Fourth Amendment protected privacy expectation without a warrant and without probable cause mandates that any derivative evidence acquired be suppressed.

II. **THE LEVINE NETWORK INVESTIGATIVE TECHNIQUE, AS DEPLOYED IN THIS CASE, DOES NOT REVEAL PROBABLE CAUSE TO JUSTIFY A SEARCH WARRANT WITHOUT ANY OTHER SUPPORTING FACTS**

Even before expert examination of the additional opportunities for error in the LNIT, as deployed, there are assumptions in the underlying theory of the LNIT that reveal high probability of False Positive Reports.

First, the LNIT is built on the assumption that the user Nodes that it surveils will be operating in the "open" mode only. FSMID2020 §2 ("We focus exclusively on opennet." [It goes on to speculate], Our methodology should work for darknet, though it would also require social engineering to join specific darknets") That is contrary to the construct of the *Freenet*, where the "Normal" mode adds additional layers of protection; however, even in the "Low" security mode, there is the potential that Users will have both "stranger" and "friend" connections. Government Freenet illustration Power Point, Document 35-1, at p. 10. The LNIT completely fails to account for the User Node that has one or more "friends" operating only in the "Darknet" mode. (For ease of discussion, we will call a User Node identified by the LNIT a "Suspect User Node" ["SUN"].) The SUN could be the sole point of entry to the *Freenet* for one or more of its "Darknet" "friends". The foundational distributive math calculation for the LNIT makes assumptions about the requestor's numbers of neighbors. Faulty assumptions about friend-of-a-friend-requester neighbor-numbers can make the remainder of the calculations unreliable.

Second, there is no explanation in the Levine white-paper of how the number of suspect block requests the LNIT should require (20 – see FSMID2020 § 4.4), before designating a SUN,

was derived. It is also not clear whether the trigger number of block requests is a user-controlled option. In the "Freenet Target Summary" provided by the Government (Document 45-1), one third of the reported "hits" have less that 20 block requests and two thirds of the reported "hits" have less than 30 block requests.

Beyond the problem with the underlying construct, the way that the LNIT is deployed and managed will also impact the reliability of SUN designation. Freenet limits block size, whether content or manifest blocks, to 32 KB; therefore, some manifests must be broken into sub-manifests. FSMID2020 § 2. FSMID2020 does not explain a distinction of treatment between requests made from a manifest and requests made from a sub-manifest. Based upon the LNIT rubric described in FSMID2020, it appears that much like the User Node with a "Darknet" "neighbor" entering the Freenet through it, a User Node that receives and then distributes the block-requests of a sub-manifest, appears to be the "requester" of those component block-requests. Identification of both relay requesters and original requesters as SUNs defeats any utility of the LNIT for developing probable cause.

Third, FSMID2020 asserts that HTL16 requests are presumed not to be "requesters". The white paper does not appear to explain any mechanism to eliminate Nodes that have both HTL16 and HTL17 requests for the same suspect blocks. Without an automatic elimination of mixed HTL16 and 17 values, the LNIT again injects error that defeats probable cause by potentially identifying relayer nodes as requester nodes.

The LNIT, as deployed, introduces additional opportunities for error in the actual configuration of the LENodes used, the data compilation among and between LENodes, the data distributed to case agents by the central collection point, and the case agent ability to read the data accurately. Many of the errors of the LNIT, as deployed, are concealed behind the

Government's failure to provide Discovery; consequently, much of the specific failure of LNIT to support probable cause in this case will require the production of source code, raw reports, and operating and training manuals. *See* Mark Lanterman Affidavit (Exhibit 4), paras. 9-28.

### III. THE GOOD FAITH EXCEPTION WILL NOT SAVE A SEARCH WARRANT BASED UPON AN UNLAWFUL SEARCH, NOR UPON THE SYSTEMICALLY UNRELIABLE LEVINE NETWORK INVESTIGATIVE TECHNIQUE

The Government has asserted that under the Good Faith Exception, the Search Warrant for the search of Defendant's house should be upheld despite the illegality of the original LNIT search and despite the unreliability of the LNIT, even if permitted, to support probable cause. The position is unsupported in law in both cases.

