```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                       SOUTHERN DIVISION

 3
     UNITED STATES OF AMERICA,        )
 4                                    )
               Plaintiff,             )
 5                                    ) Case Number: 8:19-cr-0348-PX
               vs.                    )
 6                                    ) Videoconference
     ALAKOM-ZED CRAYNE POBRE,         )
 7                                    )
               Defendant.             )
 8

 9          TRANSCRIPT OF PROCEEDINGS - MOTIONS HEARING
                 BEFORE THE HONORABLE PAULA XINIS
10                  UNITED STATES DISTRICT JUDGE
                 FRIDAY, OCTOBER 9, 2020; 9:00 A.M.
11                      GREENBELT, MARYLAND

12                      A P P E A R A N C E S

13
     FOR THE PLAINTIFF:
14
         OFFICE OF THE UNITED STATES ATTORNEY
15            BY:  JOSEPH RONALD BALDWIN, ESQUIRE
              6500 CHERRYWOOD LANE, SUITE 200
16            GREENBELT, MARYLAND 20770
              (301) 344-4238
17
              BY:  DWIGHT JOHN DRAUGHON, JR., ESQUIRE
18            6406 IVY LANE, SUITE 800
              GREENBELT, MARYLAND 20770
19            (301) 344-0863

20
         ***Proceedings Recorded by Mechanical Stenography***
21        Transcript Produced By Computer-Aided Transcription

22   _____
              MARLENE MARTIN-KERR, RPR, RMR, CRR, FCRR
23               FEDERAL OFFICIAL COURT REPORTER
                 6500 CHERRYWOOD LANE, STE 200
24                 GREENBELT, MARYLAND 20770
                        (301)344-3499
25
```

1                          A P P E A R A N C E S
                                (Continued)
2

3    FOR THE DEFENDANT:

4         HOULON, BERMAN, FINCI & LEVENSTEIN, LLC
                  BY:  RICHARD A. FINCI, ESQUIRE
5                 7850 WALKER DRIVE, SUITE 160
                  GREENBELT, MARYLAND 20770
6                 (301) 459-8200

7         CHESAPEAKE MERIDIAN
                  BY:  G ARTHUR ROBBINS, ESQUIRE
8                 1997 ANNAPOLIS EXCHANGE PARKWAY, SUITE 300
                  ANNAPOLIS, MARYLAND 21401
9                 (443) 454-7675

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2          (Call to Order of the Court.)

3               THE COURTROOM DEPUTY:   Judge Xinis is joining us.

4               THE COURT:   Good morning.

5               THE COURTROOM DEPUTY:   Good morning.

6          May I have your attention, please.   The United States

7     District Court for the District of Maryland is now in session,

8     the Honorable Paula Xinis presiding.

9          The matter now pending before this Court is criminal

10    docket number PX-19-0348, United States of America versus

11    Alakom-Zed Crayne Pobre.   We're here for the purpose of a

12    motion hearing.

13         Counsel, please identify yourselves for the record.

14              MR. DRAUGHON:   Dwight Draughon and Joseph Baldwin for

15    the Government, Your Honor.   Good morning.

16              THE COURT:   Good morning.

17              MR. FINCI:   And, Your Honor, good morning.   Richard

18    Finci and Gar Robbins on behalf of the defendant, Alakom-Zed

19    Pobre.

20              THE COURT:   And I see that Mr. Pobre is with us

21    today.   Welcome.

22         And, Ms. Kerr, you will be our court reporter.   If at any

23    point you can't hear us, please let us know.

24         For anyone who is joining by the public access line, just

25    to remind you all that we follow the same rules of the road as

1    if we were in court, which means that there are no

2    interruptions and no independent recordings of this proceeding.

3    There is only one recording and that is the one taken by

4    Ms. Kerr.  So if there is anyone who is operating any device

5    whatsoever which records this proceeding, you are in violation

6    of a court order, and you will be held in contempt.  So I

7    suggest you turn it off right now.

8         Other than that, we'll get started.  This hearing is

9    concerning a preliminary motion regarding discovery.  It's a

10   motion to compel, and so while this is a criminal matter, I

11   don't view it as having the same implications as the motion to

12   suppress or trial, for example, in which case the CARES Act

13   would trigger findings with respect to COVID that we need to do

14   this virtually versus not.  But out of an abundance of caution,

15   I'm going to make the finding that to do this in court today

16   physically, in the midst of a pandemic, and given the numbers

17   in Maryland is simply not a wise move.  It would not be safe

18   and that we can, in fact, accomplish a hearing on the motion to

19   compel without being in physical court.

20        Mr. Finci and Mr. Robbins, on behalf of Mr. Pobre, have

21   you explained to him that we're doing all proceedings that we

22   can virtually when possible because of the pandemic?

23             MR. FINCI:  Yes, Your Honor, I have.

24             THE COURT:  Okay.  And is there any objection to

25   proceeding on this format?

1          MR. FINCI:  None at all, Your Honor.  I find the

2    format to be very successful in other settings and no reason to

3    think it would be any less successful in this setting.

4          THE COURT:  Great.  Okay.

5      And, obviously, the Government is on board.  You're both

6    here.  So I appreciate it.

7      Okay.  So there has been a flurry of correspondence since

8    yesterday with respect to a late-breaking potential witness

9    that the defense wishes to call.  Let me just say this.  I'm

10   not there yet.  I've got some questions with respect to the

11   legal threshold that I think the defendant has to meet before

12   there is even a question that the source code is available, and

13   based on what I've read so far, while I'm not -- you know, I'm

14   certainly not a computer expert.  I think I get it.  And so to

15   the extent I don't get it, you tell me, and if we get to the

16   stage where you do believe under Rule 16 you're entitled to the

17   evidence in some form, we can talk about whether we need a

18   witness.  But I've got some threshold legal issues that I think

19   we might want to address first with respect to the original

20   motion to compel.

21     Am I getting it right, though, Mr. Finci, that this

22   witness is with respect to the original motion to compel?

23   Because I understand there may be some supplemental arguments

24   for additional discovery that the Government says either they

25   do not have or they do not wish to turn over.  I just want to

1    understand that this witness issue is to the first motion for

2    the source code.  Am I right.

3           MR. FINCI:  Well, the witness issue, Your Honor --

4    and, you know, it may be a mooted issue in any event at this

5    point but, nevertheless, let me just explain.

6           THE COURT:  Sure.

7           MR. FINCI:  This witness issue is a witness who would

8    explain to you how technologically he would use the source code

9    to advance, help prepare, you know, investigate the defense in

10   this case.  This was not going to be a witness who was going to

11   come in and sort of explain the technology or, you know, give a

12   defense, per se, but, rather, to explain what he would do with

13   the source code if it were provided.

14          THE COURT:  Well, you still have to show me, though,

15   how it's even material to the defense at trial or, even

16   assuming Rule 16 applies, to a suppression motion, and that's a

17   big assumption, but I'm happy to entertain it.  Then you have

18   to demonstrate to me how it's material to the defense in that

19   respect, and if -- and my sort of basic theory is if you can't

20   tell me, then you couldn't tell a jury.  So you should be able

21   to tell me, without an expert, as you would in an opening

22   statement or closing argument; and then if we need some

23   technical assistance, I'm happy to, you know, entertain it

24   later.

25          But at this point, I think it's, you know -- and I hear

1   the Government on it.  It's pretty late-breaking.  So I figured

2   I would take it one step at a time and just figure out whether

3   it's even required today.

4        MR. FINCI:  I agree.  We're ready to go forward one

5   way or the other.

6        THE COURT:  Okay.

7        MR. FINCI:  There was a case out of Arizona where a

8   judge, in a similar scenario that you're faced with here, made

9   a decision where one defendant, who presented an expert to

10  explain how the source code would assist the materiality

11  element, was able to obtain the source code -- and that was I

12  think related to torrential downpour law enforcement software

13  -- where the other defendant, in a parallel case, did not make

14  that showing and was not able to get it.  So we were following

15  along how we read the case law from another judge.  That's all.

16       THE COURT:  Was it *Budziak*?

17       MR. FINCI:  No.  This is an Arizona case, *Gonzales*,

18  Your Honor.

19       THE COURT:  Did you give it to me?

20       MR. FINCI:  You're asking me?  I don't know.  I mean,

21  I thought I had, but I can email it.

22       THE COURT:  Well, I'm asking because, you know, the

23  difference between Pobre and *Budziak* is the way the Government

24  charged the case.  And so that's why, again, I'm going right

25  back to let's do this -- we have to crawl before we walk before

1    we run.

2          The way I understand this case is that the Government has

3    charged possession, and so let's just get right into it.  Put

4    the witness -- keep the witness in the waiting room.  The

5    Government has charged possession, and so you would stand up in

6    opening statement after I told the Government, and I think they

7    would agree, the story starts, if you will, with what was found

8    on the computer.

9                MR. FINCI:  Well, we would like to back up the start

10   of the story a little bit.

11               THE COURT:  Okay.  Tell me why.

12               MR. FINCI:  We would like to include the suppression

13   issues.

14         And what I would like to do, with your permission, is turn

15   this over to co-counsel, who is Mr. Robbins, of course, who has

16   the engineering background to I think explain this process.

17               THE COURT:  Okay.

18               MR. FINCI:  I understand it but not quite as well as

19   Mr. Robbins does.  So I'm going to turn it over to him for that

20   explanation.

21               THE COURT:  All right.  Then I'm going to start with

22   you, Mr. Robbins, and I'm going to start with a really specific

23   question, which is, I'm going to take this at trial and then

24   I'm going to back it up to suppression.  I want to know at

25   trial what would be the materiality argument when the

1   Government has charged possession of suspected or child

2   pornography found -- I understand it's in the RAM, but I need

3   to understand why the source code investigating the Freenet is

4   material to your defense when the Government stands up and

5   says, "This case is about child pornography found on

6   Mr. Pobre's computer.  End of story."

7               MR. ROBBINS:  Thank you, Your Honor.  Good morning.

8               THE COURT:  Good morning.

9               MR. ROBBINS:  I will answer your question, and I will

10  answer it initially, but I would also like to alert the Court

11  that I've tried to put together a few slides to explain the

12  analysis that will take it through step by step, and I did not

13  take the path that you're looking for, but I would still like

14  at some point the opportunity to go through that because I

15  think it helps to, on a factual level, put things in a way that

16  it becomes clear why this is a material piece of evidence that

17  we're seeking in discovery.

