<pre>
 1               IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                        SOUTHERN DIVISION

 3
     UNITED STATES OF AMERICA,       )
 4                                   )
             Plaintiff,              )
 5                                   ) Case Number: 8:19-cr-0348-PX
             vs.                     )
 6                                   )
     ALAKOM-ZED CRAYNE POBRE,        )
 7                                   )
             Defendant.              )
 8

 9         TRANSCRIPT OF PROCEEDINGS - MOTIONS HEARING
             BEFORE THE HONORABLE PAULA XINIS
10               UNITED STATES DISTRICT JUDGE
           FRIDAY, OCTOBER 8, 2021; 10:00 A.M.
11                    GREENBELT, MARYLAND

12
                    A P P E A R A N C E S
13
     FOR THE PLAINTIFF:
14
         OFFICE OF THE UNITED STATES ATTORNEY
15            BY:  DAVID SALEM, ESQUIRE
              BY:  DWIGHT JOHN DRAUGHON, JR., ESQUIRE
16            6406 IVY LANE, SUITE 800
              GREENBELT, MARYLAND 20770
17            (301) 344-4237
              (301) 344-0863
18

19         ***Proceedings Recorded by Mechanical Stenography***
           Transcript Produced By Computer-Aided Transcription
20   _____

21              MARLENE KERR, RPR, RMR, CRR, FCRR
                 FEDERAL OFFICIAL COURT REPORTER
22              6500 CHERRYWOOD LANE, STE 200
                 GREENBELT, MARYLAND 20770
23                    (301)344-3499

24

25
</pre>

<u>A P P E A R A N C E S</u>
(continued)


FOR THE DEFENDANT:

    HOULON, BERMAN, FINCI & LEVENSTEIN, LLC
        BY:  RICHARD A. FINCI, ESQUIRE
        7850 WALKER DRIVE, SUITE 160
        GREENBELT, MARYLAND 20770
        (301) 459-8200

    CHESAPEAKE MERIDIAN
        BY:  G ARTHUR ROBBINS, ESQUIRE
        133 DEFENSE HIGHWAY, SUITE 213
        ANNAPOLIS, MARYLAND 21401
        (443) 454-7675

1                              INDEX

2                         OCTOBER 8, 2021

3          UNITED STATES OF AMERICA vs. ALAKOM-ZED CRAYNE POBRE

4

5                                                            PAGE

6  COMMENCEMENT OF PROCEEDINGS............................... 4

7      ECF No. 45 - MOTION TO SUPPRESS - FRANKS HEARING

8  WITNESSES FOR THE GOVERNMENT:

9  BRIAN LEVINE
           Sworn............................................ 17
10         Direct Examination by Mr. Draughon.................. 19
           Cross-Examination by Mr. Robbins.................. 122
11         Redirect Examination by Draughon.................. 184
           Witness Excused................................... 187
12
   CORY MILLS
13         Sworn............................................ 190
           Direct Examination by Mr. Draughon................. 191
14         Cross-Examination by Mr. Robbins.................. 205
           Redirect Examination by Draughon.................. 225
15
       ECF No. 46 and 47 - MOTION TO SUPPRESS PHYSICAL EVIDENCE
16
   CORY MILLS
17         Direct Examination by Mr. Draughon................. 226
           Cross-Examination by Mr. Finci.................... 237
18         Redirect Examination by Mr. Draughon.............. 262
           Witness Excused................................... 264
19
       ECF No. 48 - MOTION TO SUPPRESS STATEMENT
20
   AUSTIN MUELLER
21         Sworn............................................ 264
           Direct Examination by Mr. Draughon................. 265
22         Cross-Examination by Mr. Finci.................... 267
           Witness Excused................................... 272
23
       ECF No. 31 - MOTION TO COMPEL........................ 275
24
   PROCEEDINGS ADJOURNED................................... 291
25
   CERTIFICATE PAGE........................................ 292

1                    P R O C E E D I N G S

2          (Call to Order of the Court.)

3              THE COURTROOM DEPUTY:  May I have your attention,

4    please.

5          The United States District Court for the District of

6    Maryland is now in session, the Honorable Paula Xinis

7    presiding.

8              THE COURT:  All right.  Good morning, everyone.

9              THE COURTROOM DEPUTY:  The matter now pending before

10   this Court is criminal number PX-19-348, United States of

11   America vs. Zed Pobre.  We're here today for the purpose of a

12   motion hearing.

13         Counsel, please identify yourselves for the record.

14             MR. DRAUGHON:  Dwight Draughon and David Salem for

15   the government.  Also present at counsel's table is HSI Special

16   Agent Kelly DiAntonio.  Good morning, Your Honor.

17             THE COURT:  I'm sorry.  Kelly Di Antonio?  Is that --

18   Agent DiAntonio, did I get your name right?

19             AGENT DiANTONIO:  Yes, ma'am.

20             THE COURT:  Okay, great, thanks.  Good morning.

21             MR. FINCI:  Your Honor, good morning.  Richard Finci

22   and Gar Robbins on behalf of Zed Pobre, Your Honor.

23             THE COURT:  Okay.  Good morning to you all.

24         First question, do we have the rule on witnesses invoked?

25   Is there anyone in this room who will be called as a witness

1    other than --

2          MR. DRAUGHON:  Your Honor, I let defense counsel know

3    that if Mr. Pobre's spouse intends to testify, she should not

4    be present in the courtroom.

5          THE COURT:  Okay.

6          MR. FINCI:  Well, Your Honor, we have two separate

7    motions, as you know.  Ms. Valencic --  Dr. Valencic will not

8    be testifying in regard to the motion to suppress the physical

9    evidence.  She may be called to testify in the motion to

10   suppress the statement.  I would ask the Court to allow her to

11   stay in for the motion to suppress physical evidence and then

12   I'll ask her to step out when we start the second motion, if

13   that's permissible.

14         THE COURT:  If it works because if there is going to

15   be one witness for the government, for example, that's

16   testifying to both -- and maybe what I'll do is just put on the

17   record that I did alert counsel two days ago in an unrecorded

18   status that it is my intention to take testimony and evidence

19   not only on statements but on the motion to suppress physical

20   evidence because it's the government's position that Mr. Pobre

21   doesn't have a right to privacy in his IP address, but there is

22   far more involved in that motion.

23         And so to the extent there are going to be witnesses

24   called that overlap with statements so that we're taking the

25   testimony as to whatever is relevant from that witness once, we

1   may have an issue.

2       So let me ask the government.  In that respect, do you

3   expect that witnesses, for example, Trooper Mills, may testify

4   to both?

5           MR. DRAUGHON:  That's exactly right, Your Honor.

6   Trooper Mills will testify to both.

7           THE COURT:  Okay.  So then I do think out of an

8   abundance of caution -- give me the doctor -- -

9           MR. FINCI:  Valencic.

10          THE COURT:  Valencic.  Dr. Valencic should be

11  excluded so we just are -- we're not breaking up the testimony.

12          MR. FINCI:  Very well, Your Honor.

13          THE COURT:  Okay.

14          MR. FINCI:  That brings up a second subject as it

15  relates to Trooper Mills.

16          THE COURT:  Yes.

17          MR. FINCI:  Mr. Robbins is handling the computer side

18  of the case.  I'm handling the statement side, and I hope, with

19  respect to Trooper Mills, you will allow us to trade places

20  during his cross-examination.  Is that okay?

21          THE COURT:  I'm not sure.  Okay, if you all -- and

22  I'll say this to both sides because maybe you're doing it the

23  same, by subject matter, Government.  If you're doing it,

24  you've got to break it up into chapters.  So in other words,

25  we're not going to have sort of a tag team, up and down.

1          MR. FINCI:  No, no, no, no.

2          THE COURT:  I mean, if you do it by chapters, I

3    understand that it's really very different subject matters, but

4    it's got to be clean.

5          MR. FINCI:  We will, Your Honor.

6          THE COURT:  All right.  And same with the government.

7          MR. FINCI:  And we have one final preliminary matter.

8          THE COURT:  Okay.

9          MR. FINCI:  Your Honor, as you know, Mr. Pobre has

10   been given permission to come to my office on a regular basis

11   to work on a computer that's not connected to the Internet.

12   He's been doing that for quite some time.  He has made copious

13   notes in preparation for this hearing.  He has reviewed

14   materials, and he has it on a thumb drive that he's brought

15   with him, instead of a stack of paper.

16      And he was hoping he would have the Court's permission to

17   use his wife's laptop while he's in the courtroom to access the

18   material on his thumb drive so he can follow along and give us

19   notes and ideas as it relates to any cross-examination.  The

20   government opposes that so I needed to raise it with Your

21   Honor.

22          THE COURT:  Is the computer -- it's not going to be

23   connected to the Internet?

24          MR. FINCI:  It's not going to be connected.  She

25   doesn't have the password for the Wifi in the building, Your

1  Honor.

2          THE COURT:  Okay.  So it's just a computer version of

3  pen and paper.

4          MR. FINCI:  It would be, yes.  It will not be

5  connected to the Wifi.  We're not asking that.

6          THE COURT:  Let me find out why the government is

7  objecting to this.

8          MR. DRAUGHON:  Your Honor, it's unusual to have a

9  defendant with a laptop in the courtroom.  Typically that is

10  reserved for attorneys, and everyone else is precluded from

11  having devices; but secondly, and, perhaps, more importantly --

12          THE COURT:  Hold on.  You all are not precluded from

13  having devices, right?

14          MR. DRAUGHON:  Right.  I just said that --

15          THE COURT:  I mean, I see you all looking up stuff

16  all the time on your computers.

17          MR. DRAUGHON:  Yeah, I noted it's preserved for

18  attorneys, but everyone else is typically precluded from having

19  devices.

20          THE COURT:  Right.  And what the defense is pretty

21  much asking for is an electronic version of pen and paper with

22  the electronic version of a notebook that the defendant could

23  bring in notes, right.  So if it's not connected to the

24  Internet -- it may be unusual but fair to say this case is

25  unusual.  So just because something is unusual doesn't mean

 1   it's impermissible.

 2       So is that the extent of the government's --

 3           MR. DRAUGHON:  No, I was going to make the -- the

 4   more important point is that the reason why he has been

 5   precluded from having laptops is because he's a computer

 6   expert, and there was concern that he might be able to override

 7   any sort of barriers to Internet access.  So I understand that

 8   he may not have the password for the court's password, but I

 9   don't know the limitations of the laptop and his ability to

10   obtain Wifi --

11           THE COURT:  It's your position that in front of me,

12   in this courtroom, with court security officers and two defense

13   counsel who are officers of the Court, it is the government's

14   concern that Mr. Probe is going to spend his valuable time

15   hacking some software code?

16           MR. DRAUGHON:  I don't know what he will do, Your

17   Honor.

18           THE COURT:  Well, the proffer has been from officers

19   of the Court who have been members of this bar for decades that

20   he's going to look at the notes he made to assist in his own

21   defense, which is a Sixth Amendment right.  So I'm -- we've got

22   real issues to discuss today.  Make your record but I'm

23   inclined to deny the government's objection.

24           MR. DRAUGHON:  I understand, Your Honor.  I was just

25   telling you what the position was, but I understand Your

1    Honor's reason.

2            THE COURT:  So, Mr. Finci, Mr. Robbins, you all are

3    going to, you know, make sure there isn't any concern

4    whatsoever.

5        And, Mr. Pobre, you are affirming to me, as the judge in

6    your case, that you are only using your computer to look at

7    notes that you have made that are included within a thumb drive

8    to assist in your own defense.  Is that correct?

9            THE DEFENDANT:  That is correct.

10           THE COURT:  All right.  Okay, go ahead.  We can do

11   that.

12       All right, so as you all know, we've got several motions

13   to resolve today.  I'm just going to broadly characterize them

14   and then hear from you all as to how we're going to take the

15   evidence presentation, because I'm going to -- you know, I'll

16   take your lead.  If it makes sense to you all, it will make

17   sense to me, I'm sure.

18       We've got the motion to suppress physical evidence, the

19   motion to suppress the evidence derived from the search

20   warrant, which is a companion motion for a *Franks* hearing.  We

21   have the motion to suppress statements, and lastly, we have the

22   motion to compel the source code and other related information

23   regarding the software.

24       My thought is the source code is last because I really do

25   want to hear the evidence on the remaining motions first, but

1   it is up for discussion today.

2       Have you all discussed how you would like the witness

3   presentation to go or the evidence presentation?

4           MR. DRAUGHON:  I don't know if we've explicitly

5   discussed it, Your Honor.  My understanding was that Dr. Brian

6   Levine would testify first as to essentially all of the issues.

7   He would address the issues with the motion to suppress

8   evidence and also the motion to compel.

9           THE COURT:  Okay.

10          MR. DRAUGHON:  And then Officer Mills will testify

11  both to the motion to suppress evidence as well as the motion

12  to suppress statements.

13          THE COURT:  Okay.

14          MR. DRAUGHON:  And we also have a third officer

15  coming in, Officer Austin Mueller, who will testify about the

16  motion to suppress statements.  Our understanding is that we

17  would just -- I anticipate his testimony will be short.  So we

18  would just get his statement in, his testimony in right after

19  Officer Mills and then proceed to argument.

20          THE COURT:  Okay, that's the government's witnesses.

21      Defense?  Or are you not -- going to see how things roll?

22          MR. FINCI:  Well, we're going to see how things roll

23  on the motion to suppress physical evidence, Your Honor.  On

24  the motion to suppress the statement, my client will testify

25  and/or Dr. Valencic.

1          THE COURT:  Okay.

2      All right, and before we start, can I just get a really

3  brief proffer from the government as to the way you expect

4  to -- if everything came in, what would be the government's

5  case in chief?  I mean, it doesn't have to be super detailed.

6  I just want to understand how you're going to present -- what

7  you're going to present and how you're going to present it to

8  the jury, because I do think it's relevant to the motion, the

9  motion to compel most directly.

10          MR. DRAUGHON:  I understand, Your Honor.

11      The case in chief will be that on August 14, 2018, law

12  enforcement executed a search warrant at Mr. Pobre's residence.

13  Upon executing the search warrant, they uncovered multiple

14  files of child sexual abuse material.

15          THE COURT:  The three videos in the RAM?

16          MR. DRAUGHON:  There are more than three videos.

17          THE COURT:  In the RAM?

18          MR. DRAUGHON:  Yes.

19          THE COURT:  Anywhere else?  Anywhere else on any of

20  the hardware searched by the government?  Because I know it was

21  like a 14-plus-hour search.  I don't know if you -- I don't

22  recall if you've seized devices, but I just want to understand

23  what the totality of the evidence is and where it was found.

24          MR. DRAUGHON:  It was on a system called the RAID.

25          THE COURT:  The what?

1          MR. DRAUGHON:  The RAID, R-A-I-D.

2          THE COURT: Okay.

3          MR. DRAUGHON:  So it will be on the RAID.  It was

4 found on the RAM, but we will not be presenting testimony about

5 Freenet and anything -- any sort of bits of files that would

6 have been related to Freenet.  Freenet will not come up in the

7 case in chief unless it is presented by the defense.

8          THE COURT:  Well, but understanding where the

9 computer evidence is, it may be relevant.  So I just want to

10 make sure I nail that down and then hear the rest of the

11 evidentiary proffer.

12    So you're saying it was found on a RAM.  What's the RAID

13 again?

14          MR. DRAUGHON:  I don't want to overstep my technical

15 expertise at this moment, but it is a storage device that would

16 have had it.  So we will not be presenting evidence of any

17 files associated with Freenet on his devices.  It will be files

18 that were recovered outside of any sort of Freenet storage.

19          THE COURT:  I get it.  I get that part.  I get that

20 but the reason why I ask is until I understand where the

21 evidence was found, the incriminating evidence, I don't know

22 whether it's fair to say that what's material to the

23 preparation to the defense, putting the suppression motions to

24 the side, is limited to we executed a search warrant; we found

25 it here; end of story.

1        So I just want to understand again where it was found

2    because the defense opens with three videos on the RAM as the

3    universe of evidence, and I'm hearing that maybe there is more

4    or it's stored differently.  So can you help me out?

5            MR. DRAUGHON:  So my understanding is that there were

6    over 800 files related to like preteen hard core and other

7    material recovered.  So RAID apparently stands for Redundant

8    Array of Independent Inexpensive Disks, and it's sort of --

9    but, in short, it's a storage device that would be a part of

10   the computer system.

11           THE COURT:  Okay.  And so with that, is it that plus

12   the statements if the statements come in?

13           MR. DRAUGHON:  Yes.

14           THE COURT:  Okay.  All right, so is RAID part of the

15   RAM, or is it a separate thing that a person has to knowingly

16   set up and configure even if it's hidden and very sophisticated

17   to store the images that were found there?

18           MR. DRAUGHON:  Yes.  And, Your Honor, just to sort of

19   put an asterisk of what I say, because the RAM would sort of be

20   like the Random Access Memory or Recent Access Memory in which

21   it would show what a user would have recently have been viewing

22   on the computer.

23           THE COURT:  Yep, perhaps.

24           MR. DRAUGHON:  The RAID is just like the storage

25   device, generally.

1          THE COURT:  And that's what I'm getting at.  So there

2     was a storage.  Was it a piece of hardware, or is it a program

3     that stores within the hardware?  What is RAID exactly?

4          MR. DRAUGHON:  It is a -- I have a photo presented to

5     me by the agent.  It is a piece of hardware.

6          THE COURT:  Okay.  All right.

7          All right, is the defense prepared now to proffer how

8     Freenet may be relevant at trial, how you may be using it?

9     Because what the government is saying is it's more than just

10    three files, three videos in the RAM.  There is some separate

11    device, storage device where files were found; and if that's

12    the case, how does Freenet become -- it may be relevant to the

13    motions to suppress, and I'm not at all convinced you don't get

14    Rule 16 at this motion to suppress.  I think you may very well,

15    especially in this case, but I just want to understand if there

16    is a separate argument that it's also material to the

17    preparation of your defense for trial.

18          MR. ROBBINS:  Your Honor, I don't believe we are yet

19    able to address exactly what's going to happen at trial because

20    there are parts that are still unclear at this stage -- state

21    of discovery.  We don't really know what we're looking at from

22    the --

23          THE COURT:  Is it fair to say, though, that the

24    thrust of the Rule 16 motion at this point is for suppression

25    issues?

1       MR. ROBBINS:  The thrust of the Rule 16 issue is for
2   suppression issues, both on the Fourth Amendment initially and
3   on the reliability and probable cause.
4       THE COURT:  Okay, great.  That helps me get a bit
5   oriented, and thank you to the government.
6       So I understand that we've got suppression and then we've
7   got trial, and at the moment, there doesn't seem to be a lot of
8   overlap but we'll take it as it comes.
9       Okay.  All right, with that, Government, are you ready to
10  call your first witness?
11      MR. DRAUGHON:  Your Honor, I have a housekeeping
12  question.
13      THE COURT:  Sure.
14      MR. DRAUGHON:  Are we keeping our masks on the entire
15  time?
16      THE COURT:  If you're vaccinated and you're speaking
17  and you're more comfortable taking off your mask, you may do
18  so.  We've got, for the record, lots of PPE in the courtroom.
19  We have plexiglass.  We have two filters.  We have lots of
20  distance.  So I'm comfortable with it, and I will be taking my
21  mask off to speak.  I've been vaccinated.  So if you're good
22  with it, feel free.
23      MR. DRAUGHON:  Thank you, Your Honor.  The government
24  -- I am vaccinated, and I think it would be hard to understand
25  if I have this mask on the whole time.

1          THE COURT:  Yeah, I agree.  As long as you're

2   comfortable taking it off, I'm fine with it.  And, obviously,

3   the witness needs to take off his or her mask.

4      Okay.

5          MR. DRAUGHON:  With that, Your Honor, we can call our

6   first witness.

7          THE COURT:  Okay.

8          MR. DRAUGHON:  The government calls Dr. Brian Levine.

9          THE COURT:  And let's just make sure all witnesses

10   are out of the room.

11          THE COURTROOM DEPUTY:  The rooms are open out there.

12      (Witness enters the courtroom.)

13          THE COURTROOM DEPUTY:  Remain standing and raise your

14   right hand.

15      (Witness complied.)

16          THE COURTROOM DEPUTY:  You do solemnly swear or

17   affirm, under the penalties of perjury, that the information

18   you're about to give to the Court, in the matter now pending

19   before it, shall be the truth, the whole truth, and nothing but

20   the truth?

21          THE WITNESS:  Yes, I do.

22          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

23      (Witness sworn.)

24          THE COURTROOM DEPUTY:  Please speak loudly and

25   clearly into the microphone.  Please state your name for the

1    record, and please spell your first and last name.

2              THE WITNESS:  My name is Brian Levine, B-r-i-a-n,

3    L-e-v-i-n-e.

4              THE COURTROOM DEPUTY:  Thank you.

5              THE COURT:  And, Dr. Levine, if you would, if you're

6    comfortable with it, if you could remove your mask so that we

7    can see your face, that would be great.

8              THE WITNESS:  Okay.

9              THE COURT:  Okay.

10        And let me -- before you begin, Mr. Draughon, I have a

11   thumb drive that has been handed up that says motions hearing.

12             THE COURT REPORTER:  (Indicating.)

13             THE COURT:  Oh, is that yours, Ms. Kerr?

14             THE COURT REPORTER:  Yes, Judge.

15             THE COURT:  Thank you so much.  Really appreciate it.

16   Okay, now I know what this is.  Thanks.

17        Okay, go ahead.

18             MR. DRAUGHON:  A housekeeping matter.  The control

19   module so that I can project is not up here.  I have some PDFs

20   that I want to project.

21        (Brief pause.)

22             MR. DRAUGHON:  It's plugged in now.

23

24

25

1          BRIAN LEVINE, GOVERNMENT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3     BY MR. DRAUGHON:

4     Q.    How are you doing this morning, sir?

5     A.    I'm good.  Thank you.

6     Q.    All right.  Are you employed?

7     A.    I am.

8     Q.    By whom are you employed?

9     A.    I'm currently a professor in the College of Information

10    and Computer Sciences at the University of Massachusetts,

11    Amherst.  As part of my role there, I'm also the director of

12    what's called the Cyber Security Institute.

13    Q.    And do you have an area of expertise?

14    A.    Yes.  I've been there since 1999.  When I was hired, I

15    received -- I had just received a Ph.D. in Computer Engineering

16    where my research and dissertation were focused on the

17    Internet, and I'll call it group communication, people on the

18    Internet talking to one another.

19          Since my time -- since that time I've been at UMass, my

20    research has been along those lines, including topics such as

21    peer-to-peer networking, network security, network forensics,

22    privacy, network privacy.

23    Q.    Are you familiar with the term "digital forensics"?

24    A.    I am.  In fact, I often teach a class on digital

25    forensics.  I'm teaching it again this coming Spring semester.

1    I've taught it three or four times.  I've taught many other

2    classes at UMass as well.

3    Q.    And what is digital forensics?

4    A.    Digital forensics is the application of computer science

5    to collect information and use that information and analysis of

6    that information to support or refute a hypothesis involving,

7    say, a crime or sometimes a policy violation at a company and

8    often presentation and discussion of that evidence in a forum,

9    such as we are here today.

10   Q.    How long have you been working on digital forensics?

11   A.    For a long time.  I don't remember the exact year I got

12   involved, but to me I worked a lot, as I said, in network

13   security and privacy; and I view privacy as, in a lot of ways,

14   the other side of the coin.

15        So to answer your question directly, I don't know the

16   exact date.  I mean, the late 2000s, meaning the first decade

17   of the 2000s, I believe.

18   Q.    What is your educational background?

19   A.    As I said, I have a Ph.D. in Computer Engineering from the

20   University of California, Santa Cruz, which I received in 1999.

21   Prior to that date, I received a Masters Degree also in

22   Computer Engineering from the same institution.  Prior to that,

23   1994, I graduated from the State University of New York at

24   Albany where my degree was related.  It was Applied Mathematics

25   and Computer Science.

1  Q.    You mentioned that you are a professor.  Have you been

2  tenured or promoted while at the University of Massachusetts?

3  A.    Yes.  So, like I said, I was hired in 1999.  In 2005, I

4  was what's called promoted with tenure.  So I joined as an

5  assistant professor.  When I was promoted, I was an associate

6  professor with tenure.  I still have tenure.

7       And then in 2010, five or six years after that, I was

8  promoted to professor, or sometimes it's called full professor

9  just to distinguish it, and that's the rank -- that's the only

10 rank I can go to.

11 Q.    Have you published any papers or given any sort of

12 presentations about digital forensics or anything else?

13 A.    Yes.  So, as I said, I often have taught a class, a course

14 at UMass on digital forensics.  I've written many papers on

15 peer-to-peer networking, on forensics, on network security, on

16 forensics of peer-to-peer networking.  I don't have an exact

17 count but the overall topics that I've publish on since --

18 well, since being a grad student in 1994, but, you know,

19 especially since being employed as a professor, all told,

20 throughout my career, I don't have an exact count but 90 to 100

21 peer reviewed papers on a broad set of topics in the areas that

22 I've talked about and some others here and there, some other

23 areas here and there as well.

24 Q.    And, approximately, how many of your peer reviewed papers

25 have focused on peer-to-peer networks?

A.    I don't have an exact count.  A least 20, maybe more.  So

part of -- I'll explain that answer.  To me, peer-to-peer

networking can be defined very narrowly.  It can be defined as

an application, such as -- you know, I can see on the screen

we're going to -- and I know we're here to talk about Freenet

today.  That's an example of a peer-to-peer network.  Some

people may have heard of a very popular one called BitTorrent.

That is a peer-to-peer network.  I think that's the one the

public most hears about.

But to me, peer-to-peer networking is any collection of

persons with devices or devices themselves working together to

provide a service.  I think of -- sometimes it's called

Internet of things, little devices that we have around working

together.  That's another example of peer-to-peer.

So to me, it's a broad topic that includes what we're here

to talk about today but a lot of other topics in networking as

we use them in our daily lives.

Q.    And I'm not going to ask you what it is at this point, but

are you familiar with Freenet?

A.    I am familiar with it.

Q.    And are you familiar with law enforcement software that is

used with Freenet?

A.    I am.

Q.    And how are you familiar with that software?

A.    I was a primary person who helped design that software,

1    and I lead a research team that's responsible for providing

2    that tool to law enforcement, as well as helping them be

3    trained.  And I've testified -- this isn't the first time I've

4    testified about that topic.

5    Q.    Approximately how many times have you testified on Freenet

6    before?

7    A.    I testified a number of years ago in Maryland, not this

8    courthouse but the other one in Maryland.  I've testified also

9    including Philadelphia.  I was also in a case in Florida, also

10   a case in Missouri.  There was a case where I was asked for

11   help by the AUSA but I did not -- I was listed as a person to

12   be called, but I did not happen to be called that day.

13        And I believe that's it.  I hope I'm not forgetting one.

14   Q.    Were those examples all federal cases?

15   A.    Those are all federal cases.

16   Q.    In your prior testimonies, did you testify as an expert?

17   A.    I did.  In those cases for Freenet, I was qualified as an

18   expert.  I've also testified in other topics where -- for

19   example, I was in the Ninth Circuit, and I don't think they do

20   that there.

21              MR. DRAUGHON:  Your Honor, at this point, the

22   government moves to qualify Dr. Brian Levine as an expert in

23   digital forensics.

24              THE COURT:  Defense, any voir dire?

25              MR. ROBBINS:  No questions, Your Honor.

1          THE COURT:  Any objection?

2          MR. ROBBINS:  No.

3          THE COURT:  All right.

4      Welcome, Dr. Levine.  You are qualified as an expert in

5  digital forensics.

6          THE WITNESS:  Thank you, Your Honor.

7          THE COURT:  Okay.

8  BY MR. DRAUGHON:

9  Q.   Sir, what are peer-to-peer networks?

10 A.   Peer-to-peer networks are applications that have been

11 designed where a collection of people who are employing

12 software have kind of banded together to provide services to

13 one another.  So -- yeah, I think I'll leave it at that for

14 now.

15 Q.   And what is Freenet?

16 A.   Freenet is an example peer-to-peer application.  The

17 purposes of -- there's many purposes to Freenet.  So I'll start

18 simply.  Freenet is designed to allow people who are all

19 running the software to exchange content that has previously

20 been inserted into Freenet.

21      There's a couple of special things about Freenet that

22 differentiate it from other peer-to-peer applications.  One of

23 them is that as these requests are made for content that's been

24 previously inserted, it labels itself as a privacy-enhancing

25 technology.  It attempts to provide what's often called in my

1   field anonymity.

2        So if you make a request for content, it does its best to

3   make it unclear that when you made that request, it's yourself

4   you want that request for rather than that you're making that

5   request on behalf of someone else.  That's one of the special

6   properties of Freenet.

7        I think it's important to distinguish Freenet one other

8   way, which is -- I think I've said this a little bit already --

9   that you can only get from Freenet content that has been

10  inserted to it previously.  You cannot use Freenet to visit the

11  New York Times, your favorite newspaper.  It has to be

12  something that's in there already.

13       And, in particular, what makes it peer-to-peer is that

14  content that's been inserted is being stored by someone also

15  who's also running the software.  So that's the peer-to-peer

16  part.

17       It's not a large corporation, some large server who's

18  helping you in that regard.

19  Q.   I'm sorry.  It may seem obvious, but we're talking about

20  computer systems in the Internet.  Is that right?

21  A.   Correct.

22  Q.   Now, prior to your testimony today, did you have a chance

23  to review Government Exhibit 1, which is displayed on the

24  screen?

25  A.   I did.

1   Q.   And can you briefly describe what is Government Exhibit 1?

2   A.   Before I answer that, may I ask that the volume be

3   increased?

4              THE COURT:  Sure.  Are you having trouble hearing?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.

7              MR. DRAUGHON:  I can talk louder.

8              THE COURT:  That would be great, and maybe move the

9   microphone closer to you.  And we do change out the coverings

10  after every person.  So if you can get closer, that would be

11  great.

12             MR. DRAUGHON:  Is this better?

13             THE WITNESS:  A lot better.  Thank you.

14  BY MR. DRAUGHON:

15  Q.   Can you tell the Court generally what is Government

16  Exhibit 1?

17  A.    Okay.  So looking at Government Exhibit 1 on the screen in

18  front of me, this looks to be what's called the home page of

19  the Freenet project, which, get out your computer, load your

20  favorite browser, go to this URL listed at the top,

21  Freenetproject.org, and you'll see this on your screen.

22        And as you can see on the left side there, there's a

23  little cloud.  It's a little hard to read for me, but I think

24  everyone can see that it says "download."  So if you were

25  interested in downloading the Freenet software and you went to

1   the site, click that button.  That's how you would start the

2   process of downloading the software for your own computer.

3   Q.    Understood.  So there are about -- there are 20 slides

4   here.  We're going to walk through the slides so you can tell

5   us what you're seeing and the observations that are significant

6   to you.

7   A.    Okay.  So here we are on slide two, and this is, indeed,

8   the download page as if we had clicked on that link on the

9   prior slide.  We can see here it says "download to access

10  Freenet."  You need to install the main application, it says.

11  And then there's a blue button where, you know, for example, as

12  it says, if you're on a Windows computer, click that blue

13  button and you'll begin the installation process.  Or I should

14  say click that button, a file would be downloaded, and if you

15  were to execute that file, you would begin the installation

16  process.

17  Q.    Now showing you page 3 of Government Exhibit 1.

18  A.    So this is what you would see after you've, in fact,

19  downloaded it.  The program would start to run.  And maybe

20  everyone in the courtroom has installed software on their

21  computer.  You go through these setup stages.  Sometimes they

22  are call wizards.  This is the start of that wizard.  It says

23  select setup language.  Here whoever put together these slides,

24  I'll just say we, we've selected English.

25  Q.    Now showing you page 4.

1  A.   So this would be further along in the installation

2  process.  You can see at the top left it says "setup Freenet."

3  And it says, "Where should Freenet be installed?"  And here

4  highlighted in blue is a folder or a location on the local hard

5  drive of the person who installed this.  And assuming that's an

6  okay location, we would hit "next."

7       And then here we are again further along in the

8  installation process and it's saying, "Where should I place the

9  program's shortcut?"  Often, after we install things, we, in

10 the case of Windows, want to do things like click the start

11 menu and just see the application name, in this case Freenet,

12 and things would go.

13      So we're just being asked where would I like to -- how

14 would you like to label this application in the start menu?  So

15 Freenet is a good choice, and then we would go to the next

16 slide.

17 Q.   So that was slide five.  Now I'm showing you slide six.

18 A.   And here we are again further along in the process, and it

19 says, "Setup is now ready to begin installing," and we would

20 hit the install button.  There's a summary of what our

21 selections have been so far.

22      And if we go to the next slide.

23 Q.   Page 7.

24 A.   It says, okay, "Setup has finished installing Freenet on

25 your computer.  The application may be launched by selecting

1  the installed shortcuts."  And here we have a clicked box that

2  says "launch Freenet."  And so if we hit "finish," Freenet is

3  going to be launched in the next slide.

4       There is, notably, no ask for money, nothing about your

5  name.  This seems pretty straightforward for anyone who has

6  gone to the Freenet website, which they may have found through,

7  say, Google to get through this process pretty easily in my

8  opinion.

9  Q.   Now showing you page 8.

10  A.   Okay.  So now at this stage, Freenet has begun running.

11  We are here in a browser.  I think this is the first point

12  where things maybe start to look a little different.  Often we

13  run applications on our computer and they have their own

14  window, but sometimes we run applications in the browser.

15       So this is a browser on our computer, and it's the first

16  thing you would see if you were to install Freenet along the

17  ways that we've done it.  We can see up at the top there is the

18  Freenet logo.  I don't know what that is.  I've always thought

19  maybe a rabbit.  I have no idea.

20       And then in the middle, it says "setup Freenet," and we're

21  given three choices here.  So I think it's worth reading what

22  the choices are.  So on the left, it says, "Connect to any

23  Freenet user:  Low security."  And in the middle, there is a

24  middle choice that says, "Connect only to friends: High

25  security."  And then on the right, it says, "I want more

1    fine-grained control."

2         Let's ignore that and just focus on the two, the one on

3    the left and the one in the middle because the one on the right

4    is just more details that are just variations of what I'm going

5    to talk about.

6         So on the left, it says, "If you live in a relatively free

7    country where running Freenet is legal, you can choose this

8    option.  It is much safer than traditional P2P" -- or

9    peer-to-peer -- "traditional P2P software like BitTorrent or

10   Gnutella, but an attacker with moderate resources may be able

11   to trace your activity on Freenet back to you.  If you have

12   friends who also run Freenet, you can improve your security by

13   adding them as friends and then connecting only to them."

14        And, in fact, what they're asking you is maybe you want

15   the middle choice.  So let's look at the middle choice.  The

16   middle choice says, "Connect only to friends: High security.

17   If you know several people you want to connect to, this setting

18   allows you to create your own Freenet darknet for vastly

19   improved security.  If you only have a few people, it may not

20   be very useful, but if some of them know others or have low

21   security set, you can have a very large network."

22        So we have one choice on the left, low security, and one

23   choice in the middle, high security, and then the custom

24   settings.

25   Q.   And with the low security, is it essentially saying that

1   someone on Freenet could identify the IP address and what that

2   IP address has been doing on Freenet with moderate resources?

3                MR. ROBBINS:  Objection.

4                THE COURT:  I'm sorry?

5                MR. ROBBINS:  Objection, Your Honor.

6                THE COURT:  Basis?

7                MR. ROBBINS:  I think that he's kind of overstated

8   the evidence there.

9                THE COURT:  I'm sorry.  I'm having a hard time

10  hearing you.

11               MR. ROBBINS:  He's overstated the evidence, Your

12  Honor.

13               THE COURT:  Okay.

14               MR. ROBBINS:  He can ask the witness what does that

15  mean.

16               THE COURT:  Okay.  So the objection is leading,

17  essentially.  Okay, can you rephrase?

18               MR. DRAUGHON:  Sure.

19  BY MR. DRAUGHON:

20  Q.   Can you, in your own words, describe what it is that the

21  low security option is saying could happen?

22  A.   So this is the -- in my own words, low security is

23  referring to two things here.  The first is when you

24  communicate with anyone on the Internet directly, there is no

25  way but to tell them your IP address.  That's how the Internet

 1    works.  There is no way, by analogy, to get a letter through

 2    the post office without telling the post office the destination

 3    it's going to.

 4         On the Internet, you need to tell the destination.  And I

 5    should say, to continue the analogy, if you expect, rather, a

 6    reply from whoever you've sent that letter to, you have to give

 7    them your own address.

 8         And in Freenet, we are interested in connecting to other

 9    people so that we can go back and forth with signals and other

10    messages.

11         So in this case, low security, first of all, means that

12    you are going to contact someone, and you're going to reveal

13    your own IP address.  That's number one.

14         I think more importantly what differentiates low security

15    from high security is what it says about friends.  They're

16    saying to you -- and we'll see this word in future slides.  If

17    you are willing to connect to strangers, go ahead and connect

18    to low security.  If, instead, you have friends who you trust

19    completely, go ahead and pick high security.

20         So to me, low security means you are connecting, in their

21    words as we'll see, to a stranger; and high security means

22    you're going to connect only to your friends.

23         Now, why wouldn't -- if I may ask myself a rhetorical --

24    you know, ask myself a question, why wouldn't everyone just

25    pick high security?  And the answer is you have to know someone

```
 1   who is running Freenet who is willing to make that connection
 2   with you, and Freenet is not a popular program.  It's not
 3   like -- you're not going to go to work that day and find a
 4   bunch of people running Freenet.
 5        So how are you going to meet those people?  Even if you
 6   met them, say, over the Internet, why would you trust them?  So
 7   I think when you start out, good luck.  You kind of have to
 8   choose low security, and they're warning you.  That's one of
 9   several warnings we're going to see.  You know, you might want
10   to connect to friends.  If not, I'm telling you right now, it's
11   low security.
12   Q.   Now showing you page --
13   A.   Whoops.  Something happened.
14   Q.   Here it is.  Now showing you page 9, and this is what we
15   just read so I don't want to spend too much time on this.
16   We're going to get into the particulars of this case, but one
17   question.  Did Mr. Pobre use low security in Freenet?
18   A.   Well, I'll answer that slightly differently.  When we get
19   into the details of the case, we're going to talk about a tool
20   that I know intimately, and the only way that tool can connect
21   to anyone else on the Internet is if they have chosen low
22   security.
23             THE COURT:  And can I just ask when you say "tool,"
24   do you mean the software program that is used by law
25   enforcement?
```

1          THE WITNESS:  I do, Your Honor.

2          THE COURT:  Okay.  And that's, just so I'm clear, the

3   software that you earlier testified you designed or helped

4   design?

5          THE WITNESS:  Correct, Your Honor.

6          THE COURT:  Great, thank you.  Go ahead.

7   BY MR. DRAUGHON:

8   Q.   Now showing you slide ten.

9   A.   This is a screen in Freenet.  We're starting to look at

10  the options that are available.  This is a bit more detailed

11  than just low security and high security.  So there's a lot of

12  information on the screen.

13         Let me point out some important parts to this.  You can

14  see a little bit down from the top it says "opennet mode," and

15  it says right there, "connect to strangers and friends."  And

16  it says, "I don't know anyone who already uses Freenet.

17  Connect to other Freenet nodes automatically."  And we can see

18  there are two choices and it says -- and I'll explain the

19  difference between the two if you want, but they're both

20  opennet.  And it says, under low, "It may be quite easy for

21  others to discover your identity!"

22         The other set of options are under what are called darknet

23  mode, and it says "connect to friends only."  And it says, "I

24  know at least three people."  At least ten.  It says, "Ten plus

25  for good performance who already use Freenet."  As I said, that

1    might be a high bar for some people.

2          And it warns you about the performance.  Here performance

3    means -- Freenet is already a program that requires an immense

4    amount of patience.  I think most of us are used to very fast

5    downloads from the Internet.  Freenet requires minutes, hours,

6    even days to download content that we can get from -- you know,

7    a movie on YouTube can start streaming immediately.  Sometimes

8    if a movie doesn't start in a few seconds, we get frustrated

9    and move on.  We're talking a long time before anything happens

10   on Freenet and that's in the opennet mode.

11         So they're warning you that things are going to be pretty

12   slow if you connect to darknet mode, but they're saying that's

13   higher security.

14         So you can see on the bottom -- well, so, first of all,

15   we've clicked "low."  You can see on the bottom it's reminding

16   us that -- it says low twice.  And if you're curious -- I can

17   answer later.  I don't want to confuse things now, but let's

18   just say the low and the normal are both part of opennet mode.

19   The high and the maximum are both part of darknet mode.

20         And, again, in opennet, you're connecting to, quote,

21   strangers, and you see this warning.  And then darknet mode

22   you're connecting to, quote, your friends, whatever that means;

23   someone you trust.

24   Q.   And why does it say "low low" at the bottom of the screen?

25   A.   So that's a reminder of the security mode that you've

1  chosen, and then right next to it, it says, "1 out of 14."

2  What that's referring to is it's trying to connect to 14

3  strangers currently, and right now it's connected to just one

4  and that's not enough.

5       And so the bar, the colored bar is all the way left.  You

6  can't do much with one person.  The performance is going to be

7  terrible, and so it's trying to establish connections.  When I

8  say "it," I mean, the Freenet software is trying to establish

9  connections to other people running the Freenet software,

10  computers operated by people who are running the Freenet

11  software.

12  Q.   Now showing you page 11.

13  A.   Okay.  So this is, again, more -- we're really still in

14  the configuration process.  We've -- you know, to remind

15  everyone, we've gone to the Freenet website.  We've downloaded

16  the software.  We've gone through the installation wizard.

17  It's now up and running.  We're going through more

18  configuration options, and it's warning the user, unlike other

19  software, I'm not going to open my own window.  I'm going to

20  use your browser itself to allow the software to work.

21       Some people may be aware of on your phone and on your

22  computer, you can put your browser software in a privacy mode.

23  Sometimes it's called incognito mode or private mode, and what

24  that means is when you close the tab or you close the

25  application, information that's been stored on the computer

1  about your browsing, which sites you went to in the past, will
2  be erased.
3      And what they're saying here is I'm going to use your
4  browser to use Freenet, and if you're concerned about your
5  privacy, you want to use Freenet in your browser's privacy mode
6  or incognito mode or something that doesn't remember the
7  history.  So that's what this is about.  It's a suggestion that
8  you do that.
9  Q.   Now showing you page 12.
10 A.    Okay.  So on page 12, it's asking you for the Datastore
11 size, probably not a term most people have seen before.  So as
12 I mentioned, Freenet is a peer-to-peer application.  There is
13 no one entity running things.  It's relying on the idea that
14 people have banded together to all run the software and provide
15 their own resources to one another.  What you're providing is
16 the computer that you've purchased and, in particular, the
17 processor that's on there, the hard drive that you've
18 purchased, and then you're also providing this bandwidth to
19 your home.
20     You know, I pay for bandwidth at home.  Everyone pays for
21 bandwidth.  It's not free.  So you're donating a portion of
22 those resources at any one time towards ensuring that the
23 Freenet network is available and as performant as possible.
24     So as someone who is installing Freenet, one of the
25 questions we get is, you know, I want to store content that's

1    been inserted on the network on your computer.  How much of

2    your local hard drive would you like to donate to that cause

3    because it's not going to be available for other things that

4    you may need to do.

5         Some people have collections of home movies, images, or

6    whatever they have, their own tax returns.  You know, we store

7    those things on our own computer, and we need hard drive space

8    to do that.

9         Well, whatever you donate to Freenet here, it's not going

10   to be available to you.  So here they're suggesting that you

11   donate 20 gigabytes.  It says "GiB."  People may not be

12   familiar with that term.  It's just gigabytes.  So 20 gigabytes

13   is a suggestion.  That white area is a drop-down menu.  You

14   could choose one gigabyte if you wanted to.

15   Q.   So when people give some of their hard drive space to

16   store Freenet content, are they storing complete files?

17   A.   No.  So one of the important design features of Freenet is

18   that when you store content that's been -- when you direct your

19   computer to run Freenet and store that content, the content

20   that you're receiving is just a little portion of a file that's

21   been inserted, what's called a block.  And not only that, it's

22   encrypted.  Any content that you are storing for other people

23   when you join this network and run the software comes

24   encrypted.

25   Q.   Could someone that is sharing their hard drive with the

1   Freenet network have a complete file?

2   A.   Only if they downloaded it themselves.  It's more than

3   that.  The content that you're storing for other people, it's

4   encrypted.  So in the normal operation of the software, this

5   Datastore that we're being asked about here, by definition --

6   Freenet is not designed for any one person to store the entire

7   file because if that person went away -- and that often

8   happens.  People turn off their computers.  They shut their

9   laptops.  They go on vacation for a week -- the file would

10  disappear.

11       One of the main goals of Freenet is to make that

12  information available resiliently, despite the fact that

13  computers operate -- people who are operating computers running

14  Freenet come and go.  So you don't want to store that file at

15  just one location.  You want to break it up, store it

16  everywhere, store it redundantly.

17       And as I said, it's encrypted.  So we'll get to a

18  discussion about -- even if you wanted to decrypt this data

19  that's stored, you can't.  You need some other piece of

20  information.  We'll talk about what that is, but if you just

21  operate a node, and you look at what's been stored, you cannot

22  decrypt it having no other information.

23  Q.   I'm now going to show you page 13.

24  A.   Okay.  So at this stage, we've gone through the

25  installation process with Freenet, and we've configured it how

1   we want and we're ready to go.

2        So we're here in our browser, and we're presented in this

3   screenshot some places that we can go.  So if you're looking at

4   this and you're saying, wait, why would I start here?  Why

5   wouldn't I go to Google?  Right?  Why not have a search term?

6   This is not the regular Internet.  You can't get to Google.

7   You can only see things that have been inserted previously.

8        And Google does not index Freenet.  They have no

9   information about it.  Nobody, to my knowledge, has indexed

10  Freenet in that way, and if you're old enough, and I'm old

11  enough, you might remember before Google there was Yahoo.  And

12  in the early days of Yahoo, Yahoo was a collection of

13  interesting bookmarks that -- it was one of the largest

14  collections of bookmarks that there were.

15       And that's where we are still with Freenet.  Someone put

16  together a list of things that they found interesting on

17  Freenet, because it's the only way to find things.  You can't

18  enter a term and search for it.

19       And so let's look at this list.  There is -- it's really a

20  list of lists in some ways.  One of the first entries "Enzo's

21  Index," and it says, "Links to most Freenet websites sorted by

22  category to make it easier to find what you want."

23       The next one says, "The Filtered Index, an index without

24  pornographic or shocking sites."  That to me is personally a

25  tip-off that we're entering dangerous territory here.  We've

1  been warned that right from the get-go there's not just

2  pornographic but shockingly pornographic content if we're to

3  click the wrong thing.

4      We see this -- to me, again, "Nerdageddon" is another

5  index site.  Again, a list of content that you can see on

6  Freenet.  And it says, "An index with the most offensive

7  content removed."

8      And we can see some other lists here, and as we'll

9  probably get to today, I've scientifically examined the content

10 on Freenet with the help of law enforcement, and there is an

11 enormous amount of child sexual abuse material on it; and I

12 think that's what they're referencing here when they say

13 "offensive content."

14 Q.   Now showing you page 14.

15 A.   Okay.  So this is -- when you operate Freenet and you get

16 it going, the software, based on the settings that you

17 configured it with, will connect to strangers that are also

18 running Freenet.  That's what we're being shown here.

19     You recall in an earlier slide we selected low security.

20 So this is one of the screens that Freenet will show you as you

21 run the software, and so what we can see here is these list of

22 peers, and a peer is another computer that has been instructed

23 by its operator to run Freenet.  So we can see the list of

24 peers that our computer has connected to and is running this

25 Freenet protocol.

1          It's a little blurry, but those are IP addresses.  We can

2     see the version of Freenet that they're running.  We can see

3     the amount of time that we've been connected.  And what is it,

4     one, two, three, four, five, six -- it looks like seven

5     neighboring peers that we know exactly their IP address.

6          There are flags there because the software makes a, I

7     don't know, a broad guess as to what country they're in.

8     There's ways to do that.

9          We can see there are three more peers that are currently

10    busy, which means they're handling enough traffic.  They're

11    instructing our computer, like, give me a second; I'll get

12    right back to you.  There are two that this installation of

13    Freenet has apparently never connected to and one that it is in

14    the process of disconnecting to.

15         So this is all available to the user immediately.  We can

16    see that we're connected to strangers.  We can see their IP

17    address.  We can see how long we've been connected to them,

18    what version they're running, even where they are.  You know,

19    again, it's an estimate but some notion of the geography of

20    where they are.

21    Q.   And just to make sure we're clear, this is the regular

22    Freenet, not the law enforcement version?

23    A.   That's correct.  This is what you would get if you went to

24    the Freenet website and downloaded it, installed it, and ran it

25    yourself.

1   Q.   Now showing you page 15.

2        THE COURT:   Can you go back for a second,

3   Mr. Draughon?

4        MR. DRAUGHON:   Yes.

5        THE COURT:   I just want to make sure I look at this.

6   And just so I'm clear, Doctor, the last column that says

7   "connected idle," is that just a timestamp for how long the

8   user has been connected to the other users in the list?

9        THE WITNESS:   Correct, Your Honor.

10        THE COURT:   Thank you.

11   BY MR. DRAUGHON:

12   Q.   Now showing you page 15.

13   A.   So this is an example of what the user would see if they

14   wished to download content on Freenet.   To be clear, there's

15   several different ways to download content on Freenet.   This is

16   just one of them.   One of the things you can do is give it a

17   URL.   I'm hesitating a little bit because when we use the clear

18   Internet, we get URLs that are pretty good in terms of

19   readability.   We see things like www newspaper.com slash some

20   story.

21        Things are not that nice in Freenet.   There are URLs but

22   they're unpronounceable.   You can, in fact, maybe read out --

23   read for yourself a URL in Freenet up at the top there.   It's a

24   collection of numbers and letters, but that is a URL that if

25   you are running Freenet, you can give to Freenet and you can

1  download the content.

2       Okay.  So in this case, there is a human pronounceable

3  name of what we're downloading.  It's index-711.  You can see

4  that at the top there it says, "Freenet is downloading the page

5  you requested."  You can see that 27 seconds have gone by.  It

6  estimates that 38 seconds are to go.  The total size of what

7  we're downloading is 1.81 megabytes.  So that's pretty slow.

8  That's an example of what I was talking about.  It takes a

9  little bit of time.

10      We can see that it's estimated that -- or, I'm sorry.

11  It's telling you that 68 percent of the content -- 68.1, but

12  68 percent of the content has been downloading so far, and then

13  there's some other information.  It's telling you basically

14  where it's going to go.

15      And you can see at the bottom, just referring to something

16  that I said before, we're now up to 11 out of 14 strangers that

17  the software is trying to connect to, and there is, again, this

18  reminder that we are in the low security mode.  We're not --

19  we're in opennet.  We're connecting to strangers and we're

20  performing this download.

21  Q.   Is the reminder about the low security mode present

22  whenever Freenet users download it?

23  A.   That's correct.  It's on the bottom of the screen for most

24  anything that you do.

25      Now, we'll see in a minute that sometimes if you go to

1   view what you've downloaded, that's different because you're

2   outside -- you may still be using your browser, but you're not

3   in the Freenet application.  You're viewing what you

4   downloaded.  But here we're looking at the Freenet application.

5            THE COURT:  Can I make sure I'm understanding when

6   you say "download" what you mean?  Is that the user providing

7   content or the user requesting content and obtaining it?

8            THE WITNESS:  The latter, Your Honor.  The user here

9   has requested content to download.

10           THE COURT:  To download?

11           THE WITNESS:  To download.

12           THE COURT:  What's the term that you use when the

13  user provides the content, to create the key that, you know --

14           THE WITNESS:  I would call that an insert or an

15  upload.

16           THE COURT:  Okay, great.  Thank you.

17  BY MR. DRAUGHON:

18  Q.   Now showing you slide 16.

19  A.   So on slide 16, we see an example index site.  We were

20  talking about some before.  This is an index site called "Yet

21  Another Freenet Index," or YAFI.  I guess YAFI is an acronym.

22  We can see this was some version of YAFI from 2016.  It says on

23  the right here a list of bookmarks, is what you would call it,

24  a list of other sites on Freenet that are available for

25  download.

1        The first one is called "Dream Teen-Index."  The

2   description is "My favorite porn teen stuff."  On the bottom --

3   we can see some sites of some of the developers of Freenet in

4   the middle, and then as we get to the bottom, there's two.  One

5   is called "Little Angels."  The description is "Photos of nude

6   minors."  The one below it says "Lolitas Heaven," and it says,

7   again, "Photos of nude minors."

8        And so if you were to -- again, you're running Freenet.

9   You see this in your browser.  If you were to click one of

10  these links, you would be brought to that site.

11  Q.   Now showing you page 17.

12  A.   So page 17 is apparently Lolitas Heaven, and,

13  unfortunately, there are some victims here of abuse that have

14  been shown; thankfully redacted.  Yeah.

15  Q.   Now showing you page 18.

16  A.   So this is apparently -- in the previous slide, we saw the

17  top half of this site.  Here we're seeing the bottom half of

18  the same page as if the user scrolled down in their browser.

19            THE COURT:  Can I ask a question about this -- I'm

20  sorry.  Do you mind, Mr. Draughon?

21            MR. DRAUGHON:  No, of course not.

22            THE COURT:  Because I'm just asking like

23  clarification questions.

24       As you're walking through this, Doctor, the other Freenet

25  users, is it fair to say, cannot see what the current user is

1   doing in terms of scrolling through indexes or clicking on

2   sites.  Is that fair?

3           THE WITNESS:  I would say what they cannot see is

4   that you're scrolling.  They cannot see what's on your screen,

5   but what they can -- what they do have a view into is what

6   you've requested of them directly.  You know, whoever

7   downloaded this site asked other -- asked the strangers that

8   they are connected to I would like the content -- I would like

9   this content; do you have it?  If you have it, please give it

10  to me.  If you don't have it, please ask who you are connected

11  to.

12          THE COURT:  But that's the computers asking each

13  other for the encrypted bits, right?

14          THE WITNESS:  At the behest of the user.  At the

15  direction of the user.

16          THE COURT:  Right, I understand that.  I'm just

17  trying to understand, though, what when the behest of the user

18  is asking for it but the other Freenet participants are not --

19  it's not a person actually seeing what's being given at the

20  behest of the requester.  Is that fair?

21          THE WITNESS:  If they want to see it, they could.

22          THE COURT:  Okay, then maybe you all are going to get

23  to that.

24          THE WITNESS:  We can, for sure.

25          THE COURT:  All right, great.

1    BY MR. DRAUGHON:

2    Q.    Why don't we get to it now.

3    A.    Okay.  So as we're doing this, we've -- can I just

4    describe this page just to finish my thought and I'll answer

5    that question?

6    Q.    Of course.

7    A.    Okay.  So what we're seeing here is the bottom of that

8    same page scrolled down and it's redacted.  It might be hard to

9    see on the screen because the redaction block is black and

10   that's the same color as the background, but you can see the

11   blue outline of the block.  So -- and it's a little hard to

12   read, but we can see that on the left it says "CHK@" and then

13   some letters and numbers.

14          And then a lot of them are removed because my

15   understanding is exhibits in this trial are public, and if we

16   were to release these long digits, long series of numbers and

17   digits and someone got a hold of them, they could download this

18   site.  I mean, it would be like releasing information about how

19   you can download child sexual abuse material.  So this is

20   redacted because anybody could take these numbers and letters

21   and download this same material.

22               THE COURT:  What is this thing that we're looking at

23   right here?  Is it an index?

24               THE WITNESS:  This apparently is a set of files.

25   It's a gallery of victims of child sexual abuse, and you can

1   download these files.  So what we're showing at the bottom --

2   okay.  So what I'm trying to say, Your Honor, is that at the

3   top, we see these images, and presumably -- I've never been to

4   this site, but presumably, like any website, you could click on

5   the images and, perhaps, see not just the thumbnail but the

6   larger image; and that's how the web normally works.

7        But here at the bottom, for convenience, whoever put

8   together this site of child sexual abuse material has given the

9   user the URL to copy and paste.  So as a user, you can see

10  actually a little bit of blue under the word "inserts."  So

11  someone has highlighted the first one.  They could right click

12  and copy and then paste it like a bookmark, like you would save

13  a URL wwwnewspaper.com slash some article that I'm interested

14  in, and you would save that, perhaps.

15             THE COURT:  You would click and paste the URL, not

16  the actual image?

17             THE WITNESS:  That's right.

18       In this case, you could save the URL for later

19  downloading.  Alternatively, presumably, you could click on

20  either one of these images and download it that way, but people

21  -- whoever put --

22             THE COURT:  When you do that, when you click on the

23  URL, does it take you to an outside Freenet source, or is it

24  clicking on the URL is what triggers the request among Freenet

25  users?  Do you understand my question?

1        THE WITNESS:  I'm not sure, Your Honor, there is a

2   difference between the two.  Do you mind explaining?

3        THE COURT:  Well, my understanding of Freenet from

4   the papers and your prior testimony is that there is a group of

5   individuals, individual computers who have band together, as

6   you say, donate space, and so the documents or items that are

7   stored within it are broken up, and they remain almost like a

8   self-contained unit among the users of Freenet.

9        THE WITNESS:  Correct, Your Honor.

10       THE COURT:  Okay.

11     Now, with regard to a screen like this where there is a

12   URL and you click it, does that URL reflect a document with

13   content that is within Freenet; it's stored, you know, broken

14   up in those encrypted blocks that we talked about?  Or is the

15   URL taking you outside to an independent website that's not

16   part of Freenet?

17       THE WITNESS:  I think you could do either, but I

18   think generally in these cases, especially, what we're seeing

19   on the screen is content that's in Freenet.

20       THE COURT:  It is in Freenet?

21       THE WITNESS:  Yes.

22       THE COURT:  Okay.

23       THE WITNESS:  And, Your Honor, that's exactly what's

24   at the bottom.  It's the long form of what you're clicking on.

25   It is a URL.  I know it looks really strange, and it's not how

 1   we're used to seeing URLs that we would type into our browser,

 2   but if you copy that and you're running Freenet and you paste

 3   that into your browser, you will download -- you can see on the

 4   right here -- I have to squint.

 5            THE COURT:  Sure, but you're using Freenet to do it,

 6   right?

 7            THE WITNESS:  You're using Freenet to do it, Your

 8   Honor.

 9            THE COURT:  Okay.  So in that way, does Freenet

10   operate like its own search engine?

11            THE WITNESS:  I wouldn't call it a search engine,

12   Your Honor, because there is no way to search for anything as

13   far as I know.  You have to click on bookmarks of what other

14   people have created.  You have to take these lists of, you

15   know, very unreadable URLs and save them in your own -- in your

16   browser or put them in a notepad kind of thing and then paste

17   them.

18            THE COURT:  Okay.

19            THE WITNESS:  But if you don't mind, Your Honor, I

20   want to point out that on the right side of the screen is the

21   continuation of the URL, and you can see that looks a little

22   bit normal at the end.  It says slash

23   Lolitasheaven-Abigail.rar, or rar or something.  The next one

24   is the same but Alexa, Ali, all of these names.

25        And if you don't know, Your Honor, an rar file is like a

1  zip file.  It's a collection of images that appear to be one

2  file.  If you were to download it, you could expand it into

3  multiple files.  So there is an implication here that this is

4  not one file of this victim, presumably named Abigail, but,

5  perhaps, many instances of it.

6       And if you don't mind going back a page, you can see at

7  the top left it says "Abigail 88 pics."  So that's how I'm

8  coming to the conclusion that we could click on the thumbnail

9  or we could copy that very difficult to pronounce URL, save it

10 for later, and what we would get would be this rar file.  In

11 other words, a zip-like file, and we could expand it once we've

12 downloaded it into 88 pictures.

13           THE COURT:  And that's all done by the Freenet user,

14 correct?

15           THE WITNESS:  Correct.

16           THE COURT:  Not by typing in anything but by clicking

17 and cutting and pasting?

18           THE WITNESS:  Either.  You could presumably click --

19 like I said, I've never been to this site, but I presume you

20 could click or you have the option of copying and pasting that.

21      Do you mind going back one more?

22 BY MR. DRAUGHON:

23 Q.  So we were on slide 17.  Going back 16?

24 A.  Oh, I'm sorry, keep going to downloads.

25 Q.  15.

```
 1  A.   So here, this is -- unfortunately, I don't have a screen
 2  -- or there's not a screenshot in this exhibit, but we got to
 3  this page because someone cut and paste that long URL into
 4  this.  There's other ways to get to this page, but either one;
 5  you click or you would paste it yourself, but it's the user who
 6  does that --
 7           THE COURT:  Okay.  Thank you.
 8           THE WITNESS:  -- Your Honor.
 9  BY MR. DRAUGHON:
10  Q.   Now going to page 19.
11  A.   Oh, okay.  This is what I was looking for.  I apologize.
12  So this is one of the ways that you can download content on
13  Freenet.  This page has -- that white area is a box that you
14  can type whatever you want or paste whatever you want.
15       So what we're seeing here is that someone -- in the
16  previous slide we saw that it was highlighted blue because they
17  had used their mouse, presumably, to highlight it and then
18  right clicked and copied.  They then went to the downloads page
19  on their Freenet software and pasted it into the what's called
20  bulk download box or form.
21       And you can see it says, "You can paste a list of keys to
22  download in the box below one per line."  So whoever made these
23  -- whoever made this exhibit pasted Abigail in there and then
24  they would select download, and it would begin to download.
25  Q.   The pages that we've been reviewing, are they still the
```

1    pages that one would see if they were to download Freenet

2    today?

3    A.    Correct.

4    Q.    Are the graphics --

5    A.    There are minor changes occasionally to the software, but

6    this is very representative of what you would see.

7          THE COURT:  Is it representative of what was in place

8    in 2018?

9          THE WITNESS:  Yes, Your Honor.

10         THE COURT:  Okay.

11   BY MR. DRAUGHON:

12   Q.    You've mentioned copy and pasting these URLs and trying to

13   assemble -- I think you described it as sort of bit to a block

14   distributed throughout the network.  Is that a fair summary of

15   how you described it before?

16   A.    Yes.  Do you mind saying that again?

17   Q.    How about this; how about you say it again.  How are the

18   files stored on the network?

19   A.    Okay.  So in a way, you're asking, yeah, how are files

20   stored?  How is it that content makes its way into Freenet?  So

21   at some point, someone decides that they would like to share

22   content, and for clarity, let's say that they want to share one

23   file because --

24         THE COURT:  Upload?

25         THE WITNESS:  Upload.

1              THE COURT:  Okay.

2              THE WITNESS:  They would like to insert and upload

3      one file.

4              THE COURT:  Okay.

5              THE WITNESS:  And that makes it easy because if they

6      have multiple files, as I said, they can make it a zip file.

7      They can make it a rar file.  So let's just focus on one file

8      that they would like to insert and make available to others in

9      Freenet.

10             So they would sit down at this application.  There are

11     screens that we haven't seen yet, but it's just as easy as it

12     is to download.  We can insert in Freenet.  We can point it

13     towards -- maybe you've uploaded a file to any site on the

14     Internet.  You can point your browser to a directory or a file.

15             So we would do that in Freenet.  We would tell the Freenet

16     application this is the file I would like uploaded and then it

17     gets to work.  So what does that mean?  It takes your file.

18     And like I said, it doesn't want to give it to one other person

19     because that person might go away.  That's not very resilient,

20     and we're depending on random strangers on the Internet who

21     have things to do, and sometimes they shut off their computer.

22             So what Freenet does instead is it takes the one file that

23     we want to upload, want to insert, and it smashes it into

24     pieces, essentially.  So let's say it might take our large file

25     and smash it into 1,000 pieces.  It takes each one of those

1   pieces and it also encrypts it.  It encrypts them all with the

2   same key and puts the key aside.  Okay?

3       So the next thing the Freenet application is going to do

4   is take each encrypted piece and basically distribute it around

5   the entire Freenet network.

6           THE COURT:  So the user who wishes to upload the

7   document is going to presumably put that in the upload file and

8   then the software smashes it into a thousand pieces, encrypts

9   it, and sends it out to the other Freenet users?

10          THE WITNESS:  Exactly, Your Honor.

11          THE COURT:  Okay.

12          THE WITNESS:  And so if there are 1,000 other people,

13  to make this easy, they will each get, let's say, one piece.

14      Okay, there is -- I want to also say there's a lot of

15  details to Freenet and it gets in the way of clarity.  So I'm

16  going to explain things and then sometimes come back and

17  clarify what I had to say.  But for now, let's just say that

18  1,000 pieces get distributed and they are out there.

19      Now, at that point, you would have a list of all the

20  pieces that were inserted, and you have what's called a

21  manifest, and I think that's a very good word because if you

22  think about, if I were to ship something across the world and I

23  needed these things to go together, you would give the ship a

24  manifest of what was shared.  If you go to IKEA --

25          THE COURT:  When you say "you," are you meaning the

1    user --

2              THE WITNESS:  Uploader.

3              THE COURT:  The uploader.

4              THE WITNESS:  Yeah.

5         If the user would like to share something with the world

6    with the presumption that someone else is going to download it,

7    that person needs the manifest of all of these pieces that were

8    shipped.  If you buy something from IKEA, you get a manifest of

9    all the pieces that together will form a piece furniture; and

10   if the piece is missing, you look at the IKEA manifest and say,

11   oh, we're missing this weird part.

12        So that list is actually also inserted into Freenet as a

13   block or sometimes more but let's keep it simple, one block,

14   one piece; and then what's returned to the user is exactly that

15   weird collection of numbers and letters that we've been looking

16   at, and that is a receipt.  You can think of it as a kind of

17   password in a way, but it's returned to the uploader, the

18   uploading user.

19        And the software says good news -- I'm paraphrasing here,

20   of course.  Good news.  I've uploaded this file you would like

21   to share.  I've uploaded the manifest for anyone who would like

22   to download it, to reconstruct it, and here is a series of

23   numbers and letters that you can give to anyone else in the

24   world, and as long as they are running the Freenet software,

25   they can download it again.

1      So I can talk about what happens on the other end if you

2   would like now that we've inserted content.

3   BY MR. DRAUGHON:

4   Q.   Yes.

5   A.   Okay.  So as the user who uploaded, I can't keep that

6   result to myself.  I need to share it with someone now.  I

7   could share it with them via a text message if I trust them and

8   I have a secret to share.  I might broadcast it to the world.

9   I could broadcast it to the world by emailing it to everyone I

10  know.  In fact, I could use Freenet to broadcast it.

11     Freenet has a way where people can discuss things with one

12  another and post messages.  Sometimes we're part of groups on

13  various Internet sites where we share interests, and there's a

14  way to share your interest on the Freenet application.

15     But in any case, I have to tell the world about this URL.

16  Now, I do that.  One thing to note is that what I share is not

17  only where to get this manifest but that password, that key I

18  set aside that everything was encrypted with.  Okay?

19     So but the point is --

20          THE COURT:  You mean the key that the software

21  generates?

22          THE WITNESS:  The key that the software generated,

23  Your Honor.

24     Okay.  So anyone who has -- when I broadcast that, anyone

25  who gets the manifest can then decrypt the content.

1          THE COURT:  Is broadcasting required?

2          THE WITNESS:  I'm using "broadcast" to mean an

3   announcement.  I'm using that informally.

4          THE COURT:  Right, I know, but it's important.  So I

5   want to make sure I understand what you're saying in terms of

6   what Freenet users must do once they -- they upload the

7   document, they get the manifest, the software generates a key.

8   And then is there anything else that the uploader needs to do

9   to make it available to the Freenet users?  And, if so, what is

10  that?

11         THE WITNESS:  They have to tell someone else that

12  URL, that manifest key and the password.

13         THE COURT:  So it's not otherwise available in like

14  an index or something?

15         THE WITNESS:  It's not otherwise available, Your

16  Honor.

17         THE COURT:  Okay.  Can you just, for my sake, because

18  I'm not a computer person so this is very helpful.  Can you

19  tell me what does the -- what is the minimum that a Freenet

20  uploader needs to do to let other users know that this document

21  has been uploaded?

22         THE WITNESS:  They have to provide them that -- so if

23  you look at the screen, it's redacted, but it starts with, in

24  this case, "Chk@," it looks like, "4ik", and then there is some

25  redaction and then it ends with Lolitasheaven-Abigail.

1              THE COURT:  Okay.

2              THE WITNESS:  Okay, so that long URL needs to be

3     given to someone else, and you can do whatever you want to give

4     it to them.  You can send them an email.  You can post it on

5     the regular Internet.  You can send them a text message.  You

6     can post it on various forms on Freenet, but you have to take

7     that step.  I mean, you have to put it somewhere.  There is no

8     automatic mechanism to my knowledge where anyone would

9     automatically learn that you just uploaded that to Freenet.

10             THE COURT:  So the uploader must do something to

11    create the index that the downloaders may see?

12             THE WITNESS:  An index or, in this case, just the

13    straight URL.  Yes, the uploader has to take positive action to

14    make that available to other people.  To my knowledge, there's

15    -- I mean, that's the whole point of the software.  I can't see

16    it automatically -- that would be crazy.  Their whole design is

17    to provide privacy.  Why would they automatically tell other

18    people that you just uploaded something?  They leave it to the

19    user to take that final step to make it, for example, publicly

20    available or privately available.

21             THE COURT:  Well, when you say "publicly available,"

22    you mean on Freenet?

23             THE WITNESS:  On Freenet or, as I said, you could

24    just send an email out to the whole world.  I mean, we're

25    looking at the URLs right now.  Now they're part of this

1  testimony or this evidence.

2           THE COURT:  I guess I'm still confused, though.

3           THE WITNESS:  I'm sorry.  I'm confusing you, Your

4  Honor.

5           THE COURT:  So let's take the example of the site

6  that is at slide 17 -- 16, 17, 18, and if you could describe to

7  me the steps that the uploader would take to make that perfect,

8  slide 18 available to other Freenet users.

9           THE WITNESS:  They would create this website.  Let's

10  just say it's a file.  They would use the Freenet software to

11  then upload the file to Freenet.  The Freenet software would

12  return to that user specifically -- do you mind going to the

13  prior page?

14           MR. DRAUGHON:  Sure.

15           THE WITNESS:  They would -- the Freenet -- so to

16  start again.  There is this one file we want to upload.  This

17  is the one file, just to make it simple.  The user who created

18  this would direct the Freenet software to that one file.  The

19  Freenet software would do its work to break it up and do the

20  upload.  Some time would pass and then at the end of it, it

21  would return to the user a URL.  What is that URL?  You can see

22  it at the top of the screen.

23           THE COURT:  Yep.

24           THE WITNESS:  It says "ssk@" -- it looks like cobu,

25  et cetera.

1          THE COURT:  Okay.

2          THE WITNESS:  It's very difficult for humans to deal

3   with that, but, unfortunately, that's what Freenet provides to

4   you.

5      Okay.  So now that they have that, they've copied it and

6   they've saved it in, you know, in their notes.  Whatever it is

7   on their -- there is a file on their computer that contains

8   this exact sequence of numbers, letters, and punctuation.

9          THE COURT:  On the uploader's computer.

10          THE WITNESS:  On the uploader's computer.

11      Now that uploader must take definitive action to share

12   that with the world.  They can share it any way they have

13   access to.  They can  --

14          THE COURT:  Or not at all, right?

15          THE WITNESS:  They could elect to not share it at

16   all.

17          THE COURT:  Or share it -- because that's what I'm

18   trying to understand is within the world of Freenet, once the

19   uploader gets the key, as you say, it's up to the uploader.

20   They can share it with Freenet, other users, or not.

21          THE WITNESS:  Correct, Your Honor.

22          THE COURT:  Or outside of Freenet.  Is that right?

23          THE WITNESS:  Correct, Your Honor.

24          THE COURT:  Would it be of any value to -- someone

25   sends an email to me with that URL.  I know nothing about

1    Freenet.

2              THE WITNESS:  If you don't know nothing about

3    Freenet, then there is no value to it, Your Honor.

4              THE COURT:  Okay.  All right, now I'm getting it.

5    Thank you.

6              THE WITNESS:  Okay.

7              THE COURT:  Sorry, Mr. Draughon.  I'm trying to catch

8    up with you all.

9              MR. DRAUGHON:  I understand, Your Honor.  I had two

10   years.  I'm still learning.

11             THE COURT:  Okay.

12   BY MR. DRAUGHON:

13   Q.   The chain at the top, the URL, is that a manifest key, or

14   is the manifest key something else?

15   A.   That is the manifest key.  The URL, the manifest key,

16   they're all the same thing.

17   Q.   Now, if you want a particular video file, how do you

18   request that from your peers?

19   A.   Are you asking me if you would like the URL for a

20   particular video, or are you asking me now that I have the URL,

21   how do I request that?

22   Q.   I'm asking you both.

23   A.   Okay.  So if I'm looking for something on Freenet, this

24   goes back to what I said, there is no Google to search.  You

25   have to go to one of these index sites.  You have to do your

1   own web suffering, we used to call it, and find something
2   you're interested in, or someone has to tell you one of these
3   URLs that they have positively elected to make available to
4   everyone else.
5       So let's start from there then.  You have something you
6   would like to download.  What happens?  You take a step to
7   begin the download.  You know -- do you mind going to the next
8   slide?
9   Q.   Slide 18?
10  A.   One more, please.  So here's an example of you -- you are
11  now the downloader.  You have in your possession one of these
12  URLs, and this is one of the ways that you could now retrieve
13  that content.  So you, as the user, have to take the action in
14  this case to paste what you're interested in in this box, and
15  then there is a download button right there on the bottom left,
16  and you would have to click that.
17      So let's assume that's been the case.  What does the
18  computer do on your behalf?  So what the computer does is it
19  takes that URL.  It takes that URL and then it says, okay, the
20  first thing I need is the manifest.  I need to know what I need
21  to download and assemble.
22      Like I said, if you want to buy something from IKEA, you
23  need the instructions.  You need to know what parts you need.
24  That's the manifest.
25      So your computer would go to Freenet and ask to download

1   that manifest.  I'll come back to that.  And then now that you

2   have the manifest, what it tells you is the blocks that, if you

3   retrieved, if your computer retrieved it, could reassemble what

4   was inserted.

5       So the next thing your computer does is it looks to its

6   peers.  Remember, we saw a slide where it listed the strangers

7   that we were connected to.  It goes through the manifest and

8   block by block -- these pieces that I talk about smashing

9   things into a thousand pieces, the correct term is block.  So

10  block by block it will ask the neighbor, hello neighbor, the

11  computer asks -- you know, we're running Freenet, and we have a

12  stranger we're connected to, and at the direction of that user,

13  they are running Freenet.

14      We asked our computer to download this file.  It gets the

15  -- using the manifest key, it downloads the manifest, which is

16  a list of blocks.  For every block in the manifest it turns to

17  one of its neighbors, and it says, Do you have this block?  Do

18  you have this content?  And that computer looks and either it

19  has it or it doesn't.  Most likely it does not.

20      So it turns to its neighbors and says, Do you have this

21  content?  And eventually it's either not found or it is found,

22  and when it's found, it's returned hop by hop back to the

23  person, us, who has requested it.

24      So after a sufficient number of blocks have been

25  downloaded successfully for this particular manifest, the

1    computer can reassemble the content.  Note that the only way it

2    can reassemble that content is because part of our URL was this

3    encryption key that we used.  And so we will reassemble --

4    decrypt each block, reassemble the pieces, and now display to

5    the users exactly what they requested, the file.  If that's all

6    successful, display to the users what they requested.

7    Q.    So you mentioned that the system is designed to have the

8    requester send requests out to multiple people, as opposed to

9    just one, for efficiency; and also, that if the person, the IP

10   address that received the request does not have what has been

11   requested, it will then pass that request on to its network.

12   Is that accurate?

13   A.    That's correct.  That's correct.  The request is asking

14   its neighbor, Do you have this piece?  It's not a request to

15   forward the request for the piece.  It's the intended

16   recipient.  Hello, stranger.  Do you have this piece that I'm

17   looking for?  If you do, send it back to me.

18   Q.    So and correct me if my math is off, but if there are

19   1,000 blocks, 10 friends, so each friend would get a request

20   for 100 blocks.  Is that right?

21   A.    Okay.  So now we're getting into some of the details of

22   how this actually works, and so I think it's important to get

23   to these details to understand some aspects about the tool that

24   I think we'll eventually get to as well.

25        So continuing as you're doing, the example I introduced

1  before, if the manifest has a list of blocks that we require to

2  reconstruct the file that's been inserted, let's say we need to

3  download 1,000 of those blocks, and we have 10 strangers that

4  we're connected to.  Then because of the way the network works,

5  each of those peers that are directly -- strangers that are

6  connected to us will -- if we have 10 of them, they will get

7  about a tenth of the request.

8        So as the downloader, if I need to make 1,000 requests to

9  reassemble a file and I have 10 peers that are next to me, they

10 will each get one-tenth of a thousand or about 100 requests.

11       Now, as I said, chances are they don't have the file --

12 the block that I'm looking for.  So let's say they also have 10

13 peers.  So they started with 100 requests.  They likely don't

14 have it.  They'll turn to their peers, and they'll ask, Do you

15 have what I'm looking for?

16       So we start with 100.  We divide it in 10.  The peers that

17 are two hops from the original requester will get probably just

18 10 of the original requests.

19            THE COURT:  And what we're talking about, these

20 requests, it's all -- it all is triggered by the downloader

21 clicking on the URL and then the computer -- the Freenet

22 program does the rest.  Is that fair?

23            THE WITNESS:  Correct, Your Honor.

24            THE COURT:  Okay.

25

1    BY MR. DRAUGHON:

2    Q.   Now showing you page 20.  Anything of note here?

3    A.   So maybe we -- so this is the last page in the

4    presentation, in the exhibit, and this is after the user has

5    clicked that download button on the prior slide.  Here we see

6    that this download is in progress.  In fact, it's been

7    37 seconds, and you can see zero blocks and also zero percent

8    of what we need to download has been retrieved.

9         There is a cancel button.  And, actually, again, we see on

10   the bottom we're in low security mode.  We now have 10 out of

11   ideally 14 strangers that we will be connected to, and you can

12   see up at the top it says download in progress, one.  And

13   there's kind of a summary in the title.  It's a little awkward,

14   but it says one slash zero slash zero.  It's just a hint to the

15   user that one download is in progress.

16   Q.   Have you told us everything you know about Freenet in this

17   file sharing process?

18   A.   Everything I know?  Not everything I know.

19             MR. DRAUGHON:  Your Honor, I'm about to transition to

20   talking about the law enforcement software.

21             THE COURT:  Okay.

22             MR. DRAUGHON:  Was there anything else you wanted to

23   talk about with --

24             THE COURT:  Not -- sorry.  Have I been that

25   intrusive?  Sorry about that.  But, no, go ahead.

1  BY MR. DRAUGHON:

2  Q.   All right.  I want to now direct your attention to

3  Exhibit 2.  Do you recognize Government Exhibit 2?

4  A.   I do.

5  Q.   Can you tell us what this is?

6  A.   So this appears to be a peer reviewed paper that I was

7  co-author on.  It's entitled *A Forensically Sound Method of*

8  *Identifying Downloaders and Uploaders in Freenet*.  It's a paper

9  that I submitted for peer review to a very notable conference

10  in my field.  It's called the ACM, Computer and Communication

11  Security conference.  It appeared in November of 2020, and this

12  is the first page.

13  Q.   Now, I want to ask you questions about the law enforcement

14  software and a bit about how it works, but before we do, can

15  you tell me about the reliability of the software?  And if

16  there are things in the peer reviewed paper that I can direct

17  you to, let me know.

18  A.   Okay.  So what this paper describes is our efforts, myself

19  and my co-authors' here, to work to design a method that law

20  enforcement could use to identify with forensic soundness, as I

21  call it in the paper, downloaders and uploaders that are

22  involved in Freenet; and I was concerned about that because we

23  observed that Freenet was used very commonly for the download

24  of child sexual abuse material.

25       Law enforcement also informed me that it was common for

1  them to view that on this particular network.  In fact, as part

2  of this research effort, we carefully measured the number of

3  requests that we saw on the network that were for known child

4  sexual abuse material or for materials that were posted in

5  forums that were dedicated to the exploitation of children.

6       So we -- to start with, I want to say we made measurements

7  repeatedly over a four-year period, and there's a table in the

8  paper you can reference where, to summarize, each time over a

9  four-year period that we measured, 30 percent of the requests

10  that were made were for, again, files of interest to law

11  enforcement as it relates to the abuse of children.

12       So with that concern in mind, and as I said or alluded to

13  previously, I've done a lot of work on network forensics, and

14  this is not my first paper where we examined tools that were

15  used on the Internet, unfortunately, to exchange child sexual

16  abuse material.  We knew we had the background to come up with

17  the tool for law enforcement to use in a sound way.

18            THE COURT:  And when you say "tool," you mean

19  computer software program?

20            THE WITNESS:  Correct, Your Honor.

21            THE COURT:  Okay.

22            THE WITNESS:  Well --

23            THE COURT:  When I say "tools," it's hammer and

24  nails.  So you've come up with software that does what you're

25  about to testify it does, correct?

1          THE WITNESS:  Correct, Your Honor.  But I would say

2    not only the software but this paper.  I think that's an

3    important part of the process that we made available and quite

4    publicly what we were doing for other people to review.

5          THE COURT:  But this paper is the algorithm, correct,

6    the methodology behind the software?  Am I getting that right?

7          THE WITNESS:  Your Honor, I would say this paper is

8    not only the methodology behind the software, but it is also an

9    evaluation of the software itself by ourselves.

10          THE COURT:  Okay.

11          THE WITNESS:  So if you read through this paper,

12    we'll tell you exactly, first of all, how Freenet works in

13    detail, some of which I've described today, and then we

14    describe our approach to discovering that someone is, in fact,

15    not just relaying a request for child sexual abuse material or

16    some file interest but is, in fact, not a relayer but the

17    original person who requested it.  Okay?

18      And so we lay out our scientific method for doing that.

19    We do it with standard techniques.  We didn't invent some crazy

20    math to do it.  We used tried and true methods from -- that are

21    accepted by everyone in my field, in mathematics and so on.

22      The next thing we do is we evaluate -- well, so once we

23    developed this technique, we worked with law enforcement to

24    deploy it, and then once it was deployed, part of what we

25    describe in this paper is we evaluated how well it worked,

1    which I'll come back to because I'm still describing the paper.

2        So we evaluated how well it worked in practice, how well

3    law enforcement's use of our tool worked in practice.

4        The next thing in the paper is another evaluation of this

5    method.  I think it's important to say that in my field, when

6    you create something like this and you want to evaluate it and

7    provide evidence to other people that it's doing what you think

8    it did, you want to evaluate it more than one way.  So one of

9    the first ways we evaluated it is as I just described.  We

10   evaluated its use, you know, in real life.

11       The second thing we did is create a mathematical model of

12   what we did and evaluated the mathematical model.

13       The third thing we did is we ran simulations of the

14   scenario and evaluated the simulations.

15       Why three different methods?  Well, when you do things in

16   real life, you encounter things that happen in real life.

17   Right?  You don't get to control what you get to experiment on.

18   Whatever happens in real life is what you get to evaluate.

19   Things that don't happen frequently don't happen frequently.

20   Things that happen all the time happen all the time.

21       When you create a mathematical model, you are, by

22   definition, extracting away what happens in real life.  It

23   can't be perfect.  You know, you can watch an apple fall from a

24   tree, but there's a lot of weird things going on there and you

25   can write an evaluation for it, but the fact is it's very

1   complicated for an apple to fall from a tree, even though we

2   can write down a single formula for it.

3      So math is great for describing things very formally and

4   perfectly, but it is, in the end, just a model.  On the other

5   hand, it's very clear, very precise, and people can reason

6   about it.  When we did that, we got results about its

7   reliability that aligned with our observations of the tool in

8   real life.

9      The third thing we did is write a simulation of

10  everything.  What's nice about simulations is you can

11  experiment with scenarios that are hard to model with math.

12  Math has its limits.  So with simulations, we can come up with

13  more sophisticated scenarios, and we can vary what scenarios

14  there are.

15     As I said, in real life, I can't control what other people

16  do on Freenet.  I just get to experiment on how they actually

17  use the network.  But with simulations, I can explore all sorts

18  of possibilities.

19     So with all three of these types of evaluations, again,

20  the evaluation of how the tool is used in the field, in situ is

21  what we say in the paper, a mathematical model, which is very

22  precise but can't model everything, and the simulations which

23  allow us to vary parameters and deal with complex scenarios

24  that are hard to model, we determined that the method was very

25  reliable.

1      And one thing I want to point out -- if I may continue.  I

2  know I'm rambling on a little bit here.

3  Q.   Well, I would like for you to quantify.  When you say

4  "it's very reliable," I would like for you to quantify that.

5  A.   Okay.  So I want to focus -- this is what I was going to

6  say next, in fact.  So if we could focus on the first type of

7  evaluation, what we did is we -- as I said, law enforcement

8  were trained on this method.  In fact, there's a prior

9  publication that was peer reviewed before this.  The method is

10  the same in both papers.

11      The subsequent publication provides additional

12  evaluations, more information for people to consider but the

13  method is the same.

14      So once we had that initial peer reviewed publication, we

15  worked to ensure that law enforcement were trained on our

16  method and they used it.  Okay?  So how do you evaluate how

17  well they use it because, I don't know, there's a lot in

18  between us writing the paper and what happens when law

19  enforcement use our technique.

20          THE COURT:  Again, when you say "method, law

21  enforcement using the method," you're talking about the

22  software, right?

23          THE WITNESS:  I'm talking about -- yes, Your Honor,

24  the software that --

25          THE COURT:  They are not doing the math.

1          THE WITNESS:  They're not doing the math.  I mean,

2     some of them could, but my intent is to talk about those who

3     would use our tools.

4          Okay, so maybe I should back up.  So what did we do?  We

5     looked at this method and then we -- what's nice about the

6     Freenet software is it's available not only for anyone to

7     download but what's called the source code is available for

8     anyone to download.

9          THE COURT:  Of Freenet.

10         THE WITNESS:  Of Freenet.

11         THE COURT:  Okay.

12         THE WITNESS:  Okay.  And so we looked at Freenet, and

13    as I mentioned before, when you operate Freenet, you, as a

14    user, can put it in what's called the debug mode, and the debug

15    mode is nice because all the information that's available to

16    the Freenet software is written down to a file.  Why do they do

17    that?  Well, when you program software, bugs can crop up and

18    it's hard to figure out what happened.  So you want a log of

19    everything that happened so you can diagnose problems.  I don't

20    think most users use the debug mode, but it's available to all

21    of them.

22         When we -- I didn't get into how the technique works,

23    but if we do, I'll describe what's needed to make this

24    technique work.  And so that information that's required to

25    make the technique work is available in debug mode.

1    Okay, so imagine you're me and you want to provide a tool

2    for law enforcement that works reliably.  I'm not going to tell

3    them to put the software in debug mode because it records way

4    more information than is required to run the test, and that's

5    not very efficient.  It could be prone to error.  There's a lot

6    of problems with that.

7        It's much better -- and this is what we did.  We took the

8    Freenet open source software and we modified it not to act any

9    differently on the network, not to do anything differently,

10   certainly not to send extra traffic or not send extra traffic.

11   It just operates exactly as it's supposed to out of the box.

12           THE COURT:  Which is to do what?

13           THE WITNESS:  Which is to, at the user's behest, to

14   request content or to help other users who have asked for

15   content to perform as normally happens in Freenet.  What the

16   software is intended to do is sit there and store things that

17   have been inserted and then, you know, reply to any requests

18   for things that have been previously inserted.  So that's what

19   the normal software does.

20       Maybe you're asking, Your Honor, what does our software

21   do?

22           THE COURT:  I am.

23           THE WITNESS:  Okay, I apologize.

24       So how did we modify the Freenet software?  We modified it

25   to record -- sorry.  We modified it to log the information

1  that's necessary to run the test.

2          THE COURT:  In realtime.

3          THE WITNESS:  In realtime in a way that avoids error

4  by the law enforcement operator.  We didn't include more than

5  what was required.  We didn't include less than was required,

6  and that extra logging is the only difference between our

7  version of the software and what you would download from the

8  Freenet site.  It doesn't request extra content.  It doesn't do

9  anything differently other than very clearly log what's

10  required to do the test.

11  BY MR. DRAUGHON:

12  Q.   So just a point of clarification.  So if I were to break

13  up what the law enforcement node does into two components, one

14  being operation and one being logging, the logging is what

15  makes the law enforcement node unique but the operation is the

16  same as any other user?

17  A.   Correct.  Okay --

18          THE COURT:  I don't know what that means.  Can you

19  explain the difference between the two that Mr. Draughon just

20  discussed?

21          THE WITNESS:  Yes.  So the difference is -- so the

22  Freenet software, when you download it, if you were to go to

23  the Freenet website and download the software and start to run

24  it, it would do things in the background, and it would be

25  available for you to insert or upload files.  What does it do

1  in the background?  It handles requests by other users.  Let's

2  call that the operational part of Freenet.  That's the normal

3  use of it.

4      What does our version also do?  It logs precisely the

5  information that's required to run the statistical test I write

6  about in the paper; no more, no less.  So those are the two

7  sides.

8      And what I would like to point out, Your Honor, is what's

9  required, that logging, is completely passive.  There is no

10 extra -- there is no extra network traffic sent by the law

11 enforcement version.  It's just taking notes very carefully for

12 the law enforcement officer.

13      THE COURT:  But it's not taking notes, right?  I

14 mean, it is --

15      THE WITNESS:  That's a euphemism.

16      THE COURT:  -- recording in realtime this

17 information, which I'm sure Mr. Draughon is going to get to

18 what exactly it is because I'm -- but I'm getting the

19 difference now.  So thank you.

20      Go ahead.

21      THE WITNESS:  Okay.  So I was talking about the

22 evaluation --

23      THE COURT:  Mr. Draughon, do you have another

24 question?  Because I jumped in to understand your -- the

25 distinction that you made in your question.  Do you want to ask

1  your next question?

2          MR. DRAUGHON:  No, Your Honor.  Dr. Levine is holding

3  out on me.  I'm waiting for the quantification in the

4  reliability.

5          THE COURT:  Got it.  Okay.

6          THE WITNESS:  Okay.  So I was talking about the paper

7  and I'm talking about why, you know -- you asked for a

8  quantification of how we know this is reliable.  So we did that

9  in several ways, but the one I would like to highlight is that

10 we got to the point where we have law enforcement who are

11 specifically trained on a tool that we wrote that instantiated

12 this method, and they were out there doing that.

13     Now, what we did is we put up our own Freenet nodes that

14 were not the law enforcement version.  It was precisely the

15 exact Freenet software that you download.  These nodes did

16 nothing.  They did not request any files, CSAM, or otherwise.

17 They just sat there.

18     Now, it so happened that occasionally law enforcement

19 would see requests coming from the nodes that we put up on the

20 network, and, of course, any request that came from our nodes

21 were not requests that we originated.  They were acting as

22 relayers for somebody else who requested CSAM.

23     And so on 918 occasions, over a four-year period, law

24 enforcement looked at requests -- nodes run by law enforcement,

25 looked at requests that were relayed by our nodes and applied

1   our test to it.  They decided -- the software decided that this

2   is a chance to run the test.  It looks like someone is

3   requesting CSAM.

4        And, again, the purpose of the test is to distinguish

5   between a neighbor, a stranger but a neighbor who is requesting

6   CSAM or relaying a request for CSAM.  So 918 times law

7   enforcement ran the test that's in the paper and exactly twice

8   did they come to the incorrect conclusion that one of our nodes

9   was, in fact, the originator.

10       And so that is the basis for the statistic that I provide

11  in the abstract, that if you do 2 over 918, you'll come up with

12  .002 or less -- .2 percent, which is less than 1 percent.  That

13  is the false-positive rate as determined by us empirically for

14  this approach.

15       You can add up what's called a confidence interval to that

16  of plus or minus .003.  So, in short, I would say that the

17  false-positive rate, as we have empirically validated on the

18  network of law enforcement's use of our deployed tool as they

19  have deployed it, is less than one percent.

20       We are -- you know, it's exactly what I would call in

21  situ.  It's not random files.  It's exactly the files that they

22  think are of interest.  It's not on a simulator.  It's in the

23  Freenet network, and it's what they observed while executing

24  what they have been trained to do.

25       We also did not tell them about our nodes.  Nobody did any

1  extra work looking for them.  It was a blind test in that sense

2  and in the field.  So I don't have -- I didn't observe them

3  doing this, but I observed directly what was the result of them

4  doing this, and that's an important statistic; 2 over 918

5  times.  That's quantifiable and over a long period of time.

6  Over a four-year period we observed that.

7  BY MR. DRAUGHON:

8  Q.   So when analyzing the activity of 918 law enforcement

9  nodes that directly communicated with your test nodes, it was

10 over 99.9 percent accurate?

11 A.   I prefer to say that the false-positive rate was less than

12 one percent.

13          THE COURT:  I'm sorry.  The 918 law enforcement

14 nodes?

15          THE WITNESS:  Your Honor, 918 times law enforcement

16 nodes had the opportunity to run the test.  I don't know how

17 many law enforcement nodes.  Certainly more than one.

18          THE COURT:  I understand.  Okay.

19          THE WITNESS:  I think certainly less than 918.

20          THE COURT:  Got it.  Okay.

21 BY MR. DRAUGHON:

22 Q.   So we are -- we talked about how it's reliable.  Can you

23 now tell me how it is -- what the law enforcement node is

24 logging?

25 A.   Okay.  So I said a little bit of this before.  We actually

1   brought this up as an example.  How do you tell that someone

2   is, in fact, relaying or, in fact, the originator of some

3   request?

4        So let's go back to this example of whoever is doing this

5   original request of the file, because we're just talking about

6   downloaders.  So someone made those requests, and they decide

7   that they need to make 1,000 requests to reconstruct what they

8   want to download.  And, again, in my example, they have 10

9   neighbors they can make those requests of.

10       They will -- we can expect, on average, they will make a

11  tenth of those requests, a tenth of those 1,000 requests to

12  each of their 10 neighbors, and then those neighbors will

13  take -- if they have 10 neighbors themselves, make a cut of 10

14  percent again.

15       So what do you do as law enforcement?  You get -- you run

16  our software.  As I said, it's totally unmodified in terms of

17  its operation.  It will random -- whatever Freenet decides to

18  do in terms of what strangers law enforcement end up being

19  connected to, that's who they're connected to.  There's no

20  extra movement as to what happens.  So it gets placed and then

21  it waits for a request to be received.

22       Now, when a request is received, it's for a very

23  particular block.  That block is exactly asked for.  There is

24  no question about what block is asked for.  You can't get

25  confused.  Two blocks that have ever been inserted could ever

1     be confused because it uses what's called a cryptographic hash

2     to describe the block, but it's very unique.

3          Now, ahead of time, law enforcement has looked at these

4     public announcements of files that are of interest to them.

5     You know, when someone has inserted something in Freenet and

6     then they have publicly announced that it's available, law

7     enforcement are interested in some of what's been made publicly

8     available, and, in particular, of course, we're concerned with

9     things that are related to child sexual abuse.

10         So they have a list of files that are of interest to them,

11    and they have downloaded the manifests for those announcements.

12    So they know a list of blocks that are related to child sexual

13    abuse material.  So the law enforcement node sits there.  It's

14    randomly connected to some stranger, according to the normal

15    operation.  That stranger makes a request for a block, and the

16    request is to the law enforcement node.  They are the intended

17    recipient because that node is asked, Do you have this content

18    identified by just a random number?

19              THE COURT:  The request is made, though, to all the

20    nodes, right?

21              THE WITNESS:  Each request is made to one node, one

22    neighbor at a time.

23              THE COURT:  Okay.

24              THE WITNESS:  Okay, so --

25              THE COURT:  Can you explain that?

1          THE WITNESS:  Yeah -- yes, Your Honor.  So imagine

2    that -- I'm going to do it by analogy if that's okay.

3          So imagine I've created some homework.  So I've graded --

4    I've been behind and I've graded a thousand homework

5    assignments, and I get to class and there's a lot of students

6    in the class, and I can walk around the class and hand out the

7    homework one by one to each.  It would take forever.  I have

8    this problem constantly.

9          So instead, what I'll do is get to class and look at who

10   is in the front row.  And let's say I have 1,000 homeworks to

11   hand out and there's 10 people in the front row.  What I'll do

12   is I'll look at who this homework is really for, and I'll look

13   at who's in the front row, and I'll give it to the person in

14   the front row who I believe is kind of closest to where the

15   destination is.

16         And I'll hand out these 1,000 homeworks, and I'll just do

17   it -- you know, essentially you would expect everyone would get

18   one-tenth of the homeworks to hand out.  Those students in the

19   front row will turn around and look at their 10 nearest

20   students and hand out the -- pass along one-tenth of the

21   assignments until we get all the way across.

22         So imagine that I do that and then someone arrives in the

23   class and their goal is to figure out for a random student

24   whether they were right next to me when I handed out the

25   homework or whether they were in the second row.  And so they

1  ask them, how many homework assignments did you receive to hand

2  out?  And let's say I said to you that a person you asked said

3  102.

4       Now, given that we started with 1,000 and they got 102, do

5  you think they are two rows back?  Because for that to happen

6  would be extraordinary.  You would have to cut the homework

7  assignments by twice and still end up with 100.  It's an

8  extraordinary luck that that -- I would have to hand them out

9  poorly.

10      So that's what the law enforcement -- that is the

11 technique.  You look at how many requests you expect to go out.

12 You look at how many neighbors that person had.  This is all

13 information that's provided by Freenet.  And then you perform a

14 more precise mathematical analysis than I just described here

15 of just dividing by 10.  We do it very carefully in the paper,

16 but that's a nice analogy to what's going on.

17      And you say given that they got 102, is it more likely

18 they were right next to the person handing out the homeworks;

19 in other words, the requester of the file or that they were two

20 rows back?  If they got 12 or 8, you say, ah, I think they must

21 have been two rows back.

22      If that makes sense, I want to add that when you count --

23 you know, when you're the law enforcement node, you don't enter

24 the class late.  You are the person receiving the request.  You

25 are receiving the homeworks.  You start at zero.  And when you

1   receive just one, the result of the test is they're not the

2   originator.  They're not the original requester.  When you

3   receive two, they're not the original requester.  That has to

4   build up over time.

5        So the test starts with I don't believe they're asking for

6   this file themselves.  It hedges that way, that they're

7   essentially -- the test says, you know, failed.  They are not

8   the original requester.  Enough requests have to happen for the

9   test to trigger that it's a positive result.

10       Okay.  So I've described a lot.  Maybe I should go back to

11  something I skipped over.  I'm not sure I answered your

12  question.

13            THE COURT:  Well, yeah.

14       Go ahead, Mr. Draughon.  Go ahead and ask your next

15  question.

16  BY MR. DRAUGHON:

17  Q.   So the law enforcement node, just like any other node on

18  Freenet, would be able to look at a file on a public forum and

19  gather how many blocks is needed for that file.  Is that right?

20  A.   Yes.  So when the law enforcement node is operating, they

21  have already manifests that they're interested in.  They know

22  the number of blocks that were inserted for that manifest and,

23  therefore, they can estimate the number of blocks that are

24  required to reassemble things.  So they know that.  They know

25  --

1          THE COURT:  When you say "law enforcement," though,

2     again, is it the software program that knows that, or does law

3     enforcement add something to it?

4          THE WITNESS:  I would say, Your Honor, that I think

5     the correct answer is the law enforcement -- the software knows

6     that.

7          THE COURT:  Okay.  All right.

8          THE WITNESS:  People with the main knowledge,

9     including me, have programmed the software to do the right

10    thing, and it knows that, yeah.

11         THE COURT:  Okay.  So it's the software used by the

12    law enforcement that has, my word, an understanding of how many

13    blocks are necessary to extrapolate who the requester is.  Is

14    that correct?

15         THE WITNESS:  Correct, Your Honor.

16         THE COURT:  Okay.

17         THE WITNESS:  So there's four things.  The software

18    -- I'll try to be more precise, Your Honor.

19         The software knows the number of blocks that you would

20    expect to request to reassemble the file.  The software

21    directly observes the number of neighbors that whoever is

22    making this request has.  The third thing is it knows directly

23    how many requests were received because it received them.  It's

24    the intended recipient.  And then the fourth thing is a little

25    bit harder to describe.

1       So I'm running this test, and I'm comparing two different

2   scenarios.  Either I'm expecting that this is the original

3   requester or they are a relayer.  If they are the relayer, then

4   someone else requested the file and that person had a certain

5   number of neighbors.

6       So we have to make an estimate of what that would be.  We

7   could look at the network and say, oh, typically it's about 30,

8   but, in fact, what we do is choose a value that hedges towards

9   that the test will conclude that they are just a relayer.  In

10  other words, we have to make an estimate to make the test work,

11  but we chose an estimate much like other parts of what we do

12  that hedges towards that this person is a relayer and not the

13  original requester.

14      So those are the four values; the expected number of

15  requests you would make, the observed number of neighbors, the

16  observed number of requests, and the estimated number of

17  neighbors that whoever might be the originator has.  And,

18  again, hedge towards that they are a relayer.

19  BY MR. DRAUGHON:

20  Q.   So in Freenet, you can observe those details about the

21  neighbor that you have requested or received the request from

22  but it sounds like --

23          THE COURT:  Who is the "you?"  I'm sorry.  If you

24  all -- I'm sorry.  It's really important -- for me, terms are

25  so helpful, and we've tried -- I've tried for my own sake to

1    define terms so that I get what you're talking about.

2         Can you all help me in that regard and keep sort of like

3    terms the same so I can figure out what you're talking about?

4              MR. DRAUGHON:  Yes.

5              THE COURT:  Thank you.

6    BY MR. DRAUGHON:

7    Q.   So on Freenet, users have nodes, and the nodes are sort of

8    the profile or IP address associated with the Freenet; is that

9    right?

10   A.   Users run software on a computer.  That computer has an IP

11   address.

12   Q.   So the node is not the person; it is the --

13   A.   Software.

14   Q.   -- software.  The software at a particular IP address that

15   receives a request is able to obtain information about the

16   requester's IP address and their peers, the number of peers?

17   A.   Yes.  Can I rephrase that?

18   Q.   Yes.

19   A.   So if I were to run the Freenet software during its normal

20   operation, it would be sent as the intended recipient requests

21   for particular files, and it would be sent by its neighbors the

22   count of neighbors that its neighbor has.  So if I'm connected

23   to you and you have 10 neighbors -- sorry.

24        If my software is connected to your software and your

25   software has 10 neighbors, your software will tell my software

1    that.  It's not something that has to be asked for.  It's part

2    of the normal operation of Freenet and that goes along with

3    what I was saying, that passively all of this information is

4    available.

5         Now, could the user see this information?  Yes.  If they

6    turn on the debug setting for the software, it would be saved

7    for a file and it's ready for examination for them.  Some of it

8    is available even if you don't turn on the debug.  For example,

9    we saw a screenshot of the number of neighbors we had and their

10   IP addresses.  So this is all immediately available.

11   Q.   The --

12        MR. ROBBINS:  Sorry to interrupt.  And it's not an

13   objection, Your Honor.  I just want to know, we're getting

14   close to two hours on a relatively complex subject.

15        THE COURT:  Yeah, I was intending to take a break at

16   noon.

17        MR. ROBBINS:  Okay, thank you.

18        THE COURT:  Okay.  And, Mr. Draughon, how long do you

19   have left?  And I'm not trying to rush you, I just want to plan

20   out the rest of the day.

21        MR. DRAUGHON:  My guess would be less than an hour,

22   so between 30 and 60 minutes.

23        THE COURT:  All right.  Maybe then it makes sense to

24   take a break now, take 15 minutes.

25        MR. ROBBINS:  If he's at a great point for himself, I

1    don't want to mess with him, but I just didn't want to go --

2          THE COURT:  Mr. Draughon, yeah, that's a good point.

3    Are you at a good stopping point, or do you want to finish the

4    thought and then we can take a break?

5          MR. DRAUGHON:  Well, I want to at least finish the

6    follow-up question.

7          THE COURT:  Sure, of course.

8    BY MR. DRAUGHON:

9    Q.   It sounds like, Dr. Levine, you're saying that my software

10   -- if I were to request a file from you, you would be able to

11   see my software's IP address and my software's number of peers.

12   A.   Yes.  If you are running the Freenet software as a user

13   and you direct your Freenet software to download a file, your

14   software would contact my software and that software, my

15   instance of the software would learn exactly what you're

16   requesting, your IP address, and how many neighbors you have,

17   and that can be displayed to the user, to me, on my side of the

18   Internet.

19   Q.   Now, could your software see that information about my

20   peers?  In other words, if my peer is co-counsel, would you be

21   able to obtain or log his software's IP address and number of

22   peers?

23   A.   Not his but I would be given a unique identifier for him

24   but not his IP address.  So I would know all the unique

25   identifiers for all your neighbors.  I don't know their IP

1   address, but I don't need to know their IP address.  I just

2   need to know the count, and they are uniquely identified, not

3   by name; just a random number.

4   Q.   And I guess my last question is, so that -- does that mean

5   that your software -- and when I say "your software," any user

6   on Freenet, the node, can only get the IP address and the

7   number of peers from the direct software that has communicated

8   with it?

9   A.   Correct.

10          MR. DRAUGHON:  Your Honor, if you want, we can break

11  now.

12          THE COURT:  Okay, that's great.  Why don't we take 15

13  and we'll be back ten after 12.  Thank you.

14          THE COURTROOM DEPUTY:  This Honorable Court now

15  stands in recess.

16      (Recess taken, 11:56 A.M. - 12:13 P.M.)

17          THE COURTROOM DEPUTY:  This Honorable Court now

18  resumes in session.

19          THE COURT:  All right.  Are you ready to resume?

20          MR. DRAUGHON:  Yes, Your Honor.

21          THE COURT:  Okay.  Dr. Levine, you are in the witness

22  chair.  I'll just remind you you're still under oath.

23      Go ahead, Mr. Draughon.

24  BY MR. DRAUGHON:

25  Q.   The law enforcement nodes that we've been discussing, are

1  they tracking or monitoring any users or searching for users on

2  Freenet?

3  A.   I would say no.

4          THE COURT:  If we could take masks off, that would be

5  great, as long as you're okay with it.  Thank you.

6          THE WITNESS:  If I understood your question, I

7  wouldn't say they are tracking anyone.  They are up on the

8  network, and they are logging events that are pertinent to

9  running the method for only files of interest to them.

10 BY MR. DRAUGHON:

11 Q.   Are they searching for particular IP addresses on Freenet?

12 A.   No.  That's not how the software works.

13 Q.   You mentioned that they log in the IP address and some

14 other information.  What happens to that information that the

15 law enforcement nodes log?

16 A.   So the law enforcement nodes, as I said, log information

17 that's relevant to only files of interest.  That information

18 goes to a server because, as is common in peer-to-peer cases

19 such as BitTorrent and certainly in the case here, the law

20 enforcement nodes don't control who they are connected to or

21 where those neighbors might be.  They can be -- if the law

22 enforcement has a jurisdiction or an area of responsibility

23 that's limited, let's say Maryland, that person they are

24 randomly connected to could be in California.

25          And so my understanding of how law enforcement typically

1  operate is if they encounter something they believe to be a

2  crime, they will provide that as a tip to someone else in that

3  other jurisdiction.

4      So if a law enforcement node is up on the network someone

5  there happened to be connected to and they -- you know, we

6  wanted the nodes to work as Freenet normally works.  We thought

7  that was important.  So they will randomly be connected to

8  someone who is in another jurisdiction.

9      So to answer your question, the information that the

10  software logs about a file of interest would be logged on a

11  server, one particular server for reviewing by law enforcement

12  later to see what cases -- what leads they've received that

13  appear to be in their jurisdiction.  I say "appear" because

14  it's always an estimate based on the IP address.

15  Q.   And what would law enforcement do with that information to

16  determine if the IP address has requested CSAM?

17  A.   Okay.  So law enforcement would sit down and they'd see a

18  list of leads in their jurisdiction.  They would then do a

19  number of steps.

20      So I think to answer your question specifically, they

21  would have in front of them the list of requests, the time the

22  request came in, a unique identifier for that request.  When I

23  say "identifier," I -- well, let's just leave it at that.

24      Okay, so a unique identifier for that request and then

25  they need to follow their training, because they would only

1  have this information if they've had that training, and apply

2  the test that I've described in the paper that we see on the

3  screen.

4  Q.   How many files would the law enforcement officer need to

5  have the software -- let me back up.

6      Now that we're with the law enforcement officer, not the

7  law enforcement node but the law enforcement officer who has

8  tried to see if the IP address in their jurisdiction is

9  requesting CSAM, how many files would they need to feel

10 confident that the IP address has requested CSAM?

11 A.   Well, so if you read the paper, we only talk about running

12 the test once.  When we say that the -- when we write that the

13 false-positive rate is less than one percent, it's for one file

14 that they've examined.  Law enforcement are welcome to do more

15 than one file, but we didn't say you have to run this three

16 times in order to get this false-positive rate.  It's for one

17 instance, one set of information that you would like to try the

18 test against.

19 Q.   I want to now direct your attention to Exhibit 3, which is

20 a File of Interest #3 in this instant investigation.  Can you

21 explain to the Court what this is?

22 A.   Okay.  So this is information that's been recorded by law

23 enforcement obviously relevant to this case.  It says File of

24 Interest 3 at the top.  We can see a possible file name, and

25 then what we see in the body of what's on the screen is a list

1    of requests that were received by law enforcement running our

2    software.

3        So you can see on the first column it says "Date/Time."

4    So this was 2008, the 24th, June 24th.  At that time, we have a

5    request.  Sometime later, a couple of seconds later, there's

6    another request, and as we go, each row is another request

7    that's been received by someone who is running our software,

8    someone who has been trained in running our software.

9        Let's ignore the "Port."  It's not important for this

10   conversation.

11       We can see the "Type."  There's two types of requests in

12   Freenet.  Here we just see one of them.  So let's just keep it

13   simple.  This is a request.

14       We haven't touched upon this yet, but there's a field

15   called the Hops-to-Live.  Since we haven't touched upon it and

16   they're all the same value, I'm going to skip over that for

17   now.

18       And then we see the record of the number of peers that was

19   reported in this log.  So maybe I skipped over it.  I should

20   jump up to the top.  So this is File of Interest 3, and then

21   you can see it says "IP: 71.246.207.59."  So this is a record

22   of the requests that were sent by that node.  It's a record of

23   the requests that were received by law enforcement.  They are,

24   again, the intended recipient of these requests.

25       So the first one happened on the 24th.  When the request

1    was made, 71.246.207.59 said that it had 75 peers.  And I don't

2    know what law enforcement person did this, but they're

3    identified by 2145.

4         If we look down each row, we can see that we see 2145

5    again, and on the fourth row we see -- no, that's -- keep

6    going.  Ah, somewhere down towards the middle, I don't have row

7    numbers to point to, but it says 2161.  So that is a different

8    law enforcement node.

9         Okay.  And so we can see it again.  We can see it a few

10   times, and so with this information in hand -- in fact, there's

11   some other things we should look at.  We see 3,566 at the top

12   left.  One thing we haven't touched upon today is that -- this

13   will require a little bit of explanation.

14        One thing that's a problem with Freenet is if I were to

15   insert this file or any file into Freenet, and I talked about

16   smashing it up into pieces, if I were to do that and any one

17   piece was lost, well, then the file is not -- you could not

18   reassemble it because you need every piece possible.

19        So Freenet uses a special technique, and what it does --

20   the simple way to explain the technique is -- and this is

21   incorrect but it's simple -- it inserts each block twice.  So

22   if I need to create a file -- if I need to insert a file into

23   Freenet and it has 500 pieces, then I will double that.  I will

24   make it 1,000 pieces to make it more reliable.  I don't want

25   any one piece to go away.  So everything is inserted twice.

1          How it actually works is a bit more complicated.  I don't

2     have a great analogy for this, but here we can see that this

3     particular file was -- 1,769 are required to recover the file,

4     but to ensure resiliency, there's 3,566 available.  This may

5     sound strange but any 1,769 that can be recovered you can use

6     to reassemble the file.  Okay?

7          So the question is you need 1,769.  There's 3,566

8     available.  What's going to happen?  And so what we talk about

9     in the peer reviewed paper that I mentioned before is we did

10    experiments, and we find that you should assume there's 80 --

11    that the downloader requires 80 percent of the maximum in order

12    to reconstruct the file; and we evaluated that and that's part

13    of our analysis of the false-positive rate and so on.

14         Okay, so where are we?  So remember I talked about needing

15    four values.  The first is the number of requests that we

16    expect to happen.  That's going to be 80 percent of 3,566.  The

17    second is the number of neighbors of the subject of the test.

18    Here we see it says 75, 76, 74.  You know, on an average,

19    that's about 75 if you take the average of that column.  And

20    then we need to count the number of requests received.

21         Now, here's a listing of all those requests.  One thing to

22    tell you is you run this test at each law enforcement node.

23    You don't sum together all the requests received anywhere on

24    the network.  You could do that, in fact, but to be clear, you

25    just take the requests that are received by each law

1  enforcement node.

2       So what I would do is take the list of requests, to 2145.

3  I would take into account that 3,566 number, and I take into

4  account the average number of peers, and then I apply the

5  formula that's in the paper.

6       We haven't talked about the exact formula, but, in

7  essence, I'm doing that calculation that I talked about

8  analogously.  I expected 100 to be received and about one or

9  two were received.  So I expect that this is, in fact, the

10  person who requested the file.

11            THE COURT:  But just so we're clear, the software

12  does that, right?  Or no?

13            THE WITNESS:  So to be very -- okay.  May I answer

14  twice, Your Honor?  The short answer is, yes, the software does

15  it.  The longer answer is I had talked about -- this is a

16  spreadsheet that is also running the test for the law

17  enforcement node because it's a detailed test; you want to get

18  it right.  And you can see in the top corner here it says stat

19  test pass.  So that is -- I didn't generate this form but my

20  understanding is it's running the test that's in the paper for

21  the law enforcement node -- for the law enforcement --

22            THE COURT:  So there is -- okay, let me make sure I

23  understand.  So there is this software that we've been naming a

24  software which runs the mathematical algorithm or method that's

25  in your paper.  That's in the software, right?  Or no?

1          THE WITNESS:  Yes.  But may I expand?

2          THE COURT:  Well, then it sounds like -- I just want

3  to understand what you just said.  Then it sounds like there is

4  a second test, if you will, that's run by another software

5  program?

6          THE WITNESS:  Yes.  May I clarify?

7          THE COURT:  Yes, please.

8          THE WITNESS:  So, Your Honor, the latter is what you

9  just said; there is a second test.  We're looking at it.  This

10  is the second test.  This spreadsheet ran the test and it says

11  pass.

12      The first test is our software.  Where does that happen?

13  Well, I keep talking about the tool or the software but, in

14  fact, it has a couple components, as we have seen.  The first

15  component is that law enforcement who are trained to run our

16  software, and it simply logs information, logs information

17  that's of interest to a crime against a child.

18      As I said just prior, that information is uploaded to --

19  that lead, because often it's not in your jurisdiction, that

20  lead is placed on a central server and it's held there for

21  people -- for law enforcement to come in because so and so --

22  overnight someone saw a lead in your jurisdiction.  You would

23  come in.  You would sit down, and you would say, ah, this is a

24  case I need to investigate.

25      So when you are presented that lead -- in fact, our

1   software runs the test behind the scenes but does not show the

2   officer the results because we think, you know, they should run

3   it in this secondary fashion as well.

4            THE COURT:  Okay, so let me just understand.  The

5   first test that uploads, as you say, the lead to the server,

6   who runs that server?

7            THE WITNESS:  Law enforcement in Pennsylvania.

8            THE COURT:  But you provide the data that goes to the

9   law enforcement server in Pennsylvania?

10           THE WITNESS:  Your Honor, I would clarify to say that

11  we provided software that law enforcement use.  Law enforcement

12  who use that software logs that information, and they provide

13  it to the server that's also run by law enforcement.

14           THE COURT:  Got it.  But that software is the

15  software where earlier you testified you designed it?

16           THE WITNESS:  Correct, Your Honor.

17           THE COURT:  Got it.  And then there is a second test

18  that's run.  Is that software you designed as well?

19           THE WITNESS:  It's not, Your Honor.

20           THE COURT:  And that is the second -- what we're

21  seeing at Government's Exhibit 3?

22           THE WITNESS:  Correct, Your Honor.

23      Okay, so if I may continue?

24           THE COURT:  Yes.

25           THE WITNESS:  So what I want to say is what's nice

1  about this view of things is you don't have to take for granted

2  the stat test at the top.  It's very nice that that's run

3  because you don't want this to be an error-prone process.

4       However, even though I don't know what happened here that

5  resulted in the past, I have all the information available to

6  me to rerun the test.  It's all right here if front of me.  So,

7  in fact, I did that for this -- there are two pages here, just

8  to be clear.  There is more information on the second page, but

9  if you take -- well, I guess it's one last line.

10      So if you take all the information that's on here, you can

11  apply the test that's in the paper, and I did that, and I

12  confirmed that it, in fact -- the result is "pass."  In other

13  words, this set of requests with this information on the screen

14  tells me that it's more likely than not that this is the

15  requester of that particular file that's identified at the top.

16  BY MR. DRAUGHON:

17  Q.   And when you say that there is -- the test that the law

18  enforcement would -- so there is -- I want to make sure my

19  terminology is clear.  There is the law enforcement node, which

20  is a software that is logging data and sending it to a

21  repository that law enforcement throughout the United States

22  can access for their geography -- geographic region; and then

23  the law enforcement, for example, in Maryland would gather this

24  information displayed in Exhibit 3 and then run a test.

25      But when they're running a test, are they doing something

1 technical, or is it just they are plugging in the information

2 into a spreadsheet?

3 A.   I guess I would say the latter.  I mean, they're trained

4 and so they are taking this information from the website.  They

5 understand that it involves Freenet.  They're putting it into

6 the spreadsheet, which is going to help them run the test, yes.

7          THE COURT:  Wait, let me understand.  Are you saying

8 that there is a person who manually enters this information and

9 then does the math, or is it a software program?

10 BY MR. DRAUGHON:

11 Q.   So is there a person that would collect the data from the

12 website and bring it into the spreadsheet?

13 A.   Yes.  And then, if I may clarify, they cut and paste.

14 They're not typing.  So they're cutting and pasting and putting

15 this information into the spreadsheet.

16          THE COURT:  Okay.

17          THE WITNESS:  And then the spreadsheet would run the

18 test for them.

19          THE COURT:  So the spreadsheet is a software program;

20 am I right?

21          THE WITNESS:  I think so, Your Honor.

22          THE COURT:  Okay.  All right, well -- I'm sorry.

23 You're the expert.  I don't mean to get like --

24          THE WITNESS:  I agree with you, Your Honor.

25          THE COURT:  I want to know whether it is a software

1   program, as earlier you said it was a second software program,

2   and the line of questioning makes it sound -- it's confusing to

3   me.

4           THE WITNESS:  If I may clarify, it's a bit glorified

5   to call it software.  I think it's running a calculation.  You

6   know, spreadsheets --

7           THE COURT:  Based on your method, right?

8           THE WITNESS:  Based on my method, Your Honor, but

9   what it does is it does one calculation.  You know, it

10  tabulates and collates, but in the end, it's performing a

11  calculation.  I mean, this -- we're calling it software, but

12  the fact that you can run it in a spreadsheet should tell you

13  that it's not a very advanced -- it's not a very sophisticated

14  thing going on here.

15          THE COURT:  Is it an algorithm?

16          THE WITNESS:  It is an algorithm, Your Honor.

17          THE COURT:  Okay.

18          THE WITNESS:  Yes.  It's an implementation of that

19  algorithm, and it's able to do it in a spreadsheet.

20          THE COURT:  Got it.  Okay, thank you.

21  BY MR. DRAUGHON:

22  Q.   You mentioned briefly the Hops-to-Live, and we see here

23  that the number is 18.  What is the significance of 18 and,

24  generally, Hops-to-Live?

25  A.   Okay.  So here's another Freenet journey that we get to go

1    on.  More complications.  So let's step back and imagine that

2    I'm someone who has directed the software to download

3    something.  And as we said, I have a manifest and I need to

4    download a sufficient number of blocks to reconstruct the file.

5        I'm going to look to my neighbor and ask them for a

6    particular block, and, as I said, they might not have that

7    block.  So what will they do?  They may turn to their

8    neighbors.  That neighbor may not have the block.  Okay?  We're

9    going to go another hop.  That has to end at some point.  You

10   can't just forward requests forever on the Internet.  It would

11   just cause traffic jams, essentially.

12       So what they have is a counter called the Hops-to-Live.

13   When that hop to live counter -- Hops-to-Live counter gets to

14   zero, then the request fails and the process ends; otherwise,

15   one request would generate so much traffic on the Internet, it

16   would be crazy.

17       So what we're seeing here is -- it seems like an odd

18   number, and it is, but for whatever reason, the people who

19   designed the Freenet software decided that all requests start

20   with 18.  It's not a round number.  I don't know why they chose

21   18 but they did.

22       So there's some more details here, but suffice to say that

23   after the 18 is decremented enough, then you know it could not

24   have come from someone who is the original requester.  I don't

25   know if you want me to explain this, but if it's an 18 -- let's

1 leave it at this for now unless you have further questions.

2 But if a request comes in and this counter starts at an

3 18, then they are a candidate for the test.  So that's what

4 we're demonstrating here.  If it came in with a 16, then they

5 are not a candidate for the test, but it's information that's

6 useful.  If -- go ahead.

7 BY MR. DRAUGHON:

8 Q.   You're going towards my next question.  What if it was a

9 17?

10 A.   If it was a 17, it would also be a candidate for the test.

11 There's an algorithm in Freenet where when a request begins,

12 the original requester decides -- it flips a coin and it says,

13 oh, an 18.  Should I forward this immediately as an 18 to my

14 neighbor, or should I make it a 17?  Sometimes it comes in as

15 an 18 and sometimes it comes in as a 17.

16 So let's say that you are the original requester of a file

17 and you decide to -- the coin flip comes up heads, and your

18 request comes to me as a 17.  Okay, the other scenario is that

19 your coin flip comes up the other way and your request comes to

20 me as an 18.  Well, when I take that request that's an 18 and

21 hand it to someone else, I also do the coin flip and they might

22 get an 18 from me.

23 So the whole point of this crazy coin flipping is whenever

24 I relay a request to someone, it may go out as an 18 and, when

25 it does, they really can't be sure if I'm the originator of the

1  request or I was just merely relaying it as an 18 from someone

2  else.

3       So this is the basic anonymity mechanism of Freenet.

4  They're trying to masquerade not that you are making the

5  request but whether you are relaying the request or you have

6  originated the request.

7       So that's a lot of detail and it can be hard to

8  understand, but the important thing here is that the 18

9  represents and the 17 represents that it is a candidate for

10 applying the test.

11 Q.   I'm going to now direct your attention to Government

12 Exhibit 4.   What is Government Exhibit 4?

13 A.   So Government Exhibit 4 is a summary of -- well, so in the

14 Exhibit 3, what we saw is one of the tests that was run by law

15 enforcement.   In Exhibit 4, we're seeing a summary of all of

16 the tests that were run by law enforcement.   This is on three

17 separate pages.   So we're at the top.

18      We can see, again, that our IP address is 71.246.207.59.

19 It's the same one as before.   We can see File of Interest 1.

20 We can see, most importantly, that according to this software

21 calculation, this spreadsheet calculation, the "pass" is listed

22 there.   If you don't mind scrolling to page 2, we can see again

23 a summary of the "pass."   If we go to page 3, we can see again

24 that summarized the "pass."

25      And so this page is summarizing what happened when you ran

1   the test.

2   Q.    Can you walk us through some of your observations about

3   the details included, such as run time, average peers, et

4   cetera?  And you can tell me which page to go to.

5   A.    So let's start with Exhibit 3.

6   Q.    Page 3?

7   A.    Oh, sorry.  Exhibit 3 on the other tab.

8   Q.    Got it.

9   A.    So on Exhibit 3, we can see date and time here.  It's,

10  again, June 24, 1400 hours, 27 minutes.  And if we went to the

11  bottom, we would see, as it's summarized, a time span of

12  28 minutes.

13       If you don't mind going to the summary again and maybe

14  page 2 or 3.  One more, I think.  Actually, the fifth.  So here

15  the same information that appears in the tab is broken out a

16  little bit.  So we can see on the bottom in the middle there is

17  a green cell and it says "law enforcement No. 2145".  We can

18  see again the 28 minutes.

19       You might recall I pointed out that some of those requests

20  were not directed at 2145.  In fact, the intended recipient was

21  2161.  There were only, I don't know, three or four requests

22  that made it that far.  And this is an indication to us that

23  the software is -- the spreadsheet is doing something correct

24  here.  It is collating the request to exactly one law

25  enforcement node and it's doing more than a -- it's doing the

1  correct thing.  It's applying the test correctly, and it's

2  providing some summary values here.

3       I personally think some of this is unclear.  I don't know

4  that I would have designed it that way, but I think it's a good

5  summary of what's going on.

6       And, again, I want to stress that to me the most important

7  thing is not these different summary values.  I find them

8  distracting.  To me what's most important is that it says pass,

9  that it ran the test.  We have an indication that it ran it

10  correctly independently on each law enforcement node.

11       And like I said, I recreated the test myself by looking at

12  this raw data, and I concluded -- I came to the same conclusion

13  that when applying the formula that's in the paper, the result

14  is that -- is pass.  In other words, that this is, according to

15  the test, more likely the originator of the request rather than

16  a relayer.  And here we see that three times.

17  Q.   I want to direct your attention to the overall run time.

18  File of Interest #1: 16 minutes, 8 seconds.  Do you see that?

19  A.   I do see that.

20  Q.   File of Interest #2: 47 hours, 38 minutes, 38 seconds.

21  File of Interest #3: 28 minutes, 18 seconds.

22       First question, did I accurately read off the numbers?

23  And then second, is there any significance to those numbers?

24  A.   I do -- from what I heard, I do believe you read that

25  accurately.  That is the start and end time of these

1    observations.  That's not necessarily what you would do to run

2    the test.  If you were to look at File of Interest 2, there is

3    a break in there, and you would, you know, run the test on the

4    first part.  After the break, you would run it again.

5          But if you're just summarizing the overall start and end

6    of these requests, that appears to be accurate.  Start and end

7    of the log, that appears to be accurate.

8    Q.    And directing your attention to the summary of File of

9    Interest 2, it looks like there are four different node

10   columns.  Is that correct?

11   A.    Correct.

12   Q.    What does the green indicate at the bottom of each column?

13   A.    So this is another way to relay what the logs show.  So,

14   for example, one of the rows is entitled Total Unique Requests

15   Logged, and it says one under 1921, law enforcement node 1921.

16   Well, receiving one request is not very many.  It's not

17   informative.  I wouldn't run the test.

18         And this notion of even share and then share, these are

19   just guidelines to provide the reader of this result some

20   notion of what happened here.  The most important thing is the

21   stat test pass.  That's all that matters here.  Everything else

22   is other information to give you a gist of what's contained in

23   the spreadsheet.

24         So one tells me that I shouldn't run the test on -- or the

25   test fails, essentially, is what I would say for one request.

1   The one that says 2161, it has 38 requests.  It's in

2   24 minutes.  That to me is one of the basis to me, and I

3   calculated this myself.  The one that says 2161 with 38

4   requests, I applied the test from the paper myself, and I agree

5   that the result is pass.

6            THE COURT:  Can I ask a foundational question, which

7   is earlier you said that this is not a program that you

8   designed, this spreadsheet.  You said it's somewhat rudimentary

9   and maybe could have been designed better, and I'm

10  paraphrasing.  What familiarity do you have with the underlying

11  program that produces these results?

12           THE WITNESS:  So I saw at some point a blank version

13  of this spreadsheet, and I looked at how it was doing things

14  and I agreed that -- I didn't find any errors.

15           THE COURT:  When you say a blank version of the

16  spreadsheet, explain what you mean by precisely what you did to

17  develop knowledge of the underlying workings of this program.

18           THE WITNESS:  So this spreadsheet was created by law

19  enforcement who we collaborated with as part of this effort.

20  When you create a tool for law enforcement, there has to be law

21  enforcement who is willing to use it.

22       So someone at some point decided that it would be

23  convenient to write a spreadsheet that ran the test that --

24           THE COURT:  Write code, that write code that would

25  put everything in a spreadsheet automatically?

1          THE WITNESS:  Someone designed a spreadsheet that had

2     formulas in it that ran the test.  Yeah, some of it was -- yes,

3     Your Honor, some of it was code.

4          THE COURT:  Okay.

5          THE WITNESS:  And so this is a template that can be

6     used --

7          THE COURT:  Right.

8          THE WITNESS:  -- because you would like the process

9     to not be error-prone.  And I received an instance of the

10    spreadsheet that was not part of any case but just the template

11    itself, and I examined what they were doing to run the test and

12    it looked okay to me.

13         THE COURT:  And I guess when you say you examined,

14    did you -- what did you do to examine it?

15         THE WITNESS:  I looked at the formula.  So when I say

16    "formula," the way spreadsheets work is each cell can display a

17    number or it can calculate something based on the numbers in

18    the other cells.  So that's typically called the formula.

19        For example, a formula might simply be the average of a

20    column.  So they had a very advanced formula, but it was one

21    formula that recreated the most important equation from my

22    test, and I validated that their instantiation of that formula

23    looked correct to me.

24         THE COURT:  Okay.  Is it -- can you distinguish just

25    for me as a lay person whether this is -- this spreadsheet and

1   the way it works has any material difference between it and

2   like an Excel Spreadsheet?

3           THE WITNESS:  It is an Excel Spreadsheet, Your Honor.

4           THE COURT:  It is?  Okay.  All right, that's helpful

5   because I now understand.  So you can use Excel, if I'm

6   understanding it right, to pre-program certain formulas and

7   then the Excel program does the math?

8           THE WITNESS:  Exactly.  Your Honor, that's why I'm a

9   little hesitant to call it software --

10          THE COURT:  Got it.

11          THE WITNESS:  -- because it's a spreadsheet.  It's

12  doing something.  It's calculating things.

13      I think of software as something that has a window.  You

14  can quit.  You know, it's a bit more advanced.

15          THE COURT:  Right.

16          THE WITNESS:  But this is calculating values.  And I

17  don't know exactly in this particular instance of the

18  spreadsheet what it did.  I didn't have access to that, but I

19  recalculated the stat test, and I also agreed that -- I agree

20  that pass is the correct value here.

21          THE COURT:  But maybe I'm misunderstanding.  It's

22  a -- if this is an Excel Spreadsheet, it requires a person to

23  take the results from your software program that runs in

24  Freenet and manually input it into the spreadsheet that then

25  calculates based on a mathematical formula that's plugged into

1  Excel?

2           THE WITNESS:  Yes, Your Honor.

3           THE COURT:  Got it.

4           THE WITNESS:  And they would, for example, cut and

5  paste the values into the spreadsheet and then have it

6  calculate it.

7      It's much like if you were to think about getting a

8  mortgage.  Someone might give you a blank Excel Spreadsheet,

9  have you enter your income, how much you want to borrow, and

10 then it would calculate something for you.  I think that's akin

11 to what's happening here.

12     And I like that -- if you don't mind going to Exhibit 3,

13 whatever happened in this Excel Spreadsheet, I can do the math

14 myself by looking at the raw values that are on there.  I don't

15 need to know what the Excel Spreadsheet said.  I or anyone who

16 understands the paper we wrote and peer reviewed and had it

17 publicly published and is available, they can run the test as

18 well.

19          THE COURT:  Are you familiar, though, with the terms

20 on this?  Earlier you said, well, we don't need to discuss what

21 these certain terms are, but could you tell me what they are?

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  Okay.

24          THE WITNESS:  Which terms are you concerned with?

25          THE COURT:  So I just want to know what the lines

1  are, the rows.  Obviously, date/time, I think I know what that

2  is.  Port, Type, HTL, Peers, LE ID, Split Keys.  Can you define

3  those?

4        THE WITNESS:  Okay, so a port is analogous to -- if I

5  were to -- gee, I don't know that anyone does this anymore, but

6  in the olden days, you used to call a business and they would

7  say call 1-800-555-1212, extension 34.  And that extension 34

8  we all know is not part of the phone number.  It's something

9  that you provide once you connect the business.  And that's

10  what a port is.

11       This is saying this is a port attached to a computer we're

12  talking to.  So it's just an extension of an IP address.  If

13  the ports were different on each line, then we would separate

14  them.

15        THE COURT:  Okay.

16        THE WITNESS:  Okay.  The Type, there's two types of

17  packets that can be received by the law enforcement node, the

18  first is the request for the file that's being downloaded, but

19  you might also see something called an insert.  So an insert

20  would happen -- so while I'm -- okay, so why would an insert

21  happen?

22       So while I'm -- and it's funny because we distinguished

23  before that some people were inserting files and some people

24  were downloading, but an insert can actually happen while

25  you're downloading.  What is that about?

1    Well, if I'm downloading a file on Freenet and I notice

2    that -- let me start again.

3    If I'm downloading a file on Freenet, I might reinsert

4    some of the things I downloaded because that kind of heals a

5    file that's been up there.  I want to replace some of the

6    things that are -- it's hard to explain.  So let me try again.

7    So files are available on Freenet, and we put a lot of the

8    file up there, but as we said, sometimes people close their

9    laptops or turn off their computer and a portion of the file

10   might not be available.  So to ensure that resiliency, what

11   Freenet does is as I'm downloading, I may reinsert some of the

12   file to heal some pieces that were lost.  And so we don't see

13   that in this exhibit, but that "Type" column might say "I" for

14   insert, and that's important.

15   We didn't get into the details of what I wrote in the

16   paper, but whenever we see an insert, we decrement the request

17   count because -- and by decrementing, we're hedging towards

18   saying that this is a relayer, not an original requester.  So

19   that's a detail kind of in the weeds of what we did, but it's

20   definitely described very much in detail in the scientific

21   publication.

22   The Hops-to-Live, or HTL we talked about.  Or I can go

23   back to.

24          THE COURT:  No, I know what that acronym is.  Go

25   ahead.

1          THE WITNESS:  Okay.  And then the "Peers" is what the

2     law enforcement node has been told by this neighbor, and the

3     neighbor's IP address is 71.246, et cetera.  That's the number

4     of peers that they reported to the law enforcement node that

5     they have.  In this case, it's 71.  Later it becomes 76.

6          The number of the law enforcement node is 2145.  And then

7     we talked about when we take a file and we smash it into 1,000

8     pieces, I talked about how they are distinctly enumerated.  And

9     we can see here it's redacted, but those unique -- I'm calling

10    them identifiers, but I don't want to say that anyone has been

11    identified.  It's just a unique number.

12         THE COURT:  Right.

13         THE WITNESS:  So that's been enumerated here.

14         The reason they're redacted is if you had those values,

15    you could retrieve, in this case, this file, and there's a

16    victim here.

17         THE COURT:  Is this the same as the URL we were

18    talking about earlier?

19         THE WITNESS:  Your Honor, it's the pieces that -- the

20    URL gets you a manifest.  What is that manifest listing?  This,

21    in part, those keys, in part, what's called split keys.  That's

22    what the software calls it, a split key.  Not very intuitive.

23         THE COURT:  Okay.  Thank you.

24    BY MR. DRAUGHON:

25    Q.   I'm going to redirect you to Exhibit 4, which is the

1  Freenet Target Summary.  In this target summary, I think you

2  noted that the IP address for the three files of interest were

3  the same.  Is that right?

4  A.   That's what I see on the screen, yes.

5  Q.   Once law enforcement has identified an IP address that has

6  requested multiple files of interest, can they then go to

7  search for that IP address' activity beyond direct

8  communication with law enforcement nodes?

9  A.   I think the next step would be to take that IP address and

10  determine the ISP that provided its service, if that's what

11  you're referring to.

12       Here we see apparently Verizon FIOS business is the ISP

13  that this IP address is associated with.  And so what else

14  could they do?  Nothing with my software, but with other law

15  enforcement procedures, they could go to Verizon, ask what is

16  the -- you know, this is beyond what I do, but they would, you

17  know, using a subpoena say -- or some other legal process,

18  retrieve the home address associated with the billing records

19  of that IP address.

20  Q.   Yes.  So I think your testimony has essentially said that

21  -- one part of it -- that the law enforcement node, the logging

22  that it does is for information that it receives from a direct

23  requester, and in this case, it would be the IP address ending

24  in .59.

25       My question is could law enforcement then say, hum, .59

1    has requested this from law enforcement nodes.  Can law

2    enforcement then go and see what else .59 has requested from

3    other nodes?

4    A.   No, that's not available publicly, and the software has no

5    ability to do that, and it would be hard to do that.

6    Q.   And I want to ask you a bit about the concerns about

7    disclosing the information.  So without disclosing anything in

8    particular, why would providing the law enforcement source code

9    compromise law enforcement investigations on Freenet?

10   A.   Well, so to perform this test, law enforcement have to go

11   undercover.  They have to present themselves as other nodes in

12   the Freenet network, and if law enforcement were easily

13   identifiable, then anyone who is abusing Freenet to commit a

14   crime could simply avoid them.

15        To give an analogy, maybe undercover officers do something

16   in a car.  They drive around town in an undercover car that's

17   not marked as police.  Well, if I told you that, you would know

18   a lot of information; but if told you specifically they're blue

19   cars, they are Ford Crown Victorias, they have these

20   characteristics, then you could avoid a lot of cars and that

21   would undermine the operation of law enforcement.

22        But I think, you know, depending on what you're asking,

23   just knowing that it's a vehicle tells you quite a bit without

24   undermining what happens, and so I think similarly here there

25   is fine, minute details about the operation of law enforcement

1  nodes that, if you knew, would not help you evaluate whether

2  the algorithm is reliable but would help you avoid, as a

3  criminal, law enforcement's activities to protect us.

4  Q.    And how would producing a source code be different than

5  the information that is in the papers that you published?

6  A.    Well, the source code would provide those little tiny

7  details analogous to the fact that it's not just a car.  It's

8  this make, model, year, color of car; whereas, you can take

9  this exhibit or, rather, Exhibit 3 that specifically lists the

10 requests that are received and reapply the test.

11      Furthermore, there's a lot of information in our paper.  I

12 mean, the entire algorithm is basically there.  The evaluations

13 that we did are there.  There's really not much missing other

14 than this analogy of make, model, car, color, and year.

15 Q.    Did I hear you correctly that you said that the source

16 code will not assist in ascertaining the reliability?

17 A.    I don't believe so.  I mean, you can assess the

18 reliability by looking at the spreadsheet, for example, or at

19 least you can reapply the test; that's for sure.

20          MR. DRAUGHON:  Court's indulgence.

21          THE COURT:  Sure.

22      (Brief pause.)

23          MR. DRAUGHON:  I don't have any further questions for

24 this witness, Your Honor.

25          THE COURT:  Thank you, Mr. Draughon.

1          Mr. Robbins.

2               MR. ROBBINS:  Thank you, Your Honor.

3               MR. DRAUGHON:  Your Honor, could we take maybe a

4     two-minute break?

5               THE COURT:  Sure, that's fine.  Yep.  Is that good,

6     two-minute comfort break?

7               MR. ROBBINS:  That's fine, Your Honor.

8               THE COURT:  All right.

9               THE COURTROOM DEPUTY:  This Honorable Court now

10    stands in recess.

11              THE COURT:  And, obviously, Doctor, you're still

12    under oath.  Don't talk to anybody about your testimony, but

13    you can take a break, too.

14              THE WITNESS:  Of course, Your Honor.

15              THE COURT:  All right, thank you.

16              THE COURTROOM DEPUTY:  This Honorable Court now

17    stands in recess.

18         (Recess taken, 12:54 P.M. - 1:01 P.M.)

19              THE COURTROOM DEPUTY:  This Honorable Court now

20    resumes in session.

21              THE COURT:  Okay.  Are we ready to roll?

22              MR. ROBBINS:  Thank you, Your Honor.

23              THE COURT:  Okay.

24              MR. ROBBINS:  May I inquire?

25              THE COURT:  Yes, you may.

1          MR. ROBBINS:  Thank you.

2                    CROSS-EXAMINATION

3    BY MR. ROBBINS:

4    Q.    Good afternoon, Dr. Levine.

5    A.    Good afternoon.  But I can't quite hear you.

6    Q.    I'm sorry.  I have to get it to a good point, I guess.

7    How about that?  Is that better?

8    A.    A little better.

9    Q.    I'll try to be louder.  Pretty soon I'll not even need the

10   microphone.

11         You just spent a fair amount of time telling us about

12   Freenet and a little bit about the technique you designed.  We

13   didn't know what it was called so we called it the Levine

14   Network Investigative Technique.  If I slip into that, will you

15   understand it to mean the software that you wrote?

16   A.    I would not because that particular phrasing implies

17   something different to me as an expert, and I think that's a

18   mischaracterization.

19   Q.    Okay.  So you just want to call it the technique?

20   A.    Sure.

21   Q.    All right.

22         And then I just wanted to touch on a couple of things.

23   You spoke a little bit -- when the government was asking you

24   some questions about your whitepaper in 2020, *A Forensically*

25   *Sound Method of Identifying Downloaders and Uploaders*, there

1   was a precursor, and I think you mentioned it, but I just want

2   to make sure we're all talking about the same one.  That's the

3   statistical detection of downloaders in Freenet?

4   A.   Yes.  But may I ask that you draw the mic closer to you?

5   Q.   I'm sorry.  I'm still too far away?

6   A.   I may not be very good at hearing.

7   Q.   All right?

8   A.   That's a bit better.

9        Yes --

10  Q.   I may not be able to keep it there.

11            THE COURT:  If you can't, we may want to use the --

12  do we have a remote, the lavaliere?  Would that be easier,

13  Mr. Robbins?

14            MR. ROBBINS:  Yes.  If there's a remote, I'll do

15  that.

16            THE COURT:  Yes.

17            MR. ROBBINS:  Because that one doesn't --

18            THE COURT:  You're a little bit taller than the mic.

19  It's going to be hard to --

20            MR. ROBBINS:  If I could speak from my diaphragm,

21  right?  How about that?  Is that better?

22            THE WITNESS:  Much better.  Thank you.

23            MR. ROBBINS:  All right.  Sorry for that.

24            THE WITNESS:  Do you mind restating your question?

25            MR. ROBBINS:  Not at all.

1    BY MR. ROBBINS:

2    Q.    I'm trying to get you to identify and confirm that the

3    precursor paper was the statistical detection of downloaders in

4    Freenet?

5    A.    Yes, there are two peer reviewed publications.  This was

6    an earlier workshop peer reviewed version, and then we extended

7    the results for the paper we talked about earlier this morning

8    in a conference paper.

9    Q.    All right.  And when we say "this paper," this is

10   Exhibit 1 for the record.  And the conference paper that you

11   discussed with Mr. Draughon earlier this morning has already

12   been identified, correct?

13   A.    Correct.

14   Q.    Of those two papers, is there anything substantial that

15   the Court should understand needs to be corrected of the

16   assertions that you made in either paper?

17   A.    I think the difference between the two papers is that the

18   second one provides additional evaluation of the technique.

19   The core technique is the same between the two papers.  What we

20   evaluated is the same.

21        There is a note in the second paper about a particular --

22   a footnote about a math bug we called it that we revised for

23   clarity, but the conclusions are consistent.

24   Q.    And you're comfortable still standing by both of those

25   papers today?

A.   Well, there are, obviously, differences between the two
papers.  That's why we published two.  But the high-level
conclusion of both is that we evaluated the technique that I
spoke about, and in both cases, we provided the quantification
of that reliability.  The quantification in the first one is --
if you'd just scroll down a little bit.

Q.   We can try.

A.   Keep going.  So there you go.  Sorry, if you don't mind
stopping.

We talked about a false-positive rate of two percent.  We
did one kind of evaluation in this paper, and in the second
paper we evaluated, again, the same core technique, and we were
able to lower our false-positive rate to something below one
percent for downloaders.

There's other differences in the paper.  For example --
between the two papers.  The second one, for example, talks
about uploaders.  That was not a subject that was approached in
the first paper.

Q.   I have also included in the exhibits for you to
identify -- just because we've had the government's screens
from the Freenet -- Exhibit 3 is the current printout of the
documentation from Freenet.  Are you familiar with that?

A.   It looks to be a PDF version of something I've seen on the
web, I don't know how recently, but, okay, if you tell me it's
from the Freenet website, apparently that's what it is.

1   Q.   All right.  And has this changed substantially over the

2   years from when this case initiated to today?

3   A.   I haven't had a chance to look at that myself, but it's

4   available for -- if you wanted to look at those changes,

5   they're available to see.

6   Q.   So when you said that the user screens for downloading

7   hadn't changed, you had a chance to review those but you didn't

8   review the documentation?

9   A.   I glanced at the documentation.  I didn't carefully look

10  at whether they had changed or not.  I also was not asked about

11  the documentation earlier today.

12  Q.   Okay.  And if you would look in the binders -- we'll just

13  put the cover pages up here, but you'll see that there are two

14  pieces of testimony, and you told us about I think five

15  occasions that you've been called as a witness; four of them

16  you've actually testified and one that you were on standby.

17       One was in Missouri and that would be Exhibit 4.  This is

18  *United States vs. Alden Dickerman*?

19  A.   Okay.  I see it.

20  Q.   Do you recall that case?

21  A.   I do.

22  Q.   And in a general sense, and I know you're not going to

23  remember line by line, but in a general sense, did you come

24  away from that case feeling that there was anything that you

25  had substantially gotten wrong in your testimony?

1    A.    I don't recall anything.

2    Q.    And you're a pretty careful scientist.  That much is clear

3    already.  Is that a fair characterization?

4    A.    I think so.  I may have misspoken at some point.  If you

5    want to point something out to me, go ahead.

6    Q.    And trust me, that's not my nature.  I'm not going to do

7    let's catch him with a one-line question.  I'm just trying to

8    make sure that there is nothing that's a -- like there's a big,

9    oh, you need to know there was a problem with something.  Not

10   that you recall?

11   A.    Not that I recall.

12   Q.    Fair enough.

13         And then on Exhibit 5 is the case that I think you

14   mentioned here in the District of Maryland up in the Northern

15   Division with Judge Motz back in -- also in 2017, but later in

16   the summer.  Do you recall that case?

17   A.    I do recall that case.

18   Q.    And same thing there; nothing huge that you would --

19   A.    I don't recall anything standing out.

20   Q.    All right, fair enough.

21         Now, this technique that you've developed is, we've been

22   informed by the government, and I think there is even some

23   commentary in the feedback that you had on your second paper,

24   it's different from the Black Ice technique.  Correct?

25   A.    Correct.

1  Q.   And the difference is that yours is a statistical model

2  that's based on the number of requests that are coming in and

3  whether or not that matches whether someone would be a

4  requester or a relayer?

5  A.   Well, as I've described earlier today, there are several

6  important values, but you've identified certainly a primary

7  one.

8  Q.   And you don't completely discount Hops-to-Live, but you

9  don't make that the sword upon which you're going to fall?

10  A.   Correct.  In fact -- correct.

11  Q.   And that was one of the problems with the Black Ice model

12  is that Hops-to-Live was kind of a core element of that?

13  A.   Correct.

14  Q.   You also have referenced law enforcement database that you

15  use for reference and that was used in the Black Ice model as

16  well.  Is that the same evolving database?  Is that kind of a

17  cooperative effort?

18  A.   I don't know.  I wasn't involved in Black Ice, and I have

19  no idea what happened to any sort of Black Ice database and how

20  it relates to the leads server that I'm talking about now.  For

21  all I know, they are the same; for all I know, they're not.

22  Q.   Fair enough.

23       Now, you also mentioned that the technique that you

24  designed was to address a substantive or substantial societal

25  problem and that is the amount of child sexual abuse material

1  that moves across the Freenet.

2  A.    Correct.

3  Q.    And you estimated that was about 30 percent of the packets

4  that you were able to see at a couple of different times over

5  time that you've looked at?

6  A.    About -- so this is detailed in the second paper, and I

7  believe my memory is there's also one of the first indications

8  of that in the first paper, but definitely in the second paper

9  we four times measured the number of requests that were coming

10  through, and 30 percent were related to files of interest

11  according to law enforcement.

12  Q.    And you have to excuse me because I've been saying

13  packets, and I should be saying blocks because that's the term

14  of art that applies in this case.

15        And when you are talking about 30 -- that's 30 percent of

16  the block requests?

17  A.    Correct.

18  Q.    So when you talk about your law enforcement technique

19  here, and when we eventually get around to looking at the

20  specific reports in this case, those lines, each of those lines

21  relate to a block, not to an entire file?

22  A.    You're talking about the lines that are in the

23  spreadsheet?

24  Q.    Yes.

25  A.    Yes, each of those is a block.

1    Q.    So those are all block requests; not file requests?

2    A.    Correct.

3    Q.    So the way the Freenet works, as I understand it, and I'll

4    cheat because I'm not a scientist.  I'll take this right from

5    the affidavit for a warrant.  Freenet is a peer-to-peer

6    platform intended for censorship resistant secure and anonymous

7    communication and file sharing on the Internet.  Did the

8    affiant get that right?

9    A.    That's a description that I've seen people use, including

10   the -- yeah, I think that's correct.

11   Q.    And the affiant goes on -- so for things that get moved

12   across the Internet, Freenet can be used for communication, for

13   instance, as long as I insert whatever it is I want to send to

14   somebody else?

15   A.    Correct.

16   Q.    It can be used for email?

17   A.    Not efficiently.  You can use it for communication, and if

18   you want to consider an email -- it can be used to communicate

19   with people, and there are many applications on top of Freenet.

20   I've never used it or seen it, but my understanding is -- in

21   fact, it's referenced in one of the exhibits, but there is kind

22   of an email type thing on top of Freenet that can be used.

23         Yes, so that type of communication can be done on top of

24   Freenet.

25   Q.    And documents could be sent across Freenet?

1    A.    Of course.

2    Q.    Actual whole websites, those indexes, the links in those

3    indexes bring it to a website that's been inserted?

4    A.    Correct.  In a fashion.

5    Q.    And then, of course, media, photos, and everything else,

6    all of the ugly stuff that you're focused on in this case,

7    correct?

8    A.    Correct.

9    Q.    But all of those things end up getting sent in the --

10   getting moved around the Freenet in the same way.  They get

11   moved by -- at the highest level there is a manifest and then

12   maybe even a sub-manifest if there are too many blocks,

13   correct?

14   A.    Correct.

15   Q.    And then there are blocks, correct?

16   A.    Correct.

17   Q.    And those blocks are encrypted, correct?

18   A.    Correct.

19   Q.    And they can't be understood in any way without the key

20   that comes, I guess, from the primary manifest?  Or the

21   sub-manifest can you do it?

22   A.    Without that key, you could not decrypt.  A portion of

23   that key is the -- the word "key" here is going to appear a lot

24   in my next sentence, but without that manifest, without -- part

25   of that manifest URL is the decryption key, and unless you have

1   that, you cannot decrypt blocks that you have downloaded.

2   Q.   So I'm really trying to bear down on how the Freenet works

3   first.

4   A.   Okay.

5   Q.   So I'm going to use an off-the-wall example, if I may,

6   because you've used analogies, and it's the easiest way for

7   most of us to understand things.

8        If I am a liberty loving protestor in Hong Kong, I could

9   use the Freenet as a methodology for organizing my

10  co-dissidence, correct?

11  A.   Freenet is a tool for communication.  It can be used for

12  any kind of communication, the kind that you've described, or

13  you could use it to trade images of child sexual abuse

14  material.  It's a tool.

15  Q.   It's a tool.  So if I want to post the meeting sites, then

16  I could make them a link on a web page that's the Hong Kong

17  dissidence page or something?

18  A.   Correct.

19  Q.   And the way that someone would find out where my meeting

20  sites were would be to request the blocks that rebuild into my

21  page of we're all going to meet down at the park this week?

22  A.   Well, to -- let me answer -- you skipped a step.

23  Q.   Okay, I'm sorry.

24  A.   So the person who wants to publish any information inserts

25  it into Freenet, as you've said, but then they have to take the

1    URL that Freenet returns to them and then proactively publish

2    it, make it available to the people who might want to attend

3    the meeting, and then, as you said, any one of those people

4    could download it.

5    Q.   You're right.  Thank you.  I did leave that out.

6         So I am the organizer of the Hong Kong dissidence society,

7    and I've posted on my Hong Kong dissidence society a URL so

8    that my followers know where to meet.  My followers are all

9    hiding because they don't want the coming oppression to come

10   yank them out of their beds in the middle of the night, but

11   they could get the link from my meeting notice?

12   A.   I don't recommend it but they could.

13   Q.   They could.  And we'll get to the recommendation and

14   whether it's a good idea or not in a few minutes.

15        But they could get that, and the way Freenet is designed,

16   they could feel like when they're requesting the links, that

17   they are only requesting -- they're not requesting the whole

18   notice.  They're sending out block requests for pieces of that

19   notice.  Right?

20   A.   I don't agree because I don't see where in the Freenet,

21   you know, interface that we've looked at that it talks about

22   blocks.  It asks you for a URL and then, as we saw, if you want

23   to go to the exhibit, it downloads the requested content.  It

24   doesn't talk about split keys.  It doesn't talk about that to

25   the user.  So I disagree that they would get that impression.

1  Q.   And you don't think it says that anywhere in the

2  documentation, that your requests are split into blocks?

3  A.   Well, it says it in my paper.  I'm sure it says that all

4  over the Internet, but what I'm talking about is the user

5  interface that the user is shown.

6  Q.   And it doesn't say that the design of the Freenet is so

7  that you have a plausible deniability for anything that might

8  be held on your computer?

9  A.   It also -- well, it says that if you want to use Freenet,

10  there's some things you should be concerned about in order to

11  get that plausible deniability, including connecting to

12  strangers.  So I think there's a lot of warnings on Freenet,

13  and I think it --

14  Q.   And I'll give you right now, because you testified to it

15  originally, that you believe that there are plenty of warnings

16  on Freenet.  I'm really not here to try to argue with you.

17  A.   Okay.

18  Q.   I'm trying to find the pieces that I don't know.

19       So the request would go out.  If instead of being the

20  organizer I'm sending requests out, I would be requesting

21  pieces of -- I would be requesting blocks, the thousand pieses

22  that you talked about it being broken up into, encrypted blocks

23  --

24  A.   Correct.

25  Q.   -- of the peers around me.

1        Now, if I'm smart, I might be in -- myself, I could be in

2   darknet mode, right?  And then I would have to depend on one of

3   my friends being in opennet so that they would request things

4   in other places, or one of my friends would have to have it.

5   Right?  So if I -- if I was smart and I didn't want to be

6   found, I should be in darknet mode.

7   A.    More secure.

8   Q.    Okay.  But if I'm not smart and I'm in either open or

9   normal mode and I post a request to get the pieces of the

10  "where's the meeting," my request is going to be in a myriad of

11  blocks.  Each of those blocks -- yes?

12  A.    Correct.

13  Q.    Each of those blocks is going to be encrypted.  Yes?

14  A.    Correct.

15  Q.    It's not going to be intelligible?

16  A.    It's not going to be?

17  Q.    Intelligible.

18  A.    Intelligible?  No, it will not be.

19  Q.    And it's going to be hidden among all the other blocks

20  moving around on the Freenet?

21  A.    What do you mean by hidden?

22  Q.    In that when I send that request out, a batch of them will

23  go to each of my nearby nodes, correct?

24  A.    It would be commingled among the other requests.

25  Q.    Commingled, yes.  Commingled.

1      So it's not -- so the request goes out commingled and

2  encoded, and a normal neighbor, stranger or friend, a normal

3  neighbor is not going to be able to tell what it is I've just

4  asked for?

5  A.    I disagree.  I mean, what do you mean by normal?

6  Q.    I mean a typical Freenet node is going to see a request

7  coming from my node saying please send me the following blocks.

8  It's not going to say, oh, by the way, those blocks helped me

9  build the meeting notice for my park in Hong Kong?

10  A.    Well, I don't see why they couldn't.  I mean, that, quote,

11  unquote, normal node could also download manifests, and if what

12  they're interested in is some meeting of some group, then they

13  could keep that list in hand and then check it against what's

14  been requested.

15  Q.    So that takes us then -- I'll have to skip to a different

16  place in my notes, because I think you do address that in your

17  paper, in both papers, actually.

18      (Brief pause.)

19  BY MR. ROBBINS

20  Q.    Well, I'll get to the exact quote later but in both of

21  your White Papers --

22  A.    I'm sorry.  The peer reviewed papers?  Is that what you're

23  referring to?

24  Q.    Peer reviewed papers.

25  A.    They're not White Papers.  White Papers to me means

1  unreviewed.

2  Q.    I'm sorry.

3       In both of your peer reviewed papers -- I didn't mean to

4  diminish them.  I apologize.  In both of your peer reviewed

5  papers, you exhorted people to not misuse the technique?

6  A.    I said that it's unethical for the Freenet developers to

7  offer this to society as if it was something that could protect

8  people who were vulnerable, and I think it would be a mistake

9  if you feel like you're in a vulnerable position to make use of

10 this tool given that we have publicly shown that it really

11 doesn't provide much.

12 Q.    All right.  And we can get the quote later out of the

13 papers themselves, but let me ask you this.  The prerequisites

14 to breaking the encoded block are multi-fold to determine that

15 I'm the one asking for that encoded block, right?  All the

16 things that you had to do in your paper.

17 A.    To determine whether someone is requesting a run of blocks

18 is the relayer or the requester, yes, I believe you have to do

19 everything I said in the paper.  That's a different question

20 than what is this block?  Which manifest does this block belong

21 to?  So I'm not sure what you're asking.

22 Q.    But to do what you've described, you have to go through a

23 number of steps?

24 A.    To determine if someone is the relayer or, in fact, the

25 original requester, you have to do a number of steps.  If for a

1  given block you would like to know which manifest it belongs

2  to, it would be a lot easier.  So, again, I'm not sure which

3  question you're asking me.

4  Q.   Fair enough.

5       So do you still stand by the statement in the statistical

6  detection paper, the first paper that the Freenet is a

7  peer-to-peer system which is itself a privacy enhancing

8  technology supporting anonymous publication or data?

9  A.   I believe that's its intended purpose.  I don't think it

10  achieves that.

11  Q.   Do you believe that the affiant was correct when he states

12  that Freenet works by storing small encrypted blocks of content

13  distributed on the computers of its users connecting through

14  intermediate peers, computers, which pass on requests for

15  content and send them back without knowing the contents of the

16  complete file?

17  A.   I think if you had the manifest, then you would know the

18  contents of what this request aligns to.

19  Q.   I'm not asking what's doable.  I'm saying what is the

20  typical operating mode?

21  A.   I'm saying that if you receive a request and you know and

22  you have a list of manifests, it's pretty trivial to look at

23  what manifest this request aligns to.  If you're not looking at

24  the manifest, then you wouldn't know that.

25  Q.   So the fact that it's possible to do that is very

1   important to you?

2   A.   Yes.

3   Q.   At one point in your first peer reviewed paper on page 2,

4   actually, you said that having a Hops-to-Live of 18 or 17

5   yields an ambiguous result on who the originator may be.  Why

6   is that?

7   A.   Could you direct me to the sentence in the paper that says

8   that?

9   Q.   Sure.

10            MR. FINCI:  First paper?

11            MR. ROBBINS:  First paper, page 2.

12            MR. FINCI:  Sorry.

13   BY MR. ROBBINS:

14   Q.   If you look over in the second column --

15   A.   I see it.  Okay, and what's your question?

16   Q.   You say that the Hops-to-Live of 18 to 17 is ambiguous.

17   If the request comes in, you don't know who the originator is.

18   A.   So the sentence says, "As a result" -- I'm reading from

19   the highlight -- "if a peer receives a request with an HTL or

20   Hops-to-Live of 18 or 17, its originator is ambiguous."

21            So your question is do I stand by that statement?

22   Q.   Yes.  That's still accurate, right?

23   A.   Yes.  For example, we could go to the second paper, and

24   there's a formal mathematical statement of that.  And if your

25   goal -- so, yes, I stand by that.

1    Q.    Okay.

2         Now, in your direct testimony and really in your papers,

3    you work on the premise that everything is operating in the

4    open mode?

5    A.    Well, the reason I say that is that to operate in the

6    darknet mode -- if you were running Freenet and I was running

7    Freenet and we wanted to become friends, as they call it, in

8    darknet mode, we both have to agree to that.  So if law

9    enforcement are not operating in darknet mode, then anyone that

10   they're connected to similarly is not in darknet mode.

11   Q.    Okay.  And I'm with you there.

12        Now, let's say Mr. Draughon over here decides that he only

13   wants to operate in darknet mode.  He needs three friends.

14   That's all he needs to set it up, right?

15   A.    That's what the developer says.

16   Q.    It's going to be slower if you don't have more than that,

17   but you can do it with three.  And if he makes me one of those

18   three and I'm operating in normal mode, can you tell that I

19   have friends in the dark node -- in the darknet mode?

20   A.    That's a good question.  I'm not sure, but I assume that

21   you would tell him -- from what I know, you would tell him the

22   number of neighbors that you have and you would provide those

23   IDs.  So I don't know.

24   Q.    I'm talking about you.  You're the --

25   A.    Who am I in your scenario?

1  Q.    If the scenario that we've created here is you're running

2  a law enforcement node in open mode, I'm running the podium

3  node in normal.  Mr. Draughon is one of -- is my friend.  He's

4  got a couple of other friends somewhere else.  He's only got to

5  have three but he's running totally in dark.  Are you ever

6  going to see him?

7  A.    Well, whether you're in opennet or darknet mode, I won't

8  see the IP addresses of anyone that you're connected to.

9  Q.    Will you see that I have any darknet node?

10 A.    I don't know.

11 Q.    That hasn't been looked at, how that works?

12 A.    I haven't looked at that.

13 Q.    All right.  Let me take that another step.

14 A.    But if I may amend that, I mean, we, as I said, we put

15 nodes out on the Internet.  They connected to whoever the

16 Freenet network decided to connect it to them, and to the

17 extent the scenario you're describing happens in practice, it

18 was evaluated by the test.

19       So I haven't looked at that exactly.  Maybe that's a

20 scenario that never happens, maybe it happens commonly, but we

21 did 918 tests, and to the extent that it happens and is

22 important, it's included in our trials.

23 Q.    I found that an interesting number.  You said you did 918

24 tests.  You validated that you had a couple of them that were

25 your own nodes and so those were wrong.  Did you validate that

1  the balance were actually correct?

2  A.   Wait.  I'm sorry.  It was hard to hear that.  Can you

3  repeat that?

4  Q.   When you talk about your error rate, and error rate is

5  probably not going to be huge on your formula anyway, but let's

6  just look at that for a second because when you talk about your

7  error rate, you said we knew when our insert nodes were

8  identified as providers, that that was an error.  That only

9  happened a couple of times out of 918 times when the law

10  enforcement nodes said they had a positive.

11       Okay.  So that leaves a bunch of other times when the law

12  enforcement nodes say they have a positive, but how would you

13  know if any of them were errors or not?

14  A.   So the setup of the test -- so to answer your question,

15  the setup of the test is that we put some nodes up on Freenet.

16  The test is evaluating whether our nodes are making requests

17  for CSAM.  Our nodes never made a request for CSAM.  So every

18  time law enforcement saw requests for CSAM that were relayed by

19  our nodes, law enforcement ran the algorithm and asked is this

20  a node that's relaying CSAM.

21       By definition of the test, any positive they got was an

22  error.  So we know all of the errors because every test was of

23  a node that never asked for CSAM.  So exactly 2 of the 918

24  times was an error.

25  Q.   You know all of the errors because you found the errors

1  with respect to the nodes that you controlled.  Do you know all

2  of the errors for the nodes that you did not control?

3  A.    The tests were only run on nodes that we control.

4  Q.    One of the things you went through on the sign-in screens

5  were Datastore.  What's the size of the Datastore for a law

6  enforcement node?

7  A.    I don't set up the law enforcement nodes.  So I don't know

8  the Datastore.

9  Q.    All right.  Who sets up the law enforcement nodes?

10  A.    Law enforcement.  Law enforcement sets up the law

11  enforcement nodes.

12  Q.    What is involved in the setup?

13  A.    There's a training course that they go through, and as

14  part of the training, they are taught how to take the software,

15  run through the configuration screens, and then set them up on

16  the network.

17  Q.    And what is in the configuration screens?

18  A.    It includes things like your Datastore, you know, your

19  bandwidth, the standard configuration that Freenet asks you

20  about.

21  Q.    With respect to your concern with law enforcement use of

22  the technique that you developed, does it matter at all what

23  law enforcement does with respect to Datastore bandwidth or any

24  of the other things?

25  A.    I think it does, and I want to say that whatever settings

1  were used we evaluated them 918 times over a four-year period,

2  and whether they set them one way or the other, the 918 tests

3  demonstrate that how they set it up is effective.

4  Q.    And I think we've already touched on maybe part of the

5  validity of that test, but we'll leave that for a moment.

6  A.    Yes, I think we did.  Do you want to return to that?

7  Q.    No.

8  A.    Oh, okay.

9          THE COURT:  But just to be clear, I want to

10  understand this.  Dr. Levine, you're saying you have no

11  independent knowledge of, for example, in this case, the

12  settings that law enforcement used with regard to its own

13  Datastore.  Am I right?

14          THE WITNESS:  I don't have -- I don't run the

15  training course.

16          THE COURT:  Do you have any independent knowledge?

17          THE WITNESS:  I have some gist of what they do.

18          THE COURT:  But do you know what the Datastore was in

19  this case?  What it was set to?

20          THE WITNESS:  Oh, I certainly don't.

21          THE COURT:  Okay.  All right.

22          THE WITNESS:  I did not directly observe it.  I have

23  a general idea of what it might be.

24          THE COURT:  So earlier when you went through Freenet,

25  and we were at the screen in which the Freenet user chooses how

1   much data to donate, that's what we're talking about when we

2   discuss Datastore.  Am I right?

3           THE WITNESS:  Correct, Your Honor.  And anyone in law

4   enforcement who set this up chose some value.

5           THE COURT:  Right.

6           THE WITNESS:  I didn't directly observe what they

7   chose.

8           THE COURT:  Can you answer Mr. Robbins' question,

9   which is how does it matter?  So if you choose two bytes versus

10  two terabytes that you're volunteering to the Freenet, how

11  would it matter in terms of your reliability assessment, for

12  example?

13          THE WITNESS:  If the Datastore was set very high --

14  so what's the purpose of that Datastore?  I'm on the Freenet

15  network, and I'm just a node that's there and people are making

16  requests, and as I see the requests fulfilled and the actual

17  block is sent back, I will keep a copy of that in this

18  Datastore.

19          THE COURT:  Okay.

20          THE WITNESS:  Okay?

21      Now, eventually the Datastore will fill up.  It's totally

22  full and I see yet another block come through.  I will kick

23  something out of the Datastore and put this new thing in there,

24  and the whole point of it is that the things that are more

25  popular are cashed in the Datastore and it helps make them more

1    available.

2         So, for example, if someone requests something, it gets

3    put in my Datastore.  Someone else requests the same thing.  It

4    can be retrieved from my Datastore, and it cuts down on traffic

5    in the network.

6         You know, whether that has an effect on our test is

7    included in the in situ test that we did.

8              THE COURT:  How?

9              THE WITNESS:  Because law enforcement set that

10   configuration variable to whatever they did and --

11             THE COURT:  Okay.  But I still don't get it.

12             THE WITNESS:  Okay.

13             THE COURT:  How can it be part of your validation if

14   you don't know the quantity?

15             THE WITNESS:  Because we evaluated those nodes on the

16   network.  So to give you an example via analogy off the top of

17   my head --

18             THE COURT:  Okay.

19             THE WITNESS:  -- so there's a company.  Let's just

20   say Amazon.  They're delivering products everywhere.  They've

21   trained their drivers to do certain things.  Maybe they've

22   trained them to drive fast on the road, maybe they've trained

23   them to be nice about those deliveries.  Whatever happened in

24   that training process, when they get to the door and they drop

25   off that package, I observe, as the person who is the

1   homeowner, what the result of that training was.

2       I don't know how much gas is in their car.  I don't know

3   what happened when they walked up, but when I see them and I

4   see them drop off that package, I know the result of how they

5   set up their car, how they went through training, and I can

6   evaluate it.  I don't need to know the details of it, but I

7   know how effective they are in their delivery service.

8       Similarly here, law enforcement were trained.  They

9   performed what they did.  They set up their nodes the way they

10  did, and I tested how effective they were in performing

11  their jobs.  They did whatever they did and they tested our

12  nodes 918 times, and they got the answer correct 916 times.

13  It's an evaluation of their training.  It's an evaluation of

14  the software.  It's an evaluation of how they deployed that

15  software.

16      There's lots that happened that I don't know about.  Maybe

17  they got up and got a cup of coffee and sat down.  You might

18  ask me if that's going to --

19          THE COURT:  But I'm not asking about that.  I'm

20  asking about a variable that you, I thought, testified to was

21  important and that is the storage, the amount of storage in the

22  law enforcement node.

23          THE WITNESS:  Oh, I apologize, Your Honor.  I don't

24  think I said -- I said that was an important part of the setup.

25  I don't recall saying that was an important part of our method.

1        THE COURT:  Well, then maybe that's the distinction

2   that's been lost on me.

3        THE WITNESS:  Okay.

4        THE COURT:  How is it -- what do you mean then when

5   you say it's an important part of the setup?

6        THE WITNESS:  When anyone, including law enforcement,

7   installs Freenet, it's a question that Freenet asks you that

8   you cannot skip over.  You have to give it a value.  So you

9   can -- as we saw in the exhibit, it suggests it could be as

10   small as one gigabyte.  It could be as high as 20 gigabytes.

11   I'm sure you could set it much higher than that.

12      I don't believe --

13        THE COURT:  But let me ask you this then, because I'm

14   trying to sort of remember what you testified to in the

15   morning.  If the node -- the node who has just joined chooses a

16   very, very, very small number, would it increase the likelihood

17   that the child pornography blocks would not be in that node?

18        THE WITNESS:  I don't think -- Your Honor, I don't

19   believe it would have a significant effect on the test.

20        THE COURT:  What do you base that on?

21        THE WITNESS:  My knowledge of how Freenet operates

22   and the fact that when I'm a requester and I'm asking for

23   things, I'm generally going to -- there's a lot that goes into

24   the Freenet algorithm, but the primary purpose of it is to

25   decide for a given block, given that I have 10 neighbors next

1   to me, those people in the front row as I pass out assignments

2   --

3            THE COURT:  Right.

4            THE WITNESS:  -- I'm going to pick one of them that I

5   believe is closest to the block that I'm searching for.

6            THE COURT:  Right.

7            THE WITNESS:  So that is the primary determination by

8   which I pick the next one.  I don't think the Datastore has --

9            THE COURT:  But to follow in your analogy, if the one

10  closes to you, if the node closes to you has a capacity to only

11  accept one piece of paper, then the next time you hand out the

12  next piece of paper, if that node just has the one piece of

13  paper, that node can't accept a second piece of paper, right?

14           THE WITNESS:  Your Honor, I don't believe that's the

15  correct analogy because the Datastore is not about how many

16  requests you can receive.  The Datastore just says that when

17  the block is actually found, you should keep a copy of it.  It

18  doesn't say anything about whether you get the next request.

19  It just helps you answer a request for the same block.

20           THE COURT:  Maybe we're talking about two different

21  things.  I guess what I'm trying to wrestle with in my head is

22  the uploader.  The uploader uploads a document and gets smashed

23  into a million pieces, and one of the nodes, law enforcement

24  node may receive a block, right?  And if it's very, very small,

25  the cup that can receive the block is a really tiny cup.  Then

1    won't that affect how many blocks could actually be in that

2    particular node?

3              THE WITNESS:  I apologize.  Okay, now I understand

4    what you're asking.

5              THE COURT:  Okay.  Sorry that I'm so --

6              THE WITNESS:  So, yes, there could be -- I think what

7    you're getting at is there is this extreme that could happen,

8    and I don't believe it happens where one person could have this

9    pedabyte of, you know, storage; but what actually happens is

10   that when you join the network, you are given a unique number,

11   and when content is stored, you're given a unique number, and

12   it travels to its most unique number.

13       So when I join the network, I say, great; I'm happy to

14   store things.  Here we go.  And content that maps to me will be

15   stored, and I will store more of it if I have a ridiculous

16   amount of storage available.

17       But what we found when we observed things on the network

18   is that that doesn't seem to happen, that -- we looked at like

19   what requests are sent to our various neighbors.  Real nodes

20   that have set this value.

21             THE COURT:  Right.

22             THE WITNESS:  And we don't see that there is that

23   kind of skew that would affect the test.

24       So to go back to what I was saying before, to the extent

25   that that happens, it's in the realm of possibility, but if it

1    happens, we did not observe that it affected the test in our

2    evaluations.

3            THE COURT:  Okay.  All right, thank you.

4        Sorry, Mr. Robbins.  I just needed to understand that.

5            MR. ROBBINS:  No, this is all to make a record for

6    the Court, Your Honor, so I'm good with it.

7    BY MR. ROBBINS:

8    Q.   Dr. Levine, you're talking about Datastore, and one of the

9    things that was confusing to me is how Datastore and path

10   folding are interrelated, if at all.  It looked to me like they

11   were.  Can you explain that?

12   A.   What do you mean by path folding?  Can you explain?

13   Q.   As I understand the reading that I've done on Freenet,

14   mostly it's your writing so -- but a little bit else -- but

15   Freenet is constructed.  It's what's called a small topography?

16   A.   Small world?

17   Q.   Small world topography.  Thank you.  As I get words wrong,

18   straighten me out.

19       And that every node on the Freenet is on a circle with the

20   addresses going between zero and one and it's a whole bunch of

21   digits that identify your node and that you can be placed

22   anywhere.  I think you talked about that with Mr. Draughon,

23   that just because you happen to flip on a new node in Idaho

24   doesn't mean that your Freenet near neighbors are going to be

25   in Idaho.  They may be in Hawaii or Louisiana or wherever.

1    That's all numerical.  That's how your near --

2    A.   Correct.  It has nothing to do with your geographic

3    location.

4    Q.   Your near neighbors are numerically close, but there is

5    also a tendency of Freenet to create -- I call them cords just

6    because I don't have a better word for it, but if there is --

7    if, in the course of passing these blocks around, a node

8    figures out that there is a good place to go because they often

9    have the things -- you know, I always get asked for kitten

10   pictures, and I figure out that even though you're not a near

11   number node, you've got the kittens, and so I create a shortcut

12   to you and then you become a neighbor also?

13   A.   Can you point to me where in the Freenet source code or

14   documentation this happens?

15   Q.   Well, I found that in the Black Ice documentation.  It was

16   the cleanest explanation of it I saw.  If we go to page 7 in

17   the final exhibit that I had, I'll show the diagram.

18             MR. FINCI:  Which exhibit?

19             MR. ROBBINS:  Page 7 of the Black Ice, which I think

20   is our exhibit --

21             MR. FINCI:  10.

22             THE COURT:  Is it in the ECF?

23             MR. FINCI:  I have it here, Your Honor.

24             MR. ROBBINS:  I think we did submit it in ECF before,

25   Your Honor, but it's Exhibit 10 for the purpose of this

1    hearing.

2            THE COURT:  Okay.

3            MR. ROBBINS:  Page 7.  If you would just drop down --

4    all right, stop there.

5            MR. FINCI:  There you go.

6    BY MR. ROBBINS:

7    Q.   This is what in the Black Ice paper they call path

8    folding; in order to make the movement of information more

9    efficient.  And what that looks like is that you can end up

10   with more neighbors that may not be numerically close to you

11   but that are in areas of interest to you.

12   A.   Do you have a question?

13   Q.   My question is can you explain how that works?  Because I

14   may not understand it right.

15   A.   So this is a document that I did not write, and, you know,

16   there is a lot of intricacies to how Freenet works that we

17   haven't covered, including, like we talked about the small

18   world topology.  We never talked about, for example, how it is

19   that you arrive at 10 strangers.  They're not -- they are

20   arbitrary but they are designed in such a way that the network

21   is efficient at finding the content that you need.

22           So to give the Court an explanation of small world

23   networks -- I hope this isn't too much -- so let me not go on a

24   wild tangent here.

25           So let me just say that there's a lot of intricacies as to

1  how Freenet arranges the nodes on the network, and it wants to

2  do it in such a way that it can find content that you're

3  looking for.  To whatever extent the normal operation of these

4  intricacies of Freenet affect our tests, it was a value -- and

5  I'm sorry to sound like a broken record here, but any intricacy

6  that you can bring up, that's the reason we did the in situ

7  test.

8       If I had come here and said to you I only ran simulations

9  and those simulations were not perfect but we did the best we

10 could, then you could say to me, did your simulation take into

11 account this deep detail of Freenet that's hard to explain in

12 an open forum like this?  I would say, you know, depending on

13 the detail, I might say, no our simulations did not.

14      But whatever detail you're asking me about that's part of

15 Freenet and you're asking me did it affect the validity of the

16 test, I will repeatedly tell you if it affected the test, it

17 would have, I believe, shown up in the four years of 918 tests

18 that we ran.

19      So if your summary question is do I believe this has an

20 affect on my test, I would say the answer is no.

21 Q.   Let me do a follow-up question because I think that you

22 testified that you don't know what law enforcement was doing

23 for the size of their Datastore then.  Correct?

24 A.   I'm not -- I'm not directly -- I have not directly

25 observed what they do.

1  Q.   And you don't know if they've changed it since the time

2  you ran that test?

3  A.   Of course I don't know if they've changed it since I ran

4  the test.

5  Q.   Because you don't control the law enforcement nodes?

6  A.   I don't.

7  Q.   So you're kind of in a difficult spot to explain whether

8  it might change things if you were to run that test again

9  today?

10 A.   I'm sorry.  How does that question relate to what you just

11 asked me?  We ran the test over a four-year period.  We can

12 look at the dates.  So let's look at the dates and compare them

13 to this case.  So I'm looking -- I'm sorry.  I guess this is

14 the second paper.  I guess that's Exhibit 3?  It might be

15 Exhibit 4.  Is it Exhibit 2, the 2020 paper?  And this is not

16 paginated but I'm looking at section 5.1, and it said, "The

17 experiment began in October 2017, and ran through April 2020."

18      So are you asking me about things that happened between

19 those dates?

20 Q.   And your view is that between those dates, it didn't

21 matter; you saw consistent results?

22 A.   I'm saying that, like, to the extent that it mattered, it

23 was captured by the test that we did.

24 Q.   Okay.  And that's fine.

25      If I've understood your explanation thus far today,

1  your -- I won't say yours.  I apologize.  The law enforcement

2  node sits there like any other node, correct?

3  A.    Correct.

4  Q.    It's got an overlay of the program that you wrote but that

5  really serves as a data collection tool?

6  A.    It logs information relevant to crimes against children.

7  Q.    It's logging information, but to log that information, it

8  has to receive and examine each block request to decide whether

9  it gets thrown in the hopper of the crimes against children or

10  whether it's just -- what happens to the ones that don't get

11  saved?

12  A.    So each request that's received, for which it is the

13  intended recipient, because it has to look, as you said, at its

14  stored information and decide what to do as part of its normal

15  operation -- so everything that it receives as the intended

16  recipient, it looks at the request that was made, which is part

17  of the Freenet operation; and then you're right, it does this

18  extra looking at whether this is a manifest of interest --

19  sorry, whether this is a block of interest.  And if it is, then

20  this might get reported -- or it does get reported as a lead.

21  Q.    So does each law enforcement node have the total database

22  of blocks of interest?

23  A.    I don't recall that detail.  I'm not -- you know, I don't

24  recall it in detail.  We could assume that it does if you want.

25  Q.    I don't really want to assume.  I want to know because how

1    does -- where does the comparison get made?  Does the

2    comparison get made at the local node, or does it get made at

3    that central facility that we were talking about?

4    A.    Yeah.  I don't recall exactly because it's a lot of

5    information.  So I can't recall whether it's at the node or

6    whether it's at the central facility, but this is information

7    for which these law enforcement nodes are the intended

8    recipient of a communication.

9    Q.    I understand that.

10   A.    Okay.

11   Q.    But if -- now I'm going to be the law enforcement node for

12   a second.  Okay?  I'm sitting here and I'm sitting in the

13   stream of block requests that are coming to me, and basically a

14   piece of the Freenet has been slightly modified.  So I just

15   kind of record all of those requests that have been sent to me.

16   I mean, they're sent to me.  They're block requests sent to me.

17         Do we know how long those block requests get held before

18   they are compared against the database?

19   A.    Well, whether it happens locally or whether it happens in

20   the database, it's a matter of milliseconds.  Right?  Computers

21   do things pretty fast so --

22   Q.    Well, I don't know.

23   A.    -- we can assume for the sake of argument that it happens

24   at the server, but it would be pretty instant.

25   Q.    So all of the stream of data that comes to the law

1   enforcement nodes would get sent to the server.  The server

2   would look at them and decide which ones to keep and which ones

3   to throw away?

4   A.    All of the requests that are made of law enforcement --

5   sorry.  All of the requests that were made of the law

6   enforcement nodes are compared somewhere.  Let's assume that

7   it's at the server.  If it wasn't something of interest, then

8   it would be dropped.

9   Q.    All right.

10       Now, you at some point gave a -- in one of your papers,

11  you said longitudinal studies of the number of users of Freenet

12  are difficult, but you must have done something to come up with

13  that 30 percent number.

14  A.    The 30 percent number refers to the number of requests

15  that were received by law enforcement.

16  Q.    Okay.  And the other number that was in your study were

17  the number of terminals that could be seen or the number of

18  nodes that could be seen by your study nodes?

19  A.    I don't know what you're referring to, but any node on the

20  network, as we saw, has a list of strangers that are connected

21  to it.  You can see their IP addresses, and so that information

22  is sort of plainly available and can be tabulated.

23  Q.    And you did tabulate it, right?

24  A.    Correct.

25  Q.    What was the size that we were looking at?

1   A.   So do you want to refer to a page on the paper?

2   Q.   I guess I could if I have to.

3         MR. FINCI:  Which paper; first or second?

4         MR. ROBBINS:  It was actually in both.

5   BY MR. ROBBINS:

6   Q.   Well, rather than my scampering for the size at this

7   point, have you run across any data that would suggest that the

8   numbers that you put in each of your papers for numbers of

9   contacts or numbers of users that were observed was wrong?

10  A.   So what the paper reports is that nodes that were up on

11  the Freenet network are told, as we saw in the user interface,

12  the nodes that are connected to them, you can tabulate that and

13  when you do, you arrive at a number, and we reported that as

14  accurately as we knew how in the paper.

15       I have not run across anything that gives me pause about

16  what we reported.

17  Q.   Okay.  That's really all I was trying to get at.

18  A.   Oh, okay.

19  Q.   I just wanted to make sure that the numbers were still

20  good.

21       And I did run across in your statistical detection paper,

22  the first peer reviewed paper, your quote was, we condemn the

23  misuse of the techniques to investigate ethical uses of

24  Freenet.  Does that sound about right?

25  A.   I would not want anyone -- so, as I said, if you have a

1    tool that you are advertising to people who are vulnerable, I

2    mean, I think, you know, we can -- someone once said we can

3    measure, you know, what kind of society we are by how we

4    protect the vulnerable.

5         So I think that if you're offering a tool to people who

6    are vulnerable and saying to them that this tool is safe and

7    will protect you, I'm saying that this paper demonstrates that

8    should not be offered.

9         I mean, I care about the privacy of dissidence and

10   journalists and people who are discriminated in any number of

11   ways in our society, and here we have a tool that's being

12   offered to them as some sort of protection, and part of the

13   reason we published this, part of the reason we gave it the

14   title we gave -- what is the title?  Let's review.  The title

15   is *A Forensically Sound Method of Identifying Downloaders and*

16   *Uploaders in Freenet*, regardless of the content that they would

17   provide.

18        I think it's a shame that Freenet is offered to anyone.

19   It's not providing any sort of privacy, and that's why we

20   recommend in the last page that if what you care about is

21   privacy, whether it's children's privacy who are exploited on

22   the pictures that are shared or whether it's dissidence in an

23   authoritative regime, or maybe you care about the

24   whistle-blowing powers of journalists and other people, this is

25   not a tool I would offer to them.  I think it's important to

1   state that on the record -- I mean, in the record of a

2   publication.

3   Q.    Because the only protection available would be protection

4   written into the software.  There couldn't be any other

5   societal protections?

6   A.    I'm talking about the software that's being offered.  The

7   software itself does not provide the protection that the

8   developer states that it does.  There are other protections in

9   society, sure, but the focus of the paper is clearly on this

10  software.

11  Q.    Okay.

12       I'm going to ask you a couple of questions about the

13  actual reports in this case.  We'll go to File of Interest #1

14  first.  This is the situation where we have terminal 2145.  So

15  this one is a one-terminal file, and the stat test was yes, but

16  there are, out of a minimum number of blocks of 2000, there are

17  29 unique requests, and you say that that matches some -- that

18  matches an equation in your paper?

19  A.    What I'm saying is if you take the values that are in this

20  file of interest, and this is a two-page exhibit --

21  Q.    This is the one with only one line on the next page?

22  A.    No, it's not.

23  Q.    Oh, okay; four lines.

24  A.    And you do what's prescribed in the paper, which I did,

25  and you follow -- there is a lot of details in the paper.

1   We've tried to make it clear for the Court today, all of us,

2   about what's going on here; but if you follow what's prescribed

3   in the paper, you will come up with a conclusion that this,

4   according to the test, is more likely a relayer than a --

5   sorry.  You will come to the conclusion, according to the test,

6   that this is more likely the original requester and not a

7   relayer of the content.

8   Q.   All right.

9        And now I'm going to move to the next exhibit as well.  So

10  File of Interest #2 has four different terminals involved;

11  2145, which we see fairly prominently, 1921, 2161, and 1809.

12  So this 47 hours, you said that is not a problem?

13  A.   What I said was that in this -- what I said was the

14  47 hours or I think it's displayed here as one day, 23 hours,

15  38 minutes, et cetera, was an accurate reflexion of the

16  difference between that first row and the last row.

17  Q.   All right.  So that brings us to the question of in your

18  papers, you talk about the importance of run length.  How

19  should we, as lay people, look at these reports and then look

20  at the run length and understand that there is not some kind of

21  a violation of what you intended?

22  A.   So the good news is is that the date -- so all the

23  information is here that you need to run the test.  You would,

24  in this case, if we -- let's see.  I have to examine this

25  myself.

1          So, first of all, the first row is 1921 and then we're --

2     the second row is 2145.  So let's disregard the first row

3     because it's one packet to one node and a run of one is

4     clearly, clearly thrown out.

5     Q.    And there is another terminal like that in here, too.  So

6     there are really only two terminals?

7     A.    Okay.  So if I look, we're at June 23rd, the second row,

8     June 23rd, 2000 hours, 26 minutes and 38 seconds.  And then by

9     eye -- and I'm just doing this off the cuff here on the stand,

10    it looks like -- if you don't mind going to the second page.

11    This is all the same -- so continuing on the second page,

12    please correct me if I'm wrong, but it looks to me like this is

13    to 2145 -- oh, I'm sorry.

14         First of all, these are 16s.  Okay?  So right away I can

15    tell you that 16s can be important information for the

16    algorithm, but right here it's not a 17 or 18.  So we can

17    disregard these.

18         And then look, somewhere a few lines down we jump from

19    June 23rd to June 24th.  Okay?  So that's a significant amount

20    of time.  Not only that, so there is a -- okay.  So we've

21    jumped an enormous number of hours from 2000 to 2 o'clock in

22    morning.

23         The next line we're up to 8 o'clock in the morning, that's

24    a significant number of hours away.  I mean, we're talking more

25    than five, six, seven -- I mean, do the math, right.  So we're

1  at almost 8 o'clock in the morning, and we see now that we have

2  18s.  I think even by eye, I don't know about a lay person but

3  someone who has studied the paper, even a lay person who has

4  studied the paper can take a look at this and say that's a

5  significant amount of time.

6      The 16s are not even a part of this.  As I said in the

7  paper, there are 17s and 18s.  So you can start right there.

8  At 7:56 in the morning, you see a request.  You see it's for

9  2145.  You see that it's an 18.  Right?  In fact, it's -- I

10  might have misspoke there.  It's seven in the morning and

11  57 minutes.  Okay?

12      So here we go.  There's a whole series of runs.  We're at

13  8 o'clock in the morning.  Do you mind scanning to the -- or

14  turning to the next page.  We're at 8 o'clock, 8:01, 8:02,

15  8:06.  There is some interleaving here of the other law

16  enforcement node, but you might imagine, just focusing on 2145

17  here, we're going to keep going.  We're still at -- we're only

18  13 minutes later -- or, sorry.  We're 13 after the hour.

19      If you don't mind going to the next page.  So we're at

20  8:13.  Again, I'm doing this by eye but we still -- again,

21  we're just -- we're separating out the 2145s and the 2161s.

22  We're at 17 past the hour.

23      Do you mind going down some more?  Okay.  And then finally

24  here we are on the last page, and we see that there is a big

25  jump, right?  We're going from 8:00 in the morning to

1   1400 hours, because even that 1:00 in the morning, which

2   looks -- oh, it's the next day.

3      I mean, we were at June 24th.  We're going more than

4   24 hours later.  There's no information.  Even the one in

5   between is for a different law enforcement node.  So I suspect

6   even a lay person might ask, gee, that's a lot of time with

7   nothing happening.  This to me looks in the middle to be a run.

8           THE COURT:  It looks what?

9           THE WITNESS:  It looks to be a run of packets that

10   are associated with one another.  Those set of rows that

11   started at roughly, what was it, 7:00 in the morning and 57

12   minutes were contiguous.  There was very little interruption.

13      And then suddenly we went from 8:00 in the morning -- I'm

14   sorry.  You just moved.  Do you mind going back?  We went from

15   7:00 in the morning and 57 minutes and then here we are jumping

16   from June 24th to 8:23, roughly 26 minutes later, to a jump of

17   more than 24 hours away.  I mean, more than 24 hours to the

18   next day.

19      I think any lay person would look at this and say these

20   are two different runs.  Someone who had studied the paper

21   would look at this and say those to me look to be two different

22   tests.

23      And so that's what I did when I examined the spreadsheet.

24   I separated those out.

25

1  BY MR. ROBBINS:

2  Q.   So this examination is a little bit of an art form?

3  A.   I would say it requires some training, and it would

4  require some reading of the paper.  I wouldn't call it an art

5  form at all.  I would say I followed a prescribed method that I

6  particularly evaluated in a very scientific manner that I just

7  repeated on the stand for you very quickly and off the cuff.

8       But I don't think what I just said to you was ad hoc in

9  any way.  That comes from my informed experience and research

10  about how to do it.  To call it an art form I think is a

11  misstatement --

12  Q.   If in this --

13  A.   -- with all due respect.

14  Q.   If in this report we found that there was either a

15  repetition of account or maybe not a unique request, would any

16  of that matter if in these key numbers -- obviously, we don't

17  have the whole number but even if in the pieces that we see, if

18  we see repetition, would that matter to us?

19  A.   Yes.  If you want to go to the exact page of a peer

20  reviewed paper that's public, it describes to you what to do

21  with duplicate requests.

22  Q.   Right.  You have to somehow factor them into your formula,

23  right?

24  A.   Correct.

25  Q.   And does --

1           THE COURT:  Can I just ask a really basic question?

2           MR. ROBBINS:  Yes, ma'am.

3           THE COURT:  Because, I mean, I know you say that lay

4    people can follow this, but it is really dense to me, and so I

5    need to understand.  As you're going through and you are

6    talking about some of these terms, as in 16, we disregard them.

7    All right?  That was one thing I think you just testified to.

8    Or we see on the next day there is a very short time frame

9    where there's several requests in a row.  Okay?

10        In your view, of the 132 unique requests here, are any of

11   them not relevant to the analysis?  Or like, in other words,

12   when you say 16s, we throw them out, does that mean you

13   wouldn't consider those requests to be pertinent to the

14   analysis?

15          THE WITNESS:  Okay.  So to answer your question, Your

16   Honor, I perhaps misspoke when I said that any lay person could

17   do this.  What I tried to clarify after I said that was someone

18   who took the time to read the paper, received training, could

19   do this.

20          THE COURT:  Okay.

21          THE WITNESS:  So I'll clarify to say that if you take

22   all of the public information we have available and study it

23   and, perhaps, for some people it's not in their background to

24   take it, but there's nothing that we're doing that's not

25   available in the paper.  So if you follow what's publicly

1    available, then you can recalculate the test yourself.

2        Now, your second question -- or to get directly to what

3    you just said, is everything on here relevant?  And maybe it's

4    confusing because, I, as you say, I said, oh, throw out the 16.

5            THE COURT:  Yeah.

6            THE WITNESS:  The reason to report the 16 -- and this

7    is, I apologize, very much in the weeds -- is that when you see

8    a certain set of packets, you want to look for inserts

9    because --

10           THE COURT:  Right.  I found two.  Aren't there two

11   here?

12           THE WITNESS:  Exactly.

13           THE COURT:  Okay.

14           THE WITNESS:  And it turns out -- and there's a line

15   in the paper that says this.

16           THE COURT:  Yep.

17           THE WITNESS:  Insert -- and this is confusing, I

18   apologize, but it has to do with the details of how Freenet

19   works.  Inserts that are 16 do count.  So you want to show

20   those 16s, and I think here it's appropriate to put this

21   information up there because it says to me -- someone might

22   ask, well, where are the 16s?  And I'm getting the impression

23   of whoever put together this spreadsheet looked at that.

24       And I also know that the spreadsheet is allowed to look at

25   that.  The spreadsheet was given the chance to say, oh, a 16

1 insert.  That matters if it's within the same run.

2      So to me as -- I guess I'm certainly not a lay person.

3 That's why I'm here today.  But when I look at this spreadsheet

4 and I see all of this information, I can recreate whatever it

5 is the spreadsheet did.  You know, we all agreed I can't see

6 the formula that was used.

7           THE COURT:  Okay.

8           THE WITNESS:  But I'm able to validate that the

9 conclusion that this is a pass is correct.

10      And I agree it's confusing and terribly difficult to have

11 all of this information in here, but it allows anyone,

12 including anyone in the world who has the background and the

13 time to study the paper to come to the same conclusion that I

14 did.  They don't need the software.  They just need the

15 published paper.  And I think that's important --

16           THE COURT:  Okay.  Thank you.

17           THE WITNESS:  -- Your Honor.

18 BY MR. ROBBINS:

19 Q.   What is the impact of multiple law enforcement nodes being

20 used to compile this?  Your methodology notes that multiple

21 nodes could be used, but your technique is built on a single

22 node?

23 A.   So the question was what is the implication of having

24 multiple law enforcement nodes here in the spreadsheet, and the

25 answer is that each -- we talked about collating, that you

1    would take these rows and you would collate them by the law

2    enforcement node that observed them.  So you should run those

3    tests independently.

4        I imagine you could do the math for how you would combine

5    all of the -- you know, there's a version of my paper in some

6    universe where you consider the fact that there are multiple

7    observers.  Then you could do that math.  It would be a bit

8    harder.  I don't think it's necessary.

9        So the short answer to your question is you collate that

10   information according to the law enforcement node that's listed

11   here in the spreadsheet.

12   Q.   Do you know how many law enforcement nodes are in

13   operation?

14   A.   I do not.

15   Q.   Have you ever known?

16   A.   I know that -- you know, I know that it's -- I know the

17   gist of it.  I don't know the exact number.  It's never been

18   shared to me.

19   Q.   The greater the number of nodes, each one having a certain

20   number of neighbors, the more non-law enforcement nodes can be

21   seen?

22   A.   Well, as part of the normal operation of being a Freenet

23   node, as I said, it connects you to random strangers on the

24   Internet, and you are sent information for which you are the

25   intended recipient.

1      If you take a walk in the park, you're going to see

2  people.  If more law enforcement take a walk in the park in a

3  public setting, they're going to see more people.

4  Q.   You've talked about training.  Do you know if there is a

5  User's Manual that's distributed at this training?

6  A.   I think there are training materials.  I assume -- yeah,

7  there are training materials, if that's what you're asking.

8  Q.   Did you have a hand in writing them?

9  A.   I did not but the training materials are strongly based

10  upon the paper that we wrote, but I myself, I don't recall ever

11  typing a particular sentence or putting together a PowerPoint

12  for the training materials.

13  Q.   When someone takes the training, they go back to their

14  agency with the reference materials or the training materials

15  they got and a program on a thumb drive or --

16  A.   I don't know.  I would assume they have access to their

17  training materials.  That would be helpful, so I guess.  The

18  law enforcement software version that we've been talking about

19  is available on a law enforcement -- is available on a site

20  that law enforcement use to coordinate, and if they have taken

21  the training, that is the only way that they can download that

22  software.

23      Only law enforcement are allowed on that website, which I

24  do not run, and only law enforcement on that website that have

25  taken the training can download the law enforcement version of

1   Freenet.

2   Q.   Are you consulted when that software, the law enforcement

3   version of the technique is modified in any way?

4   A.   I'm consulted in the sense that the person who wrote it

5   works for me, and I'm part of this project, and if there was a

6   significant change, they would tell me about it.

7        If your follow-up question is has the software ever been

8   changed significantly since the publication of the paper?  No.

9   Q.   Well, my follow-up question is was this written in Java?

10  A.   Well, the original Freenet software was written in Java,

11  and our modification of it, of course, has to be.

12  Q.   As well?

13  A.   Has to be in Java as well.

14  Q.   Was there a way to lock it so that it could not be

15  changed?

16  A.   Well, any software, if you know what you're doing, can be

17  changed.  So there is no way to lock it.

18  Q.   The point at which the screen gets run of necessity comes

19  after the point at which the software logs?

20  A.   I'm sorry.  I couldn't hear you very well.

21  Q.   The point at which the screening function is run, where

22  the blocks are compared against the law enforcement files of

23  interest, of necessity, that is run after the files are

24  collected by the law enforcement nodes?

25  A.   After law enforcement receive requests intended for them,

1    they then know the name of that block.  And as I said, I'm not

2    exactly sure, but we can assume for the sake of today that that

3    comparison against files of interest is run at the server.

4    Q.    Would there be any difference in your opinion if the law

5    enforcement nodes had, in addition to their total opennet

6    structure, any friends?  In other words, if they were set up in

7    normal instead of open?

8    A.    So normal -- do you want to go -- if you don't mind, can

9    we go back to the exhibit that talks about the four modes?

10   Q.    I think we can.  Let's see if we have it, too.

11           THE COURT:  While we're doing that, can I ask just

12   some foundational questions --

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  -- about your involvement or lack thereof

15   in the training.  If I'm understanding it right, this training

16   involved application of the software that you designed,

17   correct?

18           THE WITNESS:  It's training on the software that we

19   designed, correct, Your Honor.

20           THE COURT:  Okay.  And training on, if you know, the

21   underlying algorithm and methodology that's in your paper?

22           THE WITNESS:  Yes.  Part of that training is to not

23   only say here's the software, here's how you should use it, but

24   here's an idea of what's going on in this paper; and I think

25   not everyone wants a tutorial on the math that's in the paper.

1   So I don't think it gets to that level of detail.

2          THE COURT:  It does not, okay.

3      But let me ask you this, have you reviewed the training

4   material?

5          THE WITNESS:  I have not but the person who works for

6   me is amazing, and he's a co-author on the paper, and he's part

7   of the training.

8          THE COURT:  He's reviewed it?

9          THE WITNESS:  Yeah, he's reviewed it.  He's often one

10  of the instructors that provides the training.

11         THE COURT:  Okay.

12         THE WITNESS:  So one of my co-authors is providing

13  that training.  I know him very well.  He's extremely

14  intelligent.  I have no --

15         THE COURT:  But you're relying on him --

16         THE WITNESS:  I certainly am, Your Honor.

17         THE COURT:  -- and his communication to you that the

18  training is a reliable method to learn the software and the

19  underlying methodology?

20         THE WITNESS:  Yes.

21         THE COURT:  Okay.  I just want to understand it.

22         THE WITNESS:  Of course, Your Honor.

23         THE COURT:  Okay.

24         THE WITNESS:  Yeah, he works for me.  I know him

25  well.  I have no doubts about his ability to do that.

1          THE COURT:  And so it's fair to say that other than

2  what you've learned from your colleague, you don't have any

3  independent knowledge of the training program, the training

4  module, whatever you want to call it, that law enforcement uses

5  to train its personnel?

6          THE WITNESS:  Not exactly --

7          THE COURT:  Like, how many hours --

8          THE WITNESS:  Oh --

9          THE COURT:  -- over how many weeks, what are the

10  chapters, that kind of thing.

11          THE WITNESS:  It's three days.  It's pretty

12  significant.  Three days is a lot of a person's time.

13          THE COURT:  Eight hours a day?

14          THE WITNESS:  I assume so.

15          THE COURT:  If you know.

16          THE WITNESS:  I'm sure there are breaks in there.

17          THE COURT:  Again, I just want to know what you know

18  about the training.

19          THE WITNESS:  As far as I know, it's a full day,

20  three days of training.  I have seen my colleague, my employee,

21  my colleague present an overview of Freenet.  I've had -- so

22  and I assume that some of those presentations are related to

23  what he would say in the training.  I have had enumerable

24  number of hours with him to write the paper.  So I have no

25  qualms --

1            THE COURT:  Write the underlying paper but, again,

2    not the training material?

3            THE WITNESS:  Your Honor, the training is based upon

4    the paper.  So given that I trust his ability to write the

5    paper with me and that I know that the training is based upon

6    the paper -- so I hope I'm answering your question.

7            THE COURT:  I think so.  Who is it?

8            THE WITNESS:  Brian Lynn is one of the people who I'm

9    referring to --

10            THE COURT:  Okay.  So he's a co-author on the paper.

11            THE WITNESS:  -- or he's the person I'm referring to.

12    Yes.

13            THE COURT:  Got it.  Okay, thank you.

14    BY MR. ROBBINS:

15    Q.   I'm going to have to give you what you're asking for in

16    paper because we don't seem to have it on our computer.

17            What I was asking you about, there are four modes on I

18    think page 10 of the government's PowerPoint pertaining to

19    Freenet, and my question was from the perspective of designing

20    this technique, does it make any difference to you if law

21    enforcement is in what's labeled normal mode?

22    A.   So my understanding -- so if we're all looking at this

23    exhibit and we're on the page that is entitled protection

24    against a stranger attacking you over the Internet, we see -- I

25    talked about this previously.  We see that there are two modes,

1    opennet mode and then in the middle it distinguishes darknet

2    mode.  And the question is there is low and normal for opennet,

3    and my understanding of what normal is compared to low is that

4    Freenet takes -- as it says, makes it more -- well, I'll just

5    put it in my own words; that it basically encrypts what's

6    happening on your drive so that if someone had access to your

7    computer that you're running Freenet, it would be harder to

8    make sense of what I would call the forensic information on the

9    drive.

10        So I think what's clear from this is that both low and

11   normal are in opennet mode.

12        Would you like this back?

13   Q.   I'll take it back for a second.  I may give it right back

14   to you.

15        MR. ROBBINS:  Thank you, Your Honor.

16        (Brief pause.)

17   BY MR. ROBBINS:

18   Q.   And that's your understanding of normal mode?

19   A.   That's my understanding.

20   Q.   I'll leave it there.  Thank you.

21        MR. ROBBINS:  If I may have two and a half minutes,

22   Your Honor.

23        THE COURT:  Sure.

24        MR. ROBBINS:  I'm not going anywhere.

25        THE COURT:  Okay.

1          MR. ROBBINS:  I just want to make sure that I haven't

2     missed something.

3          THE COURT:  While you all are conferring, can I ask,

4     in the beginning of your testimony, you referenced your paper

5     being peer reviewed by a particular association, that you

6     presented the paper at a conference.  Is that accurate?

7          THE WITNESS:  That's correct, Your Honor.

8          THE COURT:  Can you describe for me what was involved

9     in that peer review?

10          THE WITNESS:  Yes, Your Honor.  So there's two

11     papers.  They both went through a similar process.  I'll talk

12     about the second one and, if you want, I can distinguish what

13     happened in the first one, but for clarity --

14          THE COURT:  So the 2020 paper is the one that I

15     understood you presented at -- I think it was the ACM?

16          THE WITNESS:  Correct, Your Honor.

17          THE COURT:  Okay.  Can you tell me about that?

18          THE WITNESS:  Okay.  So the ACM, for short, is called

19     CCS or Communications and Computer Security, I believe.  It's

20     the premier security conference of the ACM.  The ACM, as I

21     said, is the most -- I believe the most prominent and important

22     professional association of computer scientists.

23          And so the way this conference works, among many others in

24     computer science, is that they convene what's called a Program

25     Committee.  So someone runs the whole conference.  Two people

1   are chairs.  Those two people look out into the field, and they

2   select people who they believe are qualified to review papers

3   on the topics that this type of conference would publish.  They

4   gather a lot of people.  Typically they are professors, people

5   with Ph.D.s in the industry, people of significance.

6        So it's important for CCS to have a double blind reviewing

7   strategy, and that means that when people like myself submit

8   papers for review, we don't include our names on the paper

9   because that might influence the outcome.  Similarly, when the

10  paper is reviewed, it is up to the chairs to assign that paper.

11  The chairs -- anyway.  So the chairs assign that paper to one

12  of the program -- actually, in our case, four, which is

13  typical, four of the program committee members.

14       They review a version of our paper with our names off.

15  They provide reviews to us without their names, but I do know

16  that it's someone on the program committee.

17       So the way it worked for CCS is we submitted one year and

18  we got some reviews back.  You're allowed to offer a rebuttal

19  to those reviews or you can pull the paper.

20       One of the comments we got in our reviews was -- in the

21  first version that we submitted, 2019, they said, why didn't

22  you apply this technique to uploaders?  So we said, that's a

23  great idea.  I bet this would work.  That took a lot of work

24  for us to do.  It's not an easy task to get empirical

25  validation of that.  We revised the paper and then we submitted

1   it again for 2020.

2         So I bring that up because part of the process of

3   submitting is the conference says if you submitted this in the

4   past, include the reviews that you did previously.  So it was

5   reviewed by I believe those four people in 2019.  We included

6   those reviews.  We included our rebuttal, because we had that

7   opportunity for the 2019 reviews.  We gave them our new version

8   of the paper that, for example, included this uploader

9   information and many more experiments and things like that.

10  And then we got back four reviews again.

11        So now eight people have reviewed this paper.  We got

12  comments from them.  We had a chance to offer a rebuttal.  It

13  was limited to some strict number of characters.  If you were

14  to look at the rebuttal, there's portions of time where we

15  leave out verbs or important parts of speech in order to make

16  the character limit.

17        At that point, they make a decision about whether the

18  paper is dead, rejected, or whether it goes to another process

19  called shepherding.  So with shepherding, someone from the

20  program committee says to you, I would like your detailed

21  response about how you're going to adjust your paper to the

22  comments that you've gotten to date.  And here we don't have a

23  character limit.

24        So we then give them a revised version of what we've

25  submitted, and then we give them a detailed document that

1  literally, for every single word that was in the reviews, what

2  we did to the paper to adjust to what they required or why we

3  didn't -- you know, why the reviewer was wrong.

4      Then at that point, the whole purpose -- now, the shepherd

5  most likely is maybe one of the reviewers, but it doesn't have

6  to be.  I've served on this type of committee myself.  I've

7  served not that year but previous times in my life.  I've been

8  a reviewer for CCS.  Sometimes people are busy and it's another

9  person who has expertise.

10     In any case, this shepherd looks at how we've revised the

11 paper.  They've looked at our comments about the reviews we've

12 received, and then they make a -- what they are there for is

13 quality control.  They want to know -- there's a lot going on

14 at these conferences.  You can't just give people reviews and

15 just assume that they're going to react to them.

16     So they are a gatekeeper for making it into the final

17 publication proceedings.  So they accepted the shepherd in this

18 case, accepted what we did.  That final version was uploaded to

19 the ACM, to the society, the people running the conference, and

20 at that point, I was also required to put together a

21 presentation.

22     Now, this was published during COVID.  So normally I would

23 have gone somewhere and given a presentation, but instead I had

24 to put together a ten-minute video, talks as fast as I could in

25 ten minutes.  In fact, that video is available for anyone to

1    see on the Internet.  And you can see my ten-minute version of

2    this paper.

3         Again, the audience is other computer scientists.  So I

4    not only talk fast, I talk -- I apologized to the stenographer.

5    I'm talking fast today.  I talk about the paper.  I talk about

6    it in terms that are not accessible to lay people but, in fact,

7    people who are attending this conference who are graduate

8    students and professors and industry people with sometimes

9    mostly Ph.D.s.

10        And then at the conference, again, because of COVID, they

11   played the video.  We were all on the equivalent of a Zoom

12   call.  I took questions from the audience, any clarifications

13   that they might have had, and that's the end of the story.

14        THE COURT:  So thank you for that.

15        My follow-up question would be did the peer review process

16   involve the actual software that executes this theorem?  So the

17   source code, is there a separate peer review process for that?

18   And, if so, did you engage in that?

19        THE WITNESS:  No, because that software is law

20   enforcement privilege.  You know, I would not release that to

21   the reviewers.

22        THE COURT:  Well, I guess the reason why I ask is

23   because there's lots of -- you know, there's medicine and there

24   is private industry computer hardware, software.  There's all

25   kinds of technology where it's still peer reviewed but it's

1   protected, you know, in many different ways.  Individuals with

2   great financial pecuniary interest find ways to protect

3   themselves.

4        So is your testimony that because it's law enforcement

5   privilege is the reason why you didn't subject it to --

6                THE WITNESS:  No, I don't believe it would be --

7                THE COURT:  -- peer review?

8                THE WITNESS:  It wouldn't be -- I think there are

9   people who write papers and then write software that's

10  associated with those contributions that decide to publicly

11  release it.  You don't have to.  It's considered a bonus if you

12  did because then anyone can use it.

13       I think in this case, I weighed whether having

14  third-parties have access to this software and the fact that I

15  could not control what would happen to it and if they reviewed

16  it and decided that maybe even accepting the paper they would

17  like to release this software to the public, that would

18  interrupt law enforcement operations.

19       And I decided that releasing this software to reviewers

20  who I didn't even know, because it's double blind, would --

21  it's more important to safeguard those investigations and

22  children's lives who are vulnerable and victimized than it is

23  to have it be part of the peer review --

24                THE COURT:  Okay, thank you.

25                THE WITNESS:  -- Your Honor.  Thank you.

1           THE COURT:  Mr. Robbins?

2           MR. ROBBINS:  No further questions for this witness.

3           THE COURT:  All right.

4      Mr. Draughon?

5           MR. ROBBINS:  Thank you.

6                         REDIRECT EXAMINATION

7    BY MR. DRAUGHON:

8    Q.   I don't have very many follow-up questions, but the first

9    question, Doctor, can you explain again how the -- can you

10   describe the blocks that are sent out when somebody makes a

11   request?

12   A.   You're asking me to describe the blocks that are sent out?

13   Q.   In your cross-examination, there were some questions about

14   people sending out particular blocks.  So I just wanted clarity

15   on when a node sends out a request, what are they sending out

16   to their peers?

17   A.   So when an original requester is trying to download a

18   file, the first thing they'll get is the manifest, which is the

19   list of blocks that are available for download at some point.

20   They were inserted.  They need to request a certain number of

21   them to reassemble the file.

22        So they will look to their neighbors, decide which

23   neighbor is the best, an estimate of which one is best to go to

24   first for a particular request, and it will send to that

25   neighbor this is the specific block I'm looking for.

1          In the exhibit, in the rows of the spreadsheet, we saw

2     that very particular -- do you mind putting it up?  That might

3     help me explain.

4     Q.   Which exhibit?  One of the government exhibits?

5     A.   File of Interest 3, for example.

6     Q.   Can I just put it up on Elmo for the sake of time?

7     A.   Perfect.  So what on the spreadsheet is called "split key"

8     is a very -- I mean, look at that.  That is a series of numbers

9     and letters that's very particular.  That is what is sent to

10    your neighbor saying I'm looking for exactly this content.  And

11    as part of that, you will send your IP address.  In the process

12    of making all these requests, you will also report the number

13    of peers that you have.  We can see that.  And, of course,

14    you're indicating that this is a request and not an insert, for

15    example.

16    Q.   At some point during the cross-examination, you said that

17    you would not recommend this tool to people who are seeking

18    protection.  Were you talking about Freenet or the law

19    enforcement tool?

20    A.   I was talking specifically about Freenet and not the law

21    enforcement tool.  The Freenet software itself I think really

22    provides no protection.

23    Q.   And when you say "protection," what are you referring to?

24    A.   Protection of the vulnerable that they are requesting

25    content that is on this network.  For some reason it's on this

1    network and not the clear Internet.  So that might be whatever

2    example you want where vulnerable need to share information and

3    they're worried about their request of that information might

4    put them in harm's way.  I don't think this is the best method

5    for them to share that information.

6    Q.    So Freenet does not -- one of the points that your paper

7    makes is that Freenet does not provide protection to the

8    requesters?

9    A.    That's correct.

10   Q.    And when you say "protection," you're referring to like

11   their ability to be identified?  What do you mean?

12   A.    Yeah, it does not provide protection for requesters to --

13   protection against being identified as the one who is

14   originally requesting this content.  If requesting content puts

15   you in harm's way and you want to hide that, I wouldn't do it

16   through Freenet.

17   Q.    I understand.

18          MR. DRAUGHON:  I have no further questions, Your

19   Honor.

20          THE COURT:  Any recross?

21          MR. ROBBINS:  None, Your Honor.

22          THE COURT:  All right.

23      Dr. Levine, that concludes your testimony.  You are free

24   to step down.  Thank you so much for your time, and you are

25   free to go.

1           THE WITNESS:  Thank you, Your Honor.  Thank you,

2      everyone.

3           THE COURT:  Thank you.

4        (Witness excused.)

5           THE COURT:  All right.  Do you all want to take a

6      short break to get your next witness ready?

7           MR. DRAUGHON:  Your Honor, when considering the order

8      of witnesses, we have Officer Mills who will testify both about

9      his --

10          THE COURT:  Right.

11          MR. DRAUGHON:  -- his process with Freenet and also

12     about the motion to suppress statements.  Then we have Officer

13     Mueller who will have a really short testimony about just the

14     statement.  Would it be okay to have Mueller testify first so

15     just we can get a better sense of time?

16          THE COURT:  As long as we can get through that

17     testimony, because I really would like the Freenet piece of

18     your presentation to be concluded so we can have some

19     conversation at the end about -- and in the interest of full

20     disclosure, I'm not going to decide the suppression issues, but

21     I may reach whether the defendant is entitled to the source

22     code under highly restrictive and protective circumstances.

23          So, in fairness, I think we should probably allow the

24     government whatever information and testimony you want me to

25     consider before making that determination, and if that affects

1    how you want to put on your witnesses, I'll leave that to you

2    because here's my concern is that by the time we get through

3    the Freenet piece of this, we may be toward the end of the day.

4    And while we try to figure out whether we could do it sort of

5    all today, is it possible, that in the end, we're only going to

6    get through the Freenet today.  We're going to have to

7    reconvene for the statements anyway and any additional, you

8    know, follow-up.

9         What do you think?

10            MR. DRAUGHON:  So the only -- okay, I think I

11   understand what you're saying, Your Honor.  Let's just proceed

12   with Officer Mills in the event that we can't get to defense

13   witnesses after Officer Mills and Officer Mueller.

14            THE COURT:  Okay.  Yep, why don't we do that and then

15   we'll sort of see where we are.

16        Okay, let's take a ten-minute break.

17            MR. SALEM:  And, Your Honor, I'm sorry, I have

18   another matter at 3:00.  So I'm going to leave the rest of the

19   hearing in very capable hands.

20            THE COURT:  Yes.  Absolutely, but it was good to see

21   you.  Thanks for joining us.

22            MR. SALEM:  Thank you.

23            THE COURTROOM DEPUTY:  This Honorable Court now

24   stands in recess.

25            MR. DRAUGHON:  Your Honor, I'm sorry, one quick

1    question.  If Dr. Levine wants to observe the rest of the

2    hearing, is he allowed to do so since he's done testifying?

3            THE COURT:  Let me ask defense what's your position

4    on it?  We're not ready to go yet.  Let's be on the record.

5    Let's get the defense position on the request that Dr. Levine

6    stay to observe.

7            MR. ROBBINS:  If I may have one moment?

8            THE COURT:  Sure.

9       (Brief pause.)

10           MR. FINCI:  Your Honor, I mean, he's an expert.  He's

11   entitled to so --

12           THE COURT:  That's my view, but I wanted to give you

13   all the opportunity to be heard.

14           MR. FINCI:  I would love to object but --

15           THE COURT:  I don't think you can, right?

16           MR. FINCI:  Right.

17           THE COURT:  Exactly.

18       That will be fine.  Dr. Levine, you're more than welcome

19   to stay.

20       Okay, thanks so much.

21           THE COURTROOM DEPUTY:  This Honorable Court now

22   stands in recess.

23       (Recess taken, 2:32 P.M. - 2:43 P.M.)

24       (Witness enters courtroom.)

25           THE WITNESS:  Good afternoon.

1          THE COURT:  Good afternoon.

2          THE COURTROOM DEPUTY:  Please remain standing and

3    raise your right hand.

4          THE WITNESS:  Yes, ma'am.

5      (Witness complied.)

6          THE COURTROOM DEPUTY:  You do solemnly promise or

7    affirm, under the penalties of perjury, that the information

8    you're about to give to the Court, in the matter now pending

9    before it, shall be the truth, the whole truth, and nothing but

10   the truth?

11         THE WITNESS:  I do.

12         THE COURTROOM DEPUTY:  Thank you.  Please be seated.

13         THE WITNESS:  Thank you.

14     (The Witness is Sworn.)

15         THE COURTROOM DEPUTY:  Please speak loudly and

16   clearly into the microphone.  Please state your first and last

17   name for the record and please spell your first and last name.

18         THE WITNESS:  Corporal Cory -- can I take my mask

19   off?

20         THE COURT:  Yes, please do.

21         THE WITNESS:  All right, thank you.

22     Corporal Cory Mills, C-o-r-y, M-i-l-l-s.

23

24

25

1        CORY MILLS, GOVERNMENT'S WITNESS, SWORN

2                  DIRECT EXAMINATION

3    BY MR. DRAUGHON:

4    Q.   Hello, sir.  Are you currently employed?

5    A.   Yes, sir.

6    Q.   By whom are you employed?

7    A.   The Maryland State Police.

8    Q.   And what is your role with the Maryland State Police?

9    A.   I'm currently assigned as a Corporal in the Maryland State

10   Police Computer Crime Section.

11   Q.   And you said "currently."  What was your role in 2018?

12   A.   My role at that time was a Trooper First Class with the

13   Maryland State Police Computer Crime Section.

14   Q.   And what were your duties in your role as Trooper First

15   Class in 2018?

16   A.   My primary focus was to be an investigator with the

17   Computer Crime Section investigating primarily cases with

18   Internet Crimes Against Children.

19   Q.   And what platforms would those Internet Crimes Against

20   Children be typically located on?

21   A.   We would receive reactive cases from the National Center

22   for Missing and Exploited Children via what we refer to as

23   cyber tips, as well as conducting proactive cases, which in

24   this case is a Freenet case or other peer-to-peer programs.

25   Q.   Can you generally explain what your experience of

1   peer-to-peer programs is?

2   A.    I've been trained in GigaTribe, BitTorrent, as well as

3   Freenet.

4   Q.    Have you received certification in ICAC Freenet

5   investigations?

6   A.    Yes, I have.

7   Q.    I'm going to now show you Government Exhibit 5.  Do you

8   recognize Government Exhibit 5?

9   A.    Yes, I do.

10  Q.    Can you tell the Court what Government Exhibit 5 is?

11  A.    This is my certification of training for ICAC Freenet

12  investigations that I received after attending the course

13  February 26th through the 27th of 2018.

14  Q.    And we're going to talk more about this particular case in

15  a bit, but was the search warrant executed in August of 2018?

16  A.    Let me just confirm, look at my report.  Tuesday,

17  August 14, 2018, yes; that's correct.

18  Q.    You mentioned doing investigations on peer-to-peer

19  programs, including Freenet.  Do you use any tools when you are

20  conducting your Freenet investigations?

21  A.    Yes, I do; law enforcement tools.

22  Q.    And generally speaking, what is that law enforcement tool?

23  A.    In this case, it was the Freenet application for the law

24  enforcement, Freenet law enforcement.  That's not what it's

25  referred to I don't think.  What my program is shown as is

1 Freenet, but it's referred to as Freenet Roundup.

2 Q.   And what is your understanding of what Freenet is?

3 A.   From my understanding, what I received in the training,

4 which I don't have any knowledge other than, is that Freenet is

5 a peer-to-peer program that is web-based allowing for the

6 access of -- the distribution and sharing of files.

7 Q.   Why do you do investigations on Freenet?

8 A.   As part of my task with the Maryland Computer Crimes --

9 Maryland State Police Computer Crime Section with the Internet

10 Crimes Against Children Task Force, I was designated to

11 investigate Internet Crimes Against Children, and that is why I

12 utilize Freenet.

13 Q.   And when you are conducting your investigation using the

14 law enforcement tool for Freenet, what are you doing?

15 A.   Honestly, nothing.  I have the -- well, not nothing, but I

16 have the computer running.  I have the program running on my

17 computer, but I do nothing else.

18 Q.   Now, you mentioned that the law enforcement tool -- and I

19 believe you had a name for it.  Can you briefly describe what

20 it is; that is, is it a website?  Is it an algorithm?  Like,

21 when you say law enforcement tool, what are you referring to?

22 A.   So there's two parts.  Are you referring -- so the actual

23 Freenet law enforcement I have, the law enforcement tool of

24 Freenet, it's just an application that accesses Freenet, as

25 well as I believe -- I just allow that to run and log

1     information that it receives.

2         I use another law enforcement tool that gives me Freenet

3     investigative leads.

4     Q.   And I'm going to jump ahead of you because I think what

5     you're talking about -- and I want to get clarification.  Are

6     you familiar with Freenet nodes?

7     A.   Yes, I am.

8     Q.   Do you have any experience of operating a Freenet node?

9     A.   To my knowledge, yes.  The Freenet -- my Freenet

10    application makes my computer a Freenet node.

11    Q.   So you just described two different law enforcement tools.

12    Was the first one -- were you referring to the Freenet node?

13    A.   No.  The Freenet application, which would be -- I believe

14    in the past it has been referred to as Freenet Roundup.  That

15    is the law enforcement tool.  But on my computer it is only

16    displayed as Freenet.

17        There is also another law enforcement tool that I access

18    that's designated for Internet Crimes Against Children

19    investigations.

20             THE COURT:  Can we get a shorthand for both of those?

21    So Freenet Roundup is the application that allows you to be a

22    node on Freenet?

23             THE WITNESS:  Yes, Your Honor.

24             THE COURT:  Okay.  And then can you give me a

25    shorthand for the other program regarding investigative leads

1   so I know what you're talking about?  You know,

2   differentiation.

3              THE WITNESS:  Would you like a -- it's a law

4   enforcement database.  It's ICAC Cops.

5              THE COURT:  Okay.  So did you say ICAC?

6              THE WITNESS:  Yes, ma'am.

7              THE COURT:  I-C-A-C?

8              THE WITNESS:  I-C-A-C, C-o-p-s.

9              THE COURT:  ICAC Cops.

10             THE WITNESS:  Yes, ma'am.

11             THE COURT:  Okay.  Got it.  Thank you.

12  BY MR. DRAUGHON:

13  Q.   And just to make sure we're all tracking, if we refer to

14  Freenet Roundup, we're talking about what you would use as a

15  node.  And when we're talking about ICAC Cops, we're talking

16  about what you would use to identify IP addresses?

17  A.   That is correct.

18  Q.   Now, focusing on ICAC Cops, when you obtain information

19  from ICAC Cops, what are you doing with that?

20  A.   What I'm doing is logging into my account.  Given that

21  I've been trained in Freenet, it will allow me to have -- I

22  would refer to it as a tab to access Freenet investigative

23  leads.  And when I click on that Freenet -- when I click on the

24  Freenet tab, it prompts to show IP addresses and the activity

25  that has been observed by law enforcement nodes on the Freenet

1  network.

2  Q.   So once you get the IP addresses and can see some of the

3  activity -- actually, let me back up.

4       When you say "activity," what are you referring to?

5  A.   Whenever you -- what it's showing -- the main things that

6  it shows are the IP address, and it shows a file name of a file

7  that is reasonably believed to be child pornography that was

8  requested.

9  Q.   Now, when you get the IP address and the file name, what

10  do you do next?

11  A.   What I would do next is you click on the file name that is

12  displayed.  The ability to do the investigations has changed,

13  but when I click on the file name, it would show me the

14  manifest key that was used to download that file.  I would then

15  take the manifest key, place it into my Freenet application to

16  download, and that could take some time, varying times.  There

17  has been times that it can be done very quickly and then other

18  times you would have to wait for it to download.

19       But then after the file is downloaded, then you access it

20  and then I would confirm if it is child pornography, which,

21  generally, yes.  I would confirm that it is child pornography,

22  and if it is child pornography, I would then begin a criminal

23  investigation.

24  Q.   Now, let's assume that you confirm that it is child sexual

25  abuse material.  What do you do next?

1  A.   For the -- there's another tool called the Freenet Target

2  Summary.  That is basically a Google Excel -- or an Excel

3  Spreadsheet, and I would -- it basically analyzes the data that

4  has been logged by ICAC -- on ICAC Cops.  I take that data and

5  put it into -- so say there is -- I need three, three files of

6  interests, FOIs.  You need three files of interest, and then

7  for each separate one I would put FOI 1, FOI 2, FOI 3, put

8  those in each tab, analyze the data, and make sure that it

9  passes.

10      And then as long as all three pass, then I would begin to

11  investigate the IP further, like sending off a subpoena to

12  locate for the date and times of the request of who is in

13  possession of that IP address at that time.

14  Q.   So, sir, you said that you analyze the data.  Are you

15  using mathematical formulas?  What do you mean when you say

16  you're analyzing it?

17  A.   No, I'm not.  I'm taking the data that has been provided

18  to ICAC Cops, putting it into the Excel Spreadsheet deemed to

19  be the Freenet Target Summary, and clicking -- I believe the

20  button is analyze data.  It analyzes the data that I took from

21  ICAC Cops by copying it off of ICAC Cops and pasting it into

22  the Excel Spreadsheet.

23  Q.   So it sounds like, and correct me if I'm wrong, that the

24  spreadsheet is doing the analyzation of the data?

25  A.   That's correct.

1  Q.   And so what are you looking at after -- after you plug in

2  the information and the spreadsheet does what it does, what are

3  you looking for?

4  A.   I'm looking for the spreadsheet to show that the data that

5  was placed into the spreadsheet passed the mathematical

6  equations that have been incorporated into the analysis that I

7  click for analyze data and just ensuring that it passes and

8  that it passes all three times for all three files that I've

9  placed into the sheet.

10  Q.   You mentioned earlier that you need three.  Why do you

11  need three?

12  A.   That's what I was trained.  I was trained that I need

13  three, and what I was explained is that it is to show that it

14  is not an isolated incident; that it is to basically assist in

15  providing that the data is sound and correct.

16  Q.   And just so we're clear, what three items, things, are you

17  referring to?

18  A.   What's referred to in my police report.  Is that what

19  you're asking?

20  Q.   No, no.  Not anything in particular to this case, but

21  generally, when you say you need three, three files?  Three

22  addresses?  What three things do you need?

23  A.   Oh, I apologize.  Three files of interest, which I would

24  confirm to be child pornography.

25  Q.   So after you determine that you have at least three files

1  that you've confirmed to be child pornography, and it sounds

2  like you have the IP address, what are you doing next?

3  A.    After I get that all three have passed from the Target

4  Freenet Summary, I would create like a -- there is a way to

5  finalize the Freenet Target Summary and create it into a PDF to

6  keep the information.  Using the information, I would then send

7  a subpoena for the IP address to obtain who and where was in

8  possession of the IP at the time of the request.

9  Q.    So if you have -- and I'm still speaking generally.  If

10  you have several files that you've confirmed to have CSAM and

11  you've associated with one IP address, can you then run a

12  search to see what other files that IP address has requested?

13  A.    Yes.  There could be more but -- and, I mean, there could

14  be less but I don't -- you need three.  So if there's not three

15  or more, you can't go further with the investigation.

16  Q.    And any sort of additional searches you would do would be

17  on ICAC Cops?

18  A.    That's correct.

19  Q.    Are you able to search for materials -- or let me restate.

20      Are you able to search for requests that were made to

21  Freenet users that were not law enforcement nodes?

22  A.    No, I cannot.

23  Q.    Speaking of law enforcement nodes, you said you had

24  experience as a node yourself, right?

25  A.    That's correct.

1  Q.   And what do you do as a law enforcement -- and I want

2  to -- Your Honor has made it clear to me that terminology is

3  important.  You're not the law enforcement node; the system

4  that you are running is the law enforcement node.  Right?

5  A.   I apologize if I caused any confusion.  That is correct.

6  The application, like the program running is the Freenet node,

7  not myself.

8  Q.   As the law enforcement officer who has custody of the law

9  enforcement node, what do you do with that node?

10 A.   I simply have the program downloaded to my undercover

11 computer.  I allow that to run just simply so that it can

12 receive requests on the Freenet network.  I do not do anything

13 further with it except for download files to confirm that it is

14 child pornography or not.

15 Q.   As the law enforcement officer working with the law

16 enforcement node, do you monitor what particular IP addresses

17 outside of your contacts would be in touch with your node or

18 anything else?

19 A.   No, I do not.

20 Q.   Now, I would like to direct your attention to the Pobre

21 investigation in particular.  How did his IP address first come

22 to your attention?

23 A.   I believe -- if I could refer back to my police report,

24 just for accuracy -- that I -- I would access the ICAC Cops, go

25 to the Freenet tab, and observed that IP address 71.246.207.59

1   had been logged as requesting files of child -- or files of

2   suspected child pornography.

3   Q.    And once you saw that information on ICAC Cops, what did

4   you do for this investigation?

5   A.    I clicked on the requested files and then was provided the

6   manifest keys, which would be for the file names that are

7   described in my police report for each instance.  I would

8   download those files, confirm them to meet the criteria for

9   CSAM, child pornography in the State of Maryland, which

10  prompted me to conduct a criminal investigation.

11  Q.    And what did you do with the information you retrieved

12  from ICAC Cops?

13  A.    What I explained was that I used the manifest key, that I

14  would go to -- so now that I have these threes files, I have

15  three tabs on my computer.  So I would go, for File of Interest

16  1, I would click -- at the time -- it has since changed.  At

17  that time, I would hit Control A to copy everything from what

18  is displayed as the Freenet investigative lead for that file.

19  Then I would go and I believe you hit -- it was paste or import

20  the data into the Target Freenet Summary.  And I did that for

21  all three files.  Click analyze data to ensure that all three

22  were checked, all three passed the Freenet Target Summary, and

23  then I sent a subpoena for the request, the date and request

24  times.

25  Q.    I'll now direct your attention to Government Exhibit

1    No. 3.  Do you recognize what's if front of you now?

2    A.    Yes.

3    Q.    I want to direct your attention on this exhibit to -- I

4    want to point you to multiple things, but you see in the first

5    block on the top left it says IP.  Do you see what I'm

6    referring to?

7    A.    Yes, 71.246.

8    Q.    And what IP addresses is that?

9    A.    That is -- I'm just confirming from my police report.

10   That is the investigative -- the IP address that I was

11   investigating for this case.

12   Q.    And did you eventually determine the geographical location

13   associated with that IP address?

14   A.    That is correct.

15   Q.    And whose residence was associated with that IP address?

16   A.    Mr. Pobre's, the defendant seated to my right here.

17   Q.    Now, I want to direct you to look under -- so you see

18   where it says Date/Time, Port, Type, and there are several

19   columns.  The information under that, where does that come

20   from?

21   A.    That's populated from ICAC Cops.

22   Q.    So when you mentioned that you take information from ICAC

23   Cops and do Control A and then you paste it, are you referring

24   to this information?

25   A.    Yes, sir, that's correct.

1  Q.   And once you do that, do you get the data points that are

2  in here?  So, for example, total time span, total unique

3  requests, does that generate automatically from the

4  spreadsheet?

5  A.   Yes, that's correct.

6  Q.   I want to now direct you to Government Exhibit 4.  Do you

7  recognize this file?

8  A.   Just confirming.  Yes, this is my Freenet Target Summary

9  that I would attach to my case file.

10 Q.   I'm going to take a moment to --

11          THE COURT:  Before you get into the guts of it, is

12 this from ICAC Cops?

13          THE WITNESS:  No, Your Honor.  This is the Excel

14 Spreadsheet that I was talking about.

15          THE COURT:  Okay.

16          THE WITNESS:  It has been formatted now into a PDF

17 after I've received -- at the bottom left of the first block --

18 well, it says Target Freenet Summary and then three of IP

19 address.  At the bottom here where it says pass, that's

20 primarily the data that I'm looking at.

21          THE COURT:  Which you get from ICAC Cops?

22          THE WITNESS:  Yes.  After the data is collected and

23 it passes --

24          THE COURT:  Got it.

25          THE WITNESS:  After its run through --

1            THE COURT:  Then you put it in this spreadsheet?

2            THE WITNESS:  Yes, Your Honor.  That's correct.

3            THE COURT:  Thank you very much.

4            THE WITNESS:  Yes, Your Honor.

5   BY MR. DRAUGHON:

6   Q.   What we're looking at on the Freenet Target Summary, is

7   this information that you retrieved from ICAC Cops, or is it

8   the information after the spreadsheet has processed?

9   A.   This would be after the process.  After I've clicked

10  analyze data, this is what I see afterwards.

11  Q.   I'm going to just briefly click through so you can see

12  each page.  So this is page 1 of Government Exhibit 4.  This is

13  page 2, and this is page 3.  Do you recall how many files of

14  interest were included in the Freenet Target Summary?

15  A.   Three.

16  Q.   And how many of them passed?

17  A.   All three passed.

18            MR. DRAUGHON:  Your Honor, I'm actually going to

19  transition to the execution of the search warrant.  I just

20  wanted to pause in case Your Honor had any follow-up questions.

21            THE COURT:  I guess does counsel want to, perhaps,

22  break this up?  Because we have two attorneys handling

23  different matters, that we do the Freenet part first and then

24  we move on to the statements?  Do you want to do it that way?

25            MR. ROBBINS:  It's probably cleaner, and it probably

 1  helps the government as well.  I think that would work, Your

 2  Honor.

 3           THE COURT:  That's fine.  That way we have only one

 4  attorney up for cross.  That would be helpful.

 5           MR. DRAUGHON:  I guess I'll say I have no further

 6  questions for this --

 7           THE COURT:  For this chapter, right, for

 8  Freenet-related information.  And then we'll move on to

 9  statements.

10           MR. DRAUGHON:  Got it.

11           THE COURT:  Okay.

12                          CROSS-EXAMINATION

13  BY MR. ROBBINS:

14  Q.   Your experience with Freenet, I think you said, is limited

15  to the course that you took and then the work you've done since

16  then?

17  A.   Yes.  Yes, sir.  I was going to say -- you caught me.  I

18  would have had to add "and investigating" as well, but being

19  trained and investigating.

20  Q.   And did you ever do any independent work on Freenet as, I

21  don't know, college work or anywhere else like that where you

22  just experimented with how it works?

23  A.   No, sir.  I had never heard of it before my assignment.

24  Q.   Gotcha.

25       You have a number of statements in your affidavit about

1   Freenet.  Would it be fair to gather that those statements come

2   from your training when you categorize what Freenet is?

3   A.    If you could be specific, sir?

4   Q.    Sure.

5   A.    I can go to my search warrant if you don't mind.

6   Q.    Sure.  I think it's on page 2 of your warrant.

7   A.    Page 2?

8         THE WITNESS:  As long as it's okay, Your Honor, I

9   have my copies here as well.

10         THE COURT:  Sure.  I don't have a problem with it.

11   Counsel, any issues?  The witness has very politely asked if he

12   could review his files that he brought.

13         MR. ROBBINS:  I think that's perfect.

14         THE COURT:  Okay.

15         MR. ROBBINS:  I apologize.

16         THE WITNESS:  No, no, thank you.

17   BY MR. ROBBINS:

18   Q.    Sir, I'm sorry.  Page 9, it starts at the bottom, Freenet

19   peer-to-peer network.

20   A.    Yes, sir.  Just to confirm, is it this part right here?

21   Q.    You're testing my eyes.  Yes, sir, that's it.

22   A.    Yes, sir.  I just wanted to confirm.  Thank you.

23   Q.    Yep.  You make a number of statements about the Freenet

24   under that section of your application.

25   A.    Yes, sir.  That's the information that I've been provided

1   through my training.

2   Q.   So this isn't independent conclusions on your part; this

3   came from some standardized training?

4   A.   That's correct.

5   Q.   The nature of Freenet being a peer-to-peer platform

6   intended for censorship resistance, secure and anonymous

7   communications?

8   A.   That is correct.

9   Q.   All right.

10       And that Freenet software -- going to the next page --

11   retrieves manifests using a list of keys to request from other

12   users a block needed to recreate a file?  About four lines in

13   on page 10 there.

14   A.   Yes, sir.  That's correct.

15   Q.   And that law enforcement Freenet nodes record requests

16   that are sent to them, and they are compared against known keys

17   to identify child pornography being downloaded?

18   A.   That is correct; sir, yes.

19   Q.   All right.

20       So this is basically a summary of what you learned in your

21   two days of training on Freenet?

22   A.   Yes, sir.

23   Q.   All right.  And that is, as far as you know, absolutely

24   accurate?

25   A.   As far as I know, yes, sir.  That's correct.

1    Q.    So you have -- you go to the training.  Do they give you

2    any manuals while you're there?

3    A.    They have provided a manual, yes, sir; that's correct.

4    Q.    And you said -- did they give you the software to set up a

5    node?

6    A.    Yes, sir; that's correct.  It came on a thumb drive.

7    Q.    All right.

8    A.    Yes, sir.

9    Q.    That was my guess before.  So they give you a thumb drive?

10   A.    Yes, sir.

11   Q.    You bring that back, and you have some terminal back at

12   your primary duty station where you're going to plug that thumb

13   drive in and that probably -- that ruins the terminal from any

14   other use?  Or can you use it for other things?

15   A.    I apologize.  By terminal, I'm sorry, what do you mean by

16   terminal?  I apologize.

17   Q.    You said that you had a computer that you use to run as a

18   law enforcement node.  Is that computer used for anything other

19   than being a law enforcement node in Freenet?

20   A.    Yes, that's my -- it's my undercover computer.

21   Q.    What does that mean?  What is an undercover computer?

22   It's not like a car.

23   A.    Oh, so that's the computer that I utilize to run

24   peer-to-peer file sharing programs, such as BitTorrent.  That's

25   the other program I have.  I have GigaTribe.  I don't use that.

1   I use primarily Freenet and BitTorrent.

2       As well as that's the computer that I utilize when I

3   receive a cyber tip from the National Center for Missing and

4   Exploited Children.  I review my cyber tips on that undercover

5   computer.  I refer to it as an undercover computer.  That's the

6   terminology we have used in the ICAC or in the Maryland ICAC.

7   Q.   And that term, does that mean anything beyond the fact

8   that it says Maryland.gov and its address?  I mean, what makes

9   it an undercover computer?

10  A.   The reason I refer to it as -- it basically doesn't have

11  some of the restrictions that -- like a Maryland -- like say I

12  received a computer from the Maryland State Police.  The

13  computer has less restrictions so that we can access the

14  Internet more freely.

15  Q.   You couldn't have done the downloads in this case if you

16  were on a state computer?

17  A.   I highly doubt it.  I wouldn't want to go on record saying

18  yes or no.  I find it highly --

19  Q.   I understand that.

20  A.   I find it highly improbable.

21  Q.   I do, too.

22       All right.  So the fact that it's an undercover computer

23  really just means that it's not a standard state computer?

24  A.   That's correct, sir.  It's much better than what we would

25  receive from our IT department.

1  Q.   You've described a number of tools, but it sounds like

2  your interface with the tools is not very in-depth.  You don't

3  have to do a lot to make these tools work?

4  A.   They have been simplified for law enforcement.

5  Q.   So you haven't really become a programmer in any way or

6  anything like that?

7  A.   I could go on the record, not close, sir, no.

8  Q.   All right.  So I'll probably end up asking you a bunch of

9  questions in which you're going to say you don't know, but I'm

10  going to ask them anyway.

11       But for starters, when your terminal is running, it's just

12  sitting out there on the Freenet like any other node, right?

13  It's not telling the rest of the Freenet that it's anything

14  special?

15  A.   Not to my knowledge, no.  Not what I've been trained in,

16  no, it's not, sir.

17  Q.   And all it does is it records all of the block requests

18  that come to it?

19  A.   That it logs.  It logs requests that it receives.

20  Q.   So it receives a request and it logs that.  It just says

21  somebody asked for this block and they had this IP address and

22  they had that many neighbors, yada, yada, ya.  And then -- is

23  that the first step?

24  A.   Well, I would just note that it doesn't tell me that it's

25  logged any information.  I don't have any -- I don't know what

1   it is logging.

2   Q.   It's invisible until -- but it gets some chunk of data and

3   then that data has to be compared somewhere against the known

4   and identified blocks that are related to CSAM.   Right?

5   A.   I believe so.

6   Q.   Do you know where that gets compared?

7   A.   Not to my -- to be quite honest, no.   Through ICAC Cops

8   but, no, I do not know.

9   Q.   Somewhere far away?

10  A.   Yes, sir.

11  Q.   Do you know where the four terminals were that were

12  involved in this case?

13  A.   No, I do not, sir.

14  Q.   Okay.   Do you know how long data gets held before it can

15  be run against the database of suspect blocks?

16  A.   No, I do not, sir.

17  Q.   Do you know how big the Datastore was on your LE node?

18  A.   No, I do not, sir.

19  Q.   Do you know how many LE nodes exist in Maryland?

20  A.   No, I do not, sir.

21  Q.   So you don't know how many exist in the country either?

22  A.   No, sir.   That's a -- no.

23  Q.   All right.   Do you know if they're all set up in the same

24  operational node?

25  A.   If they received the same training as I did, I would

1  assume the same as mine, but I do not know.  I can't attest to

2  what other people's is set up as.

3  Q.   Do you know whether yours was set up as either open or

4  normal?

5  A.   I do not recall.

6  Q.   Do you know if your computer -- your Freenet node had any

7  nodes identified as friend nodes?

8  A.   Not to my knowledge.

9  Q.   Do you know what a friend node is?

10  A.   No, I do not.

11  Q.   Do you know what kind of a computer is run for that

12  central data coordinator?

13  A.   No, I do not.

14  Q.   Do you know where?

15  A.   No, I do not.

16  Q.   Does your computer upload continuously, or do you have to

17  take it down on some periodic schedule?

18  A.   Could you repeat the question?  I apologize.

19  Q.   Sure.  Your computer is sitting in the stream of data out

20  there in Freenet and it's taking in all the things that are

21  sent to it and it's having them compared against the database

22  somewhere.  That uploads reports to ICAC?  Am I saying that

23  right, ICAC?

24  A.   I believe -- I don't know necessarily where.  I just know

25  it's provided -- it's collected from my node and --

1    Q.    And sent somewhere?

2    A.    Yes, and I'm able to access it through ICAC Cops.

3    Q.    Okay.  When that data gets sent off, do you know if that

4    happens continuously, or does your assignment include taking

5    your computer offline periodically for one reason or another?

6    A.    I know I do not take it off for any particular reason, but

7    I have lost power before.  It's been shut down and I have to

8    restart it, but it doesn't get shut down to send anything or it

9    doesn't have to be -- I do no periodic, like, checks or

10   anything.

11   Q.    So do you know what that means with respect to your

12   Freenet IP address, whether it's static or changes?

13   A.    No, I do not.

14   Q.    If you didn't go to the training and set up a law

15   enforcement node yourself, would you be eligible to get those

16   reports?

17   A.    Are you asking -- do you mean like the logs that go in

18   ICAC Cops?

19   Q.    Yes.

20   A.    No.  You actually have to receive the training, at least

21   that's the way it was whenever I received it.  I don't know

22   about other ICAC investigators.  I did not have access to the

23   Freenet tab until I received the training.  I believe like a

24   license was generated allowing me access.

25   Q.    I think we might have seen it.  Okay.

1    In that Freenet licensing, did you get -- in addition to

2  the disk, the thumb drive initially, and the training

3  materials, did you get any periodic updates?

4  A.    Yes.

5  Q.    Where did they come from?

6  A.    ICAC Cops allows you to get updates, updated programs,

7  manuals.

8  Q.    Do you know if any of those updates had anything to do

9  with what went into the database for screening?

10  A.    No, I do not.

11  Q.    Do you know how long a run lasts?

12  A.    A run?

13  Q.    Yeah.  Do you know what a run is?

14  A.    The request?  Is that -- I don't want to touch on what a

15  run is, respectfully.

16  Q.    Okay.

17    Do you know anything about the tool that's searching for

18  requesters?  Does it have any kind of discount for multiple

19  requests for the same file?

20  A.    I do not know, sir.

21  Q.    All right.  Is there anyone other than you who is

22  responsible for the maintenance on your node?

23  A.    My -- I guess like the -- we get updates periodically to

24  our UC computer, to the computers that we have.  I guess I'm

25  unfamiliar with the question.  I apologize.

1  Q.   Do you have to hand it over to somebody on occasion and

2  let them do the updates?  Or is it just whatever you do?

3  A.   So my detective sergeant, the detective sergeant at the

4  MSP Digital Forensic Lab, he has access to our undercover

5  computers.  I've never actually had to hand it over to him, but

6  he is able to access it and do updates and conduct I guess like

7  what you're referring to, maintenance to them.

8  Q.   Now, are they completely standalone?  They never touch the

9  network or the hard storage or anything like that in their lab?

10 A.   Are you asking if they are connected to like servers?

11 Q.   Yeah, your undercover.  Does it ever connect to anything?

12 A.   We had a backup server that was not -- it's been down, if

13 that's what you're asking, but I can't access anything in the

14 digital forensic lab through my undercover computer, if that's

15 what you're asking, sir.

16 Q.   And can anyone in the digital forensic laboratory access

17 your computer?

18 A.   To my knowledge, only the detective sergeant.

19 Q.   Okay.

20 A.   And possibly -- I would add possibly the sergeant that is

21 beneath him, that is like the administrative sergeant.

22 Q.   Now, you testified that when you get this positive report

23 for blocks, the report comes with a manifest key to get the

24 whole file?

25 A.   Are you talking -- like so --

1  Q.   So when you get your ICAC Cops report of

2  potential enforcement --

3  A.   I wouldn't refer to it as a report, respectfully.  If

4  you're talking like what I see with the logged information that

5  it's received?

6  Q.   Yes.

7  A.   Yes.

8  Q.   When you get that, you get along with it a manifest key to

9  get the entire file that the report only concerns some block

10  requests for?

11  A.   So what I see -- I'm just trying to follow with you, if

12  you don't mind.  So I receive the IP address and the file name.

13  I click on the file name and that's what shows me the manifest

14  key that has -- that I've labeled out in my report, if that's

15  what you're asking, sir.

16  Q.   But when you give the report for File of Interest 1, File

17  of Interest 2 from the spreadsheet that you reduced to the

18  PDF --

19  A.   Yes, sir.

20  Q.   -- that's talking about blocks, not about the entire file,

21  correct?

22  A.   It has -- is it possible to show the Freenet Target

23  Summary?  Because I think it's been redacted.

24  Q.   Yes.

25  A.   So it shows the file name and then it shows the

1  information, if that's what you're asking, associated with it.

2          MR. FINCI:  What do you want, the target summary?

3          MR. ROBBINS:  Just any one of them.

4          MR. FINCI:  Here it is right here.  Target summary.

5          MR. ROBBINS:  And then the next two as well.

6  BY MR. ROBBINS:

7  Q.   Okay.  So this is the target summary and that shows number

8  of requests and number of blocks, but what you initially get

9  doesn't show you that?  The report that you get just says this

10  is a potential IP address of interest and here's the file that

11  we think they might be looking for?

12  A.   So the only thing that I -- this is -- like, this is, I

13  would say, after -- this is after the -- like, I click analyze,

14  creates the PDF.  I have already been shown it previously, the

15  data, yes.

16  Q.   That one?

17  A.   Yes.  I wouldn't see it in this format.  To be honest, I'm

18  drawing a -- it shows very similar -- like it shows the

19  information design slightly different than what's being

20  displayed, but it shows all of the information going down in

21  that manner.

22  Q.   But what it shows there -- and I know it's all been

23  blacked out, but as I understand it, what's shown there under

24  the column that's labeled "split keys," those are keys for

25  blocks; not for full files, correct?

1  A.   I would -- I do not know, sir.  I collect the data and put

2  it into the Target Freenet Summary.

3  Q.   And you collect that data from wherever the central

4  repository of all knowledge is?

5  A.   Yes, through the ICAC Cops website.  Yes, sir.  Again, I

6  go to the Freenet investigative lead.  At that time you would

7  hit -- you would select all the information displayed on the

8  page and then import it into one of the files of interest tabs

9  in the Target Freenet Summary prior to hitting analyze data.

10              MR. ROBBINS:  If I can have one moment, Your Honor.

11              THE COURT:  Sure.

12       (Brief pause.)

13              MR. ROBBINS:  Thank you, Your Honor.  I'll step away.

14              THE COURT:  Okay.  Could I ask a couple of follow-up

15  questions before you, Mr. Draughon?

16       Sir, earlier you testified that once you get the

17  information of the three files, you -- the next step is to

18  confirm that they match as suspected child pornography.  Right?

19              THE WITNESS:  That's correct, Your Honor.

20              THE COURT:  How do you do that?

21              THE WITNESS:  So what I would do -- if I can just

22  start from the very -- like, can I run through everything?

23              THE COURT:  Yes.  And as long as you're telling me

24  what you did in this case, that would be great.

25              THE WITNESS:  Okay.  So for this case, what I would

1  do is log into ICAC Cops using my credentials.  I would go --

2  so the website has been updated.  So it doesn't look exactly

3  like it did back in 2018, but I would log in.  I would be

4  displayed information, like, sensitive to the Internet Crimes

5  Against Children task force.  There would be a tab for Freenet.

6  When I click on Freenet, I would be displayed Freenet

7  investigative leads, what I would refer to as Freenet

8  investigative leads listing out the IP addresses.  It lists out

9  the date and times and then it lists out the file name.

10         So for me to confirm that the file is child pornography, I

11  click on the file.  It takes me to a new tab in my web browser

12  -- and if I could just refer to -- so say that would be File of

13  Interest 1.  I would click Control A on that and it would

14  collect all of the information that's displayed on that tab.

15         I would then go to the Target Freenet Summary, Google

16  Excel -- excuse me, not Google -- the Microsoft Excel

17  Spreadsheet.  I would then import that in.  There's a button.

18  I can't remember if it says import or paste, but it's basically

19  to import that.  And then it would populate what you're seeing

20  for the FOIs.  And then after putting all of those in, I click

21  analyze data, and it confirms that they passed.

22              THE COURT:  Okay.  And then once they pass, do you

23  ever look at the image or the file itself?

24              THE WITNESS:  I apologize if I didn't touch that.  By

25  confirm child pornography, I view the content -- I view the

1    file, watch the file, confirm -- either view it or watch it and

2    confirm that it meets the criteria for me, meets the criteria

3    for child pornography in the State of Maryland.

4              THE COURT:  And you base that -- you make that

5    determination based on your visual observation?

6              THE WITNESS:  Based off of my training, knowledge,

7    and experience within the ICAC.

8              THE COURT:  Is it all visual, or is there something

9    else that you do to confirm you've got a child --

10             THE WITNESS:  I watch it with my eyes and confirm

11   what I see.

12             THE COURT:  And you said it's based on your training

13   and experience that you conclude what you're looking at is

14   child pornography?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Can you give me a sense of what that is?

17             THE WITNESS:  Juveniles under the age of 18 years old

18   engaged in sexual conduct or in a state of arousal.  Although,

19   it's since changed.  We used to investigate -- child erotica,

20   child pornography is different now.

21             THE COURT:  Have you received any training on

22   distinguishing between fake images and real ones?

23             THE WITNESS:  I don't know necessarily directly but

24   I've come across -- in my experiences, I've come across CGI

25   images, if that's what you're asking, Your Honor.

1          THE COURT:  CGI?

2          THE WITNESS:  Computer generated images.

3          THE COURT:  Yeah, yeah.

4          THE WITNESS:  I didn't know if that's what you're

5     asking.

6          THE COURT:  Kind of, right.

7          THE WITNESS:  Yes.  Yes, in my investigations, I

8     primarily focus on what I can determine that I feel confident

9     in my visual judgment.

10          THE COURT:  Are you trained at all to refer -- you

11     know what I mean when I say a hash value?

12          THE WITNESS:  Yes.  I could go into the Nick Mick and

13     get the hash, the MD5 hashes, SHA1 hashes, and we could go that

14     route, but I base most of my investigations on what I see.

15          THE COURT:  And what did you do in this case?

16          THE WITNESS:  Visual.

17          THE COURT:  Visual?

18          THE WITNESS:  Visual, yes, Your Honor.

19          THE COURT:  Okay.

20     One other question.  In your affidavit supporting the

21     search warrant, you did refer to the number of blocks that were

22     recorded for each of the three images.  What's the significance

23     of that?  So, for example, on page I think it's -- it all

24     depends on which document you're looking at.

25          THE WITNESS:  Yes, Your Honor.  Yes, Your Honor.

1          THE COURT:  If you have it in front of you,

2    application and affidavit for search and seizure warrant, I go

3    one, two, three paragraphs down, and that paragraph refers to

4    the IP address that we know is at issue here requesting 29

5    unique blocks.  What is the significance of that number 29 such

6    that it made it into the affidavit?  I just want to understand

7    what it is from your perspective.

8          THE WITNESS:  That's what was generated for me to

9    provide in my report.  This came -- this actually -- this

10   information is actually even generated by the Freenet Target

11   Summary as well.

12         THE COURT:  Okay.

13         THE WITNESS:  When I do that, it provides this

14   information to me as well.

15         THE COURT:  Right.  You don't count up the blocks for

16   sure?

17         THE WITNESS:  No, no, Your Honor.  No, no, no.  No, I

18   do not.  I apologize for any -- if I misspoke or confusion, but

19   this -- the information that's provided here is actually

20   provided through the Freenet Target Summary.

21         THE COURT:  And in your training, have you learned

22   what the significance of the number of blocks is?  Why that is

23   information included to the judge in a warrant?

24         THE WITNESS:  No, I just wanted -- I personally just

25   make sure I provide what I've been shown and trained to do.  I

 1   provide it so that it is -- I've disclosed it.  But I just know

 2   that blocks need to be -- the blocks need to be used to build

 3   the file.

 4           THE COURT:  Okay.  All right, and the description

 5   that's in the affidavit, does that also come from the output,

 6   or is that you -- is that your writing?

 7           THE WITNESS:  Generally, what I do for my

 8   investigations is after I download the file, I click on the

 9   file and I right click on the file and click rename.  I copy --

10   I hit Control C to copy what is displayed for the file name

11   that has been produced to -- my computer has downloaded and

12   then I paste that and I'll put like a period and then I'll put

13   the MKV.  That's generally what I do.

14           THE COURT:  And I see that.  Right under it where it

15   says "description," who authors that?

16           THE WITNESS:  That is my writing, Your Honor.

17           THE COURT:  Your writing?

18           THE WITNESS:  That is all written by me, yes, Your

19   Honor.

20           THE COURT:  Got it.  Thank you.  That's very helpful.

21           THE WITNESS:  Thank you.

22           THE COURT:  One other question.  In your training, do

23   you get any training on how the program works in terms of

24   figuring out who the requester of the image is?

25           THE WITNESS:  I was shown like the mathematical

1  equation that's used for the data.  I could not demonstrate the

2  mathematical equation.

3           THE COURT:  You and me both.

4           THE WITNESS:  But I understand there is a

5  mathematical equation that's utilized to analyze and confirm

6  the data that I receive.

7           THE COURT:  But you're not ever asked to validate or

8  to do the math yourself?

9           THE WITNESS:  Not to do the math myself, but the only

10 thing with validation would be just analyzing.  I would say I

11 hit the analyze button to validate it.

12          THE COURT:  I see.  In the Excel Spreadsheet that we

13 talked about?

14          THE WITNESS:  Yes, Your Honor.  Yes, Your Honor.

15 Like, I validate that it passed, but I do not -- I could not do

16 the mathematical equation myself, no.

17          THE COURT:  So you're trained if you put the

18 information in and you click analyze and it says pass, then you

19 can use it to further your investigation?

20          THE WITNESS:  Yes, Your Honor.  I would just add that

21 the developers have made it -- they have simplified it so that

22 what I've explained is what I've been trained in to use.

23          THE COURT:  Got it.  I appreciate that.  Thank you.

24          THE WITNESS:  Thank you, Your Honor.

25          THE COURT:  Thank you.

1          Okay, Mr. Draughon.

2               MR. DRAUGHON:  Yes.

3                         REDIRECT EXAMINATION

4     BY MR. DRAUGHON:

5     Q.    Sir, you were asked a few questions on cross-examination

6     about things like the Datastore that you chose, or whether it

7     was opennet or normal.  Do you recall about when you set up

8     your law enforcement node?

9     A.    So going back to my certification, it says February 26-27

10    of 2018.  I took that training in Columbia where -- actually, I

11    took it at my office.  So I more than likely set that up on my

12    computer either on the 26th, 27th or -- at some time in

13    February of 2018, I would have set up my computer for Freenet.

14    Q.    So we're right now October of 2021.  So over three and a

15    half years ago if my math is right?

16    A.    Yes.  Yes, sir.

17    Q.    When you set up your Freenet node, did you follow the

18    directions provided to you?

19    A.    Yes, that's correct.

20    Q.    Which directions did you follow?  Where did the directions

21    come from?

22    A.    So I received it in training.  I believe there was a

23    manual as well provided on the thumb drive.  I have a paper

24    manual that's at my office that's provided by -- all

25    participants in the training received.  And, honestly, the

1  setup -- basically, I think I -- I can't really remember if I

2  was sitting there with the manual.  I don't believe so.  I

3  think I was just going off -- it was so fresh; I just went off

4  of what they had literally just shown us in class because we

5  had the instructors at our office if I had any issues.

6  Q.   So is it fair to say that when you were setting up, you

7  weren't making independent decisions; you were following the

8  training that you were given?

9  A.   That is correct, sir.

10         MR. DRAUGHON:  Your Honor, that's all I have on this

11  topic.

12         THE COURT:  Okay.  Anything else, Mr. Robbins, before

13  we turn to statements?

14         MR. ROBBINS:  No further questions from the defense.

15         THE COURT:  Okay.

16     All right, so why don't we shift to the next.

17  BY MR. DRAUGHON:

18  Q.   Sir, we're going to switch gears and now talk about the

19  search warrant that you executed on August 14, 2018.

20  A.   Yes, sir.

21  Q.   Do you recall where that search warrant was executed?

22  A.   Yes, sir.

23  Q.   Can you tell the Court where it was?

24  A.   13504 Briarcroft Court, Laurel, Maryland 20708.

25  Q.   And why were you executing a search warrant at that

1  location?

2  A.   After receiving a subpoena compliance from Verizon saying

3  that the IP address at the time and dates of the request came

4  back to 13504 Briarcroft Court, Laurel, Maryland 20708, I

5  planned a search warrant given the criminal violation.

6  Q.   Approximately how many law enforcement officers were with

7  you, if you weren't by yourself?

8  A.   I believe approximately 12 to 16, approximately.  If I

9  could even go down to 10 to 16.  I believe it was 12.

10 Q.   Do you recall how you and the other law enforcement

11 officers entered the residence?

12 A.   I was not -- I did not enter the residence during the

13 initial, I would you say, knock and announce of the search

14 warrant.  Special Agent DiAntonio and I were located at the

15 rear perimeter of the residence to ensure -- this residence had

16 a rear door.  Not saying that any occupant would have from the

17 residence, but just to ensure, we stayed at the back of the

18 residence to make sure nobody attempted to evade law

19 enforcement and exit through the back.

20      But law enforcement, to my knowledge, knocked and

21 announced that there was a residential search warrant, and I

22 believe one, if not both occupants, came to the door, opened

23 the door, allowing law enforcement in and they -- law

24 enforcement secured the residence to ensure there was no

25 threats and then both occupants were seated in the family room

1  of the residence.

2  Q.   And how did law enforcement go about securing the

3  residence?

4  A.   So to my knowledge, they would enter, make sure that there

5  is no other occupants other than the two, in this case,

6  Mr. Pobre and Mrs. -- I don't want to mess up the name,

7  Valencic?

8  Q.   I just say his spouse.

9  A.   That's right.  If I could say -- if I could just refer to

10 her as Lynn, Mr. Pobre and Lynn, they were only -- they were

11 deemed to be the only two occupants in the residence.

12      And after that -- I apologize.  I kind of lost track

13 there.  That's -- we would make entrance and make sure there is

14 nobody else, and that's how we secure the residence.

15 Q.   In the process of securing Mr. Pobre and his spouse, were

16 they placed under arrest?

17 A.   No, they were not.

18 Q.   Were they placed in handcuffs?

19 A.   Not to my knowledge, no.

20 Q.   You stated that they were seated.  Where were they seated?

21 A.   They were seated in -- I would refer to it as the family

22 room.  I know there's some discrepancies with living room,

23 family room.  But I would refer to it as the family room.  It's

24 the main room when you walk in.

25 Q.   Why were they seated in the family room?

1  A.   We do -- we primarily try and seat any occupants at our

2  search warrants in the family room or living room due to the

3  search that will ensue more than likely in particular bedrooms,

4  offices, and we just don't want any -- like, we want to remove

5  the occupants from any area that's going to more than likely

6  have a lot of law enforcement traffic walking to and from

7  there.

8  Q.   And did you interview Mr. Pobre in the family room?

9  A.   No, I did not.

10  Q.   Where did you interview him?

11  A.   I interviewed him in the spare bedroom.  It was as you

12  walk down the hallway to the right, after -- once you walk in

13  the residence, you would be in the family room.  Walk straight

14  down the hallway, and I believe it was the first door to our

15  right.

16  Q.   And why did you interview him in that room instead?

17  A.   That room, upon our like securing of the residence, it did

18  not appear to have a lot of electronics.  We primarily would

19  not want to do it in the master bedroom.  I don't believe --

20  there was an office with a lot of computer equipment.  Given my

21  investigation, I would not want to interview somebody,

22  particularly Mr. Pobre, in the office because we'll be

23  searching that room pretty extensively.

24  Q.   How did Mr. Pobre appear when you first approached him?

25  A.   He appeared what I would deem to be normal.  I mean,

1    surprised that law enforcement was at the residence given the

2    hour in the morning, but cooperative, polite.

3    Q.    What did his mood appear to be?

4    A.    I guess docile.

5    Q.    Do you recall when you initially started to interview

6    Mr. Pobre?

7    A.    I'm sorry, sir?

8    Q.    Do you recall when you initially started to interview

9    Mr. Pobre?

10   A.    Referring to my report, I believe at approximately 0544

11   hours, so 5:44 in the morning.

12   Q.    And at some point did you tell Mr. Pobre what the basis of

13   the search warrant was?

14   A.    Yes.

15   Q.    And do you recall what his reaction was when you told him?

16   A.    About the search warrant or the specific crime that I was

17   investigating?

18   Q.    The crime that you were investigating.

19   A.    The crime that I was investigating, he -- if I can refer

20   back to my police report.  He had provided law enforcement with

21   information, and he then went to the -- let me see here.  I

22   advised Mr. Pobre of the reason for my investigation, and at

23   that time, he gave out a laugh and exhale of air and said he

24   was the suspect in a child pornography investigation and then

25   said, wow, okay, I need a lawyer.

1   Q.   And just sort of a housekeeping matter, it's fine for you

2   to refer to your notes.  Just when you're done referring to it,

3   just look up and talk to me, as opposed to reading.

4   A.   Okay.  Yes, sir.

5   Q.   At some point did -- and just so we're clear, what did you

6   tell him the investigation was regarding?

7   A.   So he had actually already indicated that he was

8   familiar -- I asked him about -- I asked him about the

9   residence, and he was saying that he was operating as a tour in

10  Freenet node, and then I changed the conversation to, well, I'm

11  interested in -- that's why I'm here is Freenet.  And he said

12  that he had been utilizing Freenet for quite some time and

13  referred to himself as an early adopter of it.

14  Q.   And what crime did you tell him you were investigating?

15  A.   Oh, I apologize.  Child pornography, sir.

16  Q.   When you told Mr. Pobre that you were investigating child

17  pornography, did he have a physical reaction?

18  A.   Yeah, I refer to it as a jovial laugh.

19  Q.   After you told him about the -- that you were

20  investigating child pornography or child sexual abuse material,

21  what were his mannerisms when you interacted with him after

22  that?

23  A.   He basically -- he raised his arms up in the air and fell

24  back and hit his head off a wall, and that was directly behind

25  him.  Is that what you're asking, sir?

1  Q.    Well --

2  A.    Okay, I was going to say -- yes, sir, that's -- he -- in

3  my report, I highlighted he just basically like went like this

4  and fell back, smacked his head off the wall.  Special Agent

5  DiAntonio and I asked him if he was okay.

6  Q.    And based on your law enforcement experience, how did you

7  interpret his reaction?

8  A.    In my opinion, it was an overdramatic response to the

9  information and, in my opinion, was to show deception.

10  Q.    And once you were past that point, how did he appear to

11  behave with you?

12  A.    After that, he appeared almost immediately calm again and

13  then went more into wanting to know the process of the search

14  warrant and what was going to transpire after that.

15          MR. DRAUGHON:  Your Honor, at this point, I would

16  like to play Government Exhibit 6.  I'm going to plug this

17  thing up into my laptop.  Will that play the audio?

18          THE COURT:  Well, we're going to make it play.  So if

19  it doesn't work, we'll fix it.

20          MR. DRAUGHON:  Well, the sound isn't coming out of my

21  laptop, which means it's going somewhere.

22          THE COURT:  All right.  Ms. Smith, you're manning the

23  ship, or womanning the ship as the case may be.  Can you help

24  us figure out what's going on?  There we go.

25          MR. DRAUGHON:  Yep.  Thank you.

1   BY MR. DRAUGHON:

2   Q.   I'm going to replay it from the beginning.  I just want

3   you to -- sir, I just want you to listen to this.  I tried to

4   pick the shortest audio, and then I'm going to ask you some

5   follow-up questions afterwards.

6   A.   Okay, sir.

7        (Audio played.)

8   BY MR. DRAUGHON:

9   Q.   Pausing it at 16 seconds.  Whose voice is that?

10  A.   That is Mr. Pobre's sir -- correction.  That's mine, sir.

11  I apologize.  That's my interview with Mr. Pobre.  I apologize.

12  Q.   Understood.  I'll continue playing.

13       (Audio played.)

14  BY MR. DRAUGHON:

15  Q.   Pausing at 52 seconds, who said "doubtful but please

16  continue"?

17  A.   Mr. Pobre, sir.

18       (Audio played.)

19  BY MR. DRAUGHON:

20  Q.   So I want to ask you a question about your tone.  Was the

21  tone that we heard during that audio clip consistent with the

22  tone that you used with Mr. Pobre throughout your interviews?

23  A.   I believe so, yes.

24  Q.   The tone that we heard Mr. Pobre use, was that consistent

25  with how he talked with you throughout the interviews?

1  A.    Yes.  To the best of my recollection, yes, sir.

2  Q.    And how would you interpret his tone?

3  A.    In my personal interpretation, I believe calm.  I mean,

4  not happy of what was going on, but, you know, if I could

5  speculate -- some investigations we have people that cry.  That

6  never occurred.  So I would deem that he was calm.

7  Q.    During the interview, were you standing over him?

8  A.    No, I was not.  Excuse me, I don't know if that came

9  through.  No, I was not.

10 Q.    What was your position in proximity to Mr. Pobre?

11 A.    I would approximate that I was, I would assume, three to

12 six feet from him at that time I believe.

13 Q.    How many officers were in the room during the interviews?

14 A.    I believe at that time, from that interview, I believe

15 that was Special Agent DiAntonio and myself; so two.

16 Q.    And there were other points in the day in which you

17 interviewed Mr. Pobre.  Did that number change for the other

18 interviews?

19 A.    No, it did not.

20 Q.    So you mentioned earlier that there were anywhere from 10

21 to 16 officers who executed the search warrant.  Were they

22 present during the interviews?

23 A.    No, they were not.  They were present in the residence but

24 not present directly with Pobre and I being interviewed.  They

25 were on scene but not in the room.

1    Q.    During those interviews, did you make any threats to

2    Mr. Pobre?

3    A.    No, I did not.

4    Q.    Did anyone make any threats in your presence?

5    A.    No, they did not.

6    Q.    Did you brandish any firearms around Mr. Pobre?

7    A.    There was my weapon holstered on my hip.  I don't know if

8    he saw that or not, but, no, I did not -- I never removed it

9    from my holster.

10   Q.    Was Mr. Pobre deprived of essentials, such as food, water,

11   bathroom breaks?

12   A.    No.  I believe we offered them multiple attempts to get

13   food, water, bathroom breaks as they needed.

14   Q.    During your interviews with Mr. Pobre in his residence,

15   did you consider him to be in custody?

16   A.    No, I did not.

17         MR. FINCI:  Objection, Your Honor.  I object to the

18   relevance of the question.

19         THE COURT:  Sustained.  Sustained.

20       Can you rephrase, Mr. Draughon.

21   BY MR. DRAUGHON:

22   Q.    Did you -- was Mr. Pobre in custody?

23         MR. FINCI:  Objection.

24         THE COURT:  Describe it.  In custody is a legal

25   conclusion.

1                MR. DRAUGHON:  Sure.

2    BY MR. DRAUGHON:

3    Q.   Was Mr. Pobre free to leave when you were interviewing

4    him?

5    A.   He could have stopped the interview at any time.  I would

6    have liked to have talked to him.  I can't speculate -- he

7    never said he wanted to leave.  So I just continued to talk to

8    him.  I never told him he couldn't leave.

9    Q.   Did he ask you at some point if he was under arrest?

10   A.   He did.

11   Q.   What did you tell him?

12   A.   I told him he was not.

13   Q.   And why did you read Mr. Pobre his rights?

14   A.   So that he was aware of his Miranda rights.

15   Q.   And why did you want to make sure he was aware of them?

16   A.   Because I wanted to ask him questions that were a result

17   of a -- that could be used in a criminal investigation where he

18   would be the defendant.

19   Q.   Were there any statements gathered from Mr. Pobre prior to

20   you reading him his rights?

21   A.   Not to my knowledge.  Not to me.  I don't know if he told

22   anybody else anything prior to that, but not to my knowledge,

23   no.

24   Q.   The interview we just heard, I believe you said

25   1420 hours.  Does that sound right?

1  A.    Yes, sir.

2  Q.    So I'm going to translate that to 2:20 p.m.?

3  A.    Yes, sir, that's correct.

4  Q.    If Mr. Pobre wanted to leave the residence entirely, would

5  he have been allowed to?

6  A.    Yes, sir.

7         MR. FINCI:  Objection, Your Honor.  Speculation.

8         THE COURT:  Well, if you know.

9         THE WITNESS:  They ultimately did leave the

10  residence.  That's why I'm advising they were able to.  They

11  did leave the residence.

12  BY MR. DRAUGHON:

13  Q.    And you said they left.  Where did they go?

14  A.    I don't know where they went.  I know that he and Lynn and

15  I believe a pet, I think a cat, left the residence.

16  Q.    Was law enforcement still present when they left?

17  A.    Yes, we were.

18         MR. DRAUGHON:  Those are all the questions I have,

19  Your Honor.  Thank you.

20         THE COURT:  Okay, thank you, Mr. Draughon.

21     Mr. Finci.

22                         CROSS-EXAMINATION

23  BY MR. FINCI:

24  Q.    Good afternoon, Corporal.

25  A.    Good afternoon, sir.  How are you?

1  Q.   I'm well, thank you.

2       Do you have a large binder over there?

3  A.   Yes, sir.

4  Q.   No, not your binder.

5  A.   Oh, I apologize.  Yes, sir.

6  Q.   Okay.  So open that to the beginning of it.

7  A.   Okay.

8  Q.   In case we need to refer to anything, we'll have it handy.

9  Okay?

10 A.   Yes, sir.

11 Q.   So first I want to set the scene on the morning of

12 August 14th of 2018.  Okay?  It's approximately 5:15 a.m. when

13 officers arrived to serve the search warrant?

14 A.   I believe that's what my report indicates, yes, sir.

15 Q.   And you've testified there were 10 to 16 officers who were

16 there to serve the warrant; is that correct?

17 A.   Yes, sir.  To serve it, yes, sir.  I was making sure you

18 said serve.

19 Q.   Was there a SWAT Team present?

20 A.   No, there was not, sir.

21 Q.   Were the officers armed?

22 A.   Yes, they were, sir.

23 Q.   And were the officers armed with anything other than their

24 sidearms when they arrived?

25 A.   We were definitely armed with our sidearms.  I do not

1  know -- some investigators are issued rifles, shotguns.  I do

2  not believe they were present but --

3  Q.   All right.  So did you -- I'll just ask it this way.  Did

4  you observe any rifles or shotguns during the execution of the

5  search warrant?

6  A.   Not to the best of my recollection, no, I did not.

7  Q.   Did you observe whether the team that arrived had a

8  battering ram to knock the door down if they needed to?

9  A.   Yes, we do have one of those, sir.

10  Q.   So when you arrived at the house, was it dark?

11  A.   Yes, sir.  I would say like just prior to dusk, about to

12  get light, but more than likely like a little dark still.

13  Q.   And do you recall any lights being on in the home?

14  A.   I don't believe any in the home.  I think we could see

15  lights coming from the office, like computer equipment, but

16  not -- not anything to signify that somebody was awake or

17  moving around, if that's what you mean.

18  Q.   Who was at the front door doing those what you described

19  as knock and announce?

20  A.   I would -- I can only speculate.

21  Q.   You don't know?

22  A.   It was a law enforcement officer, part of my unit, I can

23  assure that.  It was possibly TFC Donald (phonetic), TFC

24  Fitzgerald.

25  Q.   Just to back up for a moment, you're the lead

1   investigating officer in this case; is that correct?

2   A.   Yes, sir, that's correct.

3   Q.   So as a result of the execution of the search warrant and

4   so forth, everybody reported information to you, which you then

5   included in your report; is that correct?

6   A.   Yes, sir; that's correct.

7   Q.   And perhaps certain material in your report is not

8   information that you personally observed but might have been

9   information provided to you by some of the other troopers and

10  officers, correct?

11  A.   And going off memory, yes, it would be documented as such,

12  sir.

13  Q.   So you would have -- you eventually went inside the home;

14  is that correct?

15  A.   Yes, sir.

16  Q.   And did you observe that the front door was broken down?

17  A.   I don't recall, no, sir.

18  Q.   So is it, to the best of your recollection, the officers

19  were let into the home?  Is that correct?

20  A.   Yes, to the best of my recollection, sir; yes, sir.

21  Q.   And how long after the officers entered were you inside

22  the home?

23  A.   I would have -- by the time that they get in, it is

24  dependent -- I truly cannot recall exactly, but I would

25  definitely say I was in within five minutes more than likely;

1   but once they secure the residence, tell me it's secured, I

2   collect my notebooks, recorders, and everything.  So that time

3   and then I came in.

4   Q.   So when you entered, was Mr. Pobre and Dr. Valencic seated

5   on the sofa?

6   A.   Yes, sir.

7   Q.   And were they wearing sleeping clothes at that point --

8   A.   Yes, sir.

9   Q.   -- bed clothes?

10      And by the way, you said this was a Tuesday, a workday in

11  August of 2018, correct?

12  A.   Yes, sir.  To the best of my recollection, yes, sir.

13  Q.   You said Tuesday, right?

14  A.   Tuesday -- if I could refer back to my police report?

15  Q.   Sure, please.  If that's wrong, just correct me.

16  A.   Yes, sir, Tuesday, August 14th.  I just wanted to clarify.

17  Q.   And you would agree that's a workday, correct?

18  A.   Yes, sir, for most.

19  Q.   Now, when you came in, Mr. Pobre and Dr. Valencic were

20  seated on the sofa.  Are there other police officers in the

21  living room, family room where they were seated?

22  A.   Going off of memory, I could imagine there would be

23  possibly at minimum two to three standing around me at that

24  time.

25  Q.   And are they in uniform?

1   A.   Only one to -- I can't remember if there was a field

2   trainee, but there would only be one uniformed trooper from the

3   Maryland State Police, and then everyone else would be in what

4   we would deem as like covert clothes, like BDUs, Polo, jeans,

5   some T-shirts, kind of a mix.

6   Q.   Okay.  So just to stretch out the scene, you officers were

7   there for an exceedingly long period of time executing this

8   search warrant in this case; is that correct?

9   A.   This took -- this search warrant took longer than our

10  normal search warrants, yes, sir.

11  Q.   And while now pertinent to this issue, that's because of

12  technical problems and the number of computers and hard drives

13  and et cetera, servers --

14  A.   Yes, sir.

15  Q.   -- that were found on the premises.  Is that correct?

16  A.   Yes, sir.  We experienced a larger number than accustomed

17  to.

18  Q.   Now, we're going to talk about some statements that were

19  taken between 5:44 a.m. and the one you talked about at 1420.

20  A.   Okay, sir.

21  Q.   And then I'm going to ask you some questions about another

22  statement that you reported on.  Okay?

23  A.   Yes, sir.

24  Q.   So at approximately 5:44 a.m., is that the first time that

25  you asked Mr. Pobre to go back into a bedroom to talk to you?

1  A.    Yes, sir.

2  Q.    Between 5:15 a.m. and 5:44 a.m., was he seated on that

3  sofa in his bed clothes?

4  A.    I believe so.

5  Q.    From 5:15 to 5:44 a.m., were there officers in the living

6  room, family room, whatever you want to call it, watching

7  Mr. Pobre and Dr. Valencic?

8  A.    Yes, sir.

9  Q.    Where were those officers positioned?  Can you tell us?

10 A.    I can't speculate.  I don't believe I was in -- I was

11 moving around.  They were more than likely standing not over

12 them but somewhere like in the same vicinity as them.

13 Q.    Did you observe them standing by the front door to the

14 house?

15 A.    To the best of my recollection, no, but they very well

16 could have.  Again, I don't know exactly where the standing --

17 we were there for a long time.  I don't know where they were

18 standing but they could have.

19 Q.    And there was a male and a female officer, correct?

20 A.    There was multiple, I believe.

21 Q.    Okay, well, let me rephrase that.

22 A.    Yes, sir.

23 Q.    There was a male and a female officer standing watch over

24 Mr. Pobre and Dr. Valencic; is that correct?

25 A.    I have to be honest, sir, I didn't take note but I would

1   not challenge.

2   Q.   So at approximately 5:44 a.m., you took Mr. Pobre back

3   into a bedroom to talk to him; is that correct?

4   A.   Yes, sir; that's correct.

5   Q.   And when you got back in the bedroom, there might have

6   been some introductory discussions, but the very first thing

7   you did was read him his Miranda rights from a Miranda card; is

8   that correct?

9   A.   It's a Miranda form.  It's our MSP-180.  It's actually a

10  -- it's not a card.  It's a full piece of paper; but, yes, sir.

11  Q.   And did you ask him to sign it?

12  A.   I believe my words would have been if he agreed, to please

13  sign -- or not please, but to sign, yes.

14  Q.   And did he sign it?

15  A.   Yes.

16  Q.   And you read him your Miranda rights at that time, you

17  testified earlier today when the government was asking you

18  questions, because you wanted to ask him questions and you

19  wanted him to know his rights.  Correct?

20  A.   Yes, sir; that's correct.

21  Q.   There were -- you spoke to him for maybe -- let's just

22  estimate.  I'm not holding you to the amount of time but

23  approximately five minutes; is that correct?

24  A.   Five to ten; yes, sir.

25  Q.   And at the end of that, he clearly invoked his right to

1  counsel to you, did he not?

2  A.   Recalling the audio recording, sir, I believe it was like

3  ten minutes, and I would say within around seven minutes he

4  said he would like his -- he did not wish to speak to us.  I

5  forget.  I would have to hear the audio recording, but he did

6  not want to speak to us anymore.

7  Q.   And you didn't question the fact that he was asking for an

8  attorney in your mind; is that correct?

9  A.   No, sir.

10  Q.   You knew he was asking for an attorney?

11  A.   Yes, sir.

12  Q.   All right.  And, in fact, you respected his invocation of

13  the right to counsel, and you terminated the questioning at

14  that time; is that correct?

15  A.   Yes, sir.

16  Q.   All right.  And after that, what did you -- did you take

17  him back out to the family room to sit back on the sofa?

18  A.   After I had what I deemed he had invoked his right to an

19  attorney, I stopped asking him questions and he began asking me

20  questions, and I tried to oblige his -- to be honest, in my

21  investigations, I like to show -- I like to be honest.  So I

22  was trying to be honest with him about the investigation.

23  Q.   Did you get a chance to look at a transcript that had been

24  prepared?

25  A.   I believe it was sent to me.  I can't remember all of the

1    transcriptions but it was sent to me, yes.

2    Q.   Did you have occasion to compare it to the audio that you

3    had recorded?

4    A.   I hadn't compared it.  I have the audio recordings.  I've

5    listened to my audio recordings.

6    Q.   So you have listened to it before today?

7    A.   Yes, sir.

8    Q.   So he -- there was a few more questions and answers after

9    he invoked his right to an attorney, but shortly thereafter the

10   conversation ended; is that correct?

11   A.   I would just like to clarify.  I did not ask him anymore

12   questions.  He asked me questions.  I answered those questions,

13   and he made statements to me.  I did not ask him any further

14   questions.

15   Q.   Okay.  Shortly after that, did you escort him back out to

16   the living room?

17   A.   Yes, sir.

18   Q.   All right.  And was he instructed to sit back down on the

19   sofa?

20   A.   I don't know if he was instructed.  He was offered to have

21   a seat.  I don't know if he was instructed.  I don't believe I

22   ever instructed him but --

23   Q.   All right.  So you offered him to have a seat but you

24   didn't instruct him; is that correct?

25   A.   To the best of my recollection.  I don't even know if I

1   was the one that -- I think I escorted him out but I don't

2   recall --

3   Q.   You don't recall whether it was you that said have a seat

4   or please have a seat or would you like to have a seat?

5   A.   Yes, sir.  If it's not documented in my police report, I,

6   respectfully -- 2018, I can't remember.

7   Q.   Very well.  It's been a much longer time than we all would

8   have hoped, believe me.

9   A.   Yes, sir.  Yes, sir, I understand that.

10  Q.   So at 6:00, approximately -- we're now at approximately

11  6 a.m. correct?

12  A.   For -- after the interview?  Yes, sir.  Probably a little

13  bit shy.

14  Q.   When you proceeded back down, correct?

15  A.   Very close, yes, sir.

16  Q.   And he's still wearing his pajamas, basically?

17  A.   Yes, sir.

18  Q.   And Dr. Valencic is still wearing her sleeping clothes as

19  well; is that correct?

20  A.   Yes, sir.

21  Q.   And there are still the same number of officers around the

22  house?

23  A.   Yes, sir.

24  Q.   All right.  So at 6:50 a.m., there was another interview,

25  is that correct, a second recorded interview?

1    A.    With Mr. Pobre?

2    Q.    Correct.

3    A.    Yes, sir.  I would have to refer to my report but, yes,

4    sir, I wouldn't --

5    Q.    So let's -- and just to refresh your recollection of when

6    we're talking about, we're talking about the interview

7    discussion about getting into all of the computers; that one.

8    I think Sergeant Bedell is involved?

9    A.    Yes, sir.

10   Q.    And Corporal Brooks as well?

11   A.    I don't believe Corporal Brooks -- Corporal Brooks was not

12   there.  Corporal Brooks was I believe -- yes, so we were going

13   through the server.  I was approached by Corporal Brooks that

14   Mr. Pobre would like to speak to me again.

15         Sergeant Bedell was attempting to get into the server.  It

16   was in a basement/garage.  It was like underneath, a slight

17   drop down.  And then he said he wanted to talk to me.  So, yes,

18   sir.

19   Q.    So just to be clear, between approximately 6 a.m. and

20   6:50 a.m. when that recording starts, as we said, they are

21   still sitting in the living room next to each other in their

22   bed clothes.  At 6:50 a.m. they are still in their bed clothes;

23   is that correct?

24   A.    Yes, sir.

25   Q.    And you got the word from some other officer that

1  Mr. Pobre wanted to talk to you again?

2  A.    Corporal Brooks to be specific, yes, sir.  I remember

3  that.

4  Q.    And so you came upstairs or wherever you were, and you

5  came to see Mr. Pobre again?

6  A.    Yes, sir.

7  Q.    And you said to him what?

8  A.    That I understood that he would like to talk to me -- or I

9  think my exact words were that he would like to freely and

10  voluntarily speak to me.

11  Q.    Okay.  And then what happened?

12  A.    I believe then we walked back to the spare bedroom and

13  then Sergeant Bedell and I were seated.  I began the audio

14  recording and that's the audio recording that you're referring

15  to that we were speaking to him.

16  Q.    Did he tell you what he freely and voluntarily wanted to

17  speak with you about at 6:50 a.m.?

18  A.    Yes, sir.

19  Q.    Okay.  What did he tell you he wanted to talk to you about

20  at 6:50 a.m.?

21  A.    Off of my memory, he advised that he wanted to provide

22  passwords and pass -- passwords to gain access to the server.

23  Q.    He wanted to help with the search a little bit to --

24  right?  Is that correct?

25  A.    Yes, sir.

1  Q.   And he wanted a quid pro quo for that, didn't he?

2  A.   Yes, sir, and we corrected that.  We -- he wanted -- we

3  could not guarantee that if he provided passwords, we would not

4  be seizing the server.

5  Q.   Well, let's be clear about what we're -- that we're

6  talking about the same thing.

7  A.   I apologize.

8  Q.   He talked about whether the server would be seized, but,

9  more importantly, he was talking to you about Dr. Valencic's

10  data, her work data.

11  A.   Oh, yes, sir.

12  Q.   Do you remember that now?

13  A.   Yes, sir.  Yes, sir.  That refreshes me, yes, sir.

14  Q.   So primarily he wanted you -- he wanted to know if he

15  helped you, could he -- could you give Dr. Valencic her data

16  and not seize it.  Is that correct?

17  A.   Yes, sir.

18  Q.   All right.

19       And to jump forward for a few moments here, later that

20  day, based on your conversation, they came back to their home

21  with a large hard drive in the packaging from Best Buy so that

22  you could download Dr. Valencic's data; is that correct?

23  A.   Yes, sir.

24  Q.   All right.  That was well after in the evening, correct?

25  A.   I don't even know if I was present at that time, to be

1    quite honest.

2    Q.   So can you recall whether at 6:50 a.m. you re-Mirandized

3    them?

4    A.   I recently listened to the audio recording, and I believe,

5    yes, sir, we did.

6    Q.   Okay.  Why did you do that?

7    A.   Because I wanted to be clear that he wanted to speak to

8    me, and I wanted him again to be aware of his Miranda rights

9    and that he was choosing to waive his right to an attorney to

10   choose to speak to me.

11   Q.   There is a third recorded statement at I think it's

12   8:08 a.m.; is that correct?

13   A.   I would have -- if you're reading from my report --

14   Q.   Well, I'm actually not, no.

15   A.   Yes, sir.  If I can go back to my report?

16   Q.   Sure, go back.

17   A.   I apologize.  I knocked my binder down here and got some

18   paperwork mixed up.

19        So I'm at -- you're saying about the 6:50 interview.  I'm

20   there.  And then we have the 6:20 interview, sir.

21   Q.   So you don't recall right now the 8:08 interview because

22   it's not in your notes?

23   A.   I don't recall an interview at -- I don't -- unless there

24   is an audio recording, I don't think there was another -- there

25   wasn't an interview conducted.

1    Q.    How long, if you can recall, did the 6:50 a.m. interview

2    last?

3    A.    Again, we spent very briefly -- I don't really -- I can't

4    really approximate.  Under 20 minutes I would feel comfortable

5    saying with absolute certainty.

6    Q.    When that 6:50 a.m. interview lasted, were Mr. Pobre and

7    Dr. Valencic still wearing their pajamas?

8    A.    I believe so, sir.  I can't remember, but I wouldn't

9    challenge if they were.

10   Q.    And when you finished that interview, did you take

11   Mr. Pobre back to the living room and have him sit on the sofa

12   again?

13   A.    I believe so.

14   Q.    And were there still officers standing in the living room

15   or anywhere near the front door?

16   A.    Yes, sir.  I mean, they were definitely standing in the

17   family room.  Again, I don't know if they were blocking the

18   door, but I wouldn't challenge if somebody was standing there.

19   Q.    Now, you said that you offered throughout the day water,

20   food?

21   A.    Food, medications.

22   Q.    Medications?

23   A.    I believe so.

24   Q.    So you offered it.  Is that correct?

25   A.    I or another law enforcement officer.  Probably my

1  sergeant, especially.  My sergeant was real big on that at the

2  time, making sure food, water, medication.

3  Q.    And the reason that was needed is they had been sitting

4  there for a long time, correct?

5  A.    Yes, sir.

6  Q.    And they hadn't gone anywhere, right?

7  A.    Yes, sir.

8  Q.    They hadn't asked to go anywhere, by your own testimony,

9  right, but they also --

10 A.    They left later --

11 Q.    Right.

12 A.    They left later.  I think they asked to leave later on but

13 I don't -- at that time, they had not asked to leave.

14 Q.    And did there come a time when they asked to get dressed?

15 Were you there for that?

16 A.    I do not believe so, sir, because I was doing other

17 things.  Like, in between interviews, I had what I would deem

18 to be very minimal interactions with Mr. Pobre and his wife.

19 Q.    So you're not aware of that then?

20 A.    I don't believe so.

21 Q.    Were you aware of any time when they asked for food or

22 water?  Specifically, are you aware?

23 A.    Not specifically, no, sir.

24 Q.    Are you aware of any time when they asked to get up and

25 get a book because they were sitting there so long; they wanted

1  to read?

2  A.   I do not recall but I wouldn't challenge if that -- I

3  think that would be obliged if somebody asked for that, given

4  it was a book.

5  Q.   So it wouldn't be unusual, if they asked to go get a book,

6  that they would be permitted to stand up and go get a book?

7  A.   Yes, sir.  For search warrants, our main focus is

8  electronics.

9  Q.   Was there troopers standing in the living room until

10  Mr. Pobre and Dr. Valencic left later that afternoon?

11  A.   Given that Mr. Pobre and Mrs. Valencic were seated there,

12  yes.  Given that they were there and once they left, I do not

13  think they would just be standing there any longer.

14  Q.   Now, let's talk about when they left.  It was sometime

15  after 1420, correct?  Obviously, you spoke to Mr. Pobre at

16  1420.  Sometime after that is when they left?

17  A.   Yes.

18  Q.   And do you recall a discussion about them leaving because

19  you were going to be staying there all night, literally?

20  A.   Yes, sir.  We knew it would be uncomfortable for them to

21  keep sitting there with us as well.  So we wanted them to be --

22  let them know that they were free to go so that they could be

23  more comfortable, given law enforcement was still on the scene.

24  Q.   So at that point in time, you let them know they were free

25  to go because law enforcement was going to be there all night?

1   A.    Yes, sir.

2   Q.    By this time, do you recall if they were dressed?

3   A.    They may have still been in their night clothes.  I don't

4   recall.  I know they changed when they left, I believe.

5   Q.    All right.  I want to turn to another subject.  I didn't

6   introduce myself.  I'm Richard Finci.  Do you recall having

7   telephone conversations with me shortly after the search

8   warrant was executed?

9   A.    It's refreshing my memory.  We very well may have, sir.  I

10  don't remember the specific conversations but --

11  Q.    Do you recall receiving email from me?

12  A.    I know I've received email.  I didn't know it was from

13  you, but I remember receiving email from Mr. Pobre's counsel.

14  Q.    Right.  And do you remember those emails indicating that I

15  was -- that the person sending it was going to be Mr. Pobre's

16  attorney and that you should have conversations with me if you

17  need anything?

18  A.    Yes, sir.

19  Q.    Correct?

20  A.    Yes, sir.

21  Q.    And I asked if you would let us know if there were

22  charges, and we would surrender him.  Is that correct?  Do you

23  remember that?

24  A.    Yes, sir.  I believe so, yes, sir.

25  Q.    And also, I think there was an email between us concerning

1  Dr. Valencic's data.  Do you remember?

2  A.    It refreshes my memory.  I don't remember exactly, but I

3  know we've had conversations -- I've had conversations with his

4  counsel about that.

5  Q.    And there came a time when, in fact, in October of 2018,

6  you advised me that there were charges.  Do you remember?

7  A.    I would have to see the email.  If you're telling me that

8  I did that, I believe Mr. Pobre turned himself into the College

9  Park Barrack.

10 Q.    Okay, so let's back up.  Do you recall how that would have

11 occurred, that he turned himself into College Park Barrack?

12 A.    More than likely, you being notified or me notifying you.

13 Q.    And so did you have any conversation with -- okay.

14       After Mr. Pobre turned himself into the College Park

15 Barrack, do you know how he got from the Barrack to the

16 Hyattsville Commissioner where he was processed?

17 A.    TFC Mueller, yes, sir.

18 Q.    Do you know that because you looked at a report to refresh

19 your recollection, or do you remember?

20 A.    So I've done both.  I actually -- I work with TFC Mueller.

21 I knew TFC Mueller at that time, and I had received a field

22 arrest report, which is associated to my police report, that

23 Mr. Pobre was arrested.

24 Q.    All right.  So on the day Mr. Pobre was arrested --

25 A.    Yes, sir.

1   Q.   -- did TFC Mueller contact you and say I have Mr. Pobre;

2   I'm taking him to the Commissioner?

3   A.   If I can refer back.  I don't know the exact chronological

4   order of events.  I just know that Mr. Pobre was arrested, and

5   I was notified by -- TFC Mueller made the arrest.  I don't know

6   if TFC Mueller contacted me or if I contacted him, but I was

7   aware that TFC Mueller, knowing him personally, that he had

8   arrested Mr. Pobre.

9   Q.   So TFC Mueller, is he a member of your team or is he a

10  street officer?

11  A.   I don't know if you would find it funny, it's kind of a

12  funny situation.  He was not at this time.  He was a TFC at the

13  College Park Barrack, but TFC Mueller is now part of the

14  Maryland Internet Crimes Against Children Task Force with the

15  Computer Crime Section.

16  Q.   That's interesting.  Yes, it is funny.

17       At the time he wasn't?

18  A.   At the time he was not, sir, no.

19  Q.   But he is now?

20  A.   Yes, sir.

21  Q.   Do you know when he became a member of the Internet Crimes

22  Against Children Task Force?

23  A.   It was around March of 2020.

24  Q.   Do you know whether he had already applied to become a

25  member of the team by then, by the time Mr. Pobre was arrested?

1  A.   He was not.  He had never applied.  He was transferred

2  to -- he applied for CED, the Northern Region CED with the

3  Maryland State Police, and after being a member of the Northern

4  Region CED, he then expressed interest after some search

5  warrants there that we had had in his area to come to us.

6  Q.   So I'm not clear how you knew him already.

7  A.   Well, I guess when I say personal, personal person, he

8  was a -- I considered him a friend.  We had received trainings.

9  I can't even remember the trainings, but I just knew of him as

10 a hard worker at the College Park Barrack; and so I liked him,

11 had lines of communication and everything like that, but never

12 hung out or anything like that prior to --

13 Q.   So by reputation within the department, you knew him and

14 thought highly of him.  Is that all correct?

15 A.   That would be very accurate, yes, sir.

16 Q.   And so before he transported Mr. Pobre, I want to be

17 clear, did you know that TFC Mueller was going to transport

18 him?

19 A.   No, I did not know.

20 Q.   And did you know when he was transporting Pobre, or did

21 you find out afterwards that he had been the one?

22 A.   I feel that I was probably notified relatively quickly

23 that Mr. Pobre turned himself in, and I truly cannot remember

24 who told me that TFC Mueller served the arrest warrant, but it

25 possibly was even my sergeant or I wouldn't doubt that a

1   College Park supervisor or TFC Mueller, any of those different

2   possibilities, but I was notified.

3   Q.   Did you tell TFC Mueller that Mr. Pobre was represented by

4   counsel?

5   A.   Not to my knowledge, no.

6   Q.   When was it that TFC Mueller reported back to you as to

7   what occurred during the transport?

8   A.   I would say a short time after.  I don't know the exact

9   time.  I would say possibly the same day as October 2, 2018;

10  the same day, and I would put it at early morning,

11  mid-afternoon time.

12  Q.   And do you recall what you did when he reported back to

13  you?

14  A.   I think I -- when he told me -- or whenever I found out it

15  was him, either he reached out to me or I reached out to him, I

16  thanked him for serving the warrant for me and then we began

17  talking about what I documented in my report.

18  Q.   Okay.  And so you have a report, which is exhibit -- which

19  exhibit number is it?  I think it's 4.

20          MR. FINCI:  Could you double check, Gar?

21          THE WITNESS:  Well, I have it myself, but I can go to

22  --

23  BY MR. FINCI:

24  Q.   And it's a --

25  A.   Oh, yes, sir.

1   Q.    -- supplement narrative three?

2   A.    Yes, sir.

3   Q.    Supplement three narrative.  And that's a report you

4   generated after speaking with Trooper Mueller?

5   A.    Yes, sir.

6   Q.    Is that correct?

7   A.    Yes, sir; that's correct.

8   Q.    And it says date created on the report October 2, 2018,

9   1110 hours?

10  A.    That actually simplifies it.  Yes, sir, so it was early

11  morning, mid-morning, mid-afternoon.

12  Q.    And just to be clear, that timestamp is generated by your

13  computer; not by you?

14  A.    Oh, no, sir.  That's -- I have no control over that.  Yes,

15  sir.

16  Q.    And did you take any notes of what Trooper Mueller told

17  you anywhere?

18  A.    No, sir.  If I could speculate, I more than likely opened

19  up a supplement when I found out that he had been arrested, and

20  my notes would be my report, actually.  Like, I would document

21  the key things that I've been told and then make sure that I

22  made a legible report.

23  Q.    With respect to this narrative here, did you send it to

24  Trooper Mueller to review it for accuracy?

25  A.    I would have not -- I don't know if TFC Mueller has seen

1    this.  On that day, I would have read it to him and confirmed

2    the information.

3    Q.   And when do you think he saw this, meaning the supplement

4    three narrative?

5    A.   I don't know when.  I can't speculate on that.  I

6    apologize.

7    Q.   You said he saw.  That's why I'm asking.

8    A.   I'm sorry, sir?

9    Q.   You said he saw it a moment ago.

10   A.   Oh, so I know he has seen it this week.  I know he's

11   probably seen it -- actually, I apologize.  I can actually

12   speculate.  I sent him a copy of my report -- if I could refer

13   to my email -- two days ago, a day or two ago.

14   Q.   So you know he saw it a day or two ago, but you don't

15   recall if he saw it three years ago.  Is that accurate?

16   A.   No, sir.  That I can say that I would have -- like, over

17   the phone I would have said, hey, this is what he said?  Like,

18   asking him if what I was documenting was accurate.  And given

19   what we're having today, I sent him an email of this, and I can

20   assure you that he has seen it since then.

21   Q.   You're saying you would do that.  I'm asking you did you

22   do that?

23   A.   I apologize.  What do you want me to explain?

24   Q.   Did you over the phone read this to him and ask him if it

25   was accurate?

1    A.    Yes, sir.

2    Q.    And you did that near the time that you drafted this

3    narrative?

4    A.    Yes, sir.

5    Q.    Is that correct?

6    A.    Yes, sir; that's correct.

7              MR. FINCI:  Courts indulgence for a moment, Your

8    Honor, please.

9              THE COURT:  And just so the record is clear, is this

10   Defense Exhibit 4 that you're referring to?

11             MR. FINCI:  Yes, Your Honor.

12             THE COURT:  Okay.  So in this binder I have a 4?

13             MR. FINCI:  You do.

14        Courts indulgence for one moment.

15        (Brief pause.)

16             MR. FINCI:  That's all the questions I have, Your

17   Honor.  Thank you.

18             THE COURT:  Any redirect, Mr. Draughon?

19             MR. DRAUGHON:  Yes, brief, Your Honor.

20             THE COURT:  Okay.

21                        REDIRECT EXAMINATION

22   BY MR. DRAUGHON:

23   Q.    Sir, when you execute search warrants at anyone's house,

24   is there a certain practice with regard to whether or not you

25   let people get dressed?

1  A.    It's more what they request.  If I saw somebody in boxers

2  and no T-shirt, pants, I would obviously say, like, do you want

3  to change, get clothes on?  But if they already have night

4  clothes, I would wait for them to ask if they want to change,

5  to make it known that they want to change.

6  Q.    And I know you said you were unsure as to whether or not

7  Mr. Pobre had pajamas on during the interview.  Based on your

8  training and experience, would you have prohibited him from

9  getting dressed?

10  A.    No, I would not have prohibited him, no.  I believe, if my

11  memory serves me correct, I believe he was wearing a white

12  T-shirt and possibly night pants, like longer pants I believe.

13  Q.    It's fine.  It was a while ago.

14  A.    Yes, sir.

15          MR. DRAUGHON:  That's all I have, Your Honor.

16          THE COURT:  Any recross?

17          MR. FINCI:  No, Your Honor.

18          THE COURT:  All right.  Sir, that concludes your

19  testimony.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  You are free to leave.  Happy Friday to

22  you.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  And I appreciate your time.  All right.

25          THE WITNESS:  Thank you.  Take care.

1          (Witness excused.)

2               THE COURT:  Mr. Draughon, do you want to call your

3     next witness?

4               MR. DRAUGHON:  Yes.  The government calls Austin

5     Mueller.

6               THE COURT:  Sir, if you want to approach.

7               THE COURTROOM DEPUTY:  Please remain standing and

8     raise your right hand.

9          (Witness complied.)

10              THE COURTROOM DEPUTY:  You do solemnly swear, or

11    affirm, under the penalties of perjury, that the information

12    you're about to give to the Court, in the matter now pending

13    before, it shall be the truth, the whole truth, and nothing but

14    the truth?

15              THE WITNESS:  Yes, I do.

16              THE COURTROOM DEPUTY:  Thank you.  Please be seated.

17         (The Witness is Sworn.)

18              THE COURTROOM DEPUTY:  Please speak loudly and

19    clearly into the microphone.  Please state your full name for

20    the record and please spell your first and last name.

21              THE WITNESS:  First name is Austin Mueller -- or last

22    name is Mueller, first name is Austin.

23

24

25

1        AUSTIN MUELLER, GOVERNMENT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3    BY MR. DRAUGHON:

4    Q.    Sir, are you currently employed?

5    A.    Yes, sir.

6    Q.    By whom are you employed?

7    A.    The Maryland State Police.

8    Q.    What is your role with Maryland State Police?

9    A.    I'm an investigator for our Computer Crimes Unit.

10   Q.    Did you have the same role in September and October of

11   2018?

12   A.    No, sir.

13   Q.    What was your role then?

14   A.    At that time, I was assigned to the Maryland State Police

15   College Park Barrack.

16   Q.    And what were your duties as a barrack trooper?

17   A.    Typical duties are make traffic stops, handle calls for

18   service, make various arrests.

19   Q.    As a part of those arrests, do you occasionally transport

20   people who are arrested?

21   A.    Yes, sir.

22   Q.    I want to direct your attention to October 2, 2018.  Did

23   you transport the defendant, Mr. Pobre?

24   A.    Yes, sir.

25   Q.    Did you say anything to Mr. Pobre during your transport?

1  A.    Yes, sir.  We talked through the car -- in the car.

2  Q.    What do you typically say to people that you are

3  transporting?

4           MR. FINCI:  Objection, Your Honor.

5           THE COURT:  Sustained.

6  BY MR. DRAUGHON:

7  Q.    Do you recall what you would have said to Mr. Pobre during

8  that transport?

9  A.    Every time I transport a suspect in Prince George's

10 County, I give them -- or any county really at this point, I

11 give them a breakdown of what's going to happen when we go to

12 D.O.C. as a process for the booking.  I found in my experience

13 it makes it a lot more smoother of a process once we get inside

14 Prince George's County D.O.C.

15 Q.    Did you attempt to discuss anything related to Pobre's

16 case with him?

17 A.    No, sir.

18 Q.    What happened, if anything, after you discussed the

19 booking process with Pobre?

20 A.    At some point during that conversation, he mentioned -- he

21 made a mention about the dark web, asking if I had been on it.

22 I stated I did not.  I knew what it was, but I'd never been on

23 it at that point in my career.  And then he made a comment

24 about a collection of his, and I didn't ask anymore about it.

25 Q.    What did he say about his collection?

1  A.    He had the biggest collection.

2  Q.    Did you ask him anything about the darknet or about his

3  collection?

4  A.    No, sir.

5  Q.    Did you ask him anything during that transport?

6  A.    Relevant to the investigation, no, sir.

7  Q.    So this was roughly almost exactly three years ago.  How

8  are you confident that you didn't ask him anything?

9  A.    Sir, I never do.  That's how we're trained.

10  Q.    Do you ever --

11         MR. DRAUGHON:  That's all I have, Your Honor.  Thank

12  you.

13         THE COURT:  Okay.  Thank you, Mr. Draughon.

14                    CROSS-EXAMINATION

15  BY MR. FINCI:

16  Q.    Good afternoon, Trooper.

17  A.    Good afternoon, sir.

18  Q.    Anybody ever tell you you look like Ryan Fitzpatrick?

19  A.    Who?

20  Q.    Ryan Fitzpatrick.

21  A.    I'll take that as a compliment.

22  Q.    It is a compliment.  I think you're a little shorter, I'm

23  not positive.

24  A.    Unfortunately.

25  Q.    But you've got that beard and hairstyle just like him.

1      So you got called to the Barrack to take Mr. Pobre to the

2   Hyattsville Commissioner; is that correct?  Were you already

3   there?

4   A.   Yes, sir, I was called in.  My understanding of -- my

5   remembrance of the day was that he was -- we knew he was coming

6   in.  I got a call that he was coming in, and I was the one who

7   was told to respond to the Barrack.

8   Q.   And so it was around 8 a.m.; is that correct?

9   A.   What's that, sir?

10  Q.   Around 8 a.m.?

11  A.   Approximately, sir, yes, sir.

12  Q.   And Mr. Pobre arrived.  You knew what he was charged with;

13  is that correct?

14  A.   Sir, I knew in what relation he was charged with, but I

15  didn't know the exact charges or anything about the

16  investigation up to that point.

17  Q.   And you knew -- did you know that he was charged by now

18  Corporal Mills?

19  A.   Yes, sir.

20  Q.   And you knew Corporal Mills; is that correct?

21  A.   Vaguely.

22  Q.   All right.

23      So after you transported -- I'm going to go back to the

24  beginning in a moment, but after you transported Mr. Pobre to

25  the Hyattsville Commissioner's Office, you left him there,

1  correct?

2  A.    Yes, sir.

3  Q.    Did you have a conversation with Corporal Mills?

4  A.    Yes, sir.

5  Q.    Could you describe that conversation, please?

6  A.    Sir, I don't recall exactly what the conversation was.  I

7  did have a conversation with him telling him the two statements

8  that I previously stated.  As far as anything more, describing

9  anything, I can't describe anything more past that.  I

10  genuinely don't recall.

11  Q.    Did there come a time when you ever had a report read to

12  you by Corporal Mills?

13  A.    Yes.  During the conversation with Corporal Mills, it was

14  for the supplement of the report.  He filed a supplement, I

15  didn't, just for ease of writing the report.

16  Q.    And that's the supplement that you've seen recently; is

17  that correct?

18  A.    Yes, sir.

19  Q.    All right, good.

20        So Mr. Pobre is handcuffed next to you in your Cruiser

21  being driven to the Hyattsville Commissioner's Office, correct?

22  A.    Yes, sir.

23  Q.    The total ride took, what, ten minutes, if that?

24  A.    Approximately, sir.  Just on a given day, about 10 to

25  15 minutes.

1   Q.    And during that transport, it's fair to say that you

2   didn't advise him of his rights; is that correct?

3   A.    I don't believe I did, sir.

4   Q.    And you were made aware that he was represented by an

5   attorney; is that correct?

6   A.    I don't recall at that time, sir, but typically we are

7   aware on a typical -- that's why people turn themselves into

8   the Barrack typically.

9   Q.    Right, because you would have known that an attorney made

10  the arrangements to turn him in; is that correct?  That's why

11  you're saying that, right?

12  A.    Typically, sir; yes, sir.

13  Q.    And so during this transport, your testimony is that he

14  asked you what you knew about the dark web; is that correct?

15  A.    Yes.

16  Q.    You didn't bring it up or ask him about the dark web or

17  anything of that nature, or anything about the Internet?

18  A.    No, sir.

19  Q.    At this point in time in your career, did you have an

20  interest in becoming a computer crimes --

21  A.    Not at all, sir.

22  Q.    Investigator?

23  A.    Not at all, sir.

24  Q.    So that developed after this?

25  A.    That developed years later in a completely different

1   scenario.

2   Q.    Okay.  This was October of 2018, and you became an

3   investigator in the computer crimes in 2020?

4   A.    Yes, sir.

5   Q.    Okay.

6        And so your recollection is that he brought up the dark

7   web and then he said something about a collection; is that

8   correct?

9   A.    Yes, sir.

10  Q.    And the word he used was "collection"?

11  A.    Yes, sir.

12  Q.    All right.

13       Was there any conversation of something known as the

14  Freenet, to the best of your recollection?

15  A.    Not that I recall, sir.

16  Q.    Do you have a recollection today of exactly what he said

17  to you about the collection?

18  A.    Sir, I remember him describing it as the biggest

19  collection.  Outside of those two words, I don't recall.

20  Q.    So biggest collection?

21  A.    Biggest collection.

22  Q.    That's all you recall today?

23  A.    Yes, sir.

24  Q.    When he mentioned the dark web to you, when he mentioned

25  that first, by your testimony, did you ask him any further

1   questions about the dark web?

2   A.   No, sir.  If I recall correctly, he asked me if I had been

3   on it or if I was familiar with it in some way.  I stated I

4   wasn't and I didn't ask -- I didn't ask any further questions.

5   Q.   That's it?

6   A.   Yes.

7   Q.   And then he volunteered about his collection.  Is that

8   what your testimony is?

9   A.   Yes, sir.

10  Q.   All right, thank you.

11          MR. FINCI:  I have no further questions, Your Honor.

12          THE COURT:  Any redirect?

13          MR. DRAUGHON:  No, I don't have any questions, Your

14  Honor.

15          THE COURT:  All right.

16      Sir, that concludes your testimony.

17          THE WITNESS:  Thank you, Your Honor.

18          THE COURT:  You are free to leave.  Have a safe

19  weekend.  Thanks so much.

20          THE WITNESS:  You too, Your Honor.

21      (Witness excused)

22          THE COURT:  Government, are you calling any other

23  witnesses?

24          MR. DRAUGHON:  No, we have no other witnesses, Your

25  Honor.

1        THE COURT:  And Defense, I know you were planning on

2  calling Dr. Valencic but it is late.

3        MR. FINCI:  Yes.

4        THE COURT:  And I would imagine it's going to be --

5  is it fair to say and Mr. Pobre?

6        MR. FINCI:  Yes.

7        THE COURT:  Okay.  We're not going to get to this by

8  5 o'clock.  So I think we're going to have to find another day

9  next week where we can continue the hearing.  So why don't we

10  do that first and then we can talk about next steps.  I am,

11  remarkably enough, actually relatively open on Tuesday, Tuesday

12  or Wednesday and/or Wednesday.

13        MR. DRAUGHON:  Your Honor, I can do Wednesday.

14  Tuesday is bad for me.

15        MR. FINCI:  I can do Tuesday afternoon, Your Honor.

16  I have a short sentencing via Zoom at 9 o'clock.  I can

17  probably make it by 10:30 or any time in the afternoon.

18        THE COURT:  How about Wednesday?

19        MR. FINCI:  Yeah, that's what I meant.

20        THE COURT:  I'm sorry.  I thought I heard you say

21  Tuesday.

22        MR. FINCI:  I'm sorry if I misspoke.  I meant

23  Wednesday.

24        THE COURT:  So we could be back here by what time?

25        MR. FINCI:  I can be back here by 10:30 or any

1    time -- and then I'm available the rest of the day.

2            THE COURT:  Okay.  All right, then why don't we say

3    11 o'clock just to be -- give everybody a little bit of room on

4    Wednesday, that would be Wednesday, October 13th, to continue

5    with the testimony.

6            MR. DRAUGHON:  Your Honor, can we try for 10:30?  I

7    have a difficult child care situation that I may have to leave

8    by 1:30.

9            THE COURT:  You might have to leave by 1:30?  Yeah,

10   then if we can -- let's -- yeah, that's a good idea.  Let's

11   bring it as close to 10:30 as possible.  Does that work for you

12   all?

13           MR. FINCI:  Your Honor, I -- you know what -- it's a

14   very short sentencing.  I can do it from here.

15           THE COURT:  Okay.

16           MR. FINCI:  If you would like me to come here, it's

17   at 9 o'clock.  Hopefully they will take him right away.

18           THE COURT:  And then we'll start at 9:30 or?

19           MR. FINCI:  As soon as I'm finished, we can go right

20   in.

21           THE COURT:  That works for me.  Okay.  All right, so

22   we'll set it then for 9:30.  And I understand if, you know,

23   we're a few minutes here or there with regard to the moving

24   parts.

25       So let me ask you this, given the time is going to be

1   tight on Wednesday, do you all want to address for me now the

2   motion to compel and hear sort of some of my views on it and

3   then we can see where we are with it?

4           MR. DRAUGHON:  I defer to the Court, Your Honor.

5           THE COURT:  Defense?

6           MR. ROBBINS:  We can do it either way, Your Honor,

7   whatever is better.

8           THE COURT:  So why don't I just put out there my

9   working thoughts on it.  I do believe the first sort of

10  threshold for me is as the defense indicated, the thrust of the

11  materiality is for the suppression hearing.  I'm not seeing --

12  you know, I'm seeing that the materiality to the -- what you're

13  asking for is the source code and the training manuals.  Am I

14  getting that right?  The training information?

15          MR. ROBBINS:  That's correct, Your Honor.

16          THE COURT:  Is there anything else you're asking for

17  that I missed?

18          MR. ROBBINS:  No, Your Honor.  That will cover it.

19          THE COURT:  Okay.

20      My framework right now is predominantly on the suppression

21  motion and I do find that -- and I'm looking, you know, as an

22  illustrative example at *United States vs. Wilford*, which is

23  Judge Hollander's opinion at 961 F.Supp 2d 740, 756 that the

24  materiality consideration for Rule 16 is triggered at

25  suppression.  It can be.

1       And I find it's triggered here because the materiality

2   component at a suppression hearing is would the information

3   that is material to the motion to suppress alter the quantum of

4   proof in the defendant's favor?  That's the test that Judge

5   Hollander used.  I find that persuasive as one of the grounds

6   for materiality.

7       And I'm just cutting sort of to the quick so we can talk

8   about what does that mean.

9       I agree with that analysis, and I adopt Judge Hollander's

10  analysis and all the cases that she cited.

11      Now, defense raises law enforcement privilege as a counter

12  lead to that, and I do find that once law enforcement privilege

13  is triggered, I have to engage in that balancing analysis.  And

14  in the balancing analysis, the things that I'm thinking about

15  in terms of the defense's access to this is that I'm not sure

16  it can be obtained anywhere else.

17      I mean, I simply find Dr. Levine's explanation, which is

18  that it's at once derived from an open source and easily sort

19  of put-together-able between the paper and the Freenet to be at

20  odds with the same principle, which is that there is a special

21  secret law enforcement sauce, if you will, that should not be

22  out there for enterprising criminal minds to get their hands on

23  and infiltrate the good work of the software and its collateral

24  system.

25      As I'm understanding it from the testimony, there is the

1   Freenet Roundup and there is the ICAC Cops.  And I'm thinking

2   right now about Freenet Roundup.

3       I would like for you all to sort of address them

4   distinctly because today they came out as very distinct things,

5   and I don't want that to get sort of mashed up and here's why.

6   While I credit that -- this is very important to law

7   enforcement.  It's very important with regard to identifying

8   the individuals -- or identifying IP addresses that are linked

9   to a particular user that may be requesting this information.

10      I do find that the law enforcement system, the software

11  that is derived from Dr. Levine's algorithm is important to law

12  enforcement.  I'm not sure how else the defense can mine its

13  reliability and its accuracy but to see the source code.

14      Dr. Levine certainly testified as to the basis for the

15  government's view that its reliable and accurate but its -- you

16  know, there is a -- from the defense perspective, when you look

17  at it from where they're sitting, there is a confirmation bias

18  going on here.  I mean, there is no independent outside source

19  looking at what, in my view, reads like the same kinds of

20  algorithms that we see in other context where it sounds

21  reliable, it sounds authentic, it sounds like it will, as

22  Dr. Levine says in one of its papers, meet *Daubert*; but unless

23  it's put to the challenge and the test, we don't know that, and

24  it's the cornerstone of the search warrant affidavit.  That's

25  one.

1       And two, I still haven't heard why we can't fashion

2    safeties on this to ensure that the concerns the government has

3    elicited through Dr. Levine aren't met.

4       So the things that I'm thinking about are all the time,

5    you know, in civil work and in other work there is a

6    for-eyes-only protective order in place, for attorneys' eyes

7    and experts' eyes only and corollary agreements not to

8    disclose, not to share, to destroy after you look at it.

9       There is clean rooms that are set up for really, really,

10   really sensitive stuff for experts to look at in the criminal

11   and other context, and there has been no real conversation

12   about why there is something short of open and full disclosure

13   that can be obtained to satisfy Rule 16.

14       And squarely why I think that might be relevant here is as

15   a substantive matter, I have to tell you, I am -- I haven't

16   read everything in this binder yet, but I have read the

17   testimony from *United States vs. Hall*, and I've thought about

18   it, and I've read some cases that you all haven't cited about

19   why this very well could be a search, meaning that first step

20   of law enforcement using the software based on the algorithm to

21   gather signs, signals, communications between the Freenet users

22   that is then used for law enforcement purposes.

23       There is at least one, if not two, district judges in

24   different peer-to-peer network, you know, file sharing or

25   network sharing, I should say, peer-to-peer -- I think it was

1   BitTorrent or one of those that said that this very model that
2   was testified to today is -- it must have a warrant.  And I'll
3   give you that case so you all can think about it and tell me
4   why this case differs.

5       But unless I give the defense an opportunity to really
6   understand what is recorded, how it's recorded, and really get
7   into the nitty gritty of it, I don't think we can yet answer
8   whether this is -- the manner in which it's recorded is one
9   that would trigger Title III.  Would it trigger a search
10  warrant?  Is this, as a matter of fact, more like the defense
11  questions pointed to?  Is this like grabbing information akin
12  to other kinds of communications like email?  Or is this even
13  just communications between computers, which are I think fairly
14  captured in the plain language of the Wiretap Act?

15      We can't really get to the truth of that matter unless the
16  defense has an opportunity I think to see what in this case at
17  least for Freenet Roundup is being obtained.

18      Mr. Draughon, I have a question for you.  A lot of what I
19  read in your pleadings, now that we've had the benefit of this
20  hearing, about the concern of allowing the defense to mine a
21  database that is full of victim information really more goes to
22  ICAC Cops than it does to Freenet Roundup.  At least that's how
23  I'm hearing it.

24      I didn't hear anything in the program that Dr. Levine
25  described about identifying users using the algorithm and the

1  software that really ever got to the concern you raised in your

2  pleadings, which is allowing the defense, essentially, to

3  rummage through, you know, lots and lots and lots of law

4  enforcement investigative files.  Am I getting that right or

5  wrong?

6          MR. DRAUGHON:  Your Honor, as a preliminary matter,

7  are we going into argument today, or is that going to be held

8  off?  I suspect if it's going to be held off, I would want to

9  check that before I make a representation to the Court.  It

10  sounds like you're right, Your Honor.  It sounds like that is

11  -- the concern about victim information and suspect information

12  would be ICAC Cops.

13          THE COURT:  Right, because -- okay.  Okay.  And maybe

14  the best course of action is for us to just sort of -- you all

15  to marinade on it and we'll revisit it on Tuesday [sic], but my

16  concern is that the government's concerns really are more about

17  ICAC Cops than it is about Freenet Roundup, and the concerns

18  about the search, like whether this is a search and whether the

19  Fourth Amendment is triggered, whether there is a reasonable

20  expectation of privacy, whether Title III is at issue is really

21  about Freenet Roundup.  And if so, some of the red flags raised

22  by the government really aren't at issue here.

23      So, fundamentally, what I want you all to think about is I

24  do find it to be very difficult when the government uses a

25  program which its authenticity and its reliability has been

1  challenged by the defense.  That challenge is not frivolous.
2  It is not insubstantial.

3     The underlying methodology that has been presented has
4  been by its own creator purporting to satisfy *Daubert*.  That's,
5  I believe, in the algorithm, in the paper itself.  It is
6  purported to be accurate and reliable.  So that means there is
7  a, you know, an evidentiary threshold that you all say it will
8  be met, which is a *Daubert* standard.

9     But you also, I think, you know, referenced why is this
10  reliable, and that goes to authenticity.  And we know from
11  902.13 and 14 that when a challenge is made to -- and we can
12  look at the language together because I don't have a
13  photographic memory like Judge Grimm does, but when we look at
14  a challenge to a computer program that provides data which
15  purports to be accurate and true, if challenged, there has to
16  be some exploration for the underlying -- the underlying
17  methodology and the underlying software.

18     So, you know, with that, I'm -- that's largely why I'm
19  inclined to at least, under very tight conditions, allow the
20  defense expert, Dr. Lanterman to have access.  And that would
21  not be -- that would not be -- this is what I'm thinking about
22  -- it would not be Mr. Pobre, and it would be for attorney and
23  defense eyes only with a written advance destruction and no
24  disclosure agreement that would then be subject to contempt of
25  court if it's violated.  Any conversation about it to this

1    Court would be under seal.

2         I think I can make that sort of, you know, public access

3    determination, and I think that that satisfies the balancing

4    act that I have to do once law enforcement privilege is

5    triggered.  It's not -- you know, it's not a -- as I think the

6    defense said it right, it's not a trust us situation,

7    especially where, you know, the witness who is using it has

8    zero knowledge about how it works.  I mean, he was very candid

9    about that.  There is just, you know, I push a button.  I can't

10   tell you what it means.  I've been told it's reliable if it

11   says pass, and I rely on that.

12        So what I'm talking about really is this sort of the meat

13   of the sandwich, right.  It's the Dr. Levine gives us how he

14   created it and acknowledges that there is software he designed,

15   and then there is the end user who says I rely on it, but there

16   is all that stuff in between which is the guts of reliability

17   and authenticity.

18        And I don't find, frankly, that this is just a matter of

19   collecting IP addresses, which seemed to be where the pleadings

20   were really living for the government, which was this is -- IP

21   is public.  IP address is part of Freenet, and so if it's

22   already disclosed under the third-party doctrine, then, you

23   know, there is no expectation of privacy.  This is before that.

24   This is more, so much more than just the IP address.

25        And so for your thoughts over the weekend, so we can pick

1    up on this conversation, I would direct you to take a look at

2    *United States vs. Broy*, 209 F.Supp 3d.  It's a 2016 case.  It

3    involves a network investigation technique that was involved in

4    the playpen Tor network series.

5         And, again, this may be my sort of, you know, ignorance as

6    to why Tor network, which in that case was an open source

7    software tool, which routes communications through multiple

8    computers called nodes in order to mask a user's IP address,

9    and, thus, keeps the user's identity anonymous.  So, you know,

10   they keep the user IP address anonymous here in this one with

11   nodes.

12        In Freenet, they keep the content of the document, you

13   know, through its own mechanisms hidden; that -- you know, why

14   is it that a very similar law enforcement computer program that

15   gathers all of this information and then interprets it is

16   infringing on the defendant's Fourth Amendment rights because

17   the user did have a reasonable expectation of privacy?

18        I'd really appreciate it if you all would read it.  It

19   doesn't cite an Eastern District of Virginia case and says I

20   disagree with it, disagree with the Eastern District of

21   Virginia's analysis, and so it I think will provide us a good

22   platform to talk about this on Tuesday.

23             MR. DRAUGHON:  I think you said 209 F.Supp 3d but I

24   didn't hear the rest of it.

25             THE COURT:  209 F.Supp 3d 1045 (2016).  It's out of

1   the Central District of Illinois.

2          MR. ROBBINS:  Your Honor, may I offer a couple of

3   other cases to go into the mix?

4          THE COURT:  Sure, absolutely.

5          MR. ROBBINS:  Because things have happened since the

6   memos were filed.  There are a few of them.  One is here in the

7   Fourth Circuit, and it's not a suppression motion but it's the

8   Baltimore Air Surveillance case.

9          THE COURT:  Okay.

10          MR. ROBBINS:  And that is at 2 F. 4 330.  It's a

11   Fourth Circuit.  201 No. 21495.

12          THE COURT:  I'm sorry.  Say that again.  2 F. 4.

13          MR. ROBBINS:  330.

14          THE COURT:  Okay.

15          MR. ROBBINS:  And the case number, in case it's not

16   available by reporter because it isn't in all of the -- it's

17   201495 is the actual case number.

18          THE COURT:  201495.  Okay, that's one.  And is that

19   case -- you're citing that case for the proposition that --

20          MR. ROBBINS:  That the establishment of the Freenet

21   tool that law enforcement is using, the very establishment is a

22   search.

23          THE COURT:  I'm sorry, the what?  The establishment

24   is a search?

25          MR. ROBBINS:  Yes.

1           THE COURT:  You might want to move your microphone

2     closer to you.

3           MR. ROBBINS:  The original establishment of the

4     Freenet tool that's doing all of this collecting, that's a

5     search.

6           THE COURT:  Okay.

7           MR. ROBBINS:  In its own right.

8        There is also a case -- give me one second.  And the name

9     of that was Leaders of a Beautiful Struggle.

10          THE COURT:  Yes.

11          MR. ROBBINS:  There is a case on geofencing out of

12    the U.S. District Court in Northern -- Northern District Court

13    of Illinois.  It's called a matter of search of information

14    stored at dot, dot, dot.  It's an F.Supp 3d case.  The numbers

15    are not yet reported.  It's only available on Westlaw, 2020

16    Westlaw 4931052.  And that talks about geofencing as a

17    potential all-persons warrant.

18       There is a Florida case that I have to call to the

19    attention of the Court, even though it's not well-reasoned and

20    goes in the wrong direction in my mind, and that is *United*

21    *States vs. Sigouin*, S-i-g-o-u-i-n, 494 F.Supp 3d 1252, Southern

22    District of Florida 219, and that one is actually a Freenet

23    case, but I think the analysis broke down in a confusion in the

24    Court between hash values of blocks and requesting total files.

25          THE COURT:  Okay.

1           MR. ROBBINS:  So but at any rate, they all should be

2    in the mix for people who look at it, I think.

3           THE COURT:  Okay, that's great.  So I would -- I

4    appreciate your giving me all of that.  I'll take a look at it,

5    but, you see, that's the rub really for me to have the most

6    complete record and for the defense to have the most complete

7    ability to explain why in their view it's more like these cases

8    that the information, the manner in which the information is

9    gathered and the information itself constitutes a warrantless

10   search.

11          It can't be that I simply only hear the expert's side from

12   the government.  I mean, that's just -- it's just -- it gives

13   the defense almost nothing in terms of being able to challenge

14   it.

15          And as I heard it, it's we created, you know, in

16   conjunction with law enforcement, a tool which is a computer

17   program to perform these analyses and then the same entity and

18   institution created the model to validate it.

19          And then the thing at issue here, the software program was

20   never the thing that was peer reviewed.  I think it is a fair

21   assessment that an independent or, you know, a defense expert

22   can take an independent look at that and tell me we agree, we

23   disagree, and here's why.  You know, we don't know what the

24   defense expert is going to say, but I think it's fair when

25   we're -- when I'm trying to determine the facts to ascertain

1    whether this is a Fourth Amendment violation in the first

2    instance.

3         So with that, why don't we break, unless there is anything

4    else either side wants me to look at and/or, you know, each

5    other between now and Tuesday.

6         Is there anything, Mr. Draughon, you would like me to look

7    at?

8              MR. DRAUGHON:  Well, I have two questions, Your

9    Honor.

10             THE COURT:  Okay.

11             MR. DRAUGHON:  The first, I think you may have said

12   that there were two cases.  Was there a second case in addition

13   to --

14             THE COURT:  There was.  *Broy* I think referenced in

15   its analysis -- it referenced -- it says the court notes that

16   at least two district courts, which have considered both the

17   warrant at issue in this case and whether the respective

18   defendants had reasonable expectations of privacy in their

19   computers, have come to the conclusion that such privacy

20   expectations existed.

21        So what's notable here is law enforcement got a warrant to

22   actually put up the program that searched the user's computers

23   to explore whether the nodes were masking the IP addresses that

24   masked the obtaining of the underlying documentation, and the

25   Court went on to find that the manner in which the warrant I

1   guess was authorized was not really responsive to the Fourth

2   Amendment privacy interest and the individual defendant.

3       The two district court cases that this Court cited was

4   *Adams*, 2016 Westlaw 4212079; and *Darby*, 190 F.Supp 3d.  And at

5   this point, it is -- it's not the complete cite, but it says at

6   528 to 530.

7       And then it goes on to distinguish the reasoning from

8   Maddish or Madish (phonetic), which is the Virginia case that I

9   referenced earlier, and that's at 2016 Westlaw 3545776, Eastern

10  District of Virginia case, which goes the other way.

11      But the *Broy* court notes -- it really takes some time to

12  explain its disagreement with the rationale.

13          MR. DRAUGHON:  Thank you, Your Honor.

14      And my second question, I think the reason why we're here

15  today with only one expert is that defense expert was not

16  willing to travel.  So one issue that may short circuit this is

17  will they have an expert that would even have an opportunity to

18  look at it, or are they going to rely on the defendant?

19          THE COURT:  Well, no.  If I order this, I'm going to

20  order it for a defendant -- the identified expert,

21  Dr. Lanterman.  I mean, that's the whole purpose of his

22  affidavit.  His affidavit is I've done this before.  I've done

23  this before for a source code involving intoxilyzer, if I'm not

24  mistaken, and I was ordered by a court to do it, and I found

25  out they were unreliable when I did that.  So this is only

1  going to him.

2          MR. DRAUGHON:  Right.  And my question, Your Honor,

3  if he's unwilling to travel, then can he be an expert?

4          THE COURT:  He may not be willing to travel today but

5  -- could you tell me what's going on with that?

6          MR. ROBBINS:  If we can get the source code, we will

7  revisit that.  He's got a -- it involves the pandemic and

8  compromised members of the family and things like that as part

9  of the issue.  So we'll sort it all out.

10          THE COURT:  Okay.  Right.  So maybe between now and

11  Tuesday [sic], in the event that I rule the source code will be

12  disclosed on a very limited basis, you all could talk

13  practicalities.

14      Like, Government, there may be -- like I know you

15  preserved your objection, right, but you might have five things

16  that's really, really important to you in order to maintain as

17  much as you can the sanctity of the law enforcement interest,

18  and I am happy to hear those, and I think you should share them

19  with each other because you may come to some agreement as to

20  protocol that really would make a lot of sense to the Court.

21      And I would expect that since the defense is asking for

22  it, if I order it under very tight restrictions, they will

23  comply or not get the source code.

24          MR. ROBBINS:  We will find a way to do it, Your

25  Honor.

1          THE COURT:  What's that?

2          MR. ROBBINS:  We will find a way to do it.  If that's

3   what you order, we'll do it.

4          THE COURT:  Yes.  So that's really what I'm thinking

5   about is it would be very limited with written acknowledgement

6   that this will not be shared.  It will not be disseminated.

7   Any notes regarding it, at the conclusion of this case, could

8   be destroyed.  It could be under subject to the penalties of

9   this Court if you knowingly violate that order, and we have the

10  conversation about it under seal.  Okay?

11         Does that help, Mr. Draughon, where I'm -- sort of the

12  contours of this?

13         MR. DRAUGHON:  Yes.  And you will make a final ruling

14  on that on Wednesday?

15         THE COURT:  Correct, yeah, because the reason why I'm

16  inclined to do that is because I would like not to rule on any

17  of the substantive issues until the defense expert has an

18  opportunity to look at this and I have as robust a record as

19  possible on what it is that this software gathers and how it

20  gathers it when it's in full operation in this case.  What it

21  did, how it did it.  Because there's a lot of -- there's a lot

22  of noise in that regard, and I would like to really get to the

23  heart of it.

24         And, for example, in prior testimony of Dr. Levine, he

25  conceded in *United States vs. Hall* that there were like five

 1  categories of information, and it was substantive.  And I do

 2  think that at least -- you know, if I were adopting that

 3  testimony, that's more than just an IP address, and that gets

 4  awfully close to the kinds of signs and signals and

 5  communications between two computers that I think may very well

 6  trigger the Wiretap Act.

 7       So the defense has an opportunity, I think, to make its

 8  record in that respect, and I can only do that if I allow their

 9  expert access to the code.  Okay?

10            MR. DRAUGHON:  Yes, Your Honor.

11       And may I approach on a completely unrelated matter very

12  briefly?

13            THE COURT:  Sure.  Sure, Counsel, do you want to come

14  up?

15            MR. DRAUGHON:  It's unrelated to this case.

16            THE COURT:  Okay.  It's not a case-related --

17            MR. DRAUGHON:  No.

18            THE COURT:  Okay, yep.  That's not a problem.  Let's

19  just make sure we don't have anything else we need from anybody

20  else.

21            MR. ROBBINS:  Defense is good, Your Honor.

22            THE COURT:  All right, very good.  See you all on

23  Wednesday at 9:30.

24            MR. ROBBINS:  Thank you, Your Honor.

25            THE COURT:  Thank you.

1        (Recess taken, 5:05 P.M.)

2

3        I, Marlene Kerr, FCRR, RPR, CRR, RMR, certify that the

4    foregoing is a correct transcript of the stenographic record of

5    proceedings in the above-entitled matter.

6

7                    Dated this 16th day of October, 2021.

8
                                    /s/
9    _____
                                Marlene Kerr
                        Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25