IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO.  PX-19-348** |
| | * | |
| **ALAKOM-ZED CRAYNE POBRE,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | ****** | |

**GOVERNMENT'S SUPPLEMENTAL BRIEF OPPOSING
DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE**

The United States of America, by and through its attorneys, respectfully submits this supplemental brief in opposition to Defendant Alakom-Zed Pobre's Motion to Suppress Physical Evidence (ECF Nos. 46 and 47). As explained below, Pobre did not have an expectation of privacy for his peer-to-peer internet activity and law enforcement's logging of his requests did not constitute a Fourth Amendment search. Not only was the logging not a search because the logging was based on Pobre's direct—though unwitting—communication with law enforcement nodes, courts have consistently found that there is no reasonable expectation of privacy in Internet activity. For these reasons, the Motion should be denied.

**I.      FACTUAL BACKGROUND**

   **A.      Testimony on October 8, 2021**

The following summaries focus on the portions of testimony relevant to the issue of whether the logging of Pobre's communications with law enforcement nodes constituted a Fourth Amendment Search.

1. <u>Dr. Brian Levine</u>

Dr. Levine, an expert in networks and security, offered up an operational overview of the Freenet platform. Freenet is a peer-to-peer network of nodes that communicate with each other for storing and retrieving data files. Each node maintains its own local datastorage for reading and writing, as well as IP addresses of other nodes connected as peers. *See* Hr'g Tr. at 148:6–151:2, Oct. 8, 2021. The system operates as a cooperative distributed file system.

Dr. Levine explained that Freenet users choose between low security mode, high security mode, and custom settings when they sign up to use the platform. Hr'g Tr. at 29:20–30:24. In fact, the user's screen displaying on Freenet when the user is downloading a file provides a continuous reminder of the security level at the bottom of the page, which is labeled as "LOW" when using low security mode. *See* Hr'g Tr. at 44:21–24. Law enforcement ("LE") nodes only operated in low security mode.

In low security mode—which the defendant operated in during all relevant times—the Freenet installation screen warns users that "an attacker with moderate resources may be able to trace your activity on Freenet back to you." Hr'g Tr. at 30:10–11. Dr. Levine explained that the screens that the user would see on Freenet notifies the user that their IP address and general location are shared with their peers. Hr'g Tr. at 42:15–25. Freenet users are repeatedly advised that their identities are routinely discoverable by other users when operating in low security mode, principally because in low security mode, you are effectively connecting to strangers on Freenet (in contrast high security mode connects you to your trusted friends). Hr'g Tr. at 32:11–22. Thus, as the Freenet website states in low security mode it is "quite easy for others to discover your identity." Hr'g Tr. at 34:20–21.

When a user's node is operating Freenet in low security mode, his computer will freely connect with other unknown Freenet users—often called "strangers" on the Freenet website—which establishes a peer connection. As a part of this peer connection process, the computers exchange their IP address, how long they've been connected to the other user's node, what version they're running, and an estimate of the geography of where they are. Hr'g Tr. at 42:16–23. Anyone else using Freenet who connects to the user's node as a peer can see the IP address and other information associated with the user's computer. Dr. Levine noted that the connected nodes then can see a user node's IP address. Hr'g Tr. at 42:16–23; 92:5–9 (agreeing that "any user on Freenet, the node, can only get the IP address and the number of peers from the direct software that has communicated with it"). The LE nodes operate the same as other Freenet nodes when establishing peer connections. "[T]he law enforcement nodes don't control who they are connected to or where those neighbors might be." Hr'g Tr. at 93:19–21. The LE nodes—though undercover—operate in this manner just as any other Freenet node and thus exchange the same information when peer connections are made with other nodes operating in low security mode. A Freenet node, including a LE node, can only see the IP address of its peers and cannot see the IP addresses of its peer's neighboring nodes. Hr'g Tr. at 92:4–9; 141:7–8.

