**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STATE OF MARYLAND | : | |
| vs. | : | Case No.    8:19-cr-00348-PX |
| ALAKOM-ZED CRAYNE POBRE | : | |
| Defendant | : | |

**DEFENDANT'S POST-HEARING MEMORANDUM IN
SUPPORT OF MOTION TO SUPPRESS (AS TO WARRANTLESS
SEARCH AND EXPECTATION OF PRIVACY ISSUE ONLY)**

Comes now the Defendant, Alakom-Zed Crayne Pobre, by and through, Richard A. Finci,

Esquire and the Law Offices of Houlon, Berman, Finci & Levenstein, LLC, counsel, and G

Arthur Robbins, Esquire and CHESAPEAKE MERIDIAN, co-counsel, in reply to the Government's

Post Hearing Memorandum (ECF Document 73) respectfully states as follows:

**I.      Introduction**

This case is about a dragnet Government surveillance system, domestically deployed in

an internet overlay known as Freenet, without judicial supervision or probable cause. This stage

of the proceedings is focused solely upon the failure of the Government to comply with the

dictates of the Fourth Amendment; even if the surveillance were constitutionally valid, there

remain significant issues of reliability of the deployed investigative technique that cannot be

resolved without further discovery from the Government. The reliability issues would void the

warrant in this case; however, they are moot in the face of the constitutional invalidity of the

extra-judicial dragnet search in the first instance.

## II.    <u>Factual Background</u>

### a.    <u>The Freenet</u>

Freenet serves as "a privacy enhancing technology supporting the anonymous publication and retrieval of data"[1] that "has been consistently used by thousands of users a day for decades."[2]

> Freenet can be thought of as a large storage device. When you store a file in it, you receive a key which can be used to retrieve the file. When you supply Freenet with a key, it returns the appropriate file (if it is located). The storage space is distributed among all connected nodes on Freenet.
> Freenet is a peer-to-peer network which is both decentralized and anonymized. The nodes that you connect to only know their nearest neighbours [sic] and have no idea about how the network as a whole is structured.[3]

"Files published to Freenet are fragmented into small, encrypted blocks that are dispersed randomly throughout the network of peers." [4] In techno-speak, Freenet "is an overlay network that operates as a distributed data store, with each participating node anonymously contributing key value storage to encrypted blocks of data."[5]

The user has little or no control over what is stored in [his/her] datastore. Instead, files are kept or deleted depending on how popular they are. This allows Freenet to be censorship-resistant. There is no "delete file" operation. Defendant's Hearing Exhibit 3 at page 15.

---

[1] "Statistical Detection of Downloaders in Freenet," Brian N. Levine, et al., ECF Document 45-2 ["ECF 45-2"], page 1, column 2.

[2] Government Hearing Exhibit 2, page 1.

[3] See https://freenetproject.org/pages/documentation.html, Defendant's Hearing Exhibit 3 at page 15.

[4] Government Exhibit. 2, page 1. Further explained by Dr. Levine: "one of the important design features of Freenet is that when you store content that's been -- when you direct your computer to run Freenet and store that content, **the content that you're receiving is just a little portion of a file that's been inserted**, what's called a block. **And not only that, it's encrypted**. Any content that you are storing for other people when you join this network and run the software comes encrypted." Testimony of Brian Levine, 8 October 2021, page 38. (Emphasis added).

[5] "A Forensically Sound Method of Identifying Downloaders and Uploaders in Freenet," Brian N. Levine, et al., Government Hearing Exhibit 2 ["Government Hearing Exhibit 2"], page 2.

As designed, Freenet provides the foundation for anonymous email, forums, and chat, as well as a replacement for Facebook/Twitter.[6] Each of those applications are a part of the internet fabric that citizens have come to view as a central part of their lives.[7] Many things that once required an individual to move through the physical world to accomplish have been shifted to the online world.[8] For some individuals, the Freenet overlay is an attempt to achieve privacy in that world. Additional details about Freenet operation will be included as necessary below.

b.     **The Investigatory Target and Levine Network Investigative Technique**

Investigation coordinated between the Government and its researchers determined that perhaps 35% (in 2017)[9] falling to 30% (in 2020)[10] of Freenet requests for manifest keys[11] pertained to child sexual abuse material ("CSAM"). Presumably because the study was based upon comparing observed Freenet block requests to blocks requests that are component parts to acknowledged Government harvested and compiled manifest keys of known CSAM, there is no publicly reported data about the content of the other 65% to 70% of Freenet block requests for manifest keys observed by the Government.

Furthermore, because of the structure and operation of Freenet, the term "request for manifest keys" should not be confused with the term "users", nor necessarily even the term

---

[6] See https://freenetproject.org/pages/documentation.html, Defendant's Hearing Exhibit 3 at page 21. See also Dr Levine testimony of 8 October 2021 at page 130.

[7] "As a global hub of technological innovation and home to some of the world's leading internet companies, the United States has increased its digital population for over two decades. Today, over 90 percent of Americans have access to the internet, many of whom could no longer imagine a life without it." https://www.statista.com/topics/2237/internet-usage-in-the-united-states/#dossierKeyfigures.

[8] Health care advice, education, business and financial transactions, communications with family and friends, concerns, questions, personal research, political communications, and a myriad of other activities are performed on the internet; some creating opportunity and some creating problems as people learn how to deal with the new environment. See, i.e., https://www.elon.edu/u/news/2018/06/27/tech-experts-talk-about-internets-impact-on-daily-life/.

[9] ECF 45-2, page 1.

[10] Government Hearing Exhibit 2, page 1.

[11] A manifest key is a URI necessary to retrieve and reconstruct [an] original document. ECF 45-2, page 1.