To overcome the illegality of the LNIT search, the Government would have to demonstrate a sufficient attenuation between the illegal search and the evidence relied upon. See *Wong Sun v. U.S.*, 371 U.S. 471, 488 (1963)(return to station after days delay overcame taint of original arrest), *Brown v. Illinois*, 422 U.S. 590, 603-604 (1975)(3 factor test – time, intervening circumstances, purpose of misconduct), *Kaupp v. Texas*, 538 U.S. 626, 633 (2003)(no time lapse between illegal arrest and confession rendered confession inadmissible). Here the warrant was based directly upon an illegal search conducted for investigative purposes, with no time or intervening circumstances to alleviate the illegality. All derivative evidence based upon the illegal LNIT must be suppressed.

Even if the LNIT were not an illegal search in the first instance, its lack of reliability cannot be saved under the Good Faith Exception. *United States v. Leon*, 468 U.S. 897 (1984), and its progeny have developed a set of circumstances under which a warrant, later determined to be invalid, will be accepted by the Courts, if the officers acting under that warrant were acting "in good faith" reliance upon the warrant's validity. Of the five categories recognized to be a

potential for good faith reliance, the nearest analogue would be reliance upon an isolated error in a law enforcement database. *Herring v. U.S.*, 555 U.S. 135, 145-46 (2009). But the Supreme Court explained there that, "As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). The alleged failures of the LNIT constitute a possible example of a recurring or systemic negligence that the exclusionary rule is designed to deter. To allow the Good Faith Exception to paper over the systemic shortcomings of the LNIT would allow the exception to completely obscure the Fourth Amendment requirement for probable cause under these circumstances.

**IV.    THE SOURCE CODE AND OTHER INFORMATION ABOUT THE LEVINE NETWORK INVESTIGATIVE TECHNIQUE, AS DEPLOYED, ARE ESSENTIAL TO THE DEFENSE AND DISCOVERYABLE PURSUANT TO RULE 16 AND *BRADY V. MARYLAND***

Materiality under Rule 16 and *Brady v. Maryland* are broader than the cribbed vision that the Government seeks to enforce in this case. Here, the Discovery sought goes directly to the legality and reliability of the LNIT. Without the LNIT evidence, the affidavit supporting the search warrant alleges no probable cause and the Government evidence flowing from the search of Defendant's home and computers is inadmissible.

Federal Rule of Criminal Procedure 16(a)(1)(E) provides defendants with broad discovery rights. The rule requires the production, upon defendant's request, of documents and objects within the government's possession, custody, or control that are "*material* to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E) (emphasis added). Materiality "is not a heavy burden." *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993). Evidence is material— whether exculpatory or inculpatory — "as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating

testimony, or assisting impeachment or rebuttal." *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998) (quoting *Lloyd*, 992 F.2d at 351). A defendant makes an adequate showing of materiality where he "present[s] any facts which would tend to show that the government was in possession of information that would be helpful to the defense." *United States v. Cadet*, 727 F.2d 1453, 1466 (9th Cir. 1984).

In determining what to disclose under Rule 16, "the government cannot take a narrow reading of the term 'material' . . . [n]or may it put itself in the shoes of defense counsel in attempting to predict the nature of what the defense may or what may be material to its preparation." *United States v. Safavian*, 233 F.R.D. 12, 15 (D.D.C. 2005). Rather, "[t]he language and the spirit of the Rule are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case." *United States v. Libby*, 429 F. Supp. 2d 1, 5 (D.D.C. 2006) (quoting *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989); *see also* Fed. R. Crim. P. 16, Advisory Committee Notes (amend. 1974)(explaining how "broad discovery contributes to the fair and efficient administration of criminal justice" and that Rule 16 provides "the *minimum* amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." (emphasis added)). Because of this, disputes regarding the discoverability of information under Rule 16 "should be resolved in the defendants' favor." *United States v. Karake*, 281 F. Supp. 2d 302, 306 (D.D.C. 2003).