18      And we acknowledge that the case law, if read literally,

19  the *Popa* case, you look at those, and it looks like an adverse

20  environment for a defendant seeking matters that pertain to

21  pretrial motions, but the reality is when you look at the full

22  scope of the case law, and, remember, the case law occurs only

23  in those situations where there have been a lot of things that

24  have happened, that the denial of the discovery is followed up

25  by a trial and a conviction.  So you're only looking at cases

1   where there were a lot of other pieces of evidence.

2       And often, in this arena, as in many other arenas, the

3   language in the analysis of the court's opinions sometimes take

4   shortcuts and you end up with gaps where the reality and the

5   logical structure does not work.

6       And just to throw one out there for an initial thinking is

7   if you look at the dog record and -- the dog training and

8   records cases, those all go to probable cause.  And so all of

9   the discovery on that is in the probable cause arena.  And so

10  for the Court to leap immediately to say, "How does this impact

11  the jury question?" cuts out an entire area.

12          THE COURT:  I am going on your pleadings.  Okay?  I'm

13  not leaping to the jury question.  You did.  In your opening

14  motion to compel, the first argument was, "This is material to

15  the preparation of our defense at trial."  I didn't quite

16  understand it but I went with it.  Then the Government

17  responds, "No, it isn't.  It is not like *Budziak*.  This is a

18  possession case.  What happens at the pretrial motions isn't

19  relevant at trial."  That was essentially the Government's

20  argument.  They will correct me if I'm wrong.

21      Then you all reply.  You don't really address whether it's

22  material at trial.  You go right to suppression.  I'm okay with

23  having that conversation, but I just want to know are you

24  giving up the materiality argument at trial?  And, if not, I'd

25  like an answer to the question, which is:  How is it material

1   to the question of possession at trial?

2           MR. ROBBINS:  Fair enough, Your Honor.

3       It is -- and this is where we get stuck without the

4   expert.  But it is material if it establishes -- and this is

5   where it's easy for a court to say that's speculation, because

6   we don't have to look -- but if it establishes exculpatory

7   grounds for the files that the Government actually finds, which

8   are not the ones that show up --

9           THE COURT:  Right.  I get that.

10          MR. ROBBINS:  -- and it doesn't really matter.  The

11  results of the search have no bearing on the validity of the

12  search, but it does suggest and it -- and our expert has

13  indicated to us that there are -- there is potential

14  exculpatory material in the way that the source code actually

15  operates, the source code as deployed.  Because that's the

16  other thing we've got to get to eventually is we talk about

17  source code in this monolithic way, but it may not be as

18  monolithic as it appears to us as lay people are looking at it.

19          THE COURT:  Okay.  So proffer to me, since you would

20  have prepared your expert to testify.  Make your record.

21  Proffer to me what the expert would say as to the relevance at

22  trial.  Meaning, the child pornography found in the RAM has

23  some reasonable connection to the way that law enforcement

24  investigates child pornography on the Freenet.

25          MR. ROBBINS:  What the expert would testify to is

1  that the child pornography found in the RAM can be explained as

2  being there without the knowledge of the defendant.

3         THE COURT:  Okay.

4         MR. ROBBINS:  And evidence coming from the source

5  code collection, the actual law enforcement collection method

6  demonstrates how that -- how those files can arrive in an

7  unknowing fashion.  And that would be the place where it's

8  relevant at trial because if those files can arrive there

9  without the defendant knowing -- not that they are not there.

10 That's a different question and that's not really the issue.

11 The issue is does the defendant have to have knowledge.  And if

12 the law enforcement records show that those things are coming

13 in without his knowledge --

14        THE COURT:  Coming into law enforcement?

15        MR. ROBBINS:  No, no.  As they pass -- law

16 enforcement -- this is a massive surveillance system.

17        THE COURT:  Right.

18        MR. ROBBINS:  It pretty much sees everything that

19 comes and goes.  So if the source code shows that, then -- if

20 the source code shows how the files track to the defendant's

21 computer and how they get there, then the records in the source

22 code would -- or the source code program -- I'm calling it

23 source code because I'm not quite to the point of being able

24 to, you know -- Mr. Finci gave me a bigger compliment than

25 necessary or accurate.  I'm not an engineer.  I tend to look at

1  technical questions, which is why he got me involved in this,

2  but I am not a computer engineer.  So I can't answer that

3  specifically.

4      But the discussions we've had with our expert lead us to

5  believe that examining the source code will reveal a pattern of

6  recordkeeping that should demonstrate how those files arrived

7  on a computer, and that would be exculpatory when they are

8  arriving there without Mr. Pobre's knowledge.

9      THE COURT:  Okay.  A couple of things.  One is the

10  fact that there is a program which the Government uses that had

11  obtained probable cause to believe three different files were

12  being sought by your client.  By your own admission, they are

13  different files than what's shown up on the computer, number

14  one.

15      Number two, the fact that you have an expert to explain

16  how Freenet works and how -- I know you're shaking your head,

17  but I've got to tell you, it's not adding up on the really

18  basic level.  Like, forget aiding the trier of fact.  I don't

19  understand the proffer as to how the result of the search done

20  by the Government using its surveillance software to obtain --

21  to see that, according to them, the IP address linked to

22  Mr. Pobre sought three child pornography files that are

23  different than the ones found in the RAM.

24      Run it by me again how getting the Government's source

25  code is going to help your defense that it was unknowingly on

1    Mr. Pobre's computer.

2              MR. ROBBINS:  Thank you, Your Honor.

3              THE COURT:  Okay.

4              MR. ROBBINS:  First, you did hit the probable cause

5    question there, which we do want to get back to.

6              THE COURT:  And we will.  We will.  See, that's the

7    thing.  If you tell me, listen, this really, like, lives and

8    dies on probable cause, I'll hear you.  I'm still trying to

9    understand if it's material at trial, and we'll move on to

10   probable cause.

11             MR. ROBBINS:  And without looking at the source code,

12   I think that we would fairly have to say that the probable

13   cause issue is the stronger of the issues because we don't know

14   whether the recordkeeping -- we're not looking for the

15   recordkeeping that supported the warrant.  We're looking for

16   the records of those files showing up, the files that the

17   Government actually found because if we can show them passing

18   through the Government's system in a way that would show --

19             THE COURT:  Okay.  Are you -- when you say "that the

20   Government actually found," you're talking about the files that

21   were found in the RAM?

22             MR. ROBBINS:  Yes.

23             THE COURT:  Okay.  Now, if the Government puts on its

24   case not mentioning the investigation at all --

25             MR. ROBBINS:  Right.

1          THE COURT:  -- starts the case with, We executed a

2    search warrant on the house and the devices.  This is what we

3    found.  Admittedly, it's in the RAM, but here's the other

4    evidence that we believe shows knowing possession.  Right?

5          MR. ROBBINS:  Understood.

6          THE COURT:  Okay.  Now, how does Freenet become

7    relevant to your defense?

8          MR. ROBBINS:  Freenet becomes relevant and the

9    Government's records become relevant if they show -- and

10   particularly the Government's records as evidence of those

11   files showing up unknowingly.  Part of it you're quite correct.

12   It's just how does Freenet operate.  But part of it is, as our

13   expert explains it, the Government's monitoring system can show

14   them getting there without knowledge.  And I can't explain the

15   details of that to you.

16         THE COURT:  The Government's monitoring system can

17   show how the records ended up on Mr. Pobre's computer.

18         MR. ROBBINS:  Potentially, yes.

19         THE COURT:  But that's not enough.  I mean, that

20   sounds to me like a fishing expedition.  I think you may need

21   to take a step back.  And if your expert wants to put in

22   writing and give it to the Government, if you haven't already,

23   what the expert report would be, you know, and give it to me so

24   that if there is still a fight about -- I don't even know what

25   your expert is going to say on the existence of the -- forget

1   about the Government's surveillance, right.  How is the expert,

2   on a fundamental level, going to explain or aid the trier of

3   fact in your defense, which is, as I understand it, this is

4   unknowing?

5           MR. ROBBINS:  At the trial level, that's correct,

6   Your Honor.

7           THE COURT:  Yes.  Right.  Right.  And so that's my

8   point is until I understand sort of more fundamentally whether

9   you've got an expert who will be included in the conversation

10  because he meets the requirements of an expert, both in his

11  bona fides, his bottom line, the data supporting the bottom

12  line aids the trier of fact, I'm not sure I can then say --

13          MR. ROBBINS:  Understood.

14          THE COURT:  Okay.  Okay.  So then let's press pause

15  on the source code question at trial.

16      And now I want to move to the suppression issue, which I

17  think you do -- and I see this as the closer call.  So I'm

18  going to assume, for the sake of argument, Rule 16 applies to

19  suppression.  So now explain to me the materiality of the

20  source code with respect to your motion to suppress.

21          MR. ROBBINS:  And I will -- can I try to -- I've got

22  a number of slides.  We've already talked for a while so can I

23  try to get through them pretty quickly?

24          THE COURT:  Sure.

25          MR. ROBBINS:  I tend to be more visual.  So I think

1   they help do it.

2          THE COURT:  Okay.  All right.  And so will you use

3   Screen Share so everyone can see them?

4          MR. ROBBINS:  If I possibly can.  I'm working on it.

5          THE COURT:  There we go.

6          MR. ROBBINS:  All right.  I need to do one more thing

7   here so that I can -- maybe I can do it.

8          THE COURT:  Excellent.  Okay.

9          MR. ROBBINS:  All right.  So everybody should have a

10  blue screen up there.  So obviously we're talking about --

11  we've been talking about what's the Government's program.  I'm

12  calling it the Levine Network Investigative Technique.  It's

13  got a bunch of different labels up there.  It's just the

14  easiest way to understand it.