If a Freenet user, like this defendant (i.e., User A) directed his node to download a file, his Freenet software would send requests for the file to his Freenet peers, which in low security mode are called strangers on the Freenet website. Hr'g Tr. at 66:13–17. The requests would directly and intentionally send his IP address, the file requested, and how many peers he has to his peers. Hr'g Tr. at 91:12–18. Although law enforcement operates a slightly modified version of the Freenet software, a LE node is only able to observe requests for files that are directly and intentionally sent to the LE node operating in an undercover manner. An LE node is the intended recipient of the

requests it receives; it does not affirmatively hunt for other users' files, nor does it solicit requests from Freenet users.

Dr. Levine, as "a primary person who helped design that software," Hr'g Tr. at 22:25, explained that the only difference between the law enforcement software and the standard Freenet software run by Freenet users is that law enforcement software logs the information sent to their node by a requestor, Hr'g Tr. at 77:6–10. A copy of these requests is forwarded to the ICAC Cops server, which filters out and stores only requests for files related to child exploitation material. As Dr. Levine stated, the law enforcement Freenet software is just taking notes by recording the requests for files related to CSAM "very carefully for the law enforcement officer." Hr'g Tr. at 78:9–12.

### 2. Officer Cory Mills

Officer Cory Mills's testimony about his operation of his LE node was consistent with the usage outlined by Dr. Levine. When asked what he did with the LE node on Freenet, Officer Mills explained, "I simply have the program downloaded to my undercover computer. I allow that to run just simply so that it can receive requests on the Freenet network. I do not do anything further with it except for download files to confirm that it is child pornography or not." *Id.* at 200:8–19. During his Freenet investigations, Officer Mills can search through the database on ICAC Cops, which stores the requests for files related to child exploitation materials that were received by other LE nodes. Because this database is limited to requests made to LE nodes related to child exploitation materials, Officer Mills said that he was unable to search for requests that were made to Freenet users who were not LE nodes, *id.* at 199:20–22, nor was he able to review the activity of nodes that had not been in touch with LE nodes, *id.* at 200:8–19.

During cross examination, Officer Mills confirmed that his node is "just sitting out there on the Freenet like any other node" and "not telling the rest of the Freenet that it's anything special," and that his node just logs the "requests that it receives." *Id.* at 210:13–19. He explained that the LE node does not inform him that it has logged any information. Moreover, as a Freenet LE node operator, Officer Mills does not know what file requests the node is logging at any point. *Id.* at 210:24–211:5. The data is automatically sent to the ICAC Cops database to be compared "against the known and identified blocks that are related to CSAM." *Id.*

### B.   Declarations of Dr. Brian Levine and Detective Robert Erdely

To address this Court's questions, the Government has attached declarations by Dr. Brian Levine, Ex. A, and Detective Robert Erdely, Ex. B. The total number of Freenet nodes is not published, so in an effort to estimate the total number of Freenet nodes operating in June of 2018, Dr. Levine turned to work done on Freenet which counted the number of nodes which had connected to nodes operated by research team. In January 2017, Dr. Levine's team observed unique identifiers for over 42,000 nodes, with an average of 4,200 per day. Ex. A ¶ 6. They also observed 58,000 nodes during an eight-week period in 2012 and 17,000 nodes in March 2020, which averaged about 4,600 per day. *Id.* "With law enforcement operating no more than 45 nodes on any one day in June 2018, this would make law enforcement nodes approximately 1% of the total Freenet network when comparing to the reports of 4,200 or 4,600 nodes per day discussed above." Ex. A ¶ 7.

Detective Erdely explained how ICAC Cops stores and analyzes data obtained by the law enforcement nodes on Freenet:

> To do this, Law Enforcement runs a Law Enforcement version of Freenet which simply passes a copy of all requests received by the node to ICAC Cops where the requests are filtered. Only those requests for blocks known to be associated with child exploitation material and may be forwarded 16, 17, or 18 times are logged.