"files". A small number of users could request a disproportionate number of files. Further, large files, say video files, could require proportionately more requests to gather adequate blocks to enable reassembly at the node of the original requestor. As explained by Dr. Levine's team, "Before Freenet inserts a file into the network, it encrypts and divides the file into 32KB blocks. […] When a file is inserted into the network, a manifest block is also inserted. The manifest key contains the decryption key, and the block's hash, necessary for retrieval. The manifest block contains the hashes and decryption keys of each content block. If the manifest block cannot reference all of the content blocks, it will reference **another level of manifest blocks**."[12] It is not clear whether the Government's cited CSAM statistics are based only upon top level manifest key block request counts, or also include block counts related to sublevel manifest keys. To the extent that CSAM potentially contains more video files than the other traffic on Freenet, the inclusion of sublevel manifest keys would also artificially boost the reported block request statistics.

Dr. Levine developed a methodology to identify the "Requestors" of CSAM despite the decentralized and anonymizing nature of the Freenet. The technique that he developed (the Levine Network Investigative Technique ["LNIT"] became the foundation of the dragnet search at issue here. Dr. Levine did not address the Constitutional ramifications of the deployment of this technology; however, he and his team did raise potential for abuse. In 2017  they stated "We condemn the misuse of the techniques of this paper to investigate ethical uses of Freenet."[13] By 2020, the research team modified its position to conclude from a researcher's standpoint that the technique was acceptable for the use intended because: "Freenet offers virtually no protection

---

[12] ECF 45-2 at page 2.
[13] ECF 45-2 at page 7.

against the weakest of adversaries who would misuse our method."[14] The Government, anxious to pursue CSAM, launched the Levine Network Investigative Technique without any form of Court approval and, from the ensuing dragnet, initiated the investigation and prosecution of the Defendant in this case.

> Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding. *Olmstead v. United States*, 277 U.S. 438, 479 (1928) (Brandeis, J., dissenting)

## III.   Argument

### a.   The LNIT is a warrantless search conducted in violation of the Fourth Amendment and this case must be dismissed

Beneath the technical issues presented by the LNIT, there are fundamental facts (even on the basis of the limited Discovery that the Government has been willing to share) that can yield no conclusion other than the reality of the LNIT as a domestic search (and in fact, a dragnet search that might well be incapable of gaining judicial warrant approval without modification), performed by the Government with absolutely no judicial supervision. Its deployment violates both the Fourth Amendment and 18 U.S. Code §§ 2510-2523 (Electronic Communications) prohibitions against extra-judicial government surveillance.[15] We will start with the state of the law, then turn to

---

[14] Government's Exhibit 2, at page 12. Whether that statement survives scrutiny of real-world capabilities and resource availability will be addressed below; but it does not satisfy constitutional examination of the LNIT. As we have recognized, it is not the duty of the researcher to determine what steps the Government must fulfill to use the investigative technique in a constitutionally valid or lawful manner.

[15] As we noted in our prior pleadings, this case does not involve national security. However, even in the case of National Security matters, the Foreign Intelligence Security Act, 50 U.S. Code § 1801, requires certification by the Attorney General to the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence that the proposed surveillance meets the requirements of the Act and a copy of the certification must be immediately transmitted to the Court of Title III Judges established to provide judicial supervision. 50 U.S. Code § 1802(a) and (3), 50 U.S. Code § 1803. Electronic

the facts of the LNIT. We will explain why the Government argument and some

arguably adverse trial court decisions are fundamentally misguided. Finally, we

conclude that the LNIT must be ruled a warrantless and illegal search and that this case

must be dismissed.

### 1.    *The Government must comply with the Fourth Amendment*

The Fourth Amendment was drafted as a limit to Government intrusion upon the lives

and privacy of its citizens:

> The right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizures, shall not be violated,
> and no Warrants shall issue, but upon probable cause, supported by Oath or
> affirmation, and particularly describing the place to be searched, and the
> persons or things to be seized. *United States Constitution, Fourth Amendment*

While laws and resource realities cabin the activities of private actors, the Government is

uniquely positioned to invade constitutionally protected rights. As technology advanced across

the last 100 years, it has provided new opportunities for Government intrusion on the right of the

people to be secure in their privacy. The Courts, and the legislature, have been repeatedly called

upon to protect society and the Constitution as Government agents eagerly seek ways to use

developing technology to enhance their ability to pursue crime. The usual Government

explanation for a new warrantless and unlawful intrusion is to attempt to deny that the new

intrusion is controlled by the Fourth Amendment.

In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507 (1967), the Supreme Court had to

determine whether calls made from a public telephone booth were entitled to Fourth Amendment

---

Surveillance includes "the acquisition by an electronic, mechanical, or other surveillance device of the
contents of any wire communication to or from a person in the United States, without the consent of any
party thereto, if such acquisition occurs in the United States, …." 50 U.S. Code § 1801(f)(2) Just as in the
case of domestic law enforcement investigations, even pen registers and trap and trace devices are subject
to judicial oversight. Compare 50 U.S. Code § 1805(j) and 18 U.S. Code § 3121 et seq.

protection. While rejecting a Fourth Amendment general right to privacy, the Court made clear

that "[t]he Fourth Amendment protects people, not places. What a person knowingly exposes to

the public, even in his own home or office, is not a subject of Fourth Amendment protection. See

*Lewis* v. *United States*, 385 U.S. 206, 210; *United States* v. *Lee*, 274 U.S. 559, 563. But what he

seeks to preserve as private, even in an area accessible to the public, may be constitutionally

protected. See *Rios* v. *United States*, 364 U.S. 253; *Ex parte Jackson*, 96 U.S. 727, 733." *Katz v.*

*United States*, 389 U.S. 347, 351-52 (1967). While recognizing that the telephone conversations

of Mr. Katz were constitutionally protected, the Court also acknowledged that the Government

could have conducted surveillance by acquiring a warrant.