The government has additional disclosure obligations under *Brady* and its progeny. Specifically, in the pretrial setting, *Brady* requires disclosure of any information that is

"favorable" to the defense, "without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial."

        The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed-with the benefit of hindsight-as affecting the outcome of the trial. The question before trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed. Because the definition of " materiality" discussed in *Strickler* and other appellate cases is a standard articulated in the post-conviction context for appellate review, it is not the appropriate one for prosecutors to apply during the pretrial discovery phase. The only question before (and even during) trial is whether the evidence at issue may be " favorable to the accused"; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial. *United States v. Sudikoff,* 36 F.Supp.2d 1196, 1198-1199 (C.D.Cal.1999); *see also United States v. Acosta,* 357 F.Supp.2d 1228, 1233 (D.Nev.2005), and appended magistrate judge's decision, 357 F.Supp.2d at 1237; *United States v. Carter,* 313 F.Supp.2d 921, 924-25 (E.D.Wis.2004).

        The meaning of the term " favorable" under *Brady* is not difficult to discern. It is any information in the possession of the government-broadly defined to include all Executive Branch agencies-that relates to guilt or punishment and that tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses. It covers both exculpatory and impeachment evidence. *See United States v. Bagley,* 473 U.S. 667, 676-77, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)(both exculpatory and impeachment evidence " fall[ ] within the *Brady* rule" ); *United States v. Smith,* 77 F.3d 511, 514 (D.C.Cir.1996); *United States v. Hsia,* 24 F.Supp.2d 14 (D.D.C.1998). " The government is obligated to disclose all evidence relating to guilt or punishment which might be reasonably considered favorable to the defendant's case," that is, all favorable evidence that is itself admissible or " that is likely to lead to favorable evidence that would be admissible," *United States v. Sudikoff,* 36 F.Supp.2d at 1199-1200, or that could be used to impeach a prosecution witness. *See United States v. Trie,* 21 F.Supp.2d at 23 (" favorable evidence" encompasses " both evidence that is exculpatory and evidence that could be used to impeach a government witness" ). Where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure. *See United States v. Paxson,* 861 F.2d 730, 737 (D.C.Cir.1988) (insufficient for government to provide " niggling excuses" for its failure to provide potentially exculpatory evidence).

Under *Brady,* the prosecutors have an affirmative duty to search possible sources of exculpatory information, including a duty to learn of favorable evidence known to others acting on the prosecution's behalf, including the police, *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), and to cause files to be searched that are not only maintained by the prosecutor's or investigative agency's office, but also by other branches of government " closely aligned with the prosecution." *United States v. Brooks,* 966 F.2d at 1503 (" affirmative duty of inquiry"). *See United States v. Beers,* 189 F.3d 1297, 1304 (10th Cir.1999)(" [i]nformation possessed by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case" for *Brady* purposes); *United States v. Jennings,* 960 F.2d at 1490 (" [t]his personal responsibility cannot be evaded by claiming lack of control over the files ... of other executive branch agencies" ). *U.S. v. Safavian*, 233 F.R.D. 12, 16-17 (D.D.C. 2005)

Here, the requested Discovery goes to the validity of a search and the cross examination of the witnesses associated with the probable cause determination that supported the warrant alleged to support the search. Those grounds alone make the evidence material and production required.

A. **The Source Code and related LNIT materials will establish the full extent of the Fourth Amendment and Title 18 violations present in the LNIT, as deployed**

While Fourth Amendment failures of the LNIT, as deployed, without judicial approval or probable cause can be observed in its theoretical underpinning, the looming specter of a Government argument that the failures and invasions are "mere speculation" further militates in favor of compelled Discovery. Additionally, the details of the deployed LNIT may further exacerbate the underlying Fourth Amendment failures. The deployed LNIT will either pass Fourth Amendment muster when examined, or it will not. That question belongs to the Court and the Court is better served by an adversarial process whereby defense counsel and their experts are able to examine the LNIT and frame the evidence and issues accordingly.