15         THE COURT:  Okay.

16         MR. ROBBINS:  We know that, from the whitepapers,

17  that its purpose is to create a system that is forensically

18  sound that they can use to search for people, as described,

19  that are involved in Internet-based child sexual exploitation.

20      Obviously, from the Court's questions, you're already

21  somewhat familiar with how Freenet works.  I have to confess

22  that before I got involved in this, I was not.

23      But there are a couple of issues here.  There are two

24  Levine whitepapers that the Government has provided to us in

25  discovery, and in the Levine whitepaper, you can see this is

1   the heart of the Levine theory.  And I always get a kick out of
2   science people.  The model is straightforward.  Well, maybe for
3   him.  But that's what the Government has given us.
4       We also have the attachment to the warrant, and you've
5   seen that as an exhibit to another document.
6           THE COURT:  Can you give me, Mr. Robbins, the
7   attachment?  Oh, it's 45-1.  Okay.  Great.  Thanks.
8           MR. ROBBINS:  And this is a screen snip from it.
9   You've basically got three of these blocks that say Freenet
10  Target Summary.  The thing that we are focused on is that big
11  red block in the middle because that's where the problem
12  exists.  We can have an expert look at Dr. Levine's theory, and
13  we have this attachment to the warrant, but this entire process
14  in the middle is a black box.  It's invisible to us.
15          THE COURT:  Okay.
16          MR. ROBBINS:  So there is nothing that we know about
17  the actual process, the procedures, any of the things involved
18  in there, and as we're -- our belief is it's material for three
19  different areas.  There are two tiers of Fourth Amendment issue
20  here.  One is that the LNIT has been deployed without any court
21  involvement at the front end.  So there is no judicial
22  supervision on the deployment, and we believe that it is, in
23  fact, a Fourth Amendment search itself.
24      And the reason -- part of that argument can be made just
25  from the whitepapers, but the reason it becomes important is

1  that from the whitepapers, it becomes clear.  And I've got a

2  couple of snippets of Dr. Levine's testimony in another case,

3  and his testimony is clear as well.

4       As deployed, the LNIT can be modified on scene, and there

5  are bunches of pieces of it that can change its

6  characteristics, and the changes in those characteristics will

7  have impacts in a couple of different areas.

8       The other thing is the LNIT, as deployed, is too

9  inherently unreliable to serve as probable cause for any other

10  search, and that's that red box.  We get to the report that our

11  trooper brings to a state judge and says, "Look, I've got

12  probable cause to go to the physical address attached to that

13  Internet protocol address."  And the problem is the trooper is

14  relying on something that's not reliable and --

15            THE COURT:  Can I stop and ask a question?

16            MR. ROBBINS:  Absolutely.

17            THE COURT:  So you analogize this to drug-sniffing

18  dogs, which, ironically, I was, in my brain, analogizing this

19  to drug lab analysis.  And if you have an affiant who relies on

20  technical expertise of another source, whether it be a lab, a

21  computer expert like Levine, or the K-9 handler, right, and on

22  the face -- there is no dispute that on the face of the

23  warrant, there is probable cause.  There is -- you know, other

24  than saying I can't tell you with absolute certainty that the

25  IP address downloaded these three, but it's more probable than

1    not.

2         Where we are right now is you're saying, "Wait a minute.

3    That's misleading and I'm entitled to a *Franks* hearing because

4    this trooper -- what we know about the Levine method and how

5    it's used, this trooper, the affiant, misled the magistrate

6    judge about the reliability of this information."

7         Like the analogies here, I would expect that before you're

8    asking for the source code from the Government, you're going to

9    be able to demonstrate some other way that there is a need for

10   a *Franks* hearing.  Do you see what I'm saying?

11        Do you have something in this slide deck which is going to

12   show me why even, if you don't get the source code, there is a

13   reason now, based on the evidence, that I should be suspicious

14   of this probable cause proffer or probable cause representation

15   in the affidavit?  Does that make sense to you, Mr. Robbins?

16             MR. ROBBINS:  It does, Your Honor, and it's one of

17   the reasons that I looked to the dog cases.  The sincerity of

18   the belief of the affiant or, in the case of the dog case, the

19   sincerity of the belief of the handler that his dog was doing

20   the right thing does not determine whether there is probable

21   cause or not.  So if the system is established so that affiants

22   are being sent out with fundamentally unreliable information,

23   then they can't hide behind "I've made that representation in

24   good faith" because it's the overall system that has the issue.

25             MR. FINCI:  Your Honor, can I interject for one

1  moment?

2          THE COURT:  Sure.

3          MR. FINCI:  We did file a motion for a *Franks* hearing

4  in this case.

5          THE COURT:  Yes.

6          MR. FINCI:  What we had preliminarily.  We argued

7  some material omissions from the affidavit that we are -- you

8  know, we found through the initial discovery and the initial

9  whitepaper that we received.  And this was the later whitepaper

10 that was even more clear and provided more information.  We

11 argued a series of omissions.  I didn't review this before our

12 hearing today to just get it fresh in my mind, having written

13 it back in March or April, but we did ask for a *Franks* hearing

14 and outlined, you know, consistent with what I think you're

15 thinking, why that red area is so important.

16         THE COURT:  And that's why this is -- I'm not sure if

17 it's quite -- if I can really -- so I looked at the motion to

18 compel, and I haven't really dived into the *Franks* hearing

19 because they were separated.  And so I don't yet, without a

20 better understanding of your *Franks* issue -- I can't even

21 say -- it doesn't strike me right now as relevant, frankly, or

22 material to the defense because I haven't yet been persuaded

23 that there is a knowing or reckless material misstatement or

24 omission in the report.  So I almost have to go -- you know,

25 I've got to go back and really understand your pleadings on the

1   *Franks* issue, assuming, again, that Rule 16 even applies.

2       But I'll tell you, it's kind of six in one, half a dozen

3   in the other, right, because if I give you a *Franks* hearing,

4   I'm going to expect that the Government explained how they got

5   where they got, right, because you only get a *Franks* hearing if

6   you pass the threshold that there is a material omission or

7   comission that's knowing and reckless.

8       So I almost think, like, the question of a motion to

9   compel is mooted if I find, based on your suppression hearing

10  pleadings, that you have rung the bell on a *Franks* hearing.

11  And then it's a question of can the Government demonstrate,

12  just like in the dog in the drug cases, there wasn't some, you

13  know, knowing use of an unreliable system to get to the

14  probable cause finding.

15      Am I making sense?  First I'll start with the defense and

16  then I'll turn to the Government.

17          MR. ROBBINS:  Your Honor, I think the issue is that

18  *Franks* hearings tend to be focused on whether or not the

19  affiant was making knowing and reckless representations.

20          THE COURT:  Right.

21          MR. ROBBINS:  So there is -- again, there is a gap in

22  that probable cause needs to be based on some valid set of

23  factors.  If we tell our law enforcement folks that some -- you

24  know, a magic dowsing branch will allow them to identify

25  criminals of a certain sort, and if it shakes in your hand,

1   that's probable cause, and they go in and they make affidavits

2   from that because they are true believers, it may not be

3   reckless on the part of the officer if that's what the officer

4   has been trained and if they have been told this system works.

5   It's magic.

6        Behind the box there is a lot of magic, and when you get

7   one of these reports, you can rely on it.  That's the training

8   that the officer gets.  That doesn't mean that the Government

9   then gets to hide behind the fact that the officer was

10  misinformed.

11              THE COURT:  Right.

12              MR. ROBBINS:  And the problem that we see is that the

13  network investigative technique at issue here -- and "at issue

14  here" means as deployed.  So it's even a step beyond what the

15  whitepapers describe at the theoretic level because there is an

16  opportunity for changes to the system, and that's part of what

17  Dr. Levine's testimony is about.  He can't testify to a lot of

18  things because he doesn't know how the network investigative

19  technique gets changed in the notes that it's placed on or how

20  the data gets collected.  There is a lot of stuff that he just

21  doesn't know.  When he's been asked questions in hearings and

22  other cases, he says, "I don't know.  The law enforcement is

23  doing that."

24        So, again, we're in that red box where there is stuff that

25  Dr. Levine can't say whether it's reliable or not.  He knows

1   that his technique is reliable if it's implemented under the

2   controlled circumstances that he used in the lab.  And we know

3   that our trooper believes that the report that he got is

4   reliable because that's what he was taught in his training.

5        But there is a huge gap of functionality between

6   Dr. Levine's theoretical construct and what shows up in that

7   report.  There are a lot of things that happen that Dr. Levine

8   has testified to.  And I've got -- like I said, it's about a

9   30-slide deck, and we're only six slides in.  So I don't know

10  if we're going to get to all of them, but there are many places

11  where Dr. Levine has said, "Well, I don't know that."  When

12  he's been asked questions about how the system actually works

13  in other hearings, he says, "I don't know.  That's law

14  enforcement.  That's not me."

15       So when we say that we have to be able to figure out all

16  of the issues from only the whitepaper, that's pretty tough

17  because there is just a gap in the process, and in that gap, we

18  believe is the evidence that supports both levels of our Fourth

19  Amendment challenge.

20            MR. FINCI:  Your Honor, one of the -- in the *Franks*

21  motion, in the Freenet Target Summary, there was one of those

22  files that was found to be one of the target files, in the

23  summary, was logged with requests for that file over a period

24  of 48 hours.  That's a long period of time, which is far

25  longer, far longer than the Levine whitepaper says is the

1   amount of time for the logging to -- the maximum amount of time

2   for logging to occur for a particular file before a result can

3   be recorded, a favorable result.

4        So there is an example, specifically in our case, of their

5   evidence not matching up with the Levine report, and we don't

6   know why the source code would have reported this file as a

7   target file when the logging occurred over 48 hours.  That's

8   just one example.  It's very complex the way this program

9   works, but that's one of the examples in the *Franks* motion

10  that's not reported to the judge in the district court for why

11  maybe there is some question as to reliability of what was

12  reported in the affidavit.  That's one of the things we're

13  trying to get at.