> This filtering process is based on matching the hash values of the requested pieces to those hash values stored in the ICAC Cops system. ICAC Cops does not log each and every request it receives, it only logs those that match hash values of these pieces of files identified by Law Enforcement as relating to child exploitation. I confirmed this by checking the hash values of all requests logged on ICAC Cops and observed that all logged requests were seeking blocks associated with one of the 150,882 files ICAC Cops records as being associated with child exploitation material.

Ex. B ¶ 19.

## II.   ARGUMENT

### A.   There is No Expectation of Privacy for Internet Activity on Peer-to-Peer Networks.

As noted in Government's Omnibus Response in Opposition to Defendant's Motions, courts—including the District of Maryland—have agreed that the method used by law enforcement on Freenet does not constitute a search because individuals do not have an expectation of privacy with their peer-to-peer activity on the Internet. ECF No. 50 at 18–19.

Putting aside the direct communication that occurs on Freenet, courts have relied on the third-party doctrine, which "provides that information voluntarily disclosed to a third party, including an undercover government agent, is not protected by the Fourth Amendment." *United States v. Dickerman*, No. 4:16-CR-00258-HEA-NAB-1, 2017 U.S. Dist. NEXIS 226787, *33 (E.D. Mo. Sept. 26, 2017). "Federal courts are in agreement that an individual does not have a reasonable expectation of privacy in files he makes available for download on a conventional peer-to-peer file sharing network." *Id.* at *37. In *United States v. Dickerman*, the court explained that "Freenet is intended to protect anonymity, however that leads to anonymous association. Dickerman knowingly downloaded an application that networked his computer with those of complete strangers for the purpose of sharing files. In doing so, he assumed the risk that one of his associates would be less than trustworthy." *Id.* at *40.

Courts that *have* found an expectation of privacy in similar information have made that determination based on the defendant's expectation of privacy with his computer, not his internet use. Importantly, those cases did not involve peer-to-peer Internet activity. In those cases, law enforcement developed techniques to actively search a defendant's computer, as opposed to passively logging contacts made with LE nodes. For example, in *United States v. Adams*, the court explained that "[c]omputer users lack a legitimate expectation of privacy in information regarding the to and from addresses for emails, the IP addresses of websites visited, the total traffic volume of the user, and other addressing and routing information conveyed for the purpose of transmitting Internet communications to or from a user." *United States v. Adams*, No. 6:16-cr-11-Orl-40GJK, 2016 U.S. Dist. LEXIS 105471, *9–10 (M.D. Fla. Aug. 10, 2016). The court further explained that the defendant's expectation of privacy in his IP address is lost once he discloses the IP address to the peer-to-peer network. *Id.* at *11–12. However, the court reasoned that Adams's computer was subject to a Fourth Amendment search because the defendant's IP address was obtained via the NIT: "The NIT searches the user's computer to discover the IP address associated with that device. Therefore, one's expectation of privacy in that device is the proper focus of the analysis, not one's expectation of privacy in the IP address residing in that device." *Id.* at *14 (denying defendant's motion to suppress based on attenuating circumstances).

Other district courts have likewise determined that a Fourth Amendment search existed when law enforcement searched a defendant's computer. In *United States v. Broy*, the court noted: "Whether Broy had a reasonable expectation of privacy in his computer and its contents is equally as important as whether he had one in his IP address. This is so because the NIT was designed to yield more than just Broy's IP address. Rather, it was designed to enter Broy's computer and gather seven different pieces of information." *United States v. Broy*, 209 F. Supp. 3d 1045, 1052 (C.D.

7

Ill. 2016) (denying a motion to suppress after finding that the use of a network investigative technique to enter defendant's computer constituted a Fourth Amendment search). Similarly, in *United States v. Darby*, the FBI obtained a warrant to deploy a Network Investigative Technique to determine the IP addresses of individuals who logged into Playpen. *United States v. Darby*, 190 F. Supp. 3d 520, 526 (E.D. Va. 2016). The court found that the government's deployment of the NIT was a Fourth Amendment search because "the code placed on Defendant's computer caused Defendant's computer to transmit certain information without the authority or knowledge of Defendant. . . . it is irrelevant that Defendant might not have a reasonable expectation of privacy in some of the information searched and seized by the government." *Id.* at 530 (finding that suppression is not warranted).