> [T]his surveillance was so narrowly circumscribed that a duly
> authorized magistrate, properly notified of the need for such investigation,
> specifically informed of the basis on which it was to proceed, and clearly
> apprised of the precise intrusion it would entail, could constitutionally have
> authorized, with appropriate safeguards, the very limited search and seizure
> that the Government asserts in fact took place. Only last Term we sustained
> the validity of such an authorization, holding that, under sufficiently "precise
> and discriminate circumstances," a federal court may empower government
> agents to employ a concealed electronic device "for the narrow and
> particularized purpose of ascertaining the truth of the . . . allegations" of a
> "detailed factual affidavit alleging the commission of a specific criminal
> offense." *Osborn* v. *United States*, 385 U.S. 323, 329-330. *Katz v. United*
> *States*, 389 U.S. 347, 354-55 (1967)

When the Government urged that it's conduct could then be retroactively affirmed, the

Court firmly rejected the plea:

> Searches conducted without warrants have been held unlawful
> "notwithstanding facts unquestionably showing probable cause," *Agnello* v.
> *United States*, 269 U.S. 20, 33, for the Constitution requires "that the
> deliberate, impartial judgment of a judicial officer . . . be interposed between
> the citizen and the police. . . ." *Wong Sun* v. *United States*, 371 U.S. 471, 481-
> 482. "Over and again this Court has emphasized that the mandate of the [
> Fourth] Amendment requires adherence to judicial processes," *United States*
> v. *Jeffers*, 342 U.S. 48, 51, and that searches conducted outside the judicial
> process, without prior approval by judge or magistrate, are *per se*
> unreasonable under the Fourth Amendment — subject only to a few

specifically established and well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357-56 (1967) (internal footnotes omitted).

In 1968, two significant events occurred in the context of the articulation of protection of the public against intrusions by the Government. In a non-technology, stop-and-frisk case, the Supreme Court reiterated the holding of *Katz v. United States*: "We have recently held that "the Fourth Amendment protects people, not places," *Katz* v. *United States*, 389 U.S. 347, 351 (1967), and wherever an individual may harbor a reasonable "expectation of privacy," *id.*, at 361 (MR. JUSTICE HARLAN, concurring), he is entitled to be free from unreasonable governmental intrusion." *Terry v. Ohio*, 392 U.S. 1, 9 (1968). Second, the Federal Wiretap Act of 1968 articulated the standards by which conversations on "hard" telephone lines could be intercepted.

Because of the need to address rapidly changing technology, the Federal Wiretap Act underwent a major update in 1986 by the Electronic Communications Privacy Act ("ECPA") to address interception of computer and other digital and electronic communications. The ECPA has, in turn been updated to address continuing evolution in communications technologies and methods. See i.e., the USA Patriot Act (2001, 2005, 2006, 2011). The ECPA contains three components: Wire and Electronic Communication Interception and Interception of Oral Communications (18 U.S. Code §§ 2510-2523), Stored Wire and Electronic Communications and Transactional Records Access (18 U.S. Code §§ 2701-2713), and Pen Registers and Trap and Trace Devices (18 U.S. Code §§ 3121-3127). Each Title requires the Government to get Court authorization to conduct intercepts or acquire content, the authorization differing depending upon the type of information that the Government seeks to collect.

In *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the Supreme Court surveyed the continued need for the courts to apply the Fourth Amendment to emerging technologies and, declining to extend either voluntary exposure or third-party doctrine exclusions, found an

expectation of privacy that precluded the continuous tracking of an individual's movements

through cell-site location information. The Court started its analysis as follows:

> The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The "basic purpose of this Amendment," our cases have recognized, "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The Founding generation crafted the Fourth Amendment as a "response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California,* 573 U.S. ——, ——, 134 S.Ct. 2473, 2494, 189 L.Ed.2d 430 (2014). In fact, as John Adams recalled, the patriot James Otis's 1761 speech condemning writs of assistance was "the first act of opposition to the arbitrary claims of Great Britain" and helped spark the Revolution itself. *Id.,* at —— – ——, 134 S.Ct., at 2494 (quoting 10 Works of John Adams 248 (C. Adams ed. 1856)). *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018)

The Fourth Amendment analysis of the Supreme Court was further developed by the

Fourth Circuit in *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330 (4th Cir.

2021), where the Court was called upon to evaluate the Fourth Amendment vitality of a

warrantless persistent air surveillance system (AIR) that covered about 90% of City of Baltimore

each day during daylight hours.

The Court found that:

> The AIR program records the movements of a city. With analysis, it can reveal where individuals come and go over an extended period. Because the AIR program enables police to deduce from the whole of individuals' movements, we hold that accessing its data is a search, and its warrantless operation violates the Fourth Amendment. Accordingly, we hold that Plaintiffs' Fourth Amendment challenge is likely to succeed on the merits. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021)

The City of Baltimore resisted the conclusion that the Fourth Amendment was implicated on the grounds that the AIR program was not gathering information specifically against any individual.