**B.     The Source Code will establish the LNIT inaccuracies impacting the lack of probable cause in the reports relied upon in the application for warrant to search Defendant's home and computer equipment**

From systemic warrant database problems (*Herring v. U.S*., 455 U.S. 355 (2009)(no data presented to determine whether invalid warrant was simple error or product of widespread database problems), to Canine training and reliability issues (*United States v. Cedano-Arellano*, 332 F.3d 568, 571-572 (9th Cir. 2003), to cell site simulator data, Federal case law provides circumstances where resolution of defendants' motions to suppress are dependent upon the court having the facts necessary to resolve the issues presented. In those cases, defendants are fully dependent upon the Government meeting its obligations under Rule 16 and Brady to provide that information that is uniquely within the Governments control.

Here, FSMID2020 provides basis for concluding that even at the design level, the LNIT constitutes a Fourth Amendment search, and further that the results that it purports to deliver are not adequate to support probable cause. The as-deployed LNIT logs, records, training materials and source code will allow Defense expert witnesses to demonstrate the systemic failures to the Court. Mark Lanterman, the Chief Technology Officer of ComputerForensic Services, has provided an affidavit that states that in his opinion, the reports provided in Discovery fail to present the total array of data collected by the LNIT and that the data is critical to his assessment of the reliability of the LNIT. See Mark Lanterman Affidafit (Exhibit 4), paras. 9-28.

The Government opposes sharing material evidence that the Court requires to evaluate the legality and efficacy of its search and the Defense requires to conduct an effective defense.[3]

---

[3] While the vernacular is not often appropriate in formal pleadings, the Government is essentially saying, "**Trust us**, *this wide-ranging search of citizens, run without Court approval, does not violate the Fourth Amendment and only returns reliable results. Even if that's not true, we should be able to use the results of a warrant based on those results. And, by the way, no one is allowed to look at our work beyond what we want to tell you the results show*."

This is exactly the case for which Federal Rule of Criminal Procedure 16 and *Brady v. Maryland* require the Government to provide discovery.

**V.    DEFENDANT WAS IN CUSTODY FOR THE PURPOSES OF MIRANDA WHEN HE WAS DETAINED IN HIS HOME DURING THE EXECUTION OF THE SEARCH WARRANT**

In response to Defendant's assertion that his Miranda rights were violated after he unambiguously invoked his right to counsel and right to remain silent, the Government contends that Defendant was never in custody when he was interrogated by Officers conducting the search of his home, and therefore, never entitled to the Miranda warnings and rights in the first place.

It is well-settled that the test of whether a suspect is in custody for Miranda purposes is an objective test; whether "under the totality of the circumstances, "the suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). The key question, viewed objectively, is whether "a reasonable [person] in the suspect's position would have understood his position [as being] in custody." *Id* @ 422. In fact, "the subjective views harbored by either the interrogating officers or the person being question" are not even considered. *J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011) (*citing Stansbury v. California*, 511 U.S. 318 (1994).

Whether that person has been formally advised that he is **not** under arrest is certainly a factor the Court may consider (Defendant would contend a minor factor). *United States v. Colonna*, 511 F. 3d 431 (4th Cir., 2007). However, case law is rife with holdings that a Defendant was in custody for Miranda purposes even after being informed that they were not under arrest and free to leave. See, e.g., *United States v. Giddins*, 858 F. 3d 870, 879(4th Cir., 2017)(defendant was told falsely that he was free to leave, that he was not in trouble and was led to believe he had to answer questions to get his impounded car back while the entire time Officer's possessed an

arrest warrant); and *United States v. Hashime*, 734 F. 3d 278 (4th Cir., 2013)(Defendant told he was not under arrest and free to leave during execution of Search Warrant at his home but nevertheless in custody for Miranda purposes under the totality of the circumstances). The fact that Defendant was interrogated in his own home is another objective factor that the Court may consider but also is not dispositive. *Id.*

The undisputed and objective evidence at the Motions hearing will further establish that a team of heavily armed Officers entered the Defendant's home at approximately 5:15 a.m. Defendant and his wife, Dr. Valencic, were ordered out of bed and directed to sit on a sofa in the living room. They were both in their bed clothes. They were told not to leave the living room and Officers guarded them. They were searched but not handcuffed. Thereafter, Defendant remained in custody throughout the 13 plus hours that investigators were executing the Search Warrant in his home.