14            THE COURT:  So, again, it does sound to me like what

15  needs to happen, though, is I've got to have the hearing on the

16  *Franks* issue, and I would imagine that your expert would be

17  able to proffer or to testify to me and, in advance, give, you

18  know -- I don't have Rule 16 memorized, but I would imagine

19  that there would be some disclosure of dueling experts.

20       But bottom line is the expert would tell me the relevance

21  of the source code to get to what the expert sees as the

22  factual gap, the gap between what the affidavit says and what

23  the source code summary says and what he knows about the

24  algorithm, how it works, to say this is not reliable, Judge,

25  and you have to treat this like the dog sniff case or the other

1    cases in which the Government is not simply allowed to, you

2    know, use an affiant as a trojan horse for unreliable evidence.

3        Am I getting your argument right?

4            MR. ROBBINS:  I believe that you are, Your Honor.

5            THE COURT:  Have you supplied -- let me ask you this.

6    Have you supplied me with the Fourth Amendment law that

7    analogizes this to the K-9 sniff or the drug dog or the drug

8    reports?  And what I mean by that is cases that take good

9    challenges, independent challenges to the validity of the

10   method that was used to obtain evidence that supported a

11   probable cause finding in an affidavit for a search warrant.

12           MR. ROBBINS:  You added some pieces to that.  The

13   short answer is going to be probably no, but I wanted to get

14   the pieces again so that we can.

15           THE COURT:  Yeah, so here's the -- here's where I'm

16   not sure how the law works, because I don't necessarily think

17   you all have briefed it yet.  You've got an affiant and assume,

18   based on your argument, the affiant is just following orders

19   and using the manual as the affiant is told to do and doesn't

20   know or profess to know how it works behind the scenes, right,

21   but there is credible evidence that the behind-the-scenes work

22   is unreliable.

23        Taking your example, the drug -- the sniff or an

24   unreliable lab report.  So the affiant says, "We field-tested

25   the drugs found in the car.  It's cocaine.  The lab confirmed

1   it and then we hit the house with a search warrant."  And it

2   turns out that the lab was wrong.  Their methodology was

3   terrible.  It wasn't cocaine.  It was baby powder.  How does

4   the law, Fourth Amendment search warrant law treat that?

5           Is that simply a, you know, too-bad so-sad for the

6   defense?  You can raise it at trial, but it is not a reason to

7   invalidate the search warrant?  Or is it a basis -- I guess it

8   may be very fact-dependent, but is it a basis to say you're

9   entitled not only to more discovery but a *Franks* hearing?  Do

10  you see what I'm saying?

11          MR. ROBBINS:  Absolutely, Your Honor.

12          THE COURT:  Okay.

13          MR. ROBBINS:  And that's the direction we're going.

14  Obviously, by the time you get to trial, if it was a bad lab

15  test that was the probable cause but when the house was hit,

16  there were -- there was a kilo recovered, then the Government

17  is not even going to worry too much about whether it was a bad

18  search because that's not the issue anymore.  And certainly, if

19  there is an appeal, they are going to say there was

20  overwhelming evidence.

21          THE COURT:  Right.

22          MR. ROBBINS:  And so the whole point, the whole thing

23  that makes that lab test material is should the search warrant

24  have been issued in the first place?

25          THE COURT:  Right.  Right.  Which is --

1          MR. ROBBINS:  And that -- you have pretty much hit

2    the nail on the head with respect to what we are aiming at here

3    in that red box is that this makes a difference in, A, you

4    know, was there a search?  In the dog cases, you know, they

5    pretty much acknowledge this as -- they have been defined.

6          What hasn't been defined here is, is this network

7    investigative technique the equivalent of a cell site simulator

8    or an equivalent of a *Carpenter* cell location data?  Is the

9    level of intrusion into this network such that, under the

10   existing Supreme Court law, this is -- just the very existence

11   of this Levine Network Investigative Technique, as deployed by

12   law enforcement or whatever they put on it, is a Fourth

13   Amendment search because of what it picks up and how it tracks

14   it?

15         There are variables, and we're not going to get to all the

16   slides, but there are variables.  Some of them are in the

17   whitepapers.  Some of them are acknowledged by Dr. Levine in

18   testimony that -- that can be done.  The network investigative

19   technique is built in Java.  It is a source code that is

20   accessible to computer people.  Most of the law enforcement

21   folks working in this area are computer people.

22         And Dr. Levine says, "I don't know what's out there for

23   deployment.  I know what my test was.  I know what I can

24   validate there, but if you start asking me about how does the

25   system run, how does it accumulate data, how many knowns are

1  there, I can't answer any of those questions."

2  THE COURT:  So let me ask you this.  If at the

3  suppression hearing you say, Listen, before we even get to the

4  search warrant, we want an opportunity to demonstrate, Judge,

5  that there is a privacy interest that was invaded.  And there

6  is no exception to the search warrant that has been triggered,

7  and we're going to use an expert to do that and the expert will

8  educate you on Freenet, will educate you on why there is a

9  reasonable expectation of privacy on Freenet and how it was

10 invaded.  And then that expert does that and says -- and

11 acknowledges, Listen, if I had the source code, I could

12 strengthen this.  Or this is what I need from the source code

13 to get me to the place where I can fully explain to you why

14 it's an invasion of privacy.  That's going to be a separate

15 matter than the search warrant.

16 If we get there, then the Government is going to have to

17 respond and, you know, it may be -- it may be, I don't know

18 because we're not there yet, put up the search -- put up your

19 own expert or put up the search code to explain why it's not,

20 or I'm left only with what the defense tells me.

21 Do you see what I'm saying?  Like, the more we talk, the

22 more I'm thinking, one, the Government's alternative request of

23 if you're going to allow the expert, allow it at the

24 suppression hearing, we'll deal with it then is the better

25 course.  And, two, the discovery request is somewhat

1    preliminary.  I'm not saying it's not ultimately going to be

2    granted or denied.  I don't know.  But it feels very unripe

3    right now because we're not -- I have no factual predicate for

4    some of these proffers.

5             MR. ROBBINS:  Agreed, Your Honor.  And that's part of

6    the reason that we wanted to get an expert in front of you.

7         The problem on sequencing for the trial process from the

8    perspective of the defense is that if we don't get to do that

9    red box analysis first, then whatever happens in the initial

10   network investigative technique assessment and then in the

11   reliability assessment, the two different tiers of the Fourth

12   Amendment, one is a Fourth Amendment search in the first

13   instance by standing up the network investigative technique in

14   the way that it was stood up, the second is the output an

15   unreliable output from the purposes of swearing out a warrant,

16   both of those are going to depend, in large measure, or we

17   believe that they are going to be informed in large measure by

18   what the expert learns in inspecting the source code as to the

19   system as deployed.

20        And that's why we think that we kind of have to make that

21   leap first, but we acknowledge that we need to have an

22   affidavit from our expert as to what he thinks he can do with

23   it based on what he's read already in the two whitepapers and

24   then what the source code is going to allow him to show in

25   addition to that.  That's where we're trying to go with it.

1           THE COURT:  Well, and maybe even -- I mean, that's

2    where I think an affidavit and/or testimony would be helpful.

3    I just don't see it as yet you have demonstrated the need to

4    get the source code yet.

5           MR. ROBBINS:  Short of the affidavit, Your Honor, I

6    suspect that the Government would have an appeal almost

7    immediately and we would lose.  So we're trying to get that

8    affidavit to you.  We understand that.

9           THE COURT:  Okay.

10          MR. ROBBINS:  And that may be where we need to be for

11   today in that the -- at least with respect to the source code.

12   We can move to the other items here in a moment if you want,

13   but at least with respect to the source code, that is -- that's

14   probably the reality is that the Court needs more from us, and

15   the "more" would be in the form, at least, of an affidavit.

16       And maybe once there is an affidavit, the Government is

17   going to say, "We want a chance to cross-examine that witness,"

18   but we have to be there in order to get to the discovery that

19   we believe we need to ultimately address those fundamental

20   issues at the two different levels of Fourth Amendment.

21          THE COURT:  Okay.  And from what I can tell from the

22   docket, there is a response to the motion to suppress but there

23   has not been a rely.  Is that right?

24          MR. FINCI:  That's correct, Your Honor.

25          THE COURT:  Okay.  So what we'll set today is -- I do

1    want these issues, to the best you can, to be responded to, the

2    ones that we just discussed.  And then I'll give the Government

3    an opportunity, if you wish, to -- essentially a surreply

4    because I've raised some issues, and I think I ought, in

5    fairness, give the Government an opportunity to address what

6    the defense says.

7        And then at the suppression hearing is when I would expect

8    we will deal with this preliminary question of whether the

9    defendant maintains a reasonable expectation of privacy in

10   Freenet and, if so, does, as you say, standing up the

11   warrantless search, the first warrantless -- you know, I see

12   this as currently not much different than when law enforcement

13   agents pose as a victim or a participant in some criminal

14   activity.  They are undercover.

15       And so I've got to tell you, like, I'm not yet seeing how

16   this is an invasion of a reasonable expectation of privacy.

17   But the Government needs to respond to that and then that the

18   expert would be best placed there.  After I understand your

19   arguments with respect to the warrantless search and then your

20   arguments with respect to even if the affiant is sort of

21   unawares of all of these unreliable pieces to the initial

22   search, I should, nonetheless, put good faith aside or have a

23   *Franks* hearing for the following legal reasons, that's what I'm

24   expecting to see from the defense and then the Government

25   should respond.

1          With that in mind, Government, is there anything --

2  because I haven't -- and you're right.  We didn't get through

3  slides 7 through 30, Mr. Robbins, but they might -- I mean, if

4  there is any -- let me ask you this.  Before I turn to the

5  Government, is there anything else that you wish for me to know

6  today?  Or are these things best reserved for the suppression

7  motion?

8          MR. ROBBINS:  There are other items.  Your Honor, if

9  you recall, there were a number of items that were requested,

10 not just the source code.

11         THE COURT:  Right.  Yeah, I'm sorry.  My question was

12 limited to the source code.