Where courts have found a reasonable expectation of privacy to exist in an individual's computer-related information, such courts have drawn a crucial distinction between non-private information voluntarily shared via the internet in connection with a user's internet communications—as in this case—and the search of private information stored on an individual's computer. The instances in which courts determined there was a Fourth Amendment search when law enforcement accessed a defendant's computer does not disturb the reasoning that surveillance of internet activity does not constitute a Fourth Amendment search. *See, e.g.*, *United States v. Forrester*, 512 F.3d 500, 509 (9th Cir. 2008) ("Alba contends that the government's surveillance of his e-mail and Internet activity violated the Fourth Amendment and fell outside the scope of the then-applicable federal pen register statute. We hold that the surveillance did not constitute a Fourth Amendment search and thus was not unconstitutional.").

### B. *Carpenter* and *Leaders* Focused on the Broad Collection of Physical Movements, which is not Implicated in the Present Case.

1. *Carpenter v. United States*, 138 S. Ct. 2206 (2018)

In *Carpenter v. United States*, the Court addressed the question of "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements." 138 S. Ct. 2206, 2211 (2018). It considered the issue in the context of the government obtaining "12,898 location points cataloging Carpenter's movements—an average of 101 data points per day." *Id.* at 2212. Noting that "'a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties'" and that "the Government is typically free to obtain such information from the recipient without triggering Fourth Amendment protections," *id.* at 2216 (citations omitted), the Court ultimately held "that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI," *id.* at 2217.

When explaining its rationale, the Court said:

> Unlike the bugged container in *Knotts* or the car in *Jones*, a cell phone—almost a "feature of human anatomy," *Riley*, 573 U. S., at ___ (slip op., at 9)—tracks nearly exactly the movements of its owner. While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. . . . Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user.

*Id.* at 2218. The Court expressed concern that "[w]hoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years, and the police may—in the Government's view—call upon the results of that surveillance without regard to the constraints of the Fourth Amendment. Only the few without cell phones could escape this tireless and absolute surveillance." *Id.* Based on these concerns, the Court found that the government "invaded

Carpenter's reasonable expectation of privacy in the whole of his physical movements." *Id.* at 2219.

The Court diligently explained that its holding was limited to the constant surveillance in physical movements created by cell site location information ("CSLI"). The Court reasoned that applying the third-party doctrine in the context of CSLI would be a "significant extension of it to a distinct category of information" because there is a "world of difference between the limited types of personal information addressed in *Smith* and *Miller* and the exhaustive chronicle of location information casually collected by wireless carriers today." *Id.* at 2219. The Court explained that *Carpenter* is "not about 'using a phone' or a person's movement at a particular time. It is about a detailed chronicle of **a person's physical presence compiled every day, every moment, over several years**. Such a chronicle implicates privacy concerns far beyond those considered in *Smith* and *Miller*." *Id.* at 2220 (emphasis added). The Court noted that "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society" and that the "cell phone logs a cell-site record by dint of its operation, without any affirmative act on the part of the user beyond powering up." *Id.* "Apart from disconnecting the phone from the network, there is no way to avoid leaving behind a trail of location data. As a result, in no meaningful sense does the user voluntarily 'assume[] the risk' of turning over a comprehensive dossier of his physical movements." *Id.* Because of the unique ability of a cell phone to track a person's physical movements with CSLI, the Court emphasized that its decision in *Carpenter* was "a narrow one" that does "not disturb the application of *Smith* and *Miller* or call into question conventional surveillance techniques and tools, such as security cameras. Nor do we address other business records that might incidentally reveal location information." *Id.*

2. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330 (4th Cir. 2021)