> Defendants told us that "this case is about as far from *Carpenter* as you're ever going to get." Oral Arg. at 1:46:40. They distinguished *Carpenter* as concerning "targeted investigative activity of individuals," where investigators "already had the phone number and they already had the [suspect's] identity" and then requested specific CSLI. *Id.* This does highlight an important distinction, but it cuts in the other direction. In *Carpenter*, service providers collected comprehensive location data from their subscribers. As Defendants point out, the government's only role was to request that data as to specific investigations. Under the AIR program, the government does both. The government continuously records public movements. Then, the government—once officers know where (and when) to look—tracks movements related to specific investigations. Only by harvesting location data from the entire population could BPD ultimately separate the wheat from the chaff, retaining the 14.2 percent that was useful.
>
> Allowing the police to wield this power unchecked is anathema to the values enshrined in our Fourth Amendment. *Cf. Jones* , 565 U.S. at 416–17, 132 S.Ct. 945 (Sotomayor, J., concurring) (questioning "the appropriateness of entrusting to the Executive, in the absence of any oversight from a coordinate branch, a tool so amenable to misuse, especially in light of the Fourth Amendment's goal to curb arbitrary exercises of police power"). By protecting the people against unreasonable searches, the Constitution "protects *all*, those suspected or known to be offenders as well as the innocent." *Go-Bart Importing Co. v. United States* , 282 U.S. 344, 356–57, 51 S.Ct. 153, 75 L.Ed. 374 (1931) (emphasis added). By rejecting the general warrant, the Constitution rejects searches based on "loose, vague or doubtful bases of fact," which even "before the creation of our government," we "deemed obnoxious to fundamental principles of liberty." *Id.*
>
> Protection against such harms remains a vital constitutional function. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346-47 (4th Cir. 2021).

The factual analysis of the LNIT, as deployed, reveals it to be the online equivalent of the City of Baltimore AIR program, as ruled unconstitutional by the Fourth Circuit Court of Appeals.

2. *The facts of the LNIT*

At an abstract level, the deployed LNIT is composed of multiple parts. First, there are some number of Law Enforcement Nodes ["LEN"] that each gather every block request communication that is detected by that LEN.[16] Second, those communications are forwarded to a central Government computer system known as ICAC Cops.[17] At ICAC Cops, the collected block request communications are screened against a Government database;[18] then communications of interest are stored and compiled. Third, block request communications of interest to the Government are then assessed at ICAC Cops according to the math rubric developed by Dr. Levine to determine if a specific node of the Freenet can be probabilistically labelled a "requestor".[19] If ICAC Cops identifies a "requestor", a report is sent to the Operator of the LEN that appears to be physically located closest to the suspect "requestor" node. The ICAC Cops report then forms the critical basis for an affidavit of probable cause upon which a subsequent search warrant will issue.

---

[16] The Government, despite a centrally coordinated system with acknowledged log keeping, has steadfastly refused to reveal the number of Law Enforcement Nodes to the Court.

[17] Government Post Hearing Brief, Exhibit 2, Declaration of Robert Erdley (ECF 73-2), paragraph 19. "To do this, Law Enforcement runs a Law Enforcement version of Freenet which simply passes a copy of all requests received by the node to ICAC Cops where the requests are filtered."

[18] Law enforcement has built a list of publicly available files associated with child exploitation material and stored the hash values associated with the **file blocks** traded on Freenet. This list is stored on ICAC Cops. As of the writing of this affidavit, ICAC Cops has stored hash values for **blocks** associated with 150,882 files associated with child exploitation material. Government Post Hearing Exhibit 2 at paragraph 18. (Emphasis added.)

[19] This order of processing may be contrary to prior testimony that stated that the probabilistic assessment is done at the Law Enforcement Node; however, we work with the processing order most consistent with the latest Government submission. If the Hash screen is not available at the LENs, and the filtering of blocks is done at ICAC Cops, it is the logical construct of the system. However, the legal analysis would not change, even if the processing sequence started with probabilistic assessment at the LENs, because the content of every Freenet user would still be screened without Court approval to find all probabilistic "requestors" of any block; every probabilistic "requestor" of any block would then be sent to ICAC Cops; the Government's designed court-supervision-free Hash screen would then be applied to identify "requestors" of interest; and the process would continue.

### 3.    *Government Nodes Create Near Universal Surveillance of All Users on Freenet*

The Government has steadfastly refused to provide the number of Law Enforcement Nodes to the Court.[20] The number of LENs deployed is the best indicator of the true scope of the Government Surveillance at Issue. Scope of surveillance tells the Court important facts about the Government intrusion on society at large; refusal to provide that data is the withholding of relevant evidence. In this section, we will use the partial and non-responsive data that has been provided. That data already demonstrates massive intrusion; however, based upon adverse inference, the Court should conclude that the Government conduct is much worse and being hidden.[21] While an ***assumption*** of "Law Enforcement operating no more than 45 nodes on any one day in June 2018"[22] is used for Dr. Levine's post hearing Declaration (Document 73-1) at paragraph 7 that LENs would comprise "approximately 1% of the Freenet network," even that statement shows a massive level of intrusion when considered in the context of Dr. Levine's explanation of the LNIT data collection.

Dr. Levine, while giving testimony in <u>United States v. Hall</u>, on 30 August 2017 stated that Freenet has maybe 4,000 users per day, and that for neighbors, a typical LEN could have

---

[20] See, i.e. Dr. Levine testimony of 8 October 2021, p. 170:
    Q:  Do you know how many law enforcement nodes are in operation?
    A.  I do not.
    Q.  Have you ever known?
    A.  I know that -- you know, I know that it's -- I know the gist of it. I don't know the exact number. It's never been shared to me.

[21] Even absent a due process violation, a criminal defendant may be entitled to an adverse inference instruction pursuant to the spoliation of evidence rule. Under that evidentiary rule, "an adverse inference may be drawn against a party who [loses or] destroys relevant evidence." See Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 155 (4th Cir. 1995). In order to draw the inference, there must be "a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." Id. at 156. *United States v. Johnson*, 996 F.3d 200, 206 (4th Cir. 2021).