The Court will hear that the Defendant was scrupulously read his Miranda rights at approximately 5:46 a.m.[4], that he waived and then engaged in a short conversation with Trooper Mills and HSI S/a DiAntonio. Shortly after the interview started, Defendant invoked his right to counsel and the Investigators respected that invocation for hours ceasing all questioning while they continued to conduct their investigation on the premises. During those many hours, there was no change in the circumstances of Defendant's ongoing custody, he was not free to leave, and the circumstances were such that in essence he was detained by the Officer's in his own home under coercive circumstances.

The Court will hear testimony as to how Defendant's freedom of action was curtailed during the lengthy search. There was no change in the custodial nature of Defendant's ongoing

---

[4] The Investigator's also read Dr. Valencic her Miranda rights in order to question her about various electronic hardware items that she claimed were hers.

detention between his invocation of the right to counsel at 5:54 a.m. and the re-initiation of questioning by Trooper Mills at approximately 4:20 p.m. In fact, the extraordinarily long continuing circumstances of the ongoing search made the circumstances even more coercive and objectively custodial in nature even if Defendant was never formally placed under arrest. While Trooper Mills claims that Defendant previously waived his rights at 6:50, there is no recording of re-intiation of a conversation started by the Defendant nor were new Miranda warnings given to the Defendant. *Edwards v. Arizona*, 451 U.S. 477 (1981). In any event, Defendant again invoked his right to counsel at 4:23 p.m. shortly after answering a few questions.

The "3rd" recorded conversation began at approximately 6:50 p.m., according to the recording of this conversation. Once again, there is no indication that Defendant reinitiated the conversation although at this point he was re-advised of his Miranda rights. During this conversation, Defendant is asked a series of questions about his computer system set-up by Sgt. Bidel. The conversation is confined to technical discussion of the software being run on the systems as well as some of the hardware configurations. The Defendant was led to believe that if he assisted the Officers in their search of his systems, they might leave some of his hardware behind, in particular, Dr. Valencic's research and work-related materials.[5]

Upon consideration of the totality of the circumstances, a person detained as Defendant was, even in his own home and after being told he was not under arrest, would reasonably believe that he was not free to leave and therefore, was in custody for Miranda purposes and entitled to the full scope of its prophylactic rules and protections. The Government has the burden of establishing that Defendant knowingly and voluntarily waived those rights, that any

---

[5] In the end, Dr. Valencic's laptop was seized as well.

follow up interrogation was reinitiated by the Defendant himself. In this case, the Government cannot sustain that burden and the Defendant's statements must be suppressed.

                              Respectfully submitted,

                              /s/  
                              Richard A. Finci, Esquire  
                              Houlon, Berman, Finci & Levenstein, LLC  
                              7850 Walker Drive, Suite 160  
                              Greenbelt, Maryland 20770  
                              finci@houlonberman.com  
                              Telephone: (301) 459-8200  
                              Facsimile: (301) 459-5721

                              /s/  
                              G Arthur Robbins, Esquire, Federal Bar No. 09770  
                              CHESAPEAKE MERIDIAN  
                              1997 Annapolis Exchange Parkway, Suite 300  
                              Annapolis, Maryland 21401  
                              GarRobbins@ChesapeakeMeridian.com  
                              Telephone: 443-454-7675

## **CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that on this 16th day of November 2020, a copy of the foregoing Defendant's Reply to Government's Omnibus Response in Opposition to Defendant's Motion was served via filing in the electronic filing system to the Dwight Draughon, Esquire, Joseph Baldwin, Esquire Office of the United States Attorney, 6406 Ivy Lane, Greenbelt, Maryland 20770.

                              /s/  
                              Richard A. Finci, Esquire