13         MR. ROBBINS:  Okay.

14         THE COURT:  So the rest of the slide deck has to do

15 with the source code, and you're okay with I don't need to see

16 the rest of the slide deck right now because the source code

17 question is going to be for another day.  I just want to make

18 sure there is nothing else you want me to see before I turn to

19 the Government on the source code.

20         MR. ROBBINS:  I think you understand our position

21 well enough that I don't need to run you through the rest of

22 the slides with respect to the source code.

23         THE COURT:  Okay.  All right, great.

24      So Government, this is where I am preliminarily.  Any

25 issues with let's table this for another day?  I'm not inclined

1   to say that the defense right now is entitled to the source

2   code.  So but I don't want to say forever because it's so

3   inextricably intertwined with suppression.  And so while it may

4   not be a square question of Rule 16 because I haven't heard

5   much to say it's material to the preparation of the defense at

6   trial, and I think that the question on suppression is

7   premature, it seems like we've got to get into the merits of

8   the suppression motions and then come back to this question of

9   source code.

10      Do you disagree with that?  You're on mute, Mr. Draughon.

11          MR. DRAUGHON:  Sorry about that.  Can you hear me,

12  Your Honor?

13          THE COURT:  Yes.

14          MR. DRAUGHON:  I actually think that this is an issue

15  that could be resolved today.  I think we were in a posture

16  before in which the defendant wanted to bifurcate the hearing

17  and have the motion to compel first.  And now that after an

18  hour of proffer and argument and after a year of discovery

19  being produced and motions being filed about nine months ago,

20  we're at a point where they just can't present a coherent

21  reason as to why the requested items are material.

22          THE COURT:  No, that's not accurate.  And that's why

23  I want you to really sort of meet me where I am and tell me why

24  my understanding is wrong.  Rule 16, yes.  There hasn't been

25  much told to me why this is, from the black letter law,

1   material to the preparation of the defense at trial, and so as

2   we are right now, I'm going to deny the motion on that basis.

3        But there is a live question as to the relevance at the

4   motion to suppress stage.  The defense has raised the argument,

5   at least, that the technique itself is an invasion of a

6   reasonable expectation of privacy, and there was a warrantless

7   search, and the violation from there forward, you know,

8   everything needs to be suppressed.  Alternatively, there is a

9   problem that I don't quite understand yet that the defense is

10  saying we're going to make more clear to you, Judge, for which

11  the technique is unreliable, and the defense is going to be

12  able to show that through an expert, and the defense is going

13  to be able to show through an expert that the source code would

14  aid in that argument.

15       So I'm agreeing with you.  The motion to compel isn't

16  going anywhere today.  But at suppression, this is very

17  intertwined with the merits of their argument, and I'm simply

18  making sure you understand it's -- we're not out of the source

19  code woods yet because there is a world in which the defense

20  persuades me of either argument.  You know, I just don't have

21  enough yet.

22       So I wanted to understand if you have anything

23  preliminarily you wish for me to know on tabling the source

24  code question until I have a better understanding of the

25  suppression issues.

1          MR. DRAUGHON:  Again, I just think that based on the

2    arguments that were made in their briefing, that this was a

3    matter that would be relevant to the case in chief, and I think

4    that there is a concession that that wouldn't apply.  And the

5    case law makes it clear that if it's not relevant to the case

6    in chief and for the defense of the case in chief, it's not

7    subject to discovery under Rule 16.

8          THE COURT:  Well, under Rule 16.  But you get into a

9    suppression hearing, right, and the defense puts up enough that

10   I say, well, on this record, it seems like there is a

11   reasonable expectation of privacy, or, on this record, it seems

12   like there is serious questions about how the Government

13   conducts its surveillance and communicates that to the affiant,

14   if they persuade me of that, there may be a world in which you

15   need to put up an expert to say, Judge, their expert is all

16   washed up.  The source code is irrelevant, but here is why

17   their argument fails.

18        Or, alternatively, that there is some -- I'm just -- I

19   guess what I'm trying to understand is -- well, maybe this is

20   an unfair question because these are really so tied with the

21   merits of suppression, and your basic point is correct.  There

22   isn't enough right now that I would warrant disclosure under

23   Rule 16.

24        I just want to make sure that we're all on the same page.

25   That doesn't mean that's the law of the case, as they say, that

1    I'm never going to disclose the source code, because I see the

2    question of suppression as still very much alive, and the

3    relevance of the source code is open in my mind.

4        Does that make sense to you, Mr. Draughon?

5        MR. DRAUGHON:  Your Honor, if the idea is that there

6    can be an articulable argument to be made for suppressing the

7    search warrant, and I think at a very basic level, even without

8    getting into the weeds, that there just isn't because they

9    concede that the officer would have reason to believe in the

10   validity of it, and we have testimony that has been presented

11   as exhibits to the defendant's filings in which Dr. Levine

12   makes it clear this is accurate and that it is simple and that

13   it is not an invasion of privacy.  And terming it as a network

14   investigative technique is simply misleading.  It's false.  It

15   is not that.  We have law enforcement nodes that are sitting

16   there passively.

17       So, you know, at a basic level, it wouldn't even get close

18   to being able to establish that there is something to do with

19   the source code.

20       And multiple courts have acknowledged, including this

21   court, that there is no basis to suppress off of whether or not

22   the source code is somehow unreliable.  It is very reliable,

23   and the Levine paper that they cite to makes it clear that

24   we're looking at a 98 percent accuracy rate.

25       So the idea that there is something nefariously in the

1  middle that is a missing link that shows that this analysis

2  that shows 98 percent reliability and law enforcement relies on

3  that would somehow expose something is speculation, at best.

4          THE COURT:  Well, right.  No, I hear you that you're

5  of the mind there is really no -- there is no there-there and

6  that this is just a defense, you know, pressing where -- or

7  seeing ghosts.

8          But there's two arguments on the table.  One is we don't

9  even get to *Franks* because there is a warrantless search.  And

10 so I do expect that you all are going to take it, you know,

11 methodically through that analysis.  It's not a warrantless

12 search.  There is no reasonable expectation of privacy, and the

13 manner in which this thing is set up called Freenet, no one has

14 an expectation of privacy, and there was nothing about this

15 search that suggests otherwise.  I know -- I've seen in the

16 papers that there has been some conversation about that.  I

17 guess to the extent that there is more meat to be put on those

18 bones, do it.

19         And then, secondly, even if there were, the law that I

20 don't have a real hard grasp on is say the defense shows that

21 it is unreliable.  I know you say it's not.  But say they show

22 this technique is just horse pucky, as they said in math, which

23 is way before your time.  It's horse puckey.  It has no basis

24 in science whatsoever, but the affiant relied on it.  Do you

25 win?

1      You know, in looking to other places in the law, I know

2  there is probably not a tremendous amount of law on this, but

3  there has got to be some guidance, because in many other

4  aspects, affiants rely on experts and someone else's expertise

5  all the time.  So I need that to be teased out because if, as

6  you say, the answer is, no, the buck stops with the good-faith

7  representations of the affiant, then the likelihood that the

8  source code is going to matter is really slim.

9      Does that -- so the way I'm thinking about laying it out,

10  because I'm going to give the defense an opportunity to inform

11  me based on the conversation we've had today, and then I'm

12  going to give you one as well, and then we'll have a hearing.

13  Does that make sense?

14      MR. DRAUGHON:  Yes, I'm fine with that.  These issues

15  were intertwined.  So I can understand Your Honor wanting to

16  hear them at the same time.  I think we could argue it today,

17  but I perfectly understand waiting until we hear all of the

18  issues at once.

19      THE COURT:  Well, I'm also very concerned -- I mean,

20  you all need to talk about this.  I am happy to have a

21  suppression hearing by Zoom, but I think I'm an outlier as a

22  judge, that most judges on the bench would not do that, and I

23  probably, if I really thought about it, would say even if the

24  defendant consented, we need to do this in person.  We need to

25  do this live, and I'm willing to do that.

1      So I don't know if you all want to try to pick a date

2  today or get with each other and your respective experts and

3  then talk to Ms. Brown about a date.  But, yeah, the issues are

4  too intertwined for me to call it one hundred percent.  Yeah.

5  And I'm not going to argue, obviously, the merits of the

6  suppression today by Zoom.  And you need to brief some more.

7      So what's your druthers?  I don't believe we set a

8  suppression hearing date.  Have we?

9          MR. DRAUGHON:  No, we have not, Your Honor.

10          THE COURT:  Okay.

11          MR. FINCI:  My druthers would be to discuss it among

12  ourselves, since we both have experts, and Mr. Draughon is

13  probably going to want to bring in Dr. Levine from

14  Massachusetts.  So it would probably be easier for us, rather

15  than hash it out over Zoom, to talk about it and get a date.

16          MR. DRAUGHON:  I agree.

17          THE COURT:  All right.  That's fine.

18      Okay.  Well, this is what I would like you to do then.  If

19  you would talk amongst yourselves as to a proposed reply date

20  and surreply date for the pleadings that we've discussed, a

21  milestone date for you all to exchange expert opinions, and

22  that's set by me, and if the rules don't provide it, I want you

23  all to do it, and then a proposed hearing date that gives me at

24  least two weeks after you have filed your pleadings to get

25  really comfortable with the material.  When you give that

1  proposed hearing date, let Ms. Brown also -- or let us know in

2  the status how long you think the proceeding will take.

3       This would be like a jury trial without a jury.  So we

4  have to follow a lot of safety protocols.  It takes a good

5  amount of effort to pull off safely in-court proceedings these

6  days.

7       Mr. Baldwin is shaking his head.  Have we woken up

8  Mr. Baldwin?  No, I'm just giving you a hard time, Mr. Baldwin.

9  He's smiling.

10      So you all know, it will take a bit.  And so I want to

11 make sure that we give our staff enough time.  And I have to

12 run it through our central process right now to make sure

13 whatever date -- so give us more than one date -- that whatever

14 dates you propose and the length of time and the number of

15 witnesses, we can get scheduled.  And then it will be firm,

16 too, because there is just -- the days of rescheduling things

17 at the last minute, especially when they are either in Zoom or

18 in court, are over.  So you've got to be really, really clear

19 we're going to go forward on that date.