The Court of Appeals for the Fourth Circuit grappled with the *Carpenter* decision and how it impacts the broad collection of physical movements observable through aerial surveillance. In *Leaders of a Beautiful Struggle v. Balt. Police Dep't* ("*Leaders*"), the Fourth Circuit considered a program, AIR, that enabled "photographic, retrospective location tracking in multi-hour blocks, often over consecutive days, with a month and a half of daytimes for analysts to work with." 2 F.4th 330, 342 (4th Cir. 2021). "AIR data is a photographic record of movements, surpassing the precision even of GPS data and CSLI, which record variable location points from which movements can be reconstructed. And while the coverage is not 24/7, most people do most of their moving during the daytime, not overnight." *Id.* at 343. The Fourth Circuit ultimately held that accessing AIR data is a Fourth Amendment search because "the AIR program enables police to deduce from the whole of individuals' movements." *Id.* at 333, 345.

In applying the reasoning set forth in *Carpenter*, the Fourth Circuit noted that the "touchstone in *Carpenter* was the line of cases addressing 'a person's expectation of privacy in [their] **physical location and movements**.'" *Id.* at 340 (emphasis added). In determining that *Carpenter* applies to *Leaders*, the Fourth Circuit explained,

> More like the CSLI in *Carpenter* and GPS data in *Jones* than the radio-beeper in Knotts, the AIR program 'tracks every movement' of every person outside in Baltimore. *See id.* at 2215-19. Because the data is retained for 45 days—at least—it is a 'detailed, encyclopedic,' record of where everyone came and went within the city during daylight hours over the prior month-and-a-half. *See id.* Law enforcement can 'travel back in time' to observe a target's movements, forwards and backwards. See id. at 2218. Without technology, police can attempt to tail suspects, but AIR data is more like 'attach[ing] an ankle monitor' to every person in the city. *See id.* 'Whoever the suspect turns out to be,' they have 'effectively been tailed' for the prior six weeks.

11

*Id.* at 341. It noted that the aerial nature of the AIR program, like the cell phone technology in *Carpenter*, was only incidental to the controlling issue of privacy in "'physical location and movements'" *Id.* at 345.

*Leaders*, as *Carpenter* did previously, focused on broad collections of information voluntarily disclosed that reveal physical movement, which is tracked over extended periods of time. Neither limited ruling changes the expectation of privacy in peer-to-peer activity on the Internet. As explained below, the Defendant had no expectation of privacy in his Freenet activity, so there is no Fourth Amendment search.

      C.     *Carpenter* and *Leaders* Did Not Modify the Lack of Privacy Expectations for Internet Activity on Peer-to-Peer Networks.

Before the Fourth Circuit applied *Carpenter* to *Leaders*, it rejected the argument that *Carpenter* applied to IP addresses and subscriber information in *United States v. Wellbeloved-Stone*. Based on the precedent that a defendant "does not have a subjective expectation of privacy in his internet and phone subscriber information because by voluntarily conveying all this information to his internet and phone companies, a defendant assumes the risk that those companies would reveal that information to police," *United States v. Wellbeloved-Stone*, 777 F. App'x 605, 607 (4th Cir. 2019) (citations, quotation marks, and edit marks omitted), the Fourth Circuit found that "Wellbeloved-Stone had no reasonable expectation of privacy in his IP address or subscriber information," *id.* Addressing the applicability of *Carpenter* directly, the Fourth Circuit noted that the Court "explicitly emphasized the narrow scope of its holding, *id.*, and Wellbeloved-Stone cites no post-*Carpenter* authority extending *Carpenter*'s rationale to IP addresses or subscriber information. Accordingly, under *Bynum*, Wellbeloved-Stone had no reasonable expectation of privacy in his subscriber information, and the Government did not perform a Fourth Amendment search by obtaining that information." *Id.*

12

Beyond the Fourth Circuit, the First Circuit (IP address and images uploaded), Fifth Circuit (IP address in website's records), Sixth Circuit (IP address), Seventh Circuit (IP addresses of websites visited), Eighth Circuit (files shared on peer-to-peer network), Ninth Circuit (IP address), and Eleventh Circuit (IP address and email address) all rejected attempts to apply *Carpenter* to CSAM cases in which law enforcement obtained IP addresses or other information that defendants shared on the Internet.