[22] Given Dr. Levine's testimony in this case that he lacks knowledge of the number of LENs, and no other basis for the number used, this must be an assumption – but we don't even know why Dr. Levine picked this particular number and not a substantially larger one.

"between, say, 30 and 50. So maybe up to hundred. Maybe 200. Who knows?"[23] Defendant's

Hearing Exhibit 5, 16-cr-00469-ELH Document 61, at page 90. With the study's research nodes

(a minimum of 10 nodes from November 2016 through April 2020, with 20 additional Nodes

added in September of 2019), Dr. Levine reported: "During March 2020, 16,971 distinct open-

net peer locations were visible to our nodes, with an average of 4,607 distinct locations per

day."[24] Using Dr. Levine's post hearing declaration in conjunction with his testimony and

published papers, Law Enforcement has likely achieved at least 100% penetration of the Freenet

user network. Given that the evidence shows that Defendant had four LEN peer neighbors, the

extrapolated calculation is sustained by the observed evidence and the Court should conclude

that like the AIR program in *Leaders of a Beautiful Struggle*, Law Enforcement has grabbed an

unchecked and arbitrary power to surveil Freenet users through the use of LNIT and its

coordinated network of LENs.

The near total penetration presence of the LENs should not be surprising. From the

perspective of running an effective surveillance tool, a random law enforcement presence would

be suboptimal to the point of wasted resources – this is part of the fallacy of the Levine paper

assertion that "Freenet offers virtually no protection against the weakest of adversaries who

would misuse our method."[25] – at minimum, any adversary would need the resources to establish

---

[23] The cavalier "Who Knows?", was consistent with much of Dr. Levine's testimony; however, it captures significant details about the Government's Freenet surveillance operation. 1) Dr. Levine's acknowledged knowledge is somewhat removed from the LNIT, as deployed. 2) Even at the level of assessing Fourth Amendment vitality of the LNIT, the Government's refusal to provide data hinders the Court's ability to sustain the Government's conduct. In addition to not providing the number LENs deployed, the Government has not provided any information on LEN datastore size. Given the Freenet characteristic of self-organization for greater efficiency, nodes with a larger data store might reasonably be expected to attract more neighbor peers. This would be a way to achieve even greater network penetration than can be extrapolated from the original Levine research peers.
[24] Government Hearing Exhibit 2 at page 4.
[25] Government's Exhibit 2, at page 12. Whether that statement survives scrutiny of real-world capabilities and resource availability will be addressed below; but it does not satisfy constitutional examination of the

enough terminals to get substantial network coverage before the technique would offer

significant value. Could some unnamed repressive regime establish the necessary number of

terminals? That certainly looms as a possibility; but the question in the United States is whether

the establishment of that network is constitutional here.

> **4.**     *The Content Communications of Every Freenet User are Examined by the Government*

The Government publicly acknowledges the requirement of a Warrant to acquire the

content of internet communications:

> Title III and the Pen/Trap statute regulate access to different types of information. Title III permits the government to obtain the contents of wire and electronic communications in transmission. In contrast, the Pen/Trap statute concerns the real-time collection of addressing and other non-content information relating to those communications. *See* 18 U.S.C. § 2511(2)(h)(i) (stating that it is not a violation of Title III to use a pen register or trap and trace device); *United States Telecom Ass'n v. FCC*, 227 F.3d 450, 453-54 (D.C. Cir. 2000) (contrasting pen registers and Title III intercept devices); *Brown v. Waddell*, 50 F.3d 285, 289-94 (4th Cir. 1995) (same).
>
> The difference between addressing information and content is clear for telephone calls. The addressing information is the phone numbers of the originating and receiving telephones. The content of the communication is the actual conversation between the parties to the call.
>
> **The distinction between addressing information and content also applies to Internet communications**. For example, when computers on the Internet communicate with each other, they break down messages into discrete chunks known as packets and then send each packet out to its intended destination. Every packet contains addressing information in the header of the packet (much like the "to" and "from" addresses on an envelope), followed by the payload of the packet, which contains the contents (much like a letter inside an envelope). The Pen/Trap statute permits law enforcement to obtain the addressing information of Internet communications much as it would addressing information for traditional phone calls. However, collecting the entire packet ordinarily implicates Title III. The primary difference between an Internet pen/trap device and an Internet Title III intercept device is that the former is designed to capture and retain only addressing information, while the latter is designed to capture and retain the entire packet.

---

LNIT. As we have recognized, it is not the duty of the researcher to determine what steps the Government must fulfill to use the investigative technique in a constitutionally valid or lawful manner.

The same distinction applies to Internet email. Every Internet email message consists of a set of headers that contain addressing and routing information generated by the mail program, followed by the actual contents of the message authored by the sender. The addressing and routing information includes the email address of the sender and recipient, as well as information about when and where the message was sent on its way (roughly analogous to the postmark on a letter). *See United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) (email to/from addresses and IP addresses constitute addressing information). **The Pen/Trap statute permits law enforcement to obtain the header information of Internet emails (except for the subject line, which can contain content) using a court order, just like it permits law enforcement to obtain addressing information for phone calls and individual Internet packets using a court order. Conversely, the interception of email contents, including the subject line, requires compliance with the strict dictates of Title III.** "Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations," (CCIPS 2009) https://www.justice.gov/criminal/cybercrime/docs/ssmanual2009.pdf, link provided by USDOJ website: https://www.justice.gov/criminal-ccips/ccips-documents-and-reports, page 165 (Chapter 4 of Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations is provided as Enclosure 1) (Emphasis added.).