20      Does that make sense for everybody?

21           MR. DRAUGHON:  Makes sense, Your Honor.

22           MR. FINCI:  Yes.

23           THE COURT:  Okay.

24           MR. FINCI:  So, Your Honor, can I ask for

25 clarification on something?

1            THE COURT:  Sure.

2            MR. FINCI:  I'm going to prepare a reply to the

3    Government's response to the motions.  The reply is going to

4    address, because our hearing is going to address, the Fourth

5    Amendment argument.  In other words, the investigative

6    technique in and of itself.  We're only going to address that

7    piece.  And we're going to address, I guess, perhaps, whether

8    good faith would apply even if the probable cause were

9    unreliable.  So assuming that the -- that red area was

10   unreliable, we're going to address whether good faith would

11   apply.

12        Now, the reason I'm trying to clarify is because in the

13   Government's motion, there was Fifth and Six Amendment issues

14   related to statements.  We can hold that back for the reply for

15   now and have an opportunity later.  I'm just asking.  I'm

16   hoping the Court could clarify because I need to know what I

17   need to reply to if I'm doing an overall reply.

18            THE COURT:  Right.  I get you.

19        Mr. Draughon?

20            MR. DRAUGHON:  Your Honor, I would prefer the reply

21   captured all of the motions in issue rather than continuing to

22   piecemeal this.  I think we're in the situation now because

23   there was a preference to separate the motions, and that should

24   not have been done.  And I don't want to continue to do this

25   where we run into a situation and then once again there is a --

1          THE COURT:  Well, I was going to actually ask if

2     there is anything to reply to.  I mean, I haven't dove into the

3     statements question but, you know, if it's relatively black

4     letter and the facts are pretty clear, is there a need to

5     reply?  Are we just getting in court and taking testimony and

6     then you're arguing from that testimony?

7          MR. FINCI:  To be frank, Your Honor, what I would

8     want to have replied to is the argument that my client wasn't

9     in custody that the Government made when -- that is a

10    testimonial question for the most part, I think.

11         THE COURT:  Right.

12         MR. FINCI:  Not so much a legal question.  Well, it

13    is a legal question.  It has elements but they are well-known.

14         THE COURT:  Correct.

15         MR. FINCI:  So it's not like I can -- it will be --

16    some day it will be addressed by testimony of my client and his

17    wife.

18         THE COURT:  Right.

19         MR. FINCI:  Correct.  So that is true.  It's not a

20    technical-legal issue, per se.

21         THE COURT:  Right.  So something like that it seems

22    to me that there wouldn't be another need for a round of

23    pleadings on the law because the law, more or less, is

24    established.  I'm pretty familiar with it.  Now I need to hear

25    the testimony.  And if something comes up during the testimony

1  that needs additional briefing, you can either, you know, bring

2  it to my attention there or we can address it afterwards.

3          MR. FINCI:  I'll put in just a paragraph or two just

4  suggesting custody is at issue and this is the elements and

5  that's it.

6          THE COURT:  And that's fine.  I can't imagine that

7  there is going to be much fight about the elements of a

8  non-custodial versus custodial interrogation, and it's very

9  fact-bound.  So we're going to be dealing with the testimony.

10     Okay.  All right.  But, yes, everything else that you

11  said, Mr. Finci, captures better than I did the issues that are

12  before us.  Okay.

13          MR. FINCI:  All right.

14          THE COURT:  Anything else that you all need from me

15  then?  I'm just going to wait for your status report to tell me

16  pleading dates and suggested hearing dates.  Feel free to reach

17  out to Ms. Brown if you want to clear some dates with her

18  before putting them in the motion so that when we get it, we

19  are clear, you know, that this is what we're going to enter.

20          MR. ROBBINS:  Your Honor.

21          MR. DRAUGHON:  Sorry.  Go ahead.  I have a brief

22  scheduling question.  So I'm expecting a baby November 20th.

23          THE COURT:  Congratulations.

24          MR. DRAUGHON:  Thank you.  So there is going to be a

25  block next month in which I would be uncomfortable trying to

1 schedule something and, you know, in respect to the Court's

2 calendar and how difficult it is to schedule things.  So what I

3 would ask is that if we can't schedule something in early

4 November that's safely far enough from the expected due date,

5 that we push it to December.  And I just wanted to make sure

6 that the Court was okay with that large gap in between if we

7 have scheduling issues.

8          THE COURT:  Yeah, I'm not going to hold -- you know,

9 a baby coming is a blessing.  It's a good thing.  So either

10 you -- I can do it early in November.  That will be a quick

11 turnaround for you all in terms of pleadings, though, because I

12 do want a little bit of time to chew on everything before we're

13 in court, as well as getting all of your witnesses lined up.

14 But I'm fine with doing it if you can agree on a date and get

15 all of your witnesses in a row.

16     Likewise, if you want to push it off until, you know, some

17 time after -- during or after the holidays, I mean, I'm around.

18 I'm not going anywhere and there aren't --

19          MR. FINCI:  Who is.

20          THE COURT:  Yeah, right?  You all are my vacation.

21 It's sad.  So I'm happy to do it, you know, whenever you all

22 agree.

23          MR. DRAUGHON:  Understood, Your Honor.  Thank you.

24          MR. FINCI:  Thank you, Your Honor.

25          THE COURT:  All right.  Anything else?

1          Mr. Robbins, you had a question?

2          MR. ROBBINS:  Yeah.  There were three other items

3   that were in dispute, and I don't know if you want to leave

4   those all to be resolved.  They all concern things that

5   happened -- well, that's not entirely true.

6          With respect to the manuals and the records, that's in the

7   red box.  With respect to the peer review and the awards and

8   grants, that's really stuff from the expert papers, and those

9   we probably don't need expert testimony to say why we need them

10  and it's --

11         THE COURT:  But the Government's argument for all of

12  them is we don't have it, and the one question I would have

13  with respect to that is with the affiant, the trooper.  You

14  know, it's -- I think it is a reasonable lift to say we don't

15  have whitepapers on an independent statistician, or whatever he

16  is, about the reliability of the Levine method.

17         What am I missing?

18         MR. ROBBINS:  In Dr. Levine's whitepaper --

19         THE COURT:  Yeah.

20         MR. ROBBINS:  -- he represents that his whitepaper

21  was produced -- I'll go to the peer reviews first.  He

22  represents that his theory has been peer reviewed.

23         THE COURT:  Right.

24         MR. ROBBINS:  Part of his papers will be what those

25  peer review questions were and what the result of it was.

1          THE COURT:  Okay.

2          MR. ROBBINS:  And to the extent that the Government

3    controls their witness, they control that paper.  That is

4    relevant to where the --

5          THE COURT:  Well, here's the thing.  I don't know if

6    the Government is going to call Levine.  Levine is not law

7    enforcement.  They have proffered to me they don't have it.  So

8    I have -- there is nothing for me to call yet.  I can't make

9    the Government choose to put Levine on or ask him for this

10   material.

11       If Levine is called as a witness, and if the Government

12   still maintains it's not in their possession, custody, or

13   control, then we deal with it at the hearing, but I'm not

14   prepared today to tell the Government to go get this

15   information from Levine.

16         MR. FINCI:  Your Honor, I presume we could file a

17   motion with Your Honor for a pretrial subpoena.

18         THE COURT:  Well, I mean, I'll hear -- you mean with

19   respect to this information and serve it on Levine?

20         MR. FINCI:  Correct.  We can do that.  I don't know

21   whether the Government would then file -- or Dr. Levine would

22   file some sort of motion to quash.  It seems like it's a lot of

23   pieces that are -- should be unnecessary but we can do that.

24   So --

25         THE COURT:  Well, if the Government says Levine is

 1  expected to be a witness, then we have a Rule 17 problem, but

 2  then it calls into question whether this information is

 3  discoverable.  So I'll ask the Government that in a minute.

 4      But you've posed the same question with regard to the

 5  trooper's manuals.  Am I right about that?

 6          MR. ROBBINS:  Correct, Your Honor.

 7          MR. FINCI:  Although, the Government posed the issue

 8  of law enforcement privilege as to the manual, not as to the

 9  peer review, I presume, but as to the manual.

10          THE COURT:  Okay.  So let me turn to the Government

11  then on two things.  One is if we get to the point where I'm

12  hearing -- I'm granting a *Franks* hearing and I am hearing from

13  this trooper as to his methodology, would you agree that the

14  source of his instruction is relevant?

15          MR. DRAUGHON:  I mean, so much as that a *Franks*

16  hearing is about the trooper's knowing omission or knowing

17  misrepresentation of something in the affidavit, I don't think

18  that the source code or what he would have been basing it off

19  of is particularly relevant.  And I don't know if --

20          THE COURT:  What if the answer is there are no

21  manuals or the manual is too lines and it just says believe

22  him?

23          MR. DRAUGHON:  Yes, Your Honor.

24          THE COURT:  Doesn't that become relevant?

25          MR. DRAUGHON:  So there are two buckets.  There is

1   the law enforcement manual and then there is the stuff related

2   to the papers, and I was unclear as to which one we're talking

3   about.

4        The law enforcement manual first.  I think the same

5   argument that we have when it comes to the source code about

6   materiality and law enforcement privilege will come up again.

7   So if we're going to push the source code discussion out, I

8   think it would make sense to also deal with the law enforcement

9   manual then.  Do we even get to the point of a *Franks* hearing?

10  Do we get to the point of a discussion of motions to

11  suppression?  I think we have to table that.

12       And with regard to the opportunity, you know, the awards

13  and the grant and the peer review, it's completely -- it's not

14  relevant.  You know, it's just not close --

15            THE COURT:  Well, are you going to object?  Are you

16  going to object if the defense issues a subpoena on Dr. Levine?

17            MR. DRAUGHON:  Your Honor, I'm not going to -- at

18  this point, you know, it's not in our possession because it's

19  not material and certainly not exculpatory.  We were inclined

20  to make an effort to produce --

21            THE COURT:  That's not my question.  My question is

22  if you say to the defense, "Go get it.  If we don't have it, we

23  don't believe you're entitled to it," and then they do that,

24  are you going to come back and say the defense way overstepped?