In *United States v. Trader*, the Eleventh Circuit determined that the defendant "conveyed his internet protocol address and email address to a third party when he logged into Kik. And he did so voluntarily, affirmatively acting to open the app and log in, and without taking available steps to avoid disclosing his internet protocol address." 981 F.3d 961, 967 (11th Cir. 2020). The Eleventh Circuit noted that *Carpenter*'s "narrow" exception did not apply to "ordinary business records like email addresses and internet protocol addresses." *Id.* at 967–68. The Eleventh Circuit further noted that "the Court made clear that it did not address 'other business records that might incidentally reveal location information.' . . . Indisputably, email addresses and internet protocol addresses were not at issue in *Carpenter*." *Id.* at 968. Observing that *Carpenter* focused on privacy expectations in individual movement, the Eleventh Circuit reasoned that neither IP addresses or emails were the kind of information that recorded an individual's location and that IP addresses were the "kind of 'business record[] that might incidentally reveal location information' falls outside *Carpenter*'s narrow exception to the third-party doctrine. *Carpenter*, 138 S. Ct. at 2220." *Id.* at 968–69.

The Sixth Circuit, Ninth Circuit, and Fifth Circuit have all similarly rejected an argument that the defendant had an expectation of privacy in their Internet activity under *Carpenter*. *See, e.g., United States v. Popa*, No. 19-3807, 2020 U.S. App. LEXIS 17212, *11–12 (6th Cir. May 29,

2020) ("The Court did not overrule the third party doctrine, but simply found that '[g]iven the unique nature of cell phone location information, the fact that the government obtained the information from a third party does not overcome' Fourth Amendment protections."); *United States v. Vandyck*, 776 F. App'x 495, 496 (9th Cir. 2019) (finding that *Carpenter* does not alter the precedent that Internet users have no expectation of privacy in the IP addresses of websites they visit); *United States v. Contreras*, 905 F.3d 853, 857 (5th Cir. 2018) ("The information at issue here falls comfortably within the scope of the third-party doctrine. Frontier's records revealed only that the IP address was associated with the Contreras's Brownwood residence. They had no bearing on any person's day-to-day movement. Contreras lacked a reasonable expectation of privacy in that information.").

In *United States v. Soybel*, the court held that a pen register that captured the IP addresses of all the sites the defendant visited was not a search under *Carpenter*. 13 F.4th 584 (7th Cir. 2021). The court rejected the defendant's argument that the pen register performed a search because it "might provide an 'intimate window' into his 'familial, political, professional, religious, and sexual associations,'" explaining that this claim would also be "true for telephone pen registers like the one the Court approved in Smith." *Id.* at 593. The court also held that *Carpenter* was "distinguishable on the extent to which Soybel assumed the risk by voluntarily communicating with third parties." The court explained: "An internet user creates connection data by making the affirmative decision to access a website, just as the user of a landline generates a telephone-number record solely by choosing to dial it. . . . And here, Soybel took the affirmative step of downloading the desktop client and connecting to Grainger's servers remotely." *Id.* (internal quotation marks omitted).

14

The First Circuit found that *Carpenter* did not disrupt the third-party doctrine's application to an IP address and images uploaded to a server hosting CSAM. In *United States v. Morel*, the defendant argued that *Carpenter* has "effected a sea change in the law of reasonable expectation of privacy, and he is the beneficiary of that change, both as to his IP address information and the images uploaded to Imgur." 922 F.3d 1, 8 (1st Cir. 2019). The First Circuit found that the defendant's argument "fails under *Carpenter* and under post-*Carpenter* caselaw." *Id.* Noting that "*Carpenter* held that 'an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI [cell-site location information],'" the First Circuit stated that the third-party doctrine is applicable post-*Carpenter* even when the defendant voluntarily turn over information to third parties "on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed," *id.* at 8–9 (quotation marks omitted). And like Pobre in this matter, the Sixth Circuit observed that "Morel did not choose one of the more private website alternatives which exist." *Id.* at 10.