Freenet block requests contain private communication content. This case is not about IP addresses. It is about governmental interception and screening of all Freenet user requests for encrypted data blocks. Any requesting node requests data blocks by hash value. Hash value block requests and the encrypted blocks themselves are both unintelligible and meaningless without being reassembled into a file.[26]

No block request contains the name of the completed file – even the LE report submitted (ECF 45-1) shows only a "possible manifest key" and a "possible file name." The Law Enforcement official to whom the report is forwarded must then use the suspected name and manifest to download a copy of the file to swear that it is CSAM. The probability that any other

---

[26] See Dr. Levine's testimony on 8 October 2021 at page 135, et seq. See also *United States v. Sigouin*, 494 F. Supp. 3d 1252, 1265 (S.D. Fla. 2019) ("That hash value communicates nothing about the content of the underlying file; it also communicates nothing else about the sender, other than perhaps the sender's desire to get a copy of the corresponding block.")

block could have the same Hash value as one of the known blocks of CSAM is effectively zero; but without the ICAC Cops data base, the block requests retrieved by Law Enforcement in this case are functionally indistinguishable from any other block request on Freenet.

This is not a circumstance of information being readily discernible to any who might happen by. It requires the combination of resource capacity to create a network of LENs and to also assemble a database of block hashes that are components of the Government's target files before even the Government can "steam" open the encrypted envelope of a Freenet block request. The operation of the Freenet creates both a subjective and an objective expectation of privacy in the block requests that a user transmits.

This is the second place where the Levine study group's declaration that "Freenet offers virtually no protection against the weakest of adversaries who would misuse our method"[27] is misleading. Any hypothetical "adversary" would need the technical ability and resources to build a block request screen to identify those requestors that it wished to identify. Could it be done by a repressive regime? It likely could; but like the development of a network of surveillance terminals, in the United States, the search of every block request communication of every user on the Freenet to determine whether any block request might of interest to the government is a search of content that must be conducted pursuant to constitutional limitations on the executive, and under the supervision of the judiciary.

The Government might protest that, in this case, it is only using the CSAM database of hashes at the screening stage, so everyone else should feel secure. That brings us back to the Fourth Circuit analysis:

---

[27] Government's Exhibit 2, at page 12. Even if that statement could survive scrutiny of real-world capabilities and resource availability, it does not satisfy constitutional examination of the LNIT. As we have recognized, it is not the duty of the researcher to determine what steps the Government must fulfill to use a newly designed investigative technique in a constitutionally valid or lawful manner.

Allowing the police to wield this power unchecked is anathema to the values enshrined in our Fourth Amendment. *Cf. Jones* , 565 U.S. at 416–17, 132 S.Ct. 945 (Sotomayor, J., concurring) (questioning "the appropriateness of entrusting to the Executive, in the absence of any oversight from a coordinate branch, a tool so amenable to misuse, especially in light of the Fourth Amendment's goal to curb arbitrary exercises of police power"). By protecting the people against unreasonable searches, the Constitution "protects *all*, those suspected or known to be offenders as well as the innocent." *Go-Bart Importing Co. v. United States* , 282 U.S. 344, 356–57, 51 S.Ct. 153, 75 L.Ed. 374 (1931) (emphasis added). By rejecting the general warrant, the Constitution rejects searches based on "loose, vague or doubtful bases of fact," which even "before the creation of our government," we "deemed obnoxious to fundamental principles of liberty." *Id Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 347 (4th Cir. 2021).

The hashes for blocks of any type of file could be placed into the existing ICAC Cops screen at the will of the Executive, or one of its agents. The LNIT, as deployed, is a stark violation of the Fourth Amendment and any evidence derived from its deployment must be suppressed.

**b.    The Government's Analysis is misguided because it fails to consider the 4th Amendment violation caused by the breadth and content gathering of the LNIT in the first instance**

This case is not about IP addresses. Nor is it about Government activity undertaken pursuant to a Court order or warrant. The clearest analogy is to understand the network of Law Enforcement Nodes as the equivalent of the drone surveillance photography in *Beautiful Struggle* because, even by the Government's own admissions, virtually all traffic on the Freenet is under constant surveillance by the array of LENs. Like the AIR program, the coordinated LENs traffic collection and ICAC Cops database screen of all of the traffic on the Freenet is an unchecked . . .

". . . 21st century general search, enabling the police to collect all movements, both innocent and suspected, without any burden to "articulate an adequate reason to search for specific items related to specific crimes." *See Messerschmidt* , 565 U.S. at 560, 132 S.Ct. 1235 (Sotomayor, J., dissenting). Because that collection enables Defendants to deduce information from the whole of individuals' movements, this case is not "far from *Carpenter* ";

indeed, it is controlled by it." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 348 (4th Cir. 2021).

Based upon the Government's failure to recognize the fundamental nature of the issue before the Court, many of the cases which it argues to attempt support for the warrantless search do not advance its cause.