25  They are trying to obtain by subpoena information that is

1  within the custody or our witness.

2      I've been there.  I've done that.  It's not a good place

3  to be as a defense witness.  So -- or defense attorney.  So

4  careful.  Defense attorneys are asking this question, and if

5  the question is -- you know, if the answer is I don't know,

6  then you need to make a decision about that because it's either

7  going to be available to the defense by way of subpoena and let

8  Dr. Levine say why, you know, move to quash.  Or it's a live

9  question as to whether it's available under Rule 16 because

10  you're going to put him up as a witness and then you have to go

11  back to the rules and figure out what you have to produce.

12      It very well may be relevant to the basis of his opinion.

13  So I'm just saying, like, you know, if you know now, say it so

14  that the defense knows how to prepare.

15          MR. DRAUGHON:  Your Honor, I haven't spoken to my

16  expert to have a sense of how accessible it will even be to him

17  and how much of a burden it would be to him to pursue --

18          THE COURT:  When you say your expert, do you mean

19  Dr. Levine?

20          MR. DRAUGHON:  Yes.

21          THE COURT:  Oh, so he is a witness.

22          MR. DRAUGHON:  He would potentially be a witness in a

23  motion to suppress.

24          THE COURT:  Oh, okay.

25          MR. DRAUGHON:  If we were to call him.

1          THE COURT:  Okay.  Well, then I have my answer, which

2    is you would be making an objection if the defense tried to

3    subpoena this information.

4          MR. DRAUGHON:  Yes.

5          THE COURT:  All right.  Now we're making progress.

6      Why isn't it relevant?  Whether Dr. Levine represented

7    that his methodology in a paper was peer reviewed -- let's just

8    start there because that's a big one.  In the world of experts,

9    saying something is peer reviewed is, you know, is saying that

10   a non-expert can rely on it.  You know, it's others have looked

11   at it of similar training and experience.  Why is that not

12   relevant?

13         MR. DRAUGHON:  Well, just to be clear, either within

14   the -- so there were four discovery items.  The first was the

15   manual but then there is any sort of peer review feedback, the

16   grant, and the award, and the peer review feedback is separate

17   from the grant and the award.  You know, I can understand if

18   the Court's position was that the peer review feedback would be

19   relevant to a cross-examination if it was being used somehow to

20   challenge the source code and the analysis of it.  I would

21   argue that we don't get to that point because there is just no

22   basis to even question the validity of the source code as it

23   relates to the motion to suppress and the *Franks* hearing.  So

24   it wouldn't be necessary for the point of that.

25       But if Your Honor was inclined to determine that it would

1  be relevant for cross-examination purposes, that is separate

2  from the award and the grant, which has nothing to do with, you

3  know, why the source code is reliable and Dr. Levine's analysis

4  on the source code.

5          THE COURT:  Okay.  So let me get a really clear

6  picture from the defense.  What specifically, if you were

7  writing the subpoena today, would you be requesting of

8  Dr. Levine as the Government's expert?  Let's just do it that

9  way so that I know exactly what you're asking for.

10          MR. FINCI:  Mr. Robbins can relate because he knows

11  more about the --

12          THE COURT:  You put it in -- which ECF was it where

13  you listed it for me?

14          MR. ROBBINS:  It was an attachment, I think, to

15  Mr. Draughon's letter to the Court that you received yesterday.

16  You saw the email that we sent.

17          THE COURT:  Okay, so --

18          MR. FINCI:  It was the second motion to compel

19  discovery, Your Honor.

20          THE COURT:  All right.  Hold on.  There it is.  I've

21  got it.

22          MR. FINCI:  Sorry.  I didn't have it handy.

23          THE COURT:  All right.  So you're asking for

24  information with respect to peer review, a copy of the NSF

25  award number, and the Signature Interdisciplinary Research Area

1  Grant.  Yeah, I'm not seeing -- I can see why you want to know

2  information about the representation that it's peer reviewed.

3  What's the -- why am I making him dig up grant funding

4  information and the award number?

5          MR. ROBBINS:  Am I -- we don't care so much about the

6  funding information, Your Honor.  What we care about is what

7  this network investigative technique was designed -- was --

8  what the callout was for the award and grant that said, Here's

9  what we want you to do.  Usually there is a batch of paper that

10 goes back and forth.  There is either a grant proposal or an

11 award proposal.  Sometimes there is a query that comes back,

12 and the target of the grant and the target of the award become

13 relevant in that they bear on whether or not this entire

14 investigative technique is really just a way to try to evade

15 judicial supervision.

16     From the outset, it was an intended search mechanism that

17 has Fourth Amendment implications.  Again, a lot of this is

18 looking at the cell site location information that the

19 Government took the position initially, you know, that none of

20 that stuff is anything that we need to care about the Fourth

21 Amendment.  The Supreme Court says, Yeah, it is.  And the --

22          THE COURT:  So here's where I am on this,

23 Mr. Robbins.  I don't see it as to materiality.  That doesn't

24 mean it doesn't exist.  Okay?  And what I want you both to

25 avoid, the parties to avoid is to have a conversation about

1   this.  Pretend you're civil practitioners, okay, and you've got

2   more discovery than we have in criminal law, and you know

3   you're putting up an expert and there may be questions put to

4   that expert, whether it's at a hearing or a deposition, about

5   the bases for the algorithm, right.  And these are fair

6   questions.

7       If Dr. Levine does not, you know, give answers which

8   suggest the defense really needs to see this information, then

9   all I'm going to be doing is granting it and putting this off

10  and we're coming back for another hearing.  So, in other words,

11  if you all have a conversation about this and the defense says,

12  listen, we're interested in this information for the reasons

13  we've just said.  Is this a law enforcement tool or isn't it?

14  and Dr. Levine says, I don't care.  It's all a matter of public

15  record anyway, here it is, then just give it over.

16      If it's not, if there is some, you know, real basis for

17  saying, okay, now you're getting way far afield; you're putting

18  me to great pains to find this stuff and it's not relevant,

19  then don't.  And the defense will likely be able to ask those

20  questions of Dr. Levine at the hearing and make their record.

21      Does that make sense to you all?  I feel like, you know,

22  you all are getting in these entrenched positions, "Well, we

23  don't have it.  Well, we demand it."  And there is no

24  conversation going on about its ultimate relevance and whether

25  the doctor would even care.

1      Are my spidey senses pointing in the right direction?  Do

2   you all need to talk a little bit more about this?

3           MR. DRAUGHON:  Well, I mean, we talked a bit about

4   the Government's position that it's not relevant.

5           THE COURT:  Yeah, but I'm saying it is.  I'm saying

6   it is because we're going to have another hearing.  Right?  So

7   it is relevant if we get to that point.  I'm just saying

8   prepare for it.  Prepare for the eventuality that I may say the

9   information about the source code is relevant.  Would you be

10  prepared to give this stuff over?  And if the answer is yes,

11  because you're going to put Dr. Levine on, then I guess I would

12  just ask the question of the doctor.

13      Does he really -- this seems to me -- let me put it

14  differently.  This seems to be stuff that if the doctor is

15  meaning what he says and says what he means in the paper that I

16  reviewed, he shouldn't have no problem with giving it over.

17  And I think that maybe coming at it that way, with an

18  understanding that if the doctor is put on as an expert and the

19  defense asks these very pointed questions and I get a sense

20  that this information is relevant to the validity of his

21  opinions or the studies that he has done to support this

22  program, then we're going to break and I'm going to make him

23  give it over.

24      This is just kind of, I guess, basic stuff when I look at

25  expert witnesses and the disclosure that is required.  It has

1  to be the basis and the reasons for the opinions and the

2  witness' qualifications.  If the witness has said, I've done

3  this study and I have published it in this paper and it is

4  reasonable, it is peer reviewed, it was the subject of a grant,

5  the grant was above board, then this should be easy to answer

6  and reasonably within 16 (a)(1) -- is it (a)(1)(G)?

7         MR. ROBBINS:  (a)(1)(G), Your Honor.

8         THE COURT:  Yeah.  So I'm not going to order it yet

9  because it just -- it sounds like there are way too many moving

10 parts with respect to will we get there and, if we get there,

11 what witnesses will be put up.  But just know in advance if we

12 get to the point where I'm hearing from experts like the

13 defendant's expert, and you, in response, are going to put up

14 Dr. Levine, or in some order, this stuff is in shooting range

15 of being disclosable in my view.

16    Does that help aid you all in the conversations that you

17 should be having about advance disclosure to streamline the

18 hearing that we're going to have?

19        MR. DRAUGHON:  Yes.  To be clear, Your Honor, we're

20 talking about the peer review feedback, the grant, and the

21 award?  Those three items?

22        THE COURT:  Yep.  There is apparently -- the way that

23 I'm reading -- so there is B, C, and D in ECF 51.  The way that

24 I'm reading C and D is that these are shorthand for

25 expert-to-expert asking for information that's kind of -- like,

1  it is part of what experts ask for when they are peeking under

2  the covers of a paper or a methodology that has been put up as

3  reliable.  I could be wrong but that's what it's sounding like

4  to me.

5       So expert to expert, your expert is going to say, Yeah, we

6  know what NSF award number means and what it means to give a

7  copy of that packet over that was given over to the National

8  Science Foundation.

9       Similarly, with the Signature Interdisciplinary Research

10  Area Grant from RIT, my -- let me ask it this way,

11  Mr. Draughon.  Have you gone back to Mr. Levine, Dr. Levine and

12  asked about what these things are or sort of, you know,

13  discussed with him the relevance of them?

14            MR. DRAUGHON:  Yeah.  I mean, when we -- I asked him

15  about all three items.  He said he could reasonably get the --

16  that the peer review stuff is not readily available but he can

17  make it available.  And, once again, I don't have that in my

18  possession.

19       And then with regards to the award and grant, his

20  description of that was that it was completely irrelevant, that

21  there was nothing about the award or the grant that even

22  like -- that would give any indication as to, like, what the

23  Freenet software would have been about and what the research

24  entailed.  And he does not have that in his possession.  So it

25  would be more of a fishing expedition for him to find the award

1   or the grant.