In *United States v. Shipton*, the Eighth Circuit found that the defendant did not have an expectation of privacy in his anonymous peer-to-peer Internet communications. *See* 5 F.4th 933, 935–36 (8th Cir. 2021) ("The difficulty for Shipton is that we held, after *Carpenter*, *Riley*, and *Jones*, were decided that 'a defendant has no legitimate expectation of privacy in files made available to the public through peer-to-peer file-sharing networks.'").

### D. Law Enforcement's Logging of Pobre's Direct Communications with LE Nodes Did Not Constitute a Fourth Amendment Search.

Before addressing why Pobre did not have an expectation of privacy for his peer-to-peer activity, it is important to note that there is no Fourth Amendment search because the LE nodes in this matter were parties to the communications with Pobre's node. As part of the process of requesting a file related to CSAM, Pobre sent his requests directly to strangers, one of which was

a LE node making LE a party to his communication. *See* 18 U.S.C. § 2511(2)(c) ("It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."). As explained by Dr. Levine in his in-court testimony, the LE nodes only logs data from requests that the LE node directly receives. Hr'g Tr. at 42:16–23; 92:5–9 (agreeing that "any user on Freenet, the node, can only get the IP address and the number of peers from the direct software that has communicated with it"). Pobre misplaced his trust in the strangers he connected to as peers when he sent out a request for files related to CSAM. The analysis of whether there is a Fourth Amendment search should end there.

However, even if this Court assumed, for the sake of argument, that LE nodes logged Pobre's requests while not being a recipient of the requests, Pobre did not have a reasonable expectation of privacy in his Freenet activity and there is still no Fourth Amendment search. In *United States v. Sigouin*, the Southern District of Florida rejected the defendant's argument that he had an expectation of privacy in "the information that his computer was transmitting and/or making freely available to his neighbors on the Network." 494 F. Supp. 3d 1252, 1265 (S.D. Fla. 2019). As is the case with the CSAM investigation involving Pobre, the court noted that the FBI did not extract information from the defendant's computer and did not "obtain any information that was unavailable to other Network users. Mr. Sigouin's computer was operating in opennet mode. The FBI monitored and logged information that Mr. Sigouin's computer was voluntarily and openly making available to others on the Network." *Id.* at 1262. The court outlined the data logged by law enforcement nodes and explained why they should not be considered contents of communication:

16

> "Contents of a communication include "any information concerning the substance, purport, or meaning of" a communication. *See* 18 U.S.C. § 2510(8). The modified software logged the following pieces of data from Mr. Sigouin's computer: (1) the number and identity of his neighbors, (2) the HTL count for the request, (3) the hash value of the block being requested, (4) Mr. Sigouin's computer's address on the Network, and (5) the date and time of the request. The HTL value, the network address, and the date and time of the request are necessary for the recipient node to process the request, including returning a block to the requestor if one is found. They are the equivalent of "dialing, routing, addressing, or signaling" information commonly obtained through a pen register, which is distinct from "contents." *See* 18 U.S.C. § 3127(3). Similarly, the number and identity of Mr. Sigouin's neighbors do not contain any information that reflects the substance or meaning of a message. This information also cannot fairly be considered "contents."

*Id.* at 1263–64.

The logic that the Southern District of Florida used applies here. All of the information collected about Pobre's computer was information that he shared with the nodes connected as peers. He opted to use Freenet in low security mode and share that data with strangers, including some that happened to have been LE nodes. And perhaps more importantly, Pobre could hardly establish a reasonable expectation of privacy when there were constant reminders during set up and use that explicitly notified him that his activity was not private making his activity traceable by others. Furthermore, LE nodes only acted as benign receptacles of information and logged communications that they received, rather than solicited. Given those facts, Pobre did not have an expectation of privacy for his activity on Freenet.