The Government explores the cluster of cases concerning the jurisdictional validity of the warrant[28] authorized Network Investigative Technique ["NIT"] that was placed on a specific CSAM site in the Tor network known as *Playpen* to cause the computers of visitors to the site to return their IP addresses and other identifying data[29] to Government Investigators. In *United States v. Adams*, No. 6:16-cr-11-Orl-40GJK, 2016 U.S. Dist. LEXIS 105471, (M.D. Fla. Aug. 10, 2016), the Court found the NIT to be a Fourth Amendment search and the warrant authorizing the NIT to exceed the scope of Rule 41(b); however, the agents were not unreasonable in relying on the warrant and the Good Faith Exception applied. Similarly, *United States v. Darby*, 190 F. Supp. 3d 520 (E.D. Va. 2016), after finding probable cause for the NIT warrant at issue, the court also found that despite a Rule 41(B) violation,

> The FBI agents in this case did the right thing. They gathered evidence over an extended period and filed a detailed affidavit with a federal magistrate in support of their search warrant application. They filed the warrant application in the federal district that had the closest connection to the search

---

[28] Significantly, the warrant for the NIT at issue in the cases cited by the Government was both supported by probable cause and was not a general warrant. ""The NIT Warrant describes particular places to be searched—computers that have logged into Playpen—for which there was probable cause to search. It is not a general warrant." *United States v. Darby*, 190 F. Supp. 3d 520, 533 (E.D. Va. 2016); see also *United States v. Broy*, 209 F. Supp. 3d 1045 at 1051 (C.D. Ill. 2016) ([B]oth the place and items to be seized were described with sufficient particularity so as not to render the warrant a general one.).

[29] The information that the NIT would instruct the computers to send is described in an attachment to the warrant application. Attach. B, Warrant Appl., ECF No. 16-1 at 5. The NIT extracted from any "activating computer"—a computer that logged into Playpen using a username and password—(1) the IP address of the computer and the date and time this information is determined, (2) a unique identifier that distinguishes the data from this activating computer from that of others, (3) the type of operating system used by the computer, (4) information about whether the NIT has already been sent to the computer, (5) the computer's Host Name, (6) the computer's operating system user name, and (7) the computer's media access control ("MAC") address. *United States v. Darby*, 190 F. Supp. 3d 520, 526-27 (E.D. Va. 2016)

to be executed. The information gathered by the warrant was limited: primarily the IP addresses of those that accessed Playpen and additional information that would aid in identifying what computer accessed the site and what individual used that computer. Defendant seeks suppression because of an alleged violation of a Federal Rule of Criminal Procedure, a rule that will likely be changed to allow explicitly this type of search. The pending amendment is evidence that the drafters of the Federal Rules do not believe that there is anything unreasonable about a magistrate issuing this type of warrant; the Rules had simply failed to keep up with technological changes. That is, there is nothing unreasonable about the scope of the warrant itself. The FBI should be applauded for its actions in this case.

In short, the officers in charge of this investigation are not at all culpable. Additionally, as discussed above, there is no evidence that any failure by the FBI to understand the intricacies of the jurisdiction of federal magistrates was deliberate. Even if the NIT Warrant was void because not authorized by the Federal Magistrates Act, suppression is not warranted in this case.

In summary, the NIT Warrant did not violate Rule 41(b) and even if it did suppression is not warranted. *United States v. Darby*, 190 F. Supp. 3d 520, 538 (E.D. Va. 2016)

The Government cites *United States v. Forrester*, 495 F.3d 1041 (9th Cir. 2007), where

the **court order approved** Government pen register surveillance of IP addresses was determined

to not constitute a Fourth Amendment search.

The *Forrester* court found that surveillance of:

to/from addresses of e-mail messages, the IP addresses of websites visited and the total amount of data transmitted to or from an account. We conclude that these surveillance techniques are constitutionally indistinguishable from the use of a pen register that the Court approved in *Smith.* First, e-mail and Internet users, like the telephone users in *Smith,* rely on third-party equipment in order to engage in communication. *Smith* based its holding that telephone users have no expectation of privacy in the numbers they dial on the users' imputed knowledge that their calls are completed through telephone company switching equipment. 442 U.S. at 742, 99 S.Ct. 2577. *United States v. Forrester*, 495 F.3d 1041, 1048-49 (9th Cir. 2007),

the Court went on:

The government's surveillance of e-mail addresses also may be technologically sophisticated, but it is conceptually indistinguishable from government surveillance of physical mail. In a line of cases dating back to the nineteenth century, the Supreme Court has held that the government cannot

engage in a warrantless search of the contents of sealed mail, but can observe whatever information people put on the outside of mail, because that information is voluntarily transmitted to third parties. *See United States v. Jacobsen,* 466 U.S. 109, 114, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (stating that warrantless searches of letters and sealed packages are "presumptively unreasonable"); *United States v. Van Leeuwen,* 397 U.S. 249, 251-52, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970) (mail is "free from inspection . . . except in the manner provided by the Fourth Amendment," but postal authorities could nonetheless detain mail without warrant based on suspicious appearance and circumstances); *Ex parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1877) ("Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles."); *see also United States v. Hernandez,* 313 F.3d 1206, 1209-10 (9th Cir.2002) ("Although a person has a legitimate interest that a mailed package will not be opened and searched en route, there can be no reasonable expectation that postal service employees will not handle the package or that they will not view its exterior.") (internal citation omitted). **E-mail, like physical mail, has an outside address "visible" to the third-party carriers that transmit it to its intended location, and also a package of content that the sender presumes will be read only by the intended recipient**. The privacy interests in these two forms of communication are identical. The contents may deserve Fourth Amendment protection, but the address and size of the package do not. *United States v. Forrester*, 495 F.3d 1041, 1049-50 (9th Cir. 2007) (emphasis added).

The *Forrester* court specifically limited its holding to the limited court order approved surveillance at issue: "[O]ur holding extends only to these particular techniques and does not imply that more intrusive techniques or techniques that reveal more content information are also constitutionally identical to the use of a pen register" *United States v. Forrester*, 495 F.3d 1041, 1050 (9th Cir. 2007). Even limited to the expectation of privacy issue, *Forrester* simply does not reach the extent of intrusion present in this case.