2          THE COURT:   Okay.  So then you all are going to keep

3   talking about this.  If Dr. Levine doesn't take the stand, then

4   the subpoena shall issue.  If you tell the Government you're

5   not -- the defense you're not calling him, then the defense can

6   do what they need to do, and Dr. Levine can fight it out.  And

7   as a third-party, he can move to quash.

8          If you are going to call the doctor, which it sounds like

9   you are, it's at least reasonably possible, if we get there,

10  then he will be subject to questioning about this.  And if I

11  think that after that questioning this is relevant in some way

12  to the bona fides of the algorithm, I'm likely to order it.

13         And so if his position is it's irrelevant and it will take

14  a little work but I can turn it over, you might all decide to

15  do it just to moot the issue.  I just can't call it right now

16  because I don't have the witness in the chair, and I don't know

17  what he would say -- if we get to the witness in the chair,

18  what he would say about this stuff.

19         So do we need to set a time by which you tell the defense,

20  listen, this is potentially our witness, so don't file a

21  subpoena?  Or can we just go with what you're saying now, which

22  is, yeah, if the defendant puts up an expert, if we get there,

23  then we're going to be using Dr. Levine, so we're back in the

24  world of discovery, and the parties need to talk about this

25  further after you all sign off from me?

1          MR. DRAUGHON:  Yeah, I think your description of it

2     is right, that a lot of our decision is contingent on whether

3     the defense calls an expert.  As far as a date, I think you've

4     already suggested that we set a milestone date to exchange

5     expert opinions.  I think that would be an appropriate time,

6     that if we're going to go ahead and, you know, exchange stuff,

7     it will be at that point.

8          THE COURT:  That makes sense.  So by that date,

9     you're going to be telling the defense if you reasonably expect

10    to call Dr. Levine, at which point they will know either we

11    file this subpoena or we don't and that will also tell me

12    whether, if you are going to call Dr. Levine, these issues are

13    more about discovery.

14        And, of course, Defense, if the Government says, We're

15    going to call Dr. Levine, and they ultimately don't, then you

16    might.  I don't consider that beyond the realm of possibility

17    if we get there.  Do you hear what I'm saying?

18          MR. DRAUGHON:  Understood, Your Honor.

19          MR. ROBBINS:  Yes, Your Honor.

20          THE COURT:  Okay.  So that has to be a milestone date

21    then that's in the proposed scheduling order.

22        So we've got briefing.  We have a hearing, and we have an

23    interim date by which you all agree that you're going to

24    exchange expert opinions pursuant to Rule 16.  If you need --

25    you know, hopefully you'll come to an equitable agreement and

1  you won't need my intervention.  If you do, just let me know.

2          MR. BALDWIN:  Your Honor, if I may?

3          THE COURT:  Yes, Mr. Baldwin.

4          MR. BALDWIN:  We're talking about a milestone date

5  for exchange of expert opinions.  What we have here is, in my

6  view, and I think Mr. Draughon shares this, we're placing

7  multiple carts before the horse.  We still don't know what the

8  factual basis is for their theory yet that we've been

9  introduced through today.

10          THE COURT:  Well, I see it in the pleadings.  I mean,

11  I have seen in the opening statement that there is a challenge

12  to this was a warrantless search because there is a reasonable

13  expectation of privacy in membership of Freenet, and you

14  disagree with that, but that's argument number one.

15      And then argument number two is if it's about the

16  good-faith analysis, if I find that, as a matter of law, it

17  matters whether the expert -- the evidence that was derived

18  from this program is reliable, then the experts will be

19  important.

20      So I get it and I'm saying be prepared that if, as a

21  matter of law, I find the reliability of the expert technology,

22  methodology to be relevant to the warrant question, that you

23  have your experts ready to go.

24          MR. BALDWIN:  I understand.

25          THE COURT:  Does that make sense?

1      MR. BALDWIN:  Yes, Your Honor, I do.

2      THE COURT:  Okay.

3      MR. BALDWIN:  The only thing I would ask, though, is

4  that with respect to exchanging expert opinions, what I

5  understand is they are going to make a proffer in an expert

6  opinion and then our expert is going to look at it because we

7  don't actually know the issue with respect to the second

8  question.  I understand --

9      THE COURT:  You're asking for not simultaneous

10  exchange, but seriatim?

11     MR. BALDWIN:  Exactly, Your Honor, because we don't

12  know what that red gap is or even what the theory of that red

13  gap is.  So we can't respond to it until we know what they are

14  saying.

15     THE COURT:  That's fair, though, Mr. Finci, because I

16  don't quite get it either.  So --

17     MR. FINCI:  To be clear, Dr. Levine was disclosed as

18  an expert to the defense some time ago --

19     THE COURT:  Uh-huh.

20     MR. FINCI:  -- Your Honor, and everything we've been

21  doing has been focused on Dr. Levine's opinions.  He previously

22  gave testimony, and that's prior to the *Carpenter* decision by

23  the Supreme Court which is why we think it's -- but he gave an

24  opinion about the expectation of privacy issue in the prior

25  testimony before Judge Motz, you know, a few years ago.  He was

1    offered to us as the Government's opinion for a lot of the

2    Freenet-based arguments that they have made here.  So, I mean,

3    we started with that.  It's not as if we're making up, you

4    know, the arguments that we are --

5              THE COURT:  So let me understand the schedule --

6              MR. FINCI:  So just to be clear.

7              THE COURT:  -- or the order of events.  You moved to

8    suppress.  You get notice of expert Dr. Levine.

9              MR. FINCI:  No.  No.  The order of things, we made a

10   motion to -- we had conversations about compelling -- about

11   discovery.  We asked, after initial discovery was provided, we

12   asked for the source code and all the other materials that are

13   at issue here now.  In response to that, we were provided

14   Dr. Levine's testimony, his whitepaper.  You know, we were

15   provided information from the *Hall* case, which is the case --

16             THE COURT:  Right.

17             MR. FINCI:  We went back to that case and pulled work

18   out of it to understand more about what was going on.  We even

19   spoke to the attorney that represented the defendant in

20   that case.  Anyway, it was described to us in that disclosure

21   that Dr. Levine would be the Government's expert on -- in this

22   case.

23             THE COURT:  When?  For suppression?  For trial?

24             MR. FINCI:  Well, I mean, we didn't get a formal

25   notice but we got the email, "this is our guy."  So just to be

1    clear, we didn't get a formal notice this will be his opinions

2    at trial yet.

3          THE COURT:  Yeah, because it's inconsistent with what

4    you all are telling me that you won't even go into this stuff

5    at trial.

6          MR. FINCI:  Correct.

7          THE COURT:  Why would you need Dr. Levine?

8          MR. FINCI:  But that was the response to the initial

9    demand for source code.

10         THE COURT:  Okay.  Well, maybe because you demanded

11   source code, they said, well, if we're going to end up fighting

12   about this, we're going to need Dr. Levine.

13         MR. FINCI:  I appreciate that's what they were

14   saying, but the process was:  We want the discovery.  You can't

15   have it, but we're going to give you this Dr. Levine stuff.

16   He's going to be the Government's expert.

17      We all knew about Dr. Levine.  We've known about him for

18   the entire time we've been working on this case.  So I

19   appreciate what Mr. Baldwin is saying.  Dr. Levine testified at

20   length about expectation of privacy issues in the prior

21   testimony.

22         THE COURT:  So let me do it this way, Mr. Finci.  I

23   get that.  But at this point, on the suppression issue, it's

24   the defense burden.

25         MR. FINCI:  Very well.

1          THE COURT:  So I think you go first.  Whatever

2     schedule you come up with, you go first.  Disclose your expert.

3     Then the Government will make the decision are you going to

4     call Dr. Levine.  If so, you disclose the basis of his opinions

5     consistent with 16(G), (a)(1)(G).  And then, if necessary,

6     Defense will supplement or just let's roll at the hearing, but

7     that makes the most sense to me because it is the defense

8     burden at this point.  Okay.

9          MR. FINCI:  Very well.

10          MR. BALDWIN:  Thank you, Your Honor.

11          THE COURT:  Okay.  Anything else that you all need

12     from me?

13          MR. FINCI:  Have a nice weekend.

14          THE COURT:  Thank you.

15       By when should I expect the proposed scheduling -- I'll

16     call it a proposed scheduling order?

17          MR. DRAUGHON:  Well, hopefully we can maybe get on

18     the phone right after this and start to talk about it.  We'll

19     consult with Brian Levine as well with regards to any potential

20     hearing dates, but I think at least for the filings, we can

21     figure that out pretty quickly.

22          THE COURT:  Okay.  So why don't I say -- I'm just

23     going to enter a paperless order that defers this motion and

24     says by close of business Tuesday, that the parties shall

25     submit a proposed joint scheduling order.  If you need more

1   time, just let Ms. Brown know if, like, you're having trouble

2   getting in touch with your experts.

3           MR. FINCI:  Sounds good, Your Honor.

4           THE COURT:  Does that work?

5           MR. DRAUGHON:  Yes.

6           THE COURT:  Okay.  All right.  Yes?

7           MR. FINCI:  Is it possible for Ms. Solomon to make me

8   the host and we can have some conversations?  Or does it not

9   work that way on Government Zoom?

10          THE COURTROOM DEPUTY:  I can do that.

11          MR. FINCI:  Okay.  We can have some conversation when

12  you leave the bench.

13          THE COURT:  Okay.  I'm going.  Thank you all so much.

14  Be safe this weekend.  Talk to you soon.  Bye.

15          THE COURTROOM DEPUTY:  This Honorable Court now

16  stands adjourned.

17      (The proceedings were adjourned at 10:44 A.M.)

18

19      I, Marlene Martin-Kerr, FCRR, RPR, CRR, RMR, certify that

20  the foregoing is a correct transcript of the stenographic

21  record of proceedings in the above-entitled matter.

22

23                      Dated this 30th day of December, 2020.

24

25                      _____
                                     /s/
                            Marlene Martin-Kerr
                        Federal Official Court Reporter