In addition to Pobre not having a reasonable expectation of privacy, the number of LE nodes operating on Freenet does not come close to the type of near-constant surveillance that could compile the "comprehensive dossier" that the *Carpenter* Court and *Leaders* court expressed concern about. Though not a case about internet activity, the Western District of Pennsylvania recently considered the applicability of *Carpenter* to automatic license plate readers ("ALPRs"). In *United States v. Bowers*, ALPRs captured the defendant's "license plate on 106 occasions in 33 different ALPR locations between June 1, 2018 and October 19, 2018. *United States v. Bowers*,

17

No. 2:18-CR-00292-DWA, 2021 U.S. Dist. LEXIS 196899, *2 (W.D. Pa. Oct. 11, 2021). In response to the defendant's argument that the ALPR system was similar to the CSLI in *Carpenter*, the court stated, "[e]ven in the aggregate, the ALPR cameras capability to capture multiple shots of a single vehicle and/or store historical data does not approach the near-constant surveillance of cell-phone users public and private moves that so concerned the Court in *Carpenter*. Rather, the technology is more akin to the conventional surveillance methods, such as security cameras, that the *Carpenter* Court was careful not to call into question." *Id.* at *8. The court also addressed the defendant's argument that the ALPRs were similar to the surveillance seen with AIR technology in *Leaders*:

> The Court of Appeals applied *Carpenter* to the AIR technology, finding that, similar to the CSLI data in Carpenter, the AIR program 'track[ed] every movement' of every person outside in Baltimore and created a 'detailed, encyclopedic,' record of where everyone came and went within the city during daylight hours over the prior month-and-ahalf. The Court further likened the AIR data collection to attaching an ankle monitor to every person in the city. Because the AIR program opened 'an intimate window' into a person's associations and activities, the Court held that it violated the reasonable expectation of privacy individuals have in the whole of their movements and, thus, constituted a search within the meaning of the Fourth Amendment.

*Id.* at *12–13. The court made the correct decision that "the ALPR technology and data-collection at issue here simply do not approach those levels." *Id.* at *14.

The rational applied in *Bowers* applies here. The LE nodes on Freenet do not compile a "24/7, 365" journal of a Freenet user's activity. They do not even take note of all file-sharing activity. The LE nodes do not even note all CSAM file sharing on the Freenet network. The Freenet tool used by LE only records the requests for files related to CSAM that are directly sent to LE nodes—a far cry from the detailed recordings of physical movements made by every member of the public in the CSLI of *Carpenter* or the drones of *Leaders*. The presence of LE nodes on Freenet accounted for about 1% of all Freenet users during the period in which Pobre's activity was logged.

Pobre's effort to describe Freenet RoundUp as some sort of dragnet that indiscriminately sweeps up data is pure hyperbole. *See United States v. Shipton*, 5 F.4th 933, 936 (8th Cir. 2021) ("Shipton decries what he calls the government's 'dragnet surveillance' through programs like RoundUp eMule and the CRC's maintenance of vast databases of hash values connecting known or suspected child pornography to IP addresses where those files were offered for sharing, invoking images of an Orwellian dystopia. His concerns are overstated. These programs and databases contain only information that users of peer-to-peer networks have deliberately chosen not to keep private."). Even if the presence of LE nodes approached the levels seen in *Carpenter* or *Leaders*, which the government submits it does not, the volume of law enforcement participation in Freenet would not be relevant; the issue instead is Pobre's Internet activity, which under the case law previously cited does not raise a reasonable expectation of privacy, and does not involve the comprehensive chronicling of physical movements that the Court and the Fourth Circuit sought to protect in those cases.

### III.   CONCLUSION

For the reasons set forth above, the Government requests that the Court deny Defendant Pobre's Motion to Suppress Physical Evidence.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____
Dwight J. Draughon Jr.
Assistant United States Attorney

Dated:  November 3, 2021

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 3, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                                                Dwight J. Draughon Jr.
                                                Assistant United States Attorney