The case most closely aligned with the facts before this Court is *United States v. Sigouin*, 494 F. Supp. 3d 1252 (S.D. Fla. 2019), which upheld a warrantless FBI Freenet surveillance that appears to be closely related to the LNIT. However, as we noted when calling the *Sigouin* case to

the Court's attention, it appears that the *Sigouin* court was presented with a different factual scenario and also made a logical error in its analysis.[30]

The *Sigouin* decision is based upon the FBI deploying a single Law Enforcement Node.[31] Beyond the massive factual difference with respect to pervasiveness of surveillance achieved by a single Law Enforcement Node, as opposed to a Network of Law Enforcement Nodes that allow continuous surveillance of every user, the *Sigouin* court engaged in a further narrowing of consideration from the continuous surveillance of all Nodes neighboring the Law Enforcement Node to presuming that the surveillance of the Defendant is the only surveillance occurring. That narrowing of perspective prevented the *Sigouin* court from even addressing the general warrant, dragnet search nature of the Law Enforcement Nodes logging and examining every block request of every one of its neighbors.

The second place that the *Segouin* court went astray was in its assessment that Freenet users have no reasonable expectation of privacy in block hash requests. Here, by shifting frame of focus, the court misses the fundamental container envelope nature of block hash requests. To reject the Freenet users' expectation of privacy in block hash requests, the *Sigouin* court likened block hash requests to overheard conversation on the trading floor of the Chicago Mercantile

---

[30] While it is not in the Fourth Circuit and would not have been bound by the Fourth Circuit decision, the *Sigouin* court also reached its conclusion before it could have the benefit of the analysis in *Beautiful Struggle*.

[31] *United States v. Sigouin*, 494 F. Supp. 3d 1252, 1259-60 (S.D. Fla. 2019) ("The Affidavit further explained that, without judicial prior approval, **the FBI had set up a computer as one of the nodes on the Network** ("the FBI node"), which allowed the FBI to monitor requests for child pornography as they flowed across the Network. The computer on the FBI node ran a version of the Network software that had been modified to filter and log certain information. Specifically, for a user connected to the FBI node, the modified software logged "the IP addresses of the user's peers; the number of peers those peers report to have; a unique identifier assigned by the software (referred to as the computer's [the Network] "location"); the remaining number of times a request for a piece of a file may be forwarded; the date/time of requests received from a peer; and the digital hash value of a requested piece."")(emphasis added).

Exchange. However, plain spoken words that can be heard by anyone nearby[32] are objectively and substantially different than "the alphanumeric hash value of a block. That hash value communicates nothing about the content of the underlying file; it also communicates nothing else about the sender, other than perhaps the sender's desire to get a copy of the corresponding block." *United States v. Sigouin*, 494 F. Supp. 3d 1252, 1265 (S.D. Fla. 2019). The array of block hash requests issued by a user Node form private content communication because block hash requests are individually unintelligible; that only when collected, examined and collated, can reveal the totality of the Freenet User's communications, and through them, "his "familial, political, professional, religious, and sexual associations." *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (citing *United States v. Jones*, 565 U.S. 400, 415, 132 S.Ct. 945 (2012) (opinion of SOTOMAYOR, J.)).

The Reasonable Expectation of Privacy in content communication is not diminished simply because the Government can develop a search technology that can collect and sort every communication on the Freenet. See *Kyllo v. United States*, 533 U.S. 27, 40 (2001) ("Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a "search" and is presumptively unreasonable without a warrant."). To find no reasonable expectation of privacy, the *Sigouin* court had to ignore the complex coordinated Government technology used to achieve the collected array of hash block requests used to support probable

---

[32] Doe's conversations were overheard on the trading floor of the CME. Appellant himself describes this environment as "typically noisy and frantic." The FBI agent conducting the investigation was clearly present only a few feet from Doe and he was able to overhear and record each of Doe's statements. In fact, the agent was a participant in many of these conversations. The tape recorder concealed on the agent was unable to hear more than the agent himself could. Thus, by exposing these statements to the public in this manner, Doe cannot now contend that he reasonably believed his conversations were private and therefore subject to constitutional protection. *Matter of John Doe Trader Number One*, 894 F.2d 240, 243 (7th Cir. 1990).

cause in that case. On both the failure to recognize the extensiveness of the Government surveillance on Freenet, and the failure to recognize the reasonable expectation of privacy of Freenet Users, *Sigouin* was wrongly decided and should not be used to validate the warrantless general search at issue here.

IV.  <u>**Conclusion**</u>

The Warrantless Dragnet Search of Freenet is unlawful under the Fourth Amendment. The evidence seized as a result of the Search Warrant issued in reliance upon the results of that illegal dragnet search must be suppressed and the Indictment which also resulted must be dismissed.

Respectfully submitted,


/s/  *Richard A. Finci*
Richard A. Finci, Esquire
Houlon, Berman, Finci & Levenstein, LLC
7850 Walker Drive, Suite 160
Greenbelt, Maryland 20770
finci@houlonberman.com
Telephone: (301) 459-8200
Facsimile: (301) 459-5721


/s/  *G Arthur Robbins*
G Arthur Robbins (Federal Bar No. 09770)
CHESAPEAKE MERIDIAN
1997 Annapolis Exchange Parkway, Suite 300
Annapolis, Maryland 21401
Telephone: (443) 454-7675
GarRobbins@ChesapeakeMeridian.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 16th day of November, 2021, a copy of the foregoing Defendant's Post Hearing Memorandum in Support of Motion to Suppress (as to Warrantless Search and Expectation of Privacy Issue Only) was served via filing in the electronic filing system to the Dwight Draughon, Esquire and David Salem, Esquire, Office of the United States Attorney, 6406 Ivy Lane, Greenbelt, Maryland 20770.


/s/  *Richard A. Finci*
Richard A. Finci, Esquire