1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF MARYLAND

3                             SOUTHERN DIVISION

4

5    UNITED STATES OF AMERICA,        )  CRIMINAL
                                      )  NO. PX-19-348
6              Plaintiff,             )
                                      )
7    v.                               )
                                      )
8    ALAKOM-ZED CRAYNE POBRE,         )
                                      )
9              Defendant.             )

10                       TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE PAULA XINIS
11                    UNITED STATES DISTRICT JUDGE
                  THURSDAY, DECEMBER 2, 2021; 12:06 P.M.
12                        GREENBELT, MARYLAND

13   FOR THE PLAINTIFF:

14             OFFICE OF THE UNITED STATES ATTORNEY
               BY:  DWIGHT J. DRAUGHON, JR., ESQUIRE
15             BY:  JOSEPH R. BALDWIN, ESQUIRE
               6406 Ivy Lane
16             Suite 800
               Greenbelt, Maryland  20770
17             (301) 344-4433

18   FOR THE DEFENDANT:

19             HOULON, BERMAN, FINCI & LEVENSTEIN, LLC
               BY:  RICHARD A. FINCI, ESQUIRE
20             7850 Walker Drive
               Suite 160
21             Greenbelt, Maryland  20770
               (301) 45908200
22                  -and-

23
     OFFICIAL COURT REPORTER:
24   Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227

25     ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

1  APPEARANCES (Continued):

2

FOR THE DEFENDANT:

3

            CHESAPEAKE MERIDIAN
4           BY:  G. ARTHUR ROBBINS, ESQUIRE
            133 Defense Highway
5           Suite 213
            Annapolis, Maryland  21401
6           (443) 454-7675

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE DEPUTY CLERK:  May I have your attention, please.

2    The United States District Court for the District of Maryland

3    is now in session.  The Honorable Paula Xinis is presiding.

4          THE COURT:  Good morning, everybody.  Or good

5    afternoon.

6          (Counsel reply, "Good afternoon, Your Honor.")

7          THE COURT:  All right.  If you could give me one

8    second.

9          (Pause.)

10          THE COURT:  Okay.  All right.  Would the government

11    call the case?

12          MR. DRAUGHON:  Yes, Your Honor.  Calling the case of

13    the United States vs. Alakom-Zed Crayne Pobre, Case No.

14    PX-19-348.  Dwight Draughon and Joseph Baldwin for the

15    government, Your Honor.  Also present at counsel's table is

16    special agent -- HSI Special Agent Kelly DiAntonio.

17          THE COURT:  Good morning.  Good afternoon.  Sorry

18    about that.

19          MR. ROBBINS:  Good afternoon, Your Honor.  Gar

20    Robbins and Rich Finci here with Mr. Pobre.

21          MR. FINCI:  Good afternoon, Your Honor.

22          THE COURT:  All right.  Okay, Counsel.  This is the

23    follow-up hearing in Mr. Pobre's case on the motion to

24    suppress.  As we talked about last time, I am taking this,

25    eating the elephant one bite at a time, as they say, and we are

1    discussing today the question of whether Mr. Pobre had a

2    reasonable expectation of privacy.  And then if so, then the

3    inquiry likely ends at there is a Fourth Amendment violation.

4    If not, then we will move on to the next question, which is the

5    *Franks* issue under the search warrant.

6         And so what I intend to do today is hear argument and any

7    additional evidence from either side and then take it under

8    advisement so that you all know.

9         Okay.  Where would you all like to begin?

10        MR. DRAUGHON:  Your Honor, the government has two

11   witnesses that it would like to present.  Dr. Brian Levine will

12   have a pretty brief testimony, and then Detective Robert Erdely

13   will talk about the -- the content of the declaration and

14   expand upon a bit the focus on ICAC Cops and his role there.

15        THE COURT:  Defense, you all can reserve whether you

16   have additional evidence you would like to put in.

17        Is there anything else we need to do before we have the

18   government call its first witness?  Let's do it.

19        MR. DRAUGHON:  The government calls Dr. Brian Levine.

20        THE DEPUTY CLERK:  If you could come up to the

21   witness box and remain standing.  And raise your right hand.

22        DR. BRIAN LEVINE, GOVERNMENT'S WITNESS, SWORN

23        THE DEPUTY CLERK:  Thank you.  Please be seated.

24        Please state your first and last name for the record and

25   please spell your first and last name.

1          THE WITNESS:  My name is Brian Levine, B-r-i-a-n,

2     L-E-V-I-N-E.

3          MR. DRAUGHON:  Your Honor, since we have discussed

4     Dr. Levine's background, I am just going to jump into the

5     questions that I have for today.

6          THE COURT:  And the defense doesn't have any

7     additional voir dire on qualifications?

8          MR. ROBBINS:  No.

9          THE COURT:  So, Dr. Levine, welcome again, and we

10    will continue.  You are already qualified, so go ahead.

11         THE WITNESS:  Thank you, Your Honor.

12                     DIRECT EXAMINATION

13    BY MR. DRAUGHON:

14    Q.    Sir, can you tell the Court the maximum number of law

15    enforcement nodes that were on the Freenet network in June in

16    2018?

17    A.    The maximum number of law enforcement nodes was 45 on any

18    given date in that month.

19    Q.    And why did you focus on June 2018 just to remind the

20    Court?

21    A.    Because it's relevant to the Court, to the case.

22    Q.    About what percentage of Freenet users did this number

23    account for, so the 45 law enforcement nodes?

24    A.    To estimate it, I would estimate it at about one percent.

25    Given observations that we have made scientifically about the

1 Freenet network, I think one percent is a conservative

2 estimate.  No more than one percent.

3 Q.    And for the Freenet users, about how many peers does each

4 Freenet node have?

5 A.    So we also examined this quite in depth in the paper that

6 we published in 2020, which is, from my prior testimony, I know

7 an exhibit in this case, so you can look in the paper, and, for

8 example, you can see that the median was 48 for peers that we

9 were connected to.  No more than about 70.  Maybe a little

10 higher.  99 percent were about 69 or lower.

11 Q.    Do the Freenet nodes -- do the users of the nodes pick

12 the number of their peers?

13 A.    They do affect the number of peers that they have based

14 on the settings at installation, or they can adjust that at

15 their will due to the configuration settings.

16 Q.    Based on one percent of the nodes on Freenet being law

17 enforcement, the Freenet nodes having a median of 48 peers,

18 what is the chance that a user is connected to a law

19 enforcement node?

20 A.    For those nodes, it's more likely than not that they are

21 not connected to a law enforcement node.  And, in fact, if you

22 consider not just the median but, as I said, these nodes that

23 have higher number of neighbors, say 69 or fewer, it's still

24 more likely than not that they are not connected to a law

25 enforcement node among all of the neighbors that they have

1    chosen at any given time.

2    Q.    And just so the Court has a sense, if we go with one

3    percent of 48, is there an approximate number of what

4    percentage of the users would be connected to a law enforcement

5    node?

6    A.    If each neighbor they have is a 99-percent chance of not

7    being law enforcement and they are picking 48 neighbors, you

8    can do a little bit of math and you come up with something like

9    40 percent chance of them being connected to a law enforcement

10   node, so more likely than not that they are not connected to

11   law enforcement.

12   Q.    The neighbors that the law enforcement nodes are

13   connected to, those are the IP addresses that the law

14   enforcement nodes can see or can they see more than that?

15   A.    As a law enforcement node or any node on the network, you

16   can only observe the IP addresses of the peers that you are

17   directly connected to.  You cannot see IP addresses of

18   neighbors of neighbors.

19   Q.    I want to ask you about Datastore.  Does Datastore affect

20   how users -- how Freenet nodes send or receive requests on

21   Freenet?

22   A.    Yes.  Let me clarify.  I am not sure I was exactly clear

23   last time I testified here.  So there are really two types of

24   mechanisms that are similar for Freenet node.  There is the

25   Datastore that you are asking me about and then there is a

1  cache, so the cache, the purpose of the cache is if I were to

2  make -- my node was to make a request of your node and then a

3  response came back for what I was looking for, I would cache

4  that.  Maybe to clarify, if any request is coming through me, I

5  forward that request to you, you give me the -- the block that

6  the request is looking for, I am passing that block to whoever

7  sent me the request, I will cache that in order to improve

8  performance on the network.

9      The Datastore is a little different.  The Datastore is

10  configurable when you start the program.  The Datastore is a

11  little different.  So whenever content is inserted into

12  Freenet, it is spread around the network, as we have talked

13  about in my prior testimony, and then it ends up in one

14  Datastore or another.  Each block ends up in a Datastore.

15      Now, as files are inserted, those Datastores will fill

16  up, and when -- let's assume we are at a point where all the

17  Datastores are full and another file is inserted, well

18  something has got to go.  So something will be lost.  If

19  everyone were to double their Datastore, then files that have

20  been inserted would have more longevity, they'd last for

21  longer, they wouldn't be pushed out as fast.

22      Does it affect the routing algorithm?  Not really,

23  because the routing algorithm is based on who my neighbors are

24  and their, what's called their location, which is really a,

25  it's not a geographic location at all, it's kind of a position,

1    it's an abstract virtual location, if you will, so that's the

2    primary determinate.  And, again, if I was to increase my

3    Datastore, that wouldn't affect the routing algorithm, not

4    directly.

5    Q.    Do law enforcement nodes set their Datastores to be

6    substantially different than other Freenet nodes?

7    A.    No.

8    Q.    If a law enforcement node or any other node is not the

9    intended recipient of a request, can it determine what the

10   request was?

11   A.    I'm sorry.  Can you say that again?

12   Q.    Yes.  If a law enforcement node or any other node on

13   Freenet is not the intended recipient of a request, can it --

14   can that node determine what the request was?

15   A.    No, because it would never receive it.  It's not the

16   intended recipient.  Sorry.  Maybe I misunderstood your

17   question.

18   Q.    No.  No.  You are following quite well.  I have a

19   follow-up question.

20   A.    Oh, okay.

21   Q.    What would prevent any other node on Freenet from being

22   able to sort of intercept the request being sent from one node

23   to another?

24   A.    Well, a number of things.  First of all, all connections

25   between any two peers on Freenet are encrypted, so even if you

 1   were to somehow intercept it, you could not decrypt that

 2   message that was sent between these two peers.

 3          Second of all, how would you be in a position to receive

 4   that traffic?  You'd have to somehow reroute the Internet.

 5   You'd have to be in a position to intercept that traffic.

 6   There is really no way to do it short of physically driving to

 7   wherever those connections are on the Internet to physically

 8   intercept it.  It's simply not received.  It's not routed to an

 9   end point that you are running.

10          MR. DRAUGHON:  That's all from the government, Your

11   Honor.

12          THE COURT:  Okay.  Mr. Robbins.

13          MR. ROBBINS:  Thank you, Your Honor.

14                      CROSS-EXAMINATION

15   BY MR. ROBBINS:

16   Q.   Good afternoon, Dr. Levine.

17          You said 45 rather certainly here today.  Where did you

18   learn that number?

19   A.   I will answer, but I would ask you to stand a little bit

20   closer to the mike.  I believe I heard your question.

21          So that number is based on an examination of data held by

22   law enforcement.

23   Q.   So there is a log or something that you saw that allowed

24   you to conclude that in the month in question, there were no

25   more than 45 nodes -- law enforcement nodes running on any

Levine - Cross

 1  given day?

 2  A.    I didn't see it directly.

 3  Q.    Ah.  So then how did you get that number?

 4  A.    Someone who works for me performed that query and then

 5  reported it to me.

 6  Q.    And what did -- did they see the log?

 7  A.    Yes.  They performed the query.

 8  Q.    And this person who works for you, did they -- is it a

 9  person who works at ICAC Cops or is it a person who works at

10  your university?

11  A.    It's a person that works at my university.

12  Q.    You hesitated.  Do they work both places?

13  A.    No.  They work at my university.  To my knowledge, they

14  performed the query.

15  Q.    So this is really a hearsay inquiry?  You don't know --

16  you didn't look at the log yourself?

17  A.    I didn't look at the logs myself.

18  Q.    You spent a little bit of time talking about numbers, and

19  I want to get back to numbers in a minute, but you also said

20  that the number of -- of peers that you have can be impacted by

21  the settings you select.

22        What settings are selected by law enforcement?

23  A.    Law enforcement are instructed in their training to set

24  their nodes to look like other nodes on the network.  They

25  don't have peers that are very small or very large.  The whole

Levine - Cross

1    purpose of running the law enforcement nodes is to have them

2    act like any other node on the network for two reasons.  One,

3    there could be some argument that maybe their settings affect

4    the performance of the test, I think that's what you are

5    alluding to here, so we try to avoid that sort of query.  The

6    second is it's an undercover operation and you would not want

7    the law enforcement nodes, when they are investigating crimes

8    against children, to be able to be detected by those who would

9    commit those crimes because it would, of course, undermine the

10   purpose of the undercover investigation.

11   Q.    When you ran your tests in -- for the two peer-reviewed

12   papers, did you do anything with the settings for the number of

13   peers your terminals could have in those tests?

14   A.    Well, the nodes that we run are different than law

15   enforcement nodes.

16   Q.    Right.

17   A.    Right.  So we gave them a variety, as is explained in the

18   paper, of different number of neighbors that they might have in

19   order to see whether that would have any effect on the test.

20   Q.    What was the range of number of neighbors that you

21   allowed your nodes to have?

22   A.    I don't recall exactly.  Very similar to something

23   around, you know, say 20 to 40.  But it wasn't especially high

24   or low.

25   Q.    Now, you probably recall that in a prior hearing, you had

Levine - Cross

1   testified that law enforcement nodes could have 100, maybe even

2   200 nodes.  Are you now rejecting that testimony?

3   A.    So, I saw that quote you made of me in your -- I don't

4   know what it's called, in a filing that you made recently, and

5   I feel that my recollection of that testimony was that defense

6   counsel like yourself was asking me a hypothetical, they were

7   drawing out a hypothetical for me to go through, and my

8   response was essentially -- what I meant was I don't know; this

9   is your hypothetical.  They could have this, they could have

10  that.  You tell me is what I meant by that testimony.

11        But in short, I didn't configure the law enforcement

12  nodes and so I didn't know for his hypothetical what he was

13  getting at.

14  Q.    All right.  You have not configured the law enforcement

15  nodes and you have not reviewed, by your testimony in this

16  case, the training that the law enforcement node people get, so

17  you don't know how these law enforcement nodes are configured.

18  Correct?

19  A.    We know that the training is not to set anything that

20  would, again, allow someone to detect that you were in law

21  enforcement by setting it too high or setting it too low, or in

22  addition, to do something that would bring up some question as

23  to whether the test works because these nodes are supposed to

24  be just like any other on the Internet, and all we do, as I

25  have said previously, is log the information that they get.

Levine - Cross

1   Q.    All right.  So, in the nodes that you ran for your
2   studies, the two studies, one in 2012 and one in 2017, running
3   -- and I'm sorry.  You didn't do 2012.  That was the Rouse
4   [phonetic] study.  Is that how he pronounces his name?
5   A.    It's a woman.  Stephanie, I believe her last name is
6   Rouse.  I have never met her.  I am not sure of the
7   pronunciation.
8   Q.    In the Rouse study, they were running 55 nodes and found
9   58,000 pre-net nodes over an eight-week period.  But in 2017,
10  you found 42,000 nodes during the month of January.  Correct?
11  A.    No.  I wouldn't state it that way because you are
12  dropping the units, so to speak.  In other words, her reporting
13  is over an eight-week period.
14  Q.    Right.
15  A.    The number that you stated for us was per day.
16  Q.    You saw 4200 per day, 42,000 during January of 2017 is
17  what I believe you put in your statement?
18  A.    Yes.  I just was clarifying that you can't drop the per
19  day or per month.
20  Q.    Right.  So the month of January 2017, the nodes that you
21  were running saw 42,000 peers?
22  A.    Over that period.
23  Q.    Over the period.  Yeah, not all at once, but over that
24  period?
25  A.    Yeah.  You have to be careful about saw here.  As a

Levine - Cross

1  result of running the operation -- as a result of running an
2  operational node, you are told about the existence of peers
3  that exist in the network.
4  Q.    Right.  Language gets tricky here because it's -- it's
5  easy to attribute to the nodes' automatic performance kind of
6  human actions.  Correct?
7  A.    No.  What I am clarifying is that you directly connect to
8  someone via an IP address, but who you are directly connected
9  to, they will inform you of the existence of other nodes, and I
10  am trying to clarify being told about the existence of other
11  nodes versus directly connecting to some of them.
12  Q.    Well, your papers, and I believe even your declaration,
13  refer to unique identifiers?
14  A.    Correct.
15  Q.    That would be IP addresses or UIDs?
16  A.    No.  That's exactly what I am trying to clarify, that
17  these unique identifiers are what Freenet calls a location.
18  What I am clarifying is a virtual location.  It's not a
19  geographic location.  It's a randomly, arbitrarily assigned,
20  hopefully unique number.  And I am saying that the observations
21  -- the population count is what I am reporting based on
22  operating a node, and that's different than the count of
23  directly connected IP addresses you come across.  So we are not
24  reporting IP addresses but a population count, an estimate.
25  Q.    Now, that population count would be of the users in the

Levine - Cross

 1  Freenet during the time you were observing it?

 2  A.    The number of nodes that were operational.

 3  Q.    Yeah.  All right.  We are going to keep switching words.

 4  A.    I am not switching words.

 5  Q.    Shall we stay --

 6          THE COURT:  Stop talking over each other, please.

 7  It's very hard on the court reporter to keep that straight.

 8  Okay.  You go first, Mr. Robbins, and then you, Dr. Levine.

 9  BY MR. ROBBINS:

10  Q.    I should know better, and I will try to stay with the

11  word "nodes" because I think that's probably what you prefer?

12  A.    I do.

13  Q.    I will try to stay with the word "nodes."

14          In your 2017 study, you found 42,000 nodes by unique

15  identifiers over the month of January 2017.  Correct?

16  A.    Correct.  I wish I had the statement up here, but that's

17  my recollection of what I wrote in the statement.

18  Q.    Let me see if I can find a copy of it for you.

19          This will be Document 73-1 filed with the government's

20  brief.  Now I have to put on my mask to come visit.

21  A.    Thank you very much.

22  Q.    Okay.  All right.  So I think I am referring to paragraph

23  6 of your declaration.  Right?

24  A.    Correct.

25  Q.    And I think I took a quote, I try very hard to use those,

Levine - Cross

```
 1    "We received unique identifiers for over 42,000 nodes during

 2    January of 2017 with an average of 4200 per day."

 3    A.    Correct.

 4    Q.    "And we received nearly 17,000" -- I presume that refers

 5    back to unique identifiers again?

 6    A.    Correct.

 7    Q.    -- "during March of 2020 with an average of about 4600

 8    per day."  Is that correct?

 9    A.    Correct.

10    Q.    How many nodes were you running at that time?

11    A.    This is reported in the paper and I believe it was about

12    20 during March 2020.

13    Q.    So in March 2020, you were running 20 nodes, and with

14    those 20 nodes saw an average of about 4600 IUD -- UID, unique

15    identifiers, of other nodes operating in the Freenet?

16    A.    Correct.

17    Q.    And then in paragraph 7, you then presume that law

18    enforcement can only manage 4200 per day with 45 nodes?

19    A.    No.  I'm sorry.  That's not what that sentence is saying.

20    Q.    Okay.  What is paragraph 7 saying?

21    A.    Paragraph 7 is trying to put all the content above into a

22    single, let's say, takeaway point.  So what I am saying there

23    is that when we look at the paragraphs above, based on our own

24    observations, we made an estimate of, let's say, 4200 per day

25    in 2017, there were 4600 per day in 2020, so that's our best --
```

1    really our only estimate of how many people -- how many nodes

2    there were operational on Freenet, and, as I say, probably a

3    bit higher than that because we surely didn't see everyone, but

4    let's go with something between 4200 and 4600 per day.  So we

5    know that law enforcement were operating no more than 45 per

6    day, so 45 over 4200 or 45 over 4600, you end up with something

7    close to one percent.

8    Q.    But the fact of the matter is that you detected that many

9    with 20 nodes?  You -- not you.  I'm sorry.  The terminals your

10   study -- the nodes your study was running detected unique

11   identifiers for Freenet nodes operating on any given day or on

12   an average day in March of 2020, an average of 4600 nodes with

13   20 terminals, you could see -- there I go again -- the study

14   nodes detected and -- and unique identifying data for 4600

15   nodes.  Correct?

16   A.    Correct.

17   Q.    And, yet, the very next paragraph, you are saying that

18   the 45 nodes wouldn't be able to do that?

19   A.    No.  No.  That's not what it's saying.  I am saying that

20   we estimated the population to be 4600 per day.  Law

21   enforcement were operating 45 per day.  45 out of 4600 is close

22   to one percent of the population.

23   Q.    What is --

24   A.    Perhaps --

25   Q.    What is 20 out of 4600?

1   A.     Something like half a percentage.

2   Q.     And, yet, the study nodes detected 4600 unique

3   identifiers per day?

4   A.     So maybe what you are getting at, and I am very unclear

5   what you are getting at, is that perhaps there were more than

6   4600?  Perhaps if we had operated more than 20 nodes, our

7   estimate of the population would have been larger?  Is that

8   your point?

9   Q.     No.  My point is this:  You, in your testimony today,

10  have indicated that you believe there to be 48 neighbors for

11  most nodes on the median?

12  A.     I measured that in the 2020 paper.  It's Figure 2.

13  Q.     And it can be up to 70; most are 69 or lower?

14  A.     Correct.

15  Q.     That is a number that we also see in the report that was

16  part of your testimony on the first day in this case because

17  the -- the suspect node had 72 neighbors or 72.3 or some such

18  thing.  Do you recall that?

19  A.     I do.

20  Q.     So if every law enforcement node has somewhere between 48

21  and 69 neighbors -- you are shaking your head.  It won't?

22  A.     I don't know where you are getting that figure from.  Law

23  enforcement looks something like everyone else.  So it can be

24  somewhere between -- yeah, somewhere between, I don't know, 20

25  and 60, something that looks very much like the median.

1  Q.    Whatever median is.  So even -- let's say 50 --

2  A.    Okay.

3  Q.    -- that is a good, easy number.

4  A.    Let's use 50 as a hypothetical.

5  Q.    If every law enforcement node has 50 neighbors, then they

6  are getting block requests -- that's what a neighbor does --

7  from those neighbors.  Correct?

8  A.    So there is -- there is two different questions.  One

9  question is when a law enforcement node starts up, what are the

10 chances that they are connected to someone who is requesting

11 child exploitation material?

12        A different question is when someone who is requesting

13 child exploitation materials starts up their node, what are the

14 odds that they are connected to law enforcement?  These are two

15 different questions.

16 Q.    Those may be your questions from an enforcement

17 perspective.  Those are not the questions that I am asking.

18 A.    Okay.  Which question are you asking, sir?

19 Q.    I am asking how many neighbors does a typical law

20 enforcement node have?

21 A.    I don't know.  I am not law enforcement.  But I know that

22 the training tells them that they should do something typical

23 for the network.  What's typical for the network?  You can look

24 at Figure 2 of the paper, which shows, for example, the median

25 is 48.

Levine - Cross

1   Q.    All right.  And of those neighbors, law enforcement

2   terminals are going to act like any other terminal you have

3   told us?

4   A.    Correct.

5   Q.    Except that they are going to law -- except that they are

6   going to pass to ICAC Cops, I guess, any request that has 16,

7   17, or 18 Hops-to-Live?

8   A.    So if someone were to request CSAM and make a request of

9   law enforcement nodes, law enforcement would look at those

10  requests, and regardless of whether -- not knowing whether it

11  was CSAM or not of interest, it would go to ICAC Cops, and then

12  one of the things ICAC Cops would do would be to immediately

13  filter this information based on whether it is previously seen

14  to be a -- of interest, meaning related to child exploitation

15  material.

16  Q.    I think we are getting to where I am trying to ask the

17  question.  There is a law enforcement node.  It pops up onto

18  the network -- and we will get into whether it has more

19  neighbors or not in a minute -- but it pops onto the network.

20  I am the reverend of the Church of the Rising Sun and I am

21  already on the network, okay, and it so happens that when that

22  law enforcement node pops up, it becomes my neighbor.

23        When I send out my special sermon or my special hymns for

24  this work to my faithful flock or when I ask for directions to

25  the gathering of my faithful flock, that request is going to be

Levine - Cross

1  spread across however many neighbors I have.  Correct?

2  A.     When you start up a Freenet node and you install it and

3  the software instructs you that I am now going to connect you

4  with un-trusted neighbors and you unwillingly -- unknowingly,

5  rather, connect to law enforcement, those requests that you

6  sent would be intentionally sent to your -- unknowingly sent to

7  law enforcement.  Law enforcement, as you say, would look at

8  that, sends it to the ICAC Cops server, and then immediately

9  discard it because, judging by your example, what the sermon is

10 about is not of interest to law enforcement.

11 Q.     The question is that -- that request, no matter what it

12 may be, if it has 16, 17, or 18 Hops-to-Live, a law enforcement

13 node is going to send it to the central processer?

14 A.     As the intended recipient, yes, it will send it to the

15 central processer, which will examine it to see whether it is

16 of interest and then drop it.

17 Q.     And the law enforcement node -- if instead of a central

18 processer, the law enforcement node had someone sitting there

19 trying to decipher what my Church of the Rising Sun was sending

20 out, those blocks would be wholly indecipherable?

21 A.     Unless they had also the, you know, the files -- the list

22 of blocks of interest, correct.

23 Q.     And they would have had to have some way to compile that

24 information and do an analysis?

25 A.     Right.  For example, they could read the Frost message

Levine - Cross

1   boards that are dedicated to child exploitation and then look

2   for such manifests.

3   Q.    Trust me, I understand we are talking about CSAM here.

4   That's what you have designed to go it for.  But I am trying to

5   get how the -- how the technology itself works.

6   A.    Okay.

7   Q.    So assume, for the sake of argument, that we are not

8   talking about child sexual assault or material here, we are

9   talking about sermons from the Church of the Rising Sun or

10  something else, I am just trying to see how those files move

11  around because that's the important question for what we are

12  here for today.

13  A.    Okay.

14  Q.    Now, that -- that file, and if there is another law

15  enforcement node who I have as a different neighbor, he will

16  probably get -- I'm sorry -- that node will get different

17  blocks than the node that I just talked about because when I

18  sent the block requests out, they get scattered, everything

19  gets broken down and scattered, so they will get different

20  blocks?

21  A.    They will get different requests for blocks.

22  Q.    Requests for blocks.

23        Now, is it only requests for blocks that get sent to the

24  federal server or is it also blocks themselves?

25  A.    A record of an insert would also be sent because that

Levine - Cross

1  helps reduce false positives of the -- of the -- of the -- of

2  the -- of the method that's used by law enforcement.

3  Q.    Okay.  So all of those will get sent, and then we are

4  relying on the screening function at the central server to get

5  only the ones that we care about?

6  A.    Correct.

7  Q.    I want to go to one more number thing and then I am going

8  to go to a different direction.

9        You, in your two peer-reviewed studies, and I am going to

10 go back to the Rouse study as well, Rouse measures about 58,000

11 Freenet nodes in 2012.  You -- you -- you find unique

12 identifiers for 42,000 nodes in 2017, one month, so it's a

13 slightly different period, I understand, and then for a month

14 in 2020, you found about 17,000 unique identifiers for nodes.

15       Is it fair to say that it looks like the Freenet is

16 shriveling?

17 A.    Looks like it.

18 Q.    Because you have got, for your per-day coverage, you

19 actually did better in March of 2020 than you did in January of

20 2017?

21 A.    Looks like it.

22 Q.    Well, is there any other fair way to read those

23 statements?

24 A.    I think that's one explanation.

25 Q.    What's a secondary one?

Levine - Cross

1  A.    More measurement is necessary.  I think that's a fair

2  explanation, what you are saying.

3  Q.    Okay.  You said something in the course of your direct

4  this morning, afternoon, whatever we are in, about Datastore

5  not directly affecting the routing algorithm, which would

6  suggest that Datastore can indirectly affect the routing

7  algorithm.  Tell us what that means.

8  A.    I can't think of a reason it would indirectly affect it.

9  I was just perhaps hedging a bit there.  So I guess -- I can't

10 think of a reason it would indirectly affect it.

11 Q.    There is -- there is a -- I keep reading these papers

12 trying to figure this out, but there is a function of the

13 Freenet, which some places it's called folding and sometimes

14 it's courting, where you can swap your neighbors -- even if

15 someone hasn't left the network, you can swap neighbors, right,

16 because it might be a more efficient path from the perspective

17 of the Freenet?

18 A.    There is mechanisms in Freenet to -- to move nodes around

19 to try to make the network more efficient at retrieving

20 requested information.

21 Q.    And -- and what that is is it -- it -- a node asks for a

22 block and it goes out maybe a couple of hops, and somebody

23 says, Here it is over here, do you want to make that -- that

24 node -- do you want to make that node a neighbor?  And, again,

25 I am going into the human -- the human characterization, but do

1   you understand what I am trying to ask?

2   A.    I do.  Sorry.  What is your --

3   Q.    The question is:  There is a folding function within the

4   Freenet so that it operates more efficiently.  Correct?

5   A.    Correct.

6   Q.    And that folding function is based upon the Freenet's

7   perception of there being a faster way to move data around.

8   Correct?

9   A.    An appearance of a faster way, correct.

10  Q.    The Freenet could be wrong, I suppose, but it believes

11  that's a faster way?

12  A.    Correct.

13  Q.    So the Freenet, itself, or the nodes of the Freenet offer

14  to one another to -- to change the neighbor configuration that

15  may have existed when the node first came onto the big ring?

16  A.    Correct.  There is a rearrangement of the topology.

17  Q.    And that's why you get some connections of neighbors

18  across the ring or wherever?

19  A.    Correct.

20  Q.    And the -- in the old -- the old paper by Becker when

21  they first started trying to look at the Freenet, when I look

22  at that, he called it folding.  I think you have called it

23  something else.

24  A.    I am familiar with what you are talking about.

25  Q.    Okay.  If -- if there is a terminal -- if there is a node

Levine - Cross

1    that has a larger Datastore, it is going to be a shortcut to

2    more blocks, is it not, of any kind?

3    A.     So, that mechanism of rearranging -- so yes, it might be.

4    I will just say that.

5    Q.     And, again, I understand what you are looking at, but the

6    fact of the matter is if a law enforcement node acts like any

7    other node, probably 60-some-percent of its Datastore is going

8    to be innocent information because your study says 30, 35

9    percent is CSAM.  Is that fair?

10   A.     What I actually said was that 30 percent or so of the

11   requests were for CSAM.  That's different than what's in the

12   Datastore, but we could assume it's something close to that.

13   It's just a slightly different measurement.  But if you want,

14   we could assume.

15   Q.     So in -- I have to double back, I don't know that it's

16   directly relevant for this part of the question, but when you

17   say "request," is that just top-level manifest requests or does

18   that include the sub-level manifest requests that you talked

19   about the other day?

20   A.     Any requests that come in for a specific block, if the

21   block is for a manifest that's of interest, meaning related to

22   child exploitation materials, we count that as a cell.

23   Q.     So any one of them will count?

24   A.     Any block request.

25   Q.     And that's fair enough.

Levine - Cross

```
 1        And the -- the bigger file, the more blocks it's going to
 2   have?
 3   A.    Correct.
 4   Q.    So when you said "not directly," that leaves open the
 5   possibility that indirectly Datastore is going to impact how
 6   much neighbors it has?
 7   A.    Let me amend that statement, then.  I think Freenet is a
 8   complicated network.  I think there are many factors that
 9   influence its operation.  I think -- I can't think of an
10   indirect reason that it would affect the results of the test.
11   I think to the extent that it does and that I am overlooking
12   something, then our careful examination and evaluation in situ,
13   which I talked about during my last testimony, takes it into
14   account.  I don't see a reason why the Datastore would affect
15   any result that we are doing.
16        I think even if you doubled your Datastore, it wouldn't
17   have a significant effect on what we are talking about.  The
18   mechanisms you are referring to, path folding, are just a
19   normal part of the operation of Freenet to make it a small
20   world.  And, in fact, I think it makes the results better, this
21   movement of peers back and forth, because it allows a certain
22   amount of churn that we talk about in the paper and it brings
23   things closer to an even share is what it's sometimes been
24   called colloquially which is the high-level explanation for why
25   our method works.
```

Levine - Cross

1    So I think all in all, I will just state very clearly

2    right now I don't see a reason that the Datastore would have

3    any appreciable effect on the results of the test given that

4    it's within normal settings of the algorithm.

5    Q.    Not on the results of the tests but perhaps on the number

6    of peers that a law enforcement node would typically have?

7    A.    I don't see how you are coming to that conclusion.  If

8    you want to clarify why you think that's the case, I could try

9    to agree with you, but I don't see your reason for it.   My

10   primary concern is the -- the accuracy of the test and the

11   operation of law enforcement nodes, and with those two things

12   in mind, I don't see how a Datastore being half as large or

13   double would affect the outcome.

14   Q.    Understood.

15         And I understand that your goal is to make sure that your

16   test produces accurate results.  If it says that something is

17   there, it really is there.  And that's -- that's not the issue

18   that we are looking at here.

19         The question is whether the law enforcement nodes -- the

20   question for today really, from your perspective, is the size

21   of the presence of the law enforcement nodes.  So if the law

22   enforcement -- so the question becomes:  If the law enforcement

23   Datastore can impact its number of neighbors, that's the

24   question, and you are saying it's possible?

25   A.    I don't think -- no.  No.  I don't believe the Datastore

1    would affect the number of neighbors it has.  That's a
2    different question than you asked me to my recollection here
3    today.
4    Q.    All right.
5    A.    I'm sorry.  Maybe you could rephrase the question so I
6    can answer it clearly right now?
7    Q.    The question that Mr. Draughon asked was:  Can the
8    Datastore impact the routing, and you said not directly, which
9    is what --
10   A.    Oh, the routing -- I'm sorry.  Go ahead.
11   Q.    That's what raised the question.
12   A.    The routing is different than the number of neighbors.
13   To my recollection, just right now, you said, Would it affect
14   the number of neighbors?
15   Q.    Okay.
16   A.    That's different than the routing.
17   Q.    Explain the difference.
18   A.    The number of neighbors you have is simply the number of
19   neighbors.  It's a setting that anyone can adjust.  The
20   routing, to me, is a decision by a node, by the software whom
21   -- to whom should I send this request, neighbor A, neighbor B,
22   neighbor C, and so on.  Routing to me is a decision just like
23   when you are at a traffic light, should I make a left or a
24   right or go straight, that's a routing decision.  The number of
25   neighbors is akin to I have three options: left, right, or go

Levine - Cross

```
 1  straight.
 2  Q.    Fair enough.
 3        And it is your -- your belief that the law enforcement
 4  nodes had a -- had -- were working with -- they were, like
 5  every other node, the median presence of 48 neighbors and maybe
 6  higher, maybe lower?
 7  A.    Correct.
 8  Q.    Fair enough.
 9            MR. ROBBINS:  I have no further questions, Your
10  Honor.
11            THE COURT:  I have a couple.
12            THE WITNESS:  Yes, Your Honor.
13            THE COURT:  You know I always have a couple.  I
14  appreciate it.  Bear with me so I can -- I am trying to get
15  this.
16        Okay.  You testified that -- to Mr. Draughon's question
17  that there is about, in the operative time period, 45 law
18  enforcement nodes in operation.  Am I getting that right?  This
19  was the June 2018 time frame?
20            THE WITNESS:  At most during any given day.
21            THE COURT:  Oh, okay.  Right.  But -- and you said
22  that it was a colleague of yours who ran a query to ascertain
23  that number.  Right?
24            THE WITNESS:  Correct.
25            THE COURT:  Are you familiar with what the query is
```

Levine - Cross

1  to get that number?  Like, how does it work?

2          THE WITNESS:  Well, there is logs of all this

3  information.  Excuse me.  There is logs of all this

4  information, and as we saw in the exhibits the last time I was

5  here, for each row of information that's in the spreadsheet, we

6  saw a law enforcement I.D. number that was associated with that

7  bit of logged information.  So those numbers, to my knowledge,

8  are not sequential.  For example, one of them, to memory, was

9  2145.  I believe they are randomly assigned.  So you can look

10  at all of the logged information and say how many distinct law

11  enforcement I.D.s were there on any given day?  So it would be

12  like a database query that would do that.

13          THE COURT:  So you, as the query runner, are given

14  the unique I.D.s that are known to be a law enforcement node?

15          THE WITNESS:  Correct.  And then you could count the

16  number of distinct I.D.s.

17          THE COURT:  That makes sense to me.

18      Who gives you the list of unique I.D.s that are known law

19  enforcement nodes?

20          THE WITNESS:  I don't know if they looked at the

21  exact law enforcement I.D.s like the Freenet I.D., if that's

22  what you are referring to, Your Honor, or just counting the

23  2145, but that --

24          THE COURT:  Well, see, that's important.  That's why

25  I am asking is because the testimony has been about law

Levine - Cross

1    enforcement, but one of my follow-up questions is what is law

2    enforcement?  Is it one particular agency like the FBI working?

3    Is it FBI in conjunction with other state agencies?  See, I'm

4    trying to understand that subset and who or what is law

5    enforcement.  And one of the ways to ask that is to ask about

6    how your associate received that information, the known -- the

7    known of law enforcement so you could run the query?

8              THE WITNESS:  So there is a database in Pennsylvania

9    of the information that's been logged as part of law

10   enforcement's use of these -- of these tools.

11             THE COURT:  Okay.

12             THE WITNESS:  So that database is very carefully

13   annotated by which law enforcement node -- and I will get to

14   your full question -- which law enforcement node logged that

15   information to the server, and that law enforcement node is

16   identified both by its -- well, this virtual location that

17   Freenet assigns to it and also a law enforcement I.D.  We can

18   see that.  I am making that conclusion by looking at the

19   spreadsheet.

20        To your question of what -- which law enforcement, to my

21   knowledge, FBI has done operations on this as do state law

22   enforcement.  Our primary contacts are state law enforcement.

23             THE COURT:  Okay.

24             THE WITNESS:  Or both, really.  Or both.

25             THE COURT:  So if I am getting it, then, there is the

1    Pennsylvania server of information, and that's where law

2    enforcement agencies go to obtain information on CSAM.  Is that

3    fair?  And that's where the law enforcement -- I'm trying to

4    understand where you got those unique I.D.s that you then used

5    the query to figure out that on any given day, 45 nodes are law

6    enforcement?

7            THE WITNESS:  From that database in Pennsylvania that

8    all, to my knowledge, all law enforcement use when running

9    Freenet operations.

10           THE COURT:  And I'm sorry, remind me, the

11   Pennsylvania database is where the filtered CSAM information

12   goes once the law enforcement node is up, running, and

13   gathering the information off of the Freenet?

14           THE WITNESS:  Correct, Your Honor.

15           THE COURT:  And you go sort of backwards, you figure

16   out which unique identifier and law enforcement I.D. nodes are

17   in that Pennsylvania --

18           THE WITNESS:  Database.

19           THE COURT: -- database, and then you run those unique

20   identifiers through to come up with 45 on any given day?

21           THE WITNESS:  Maximum any given day, Your Honor.

22           THE COURT:  Got it.

23       And then the next piece, as I understand your testimony,

24   is any -- at the same time, maybe give or take a year here or

25   there, the -- the -- any node on the Freenet has an average of

Levine - Cross

1    48 neighbors?

2            THE WITNESS:  A median.  Almost the same thing, very

3    close.  Let's say median just to be precise.

4            THE COURT:  But the top is like 70, right?

5            THE WITNESS:  Again, there is a Figure 2 in my paper

6    which is one of the exhibits.  I think the very top was, by

7    memory, 80, 81.  99 percent of them by eye looked to be about

8    70, 69, or lower.

9            THE COURT:  Then maybe you can explain to me the

10   math.  I then understood your testimony to be, as part of your

11   affidavit, you discussed, when doing the -- doing the math on

12   the percentage of law enforcement nodes against the entire

13   population of Freenet nodes, you referenced that in your

14   January 2017 paper.  Is that right?

15           THE WITNESS:  Correct.

16           THE COURT:  There were an average of 4200 unique

17   identifiers per day?

18           THE WITNESS:  Correct.

19           THE COURT:  And that was based on your 20 nodes?

20           THE WITNESS:  No.  I'm sorry.  Not per day.  Did you

21   say 42,000 per day or did you say 4200?

22           THE COURT:  I am looking at the sentence, "We

23   received unique identifiers for over 42,000 nodes during

24   January 2017 with an average of 4200 per day."

25           THE WITNESS:  Correct, Your Honor.

Levine - Cross

```
 1              THE COURT:  Okay.  So, and that was having 20 of your
 2    own nodes up and running?
 3              THE WITNESS:  20 or so.
 4              THE COURT:  Okay.  Maybe the difference is between
 5    node and unique identifier, but when I do the rough math,
 6    that's 20 nodes with 200.
 7              THE WITNESS:  There is a difference.
 8              THE COURT:  Okay.  Tell me the difference.  Maybe I
 9    will figure out where my math error is.
10              THE WITNESS:  Okay.  So if I am on Freenet and I am
11    running a node, I might have 30 -- let's make the numbers easy
12    if it's okay -- I might have ten neighbors, and I will learn
13    directly about those ten neighbors.  Each of those ten
14    neighbors has ten neighbors, and they will tell me not the IP
15    addresses of those neighbors, they will not -- they will tell
16    me only that they exist.  They will actually even tell me this
17    virtual location.
18         So from each of my ten neighbors, I will learn about the
19    existence of ten other nodes.  So by putting up a node, I am in
20    direct communication with only ten nodes, but they tell me that
21    there are 100 other nodes in existence.  It's sort of like if I
22    go to a baseball stadium, I sit next to about ten people, but
23    they -- maybe that's not the right analogy here.  But my
24    friends have friends.
25              THE COURT:  Got it.
```

1          THE WITNESS:  I can get in touch quite easily with

2    100 people by contacting ten of my friends.

3          So estimating the population of Freenet is a very

4    different number than the very limited, very, you know, much

5    smaller number than I am in direct communication with.  So the

6    number of neighbors you have is just one hop away.  The

7    estimate of how many people are two hops away from you, it

8    exponentially increases.

9          THE COURT:  So the reason why you are discussing this

10   is because unique identifiers, that term is as to the friends

11   of the friends on Freenet, not just the immediate neighbors?

12          THE WITNESS:  Correct.

13          THE COURT:  So I am really not -- I am not measuring

14   -- I am measuring apples against oranges when I say nodes

15   versus unique identifiers?

16          THE WITNESS:  That's what I am trying to get across,

17   Your Honor.

18          THE COURT:  All right.  That's helpful.  I think

19   those are all of -- I think those are all of my questions.

20          Did anybody have any follow-up questions from either

21   me -- or Mr. Draughon, let's go back to you for any redirect.

22          MR. DRAUGHON:  Yes, Your Honor.  I have a few

23   questions, Your Honor.

24                        REDIRECT EXAMINATION

25   BY MR. DRAUGHON:

1    Q.    Sir, I am going to show you Government Exhibit No. 2,

2    which is the paper you referred to a forensically sound method

3    of identifying downloaders and uploaders.

4          Is this the figure that you were referring to?

5    A.    Yes.  That's exactly Figure 2.

6    Q.    When you were talking about the size of the Datastore,

7    were you referring to the Datastore of the law enforcement

8    nodes or the Datastore of the law enforcement server in

9    Pennsylvania?

10   A.    Oh, always the Datastore of the law enforcement nodes.

11         MR. DRAUGHON:  That's all I have, Your Honor.  Thank

12   you.

13         THE COURT:  Mr. Robbins, any follow-up?

14         MR. ROBBINS:  Thank you, Your Honor.

15                       RECROSS-EXAMINATION

16   BY MR. ROBBINS:

17   Q.    Leaving aside the neighbors of neighbors -- sorry about

18   that.

19         Leaving aside the neighbors of neighbors, if each law

20   enforcement node has about 50 neighbors, then the total number

21   of neighbors to law enforcement nodes would be figured out by

22   the number of law enforcement nodes times 50 neighbors.

23   Correct?

24   A.    In your hypothetical, that would be a maximum because

25   sometimes they will overlap by accident.

1  Q.    As in this case we had, but that would be the, kind of

2  the universe?

3  A.    That would be the upper bound.

4          MR. ROBBINS:  Got it.  Thank you.

5          THE COURT:  All right.  Thank you, Dr. Levine, for

6  your testimony.  I appreciate it.  You may step down.

7          THE WITNESS:  Thank you, Your Honor.

8          MR. DRAUGHON:  Your Honor, the government calls

9  Detective Robert Erdely.

10          THE DEPUTY CLERK:  Please step up to the witness box.

11  Please remain standing and raise your right hand.

12        ROBERT ERDELY, GOVERNMENT'S WITNESS, SWORN

13          THE DEPUTY CLERK:  Thank you.  Please be seated.

14        Please state your full name for the record and please

15  spell your first and last name.

16          THE WITNESS:  Robert Erdely, R-O-B-E-R-T,

17  E-R-D-E-L-Y.

18                    DIRECT EXAMINATION

19  BY MR. DRAUGHON:

20  Q.    Sir, can you describe your employment history?

21  A.    Yes.

22          THE COURT:  And before you start, Detective Erdely,

23  if you are comfortable and you are vaccinated, and those are

24  two ifs, and you don't have to disclose it, you can take off

25  your mask, but you don't have to.  It's totally up to you.

1      THE WITNESS:  I am fully vaccinated.  Thank you, Your

2  Honor.

3      THE COURT:  All right.

4  BY MR. DRAUGHON:

5  Q.    Can you describe your employment history?

6  A.    Yes.  I started with the Pennsylvania State Police in --

7  I went in the academy in October of 1991.  I continued until I

8  retired April of 2012.  The day I retired, the very next day, I

9  started with the Indiana County District Attorney's Office.  As

10 I was employed by the Pennsylvania State Police, I progressed

11 through different positions, but, ultimately, I ended up with

12 the computer crime unit in 1998, the end of 1998.

13     I continued with that role as a computer crime

14 investigator and forensic examiner through until about 2007, at

15 which time I became the computer crime unit supervisor for the

16 state of Pennsylvania, and I continued with computer crime work

17 with the Indiana County District Attorney's Office.

18     While I was with the Pennsylvania State Police, they sent

19 me through different training to be in that unit, some specific

20 to computer forensics, others more related to just technology

21 in general.  I went through four different certification

22 processes for computer forensics.  Two were software specific,

23 end case and guidance software, and two were more broad through

24 the Federal Law Enforcement Training Center and another

25 organization known as IASIS.

1  Q.    So in your role, you mentioned in 2007, you became

2  supervisor of a computer crime unit.

3        Can you discuss what you did in that role as it pertains

4  to this case?

5  A.    Yes.  Around that same time in 2007, I began development

6  of a system that would allow me to search file sharing networks

7  and receive that publicly available information and turn it

8  into investigative leads, a starting point to do

9  investigations.

10       The system ultimately grew into what it is today, and

11  it's referred to as ICAC Cops.  After my initial development,

12  at some point, we became involved with University of

13  Massachusetts, Amherst to continue development beyond what I

14  had started.  And from there, we developed several law

15  enforcement pieces of software, investigative tools for law

16  enforcement, one of which is investigative protocol or

17  technique for Freenet investigations.

18  Q.    You mentioned that you retired.

19       Are you still involved in any capacity with ICAC Cops?

20  A.    Yes.  So I retired April of 2020 from the Pennsylvania

21  State Police.  Right around the time I retired, I believe just

22  before, there was a memorandum of understanding established

23  between the Indiana County District Attorney's Office and the

24  Pennsylvania State Police so that I could continue to be part

25  of the development and maintain -- continue to maintain the

1  server as a system administrator and database administrator.

2  So I am still in that role today.

3  Q.    You mentioned Freenet in your response.

4       How long have you been involved in investigations that

5  involve Freenet?

6  A.    Since its inception 2011, 2012, I believe, in that time

7  frame.

8  Q.    Are you familiar with the law enforcement software that

9  is used with Freenet?

10 A.    Yes, I am.

11 Q.    How are you familiar with that software?

12 A.    I worked side-by-side with the primary programmer that

13 works for the University of Massachusetts, Amherst.

14 Q.    Have you testified about Freenet before?

15 A.    I have done investigations, used the software.  I don't

16 believe I have ever been in federal court as an expert on

17 Freenet, though.

18 Q.    Have you testified about other peer-to-peer sites?

19 A.    Yes.  All the other peer-to-peer software, I have been in

20 state and federal courts and been certified as an expert

21 relating to file sharing in general, but not one specifically

22 for Freenet, but all the other ones, yes.

23 Q.    Approximately how many times have you testified about

24 peer-to-peer forensics?

25 A.    More than 100.  That's conservative.  That's a

1  combination of some of my own cases but mostly supporting other

2  people's cases as being one of the, you know, primary

3  developers and been involved since its inception.

4  Q.    You mentioned in a prior answer that you have been

5  certified as an expert.

6        What were you certified as an expert in?

7  A.    Peer-to-peer file sharing, computer forensics, technology

8  in general.

9            MR. DRAUGHON:  Your Honor, at this point, the

10  government moves to qualify the witness as an expert in

11  computer crimes and forensics with peer-to-peer file sharing

12  networks.

13            THE COURT:  Any voir dire?

14            MR. ROBBINS:  Very briefly, Your Honor.

15            THE COURT:  Okay.

16                   VOIR DIRE EXAMINATION

17  BY MR. ROBBINS:

18  Q.    Good afternoon, sir.

19  A.    Good afternoon, sir.

20  Q.    In your resume, you note two different cases where you

21  testified this year probably in federal court.  Is that

22  correct?

23  A.    Yes, sir, the last two on my C.V.

24  Q.    The last two on your C.V.?

25  A.    Yes, sir.

Erdely - voir dire

1   Q.    I'm sorry.  One of them was *United States vs. Gonzales.*

2   What district was that in?

3   A.    I am not sure if Arizona has more than one district, but

4   it was in Phoenix, Arizona.

5   Q.    In Arizona.  Okay.

6         And the network was the issue in that case?

7   A.    It was a BitTorrent case.

8   Q.    And then you also talked about *United States vs. Jones*?

9   A.    Yes, sir.  They were running in tandem, but also a

10  Phoenix, Arizona case, also BitTorrent.

11  Q.    In your C.V. and again here, you have mentioned not only

12  peer-to-peer networks but also computer forensics and computer

13  expertise.

14        They are related but slightly different.  Correct?

15  A.    Correct.  Computer forensics and peer-to-peer file

16  sharing are two different things.

17  Q.    And it's a different approach, and in both cases, you are

18  going to try to be accurate, but you have to have a different

19  skill set for each?

20  A.    I would tend to agree with that statement.

21        MR. ROBBINS:  I have no further questions, Your

22  Honor.

23        THE COURT:  And just so I am clear, the government is

24  offering Detective Erdely on both peer-to-peer and computer

25  forensics.  Is that correct?

Erdely - Voir Dire

```
 1              MR. DRAUGHON:  That's correct, Your Honor.

 2              THE COURT:  With that, do you have any other

 3   follow-up?

 4              MR. ROBBINS:  We would ask that the government step

 5   back from the forensics.  I don't think it's relevant for

 6   today.

 7              THE COURT:  Do you want to approach?

 8              MR. ROBBINS:  It would probably save us some time.

 9              THE COURT:  Maybe we should discuss this at the

10   bench.

11         (The following discussion was held at sidebar; all

12   counsel present.)

13              MR. ROBBINS:  I suspect, Your Honor, that the

14   government doesn't truly need Mr. Erdely as a computer

15   forensics expert for their purposes today, and I wouldn't want

16   that to come back and bite us at some later point if there is

17   some issue on the computer forensics.

18              THE COURT:  I don't understand.

19              MR. ROBBINS:  That, today, he's here principally, as

20   I understand it from his -- his statement that was submitted,

21   he's here to speak to his knowledge of peer-to-peer networks

22   and specifically his knowledge as the custodian of the ICAC

23   Cops system.  None of those things are really dependent on his

24   expertise or lack thereof in forensics, and so there is no

25   reason to designate him as a forensic expert for purposes of
```

1    today's hearing.

2              THE COURT:  What's going on here?  Who is handling

3    the witness?

4              MR. DRAUGHON:  I am handling the witness.

5              THE COURT:  Then you give me the -- you do Cyrano and

6    you give me the bottom line.

7              MR. DRAUGHON:  Your Honor, the concern is that the --

8    how the data moves through the law enforcement nodes may be

9    relevant to the Court as opposed to just what happens with the

10   server.

11             THE COURT:  And wasn't the voir dire about cases that

12   we discussed the last time we were all together, about the

13   difference between -- I have a feeling, given the briefing that

14   I have read and thought about, that the difference between some

15   of the cases that I was giving you all and the way in which the

16   investigative, you know, how playpen and NIT worked versus how

17   this works is really central before me.  To the extent this

18   detective has any training and expertise on it, since

19   peer-to-peer file sharing -- there is a universe of

20   peer-to-peer filing, some have been investigated one way and

21   some have been investigated another, I am going to overrule the

22   objection because it sounds like the government is going to be

23   eliciting evidence in that that's relevant and in that

24   wheelhouse of this detective.  That's why I asked because I

25   wanted to make sure you had a full opportunity to voir dire in

1    the event you think he's not qualified for that.

2          MR. ROBBINS:  Based on the statement that the

3    government provided and the notice that he was going to be

4    testifying to the information in his statement, that does not

5    include anything about computer forensics, and so I am not

6    really prepared to talk about computer forensics.  I am

7    prepared to deal with anything that pertains to the network.

8    But the computer forensics is really not -- not at issue in

9    this hearing, so I am a little surprised by that designation.

10          THE COURT:  Well, so is your -- is your objection a

11    lack of notice objection?

12          MR. ROBBINS:  Well, I would add that objection in.

13          THE COURT:  Well, I am trying to figure out what your

14    objection is.  Is it that he doesn't have a basis, a training,

15    education, and experience, because on that, I'd overrule it.

16          MR. ROBBINS:  Yeah.  I understand -- on the surface,

17    Your Honor, I understand that.  I just, I have not examined him

18    as a computer forensics individual before this hearing because

19    there was no real reason to anticipate that we were looking at

20    computer forensics today.

21          THE COURT:  Well, to the extent he is discussing how

22    ICAC Cops works --

23          MR. ROBBINS:  -- fully qualified.

24          THE COURT:  And so to the extent that he is going to

25    say that ICAC Cops works in tandem with UMass, it's a passive

1    receptacle of information, it doesn't do any searching on

2    anybody's computers, I am going to allow all that.

3           MR. ROBBINS:  I understand.

4           THE COURT:  That may overlap.  So I think the way we

5    should deal with this is to the extent you think that the

6    government is wading into testimony that you haven't received

7    proper notice of, object, and we will discuss it, but until we

8    get into the testimony, I really can't call it.  I will

9    overrule the objection for him being qualified in both areas.

10   Does that make sense?

11          MR. ROBBINS:  And I have no -- I have no difficulty

12   with where I anticipate the government going.  I was really

13   thinking downstream.  I don't want to create havoc for later.

14          THE COURT:  Well, then let's take it -- we will take

15   it incrementally and we will see where it goes.

16          MR. DRAUGHON:  Thank you.

17        (End of sidebar discussion.)

18          THE COURT:  Welcome, Detective.  You are qualified as

19   an expert on peer-to-peer file sharing and forensics.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  Okay.  Mr. Draughon.

22               DIRECT EXAMINATION (Continued)

23   BY MR. DRAUGHON:

24   Q.   Sir, prior to your testimony today, did you have an

25   opportunity to review Government Exhibit 7?

1   A.    Yes, I did.

2   Q.    And are you familiar with what Government Exhibit 7

3   outlines?

4   A.    Yes, I am.

5   Q.    Can you briefly tell the Court what that is?

6   A.    Yes.  It's a, just a single page, and it graphically

7   shows the process in which we view observations on Freenet and

8   how they are routed to ICAC Cops and that -- what they are done

9   with once they are received at that location.

10            THE COURT:  Do I have Government 7?

11            MR. DRAUGHON:  Let me hand you a copy, Your Honor.

12            THE COURT:  Great.  Thank you.  And does defense have

13   Government 7?

14            MR. ROBBINS:  Mr. Draughon gave us a copy, Your

15   Honor.

16            THE COURT:  All right.  Thank you.  Thank you.

17            MR. DRAUGHON:  Thank you, Your Honor.

18        At this point, I am going to use Government Exhibit 7

19   with this witness.

20            THE COURT:  Sure.  Okay.  Thanks.

21   BY MR. DRAUGHON:

22   Q.    Sir, referring to Government Exhibit 7, can you walk us

23   through what happens when a law enforcement node receives a

24   request for CSAM?

25   A.    Yes.  So, in this example, if you look at the left, there

1   is a section that says "Freenet node run by user," and that

2   Freenet user, the yellow smiley face wants to download a file.

3   And although it's hard to read on the ELMO, it says in the

4   little captioned area that there are 600 blocks necessary.  And

5   as you can see in this example, that Freenet node or user, node

6   being run by a user, rather, is connected to five peers.  Peer

7   four is the law enforcement Freenet node.

8          So what happens typically is that they will just

9   approximately in equal portions send off the request for those

10  blocks of data which make up that whole file somewhat equally.

11  And peer four will receive direct communication because each

12  one of those five peers connected to the main Freenet node in

13  yellow have a direct connection with each other.  Albeit the

14  connections are encrypted, they are just communication between

15  Point A and Point B.  And all I know is what information is

16  told to me directly.  I have no ability to see any of the other

17  communication to peer one, two, three, or five.

18         And so when I get the request for a portion of those 600

19  blocks, what the law enforcement Freenet node does above and

20  apart from what Freenet requires to be done is that it just

21  sends these observations that were directed to peer four, the

22  law enforcement node, to a server.

23         And in that server, we have a list of all the blocks that

24  make up all the files that we currently investigate on Freenet.

25  There is -- and I did check as of November 1st when I wrote my

1  affidavit -- there was just over 150,000 files that we have

2  identified on Freenet, and each one of those 150 or so files

3  have a number of blocks associated with them.  So this law

4  enforcement server, ICAC Cops, has a list of those 150,000

5  files, but more importantly, each and every block that makes up

6  those 150,000 files.

7       So once the observation happens to peer 4 from the

8  Freenet node and it arrives at the Freenet server, that's where

9  we determine whether or not this is one that we will

10 investigate.  And the way we do that is I just simply match the

11 value of the block requested with all the values belonging to

12 those 150,000 files, and if it matches, we insert a record or

13 we write an entry in the database detailing that observation.

14      If the hash does not match, it is never written.  It's

15 the comparison is made, and poof, it's gone.  It would serve

16 really no purpose to even record that because the files are

17 identified by a unique identifier that -- it uniquely

18 identifies the piece of the file, but I don't even know what

19 they go to.  I have to know all of the pieces that make up a

20 file for it to have any relevance to me and law enforcement's

21 investigations.

22      So that's essentially what happens once the observation

23 happens to any of our law enforcement nodes.

24 Q.   And the law enforcement server that we see on the bottom

25 right, is that what we have been referring to as ICAC Cops?

1    A.    Yes.   That's one element of what ICAC Cops does.

2    Q.    The method that you outlined going from a Freenet node

3    run by a user sending a request to a law enforcement node and

4    that law enforcement node sending it to the server, is that the

5    same as a Network Investigative Technique?

6    A.    Oh, no, not at all.

7    Q.    How is it distinct?

8    A.    We are only looking at what is publicly available, and

9    more specifically, direct communication from one user to a law

10   enforcement node.   No other communication between any other

11   nodes.   It has to be a law enforcement node directly connected

12   to some other user of Freenet.

13         With a NIT, they might use an exploit or something to see

14   more information beyond what is publicly available.   That's not

15   what's happening here.   This is like trash at the curb.   It's

16   just available to the public.   Anyone can see this information,

17   see the IP addresses of these nodes when you are directly

18   connected to them.   If I am not, I have no idea.

19   Q.    Are law enforcement nodes tracking any users or searching

20   for users on Freenet?

21   A.    No, not at all.   We connect like any other user and we

22   just sit there passively.   And as requests come to us from any

23   of the nodes we are connected to, we do this comparison that I

24   just outlined in my testimony just seconds ago.

25   Q.    And can you specify what information law enforcement

1   nodes would pass to ICAC Cops?

2   A.    Yeah.  The law enforcement node, first of all, it has to

3   know the IP address.  When you are directly connected to users

4   on the computer, whether my connection is to a web server or I

5   am sending an email, we are going to know the IP address.  So

6   the IP address, there is also something referred to as a

7   networking port, the date and time that the observation

8   happened, the -- it's actually a SHA256 hash value of the block

9   of data which is 32 kilobytes, which, again, it would be

10  meaningless unless we knew what files that block would go to,

11  and then it's date and time stamped.  If we insert it, all that

12  information would be written to the law enforcement server.

13  Q.    You mentioned that you checked prior testimony in your

14  statement to the Court how many CSAM files were on the server

15  in ICAC Cops.

16        Did you do any analysis of those files when you checked

17  it?

18  A.    Yes.  So if you can imagine two portions of data, the

19  first portion is a record of what files we found on Freenet via

20  something called a free site or the message boards, but,

21  essentially, it's the same way Freenet users find files

22  themselves.  So we, as law enforcement, do the same thing the

23  public does, the Freenet community, I should say, and we go to

24  these free sites, and often, they indicate the type of material

25  that you should expect to find.  For instance, you might find a

1  free site labelled "PTHC."  Throughout my years of doing these

2  investigations, I know that means preteen hard core or preteen.

3  Or sometimes they indicate it by age.  Ten YO would tell me ten

4  years.  So we find those sites.  And these sites are just like

5  a website except they only live on Freenet.  You can only

6  access them on Freenet.

7      And from there, you can discover a key to a file.

8  Oftentimes they are labelled or the file names and such tell

9  you what the content purports to be at the very least.  And so

10  we collect those, just like the end user would collect a key to

11  get a file that he or she was interested in.  So -- so that's

12  the first part.  We are going to document the key.

13      And then there is something called a manifest, and it's

14  one of the more important parts because that's the only thing

15  that's going to tell me what blocks of data belongs to what

16  files.  And so then we are going to take that key and document

17  the -- the key that initially starts the downloading process,

18  but we want to get the manifest so we can list all the block

19  unique values associated with that file.

20      And so all that information --

21          THE COURT:  How do you get the manifest, sir?

22          THE WITNESS:  It comes down through Freenet.  It's

23  actually part of the data.  So the key gets us the manifest.

24  Then once you have the manifest, you can actually start

25  requesting these blocks of data, and each block of data on

1  Freenet is 32 kilobytes, which is pretty small.  So there is

2  lots of them.  And so we document that.

3      Now, I know here is a file, here is the -- the check key

4  or SSK key that would get us the manifest, and then we can

5  start asking for the individual blocks of data.  So we document

6  that just as a starting point for law enforcement because

7  without that, I can't do the comparison later.

8      So then the second thing in our database, ICAC Cops, is

9  all the observations that are a direct result from that earlier

10 work I spoke of, the comparison happens, and we either choose

11 to keep it or throw it away.

12     So in preparation for this hearing, what I did was I

13 first looked -- and I didn't try to go back in time.  As of the

14 writing of my affidavit, there were 150,800ish -- I don't have

15 my report in front of me -- but files, and then I knew all the

16 -- the blocks of data that make up those 150,800-and-some-odd

17 files, and I compared those blocks, the hash value associated

18 with those blocks to our observations to ensure that that's all

19 we have in our database.  We are not collecting everything out

20 there.  We are only collecting information about these 150,000

21 files.

22     I don't think -- we don't have enough equipment, staff,

23 bandwidth to even consider capturing all the data on Freenet.

24 We have a, more of a targeted approach where we are only going

25 to be able to receive information that we are directly

1    connected to and is available to the public and then record

2    observations.  It's meaningful to law enforcement.

3         Again, even if I did try to collect everything, I am not

4    saying it's impossible, I don't think it's possible for me and

5    our setup with our hardware, but it's meaningless because if

6    you don't know what data that file is part of and have a

7    decryption key to even get into the data, it's meaningless.  It

8    has no investigative purpose.

9    BY MR. DRAUGHON:

10   Q.   How would ICAC Cops be able to determine whether or not

11   the request that is transferred from the law enforcement node

12   was from an original requestor?

13   A.   So -- and that's where the analysis and the paper written

14   by University of Massachusetts, Amherst comes into play.  It

15   comes down to statistics and probability.  And actually in my

16   report, I had a couple graphics that make it easier for me to

17   explain, but in a nutshell, just keeping all things equal,

18   nice, round numbers, if I am a node, whether I am law

19   enforcement or not, it really doesn't matter.  I am just going

20   to speak of the probabilities here in pretty laymen's terms.

21        So if I am a node and I have ten people connected around

22   me and I want to get a file that has 1,000 blocks of data,

23   then, generally speaking, it's somewhat equal, I would expect

24   to see of -- that any of those ten nodes I am connected to, I

25   would send approximately 100 requests because I need 1,000

1    pieces to make it up, so 100 times ten is 1,000, and that is --

2    that would be a person who would be the requestor.

3         But now let's just say that I am not the requestor and I

4    am just passing it on, I got the request from somebody else.

5    Just one more hop deep into this transmission or communication,

6    it becomes significantly less because now, the original

7    requestor needed 1,000 blocks, 100 came to me, and I didn't

8    have any of those 100, and now I have ten people on my circle,

9    so to speak, my connected nodes, so I would divvy that up ten a

10   piece to ten nodes.

11        So the original requestor -- if it was the original

12   requestor, I would expect to see approximately 100 requests,

13   but if it was one hop beyond that requestor, that would be

14   reduced to ten, keeping all the numbers equal.  And if we go

15   one more hop deep, it would be a tenth of that at one.

16        So it just comes down to statistics and probabilities,

17   and really that's what the -- the paper was about that I am

18   sure at some point has already been spoken of in these

19   proceedings.

20   Q.    You mentioned hops.  Are you referring to Hops-to-Live?

21   A.    Yes.  That's an aspect of Freenet if you'd like me to

22   explain it.

23   Q.    Well, does the Hops-to-Live have any impact on what the

24   ICAC Cops server retains or discards?

25   A.    Yes.  Because the way the hops work on Freenet, Freenet

1    tries to anonymize and hide who the original requestor was.

2    And the way that's done is that if I am the original requestor

3    and I am sending a request for a block of data to the attorney,

4    that -- I lost my train of thought.

5            THE COURT:  I think the question was how is

6    Hops-to-Live relevant to which I am hanging on my seat because

7    I want to understand it.

8            THE WITNESS:  Okay.  It's terrible to get old.

9        So the way it tries to anonymize that is basically, in a

10   computer "sciency" way, it does a coin flip.  And Freenet

11   starts with 18 hops.  That's the default in the program.

12   However, if I -- every time me, the requestor, sending a

13   request for data to one of my connected nodes, as it arrives,

14   if it had a Hop-to-Live count of 18, then he knows I am the

15   requestor because that's the default for Freenet.

16       So instead of just always sending it as a 18, it does

17   this programatic coin flip, and now he wouldn't know because it

18   could arrive to him as an 18 or a 17.  Heads, I keep it an 18.

19   Tails, I deck -- I decrement one to 17.

20       So that's a long way to get to the answer, sir, so I

21   apologize, but -- and then if it's 16, I know that it couldn't

22   be the requestor because it's only going to be an 18 or a 17 if

23   I am the original requestor, assuming all the defaults.

24       And so all we log in ICAC Cops, it isn't every

25   observation, it's only the ones that help us do the statistical

1    analysis which is an observation with a Hop-to-Live count of

2    18, potentially, the original requestor, 17, also the potential

3    original requestor, or 16, which would discount that IP

4    address.  So we only keep 16s, 17s, and 18s, only those

5    observations.

6    BY MR. DRAUGHON:

7    Q.    So I want to make sure I understand the filtering

8    process.

9          The first stop is that ICAC Cops only receives requests

10   sent directly to law enforcement nodes?

11   A.    Correct.

12   Q.    And then it will only retain the requests that relate to

13   CSAM as opposed to any other content?

14   A.    Correct.

15   Q.    And then it will only retain it if it's Hops-to-Live 16,

16   17, or 18?

17   A.    Correct.

18   Q.    So does that mean if it's Hops-to-Live 12, it -- will

19   that be retained to ICAC Cops?

20   A.    No.

21   Q.    And referring to the CSAM, how would the law enforcement

22   officers know the IP addresses that are downloaded in CSAM?

23   A.    So that's part of the communication.  That's part of the

24   communication.  So when there is a law enforcement node on the

25   Internet and it's connected to another node, it's just

1    generally how the Internet works, I am going to know the IP

2    address.  It's actually in the headers of packets of data that

3    flow back and forth.  All that information lands into this law

4    enforcement system, ICAC Cops, and -- and the nodes are run by

5    trained law enforcement officers.

6         So how I can take that information, these observations,

7    and do an investigation, we'd have to review data on ICAC Cops,

8    and we would look for an IP address believed to be in our

9    jurisdiction, and then we would apply the math that is derived

10   from the university paper, the peer-reviewed paper, and

11   determine, using probability and math, is he likely the

12   requestor of data.  So what we consider are those 17s and 18s.

13   We know how many nodes a -- we know how many nodes a person is

14   connected to that is connected to us.  We don't know their IPs,

15   but we -- we know that because that's going to be part of the

16   math.  And we look for, basically, our fair share.

17        And it goes back to my earlier example, 1,000 files,

18   there is ten nodes that I am connected to, so approximately 100

19   each connected node, and we apply that.  And that's very

20   simplistic as it's more math than I am able to sit here and

21   speak of.  That would be Dr. Levine's area of expertise.

22   Q.   Now, once a law enforcement officer has identified an IP

23   address that it figures out has requested CSAM, can it then go

24   back to ICAC Cops and figure out other requests made by that IP

25   address if it was not sent to a law enforcement node?

1  A.    Oh, no.  The only thing we can see is direct

2  communication between an IP address, a node on Freenet, and a

3  law enforcement node.  Again, we have no way to look into the

4  other encrypted connections between all the other nodes.  Even

5  if it wasn't encrypted, it's a TCP connection, it's something

6  in the Internet, I don't have the ability to listen across the

7  whole Internet around the world.  All I know is the

8  communication between a node and law enforcement and it's

9  because the communication is directed to us through that

10 encrypted connection.

11 Q.    Sir, does the law enforcement server log the IP address

12 of the -- the neighbors of neighbors, that is to say, not a

13 direct connection but the peers of the direct connection?

14 A.    So, the answer is no, and it's -- I am certain of that

15 because we don't know the IP address of the neighbors of

16 neighbors.  We only know the IP address of those we are

17 connected to.  So, no, we don't log it because it's not

18 available to be logged.  It's just not there.

19       Even beyond that, if I had ten nodes connected to me, the

20 law enforcement node, I don't even log all ten IPs that I am

21 connected to.  The only logging happens is if they make a

22 request for a block of data and it matches one of the blocks to

23 those 150,000ish files.

24       So we not only don't log neighbors of neighbors because

25 it's not available, it's not communications that we are privy

1   to, I don't even know how you do it, but we don't even log all

2   the IPs of the people we are connected to until a block of data

3   flows through that's a 16, 17, or 18 and matches the hash value

4   of a block of data that belongs to one of those 150,000 files.

5          MR. DRAUGHON:  That's all for the government, Your

6   Honor.

7          THE COURT:  I just have one quick follow-up question

8   before I turn it over to Mr. Robbins.

9       When you testified about Hops-to-Live 16, 17, 18, is that

10  information automatically available through the Freenet program

11  to any node that is on the Freenet?

12         THE WITNESS:  Yes, ma'am.  That's a great question.

13  I am sure I wasn't clear.  It has to be because that's what

14  determines whether or not this communication gets passed on

15  forever.  Hop-to-Live count, it has to end somewhere, so that

16  is part of the communication, and I failed to fully explain it.

17  It arrives to me at 18, I decrement it to 17, and pass it on

18  because I didn't have a block.  The next user would reduce it

19  by one again until it got to zero.  If the block isn't found,

20  it gets reported back through that same chain to the original

21  requestor saying I couldn't find it.

22         THE COURT:  Okay.  Thank you.  Appreciate it.

23      Mr. Robbins.

24         MR. ROBBINS:  Thank you, Your Honor.

25                     CROSS-EXAMINATION

Direct - Cross

1   BY MR. ROBBINS:

2   Q.    Good afternoon again, sir.

3   A.    Good afternoon.

4   Q.    First question.  You talked about the 100 and however

5   many thousand files there were.  How many blocks is that?

6   A.    I don't know.  I can tell you that each block is 32

7   kilobytes, which is a very, very small chunk of data.  So there

8   is a lot.

9   Q.    Like a file could have thousands of blocks even?

10  A.    Thousands of blocks to make up one file, correct.

11  Q.    And -- and the bigger the file, the more blocks,

12  obviously?

13  A.    Exactly.

14  Q.    And --

15  A.    Just divide the total size by 32 kilobytes and that would

16  be how many blocks make up that file.

17  Q.    Plus the manifests and the sub-manifests too?

18  A.    Yeah.  The manifests --

19  Q.    Those blocks --

20         THE COURT:  One at a time, please.  The court

21  reporter can only take down one voice at a time.

22         THE WITNESS:  I know better.  I apologize.

23         MR. ROBBINS:  Me, too.

24  BY MR. ROBBINS:

25  Q.    So the number of blocks for a file will be all of the

Freely - Cross

1  data blocks, the top-level manifest, and any sub-manifest, and

2  ICAC Cops has got all of those.  Correct?

3  A.    Yes.  And it's actually more than that because there is

4  something called forward error correction that make it -- so a

5  number of blocks you need to make up a file, there is something

6  in computer science referred to as forward error correction.  I

7  didn't create it; somebody did.  But, basically, there are

8  redundancies built in.  So if a block isn't available, I can

9  still get that file.

10        So what happens is if there are 1,000 blocks necessary to

11  download a file, there is typically 2,001, but all you need is

12  any of those thousand blocks and you have the whole file, and

13  it does other -- it adds more -- more to the Freenet protocol

14  than that in that it can self-heal and recreate missing blocks.

15  That's what forward error correction does.

16  Q.    Based on what you have said, it would be fair to compile

17  that loosely and say that ICAC Cops has in its database

18  millions of blocks?

19  A.    Millions, easily, yes.

20  Q.    All right.  In your statement that you prepared for court

21  today, in paragraph 3, you note that Freenet is a file sharing

22  network, and any file sharing network, including Freenet,

23  allows its users to share any type of music, video, text, or

24  image file?

25  A.    Yes.  There is lots of different files that could be

Freely - Cross

1  shared.  If it's a digital file, short of a size limitation or
2  something in that file sharing network, you can share it.
3  Q.     When you spoke of retaining files, that's all done back
4  at ICAC Cops?  None of the law enforcement nodes are retaining,
5  or do they retain files also?
6  A.     No.  No.  That's -- I am unclear about your question.
7  Retaining files --
8  Q.     You talked -- I'm sorry.  Retaining -- retaining data of
9  a block of interest, it's a 16, 17, or 18 Hops-to-Live, it's a
10  request for one of the blocks of -- that fits your screen, and
11  you log the -- the fields of data that are available about that
12  requestor?
13  A.     That all happens at ICAC Cops.
14  Q.     It all happens at ICAC Cops pretty much automatically.
15  Does it happen realtime?
16  A.     Milliseconds, as long as it takes to get from Point A to
17  Point B.  The alternative would be that every copy of law
18  enforcement Freenet would need a list locally of all the blocks
19  of data, so that's why the choice was made to do the comparison
20  at ICAC Cops.
21  Q.     And it's -- and it's done realtime?
22  A.     Yes.
23  Q.     So these terminals are out there running and just sending
24  the data back?
25  A.     Correct.

Lacey - Cross

1   Q.    Okay.  How many terminals are there?

2   A.    How many law enforcement nodes?

3   Q.    Yeah, nodes.  I'm sorry.  How many nodes?  I will try to

4   use the right language.

5   A.    That's fine.  On any given day, 40 to 50.  It's something

6   I don't really count.  I mean, I didn't count them, but I could

7   certainly figure it out.

8   Q.    And how do those law enforcement nodes pass the -- the

9   block requests back to ICAC Cops?

10  A.    Through a secure connection from over the Internet to

11  ICAC Cops.

12  Q.    VPN of some sort?

13  A.    Not a VPN.  It's just using SSL, secure socket layer,

14  HTPS, same way you'd go to your bank.

15  Q.    And if I understood what you were saying earlier, the law

16  enforcement nodes are passing all requests, not just the 16,

17  17, 18?  That screening is done at ICAC Cops as well?

18  A.    No.  I believe the hop to lives -- I'd have to double

19  check.  I didn't write Freenet, the Freenet node myself.  It

20  was done through UMass.  But only the 16, 17, and 18s need to

21  go to ICAC Cops, but the rest are irrelevant.  It would be

22  needless network traffic.

23  Q.    Okay.  So, now, you said that you have confirmed -- if I

24  read this right -- ICAC Cops doesn't log each and every

25  request, only those that match the hash values of the pieces of

Eng Tl - Cross

1  files -- these are the block hash values?

2  A.    Yes.

3  Q.    -- identified by law enforcement as relating to child

4  exploitation.  I confirmed this by checking the hash values of

5  all requests logged and observed that all logged requests were

6  seeking blocks associated with one of the -- I guess it's

7  150,000 files, but we are really talking about millions of

8  blocks.  How did you do that confirmation?

9  A.    It's a Microsoft SQL Server 27B.  I'm a Microsoft

10 certified network engineer and a Microsoft certified database

11 administrator.  You just write a SQL query and I do a

12 comparison.  Here is the known -- let's just say, for sake of

13 argument, two million blocks and the hash value associated with

14 them.

15 Q.    Okay.

16 A.    And I just have to query all the observations and say,

17 Show me any observations where the hash value is not in this

18 other table.  It's a very simple way of describing it.  But I

19 can do and compare -- you know, make billions of comparisons in

20 seconds because of SQL server and the way -- it stands for

21 structured query language, I believe.

22 Q.    Now, you retained, you said, the 16 Hops-to-Live as well

23 as the 17 and 18s.

24       What's the purpose of retaining those?

25 A.    Well, it's a -- the initial reason, early in its

1   development, was it's a disqualifier.  I know that this IP

2   address could not have been the original requestor.  Beyond

3   that, what it's turned into -- it's a somewhat complicated

4   reason, but I can certainly do my best to try to explain it,

5   and it more directly relates to the statistical paper relating

6   to Freenet investigations that the university wrote and was

7   peer-reviewed.

8          There is formulas, math formulas in there.  So what

9   happens is if I request a block of data and I send it off as a

10  Hop-to-Live count 18, and you are one of my connected nodes,

11  Your Honor, and you don't have it and you pass it along to 17,

12  16, 15, 14, so that goes into the math, that goes into the

13  statistics, and we are trying to figure out is it more likely,

14  you know, or probable that they are the original requestors?

15  And so that becomes part of the math.

16         However, and it goes back to something I briefly touched

17  on is that forward error correction, how you can recreate

18  missing pieces, you only need half of all the blocks associated

19  with -- actually half minus one.  So what happens is forward

20  error correction self-heals these files and keeps them

21  available on Freenet.

22         And so, to be fair, if -- if I send -- if you are the law

23  enforcement node and I send you a request and -- of -- for a

24  block of data and then you forward it on, that's going to go

25  into the math telling us whether -- whether I am probably --

Everly - Cross

1   probably the original requestor.

2        However, there is a chance that, you know, nobody had it

3   through those 18 hops.  So what happens is me, the original

4   requestor, at times will not be able to find that block of

5   data, but if I have enough of the blocks for that slice or

6   chunk of a file, I could help self-heal it.  It's actually

7   written into the Freenet code.  So an insert happens.

8        So to make the math work and be fair, we have to track

9   the 16s to look for those inserts because they are subtracted

10  back.  If you made 100 requests to me but there was an insert,

11  I am not going to do the math on 100 requests, I'd rather do it

12  on 99 to make the math consistent and work and make sure all

13  things are equal, so to speak.

14       But that's basically why we keep the 16s because the

15  inserts can come in at the 16s and we want to subtract that

16  from the number -- it would work to our -- law enforcement's

17  unfair advantage to not subtract it.  It's to the requestor's

18  benefit that we do subtract it to -- to make sure that we are

19  doing the right thing, so to speak, taking the high ground.

20  Q.   Okay.  Fair enough.

21       Do you have a protocol or policy statement for how many

22  friends law enforcement nodes are supposed to have?

23  A.   I know of no policy.  And -- no.  I don't know of any

24  policy.  It's a configurable setting.

25  Q.   So every law enforcement officer who is in charge of a

1  node can set it up the way he wants?

2  A.    It's -- it's a setting within Freenet.  Any -- anybody

3  can change that value.  It has -- it's selected, to some

4  degree, I think based on your bandwidth, but it's a

5  configurable setting within Freenet.  You can affect how many

6  connections you have.

7        Typically, what I see on Freenet, I just recently wrote

8  three warrants on Freenet and they were between 30 and 40, and

9  I know I, in my examples, used ten, but I just was trying to

10 keep round numbers.  It's easier to understand that way.

11 Q.    There was a statement in -- in the Freenet literature

12 that says, "Freenet will self-organize into a distributed

13 clustered structure where nodes tend to hold data items that

14 are close together in key space."

15       Does that mean anything to you?

16 A.    Repeat it again.  I will try to decipher it.

17 Q.    "Freenet will self-organize into a distributed clustered

18 structure where nodes tend to hold data items that are close

19 together in key space."

20 A.    I don't want to respond to your question and not be sure

21 of it.  I'd have -- it would be an educated guess.

22 Q.    I won't ask you to do that.  That's not fair.

23 A.    Okay.

24 Q.    When you say that there are 40 to 50 law enforcement

25 nodes operating on any given day, is there a record of that

Eddy - Cross

1   somewhere, or how do you reach that number?

2   A.    The different nodes, we'd be able to decipher from the

3   database.  We know who made the submission so I could just do a

4   count on any given day or any given hour.  I did not do that in

5   preparation for this hearing, but yes, there is a method to

6   determine that.

7   Q.    But not logged or it is logged?

8   A.    It's in the database.

9   Q.    So you could do one of your SSQL queries and find out --

10  A.    Yes.

11  Q.    Okay.  I am going to go back to Government's Exhibit 7 if

12  I may for a moment just to ask some questions to make sure that

13  I am clear on it.  And I won't write on this one.

14        The smiley faces are not people.  They are nodes.

15  Correct?

16  A.    Correct.  It's a piece of software being run by a smiley

17  face, a node.

18  Q.    It's a node.  Okay.

19        And the nodes, you have peers one through five, and you

20  say in your note down below that it's going to be several times

21  greater.  That's the 40 you were talking about?

22  A.    Correct.  This is just a demonstrative example.

23  Q.    And on the line where you have an arrow going out, for

24  instance, to peer No. 5, and say, "Do you have these blocks?,"

25  those would be -- do you have the -- the blocks in my -- in my

Emery - Cross

1   list to you, peer No. 5?

2   A.    Okay.

3   Q.    These blocks is --

4   A.    Oh, yeah.

5   Q.    -- says five times, but each one of those requests is

6   different.  Correct?

7   A.    Correct.  That's just the yellow Freenet node user

8   requesting blocks of data of peer five, which I am not a party

9   to that communication.

10  Q.    Right.  So the -- the -- the node of the Freenet user has

11  put probably a top-level manifest request, maybe something

12  lower, but for the -- for the things that you are looking at,

13  but even anything else, and with the last witness, I talked

14  about the Church of the Rising Sun.  If I have my hymns and my

15  -- my sermons and I want to move them around, and I request it,

16  I am going to put out a manifest to skip the pieces back, or

17  one of my flock may say, I would like to have a copy of the

18  reverend's sermon from last week, and he will have, from a menu

19  somewhere, the manifest request that he's got to make to get

20  all of the pieces of my sermon?

21  A.    That's one of the first things that has to happen.  I

22  don't know if it's happening in that communication between the

23  requestor and peer five, but I don't -- I am not following what

24  your question is.

25  Q.    My question is that that manifest request gets broken

Emery - Cross

1  into a whole bunch of things like you were telling the judge

2  about, and each of the sets of block requests that go out to a

3  peer, I am not giving each peer my entire manifest.  I am

4  giving each peer a piece.

5       You used 1,000 files and broke it into -- I mean 1,000

6  blocks and broke it into 100 when we really find out that it's

7  probably substantially more than that for any substantial --

8  substantial size, it gets broken down, and the block requests

9  get sent out, and another batch of block requests get sent out

10 over here.

11      So my -- my member of my church looking to get my sermon

12 is going to ask -- he's going to put on -- he's going to enter

13 a manifest request in his node.  His node is going to put out

14 to all the peers of that node requests for blocks.  Correct?

15 A.    Correct.  Once you have the manifest and you know all the

16 blocks, you can ask any of your peers for any combination of

17 those blocks.

18 Q.    And as -- as those -- as those peers get them, if it --

19 let's say it's my -- it's a member of my congregation sitting

20 there with a yellow smiley face.  As peer five gets the sermon

21 request blocks -- the block requests that pertain to my sermon,

22 peer No. 5 has got no clue that he's getting requests for

23 pieces of my sermon?  He's got no -- right?  Because it's

24 encoded and it's only a little piece of it?

25 A.    Correct.  Peer five would have -- unless he had the

Early Cross

```
 1   manifest, he would have no idea that the blocks of data being
 2   requested belonged to a sermon.
 3   Q.    Because it's all encoded?
 4   A.    It's encrypted.
 5   Q.    Encrypted?
 6   A.    Yes.
 7   Q.    It's all encrypted?
 8   A.    Yes.
 9   Q.    And he's only getting a little piece of it?  If I have 40
10   peers, he's only getting approximately a 40th of my block
11   requests?
12   A.    Correct.
13   Q.    Instead of it ending up with peer five or one of the
14   other 35 folks, it goes to peer four, my law enforcement node
15   neighbor, same thing happens?  Peer four gets my request for
16   blocks -- now I am saying "my," I have slipped into it again --
17   the node request for blocks from my initial node, and peer four
18   has no idea whether it's a request for a sermon, a request for
19   pictures of kitties, or a request for CSAM?
20   A.    Correct.
21   Q.    Just forwards all of those to ICAC Cops?
22   A.    Correct.
23   Q.    Because they are all meaningless to the law enforcement
24   node?
25   A.    Correct.
```

Freely - Cross

1  Q.    And the only thing that gives them any meaning is your

2  ability to run them against your screen?

3  A.    To run them against the database of all the blocks that

4  make up those 150,000 or so files, correct.

5  Q.    You had a major hand if not -- if you weren't the father

6  of it, you had a major hand in creating this database.

7  Correct?

8  A.    I am the system administrator.  I do some development

9  work and programming as it relates to the -- the server.  I did

10  not write the Freenet investigative software.  That was

11  University of Massachusetts, Amherst.

12  Q.    Understood, the law enforcement nodes that collect the

13  data.

14        But as far as the database of blocks that can be built

15  into CSAM, that's within your -- your control?

16  A.    I just want to be clear it's not the files themselves.

17  Q.    Understood.

18  A.    It's the hash value of the files themselves.

19  Q.    The hash values?

20  A.    There is no way for me to take what's in the database and

21  create a file from it except for to use them on Freenet and get

22  those blocks of data.

23  Q.    Which is -- I'm sorry.  That's exactly what the law

24  enforcement officers that get your reports back have to do.

25  Correct?  You say we found these three blocks in a way that we

Freely - Cross

```
1   believe you may have a suitable subject for investigation, they
2   tie to this manifest, and then the law enforcement node -- or
3   the law enforcement officer, whether he does it on the Freenet
4   node or somewhere else, has to download the file to figure out
5   whether or not -- whether or not it's what we suspect it is?
6   A.    Correct.  They would need to download that file that has
7   that hash value, view it, and confirm it violates their
8   statutes because in Connecticut, child pornography is 16 and
9   under.  17 is an adult, which is different than federal.  I
10  can't --
11  Q.    It's --
12  A.    It's the underwriting investigator.
13  Q.    Understood.
14        How does ICAC Cops know that that request wasn't --
15  wasn't one that should be investigated?  When the -- when the
16  law enforcement officer either on the LE node that's used to
17  collect this data or on some other LE node constructs the file
18  from the manifest, why does that not trigger the ICAC Cops
19  system?
20  A.    And it goes to I think on the first page or two of my
21  affidavit I filed in this case, it speaks of the fact that this
22  is a -- ICAC Cops is more than just Freenet.  It's a case
23  coordination tool.  I know the law enforcement officers that
24  have access to our server who have been Freenet trained, and we
25  know their IP addresses, so it's easy to exclude law
```

Freely - Cross

1  enforcement from that list which needs to be done with other

2  file sharing networks as well because as we are downloading,

3  which we have to do, you know, the system knows the IP address

4  of the undercover officer.

5  Q.    So there is another database that says ignore these ones?

6  A.    Yeah.  There are many more aspects of ICAC Cops on that

7  database than I have described here.  I tried to limit it to

8  what relates to Freenet.

9  Q.    How long do you maintain the files?

10  A.    The -- the records go back since we started collecting

11  data on Freenet and the other file sharing networks.  It could

12  be relevant in a suppression hearing five years later.  We

13  don't throw away the observations, these publicly available

14  observations.

15  Q.    So if there was -- if there was a 16 or 17 or 18

16  Hops-to-Live at an IP address somewhere in the past, even if it

17  doesn't show up in this report, the law enforcement officer

18  could request that?

19  A.    The law enforcement officer could use ICAC Cops to do

20  that research, yes.

21  Q.    If something were to happen that you no longer controlled

22  what blocks went into the database, then there could be blocks

23  for files that were not CSAM also placed in the database to get

24  flagged?

25  A.    If we reprogrammed things to collect everything, would we

Eddy - Cross

1  be able to collect everything?

2  Q.    No, not everything.  Let's say, for some reason, my

3  Church of the Rising Sun drew negative attention, and the FBI

4  came to you and said, We need to be able to figure out who is

5  asking for those sermons, and we have got a copy of it because

6  we had a piece of information, so you can get every single

7  block that would fit into the manifest and you could just pop

8  those into your -- into your CSAM database, and we know it's

9  not CSAM, but for our purposes, because it's a matter of

10  national urgency, we would like you to do that, and we know you

11  have got law enforcement nodes out there, let us know if you

12  have got any neighbors who are asking for that sermon?

13  A.    So your question is -- I just want to be clear -- if I

14  had blocks of data that make up a whole file and I had the

15  manifest, could I collect data that didn't relate to child

16  exploitation investigations?  That's your question, could we do

17  that?

18  Q.    Yes.

19  A.    Yes.  It's not what we do, nor have we ever done it.

20  Q.    I understand that.  I understand you have put an entire

21  career into doing this and do a good job of it, so I understand

22  that.  I am just trying to get capabilities of the system.

23  A.    Yes.  And that's true with any file sharing network.  You

24  can search for anything and find anything and investigate

25  anything.

Draughon - Cross

1  Q.    And it really relies on you keeping track of things?

2  A.    Me being one of them, but yes, there is a whole -- there

3  is more people beyond me that make this project work.  I just

4  started it.

5  Q.    Got it.  Okay.

6            MR. ROBBINS:  No further questions, Your Honor.

7            THE COURT:  All right.  Mr. Draughon, any redirect?

8            MR. DRAUGHON:  Yes, Your Honor, briefly.

9            THE COURT:  All right.

10                      REDIRECT EXAMINATION

11  BY MR. DRAUGHON:

12  Q.    Sir, do you happen to know the size of the server for

13  ICAC Cops?

14  A.    The size of the server?  Like the -- the size of the

15  storage of data?

16  Q.    Yes.  Its capacity, so a terabyte?  Like, what's the data

17  storage size?

18  A.    Well, we have many different networks we investigate, but

19  the database is a few terabytes.  I don't have a number.  I

20  didn't check before I came.  But a fraction of that is Freenet.

21  Q.    So a fraction of a few terabytes would be Freenet?

22  A.    Yes.

23  Q.    Would the -- based on your expertise with this -- with

24  computer forensics and peer-to-peer in the computers, would the

25  size used for Freenet be something that a different person

1  could acquire and store for, like, their computer system?  I

2  will try to ask that --

3  A.    Let me make sure I understand your question, sir.

4  Q.    I will try to ask that another way.

5       Could someone outside of law enforcement have a similarly

6  sized server?

7  A.    Oh, yes.  I mean, a home computer that you get can have

8  several terabytes of storage.  They have 18 terabyte SATA

9  drives which is the type of drive that just goes in your home

10  computer.  18 terabytes.  That would store all the observation

11  data for everything we have done from over ten years.  Anyone

12  could do it.  It's a few lines of code.  I am making it sound

13  simpler than it is to add a logging feature to this publicly

14  available piece of software, but anyone could do it.

15            MR. DRAUGHON:  That's all for the government, Your

16  Honor.

17            THE COURT:  Any recross?

18            MR. ROBBINS:  I'm sorry, Your Honor.  Very briefly.

19                      RECROSS-EXAMINATION

20  BY MR. ROBBINS:

21  Q.    How many people have worked on building the CSAM

22  database?

23  A.    It's hard to quantify because, I just want to be clear,

24  all the files that we investigate across Freenet as opposed to

25  all the other file sharing networks come from multiple ways.  I

Erdely Recross

1  will just describe the ways, and I could approximate, that's

2  the best I could do.

3       We download the material off the file sharing networks,

4  we observe it, and it qualifies to be added.  It would be added

5  that way.  I seize a computer as part of an investigation, we

6  do forensics anyways, identify a lot of CSAM material in that

7  way.  And then other investigators that are part of the ICAC

8  Cops system, law enforcement community, can submit them as

9  well.

10      Currently, we have a team of about eight to ten state

11 troopers with the Pennsylvania State Police that are evaluating

12 material to be included.  There is a process.  And then I am

13 the primary person throughout the existence of the system to

14 actually put them into the system to be investigated across all

15 these file sharing networks.  But beyond me, there is -- I have

16 a backup who lives in the same town as me, also a county

17 detective.

18      Over time, if I am including all the cops across the

19 nation, FBI included, HSI, that submit to me, it could be 100.

20 Q.   It could be 100 people.  Because there are task forces

21 out there?  You wrote about them in the paper that's mentioned

22 in your C.V.

23 A.   ICAC Task Force, Internet Crimes Against Children Task

24 Force, ICAC, it's a federally funded task force, 63 task forces

25 across the country, I believe, 62 or 63, but that being said,

1    ICAC Cops is primarily used by ICAC, but not necessarily

2    exclusively used by ICAC, so I don't want you to think one

3    directly relates to the other.  But yeah, yes, this task force

4    is tasked with investigating crimes against children, and so

5    much of the source of the material which I can include comes

6    from them.

7         Freenet is a little different in that we are going out

8    looking for the files like other Freenet users by the free

9    sites and Frost, for instance, like a message board, so it's a

10   little different with Freenet, but then again, if someone has a

11   big seizure of material and the individual was a Freenet user,

12   hopefully they find a way to get me that material that was

13   derived from Freenet that I could include it in our

14   investigative process.

15   Q.   Got it.  And this has been going on since 2012?

16   A.   2011, 2012-ish for Freenet, somewhere in that time frame,

17   but the system dates back to 2007.

18             MR. ROBBINS:  Thank you very much, sir.  I appreciate

19   it.

20             THE COURT:  Thank you, Detective.  That concludes

21   your testimony.  You may step down.

22             THE WITNESS:  Thank you, Your Honor.

23             THE COURT:  You are free to stay.  You are free to

24   head back to Pennsylvania.  I appreciate your time.

25         Why don't we take a break until 2:30 and then I will hear

1     from counsel.

2          Defense, do you have any evidence you are putting on?

3               MR. ROBBINS:  No.  Thank you, Your Honor.

4               THE COURT:  Okay.  All right.  Then I will hear from

5     you all at 2:30.  Thank you.

6               MR. ROBBINS:  Thank you, Your Honor.

7          (Recess taken from 2:14 p.m. until 2:33 p.m.)

8               THE COURT:  All right, everybody.  Okay.  I am ready

9     to hear from you all.

10         What I suggest is defense, it's your motion, you go

11    first, government respond, and then we will give the defense

12    the last word.  Okay?

13              MR. ROBBINS:  Your Honor, obviously, you have our

14    pleadings and we know the Court reads those, and we have laid

15    out the reason that we believe that this is a Fourth Amendment

16    issue and an issue under which there can be no evidence that

17    could be used in the first instance for supporting an affidavit

18    for a search warrant.

19         I think the witnesses today helped support that, and in

20    particular, Mr. Erdely has supported that.  I don't know how

21    many times in the course of his direct he talked about the

22    block requests being totally meaningless without having a

23    government screen to evaluate those block requests, to know

24    what they mean.

25         But all of those block requests for every neighbor of

1  every law enforcement node in operation is continuously

2  collected.  If you take the typical -- if you take the median

3  that Dr. Levine wanted to talk about of 48 nodes and you say --

4  48 neighbors and you take the 45 nodes that they wanted to

5  acknowledge, that's still 2160 nodes being surveilled at all

6  times, and there are probably, if the numbers are right, maybe

7  4500 in existence.

8           THE COURT:  But if there is no reasonable expectation

9  of privacy in those nodes, it doesn't matter, so where I think

10 we need to start is on the law with respect to the exception to

11 the third-party doctrine because I am not really sure -- the

12 numbers aren't moving me.  What's moving me is where in the law

13 do I fit this all?

14          MR. ROBBINS:  This all fits because we are looking at

15 the packet request -- the blocks, the block requests.

16          THE COURT:  Okay.

17          MR. ROBBINS:  The block requests are meaningless just

18 like the movement of an individual on the street on any given

19 moment in time is meaningless.  It doesn't -- it, in and of

20 itself, has no value.  It's only by the leveraging of the

21 technology and the leveraging of the numbers that that can --

22 that that can be -- that blind can be pried open, if you will.

23 It is not a matter of the law enforcement officer walking by

24 and seeing something in plain view.  It is a matter of a

25 reasonable expectation of privacy in the block requests that

1    are being communicated by the -- by the node.

2         And so that's -- that's where it all comes together is

3    that those block requests are not open communications that can

4    be heard from -- by anybody.  It's not the shouting on the

5    floor of the Chicago Exchange.  That's not what it is.

6         It is a sealed communication.  It's like the metadata

7    analysis that has been done for emails.  It is --

8              THE COURT:  But anybody can join Freenet and stand up

9    a node?

10             MR. ROBBINS:  Anyone can join Freenet and stand up a

11   node.

12             THE COURT:  And that's all been done?

13             MR. ROBBINS:  No.

14             THE COURT:  Well, the law enforcement officer, the

15   detective today, and, you know, as I understand it, what they

16   have done is stand up a node, just like anybody else stands up

17   a node.  The only difference is that they passively record the

18   information that they receive as a node.  Right?

19             MR. ROBBINS:  They record the information they

20   receive as a node including the content of the block request.

21   So it turns on the block request.  Is the block request --

22             THE COURT:  The hash value of the block request is

23   what you are saying?

24             MR. ROBBINS:  Yes.  Is that -- is that a private

25   communication?  Is that like the metadata involved in an email

1    --

2            THE COURT:  But it's not the content that makes it

3    private, is it?

4            MR. ROBBINS:  It is because the metadata involved in

5    an email can be picked up by anyone along the stream as well.

6            THE COURT:  But it's not an email.  It's not an

7    email.  See, that's what -- the challenge to me and the

8    challenge that I was having with you all the last time, and

9    your briefing has helped in this regard, is what doctrine do we

10   put this in?  It's the third-party doctrine seems to be where

11   we are.  And then, you know, I raised *Carpenter* and *Leaders*

12   because you raised *Carpenter* and *Leaders*, but the more I look

13   at those cases, I don't think I can fit in that because they

14   are a very, very express, narrow exception that has been made

15   to the third-party doctrine only for the whole of the person's

16   physical movements, and every circuit has rejected expanding it

17   the way that we talked about last time in this Court.

18           MR. ROBBINS:  And the -- the difficulty there is

19   that, one, the third-party doctrine is a problematic doctrine

20   anyway, but leaving that aside even, the thrust of *Carpenter*

21   and *Leaders* is that the Fourth Amendment exists to protect

22   people and their expectation of privacy.

23       One of the things that we -- that we have referred to

24   really from the early briefing in this case is the Foreign

25   Information Surveillance Act, and this is obviously not a

1   Foreign Information Surveillance Act case, but that's one of

2   the -- the problem that this Court confronts is one of the

3   problems that the Supreme Court had to confront in the case

4   that led to the drafting of the Foreign Information

5   Surveillance Act.  The Supreme Court case is *United States vs.*

6   *United States District Court*, 407 U.S. 297.

7          THE COURT:  Is this included in any of the pleadings?

8   Is it an early one?

9          MR. ROBBINS:  We have always talked about the Act.  I

10   don't think that I have talked about the case.

11          THE COURT:  Okay.

12          MR. ROBBINS:  So it's *United States vs. United States*

13   *District Court*, 407 U.S. 297, 92, Supreme Court, 2125.  It's a

14   1972 case.  And the -- the thing that had happened there was

15   the Courts had always said, Well, what do we do when it's

16   national security?  This is not something -- there is a whole

17   national security exception.  We are not going to look at this

18   because we don't look at national security stuff.  The Supreme

19   Court said that's not true.  The Fourth Amendment still exists

20   for U.S. citizens and you still have to look at whether or not

21   this is a scenario where the -- where the executive can be

22   allowed to operate free of any supervision because of the level

23   of -- the level of intrusion on citizens.  And it's not a risk

24   that executive discretion can reasonably be exercised.  The

25   judicial role has to be there.

1          There is another case more recent than that that's sort

2     of in the same area, and it was decided in the government's

3     favor, but it found that there was a Fourth Amendment violation

4     for the collection of metadata, and that's *United States vs.*

5     *Moalin*, 973 F.3d 977, that's Ninth Circuit, 2020, and found

6     that in that case, even though there had been a Fourth

7     Amendment violation -- and we can send these cites to both the

8     government and the Court after the hearing -- even though there

9     had been a Fourth Amendment violation, there was enough other

10    data presented in the affidavit for the search warrant that the

11    metadata collection violation didn't matter, that it didn't

12    have any impact on the availability --

13          THE COURT:  How was the data collected?  I mean, in

14    other words, I am interested in cases that are factually

15    similar to this one, sure.  But I am hearing abstract metadata

16    collection.  It's not in the papers.  What am I going to be

17    looking at here?

18          MR. ROBBINS:  What you are going to be looking at,

19    Your Honor, is you are going to be looking at a case where the

20    government was collecting metadata over an extended period of

21    time on the theory that --

22          THE COURT:  But how?  How?

23          MR. ROBBINS:  Broad-based Internet metadata

24    collection not targeted at an individual.

25          THE COURT:  But I am saying through malware, like the

1  NIT --

2           MR. ROBBINS:  No.

3           THE COURT: -- or through --

4           MR. ROBBINS:  Just through network surveillance.

5  This is -- and we are not alleging -- we are not alleging

6  malware in this case.  We are not alleging --

7           THE COURT:  I know, but why are we talking about this

8  case now and it hasn't been provided for me to look at until

9  right this minute?

10          MR. ROBBINS:  I am talking about this case now

11 because our prior focus had been on the overall scope of the

12 government program.  We have been talking about the -- the

13 foreign -- the Foreign Intelligence Surveillance Act.  These

14 cases are tied to that.  They were not directly on point

15 previously so I hadn't briefed them previously.  We have gone

16 into new areas in testimony today, and these cases may help

17 look at that because the government's focus is what did you

18 communicate to me, and that's not what we are looking at.

19      What we are looking at is the government collecting data

20 from everybody, and that is where the intrusion occurs.  And it

21 could be that they can then now somehow if they put the

22 appropriate procedure in place, but if they -- if they are --

23          THE COURT:  Let's just stop for a second because I am

24 a really simple model and you have been using this analogy with

25 the witnesses that what if the node wanted the preacher's

1  sermon, and that's on the -- that was using the Freenet.  What

2  if a law enforcement officer went to a service undercover, and,

3  like every other parishioner, sat and listened to the sermon

4  and posed as a member of the congregation for every sermon that

5  this particular preacher gave and every meeting that they had

6  and gathered data and talked to people and brought it back and

7  filtered through it and figured out what was criminal and what

8  wasn't, why isn't this the electronic version of that?  That's

9  completely lawful.

10        MR. ROBBINS:  And that's precisely what was addressed

11  in *Carpenter* and *Beautiful Struggle*, and the problem is it's

12  not -- it's not the sermon because remember, you got to have

13  the sermon before you can do this, it's the identifying of all

14  of the people who collect -- who ask for the sermon.  It's the

15  identification of the people --

16        THE COURT:  No.  But if that happened with the law

17  enforcement officer in the room taking note of everybody who

18  was there who asked for the sermon, there would be no Fourth

19  Amendment violation.  It's a public space.  Everyone has made

20  themselves available by choice, which is different than

21  *Carpenter* and different than *Leaders*.  That was, in my view,

22  one of the critical differences was, as the Supreme Court says,

23  we don't have a choice -- when we have phones, we don't have a

24  choice about how much our lives are tracked through this.

25        The example I am using in my view is a real-world

1  physical example of I have a choice to go to the meeting space,

2  and if it happens that my neighbor is a law enforcement

3  officer, that's a risk I take.

4       Similarly, in Freenet, if I become a Freenet user, I have

5  a choice.  I don't have to be Freenet, and if I am in Freenet,

6  even the -- even the disclaimer says you may be subject to

7  other people seeing your stuff.  And, you know, I remember from

8  the first hearing that it has a banner that's kind of like a

9  disclaimer, If you don't put yourself in dark mode, then you

10  are out there.

11      So I go back to my question is why -- what's the big

12  difference between Freenet and the open meeting space that I

13  have just described?

14            MR. ROBBINS:  The big difference is the persistent

15  presence.

16            THE COURT:  Persistent presence?

17            MR. ROBBINS:  The persistent presence, the ability to

18  use technology to see things that you couldn't see before.

19  Just as in *Kyllo*, the difference was you can use infrared to

20  see into a house --

21            THE COURT:  Except in your example right there, the

22  law enforcement had the -- they had the leg up.  They had the

23  -- the -- the technology superiority.  And what I am hearing

24  here is that the node, but for the passive recording of

25  information, which you may say that's it, that's it right

1   there, Judge, but for that, they don't operate any differently,

2   they are on all fours with the other nodes?

3           MR. ROBBINS:  Because the government position is

4   trying to isolate the node.  It is not the node.  It is the

5   network of nodes and it is the ICAC Cops database.  It is the

6   system as a whole that now has created a persistent presence

7   that will allow surveillance over time of everybody on the

8   Freenet, and that's -- that's what's different.

9           Now, can they do that and then get to it in a different

10  way?  There is probably a mechanism to do it, but the problem

11  is they have created a system -- it's not -- it's not the one

12  law enforcement node or in this case the four law enforcement

13  nodes.  It's the network of law enforcement nodes and the ICAC

14  Cops with the database built over ten years.

15          THE COURT:  Okay.  So the only thing I have on the

16  network of law enforcement nodes is there has been no

17  counterevidence to shake that it is at, I think the best

18  estimate is one percent of the nodes are law enforcement?

19          MR. ROBBINS:  No.  You have had the testimony of the

20  witness that says that each of those nodes has got 40 some

21  neighbors.

22          THE COURT:  No.  I understand that.  But as to the

23  entire population, right, of -- that's what I understand

24  Dr. Levine and, to some degree, I think Detective Erdely

25  corroborated is that out of a population of several thousand

1    nodes, one percent is law enforcement.  I mean, this was a big

2    deal for you all factually.  And now we have the facts and it's

3    not that much.

4              MR. ROBBINS:  No.  The big deal for us was the

5    intrusion by the number of neighbors.  It's the 45 neighbors

6    held by each of those law enforcement nodes -- excuse me, 48

7    neighbors held by each of those law enforcement nodes.  That's

8    where the intrusion comes because that gives you a much deeper

9    level of coverage.  It's not one percent coverage.

10             THE COURT:  So your analysis would change if it were

11   only four neighbors?  Would you be conceding the point and

12   withdrawing the motion if in this case it was four --

13             MR. ROBBINS:  The case would be weaker.

14             THE COURT: -- nodes?

15        Why is that a material difference?

16             MR. ROBBINS:  It's the change in the level of

17   watching that matters.  You have got -- it's a, obviously, a

18   two-part question, and we have gone back and forth.  You have

19   got the expectation of privacy.  If there is a node that puts

20   out a block request, the ability of anyone but the government

21   to decipher that block request is pretty close to nil.  The

22   government has spent since 2007, I thought it was since 2012,

23   but from Mr. Erdely, it's from 2007 they have been building

24   this database that allows them to know what that block request

25   is.

1        That is a substantial resource allocation and a

2    substantial use of technology that doesn't exist for the

3    typical user.  For the typical user, if -- if I am running a

4    node and you are running a node and you put out a block request

5    for whatever and it comes through my node, even though, yeah,

6    technically, I can look and see that a block request came

7    through, as was said by the witness, it is meaningless.  It's a

8    sealed envelope.

9        THE COURT:  But this witness also said that if you

10   take the entire universe of data that I think ICAC Cops runs,

11   for which Freenet is only a fraction since 2012 was it, it

12   wouldn't even fit on a drive -- I mean, there would be plenty

13   of room on a drive that I could go to Staples and buy and put

14   in my home.

15       How is that some sort of a -- I mean, the word you used

16   in your pleading was "dragnet," an informational dragnet, when,

17   if I understood this witness right, and he was really

18   unchallenged in this regard, I could buy a hard drive that

19   would give him plenty of room, so I'd run his ICAC Cops for two

20   more decades?

21       MR. ROBBINS:  It would be a blank hard drive.  You

22   don't have the hundreds of law enforcement officers to build

23   that database.

24       THE COURT:  No.  No.  No.  But my point is that the

25   -- the informational intrusion that you are talking about has

1    resulted in so little, really, relative data.  I mean, it's

2    important data to law enforcement, but in the end of the day,

3    it's just not that much looking I guess is the bottom line.  I

4    mean, it sounded like a lot, right, a million pieces, but what

5    I was thinking about was if I took this piece of paper and I

6    ripped it up, I could rip it up into a million pieces, but in

7    the end of the day, it's a piece of paper, so it's all sort of

8    relative.

9         MR. ROBBINS:  Understood.  But that -- that cuts to

10   the point of the expectation of privacy.  The -- the block

11   itself is meaningless to anyone without that law enforcement

12   database or some comparable tool that is used to look at the

13   block request.  So the -- the purpose of the analogy was law

14   enforcement has set up its database looking for CSAM, a

15   laudable goal, but they have now got the mechanism in place

16   with no supervision, no authorization, and no supervision to

17   search for anything.

18        THE COURT:  But if it's public, they don't need

19   authorization or supervision.  That's the tautological

20   conversation we are having.  Like, unless I can have an

21   evidentiary foundation that there is a reasonable expectation

22   of privacy for those individuals who log into Freenet, it

23   doesn't matter if it's unsupervised.

24        MR. ROBBINS:  My block request is meaningless to

25   everybody in the world except for an entity that can leverage

1  resources to build a screen that will then take that block

2  request and associate it to a certain thought.  It's

3  meaningless.  It is a sealed envelope.

4          THE COURT:  But what about --

5          MR. ROBBINS:  Just like an envelope can be steamed

6  open.

7          THE COURT: -- doing that is unconstitutional?  The

8  fact that law enforcement, as a body, part of their

9  investigative toolbox is to gather evidence and to keep that

10 evidence in a place where there is, you know, institutional

11 memory so that investigations can be improved.

12     What transforms that into something in this case

13 unconstitutional?

14          MR. ROBBINS:  Well, this case, the -- the running of

15 the screen is comparable to the steaming of an envelope.  There

16 is nothing that would prevent postal inspectors from steaming

17 envelopes, a certain number of them, and just looking to see

18 what's in there.

19          THE COURT:  That's a physical intrusion.  When I lick

20 my envelope and I put it in the mail and I say it goes to you,

21 Mr. Robbins, I do have -- I mean, I can just right away see an

22 argument for a reasonable expectation of privacy there.

23     Is your argument that everybody that joins the Freenet

24 has sort of, within that community, a reasonable expectation of

25 privacy simply because it's Freenet?

1          MR. ROBBINS:  The argument is that the block requests

2    are the functional equivalent of an envelope because nobody can

3    decipher them.  The witness said that repeatedly, nobody can

4    decipher what those block requests say.  So it's sealed.  It's

5    absolutely sealed.  It's meaningless.

6          THE COURT:  But the witness also said that the way in

7    which the law enforcement obtained the information to decipher

8    the code is doing what anybody else on Freenet could do, going

9    to the Frost, going to the other sort of Freenet-specific

10   websites and gathering that information.

11         MR. ROBBINS:  The fact that it can be done with

12   enough resources doesn't make it legal.  Just like anyone can

13   steam an envelope open, that doesn't make it legal.  That

14   doesn't mean that the government can do it.

15         THE COURT:  That's a false analogy then.

16         MR. ROBBINS:  Why?

17         THE COURT:  I will tell you why.  Because if I am in

18   Freenet, and I can move about Freenet freely, right, I can go

19   to this website, I can look at this manifest, I can see what

20   someone is offering, and it's -- it's wide open to me if I am

21   in that community, that is very different than if you hand me

22   an envelope and you say, This is really meant for Mr. Finci,

23   and I go back and I, you know, and I steam it open, that's a

24   completely different factual scenario.

25         MR. ROBBINS:  Okay.  I think I understand what you

1 are saying, Your Honor.  But then I arrive at *Beautiful*

2 *Struggle* where Baltimore City or a neighborhood in Baltimore

3 City, I can walk anywhere in Baltimore City, but I don't expect

4 that my movements are going to be tracked.

5          THE COURT:  And I agree with you and I think that

6 that is, to me, the closest, like, you know, doctrinal analogy

7 that gives me real pause in this case.  It really does.  This

8 is a very uncomfortable case.  When you read *Leaders* and you

9 read *Carpenter*, it's a narrow exception to the -- to the --

10 it's about, you know, the whole of someone's movements that

11 they can't control because they don't have -- we don't have,

12 you know, like, choice in carrying our cell phones or choice in

13 how we move about the city.

14          MR. ROBBINS:  But don't we?  We can choose not to

15 have a cell phone.  We can choose not to go to Baltimore.

16          THE COURT:  But the fact of the matter is that the

17 Courts have made it really clear I am not to expand that

18 doctrine if it doesn't involve physical movement, and I, you

19 know --

20          MR. ROBBINS:  And I am --

21          THE COURT:  Above my pay grade.

22          MR. ROBBINS:  I understand.  Our record needs to be

23 that we are looking at the Internet as the functional

24 equivalent, for today's society, as the streets of Baltimore.

25          THE COURT:  Mm-hmm.

1          MR. ROBBINS:  The -- that second case that I

2     mentioned today that we are going to email to chambers later,

3     the 2020 case in the *Feeza Erina*, *United States vs. Moalin*, has

4     got a very helpful Fourth Amendment assessment there with

5     respect to metadata.  If we fall into the third-party doctrine,

6     which we believe to be wrong -- and we provided the Court the

7     segueing case and that was revolved on the third-party doctrine

8     -- but the problem is that that focuses purely on the one

9     communication, and it assumes that the only communication at

10    issue is the block request that happened to result in the

11    investigation when, in fact, that law enforcement node was

12    collecting block requests from 48, 47, maybe more other

13    neighbors at the same time, it was sending all of those to ICAC

14    Cops.  All of those people had all of their private movement on

15    the Internet via Freenet, all of that movement was being

16    monitored by the government.  It was a government surveillance

17    of all of it.

18          Now, the government's only interested in this case in a

19    certain part of that movement.  It's only interested in the

20    CSAM, so that's the tool that they have built.  But Mr. Erdely

21    told us, Well, you give me some other file and we will find all

22    the people who were talking about that, too, and that's the

23    problem is that it's got no court supervision.

24          We are not saying that this can't be done.  What we are

25    saying is that the Freenet Network Investigative Technique here

1    requires court supervision to be in compliance with the Fourth

2    Amendment.  And we don't know exactly how that all would work

3    yet, we haven't figured that out yet -- you talk about pay

4    grades; that's probably way above our pay grade -- but that's

5    what we are saying is that this -- this Freenet -- the Levine

6    Network Investigative Technique, and I think Mr. Erdely called

7    it an investigative tool or technique a couple times himself,

8    that is what should be happening -- be conducted under the

9    supervision of a Court.

10         You look at the -- most of the other cases -- you look at

11   the cases -- and the cases where the government has gone to a

12   Court, they get a lot of -- a lot of latitude even if they have

13   -- even if the Court has maybe granted them a greater license

14   than they should have had because they have done the right

15   thing.

16         It's not necessarily the people in the position of

17   Mr. Erdely that -- that are going astray here.  They are trying

18   to do their job, they know they are supposed to do it within

19   the law, but that -- but they maybe don't have all the tools

20   that they need, and they -- they may be reflecting on this in

21   the context of a lot of the big data things that are happening

22   where the surveillance state is -- I don't want to sound too

23   extravagant about this, but this is really just -- it's another

24   manifestation of the big data surveillance state in that it

25   allows the government to leverage resources to track every

1  movement of citizens, and do it, in this case, without the

2  supervision of a Court.

3      There -- when that was looked at back in '72 when the

4  Foreign Information Surveillance Act was passed, the Supreme

5  Court said -- or just before it, the Supreme Court said you got

6  to create a mechanism by which we have a Title III Court look

7  at this stuff.

8          THE COURT:  But here, because one of those areas --

9  and I think that the other part of this the government has put

10  to bed is that there isn't any wiretap act violation, that

11  clearly the exception here is that the node is talking directly

12  to another node, it is not intercepting anything.  Right?

13          MR. ROBBINS:  This is a Fourth Amendment case.

14          THE COURT:  It's not a -- right.  And so the reason

15  why that seems somewhat apt or, you know, that's relevant to

16  this conversation has completely escaped me now.  I had a train

17  of thought that actually was responsive to what you were just

18  saying and I have lost it.  So continue.

19          MR. ROBBINS:  It is a -- the two places where you

20  look at the various wiretap act and the -- and the -- and the

21  -- the -- the trap, the dial trap is that at some stage, there

22  is a difference between whether or not you are picking up

23  content or not content, and if you are just picking up numbers

24  dialed, then you don't have to worry about it.  So that's what

25  moves it from one part of that title to another part.

1          THE COURT:  Right.

2          MR. ROBBINS:  But -- and that's probably the place

3    where there is some analogous assessment going on because most

4    of the things that the government's talking about are probably

5    not content.  It's the block request itself which is the

6    content.  And so by there being content involved, that's --

7    that's what makes this Fourth Amendment issue and maybe Title

8    III, but it's -- Title III is a bad fit probably because it

9    doesn't cover all of the different pieces of this.

10          I think it probably ends up being analyzed on the Fourth

11   Amendment, but if it was to go under the electronic act, it

12   would be Title III and not the -- the dialer just because the

13   content is involved.

14          But, again, it comes back to where the -- we are

15   struggling with we see this as being a content case, and the

16   Court is struggling with whether or not that -- that content

17   can be viewed as a protected content or whether the -- whether

18   anybody on the Freenet has any expectation of privacy for any

19   block request that is transmitted by their node, and that is

20   the -- is where --

21          THE COURT:  Well, then, in that regard, isn't it

22   relevant that Freenet does have disclaimers in that respect?  I

23   mean, we have seen lots of cases where an employee, it's a

24   government employee using a government computer, and a banner

25   pops up that says, Listen, you may be subject to monitoring,

1    surveilling at any time, and companies do this, too, right, we

2    just want to let you know if you think you have got an

3    expectation of privacy, you really don't.  And here, there has

4    been facts about, you know, this is an open net, so doesn't

5    that move the analysis away from --

6              MR. ROBBINS:  I don't believe it does, Your Honor,

7    because the analysis says you have to recognize that any regime

8    with enough resources could potentially break this.  It's a

9    question of resources.  So the government is in a different

10   position than most Freenet users, and the question is also one

11   of just because it's possible for some other Freenet user to do

12   it, does that make it Fourth Amendment permissible for the

13   government to do it?  And that has never been a Fourth

14   Amendment case that I have seen that says because somebody else

15   could break into a box, the government can break -- that's not

16   the way the Fourth Amendment works.  The Fourth Amendment is

17   there to protect people against the government.

18        So the fact that conceivably some other regime could do

19   this is not relevant to whether or not the -- the United States

20   Government or the states within the United States should have a

21   warrant and judicial supervision before they undertake this

22   activity that is a search.

23        I see you nodding.  I think you understand our argument.

24             THE COURT:  I do get it.  I do.  I am just still, you

25   know, struggling.

1            MR. ROBBINS:  I understand, Your Honor.  Thank you.

2            THE COURT:  Thank you.

3            MR. DRAUGHON:  Your Honor, the government's position

4    is that there is no constitutional violation for the data

5    collected that served as the basis for the search warrant at

6    issue in this case.

7            The first basis being that the communication was direct,

8    consensual communication with law enforcement nodes, and the

9    second basis that there was no expectation of privacy either

10   subjective or objective, and that the *Carpenter* and *Beautiful*

11   *Struggle* line of cases does not change that.

12           THE COURT:  So assume I am convinced by -- that there

13   is not a wiretap act violation, you have answered that, there

14   is not -- this doesn't fit into *Carpenter* and *Leaders of a*

15   *Beautiful Struggle*.  But perhaps, if I am getting the defense's

16   argument right, it might live in the sort of *Katz-Kyllo* world

17   which is the government has outsized resources and a

18   technological advantage and, therefore, it's picking up on,

19   yes, what would be public communication, but that really is

20   meant to be kept private, and so is there not -- doesn't this

21   really fit into -- I think it was *Katz*, the person who was

22   making a call on the pay phone who was overheard by this

23   really, you know, nifty technology back then, and it sounds

24   like that's where the defense is living.

25           What is your response to that?

1      MR. DRAUGHON:  I think there are three reasons that

2 that response does not work.  The first is one of the questions

3 that Detective Erdely answered towards the end was that the

4 data -- the server size here is not something that a typical

5 person could not be able to acquire on their own if they were

6 to have a personal computer.

7      The second is that the -- when you mentioned like sort of

8 a regime that's being able to access this, and not just like

9 some random user, I want to point out -- and this was the

10 slides, Government Exhibit 1, which is like the slides of how

11 you set it up, it says, But an attacker with moderate resources

12 may be able to trace your activity on Freenet back to you.

13 This is not a regime capable thing.  This is something that,

14 given that the type of people on Freenet who are usually

15 computer savvy, they would typically fit into that moderate

16 capability.

17      And the third is that the -- the data used to compare the

18 request sent to law enforcement nodes is publically available

19 on these Freenet sites.  You know, so the -- the government is

20 not using anything, whether it be the server, the file names,

21 and hash values, or the technological expertise that another

22 Freenet user who happens to not be law enforcement and has

23 moderate resources couldn't do themselves.  So that's why it

24 doesn't go into, like, the *Kyllo-Katz* line of cases.

25      I don't want to spend too long harping on it, but as Your

1    Honor noted, the -- because this is not a case in which there
2    are interceptions, it is not a case which there is some sort of
3    Network Investigative Technique, and I want to point out that
4    Detective Erdely specifically said that this is not a net case,
5    that that is not what happens here.  Because those things do
6    not happen, these are direct communications, and as the defense
7    exhibit to their supplemental response pointed out on Section
8    B, page 168, consent of a party to the communication is an
9    exception to any sort of concerns about whether there is a
10   wiretap act violation, and Your Honor noted that already.

11         But this is -- because this is a direct communication,
12   there isn't an issue with there being some sort of like Fourth
13   Amendment search because law enforcement received it
14   themselves.

15             THE COURT:  But I think the defense's point is, okay,
16   putting the direct communication between defendant's node and
17   the law enforcement node, there is 40 other nodes who are also
18   attached to other citizens and all of -- the law enforcement
19   node is gathering all of that information so it is more like --
20   it's like the electronic version of *Leaders* and that's just
21   different.  That's, like, a different question to be answered.
22   Is that permissible?

23             MR. DRAUGHON:  Yes.  So because it is -- I think if I
24   am understanding Your Honor's point is that the -- if I am law
25   enforcement node and I am connecting to Freenet Node A and

1   Freenet Node A has 40 users, then I could theoretically be

2   retaining the information or their request that Freenet Node A

3   got from those 40 peers that it has.

4            THE COURT:  That, as well as I am law enforcement

5   node, and because I am a node, I have 100 direct or 40 direct

6   neighbors, I have A, but I also have 39 others, and that law

7   enforcement node gathers all the information from all 40 but

8   just discards or it doesn't get used ultimately by ICAC Cops.

9   They are just interested in a really narrow segment, right, and

10  the analogy is just like the drone in Baltimore, it gathers all

11  the information, but it's really only interested in a narrow

12  segment of it?

13           MR. DRAUGHON:  Right.

14           THE COURT:  What's the -- what's the material

15  difference between that and *Leaders*?

16           MR. DRAUGHON:  To the -- the first, with the idea

17  that, like, the law enforcement node can gather information

18  that another node received from other nodes, if I have a phone

19  conversation with a chatterbox that really loves to, like,

20  gossip into a room, and that person spoke to 20 people, I

21  didn't speak to those people, and had I intercepted that

22  conversation with those 20 people, that would have been a

23  violation, but that person just spoke to 20 people and now they

24  are telling me everything that person said, there is no

25  violation there.  At the end point that law enforcement comes

1  into play, it is a consensual communication.

2          THE COURT:  But how about the other 20 -- how about

3  that?

4          MR. DRAUGHON:  So with regards to that, Dr. Levine

5  explained that because there is a one-percent presence of law

6  enforcement nodes at any given point at least in June 2018,

7  which is relevant here, there was about a 40-percent chance

8  that Freenet users on Freenet would have been connected to a

9  law enforcement node.

10          THE COURT:  On any given day?

11          MR. DRAUGHON:  Right.  So that is going to be

12  distinct from *Carpenter* and *Beautiful Struggle* which

13  essentially says everybody is going to be exposed to this.  But

14  more importantly is not the percentage, it's the consensual

15  matter, it's the lack of compulsion that if you live in

16  Baltimore, you have no option but to walk around.  If you live

17  in the world today, you have no option but to have a cell

18  phone.

19      The defense, in their supplemental response, made Freenet

20  akin to Facebook, and I want to be clear, like one -- like one

21  of the most popular sites in the world is not comparable to one

22  that the defense in their cross suggested Freenet was losing

23  its popularity, and that, at some point, it had 4600 users a

24  day, but now it's going down.  That is not close to Facebook.

25          Furthermore, in Facebook, you can send messages

1  privately.  You can also post to anyone.  And if you don't have

2  your Facebook account in some sort of private setting, anybody,

3  including law enforcement, can see what you are posting, and

4  there is no violation there.

5       If you were to randomly see those Facebook suggestions

6  about friends and you start sending those Facebook friends,

7  Hey, you want to buy coke, if that happens to be a law

8  enforcement officer, there is no violation there because that

9  is a direct communication.  They are not intercepting any sort

10  of communication of users.

11       THE COURT:  And if law enforcement opened up a

12  Facebook page, and, because of resources, were able to download

13  every Facebook friend and friend of friend and likes, and no

14  violation there?  It's just what law enforcement can do and

15  it's the price of all of us, those of us who choose to be part

16  of Facebook being part of Facebook, it's a risk?  Is that what

17  you are saying?

18       MR. DRAUGHON:  Yes.  And my point, Your Honor, is

19  Facebook is substantially larger than what we are talking about

20  here.  And even in that case, there is no case law in all of

21  the circuits that have looked at this that have said that any

22  sort of public accessible content requests, anything of the

23  like on the Internet would constitute some sort of exception to

24  third-party doctrine.  The reality is that in these situations,

25  especially on Freenet, these people are choosing to send that

1   out.  They are choosing to be in an open net as opposed to dark

2   mode.

3         Your Honor, I am going to take a moment to jump around

4   and make sure I am not being redundant.

5         I do want to note one of the other things that there were

6   discussions about.  Well, what if it was a church sermon?  We

7   are talking about CSAM material.  We are talking about material

8   that once you publicly post it, once you request it, it is

9   illegal immediately.

10        We are not talking about innocent data.  And doctor --

11  Detective Erdely explained that the filtering process in which

12  the data is not saved happens in milliseconds, it is in

13  realtime, which means that all of the data that is not CSAM

14  would not be retained, is not being retained at all.  And that

15  goes to the idea of if I have law enforcement node, I have 40

16  peers, well, the data being retained is only going to be the

17  hit CSAM and that is Hops-to-Live 16, 17, 18, so that is going

18  to be substantially less than retaining everything that my

19  peers have sent me in addition to the reality that my peers may

20  constitute only 40 percent or certainly less than half of the

21  users on Freenet at any given day.

22        The -- simply because some of the strangers with whom the

23  defendant and other Freenet users may happen to be law

24  enforcement officers and they observed and analyzed those

25  communications to identify it does not render a search.

1      And with regards to, like, the subjective expectation of

2   privacy, this is a situation in which, as Your Honor noted,

3   there are multiple instances in which they are told that it may

4   be, and I quote, quite easy for others to discover your

5   identity, exclamation point.  And the warnings exist throughout

6   their use.

7      Now, a government computer that the Courts have already

8   determined the expectation of privacy doesn't exist because of

9   the warning at the front, Your Honor, I only see that when I

10  first log in.  Everything I do after the fact, there are no

11  reminders.  And Courts have decided that that is not a

12  situation in which there is an expectation of privacy.

13     Contrast that to here in which Freenet users are

14  persistently seeing that warning at the bottom of the screen,

15  there isn't an opportunity for somebody to say they

16  subjectively expected that this would somehow be an expectation

17  of privacy.

18     And then objectively --

19     THE COURT:  Well, how about the -- what's the

20  response to Mr. Robbins' point is that really the only -- the

21  content that really matters is the block, and the block is the

22  thing that is, by virtue of it being, you know, smashed up and

23  spread out among the Freenet participants, is effectively

24  encrypted, and so when law enforcement gets it and then

25  compares it to their, you know, their database, that that

1   somehow is a content-based search and that's different, that

2   that makes it -- that nudges this into a violation of a

3   reasonable expectation of privacy, or that gives it its

4   expectation of privacy, that fact is why the users have an

5   expectation of privacy, what's the response to that?

6            MR. DRAUGHON:  So if there happens to be a user who's

7   interested, and it doesn't have to be CSAM, say there is a user

8   who is interested in knowing any time somebody sends out a

9   request for a rap album, they could have gone to, like, a

10  popular Freenet website that lists all of the hash values for

11  rap albums and stored that on their database, and then when

12  they get requests, they can compare that to their database to

13  see if this person requested a rap album.

14       So because the content is directly sent to that person,

15  their ability to ascertain what it is based on something that

16  they have chronicled doesn't turn it into being some sort of

17  like invasion of a private communication especially when the

18  communication is being sent directly to the person who is doing

19  it.

20            THE COURT:  So I think that's -- am I getting right

21  your way of saying is like it doesn't matter if it's content,

22  it's the totality of the evidence, it's the fact that they are

23  equivalent to all in a room, and if I am in a room with you and

24  I ask you, Do you have this piece of paper?, and you say yes or

25  no and you pass it onto the next person, simply because you are

1  law enforcement when I ask you, Do you have this piece of

2  paper?, it doesn't transform it into a reasonable expectation

3  of privacy?

4       I mean, because here is my -- one of my struggles is at

5  what point does private become public?  Like, we are all in a

6  room together, and even if we decide that, you know what, we

7  are just all going to have this conversation amongst ourselves,

8  to some degree, it is public, right, because I am sharing it

9  with you all?  But at the same time, if we said, Listen, we are

10 going to keep it just between ourselves, we are going to lock

11 the door, we are going to put up some paper so nobody can see

12 in, and take some measures to keep it just amongst ourselves,

13 does that turn it into private such that the Fourth Amendment

14 is triggered?

15           MR. DRAUGHON:  And that would be the defendant or

16 another Freenet user going into dark net mode.

17           THE COURT:  That's the government's argument, right,

18 that there is this other option, and this would be a different

19 case from your perspective?

20           MR. DRAUGHON:  Yes, Your Honor.  And the -- with

21 regards to, like, the subjective understanding, the -- the

22 warnings that Freenet persistently gives you doesn't specify

23 they may be able to find your IP address.  It says your

24 activity.  It is saying what you do on Freenet could be easily

25 ascertained by another user, and that would include, whether or

1    not we are considering it content or not, it would include the

2    request of the hash values.

3         As Your Honor knows, the burden of showing a legitimate

4    expectation of privacy, it rests with the defendant, and there

5    is no subjective expectation of privacy based on what we

6    discussed already.  And this Court, including every other Court

7    that has considered it, has pointed out that to the extent

8    there is -- and I quote, To the extent that there is an

9    allegation that the pre-warrant investigation was improper,

10   this Court has credited Dr. Levine's testimony and that Freenet

11   and what it warrants makes the information not private and

12   there is no expectation of privacy.

13        Dr. Levine, Dr. (Sic) Erdely, and Officer Mills have all

14   testified that the requests on Freenet and law enforcement

15   nodes records are direct communications and that Freenet

16   repeatedly warns its users and there is no evidence to the

17   contrary.  So this is just not a situation in which the

18   defendant can reasonably say there was a subjective expectation

19   of privacy.

20        And with regards to objective, and there is no

21   expectation there as well, the Supreme Court has said there is

22   no objective expectation of privacy when he voluntarily turns

23   over that information to third parties, and that's what we have

24   here.

25        And while *Beautiful Struggle* and *Carpenter* have made it

1  clear that there is a narrow exception that can exist, those

2  focus on physical movements, those focus on non-stop,

3  compulsive behavior, and it simply does not apply to this case.

4          And just for the sake of pointing it out, even if the

5  Court were to decide that there is -- that there was not a

6  direct communication, that the third-party doctrine does not

7  apply, and that there was some sort of interception or some

8  other nefarious activity, which the government submits does not

9  exist, the good-faith exception would apply because what the

10  case law says is that if law enforcement relied on binding case

11  law at the time, and this happened in 2018, which is before

12  *Beautiful Struggle*, there would be -- there would be a

13  good-faith exception because they followed the law at the time.

14          So even if *Beautiful Struggle* --

15          THE COURT:  Well, that's with regard to *Leaders*.  But

16  putting that aside, I mean, I haven't gotten to that second

17  question because that search warrant is its own, you know, is

18  its own argument for later.

19          So, I mean, I hear what you are saying, if I credit the

20  analogy, then the analogy wasn't so clearly established in the

21  law, and I know I am borrowing from 1983, but so clear that it

22  would be an exception to the good-faith requirement, but there

23  is other reasons why the warrant -- we still have to talk about

24  it because I see the defense getting antsy, like, wait a

25  minute, we didn't -- we were not going to talk about the

1  warrant, whether good faith applies today, and that's fair, we

2  are not.  But I hear your point.

3       MR. DRAUGHON:  I am not going beyond that point with

4  regards to the good-faith exception.

5       That is all from the government, Your Honor.  Thank you.

6       THE COURT:  Thank you.

7     Mr. Robbins, anything in response?

8       MR. ROBBINS:  Never trust an attorney --

9       THE COURT: -- when they say only one more thing, only

10 one more question?

11      MR. ROBBINS:  The focus here, Your Honor, is the all

12 content, and the important thing to recognize in the analogy

13 that you used about talking in the room and saying, Can I have

14 this piece of paper?, this piece of paper is pretty clear --

15 I'm sorry, saying this piece of paper is pretty clear,

16 everybody can see the piece of paper, there is a lot of

17 communication going on there, block requests are not that.

18      Block requests are containers being sent across the

19 Freenet, and the container cannot be peered into without the

20 X-ray machine of ICAC Cops.  That's what allows you to look

21 inside the block requests that interests them.  But they also

22 say, given their interest and given the system that they have

23 set up, they can look at anything else.

24      They have got a substantial presence on the Freenet, they

25 have got deep intrusion, and they are collecting the

1   communications of every neighbor to a law enforcement node,

2   apparently, 24/7, realtime, and they are comparing it against

3   their database.  There is no judicial supervision saying what

4   goes into their database.

5          That's our issue, that's our concern, what we believe

6   makes this a violation of the Fourth Amendment, and that's the

7   thing that we would have the Court focus on.

8             THE COURT:  Okay.  Well, I appreciate that.  That's

9   very helpful.

10         So what I said in the beginning still holds.  I am going

11  to take it all under advisement.  I have got to really think

12  about this.  I appreciate the arguments and the pleadings as

13  well as the testimony.  We are not going to let a lot of grass

14  grow under our feet.  I can't tell you exactly when, but we

15  will issue a written opinion and order and next steps from

16  there.

17         Okay.  All right.  Thank you all for your time.  If I

18  don't see before you the holidays, all have a safe and peaceful

19  one.

20            MR. FINCI:  You too, Your Honor.

21            THE COURT:  Thank you.

22         (The proceedings were concluded at 3:25 p.m.)

23

24                      - - - - -

25

INDEX TO TESTIMONY

<u>GOVERNMENT'S WITNESSES</u>:

<u>DR. BRIAN LEVINE</u>                                        <u>PAGE</u>

    Direct examination by Mr. Draughon          5
    Cross-examination by Mr. Robbins            10
    Redirect examination by Mr. Draughon        37
    Recross-examination by Mr. Robbins          38

<u>ROBERT ERDELY</u>                                          <u>PAGE</u>

    Direct examination by Mr. Draughon          39
    Voir dire examination by Mr. Robbins        43
    Direct examination by Mr. Draughon          48
    Cross-examination by Mr. Robbins            63
    Redirect examination by Mr. Draughon        79
    Recross-examination by Mr. Robbins          80

1                    C E R T I F I C A T E

2              I, Renee A. Ewing, an Official Court Reporter for

3    the United States District Court for the District of Maryland,

4    do hereby certify that the foregoing is a true and correct

5    transcript of the stenographically reported proceedings taken

6    on the date and time previously stated in the above matter;

7    that the testimony of witnesses and statements of the parties

8    were correctly recorded in machine shorthand by me and

9    thereafter transcribed under my supervision with computer-aided

10   transcription to the best of my ability; and that I am neither

11   of counsel nor kin to any party in said action, nor interested

12   in the outcome thereof.

13

14
                    Renee A  Ewing
15
                    Renee A. Ewing, RPR, RMR, CRR
16                  Official Court Reporter
                    April 6, 2022
17

18

19

20

21

22

23

24

25

**'**

**'72** [1] - 101:3

**1**

**1** [1] - 105:10
**1,000** [8] - 56:22, 56:25, 57:1, 57:7, 60:17, 64:10, 73:5
**10** [1] - 118:5
**100** [17] - 13:1, 36:21, 37:2, 42:25, 56:25, 57:1, 57:7, 57:8, 57:12, 60:18, 63:4, 69:10, 69:11, 73:6, 81:19, 81:20, 107:5
**12** [1] - 59:18
**12:06** [1] - 1:11
**133** [1] - 2:4
**14** [1] - 68:12
**15** [1] - 68:12
**150** [1] - 51:2
**150,000** [8] - 51:1, 51:4, 51:6, 51:12, 55:20, 62:4, 67:7, 75:4
**150,000ish** [1] - 61:23
**150,800-and-some-odd** [1] - 55:16
**150,800ish** [1] - 55:14
**16** [15] - 21:6, 22:12, 58:21, 59:3, 59:15, 62:3, 62:9, 65:9, 66:16, 66:20, 67:22, 68:12, 76:8, 77:15, 110:17
**160** [1] - 1:20
**168** [1] - 106:8
**16s** [4] - 59:4, 69:9, 69:14, 69:15
**17** [18] - 21:7, 22:12, 58:18, 58:19, 58:22, 59:2, 59:16, 62:3, 62:9, 62:17, 65:9, 66:17, 66:20, 67:23, 68:11, 76:9, 77:15, 110:17
**17,000** [2] - 17:4, 24:14
**17s** [2] - 59:4, 60:12
**18** [21] - 21:7, 22:12, 58:11, 58:14, 58:16, 58:18, 58:22, 59:2, 59:16, 62:3, 62:9, 62:17, 65:9, 66:17, 68:10, 69:3, 77:15, 80:8, 80:10, 110:17
**18s** [4] - 59:4, 60:12, 66:20, 67:23

**1972** [1] - 87:14
**1983** [1] - 115:21
**1991** [1] - 40:7
**1998** [2] - 40:12
**1st** [1] - 50:25

**2**

**2** [6] - 1:11, 19:12, 20:24, 35:5, 38:1, 38:5
**2,001** [1] - 64:11
**20** [17] - 12:23, 17:12, 17:13, 17:14, 18:9, 18:13, 18:25, 19:6, 19:24, 35:19, 36:1, 36:3, 36:6, 107:20, 107:22, 107:23, 108:2
**200** [2] - 13:2, 36:6
**2007** [6] - 40:14, 41:1, 41:5, 82:17, 93:22, 93:23
**2011** [2] - 42:6, 82:16
**2012** [8] - 14:2, 14:3, 24:11, 40:8, 42:6, 82:15, 93:22, 94:11
**2012-ish** [1] - 82:16
**2017** [12] - 14:2, 14:9, 14:16, 14:20, 16:14, 16:15, 17:2, 17:25, 24:12, 24:20, 35:14, 35:24
**2018** [5] - 5:16, 5:19, 31:19, 108:6, 115:11
**2020** [12] - 6:6, 17:7, 17:12, 17:13, 17:25, 18:12, 19:12, 24:14, 24:19, 41:20, 88:5, 99:3
**2021** [1] - 1:11
**2022** [1] - 119:16
**20770** [2] - 1:16, 1:21
**2125** [1] - 87:13
**213** [1] - 2:5
**21401** [1] - 2:5
**2145** [2] - 32:9, 32:23
**2160** [1] - 84:5
**24/7** [1] - 117:2
**27B** [1] - 67:9
**297** [2] - 87:6, 87:13
**2:14** [1] - 83:7
**2:30** [2] - 82:25, 83:5
**2:33** [1] - 83:7

**3**

**3** [1] - 64:21
**30** [4] - 27:8, 27:10, 36:11, 70:8

**301** [3] - 1:17, 1:21, 1:24
**32** [4] - 53:9, 55:1, 63:6, 63:15
**344-3227** [1] - 1:24
**344-4433** [1] - 1:17
**35** [2] - 27:8, 74:14
**37** [1] - 118:6
**38** [1] - 118:6
**39** [2] - 107:6, 118:8
**3:25** [1] - 117:22

**4**

**4** [1] - 51:7
**40** [15] - 7:9, 12:23, 66:5, 70:8, 70:24, 71:21, 74:9, 92:20, 106:17, 107:1, 107:3, 107:5, 107:7, 110:15, 110:20
**40-percent** [1] - 108:7
**407** [2] - 87:6, 87:13
**40th** [1] - 74:10
**42,000** [8] - 14:10, 14:16, 14:21, 16:14, 17:1, 24:12, 35:21, 35:23
**4200** [9] - 14:16, 17:2, 17:18, 17:24, 18:4, 18:6, 35:16, 35:21, 35:24
**43** [1] - 118:9
**443** [1] - 2:6
**45** [16] - 5:17, 5:23, 10:17, 10:25, 17:18, 18:5, 18:6, 18:18, 18:21, 31:17, 34:5, 34:20, 84:4, 93:5
**4500** [1] - 84:7
**454-7675** [1] - 2:6
**45908200** [1] - 1:21
**4600** [13] - 17:7, 17:14, 17:25, 18:4, 18:6, 18:12, 18:14, 18:20, 18:21, 18:25, 19:2, 19:6, 108:23
**47** [1] - 99:12
**48** [14] - 6:8, 6:17, 7:3, 7:7, 19:10, 19:20, 20:25, 31:5, 35:1, 84:3, 84:4, 93:6, 99:12, 118:9

**5**

**5** [4] - 71:24, 72:1, 73:22, 118:5
**50** [7] - 20:1, 20:4, 20:5, 38:20, 38:22,

66:5, 70:24
**55** [1] - 14:8
**58,000** [2] - 14:9, 24:10

**6**

**6** [2] - 16:23, 119:16
**60** [1] - 19:25
**60-some-percent** [1] - 27:7
**600** [2] - 50:4, 50:18
**62** [1] - 81:25
**63** [3] - 81:24, 81:25, 118:10
**6406** [1] - 1:15
**69** [5] - 6:10, 6:23, 19:13, 19:21, 35:8

**7**

**7** [10] - 17:17, 17:20, 17:21, 48:25, 49:2, 49:10, 49:13, 49:18, 49:22, 71:11
**70** [4] - 6:9, 19:13, 35:4, 35:8
**72** [1] - 19:17
**72.3** [1] - 19:17
**73-1** [1] - 16:19
**7850** [1] - 1:20
**79** [1] - 118:10

**8**

**80** [2] - 35:7, 118:11
**800** [1] - 1:16
**81** [1] - 35:7

**9**

**92** [1] - 87:13
**973** [1] - 88:5
**977** [1] - 88:5
**99** [3] - 6:10, 35:7, 69:12
**99-percent** [1] - 7:6

**A**

**ability** [7] - 50:16, 61:6, 75:2, 91:17, 93:20, 112:15, 119:10
**able** [15] - 9:22, 12:8, 18:18, 55:25, 56:10, 60:20, 69:4, 71:2, 78:1, 78:4, 105:5, 105:8, 105:12, 109:12, 113:23

**absolutely** [1] - 97:5
**abstract** [2] - 9:1, 88:15
**academy** [1] - 40:7
**access** [3] - 54:6, 76:24, 105:8
**accessible** [1] - 109:22
**accident** [1] - 38:25
**account** [3] - 5:23, 28:14, 109:2
**accuracy** [1] - 29:10
**accurate** [2] - 29:16, 44:18
**acknowledge** [1] - 84:5
**acquire** [2] - 80:1, 105:5
**Act** [6] - 86:25, 87:1, 87:5, 87:9, 89:13, 101:4
**act** [7] - 12:2, 21:2, 101:10, 101:20, 102:11, 104:13, 106:10
**action** [1] - 119:11
**actions** [1] - 15:6
**activity** [4] - 103:22, 105:12, 113:24, 115:8
**acts** [1] - 27:6
**add** [2] - 47:12, 80:13
**added** [1] - 81:4
**addition** [2] - 13:22, 110:19
**additional** [3] - 4:7, 4:16, 5:7
**address** [17] - 15:8, 53:3, 53:5, 53:6, 59:4, 60:2, 60:8, 60:23, 60:25, 61:2, 61:11, 61:15, 61:16, 68:2, 77:3, 77:16, 113:23
**addressed** [1] - 90:10
**addresses** [10] - 7:13, 7:16, 7:17, 15:15, 15:23, 15:24, 36:15, 52:17, 59:22, 76:25
**adds** [1] - 64:13
**adjust** [2] - 6:14, 30:19
**administrator** [4] - 42:1, 67:11, 75:8
**adult** [1] - 76:9
**advantage** [2] - 69:17, 104:18
**advisement** [2] - 4:8, 117:11
**affect** [14] - 6:13, 7:19,

8:22, 9:3, 12:3, 25:6, 25:8, 25:10, 28:10, 28:14, 29:13, 30:1, 30:13, 70:5
**affecting** [1] - 25:5
**affidavit** [6] - 35:11, 51:1, 55:14, 76:21, 83:17, 88:10
**afternoon** [11] - 3:5, 3:6, 3:17, 3:19, 3:21, 10:16, 25:4, 43:18, 43:19, 63:2, 63:3
**age** [1] - 54:3
**agencies** [2] - 33:3, 34:2
**agency** [1] - 33:2
**agent** [1] - 3:16
**Agent** [1] - 3:16
**ago** [1] - 52:24
**agree** [3] - 29:9, 44:20, 98:5
**ahead** [2] - 5:10, 30:10
**AIDED** [1] - 1:25
**aided** [1] - 119:9
**akin** [2] - 30:25, 108:20
**ALAKOM** [1] - 1:8
**Alakom** [1] - 3:13
**ALAKOM-ZED** [1] - 1:8
**Alakom-Zed** [1] - 3:13
**albeit** [1] - 50:13
**album** [2] - 112:9, 112:13
**albums** [1] - 112:11
**algorithm** [6] - 8:22, 8:23, 9:3, 25:5, 25:7, 29:4
**allegation** [1] - 114:9
**alleging** [3] - 89:5, 89:6
**allocation** [1] - 94:1
**allow** [4] - 13:20, 41:6, 48:2, 92:7
**allowed** [3] - 10:23, 12:21, 87:22
**allows** [5] - 28:21, 64:23, 93:24, 100:25, 116:20
**alluding** [1] - 12:5
**almost** [1] - 35:2
**alternative** [1] - 65:17
**amend** [1] - 28:7
**Amendment** [20] - 4:3, 83:15, 86:21, 87:19, 88:3, 88:7, 88:9, 90:19, 99:4, 100:2, 101:13, 102:7, 102:11, 103:12, 103:14, 103:16,

106:13, 113:13, 117:6
**AMERICA** [1] - 1:5
**Amherst** [4] - 41:13, 42:13, 56:14, 75:11
**amount** [1] - 28:22
**analogous** [1] - 102:3
**analogy** [9] - 36:23, 89:24, 95:13, 97:15, 98:6, 107:10, 115:20, 116:12
**analysis** [8] - 22:24, 53:16, 56:13, 59:1, 85:7, 93:10, 103:5, 103:7
**analyzed** [2] - 102:10, 110:24
**Annapolis** [1] - 2:5
**annotated** [1] - 33:13
**anonymize** [2] - 58:1, 58:9
**answer** [5] - 10:19, 30:6, 43:4, 58:20, 61:14
**answered** [3] - 104:13, 105:3, 106:21
**anticipate** [2] - 47:19, 48:12
**antsy** [1] - 115:24
**anyway** [1] - 86:20
**anyways** [1] - 81:6
**apart** [1] - 50:20
**apologize** [2] - 58:21, 63:22
**appearance** [1] - 26:9
**APPEARANCES** [1] - 2:1
**apples** [1] - 37:14
**applies** [1] - 116:1
**apply** [5] - 60:9, 60:19, 115:3, 115:7, 115:9
**appreciable** [1] - 29:3
**appreciate** [7] - 31:14, 39:6, 62:22, 82:18, 82:24, 117:8, 117:12
**approach** [3] - 44:17, 45:7, 55:24
**appropriate** [1] - 89:22
**approximate** [2] - 7:3, 81:1
**April** [3] - 40:8, 41:20, 119:16
**apt** [1] - 101:15
**arbitrarily** [1] - 15:19
**area** [3] - 50:4, 60:21, 88:2
**areas** [3] - 48:9, 89:16, 101:8

**argument** [11] - 4:6, 12:3, 23:7, 67:13, 96:22, 96:23, 97:1, 103:23, 104:16, 113:17, 115:18
**arguments** [1] - 117:12
**Arizona** [4] - 44:3, 44:4, 44:5, 44:10
**arrive** [2] - 58:18, 98:1
**arrives** [3] - 51:8, 58:13, 62:17
**arrow** [1] - 71:23
**ARTHUR** [1] - 2:4
**ascertain** [2] - 31:22, 112:15
**ascertained** [1] - 113:25
**aside** [4] - 38:17, 38:19, 86:20, 115:16
**aspect** [1] - 57:21
**aspects** [1] - 77:6
**assault** [1] - 23:8
**assessment** [2] - 99:4, 102:3
**assigned** [2] - 15:19, 32:9
**assigns** [1] - 33:17
**associate** [2] - 33:6, 96:2
**associated** [7] - 32:6, 51:3, 54:19, 55:17, 67:6, 67:13, 68:18
**assume** [5] - 8:16, 23:7, 27:12, 27:14, 104:12
**assumes** [1] - 99:9
**assuming** [1] - 58:23
**astray** [1] - 100:17
**attached** [1] - 106:18
**attacker** [1] - 105:11
**attention** [2] - 3:1, 78:3
**ATTORNEY** [1] - 1:14
**attorney** [2] - 58:3, 116:8
**Attorney's** [3] - 40:9, 40:17, 41:23
**attribute** [1] - 15:5
**authorization** [2] - 95:16, 95:19
**automatic** [1] - 15:5
**automatically** [2] - 62:10, 65:14
**availability** [1] - 88:12
**available** [15] - 41:7, 52:8, 52:14, 52:16, 56:1, 61:18, 61:25, 62:10, 64:8, 65:11, 68:21, 77:13, 80:14,

90:20, 105:18
**average** [8] - 17:2, 17:7, 17:14, 18:12, 34:25, 35:16, 35:24
**avoid** [1] - 12:5

## B

**background** [1] - 5:4
**backup** [1] - 81:16
**backwards** [1] - 34:15
**bad** [1] - 102:8
**BALDWIN** [1] - 1:15
**Baldwin** [1] - 3:14
**Baltimore** [7] - 98:2, 98:3, 98:15, 98:24, 107:10, 108:16
**bandwidth** [2] - 55:23, 70:4
**bank** [1] - 66:14
**banner** [2] - 91:8, 102:24
**baseball** [1] - 36:22
**based** [17] - 6:13, 6:16, 8:23, 10:21, 15:21, 17:23, 21:13, 26:6, 35:19, 47:2, 64:16, 70:4, 79:23, 88:23, 112:1, 112:15, 114:5
**basis** [4] - 47:14, 104:5, 104:7, 104:9
**batch** [1] - 73:9
**bear** [1] - 31:14
**Beautiful** [8] - 90:11, 98:1, 104:10, 104:15, 108:12, 114:25, 115:12, 115:14
**became** [3] - 40:15, 41:1, 41:12
**Becker** [1] - 26:20
**become** [2] - 91:4, 113:5
**becomes** [4] - 21:22, 29:22, 57:6, 68:15
**bed** [1] - 101:10
**BEFORE** [1] - 1:10
**began** [1] - 41:5
**begin** [1] - 4:9
**beginning** [1] - 117:10
**behavior** [1] - 115:3
**belief** [1] - 31:3
**believes** [1] - 26:10
**belonged** [1] - 74:2
**belonging** [1] - 51:11
**belongs** [2] - 54:15, 62:4
**below** [1] - 71:20
**bench** [1] - 45:10

**benefit** [1] - 69:18
**BERMAN** [1] - 1:19
**best** [5] - 17:25, 68:4, 81:2, 92:17, 119:10
**better** [4] - 16:10, 24:19, 28:20, 63:22
**between** [22] - 9:25, 10:2, 18:4, 19:20, 19:24, 36:4, 41:23, 46:13, 46:14, 50:14, 52:10, 61:2, 61:4, 61:8, 70:8, 72:22, 91:12, 101:22, 106:16, 107:15, 113:10
**beyond** [8] - 41:13, 52:14, 57:13, 61:19, 68:2, 79:3, 81:15, 116:3
**big** [8] - 26:15, 82:11, 91:11, 91:14, 93:1, 93:4, 100:21, 100:24
**bigger** [2] - 28:1, 63:11
**billions** [1] - 67:19
**binding** [1] - 115:10
**bit** [7] - 4:14, 7:8, 10:19, 11:18, 18:3, 25:9, 32:7
**bite** [2] - 3:25, 45:16
**BitTorrent** [2] - 44:7, 44:10
**blank** [1] - 94:21
**blind** [1] - 84:22
**block** [66] - 8:5, 8:6, 8:14, 20:6, 23:18, 25:22, 27:20, 27:21, 27:24, 51:5, 51:11, 53:8, 53:10, 54:18, 54:25, 58:3, 61:22, 62:2, 62:4, 62:18, 62:19, 63:6, 64:8, 65:9, 66:9, 67:1, 68:9, 68:24, 69:4, 73:2, 73:8, 73:9, 73:21, 74:10, 78:7, 83:22, 83:23, 83:25, 84:15, 84:17, 84:25, 85:3, 85:20, 85:21, 85:22, 93:20, 93:21, 93:24, 94:4, 94:6, 95:10, 95:13, 95:24, 96:1, 97:1, 97:4, 99:10, 99:12, 102:5, 102:19, 111:21, 116:17, 116:18, 116:21
**blocks** [64] - 22:20, 22:22, 23:17, 23:20, 23:21, 23:22, 23:23,

23:24, 27:2, 28:1,
50:4, 50:10, 50:19,
50:23, 51:3, 54:15,
54:25, 55:5, 55:16,
55:17, 55:18, 56:22,
57:7, 61:22, 63:5,
63:9, 63:10, 63:11,
63:16, 63:19, 63:25,
64:1, 64:5, 64:10,
64:12, 64:14, 64:18,
65:10, 65:18, 67:6,
67:8, 67:13, 68:18,
69:5, 71:24, 71:25,
72:3, 72:8, 73:6,
73:14, 73:16, 73:17,
73:21, 74:1, 74:16,
74:17, 75:3, 75:14,
75:22, 75:25, 77:22,
78:14, 84:15
**board** [1] - 82:9
**boards** [2] - 23:1,
53:20
**body** [1] - 96:8
**borrowing** [1] -
115:21
**bottom** [4] - 46:6,
51:24, 95:3, 111:14
**bound** [1] - 39:3
**box** [3] - 4:21, 39:10,
103:15
**break** [4] - 82:25,
103:8, 103:15
**Brian** [3] - 4:11, 4:19,
5:1
**BRIAN** [3] - 4:22, 5:1,
118:4
**brief** [2] - 4:12, 16:20
**briefed** [1] - 89:15
**briefing** [3] - 46:13,
86:9, 86:24
**briefly** [5] - 43:14,
49:5, 68:16, 79:8,
80:18
**bring** [1] - 13:22
**brings** [1] - 28:22
**broad** [2] - 40:23,
88:23
**broad-based** [1] -
88:23
**broke** [2] - 73:5, 73:6
**broken** [3] - 23:19,
72:25, 73:8
**brought** [1] - 90:6
**build** [2] - 94:22, 96:1
**building** [2] - 80:21,
93:23
**built** [4] - 64:8, 75:14,
92:14, 99:20
**bunch** [1] - 73:1
**burden** [1] - 114:3

**buy** [3] - 94:13, 94:18,
109:7
**BY** [20] - 1:14, 1:15,
1:19, 2:4, 5:13,
10:15, 16:9, 37:25,
38:16, 39:19, 40:4,
43:17, 48:23, 49:21,
56:9, 59:6, 63:1,
63:24, 79:11, 80:20

# C

**C.V** [4] - 43:23, 43:24,
44:11, 81:22
**cache** [5] - 8:1, 8:3,
8:7
**cannot** [2] - 7:17,
116:19
**capabilities** [1] -
78:22
**capability** [1] - 105:16
**capable** [1] - 105:13
**capacity** [2] - 41:19,
79:16
**captioned** [1] - 50:4
**capturing** [1] - 55:23
**care** [1] - 24:5
**career** [1] - 78:21
**careful** [2] - 14:25,
28:12
**carefully** [1] - 33:12
**Carpenter** [10] - 86:11,
86:12, 86:20, 90:11,
90:21, 98:9, 104:10,
104:14, 108:12,
114:25
**carrying** [1] - 98:12
**case** [53] - 3:11, 3:12,
3:23, 5:21, 6:7,
13:16, 19:16, 29:8,
39:1, 40:23, 41:4,
44:6, 44:7, 44:10,
76:21, 76:22, 86:24,
87:1, 87:3, 87:5,
87:10, 87:14, 88:1,
88:6, 88:19, 89:6,
89:8, 89:10, 92:12,
93:12, 93:13, 96:12,
96:14, 98:7, 98:8,
99:1, 99:3, 99:7,
99:18, 101:1,
101:13, 102:15,
103:14, 104:6,
106:1, 106:2, 106:4,
109:20, 113:19,
115:3, 115:10
**Case** [1] - 3:13
**cases** [16] - 43:1, 43:2,
43:20, 44:17, 46:11,
46:15, 86:13, 88:14,

89:14, 89:16,
100:10, 100:11,
102:23, 104:11,
105:24
**cell** [4] - 27:22, 98:12,
98:15, 108:17
**Center** [1] - 40:24
**central** [5] - 22:13,
22:15, 22:17, 24:4,
46:17
**certain** [5] - 28:21,
61:14, 96:2, 96:17,
99:19
**certainly** [4] - 10:17,
66:7, 68:4, 110:20
**certification** [1] -
40:21
**certified** [5] - 42:20,
43:5, 43:6, 67:10
**certify** [1] - 119:4
**chain** [1] - 62:20
**challenge** [2] - 86:7,
86:8
**chambers** [1] - 99:2
**chance** [5] - 6:18, 7:6,
7:9, 69:2, 108:7
**chances** [1] - 20:10
**change** [5] - 26:14,
70:3, 93:10, 93:16,
104:11
**characterization** [1] -
25:25
**charge** [1] - 69:25
**chatterbox** [1] -
107:19
**check** [4] - 50:25,
55:3, 66:19, 79:20
**checked** [2] - 53:13,
53:16
**checking** [1] - 67:4
**CHESAPEAKE** [1] -
2:3
**Chicago** [1] - 85:5
**child** [9] - 20:11,
20:13, 21:14, 23:1,
23:8, 27:22, 67:3,
76:8, 78:15
**children** [2] - 12:8,
82:4
**Children** [1] - 81:23
**choice** [8] - 65:19,
90:20, 90:23, 90:24,
91:1, 91:5, 98:12
**choose** [4] - 55:10,
98:14, 98:15, 109:15
**choosing** [2] - 109:25,
110:1
**chosen** [1] - 7:1
**chronicled** [1] -
112:16

**chunk** [2] - 63:7, 69:6
**church** [2] - 73:11,
110:6
**Church** [5] - 21:20,
22:19, 23:9, 72:14,
78:3
**churn** [1] - 28:22
**circle** [1] - 57:8
**Circuit** [1] - 88:5
**circuit** [1] - 86:16
**circuits** [1] - 109:21
**cites** [1] - 88:7
**citizens** [4] - 87:20,
87:23, 101:1, 106:18
**City** [3] - 98:2, 98:3
**city** [1] - 98:13
**clarify** [5] - 7:22, 8:4,
15:10, 15:16, 29:8
**clarifying** [3] - 14:18,
15:7, 15:18
**clear** [13] - 7:22,
44:23, 62:13, 71:13,
75:16, 78:13, 80:23,
98:17, 108:20,
115:1, 115:21,
116:14, 116:15
**clearly** [4] - 29:1, 30:6,
101:11, 115:20
**CLERK** [5] - 3:1, 4:20,
4:23, 39:10, 39:13
**close** [8] - 18:7, 18:21,
27:12, 35:3, 70:14,
70:18, 93:21, 108:24
**closer** [2] - 10:20,
28:23
**closest** [1] - 98:6
**clue** [1] - 73:22
**clustered** [2] - 70:13,
70:17
**code** [3] - 69:7, 80:12,
97:8
**coin** [2] - 58:10, 58:17
**coke** [1] - 109:7
**colleague** [1] - 31:22
**collect** [9] - 54:10,
56:3, 75:12, 76:17,
77:25, 78:1, 78:15,
90:14
**collected** [3] - 84:2,
88:13, 104:5
**collecting** [7] - 55:19,
55:20, 77:10, 88:20,
89:19, 99:12, 116:25
**collection** [4] - 88:4,
88:11, 88:16, 88:24
**colloquially** [1] -
28:24
**combination** [2] -
43:1, 73:16
**comfortable** [1] -

39:23
**coming** [2] - 8:4, 29:7
**commit** [1] - 12:9
**communicate** [1] -
89:18
**communicated** [1] -
85:1
**communication** [34] -
36:20, 37:5, 50:11,
50:14, 50:17, 52:9,
52:10, 57:5, 59:23,
59:24, 61:2, 61:8,
61:9, 62:14, 62:16,
72:9, 72:22, 85:6,
85:25, 99:9, 104:7,
104:8, 104:19,
106:8, 106:11,
106:16, 108:1,
109:9, 109:10,
112:17, 112:18,
115:6, 116:17
**communications** [6] -
61:25, 85:3, 106:6,
110:25, 114:15,
117:1
**community** [4] -
53:23, 81:8, 96:24,
97:21
**companies** [1] - 103:1
**comparable** [3] -
95:12, 96:15, 108:21
**compare** [3] - 67:19,
105:17, 112:12
**compared** [1] - 55:17
**compares** [1] - 111:25
**comparing** [1] - 117:2
**comparison** [6] -
51:15, 52:23, 55:7,
55:10, 65:19, 67:12
**comparisons** [1] -
67:19
**compile** [2] - 22:23,
64:16
**completely** [3] - 90:9,
97:24, 101:16
**compliance** [1] -
100:1
**complicated** [2] -
28:8, 68:3
**compulsion** [1] -
108:15
**compulsive** [1] -
115:3
**computer** [33] - 40:12,
40:13, 40:15, 40:16,
40:20, 40:22, 41:2,
43:7, 43:11, 44:12,
44:15, 44:24, 45:14,
45:17, 47:5, 47:6,
47:8, 47:18, 47:20,

53:4, 58:10, 64:6, 79:24, 80:1, 80:7, 80:10, 81:5, 102:24, 105:6, 105:15, 111:7, 119:9
**COMPUTER** [1] - 1:25
**computer-aided** [1] - 119:9
**COMPUTER-AIDED** [1] - 1:25
**computers** [2] - 48:2, 79:24
**conceding** [1] - 93:11
**conceivably** [1] - 103:18
**concern** [3] - 29:10, 46:7, 117:5
**concerns** [1] - 106:9
**conclude** [1] - 10:24
**concluded** [1] - 117:22
**concludes** [1] - 82:20
**conclusion** [2] - 29:7, 33:18
**conducted** [1] - 100:8
**configurable** [3] - 8:10, 69:24, 70:5
**configuration** [2] - 6:15, 26:14
**configure** [1] - 13:11
**configured** [2] - 13:14, 13:17
**confirm** [1] - 76:7
**confirmation** [1] - 67:8
**confirmed** [2] - 66:23, 67:4
**confront** [1] - 87:3
**confronts** [1] - 87:2
**congregation** [2] - 73:19, 90:4
**conjunction** [1] - 33:3
**connect** [4] - 15:7, 22:3, 22:5, 52:21
**connected** [35] - 6:9, 6:18, 6:21, 6:24, 7:4, 7:9, 7:10, 7:13, 7:17, 15:8, 15:23, 20:10, 20:14, 50:6, 50:12, 52:11, 52:18, 52:23, 53:3, 56:1, 56:21, 56:24, 57:9, 58:13, 59:25, 60:14, 60:18, 60:19, 61:17, 61:19, 61:21, 62:2, 68:10, 108:8
**Connecticut** [1] - 76:8
**connecting** [2] - 15:11, 106:25
**connection** [7] -

50:13, 53:4, 61:5, 61:10, 61:13, 66:10
**connections** [6] - 9:24, 10:7, 26:17, 50:14, 61:4, 70:6
**consensual** [3] - 104:8, 108:1, 108:14
**consent** [1] - 106:8
**conservative** [2] - 6:1, 42:25
**consider** [3] - 6:22, 55:23, 60:12
**considered** [1] - 114:7
**considering** [1] - 114:1
**consistent** [1] - 69:12
**constitute** [2] - 109:23, 110:20
**constitutional** [1] - 104:4
**constructs** [1] - 76:17
**contacting** [1] - 37:2
**contacts** [1] - 33:22
**container** [1] - 116:19
**containers** [1] - 116:18
**content** [23] - 4:13, 8:11, 17:21, 54:9, 59:13, 85:20, 86:2, 101:23, 102:5, 102:6, 102:13, 102:15, 102:16, 102:17, 109:22, 111:21, 112:1, 112:14, 112:21, 114:1, 116:12
**content-based** [1] - 112:1
**context** [1] - 100:21
**continue** [5] - 5:10, 41:13, 41:24, 41:25, 101:18
**continued** [3] - 40:7, 40:13, 40:16
**Continued** [2] - 2:1, 48:22
**continuously** [1] - 84:1
**contrary** [1] - 114:17
**contrast** [1] - 111:13
**control** [2] - 75:15, 98:11
**controlled** [1] - 77:21
**conversation** [5] - 95:20, 101:16, 107:19, 107:22, 113:7
**convinced** [1] - 104:12
**coordination** [1] -

76:23
**Cops** [53] - 4:14, 11:9, 21:6, 21:11, 21:12, 22:8, 41:11, 41:19, 45:23, 47:22, 47:25, 49:8, 51:4, 51:25, 52:1, 53:1, 53:15, 55:8, 56:10, 57:24, 58:24, 59:9, 59:19, 60:4, 60:7, 60:24, 64:2, 64:17, 65:4, 65:13, 65:14, 65:20, 66:9, 66:11, 66:17, 66:21, 66:24, 74:21, 76:14, 76:18, 76:22, 77:6, 77:19, 79:13, 81:8, 82:1, 92:5, 92:14, 94:10, 94:19, 99:14, 107:8, 116:20
**cops** [1] - 81:18
**copy** [6] - 16:18, 49:11, 49:14, 65:17, 72:17, 78:5
**core** [1] - 54:2
**Correct** [1] - 75:25
**correct** [64] - 13:18, 14:10, 15:6, 15:14, 16:15, 16:16, 16:24, 17:3, 17:6, 17:8, 17:9, 17:16, 18:15, 18:16, 19:14, 20:7, 21:4, 22:1, 22:22, 24:6, 26:4, 26:5, 26:8, 26:9, 26:12, 26:16, 26:19, 28:3, 31:7, 31:24, 32:15, 34:14, 35:15, 35:18, 35:25, 37:12, 38:23, 43:22, 44:14, 44:15, 44:25, 45:1, 59:11, 59:14, 59:17, 63:10, 64:2, 65:25, 71:15, 71:16, 71:22, 72:6, 72:7, 73:14, 73:15, 73:25, 74:12, 74:20, 74:22, 74:25, 75:4, 75:7, 76:6, 119:4
**correction** [5] - 64:4, 64:6, 64:15, 68:17, 68:20
**correctly** [1] - 119:8
**corroborated** [1] - 92:25
**counsel** [4] - 13:6, 45:12, 83:1, 119:11
**Counsel** [2] - 3:6, 3:22
**counsel's** [1] - 3:15
**count** [14] - 15:21, 15:22, 15:24, 15:25, 27:22, 27:23, 32:15,

58:14, 59:1, 62:15, 66:6, 68:10, 71:4
**counterevidence** [1] - 92:17
**counting** [1] - 32:22
**country** [1] - 81:25
**County** [3] - 40:9, 40:17, 41:23
**county** [1] - 81:16
**couple** [5] - 25:22, 31:11, 31:13, 56:16, 100:7
**course** [3] - 12:9, 25:3, 83:21
**court** [7] - 16:7, 42:16, 43:21, 63:20, 64:20, 99:23, 100:1
**COURT** [133] - 1:1, 1:23, 3:4, 3:7, 3:10, 3:17, 3:22, 4:15, 5:6, 5:9, 10:12, 16:6, 31:11, 31:13, 31:21, 31:25, 32:13, 32:17, 32:24, 33:11, 33:23, 33:25, 34:10, 34:15, 34:19, 34:22, 35:4, 35:9, 35:16, 35:19, 35:22, 36:1, 36:4, 36:8, 36:25, 37:9, 37:13, 37:18, 38:13, 39:5, 39:22, 40:3, 43:13, 43:15, 44:23, 45:2, 45:7, 45:9, 45:18, 46:2, 46:5, 46:11, 47:10, 47:13, 47:21, 47:24, 48:4, 48:14, 48:18, 48:21, 49:10, 49:12, 49:16, 49:20, 54:21, 58:5, 62:7, 62:22, 63:20, 79:7, 79:9, 80:17, 82:20, 82:23, 83:4, 83:8, 84:8, 84:16, 85:8, 85:12, 85:14, 85:22, 86:2, 86:6, 87:7, 87:11, 88:13, 88:22, 88:25, 89:3, 89:7, 89:23, 90:16, 91:16, 91:21, 92:15, 92:22, 93:10, 93:14, 94:9, 94:24, 95:18, 96:4, 96:7, 96:19, 97:6, 97:15, 97:17, 98:5, 98:16, 98:21, 98:25, 101:8, 101:14, 102:1, 102:21, 103:24, 104:2, 104:12, 106:15, 107:4, 107:14, 108:2,

108:10, 109:11, 111:19, 112:20, 113:17, 115:15, 116:6, 116:9, 117:8, 117:21
**Court** [37] - 3:2, 5:14, 5:20, 5:21, 7:2, 46:9, 49:5, 53:14, 83:14, 86:17, 87:2, 87:3, 87:5, 87:6, 87:13, 87:19, 88:8, 90:22, 99:6, 100:9, 100:12, 100:13, 101:2, 101:5, 101:6, 102:16, 114:6, 114:10, 114:21, 115:5, 117:7, 119:2, 119:3, 119:16
**courting** [1] - 25:14
**Courts** [4] - 87:15, 98:17, 111:7, 111:11
**courts** [1] - 42:20
**cover** [1] - 102:9
**coverage** [3] - 24:18, 93:9
**Crayne** [1] - 3:13
**CRAYNE** [1] - 1:8
**create** [4] - 48:13, 64:7, 75:21, 101:6
**created** [2] - 92:6, 92:11
**creating** [1] - 75:6
**credit** [1] - 115:19
**credited** [1] - 114:10
**crime** [5] - 40:12, 40:13, 40:15, 40:16, 41:2
**crimes** [4] - 12:7, 12:9, 43:11, 82:4
**Crimes** [1] - 81:23
**criminal** [1] - 90:7
**CRIMINAL** [1] - 1:5
**critical** [1] - 90:22
**cross** [1] - 108:22
**Cross** [2] - 118:5, 118:10
**CROSS** [2] - 10:14, 62:25
**Cross-examination** [2] - 118:5, 118:10
**CROSS-EXAMINATION** [2] - 10:14, 62:25
**CRR** [2] - 1:24, 119:15
**CSAM** [26] - 21:8, 21:11, 23:3, 27:9, 27:11, 34:2, 34:11, 49:24, 53:14, 59:13, 59:21, 59:22, 60:23, 74:19, 75:15, 77:23,

78:8, 78:9, 80:21, 81:6, 95:14, 99:20, 110:7, 110:13, 110:17, 112:7
**curb** [1] - 52:15
**custodian** [1] - 45:22
**cuts** [1] - 95:9
**Cyrano** [1] - 46:5

## D

**dark** [3] - 91:9, 110:1, 113:16
**data** [63] - 10:21, 18:14, 26:7, 46:8, 50:10, 53:9, 53:18, 54:15, 54:23, 54:25, 55:5, 55:16, 55:23, 56:6, 56:7, 56:22, 58:3, 58:13, 60:2, 60:7, 60:12, 61:22, 62:2, 62:4, 63:7, 64:1, 65:8, 65:11, 65:19, 65:24, 68:9, 68:24, 69:5, 70:13, 70:18, 72:8, 74:1, 75:13, 75:22, 76:17, 77:11, 78:14, 78:15, 79:15, 79:16, 80:11, 88:10, 88:13, 89:19, 90:6, 94:10, 95:1, 95:2, 100:21, 100:24, 104:4, 105:4, 105:17, 110:10, 110:12, 110:13, 110:16
**database** [37] - 32:12, 33:8, 33:12, 34:7, 34:11, 34:18, 34:19, 42:1, 51:13, 55:8, 55:19, 64:17, 67:10, 71:3, 71:8, 75:3, 75:6, 75:14, 75:20, 77:5, 77:7, 77:22, 77:23, 78:8, 79:19, 80:22, 92:5, 92:14, 93:24, 94:23, 95:12, 95:14, 111:25, 112:11, 112:12, 117:3, 117:4
**Datastore** [27] - 7:19, 7:25, 8:9, 8:10, 8:14, 8:19, 9:3, 25:4, 25:6, 27:1, 27:7, 27:12, 28:5, 28:14, 28:16, 29:2, 29:12, 29:23, 29:25, 30:8, 38:6, 38:7, 38:8, 38:10
**Datastores** [3] - 8:15, 8:17, 9:5

**date** [4] - 5:18, 53:7, 53:11, 119:6
**dates** [1] - 82:17
**deal** [4] - 47:7, 48:5, 93:2, 93:4
**decades** [1] - 94:20
**DECEMBER** [1] - 1:11
**decide** [2] - 113:6, 115:5
**decided** [2] - 88:2, 111:11
**decipher** [7] - 22:19, 70:16, 71:2, 93:21, 97:3, 97:4, 97:7
**decision** [3] - 30:20, 30:22, 30:24
**deck** [1] - 58:19
**declaration** [3] - 4:13, 15:12, 16:23
**decrement** [2] - 58:19, 62:17
**decrypt** [1] - 10:1
**decryption** [1] - 56:7
**dedicated** [1] - 23:1
**deep** [3] - 57:5, 57:15, 116:25
**deeper** [1] - 93:8
**default** [2] - 58:11, 58:15
**defaults** [1] - 58:23
**defendant** [4] - 110:23, 113:15, 114:4, 114:18
**Defendant** [1] - 1:9
**DEFENDANT** [2] - 1:18, 2:2
**defendant's** [1] - 106:16
**defense** [12] - 4:15, 5:6, 13:5, 49:12, 83:2, 83:10, 83:11, 104:24, 106:6, 108:19, 108:22, 115:24
**Defense** [1] - 2:4
**defense's** [2] - 104:15, 106:15
**degree** [3] - 70:4, 92:24, 113:8
**demonstrative** [1] - 71:22
**dependent** [1] - 45:23
**depth** [1] - 6:5
**DEPUTY** [5] - 3:1, 4:20, 4:23, 39:10, 39:13
**derived** [2] - 60:9, 82:13
**describe** [3] - 39:20, 40:5, 81:1

**described** [2] - 77:7, 91:13
**describing** [1] - 67:18
**designate** [1] - 45:25
**designation** [1] - 47:9
**designed** [1] - 23:4
**detailing** [1] - 51:13
**detect** [1] - 13:20
**detected** [5] - 12:8, 18:8, 18:10, 18:14, 19:2
**detective** [4] - 46:18, 46:24, 81:17, 85:15
**Detective** [10] - 4:12, 39:9, 39:22, 44:24, 48:18, 82:20, 92:24, 105:3, 106:4, 110:11
**determinate** [1] - 92:2
**determine** [6] - 9:9, 9:14, 51:9, 56:10, 60:11, 71:6
**determined** [1] - 111:8
**determines** [1] - 62:14
**developed** [1] - 41:14
**developers** [1] - 43:3
**development** [6] - 41:5, 41:11, 41:13, 41:25, 68:1, 75:8
**dial** [1] - 101:21
**dialed** [1] - 101:24
**dialer** [1] - 102:12
**DiAntonio** [1] - 3:16
**difference** [13] - 30:17, 36:4, 36:7, 36:8, 46:13, 46:14, 85:17, 91:12, 91:14, 91:19, 93:15, 101:22, 107:15
**differences** [1] - 90:22
**different** [49] - 8:9, 8:11, 9:6, 12:14, 12:18, 15:22, 20:8, 20:12, 20:15, 23:15, 23:16, 23:19, 23:21, 24:8, 24:13, 27:11, 27:13, 30:2, 30:12, 30:16, 37:4, 40:11, 40:19, 40:21, 43:20, 44:14, 44:16, 44:17, 44:18, 64:25, 71:2, 72:6, 76:9, 79:18, 79:25, 82:7, 82:10, 90:20, 90:21, 92:8, 92:9, 97:21, 97:24, 102:9, 103:9, 106:21, 112:1, 113:18
**differently** [1] - 92:1
**difficulty** [2] - 48:11, 86:18

**digital** [1] - 65:1
**DIRE** [1] - 43:16
**dire** [5] - 5:7, 43:13, 46:11, 46:25, 118:9
**direct** [20] - 25:3, 36:20, 37:5, 50:11, 50:13, 52:9, 55:9, 61:1, 61:13, 83:21, 104:7, 106:6, 106:11, 106:16, 107:5, 109:9, 114:15, 115:6
**DIRECT** [3] - 5:12, 39:18, 48:22
**Direct** [3] - 118:5, 118:8, 118:9
**directed** [2] - 50:21, 61:9
**direction** [1] - 24:8
**directions** [1] - 21:24
**directly** [24] - 7:17, 9:4, 11:2, 15:7, 15:8, 15:11, 15:23, 25:5, 27:16, 28:4, 30:8, 36:13, 50:16, 52:11, 52:17, 53:3, 55:25, 59:10, 68:5, 82:3, 89:14, 101:11, 112:14, 112:18
**discard** [1] - 22:9
**discards** [2] - 57:24, 107:8
**disclaimer** [2] - 91:6, 91:9
**disclaimers** [1] - 102:22
**disclose** [1] - 39:24
**discount** [1] - 59:3
**discover** [2] - 54:7, 111:4
**discretion** [1] - 87:24
**discuss** [3] - 41:3, 45:9, 48:7
**discussed** [4] - 5:3, 35:11, 46:12, 114:6
**discussing** [3] - 4:1, 37:9, 47:21
**discussion** [2] - 45:11, 48:17
**discussions** [1] - 110:6
**disqualifier** [1] - 68:1
**distinct** [4] - 32:10, 32:16, 52:7, 108:12
**distributed** [2] - 70:12, 70:17
**District** [9] - 3:2, 40:9, 40:17, 41:23, 87:6, 87:13, 119:3
**DISTRICT** [3] - 1:1,

1:2, 1:11
**district** [2] - 44:2, 44:3
**divide** [1] - 63:15
**DIVISION** [1] - 1:3
**divvy** [1] - 57:9
**doctor** [1] - 110:10
**doctrinal** [1] - 98:6
**doctrine** [11] - 84:11, 86:9, 86:10, 86:15, 86:19, 98:18, 99:5, 99:7, 109:24, 115:6
**Document** [1] - 16:19
**document** [4] - 54:12, 54:16, 55:2, 55:5
**done** [18] - 33:21, 42:15, 49:8, 50:20, 58:2, 65:3, 65:21, 66:17, 66:20, 77:1, 78:19, 80:11, 85:7, 85:12, 85:16, 97:11, 99:24, 100:14
**door** [1] - 113:11
**double** [4] - 8:19, 27:15, 29:13, 66:18
**doubled** [1] - 28:16
**down** [10] - 23:19, 39:6, 54:22, 56:15, 57:16, 63:21, 71:20, 73:8, 82:21, 108:24
**download** [6] - 50:2, 64:11, 76:4, 76:6, 81:3, 109:12
**downloaded** [1] - 59:22
**downloaders** [1] - 38:3
**downloading** [2] - 54:17, 77:2
**downstream** [1] - 48:13
**DR** [2] - 4:22, 118:4
**Dr** [14] - 4:11, 4:19, 5:4, 5:9, 10:16, 16:8, 39:5, 60:21, 84:3, 92:24, 108:4, 114:10, 114:13
**drafting** [1] - 87:4
**dragnet** [2] - 94:16
**DRAUGHON** [40] - 1:14, 3:12, 4:10, 4:19, 5:3, 5:13, 10:10, 37:22, 37:25, 38:11, 39:8, 39:19, 40:4, 43:9, 45:1, 46:4, 46:7, 48:16, 48:23, 49:11, 49:17, 49:21, 56:9, 59:6, 62:5, 79:8, 79:11, 80:15, 104:3, 105:1, 106:23, 107:13,

107:16, 108:4, 108:11, 109:18, 112:6, 113:15, 113:20, 116:3
**Draughon** [11] - 3:14, 30:7, 37:21, 48:21, 49:14, 79:7, 118:5, 118:6, 118:8, 118:9, 118:10
**Draughon's** [1] - 31:16
**drawing** [1] - 13:7
**drew** [1] - 78:3
**Drive** [1] - 1:20
**drive** [5] - 80:9, 94:12, 94:13, 94:18, 94:21
**drives** [1] - 80:9
**driving** [1] - 10:6
**drone** [1] - 107:10
**drop** [2] - 14:18, 22:16
**dropping** [1] - 14:12
**due** [1] - 6:15
**during** [4] - 14:10, 14:16, 16:1, 17:1, 17:7, 17:12, 28:13, 31:20, 35:23
**Dwight** [1] - 3:14
**DWIGHT** [1] - 1:14

## E

**E-R-D-E-L-Y** [1] - 39:17
**early** [3] - 67:25, 86:24, 87:8
**easier** [2] - 56:16, 70:10
**easily** [3] - 37:1, 64:19, 113:24
**easy** [5] - 15:5, 20:3, 36:11, 76:25, 111:4
**eating** [1] - 3:25
**educated** [1] - 70:21
**education** [1] - 47:15
**effect** [3] - 12:19, 28:17, 29:3
**effectively** [1] - 111:23
**efficient** [2] - 25:16, 25:19
**efficiently** [1] - 26:4
**eight** [3] - 14:9, 14:13, 81:10
**eight-week** [2] - 14:9, 14:13
**either** [5] - 4:7, 37:20, 55:10, 76:16, 104:9
**electronic** [3] - 90:8, 102:11, 106:20
**element** [1] - 52:1
**elephant** [1] - 3:25

**eliciting** [1] - 46:23
**ELMO** [1] - 50:3
**email** [6] - 53:5, 85:25, 86:5, 86:6, 86:7, 99:2
**emails** [1] - 85:7
**employed** [1] - 40:10
**employee** [2] - 102:23, 102:24
**employment** [2] - 39:20, 40:5
**encoded** [2] - 73:24, 74:3
**encrypted** [9] - 9:25, 50:14, 61:4, 61:5, 61:10, 74:4, 74:5, 74:7, 111:24
**End** [1] - 48:17
**end** [10] - 10:9, 18:6, 40:12, 40:23, 54:10, 62:15, 95:2, 95:7, 105:3, 107:25
**ended** [1] - 40:11
**ending** [1] - 74:13
**ends** [4] - 4:3, 8:13, 8:14, 102:10
**Enforcement** [1] - 40:24
**enforcement** [198] - 5:15, 5:17, 5:23, 6:17, 6:19, 6:21, 6:25, 7:4, 7:7, 7:9, 7:11, 7:12, 7:14, 7:15, 9:5, 9:8, 9:12, 10:22, 10:25, 11:22, 11:23, 12:1, 12:7, 12:15, 13:1, 13:11, 13:14, 13:16, 13:17, 13:21, 17:18, 18:5, 18:21, 19:20, 19:23, 20:5, 20:9, 20:14, 20:16, 20:20, 20:21, 21:1, 21:9, 21:17, 21:22, 22:5, 22:7, 22:10, 22:12, 22:17, 22:18, 23:15, 24:2, 27:6, 29:6, 29:11, 29:19, 29:21, 29:22, 31:3, 31:18, 32:6, 32:11, 32:14, 32:19, 32:21, 33:1, 33:2, 33:5, 33:7, 33:13, 33:14, 33:15, 33:17, 33:20, 33:22, 34:2, 34:3, 34:6, 34:8, 34:12, 34:16, 35:12, 38:7, 38:8, 38:10, 38:20, 38:21, 38:22, 41:15, 41:16, 42:8, 46:8, 49:23, 50:7,

50:19, 50:22, 51:4, 51:23, 51:24, 52:3, 52:4, 52:10, 52:11, 52:19, 52:25, 53:2, 53:12, 53:22, 55:6, 56:2, 56:11, 56:19, 59:10, 59:21, 59:24, 60:4, 60:5, 60:22, 60:25, 61:3, 61:8, 61:11, 61:20, 65:4, 65:18, 66:2, 66:8, 66:16, 67:3, 68:23, 69:22, 69:25, 70:24, 74:14, 74:23, 75:12, 75:24, 76:2, 76:3, 76:16, 76:23, 77:1, 77:17, 77:19, 78:11, 80:5, 81:8, 84:1, 84:23, 85:14, 90:2, 90:17, 91:2, 91:22, 92:12, 92:13, 92:16, 92:18, 93:1, 93:6, 93:7, 94:22, 95:2, 95:11, 95:14, 96:8, 97:7, 99:11, 104:8, 105:18, 105:22, 106:13, 106:17, 106:18, 106:25, 107:4, 107:7, 107:17, 107:25, 108:6, 108:9, 109:3, 109:8, 109:11, 109:14, 110:15, 110:24, 111:24, 113:1, 114:14, 115:10, 117:1
**enforcement's** [3] - 33:10, 51:20, 69:16
**engineer** [1] - 67:10
**ensure** [1] - 55:18
**enter** [1] - 73:12
**entire** [5] - 35:12, 73:3, 78:20, 92:23, 94:10
**entity** [1] - 95:25
**entry** [1] - 51:13
**envelope** [8] - 94:8, 96:3, 96:5, 96:15, 96:20, 97:2, 97:13, 97:22
**envelopes** [1] - 96:17
**equal** [5] - 50:9, 56:17, 56:23, 57:14, 69:13
**equally** [1] - 50:10
**equipment** [1] - 55:22
**equivalent** [3] - 97:2, 98:24, 112:23
**ERDELY** [2] - 39:12, 118:7
**Erdely** [16] - 4:12,

39:9, 39:16, 39:22, 44:24, 45:14, 83:20, 92:24, 93:23, 99:20, 100:6, 100:17, 105:3, 106:4, 110:11, 114:13
**Erina** [1] - 99:3
**error** [6] - 36:9, 64:4, 64:6, 64:15, 68:17, 68:20
**escaped** [1] - 101:16
**especially** [3] - 12:23, 109:25, 112:17
**ESQUIRE** [4] - 1:14, 1:15, 1:19, 2:4
**essentially** [4] - 13:8, 51:22, 53:21, 108:13
**established** [2] - 41:22, 115:20
**estimate** [9] - 5:24, 6:2, 15:24, 17:24, 18:1, 19:7, 37:7, 92:18
**estimated** [1] - 18:20
**estimating** [1] - 37:3
**evaluate** [1] - 83:23
**evaluating** [1] - 81:11
**evaluation** [1] - 28:12
**event** [1] - 47:1
**evidence** [9] - 4:7, 4:16, 46:23, 83:2, 83:16, 96:9, 96:10, 112:22, 114:16
**evidentiary** [1] - 95:21
**Ewing** [4] - 1:24, 119:2, 119:14, 119:15
**exact** [1] - 32:21
**exactly** [8] - 7:22, 12:22, 15:16, 38:5, 63:13, 75:23, 100:2, 117:14
**examination** [12] - 10:21, 28:12, 118:5, 118:5, 118:6, 118:6, 118:8, 118:9, 118:9, 118:10, 118:10, 118:11
**EXAMINATION** [10] - 5:12, 10:14, 37:24, 38:15, 39:18, 43:16, 48:22, 62:25, 79:10, 80:19
**examine** [1] - 22:15
**examined** [2] - 6:5, 47:17
**examiner** [1] - 40:14
**example** [12] - 6:8, 20:24, 22:9, 22:25, 32:8, 49:25, 50:5,

60:17, 71:22, 90:25, 91:1, 91:21
**examples** [1] - 70:9
**except** [6] - 21:5, 54:5, 75:21, 91:21, 95:25
**exception** [12] - 84:10, 86:14, 87:17, 98:9, 101:11, 106:9, 109:23, 115:1, 115:9, 115:13, 115:22, 116:4
**Exchange** [1] - 85:5
**exclamation** [1] - 111:5
**exclude** [1] - 76:25
**exclusively** [1] - 82:2
**excuse** [2] - 32:3, 93:6
**executive** [2] - 87:21, 87:24
**exercised** [1] - 87:24
**Exhibit** [7] - 38:1, 48:25, 49:2, 49:18, 49:22, 71:11, 105:10
**exhibit** [2] - 6:7, 106:7
**exhibits** [2] - 32:4, 35:6
**exist** [7] - 15:3, 36:16, 94:2, 111:5, 111:8, 115:1, 115:9
**existed** [1] - 26:15
**existence** [7] - 15:2, 15:9, 15:10, 36:19, 36:21, 81:13, 84:7
**exists** [2] - 86:21, 87:19
**expand** [2] - 4:14, 98:17
**expanding** [1] - 86:16
**expect** [4] - 53:25, 56:23, 57:12, 98:3
**expectation** [26] - 4:2, 84:8, 84:25, 86:22, 93:19, 95:10, 95:21, 96:22, 96:24, 102:18, 103:3, 104:9, 111:1, 111:8, 111:12, 111:16, 112:3, 112:4, 112:5, 113:2, 114:4, 114:5, 114:12, 114:18, 114:21, 114:22
**expected** [1] - 111:16
**experience** [1] - 47:15
**expert** [8] - 42:16, 42:20, 43:5, 43:6, 43:10, 45:15, 45:25, 48:19
**expertise** [6] - 44:13, 45:24, 46:18, 60:21, 79:23, 105:21

**explain** [6] - 30:17, 35:9, 56:17, 57:22, 62:16, 68:4
**explained** [3] - 12:17, 108:5, 110:11
**explanation** [3] - 24:24, 25:2, 28:24
**exploit** [1] - 52:13
**exploitation** [7] - 20:11, 20:13, 21:14, 23:1, 27:22, 67:4, 78:16
**exponentially** [1] - 37:8
**exposed** [1] - 108:13
**express** [1] - 86:14
**extended** [1] - 88:20
**extent** [7] - 28:11, 46:17, 47:21, 47:24, 48:5, 114:7, 114:8
**extravagant** [1] - 100:23
**eye** [1] - 35:7

## F

**F.3d** [1] - 88:5
**face** [3] - 50:2, 71:17, 73:20
**Facebook** [11] - 108:20, 108:24, 108:25, 109:2, 109:5, 109:6, 109:12, 109:13, 109:16, 109:19
**faces** [1] - 71:14
**fact** [13] - 6:21, 18:8, 27:6, 28:20, 76:21, 96:8, 97:11, 98:16, 99:11, 103:18, 111:10, 112:4, 112:22
**factors** [1] - 28:8
**facts** [2] - 93:2, 103:4
**factual** [1] - 97:24
**factually** [2] - 88:14, 93:2
**failed** [1] - 62:16
**fair** [15] - 24:15, 24:22, 25:1, 27:9, 27:25, 31:2, 31:8, 34:3, 60:16, 64:16, 68:22, 69:8, 69:20, 70:22, 116:1
**faith** [5] - 115:9, 115:13, 115:22, 116:1, 116:4
**faithful** [2] - 21:24, 21:25
**fall** [1] - 99:5

**false** [2] - 24:1, 97:15
**familiar** [5] - 26:24, 31:25, 42:8, 42:11, 49:2
**far** [1] - 75:14
**fast** [1] - 8:21
**faster** [3] - 26:7, 26:9, 26:11
**father** [1] - 75:5
**favor** [1] - 88:3
**FBI** [5] - 33:2, 33:3, 33:21, 78:3, 81:19
**feature** [1] - 80:13
**federal** [5] - 23:24, 42:16, 42:20, 43:21, 76:9
**Federal** [1] - 40:24
**federally** [1] - 81:24
**feet** [1] - 117:14
**Feeza** [1] - 99:3
**few** [4] - 37:22, 79:19, 79:21, 80:12
**fewer** [1] - 6:23
**fields** [1] - 65:11
**Figure** [4] - 19:12, 20:24, 35:5, 38:5
**figure** [12] - 19:22, 25:12, 34:5, 34:15, 36:9, 38:4, 47:13, 60:24, 66:7, 68:13, 76:4, 78:4
**figured** [3] - 38:21, 90:7, 100:3
**figures** [1] - 60:23
**file** [49] - 8:17, 23:14, 28:1, 41:6, 42:21, 43:7, 43:11, 44:15, 46:19, 48:19, 50:2, 50:10, 51:18, 51:20, 54:7, 54:8, 54:11, 54:19, 55:3, 56:6, 56:22, 63:9, 63:10, 63:11, 63:16, 63:25, 64:5, 64:9, 64:11, 64:12, 64:21, 64:22, 64:24, 65:1, 65:2, 69:6, 75:21, 76:4, 76:6, 76:17, 77:2, 77:11, 78:14, 78:23, 80:25, 81:3, 81:15, 99:21, 105:20
**filed** [2] - 16:19, 76:21
**files** [39] - 8:15, 8:19, 22:21, 23:10, 50:24, 51:1, 51:2, 51:5, 51:6, 51:12, 51:16, 53:10, 53:14, 53:16, 53:19, 53:21, 54:16, 55:15, 55:17, 55:21, 60:17, 61:23, 62:4,

63:5, 64:25, 65:3, 65:5, 65:7, 67:1, 67:7, 68:20, 73:5, 75:4, 75:16, 75:18, 77:9, 77:23, 80:24, 82:8
**filing** [2] - 13:4, 46:20
**fill** [1] - 8:15
**filter** [1] - 21:13
**filtered** [2] - 34:11, 90:7
**filtering** [1] - 59:7, 110:11
**Finci** [2] - 3:20, 97:22
**FINCI** [4] - 1:19, 1:19, 3:21, 117:20
**fine** [1] - 66:5
**first** [24] - 4:18, 4:24, 4:25, 9:24, 16:8, 19:16, 26:15, 26:21, 39:15, 53:2, 53:19, 54:12, 55:13, 59:9, 63:4, 72:21, 76:20, 83:11, 83:17, 91:8, 104:7, 105:2, 107:16, 111:10
**fit** [8] - 78:7, 84:13, 86:13, 94:12, 102:8, 104:14, 104:21, 105:15
**fits** [2] - 65:10, 84:14
**five** [11] - 50:6, 50:12, 50:17, 71:19, 72:5, 72:8, 72:23, 73:20, 73:25, 74:13, 77:12
**flagged** [1] - 77:24
**flip** [2] - 58:10, 58:17
**flock** [3] - 21:24, 21:25, 72:17
**floor** [1] - 85:5
**flow** [1] - 60:3
**flows** [1] - 62:3
**focus** [8] - 4:14, 5:19, 89:11, 89:17, 115:2, 116:11, 117:7
**focuses** [1] - 99:8
**folding** [5] - 25:13, 26:3, 26:6, 26:22, 28:18
**folks** [1] - 74:14
**follow** [7] - 3:23, 9:19, 33:1, 37:20, 38:13, 45:3, 62:7
**follow-up** [7] - 3:23, 9:19, 33:1, 37:20, 38:13, 45:3, 62:7
**followed** [1] - 115:13
**following** [3] - 9:18, 45:11, 72:23
**FOR** [4] - 1:2, 1:13,

1:18, 2:2
**Force** [2] - 81:23, 81:24
**force** [2] - 81:24, 82:3
**forces** [2] - 81:20, 81:24
**foregoing** [1] - 119:4
**foreign** [1] - 89:13
**Foreign** [5] - 86:24, 87:1, 87:4, 89:13, 101:4
**forensic** [2] - 40:14, 45:25
**forensically** [1] - 38:2
**forensics** [20] - 40:20, 40:22, 42:24, 43:7, 43:11, 44:12, 44:15, 44:25, 45:5, 45:15, 45:17, 45:24, 47:5, 47:6, 47:8, 47:18, 47:20, 48:19, 79:24, 81:6
**forever** [1] - 62:15
**formulas** [2] - 68:8
**forth** [3] - 28:21, 60:3, 93:18
**forward** [7] - 8:5, 64:4, 64:6, 64:15, 68:17, 68:19, 68:24
**forwards** [1] - 74:21
**foundation** [1] - 95:21
**four** [10] - 40:21, 50:7, 50:11, 50:21, 74:14, 74:15, 74:17, 92:12, 93:11, 93:12
**fours** [1] - 92:2
**Fourth** [20] - 4:3, 83:15, 86:21, 87:19, 88:3, 88:6, 88:9, 90:18, 99:4, 100:1, 101:13, 102:7, 102:10, 103:12, 103:13, 103:16, 106:12, 113:13, 117:6
**fraction** [1] - 79:20, 79:21, 94:11
**frame** [3] - 31:19, 42:7, 82:16
**Franks** [1] - 4:3
**free** [7] - 53:20, 53:24, 54:1, 82:8, 82:23, 87:22
**freely** [1] - 97:18
**Freenet** [165] - 5:15, 5:22, 6:1, 6:3, 6:4, 6:11, 6:16, 6:17, 7:20, 7:21, 7:24, 8:12, 9:6, 9:13, 9:21, 9:25, 15:17, 16:1,

17:15, 18:2, 18:11, 22:2, 24:11, 24:15, 25:13, 25:17, 25:18, 26:4, 26:10, 26:13, 26:21, 28:7, 28:19, 32:21, 33:17, 34:9, 34:13, 34:25, 35:13, 36:10, 37:3, 37:11, 41:17, 42:3, 42:5, 42:9, 42:14, 42:17, 42:22, 49:7, 50:1, 50:2, 50:5, 50:7, 50:12, 50:19, 50:20, 50:24, 51:2, 51:8, 52:2, 52:12, 52:20, 53:19, 53:21, 53:23, 54:5, 54:6, 54:22, 55:1, 55:23, 57:21, 57:25, 58:10, 58:15, 61:2, 62:10, 62:11, 64:13, 64:21, 64:22, 65:18, 66:19, 68:6, 68:21, 69:7, 70:2, 70:5, 70:7, 70:8, 70:11, 70:12, 70:17, 72:7, 72:10, 75:10, 75:21, 76:3, 76:22, 76:24, 77:8, 77:11, 79:20, 79:21, 79:25, 80:24, 82:7, 82:8, 82:10, 82:11, 82:13, 82:16, 85:8, 85:10, 90:1, 91:4, 91:5, 91:12, 92:8, 94:11, 95:22, 96:23, 96:25, 97:8, 97:9, 97:18, 99:15, 99:25, 100:5, 102:18, 102:22, 103:10, 103:11, 105:12, 105:14, 105:19, 105:22, 106:25, 107:1, 107:2, 108:8, 108:19, 108:22, 109:25, 110:21, 110:23, 111:13, 111:23, 112:10, 113:16, 113:22, 113:24, 114:10, 114:14, 114:15, 116:19, 116:24
**Freenet's** [1] - 26:6
**Freenet-specific** [1] - 97:9
**friend** [3] - 109:13
**friends** [8] - 36:24, 37:2, 37:10, 37:11, 69:22, 109:6
**front** [2] - 55:15, 111:9
**Frost** [3] - 22:25, 82:9,

97:9
**full** [4] - 8:17, 33:14, 39:14, 46:25
**fully** [3] - 40:1, 47:23, 62:16
**function** [4] - 24:4, 25:12, 26:3, 26:6
**functional** [2] - 97:2, 98:23
**funded** [1] - 81:24
**furthermore** [1] - 108:25

## G

**Gar** [1] - 3:19
**gather** [2] - 96:9, 107:17
**gathered** [1] - 90:6
**gathering** [4] - 21:25, 34:13, 97:10, 106:19
**gathers** [2] - 107:7, 107:10
**general** [3] - 40:21, 42:21, 43:8
**generally** [2] - 56:23, 60:1
**geographic** [2] - 8:25, 15:19
**given** [24] - 5:18, 5:25, 7:1, 11:1, 18:11, 29:3, 31:20, 32:11, 32:13, 34:5, 34:20, 34:21, 46:13, 66:5, 70:25, 71:4, 84:18, 105:14, 108:6, 108:10, 110:21, 116:22
**goal** [2] - 29:15, 95:15
**Gonzales** [1] - 44:1
**good-faith** [4] - 115:9, 115:13, 115:22, 116:4
**gossip** [1] - 107:20
**government** [43] - 3:10, 3:15, 4:10, 4:18, 4:19, 10:10, 39:8, 43:10, 44:23, 45:4, 45:14, 46:22, 47:3, 48:6, 48:12, 62:5, 80:15, 83:11, 83:23, 88:8, 88:20, 89:12, 89:19, 92:3, 93:20, 93:22, 97:14, 99:16, 100:11, 100:25, 101:9, 102:24, 103:9, 103:13, 103:15, 103:17, 104:17, 105:19, 111:7,

115:8, 116:5
**Government** [9] - 38:1, 48:25, 49:2, 49:10, 49:13, 49:18, 49:22, 103:20, 105:10
**government's** [7] - 16:19, 88:2, 89:17, 99:18, 102:4, 104:3, 113:17
**GOVERNMENT'S** [3] - 4:22, 39:12, 118:3
**Government's** [1] - 71:11
**grade** [2] - 98:21, 100:4
**grades** [1] - 100:4
**granted** [1] - 100:13
**graphically** [1] - 49:6
**graphics** [1] - 56:16
**grass** [1] - 117:13
**great** [2] - 49:12, 62:12
**greater** [2] - 71:21, 100:13
**GREENBELT** [1] - 1:12
**Greenbelt** [1] - 1:16, 1:21
**grew** [1] - 41:10
**ground** [1] - 69:19
**grow** [1] - 117:14
**guess** [5] - 21:6, 25:9, 67:6, 70:21, 95:3
**guidance** [1] - 40:23

## H

**half** [5] - 19:1, 29:12, 68:18, 68:19, 110:20
**hand** [6] - 4:21, 39:11, 49:11, 75:5, 75:6, 97:21
**handling** [2] - 46:2, 46:4
**hanging** [1] - 58:6
**hard** [7] - 16:7, 16:25, 50:3, 54:2, 80:23, 94:18, 94:21
**hardware** [1] - 56:5
**harping** [1] - 105:25
**hash** [16] - 51:14, 53:8, 55:17, 62:3, 66:25, 67:1, 67:4, 67:13, 67:17, 75:18, 75:19, 76:7, 85:22, 105:21, 112:10, 114:2
**havoc** [1] - 48:13
**head** [2] - 19:21, 82:24

**headers** [1] - 60:2
**heads** [1] - 58:18
**heal** [2] - 64:14, 69:6
**heals** [1] - 68:20
**hear** [6] - 4:6, 82:25, 83:4, 83:9, 115:19, 116:2
**heard** [2] - 10:20, 85:4
**hearing** [12] - 3:23, 12:25, 46:1, 47:9, 47:18, 55:12, 71:5, 77:12, 88:8, 88:15, 91:8, 91:23
**hearsay** [1] - 11:15
**hedging** [1] - 25:9
**held** [4] - 10:21, 45:11, 93:6, 93:7
**help** [3] - 58:25, 69:6, 89:16
**helped** [2] - 83:19, 86:9
**helpful** [3] - 37:18, 99:4, 117:9
**helps** [1] - 24:1
**hereby** [1] - 119:4
**hesitated** [1] - 11:12
**hide** [1] - 58:1
**high** [4] - 12:23, 13:21, 28:24, 69:19
**high-level** [1] - 28:24
**higher** [4] - 6:10, 6:23, 18:3, 31:6
**Highway** [1] - 2:4
**himself** [1] - 100:7
**history** [2] - 39:20, 40:5
**hit** [1] - 110:17
**hmm** [1] - 98:25
**hold** [2] - 70:13, 70:18
**holds** [1] - 117:10
**holidays** [1] - 117:18
**home** [3] - 80:7, 80:9, 94:14
**Honor** [62] - 3:6, 3:12, 3:15, 3:19, 3:21, 4:10, 5:3, 5:11, 10:11, 10:13, 31:10, 31:12, 32:22, 34:14, 34:21, 35:25, 37:17, 37:22, 37:23, 38:11, 38:14, 39:7, 39:8, 40:2, 43:9, 43:14, 44:22, 45:1, 45:13, 46:7, 47:17, 48:20, 49:11, 49:15, 49:17, 62:6, 62:24, 68:11, 79:6, 79:8, 80:16, 80:18, 82:22, 83:3, 83:6, 83:13, 88:19, 98:1, 103:6, 104:1,

104:3, 106:1, 106:10, 109:18, 110:3, 111:2, 111:9, 113:20, 114:3, 116:5, 116:11, 117:20
**Honor's** [1] - 106:24
**Honorable** [1] - 3:3
**HONORABLE** [1] - 1:10
**Hop** [4] - 58:14, 59:1, 62:15, 68:10
**hop** [5] - 37:6, 57:5, 57:13, 57:15, 66:18
**Hop-to-Live** [4] - 58:14, 59:1, 62:15, 68:10
**hopefully** [2] - 15:20, 82:12
**hops** [6] - 25:22, 37:7, 57:20, 57:25, 58:11, 69:3
**Hops** [12] - 21:7, 22:12, 57:20, 57:23, 58:6, 59:15, 59:18, 62:9, 65:9, 67:22, 77:16, 110:17
**Hops-to-Live** [12] - 21:7, 22:12, 57:20, 57:23, 58:6, 59:15, 59:18, 62:9, 65:9, 67:22, 77:16, 110:17
**HOULON** [1] - 1:19
**hour** [1] - 71:4
**house** [1] - 91:20
**HSI** [2] - 3:16, 81:19
**HTPS** [1] - 66:14
**human** [3] - 15:6, 25:25
**hundreds** [1] - 94:22
**hymns** [2] - 21:23, 72:14
**hypothetical** [6] - 13:6, 13:7, 13:9, 13:12, 20:4, 38:24

## I

**I.D** [4] - 32:6, 32:21, 33:17, 34:16
**I.D.s** [6] - 32:11, 32:14, 32:16, 32:18, 32:21, 34:4
**IASIS** [1] - 40:25
**ICAC** [57] - 4:14, 11:9, 21:6, 21:11, 21:12, 22:8, 41:11, 41:19, 45:22, 47:22, 47:25, 49:8, 51:4, 51:25, 52:1, 53:1, 53:15,

55:8, 56:10, 57:24, 58:24, 59:9, 59:19, 60:4, 60:7, 60:24, 64:2, 64:17, 65:4, 65:13, 65:14, 65:20, 66:9, 66:11, 66:17, 66:21, 66:24, 74:21, 76:14, 76:18, 76:22, 77:6, 77:19, 79:13, 81:7, 81:23, 81:24, 82:1, 82:2, 92:5, 92:13, 94:10, 94:19, 99:13, 107:8, 116:20
**idea** [5] - 52:18, 74:1, 74:18, 107:16, 110:15
**identification** [1] - 90:15
**identified** [5] - 33:16, 51:2, 51:17, 60:22, 67:3
**identifier** [3] - 34:16, 36:5, 51:17
**identifiers** [15] - 15:13, 15:17, 16:15, 17:1, 17:5, 17:15, 18:11, 19:3, 24:12, 24:14, 34:20, 35:17, 35:23, 37:10, 37:15
**identifies** [1] - 51:18
**identify** [2] - 81:6, 110:25
**identifying** [3] - 18:14, 38:3, 90:13
**identity** [1] - 111:5
**ifs** [1] - 39:24
**ignore** [1] - 77:5
**III** [4] - 101:6, 102:8, 102:12
**illegal** [1] - 110:9
**image** [1] - 64:24
**imagine** [1] - 53:18
**immediate** [1] - 37:11
**immediately** [3] - 21:12, 22:8, 110:9
**impact** [5] - 28:5, 29:23, 30:8, 57:23, 88:12
**impacted** [1] - 11:20
**important** [5] - 23:11, 32:24, 54:14, 95:2, 116:12
**importantly** [2] - 51:5, 108:14
**impossible** [1] - 56:4
**improper** [1] - 114:9
**improve** [1] - 8:7
**improved** [1] - 96:11
**IN** [1] - 1:1
**inception** [1] - 42:6,

43:3

**include** [6] - 27:18, 47:5, 82:5, 82:13, 113:25, 114:1
**included** [3] - 81:12, 81:19, 87:7
**including** [5] - 64:22, 81:18, 85:20, 109:3, 114:6
**increase** [1] - 9:2
**increases** [1] - 37:8
**incrementally** [1] - 48:15
**indecipherable** [1] - 22:20
**INDEX** [1] - 118:1
**Indiana** [3] - 40:9, 40:17, 41:23
**indicate** [2] - 53:24, 54:3
**indicated** [1] - 19:10
**indirect** [1] - 28:10
**indirectly** [4] - 25:6, 25:8, 25:10, 28:5
**individual** [5] - 47:18, 55:5, 82:11, 84:18, 88:24
**individuals** [1] - 95:22
**influence** [1] - 28:9
**inform** [1] - 15:9
**information** [44] - 13:25, 21:13, 22:24, 25:20, 27:8, 32:3, 32:4, 32:5, 32:7, 32:10, 33:6, 33:9, 33:15, 34:1, 34:2, 34:11, 34:13, 41:7, 47:4, 48:1, 50:15, 52:14, 52:16, 52:25, 53:12, 54:20, 55:20, 55:25, 60:3, 60:6, 62:10, 78:6, 85:18, 85:19, 91:25, 97:7, 97:10, 106:19, 107:2, 107:7, 107:11, 107:17, 114:11, 114:23
**Information** [4] - 86:25, 87:1, 87:4, 101:4
**informational** [2] - 94:16, 94:25
**infrared** [1] - 91:19
**initial** [3] - 41:11, 67:25, 74:17
**innocent** [2] - 27:8, 110:10
**inquiry** [2] - 4:3, 11:15
**insert** [5] - 23:25, 51:12, 53:11, 69:7,

69:10
**inserted** [4] - 8:11, 8:15, 8:17, 8:20
**inserts** [2] - 69:9, 69:15
**inside** [1] - 116:21
**inspectors** [1] - 96:16
**install** [1] - 22:2
**installation** [1] - 6:14
**instance** [4] - 53:25, 71:24, 82:9, 83:17
**instances** [1] - 111:3
**instead** [3] - 22:17, 58:16, 74:13
**institutional** [1] - 96:10
**instructed** [1] - 11:23
**instructs** [1] - 22:3
**Intelligence** [1] - 89:13
**intend** [1] - 4:6
**intended** [4] - 9:9, 9:13, 9:16, 22:14
**intentionally** [1] - 22:6
**intercept** [4] - 9:22, 10:1, 10:5, 10:8
**intercepted** [1] - 107:21
**intercepting** [2] - 101:12, 109:9
**interception** [1] - 115:7
**interceptions** [1] - 106:2
**interest** [8] - 21:11, 21:14, 22:10, 22:16, 22:22, 27:21, 65:9, 116:22
**interested** [9] - 54:11, 88:14, 99:18, 99:19, 107:9, 107:11, 112:7, 112:8, 119:11
**interests** [1] - 116:21
**Internet** [13] - 10:4, 10:7, 13:24, 59:25, 60:1, 61:6, 61:7, 66:10, 81:23, 88:23, 98:23, 99:15, 109:23
**intrusion** [7] - 87:23, 89:20, 93:5, 93:8, 94:25, 96:19, 116:25
**invasion** [1] - 112:17
**investigate** [5] - 50:24, 51:10, 78:24, 79:18, 80:24
**investigated** [4] - 46:20, 46:21, 76:15, 81:14
**investigating** [2] - 12:7, 82:4

**investigation** [6] - 12:10, 60:7, 76:1, 81:5, 99:11, 114:9
**investigations** [9] - 41:9, 41:17, 42:4, 42:15, 51:21, 54:2, 68:6, 78:16, 96:11
**Investigative** [4] - 52:5, 99:25, 100:6, 106:3
**investigative** [9] - 41:8, 41:15, 41:16, 46:16, 56:8, 75:10, 82:14, 96:9, 100:7
**investigator** [2] - 40:14, 76:12
**investigators** [1] - 81:7
**involve** [2] - 42:5, 98:18
**involved** [8] - 41:12, 41:19, 42:4, 43:3, 85:25, 86:4, 102:6, 102:13
**IP** [27] - 7:13, 7:16, 7:17, 15:8, 15:15, 15:23, 15:24, 36:14, 52:17, 53:3, 53:5, 53:6, 59:3, 59:22, 60:1, 60:8, 60:22, 60:24, 61:2, 61:11, 61:15, 61:16, 68:1, 76:25, 77:3, 77:16, 113:23
**IPs** [3] - 60:14, 61:20, 62:2
**irrelevant** [1] - 66:21
**isolate** [1] - 92:4
**issue** [13] - 4:5, 29:17, 44:6, 45:17, 47:8, 83:16, 99:10, 102:7, 104:6, 106:12, 117:5, 117:15
**items** [2] - 70:13, 70:18
**itself** [5] - 23:5, 26:13, 84:20, 95:11, 102:5
**IUD** [1] - 17:14
**Ivy** [1] - 1:15

## J

**January** [8] - 14:10, 14:16, 14:20, 16:15, 17:2, 24:19, 35:14, 35:24
**job** [2] - 78:21, 100:18
**join** [2] - 85:8, 85:10
**joins** [1] - 96:23
**Jones** [1] - 44:8

**Joseph** [1] - 3:14
**JOSEPH** [1] - 1:15
**JR** [1] - 1:14
**Judge** [1] - 92:1
**judge** [1] - 73:1
**JUDGE** [1] - 1:11
**judging** [1] - 22:9
**judicial** [3] - 87:25, 103:21, 117:3
**jump** [2] - 5:4, 110:3
**June** [4] - 5:15, 5:19, 31:19, 108:6
**jurisdiction** [1] - 60:9

## K

**Katz** [3] - 104:16, 104:21, 105:24
**Katz-Kyllo** [1] - 104:16
**keep** [11] - 16:3, 16:7, 25:11, 55:11, 58:18, 59:4, 69:14, 70:10, 96:9, 113:10, 113:12
**keeping** [3] - 56:17, 57:14, 79:1
**keeps** [1] - 68:20
**Kelly** [1] - 3:16
**kept** [1] - 104:20
**key** [11] - 54:7, 54:10, 54:12, 54:16, 54:17, 54:23, 55:3, 55:4, 56:7, 70:14, 70:19
**kilobytes** [4] - 53:9, 55:1, 63:7, 63:15
**kin** [1] - 119:11
**kind** [5] - 8:25, 15:5, 27:2, 39:1, 91:8
**kitties** [1] - 74:19
**knowing** [2] - 21:10, 112:8
**knowledge** [6] - 11:13, 32:7, 33:21, 34:8, 45:21, 45:22
**known** [6] - 32:14, 32:18, 33:6, 33:7, 34:5, 34:8, 34:12, 34:16, 35:12, 38:7, 38:8, 38:10, 38:19, 38:21, 38:22, 41:14, 41:15, 42:8, 46:8, 49:23, 50:7, 50:19, 50:22, 51:3, 51:20, 51:23, 51:24, 52:3, 52:4, 52:9, 52:11, 52:19, 52:25, 53:2, 53:12, 53:22, 55:6, 56:2, 56:11, 56:18, 59:10, 59:21, 59:24, 60:3, 60:5, 60:22, 60:25, 61:3, 61:8, 61:11, 61:20, 65:4, 65:17, 66:2, 66:8,
**knows** [3] - 58:14, 77:3, 114:3
**Kyllo** [3] - 91:19, 104:16, 105:24
**Kyllo-Katz** [1] - 105:24

## L

**L-E-V-I-N-E** [1] - 5:2
**labelled** [2] - 54:1, 54:8
**lack** [3] - 45:24, 47:11, 108:15
**laid** [1] - 83:14

**lands** [1] - 60:3
**Lane** [1] - 1:15
**language** [3] - 15:4, 66:4, 67:21
**large** [2] - 11:25, 29:12
**larger** [3] - 19:7, 27:1, 109:19
**last** [17] - 3:24, 4:24, 4:25, 7:23, 8:20, 14:5, 28:13, 32:4, 39:15, 43:23, 43:24, 46:12, 72:13, 72:18, 83:12, 86:8, 86:17
**latitude** [1] - 100:12
**laudable** [1] - 95:15
**Law** [1] - 40:24
**law** [209] - 5:14, 5:17, 5:23, 6:16, 6:18, 6:21, 6:24, 7:4, 7:7, 7:9, 7:11, 7:12, 7:13, 7:15, 9:5, 9:8, 9:12, 10:22, 10:25, 11:22, 11:23, 12:1, 12:7, 12:14, 13:1, 13:11, 13:14, 13:16, 13:17, 13:20, 17:17, 18:5, 18:20, 19:20, 19:22, 20:5, 20:9, 20:14, 20:19, 20:21, 21:1, 21:5, 21:9, 21:17, 21:22, 22:5, 22:7, 22:10, 22:12, 22:17, 22:18, 23:14, 24:2, 27:6, 29:6, 29:11, 29:19, 29:21, 29:22, 31:3, 31:17, 32:6, 32:10, 32:14, 32:18, 32:21, 32:25, 33:1, 33:4, 33:7, 33:9, 33:13, 33:14, 33:15, 33:17, 33:20, 33:21, 33:22, 34:1, 34:3, 34:5, 34:8, 34:12, 34:16, 35:12, 38:7, 38:8, 38:10, 38:19, 38:21, 38:22, 41:14, 41:15, 42:8, 46:8, 49:23, 50:7, 50:19, 50:22, 51:3, 51:20, 51:23, 51:24, 52:3, 52:4, 52:9, 52:11, 52:19, 52:25, 53:2, 53:12, 53:22, 55:6, 56:2, 56:11, 56:18, 59:10, 59:21, 59:24, 60:3, 60:5, 60:22, 60:25, 61:3, 61:8, 61:11, 61:20, 65:4, 65:17, 66:2, 66:8,

10

66:15, 67:3, 68:22, 69:16, 69:22, 69:25, 70:24, 74:14, 74:23, 75:12, 75:23, 76:2, 76:3, 76:16, 76:23, 76:25, 77:17, 77:19, 78:11, 80:5, 81:8, 84:1, 84:10, 84:12, 84:23, 85:14, 90:2, 90:16, 91:2, 91:22, 92:12, 92:13, 92:16, 92:18, 93:1, 93:6, 93:7, 94:22, 95:2, 95:11, 95:13, 96:8, 97:7, 99:11, 100:19, 104:8, 105:18, 105:22, 106:13, 106:17, 106:18, 106:24, 107:4, 107:6, 107:17, 107:25, 108:5, 108:9, 109:3, 109:7, 109:11, 109:14, 109:20, 110:15, 110:23, 111:24, 113:1, 114:14, 115:10, 115:11, 115:13, 115:21, 117:1

**lawful** [1] - 90:9
**layer** [1] - 66:13
**laymen's** [1] - 56:20
**LE** [2] - 76:16, 76:17
**Leaders** [9] - 86:11, 86:12, 86:21, 90:21, 98:8, 104:14, 106:20, 107:15, 115:15
**leads** [1] - 41:8
**learn** [3] - 10:18, 36:12, 36:18
**least** [2] - 54:9, 108:6
**leaves** [1] - 28:4
**leaving** [3] - 38:17, 38:19, 86:20
**led** [1] - 87:4
**left** [4] - 25:15, 30:23, 30:25, 49:25
**leg** [1] - 91:22
**legal** [2] - 97:12, 97:13
**legitimate** [1] - 114:3
**less** [3] - 57:6, 110:18, 110:20
**level** [9] - 27:17, 27:18, 28:24, 64:1, 72:11, 87:22, 87:23, 93:9, 93:16
**LEVENSTEIN** [1] - 1:19
**leverage** [2] - 95:25,

100:25
**leveraging** [2] - 84:20, 84:21
**Levine** [12] - 4:11, 4:19, 5:1, 5:9, 10:16, 16:8, 39:5, 84:3, 92:24, 100:5, 108:4, 114:13
**LEVINE** [2] - 4:22, 118:4
**Levine's** [3] - 5:4, 60:21, 114:10
**license** [1] - 100:13
**lick** [1] - 96:19
**light** [1] - 30:23
**likely** [6] - 4:3, 6:20, 6:24, 7:10, 60:11, 68:13
**limit** [1] - 77:7
**limitation** [1] - 65:1
**limited** [1] - 37:4
**line** [5] - 46:6, 71:23, 95:3, 104:11, 105:24
**lines** [1] - 80:12
**list** [8] - 22:21, 32:18, 50:23, 51:4, 54:18, 65:18, 72:1, 77:1
**Listen** [1] - 113:9
**listen** [2] - 61:6, 102:25
**listened** [1] - 90:3
**lists** [1] - 112:10
**literature** [1] - 70:11
**Live** [16] - 21:7, 22:12, 57:20, 57:23, 58:6, 58:14, 59:1, 59:15, 59:18, 62:9, 62:15, 65:9, 67:22, 68:10, 77:16, 110:17
**live** [4] - 54:5, 104:16, 108:15, 108:16
**lives** [3] - 66:18, 81:16, 90:24
**living** [1] - 104:24
**LLC** [1] - 1:19
**locally** [1] - 65:18
**location** [9] - 8:24, 8:25, 9:1, 15:17, 15:18, 15:19, 33:16, 36:17, 49:9
**lock** [1] - 113:10
**log** [14] - 10:23, 11:6, 11:16, 13:25, 58:24, 61:11, 61:17, 61:20, 61:24, 62:1, 65:11, 66:24, 95:22, 111:10
**logged** [9] - 32:7, 32:10, 33:9, 33:14, 61:18, 67:5, 71:7
**logging** [2] - 61:21,

80:13
**logs** [3] - 11:17, 32:2, 32:3
**longevity** [1] - 8:20
**look** [32] - 6:7, 11:16, 11:17, 11:24, 17:23, 20:23, 21:9, 22:7, 23:1, 26:21, 32:9, 49:25, 60:8, 60:16, 61:3, 69:9, 86:12, 87:17, 87:18, 87:20, 89:8, 89:17, 94:6, 95:12, 97:19, 100:10, 101:6, 101:20, 116:20, 116:23
**looked** [5] - 32:20, 35:7, 55:13, 101:3, 109:21
**looking** [21] - 8:3, 8:6, 27:5, 29:18, 33:18, 35:22, 47:19, 52:8, 72:12, 73:11, 82:8, 84:14, 88:17, 88:18, 88:19, 89:18, 89:19, 95:3, 95:14, 96:17, 98:23
**looks** [5] - 19:23, 19:25, 24:15, 24:17, 24:21
**loosely** [1] - 64:17
**losing** [1] - 108:22
**lost** [3] - 8:18, 58:4, 101:18
**loves** [1] - 107:19
**low** [2] - 12:24, 13:21
**lower** [5] - 6:10, 19:13, 31:6, 35:8, 72:12

**M**

**ma'am** [1] - 62:12
**machine** [2] - 116:20, 119:8
**mail** [1] - 96:20
**main** [1] - 50:12
**maintain** [3] - 41:25, 77:9
**major** [2] - 75:5, 75:6
**malware** [2] - 88:25, 89:6
**manage** [1] - 17:18
**manifest** [24] - 27:17, 27:18, 27:21, 54:13, 54:18, 54:21, 54:23, 54:24, 55:4, 64:1, 72:11, 72:16, 72:19, 72:25, 73:3, 73:13, 73:15, 74:1, 76:2, 76:18, 78:7, 78:15,

97:19
**manifestation** [1] - 100:24
**manifests** [4] - 23:2, 63:17, 63:18
**March** [5] - 17:7, 17:12, 17:13, 18:12, 24:19
**MARYLAND** [2] - 1:2, 1:12
**Maryland** [5] - 1:16, 1:21, 2:5, 3:2, 119:3
**mask** [2] - 16:20, 39:25
**Massachusetts** [4] - 41:13, 42:13, 56:14, 75:11
**match** [3] - 51:10, 51:14, 66:25
**matches** [3] - 51:12, 61:22, 62:3
**material** [14] - 20:11, 21:15, 23:8, 53:24, 81:3, 81:6, 81:12, 82:5, 82:11, 82:12, 93:15, 107:14, 110:7
**materials** [2] - 20:13, 27:22
**math** [16] - 7:8, 35:10, 35:11, 36:5, 36:9, 60:9, 60:11, 60:16, 60:20, 68:8, 68:12, 68:15, 68:25, 69:8, 69:11, 69:12
**matter** [14] - 18:8, 22:11, 27:6, 56:19, 78:9, 84:9, 84:23, 84:24, 88:11, 95:23, 98:16, 108:15, 112:21, 119:6
**matters** [2] - 93:17, 111:21
**maximum** [4] - 5:14, 5:17, 34:21, 38:24
**mean** [18] - 59:18, 66:6, 70:15, 73:5, 80:7, 83:24, 88:13, 93:1, 94:12, 94:15, 95:1, 95:4, 96:21, 97:14, 102:23, 113:4, 115:16, 115:19
**meaning** [3] - 21:14, 27:21, 75:1
**meaningful** [1] - 56:2
**meaningless** [12] - 53:10, 56:5, 56:7, 74:23, 83:22, 84:17, 84:19, 94:7, 95:11, 95:24, 96:3, 97:5

**means** [3] - 25:7, 54:2, 110:13
**meant** [4] - 13:8, 13:10, 97:22, 104:20
**measured** [1] - 19:12
**measurement** [2] - 25:1, 27:13
**measures** [2] - 24:10, 113:12
**measuring** [2] - 37:13, 37:14
**mechanism** [4] - 27:3, 92:10, 95:15, 101:6
**mechanisms** [3] - 7:24, 25:18, 28:18
**median** [11] - 6:8, 6:17, 6:22, 19:11, 19:25, 20:1, 20:24, 31:5, 35:2, 35:3, 84:2
**meeting** [3] - 90:5, 91:1, 91:12
**member** [3] - 73:11, 73:19, 90:4
**memorandum** [1] - 41:22
**memory** [3] - 32:8, 35:7, 96:11
**mentioned** [10] - 41:1, 41:18, 42:3, 43:4, 44:11, 53:13, 57:20, 81:21, 99:2, 105:7
**menu** [1] - 72:18
**MERIDIAN** [1] - 2:3
**message** [4] - 10:2, 22:25, 53:20, 82:9
**messages** [1] - 108:25
**met** [1] - 14:6
**metadata** [9] - 85:6, 85:25, 86:4, 88:4, 88:11, 88:15, 88:20, 88:23, 99:5
**method** [5] - 24:2, 28:25, 38:2, 52:2, 71:5
**Microsoft** [3] - 67:9, 67:10
**might** [8] - 12:18, 25:16, 27:3, 36:11, 36:12, 52:13, 53:25, 104:16
**mike** [1] - 10:20
**million** [3] - 67:13, 95:4, 95:6
**millions** [3] - 64:18, 64:19, 67:7
**milliseconds** [2] - 65:16, 110:12
**Mills** [1] - 114:13
**mind** [1] - 29:12

**minus** [1] - 68:19
**minute** [4] - 11:19, 21:19, 89:9, 115:25
**missing** [2] - 64:14, 68:18
**misunderstood** [1] - 9:16
**Moalin** [2] - 88:5, 99:3
**mode** [3] - 91:9, 110:2, 113:16
**model** [1] - 89:24
**moderate** [3] - 105:11, 105:15, 105:23
**moment** [3] - 71:12, 84:19, 110:3
**monitored** [1] - 99:16
**monitoring** [1] - 102:25
**month** [8] - 5:18, 10:24, 14:10, 14:19, 14:20, 16:15, 24:12, 24:13
**morning** [3] - 3:4, 3:17, 25:4
**most** [7] - 19:11, 19:13, 31:20, 100:10, 102:3, 103:10, 108:21
**mostly** [1] - 43:1
**motion** [3] - 3:23, 83:10, 93:12
**move** [8] - 4:4, 23:10, 25:18, 26:7, 72:15, 97:18, 98:13, 103:5
**movement** [7] - 28:21, 84:18, 98:18, 99:14, 99:15, 99:19, 101:1
**movements** [4] - 86:16, 98:4, 98:10, 115:2
**moves** [3] - 43:10, 46:8, 101:25
**moving** [2] - 84:12
**MR** [118] - 3:12, 3:19, 3:21, 4:10, 4:19, 5:3, 5:8, 5:13, 10:10, 10:13, 10:15, 16:9, 31:9, 37:22, 37:25, 38:11, 38:14, 38:16, 39:4, 39:8, 39:19, 40:4, 43:9, 43:14, 43:17, 44:21, 45:1, 45:4, 45:8, 45:13, 45:19, 46:4, 46:7, 47:2, 47:12, 47:16, 47:23, 48:3, 48:11, 48:16, 48:23, 49:11, 49:14, 49:17, 49:21, 56:9, 59:6, 62:5, 62:24, 63:1, 63:23,

63:24, 79:6, 79:8, 79:11, 80:15, 80:18, 80:20, 82:18, 83:3, 83:6, 83:13, 84:14, 84:17, 85:10, 85:13, 85:19, 85:24, 86:4, 86:18, 87:9, 87:12, 88:18, 88:23, 89:2, 89:4, 89:10, 90:10, 91:14, 91:17, 92:3, 92:19, 93:4, 93:13, 93:16, 94:21, 95:9, 95:24, 96:5, 96:14, 97:1, 97:11, 97:16, 97:25, 98:14, 98:20, 98:22, 99:1, 101:13, 101:19, 102:2, 103:6, 104:1, 104:3, 105:1, 106:23, 107:13, 107:16, 108:4, 108:11, 109:18, 112:6, 113:15, 113:20, 116:3, 116:8, 116:11, 117:20
**multiple** [2] - 80:25, 111:3
**music** [1] - 64:23

**N**

**name** [7] - 4:24, 4:25, 5:1, 14:4, 14:5, 39:14, 39:15
**names** [2] - 54:8, 105:20
**narrow** [5] - 86:14, 98:9, 107:9, 107:11, 115:1
**nation** [1] - 81:19
**national** [4] - 78:10, 87:16, 87:17, 87:18
**nearly** [1] - 17:4
**necessarily** [2] - 82:1, 100:16
**necessary** [3] - 25:1, 50:4, 64:10
**need** [13] - 4:17, 45:14, 56:25, 64:5, 64:11, 65:18, 66:20, 68:18, 76:6, 78:4, 84:10, 95:18, 100:20
**needed** [1] - 57:7
**needless** [1] - 66:22
**needs** [2] - 77:1, 98:22
**nefarious** [1] - 115:8
**negative** [1] - 78:3
**neighbor** [3] - 7:6, 20:6, 21:22, 23:15, 25:24, 26:14, 30:21,

30:22, 74:15, 83:25, 91:2, 117:1
**neighborhood** [1] - 98:2
**neighbors** [62] - 6:23, 6:25, 7:7, 7:12, 7:18, 8:23, 12:18, 12:20, 19:10, 19:17, 19:21, 20:5, 20:7, 20:19, 21:1, 21:19, 22:1, 22:4, 25:14, 25:15, 26:17, 28:6, 29:23, 30:1, 30:12, 30:14, 30:18, 30:19, 30:25, 31:5, 35:1, 36:12, 36:13, 36:14, 36:15, 36:18, 37:6, 37:11, 38:17, 38:19, 38:20, 38:21, 38:22, 61:12, 61:15, 61:16, 61:24, 78:12, 84:4, 92:21, 93:5, 93:7, 93:11, 99:13, 107:6
**net** [5] - 14:9, 103:4, 106:4, 110:1, 113:16
**network** [28] - 5:15, 6:1, 7:15, 8:8, 8:12, 11:24, 12:2, 15:3, 20:23, 21:18, 21:19, 21:21, 25:15, 25:19, 28:8, 44:6, 47:7, 64:22, 65:2, 66:22, 67:10, 78:23, 89:4, 92:5, 92:13, 92:16
**Network** [4] - 52:5, 99:25, 100:6, 106:3
**networking** [1] - 53:7
**networks** [10] - 41:6, 43:12, 44:12, 45:21, 77:2, 77:11, 79:18, 80:25, 81:3, 81:15
**never** [5] - 9:15, 14:6, 51:14, 103:13, 116:8
**new** [1] - 89:16
**next** [8] - 4:4, 18:17, 34:23, 36:22, 40:8, 62:18, 112:25, 117:15
**nice** [1] - 56:18
**nifty** [1] - 104:23
**nil** [1] - 93:21
**Ninth** [1] - 88:5
**NIT** [3] - 46:16, 52:13, 89:1
**NO** [1] - 1:5
**nobody** [4] - 69:2, 97:2, 97:3, 113:11
**node** [135] - 6:4, 6:19, 6:21, 6:25, 7:5, 7:10, 7:15, 7:24, 8:2, 9:8,

9:12, 9:14, 9:21, 9:22, 12:2, 13:16, 15:2, 15:22, 19:17, 19:20, 20:5, 20:9, 20:13, 20:20, 21:17, 21:22, 22:2, 22:13, 22:17, 22:18, 23:15, 23:16, 23:17, 25:21, 25:24, 26:15, 26:25, 27:6, 27:7, 29:6, 30:20, 31:5, 32:14, 33:13, 33:14, 33:15, 34:12, 34:25, 36:5, 36:11, 36:19, 38:20, 49:23, 50:1, 50:5, 50:7, 50:12, 50:19, 50:22, 51:8, 52:2, 52:3, 52:4, 52:10, 52:11, 53:2, 56:11, 56:18, 56:21, 59:24, 59:25, 60:19, 60:25, 61:2, 61:3, 61:8, 61:20, 62:11, 66:19, 68:23, 70:1, 71:17, 71:18, 72:7, 72:10, 73:13, 73:14, 74:14, 74:17, 74:24, 76:2, 76:4, 76:16, 76:17, 84:1, 85:1, 85:9, 85:11, 85:16, 85:17, 85:18, 85:20, 89:25, 91:24, 92:4, 92:12, 93:19, 94:4, 94:5, 99:11, 101:11, 101:12, 102:19, 106:16, 106:17, 106:19, 106:25, 107:5, 107:7, 107:17, 107:18, 108:9, 110:15, 117:1
**Node** [3] - 106:25, 107:1, 107:2
**nodes** [140] - 5:15, 5:17, 5:23, 6:11, 6:16, 6:17, 6:20, 6:22, 7:12, 7:14, 7:20, 9:5, 9:6, 10:25, 11:24, 12:1, 12:7, 12:14, 12:15, 12:21, 13:1, 13:2, 13:12, 13:15, 13:17, 13:23, 14:1, 14:8, 14:9, 14:10, 14:20, 15:9, 15:11, 16:2, 16:11, 16:13, 16:14, 17:1, 17:10, 17:13, 17:14, 17:15, 17:18, 18:1, 18:9, 18:10, 18:11, 18:12, 18:14, 18:15, 18:18, 19:2, 19:6, 19:11, 21:9, 24:11,

24:12, 24:14, 25:18, 26:13, 29:11, 29:19, 29:21, 31:4, 31:18, 32:19, 34:5, 34:16, 35:12, 35:13, 35:19, 35:23, 36:2, 36:6, 36:19, 36:20, 36:21, 37:14, 38:8, 38:10, 38:21, 38:22, 46:8, 51:23, 52:11, 52:17, 52:19, 52:23, 53:1, 56:24, 57:9, 57:10, 58:13, 59:10, 60:4, 60:13, 60:18, 61:4, 61:19, 65:4, 66:2, 66:3, 66:8, 66:16, 68:10, 69:22, 70:13, 70:18, 70:25, 71:2, 71:14, 71:19, 75:12, 78:11, 84:3, 84:4, 84:5, 84:9, 92:2, 92:5, 92:13, 92:16, 92:18, 92:20, 93:1, 93:6, 93:7, 93:14, 104:8, 105:18, 106:17, 107:18, 108:6, 114:15
**nodes'** [1] - 15:5
**non** [1] - 115:2
**non-stop** [1] - 115:2
**none** [2] - 45:23, 65:4
**normal** [2] - 28:19, 29:4
**note** [5] - 43:20, 64:21, 71:20, 90:17, 110:5
**noted** [3] - 106:1, 106:10, 111:2
**NOTES** [1] - 1:25
**nothing** [1] - 96:16
**notice** [3] - 47:3, 47:11, 48:7
**November** [1] - 50:25
**nudges** [1] - 112:2
**number** [46] - 5:14, 5:17, 5:22, 6:12, 6:13, 6:23, 7:3, 9:24, 10:18, 10:21, 11:3, 11:20, 12:12, 12:18, 12:20, 14:15, 15:20, 16:2, 19:15, 20:3, 24:7, 29:5, 29:23, 30:1, 30:12, 30:14, 30:18, 30:24, 31:23, 32:1, 32:6, 32:16, 37:4, 37:5, 37:6, 38:20, 38:22, 51:3, 63:25, 64:5, 69:16, 71:1, 79:19, 93:5, 96:17

**numbers** [11] - 11:18, 11:19, 32:7, 36:11, 56:18, 57:14, 70:10, 84:6, 84:12, 84:21, 101:23
**nutshell** [1] - 56:17

# O

**object** [1] - 48:7
**objection** [6] - 46:22, 47:10, 47:11, 47:12, 47:14, 48:9
**objective** [3] - 104:10, 114:20, 114:22
**objectively** [1] - 111:18
**observation** [7] - 51:7, 51:13, 51:22, 53:7, 58:25, 59:1, 80:10
**observations** [14] - 5:25, 15:20, 17:24, 49:7, 50:21, 55:9, 55:18, 56:2, 59:5, 60:6, 67:16, 67:17, 77:13, 77:14
**observe** [2] - 7:16, 81:4
**observed** [2] - 67:5, 110:24
**observing** [1] - 16:1
**obtain** [1] - 34:2
**obtained** [1] - 97:7
**obviously** [4] - 63:12, 83:13, 86:25, 93:17
**occurs** [1] - 89:20
**October** [1] - 40:7
**odds** [1] - 20:14
**OF** [5] - 1:2, 1:5, 1:10, 1:14, 1:25
**offer** [1] - 26:13
**offering** [2] - 44:24, 97:20
**Office** [3] - 40:9, 40:17, 41:23
**OFFICE** [1] - 1:14
**Officer** [1] - 114:13
**officer** [13] - 60:22, 69:25, 76:3, 76:16, 77:4, 77:17, 77:19, 84:23, 85:14, 90:2, 90:17, 91:3, 109:8
**officers** [6] - 59:22, 60:5, 75:24, 76:23, 94:22, 110:24
**official** [1] - 119:16
**OFFICIAL** [1] - 1:23
**Official** [1] - 119:2
**often** [1] - 53:24
**oftentimes** [1] - 54:8

**old** [3] - 26:20, 58:8
**once** [10] - 14:23, 34:12, 49:9, 51:7, 51:22, 54:24, 60:22, 73:15, 110:8
**one** [93] - 3:7, 3:25, 5:24, 6:1, 6:2, 6:16, 7:2, 8:13, 9:22, 12:2, 14:2, 18:7, 18:22, 20:8, 21:12, 24:7, 24:12, 24:24, 24:25, 26:14, 27:23, 32:8, 33:1, 33:2, 33:5, 35:6, 37:6, 41:16, 42:21, 43:2, 44:1, 44:3, 46:20, 50:12, 50:17, 51:2, 51:9, 52:1, 52:9, 54:14, 57:5, 57:13, 57:15, 58:13, 58:19, 61:22, 62:4, 62:7, 62:19, 63:10, 63:20, 63:21, 65:10, 67:6, 68:10, 68:19, 71:9, 71:13, 71:19, 72:5, 72:17, 72:21, 74:13, 76:15, 79:2, 82:2, 86:19, 86:23, 87:1, 87:2, 87:8, 88:15, 90:22, 92:11, 92:18, 93:1, 93:9, 99:8, 101:8, 101:25, 103:10, 105:2, 108:5, 108:20, 108:21, 110:5, 113:4, 116:9, 116:10, 117:19
**one-percent** [1] - 108:5
**ones** [4] - 24:5, 42:22, 58:25, 77:5
**open** [10] - 28:4, 84:22, 85:3, 91:12, 96:6, 97:13, 97:20, 97:23, 103:4, 110:1
**opened** [1] - 109:11
**operate** [2] - 87:22, 92:1
**operated** [1] - 19:6
**operates** [1] - 26:4
**operating** [6] - 15:22, 17:15, 18:5, 18:11, 18:21, 70:25
**operation** [7] - 12:6, 15:1, 28:9, 28:19, 29:11, 31:18, 84:1
**operational** [3] - 15:2, 16:2, 18:2
**operations** [2] - 33:21, 34:9
**operative** [1] - 31:17

**opinion** [1] - 117:15
**opportunity** [3] - 46:25, 48:25, 111:15
**opposed** [4] - 46:9, 59:13, 80:24, 110:1
**option** [3] - 108:16, 108:17, 113:18
**options** [1] - 30:25
**oranges** [1] - 37:14
**order** [3] - 8:7, 12:19, 117:15
**organization** [1] - 40:25
**organize** [2] - 70:12, 70:17
**original** [14] - 56:12, 57:6, 57:11, 58:1, 58:2, 58:23, 59:2, 59:3, 62:20, 68:2, 68:14, 69:1, 69:3
**ourselves** [3] - 113:7, 113:10, 113:12
**outcome** [2] - 29:13, 119:12
**outlined** [2] - 52:2, 52:24
**outlines** [1] - 49:3
**outside** [1] - 80:5
**outsized** [1] - 104:17
**overall** [1] - 89:11
**overheard** [1] - 104:22
**overlap** [2] - 38:25, 48:4
**overlooking** [1] - 28:11
**overrule** [3] - 46:21, 47:15, 48:9
**own** [6] - 17:23, 36:2, 43:1, 105:5, 115:17, 115:18

# P

**p.m** [3] - 83:7, 117:22
**P.M** [1] - 1:11
**packet** [1] - 84:15
**packets** [1] - 60:2
**PAGE** [2] - 118:4, 118:7
**page** [4] - 49:6, 76:20, 106:8, 109:12
**paper** [26] - 6:5, 6:7, 12:18, 17:11, 19:12, 20:24, 26:20, 28:22, 35:5, 35:14, 38:2, 56:13, 57:17, 60:10, 68:5, 81:21, 95:5, 95:7, 112:24, 113:2, 113:11, 116:14, 116:15, 116:16

**papers** [4] - 12:12, 15:12, 25:11, 88:16
**paragraph** [6] - 16:22, 17:17, 17:20, 17:21, 18:17, 64:21
**paragraphs** [1] - 17:23
**parishioner** [1] - 90:3
**part** [24] - 19:16, 27:16, 28:19, 33:9, 35:10, 41:24, 54:12, 54:23, 56:6, 59:23, 60:15, 62:16, 68:15, 81:5, 81:7, 93:18, 96:8, 99:19, 101:9, 101:25, 109:15, 109:16
**participants** [1] - 111:23
**particular** [3] - 33:2, 83:20, 90:5
**parties** [2] - 114:23, 119:7
**parts** [1] - 54:14
**party** [11] - 72:8, 84:11, 86:10, 86:15, 86:19, 99:5, 99:7, 106:8, 109:24, 115:6, 119:11
**pass** [6] - 21:6, 53:1, 62:17, 66:8, 68:11, 112:25
**passed** [2] - 62:14, 101:4
**passing** [3] - 8:6, 57:4, 66:16
**passive** [2] - 47:25, 91:24
**passively** [2] - 52:22, 85:17
**past** [1] - 77:16
**path** [2] - 25:16, 28:18
**PAULA** [1] - 1:10
**Paula** [1] - 3:3
**pause** [1] - 98:7
**Pause** [1] - 3:9
**pay** [4] - 98:21, 100:3, 100:4, 104:22
**peaceful** [1] - 117:18
**peer** [49] - 12:11, 24:9, 42:18, 42:19, 42:24, 43:7, 43:11, 44:12, 44:15, 44:24, 45:21, 46:19, 46:20, 48:19, 50:6, 50:11, 50:17, 50:21, 51:7, 60:10, 68:7, 71:24, 72:1, 72:8, 72:23, 73:3, 73:4, 73:20, 73:22, 73:25, 74:13, 74:14, 74:15, 74:17, 79:24

**peer-reviewed** [4] - 12:11, 24:9, 60:10, 68:7
**peer-to-peer** [13] - 42:18, 42:19, 42:24, 43:7, 43:11, 44:12, 44:15, 44:24, 45:21, 46:19, 46:20, 48:19, 79:24
**peered** [1] - 116:19
**peers** [27] - 6:3, 6:8, 6:12, 6:13, 6:17, 7:16, 9:25, 10:2, 11:20, 11:25, 12:13, 14:21, 15:2, 28:21, 29:6, 50:6, 50:12, 61:13, 71:19, 73:14, 73:16, 73:18, 74:10, 107:3, 110:16, 110:19
**Pennsylvania** [14] - 33:8, 34:1, 34:7, 34:11, 34:17, 38:9, 40:6, 40:10, 40:16, 40:18, 41:20, 41:24, 81:11, 82:24
**people** [27] - 13:16, 18:1, 36:22, 37:2, 37:7, 56:21, 57:8, 62:2, 71:14, 79:3, 80:21, 81:20, 86:22, 90:6, 90:14, 90:15, 91:7, 99:14, 99:22, 100:16, 103:17, 105:14, 107:20, 107:21, 107:22, 107:23, 109:25
**people's** [1] - 43:2
**per** [19] - 14:15, 14:16, 14:18, 14:19, 17:2, 17:8, 17:18, 17:24, 17:25, 18:4, 18:5, 18:20, 18:21, 19:3, 24:18, 35:17, 35:20, 35:21, 35:24
**per-day** [1] - 24:18
**percent** [17] - 5:24, 6:1, 6:2, 6:10, 6:16, 7:3, 7:9, 18:7, 18:22, 27:9, 27:10, 35:7, 92:18, 93:1, 93:9, 108:5, 110:20
**percentage** [5] - 5:22, 7:4, 19:1, 35:12, 108:14
**perception** [1] - 26:7
**performance** [3] - 8:8, 12:4, 15:5
**performed** [3] - 11:4, 11:7, 11:14

**perhaps** [6] - 18:24, 19:5, 19:6, 25:9, 29:5, 104:15
**period** [8] - 14:9, 14:13, 14:22, 14:23, 14:24, 24:13, 31:17, 88:20
**permissible** [2] - 103:12, 106:22
**persistent** [4] - 91:14, 91:16, 91:17, 92:6
**persistently** [2] - 111:14, 113:22
**person** [17] - 11:8, 11:9, 11:11, 57:2, 60:13, 79:25, 81:13, 104:21, 105:5, 107:20, 107:23, 107:24, 112:13, 112:14, 112:18, 112:25
**person's** [1] - 86:15
**personal** [1] - 105:6
**perspective** [4] - 20:17, 25:16, 29:20, 113:19
**pertain** [1] - 73:21
**pertains** [2] - 41:3, 47:7
**Phoenix** [2] - 44:4, 44:10
**phone** [4] - 98:15, 104:22, 107:18, 108:18
**phones** [2] - 90:23, 98:12
**phonetic** [1] - 14:4
**physical** [5] - 86:16, 91:1, 96:19, 98:18, 115:2
**physically** [2] - 10:6, 10:7
**pick** [1] - 6:11
**picked** [1] - 86:5
**picking** [4] - 7:7, 101:22, 101:23, 104:18
**pictures** [1] - 74:19
**piece** [17] - 34:23, 51:18, 57:10, 71:16, 73:4, 73:24, 74:9, 78:6, 80:14, 95:5, 95:7, 112:24, 113:1, 116:14, 116:15, 116:16
**pieces** [11] - 41:15, 51:19, 57:1, 66:25, 68:18, 72:16, 72:20, 73:23, 95:4, 95:6, 102:9

**place** [4] - 89:22, 95:15, 96:10, 102:2
**placed** [1] - 77:23
**places** [3] - 11:12, 25:13, 101:19
**plain** [1] - 84:24
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 1:13
**play** [2] - 56:14, 108:1
**playpen** [1] - 46:16
**pleading** [1] - 94:16
**pleadings** [3] - 83:14, 87:7, 117:12
**plenty** [2] - 94:12, 94:19
**plus** [1] - 63:17
**Pobre** [3] - 3:13, 3:20, 4:1
**POBRE** [1] - 1:8
**Pobre's** [1] - 3:23
**Point** [4] - 50:15, 65:16, 65:17
**point** [29] - 8:16, 10:9, 17:22, 19:8, 19:9, 41:8, 41:12, 43:9, 45:16, 49:18, 55:6, 57:18, 89:14, 93:11, 94:24, 95:10, 105:9, 106:3, 106:15, 106:24, 107:25, 108:6, 108:23, 109:18, 111:5, 111:20, 113:5, 116:2, 116:3
**pointed** [2] - 106:7, 114:7
**pointing** [1] - 115:4
**Police** [4] - 40:6, 40:10, 40:18, 41:21, 41:24, 81:11
**policy** [3] - 69:21, 69:23, 69:24
**poof** [1] - 51:15
**pop** [1] - 78:7
**pops** [4] - 21:17, 21:19, 21:22, 102:25
**popular** [2] - 108:21, 112:10
**popularity** [1] - 108:23
**population** [10] - 15:21, 15:24, 15:25, 18:20, 18:22, 19:7, 35:13, 37:3, 92:23, 92:25
**pornography** [1] - 76:8
**port** [1] - 53:7
**portion** [2] - 50:18, 53:19
**portions** [2] - 50:9,

53:18
**posed** [1] - 90:4
**position** [7] - 8:25, 10:3, 10:5, 92:3, 100:16, 103:10, 104:3
**positions** [1] - 40:11
**positives** [1] - 24:1
**possibility** [1] - 28:5
**possible** [3] - 29:24, 56:4, 103:11
**post** [2] - 109:1, 110:8
**postal** [1] - 96:16
**posting** [1] - 109:3
**potential** [1] - 59:2
**potentially** [2] - 59:2, 103:8
**pre** [2] - 14:9, 114:9
**pre-net** [1] - 14:9
**pre-warrant** [1] - 114:9
**preacher** [1] - 90:5
**preacher's** [1] - 89:25
**precise** [1] - 35:3
**precisely** [1] - 90:10
**prefer** [1] - 16:11
**preparation** [2] - 55:12, 71:5
**prepared** [3] - 47:6, 47:7, 64:20
**presence** [8] - 29:21, 31:5, 91:15, 91:16, 91:17, 92:6, 108:5, 116:24
**present** [3] - 3:15, 4:11, 45:12
**presented** [1] - 88:10
**presiding** [1] - 3:3
**presume** [2] - 17:4, 17:17
**preteen** [1] - 54:2
**pretty** [7] - 4:12, 55:1, 56:20, 65:14, 93:21, 116:14, 116:15
**prevent** [2] - 9:21, 96:16
**previously** [5] - 13:25, 21:13, 89:15, 119:6
**price** [1] - 109:15
**pried** [1] - 84:22
**primarily** [1] - 82:1
**primary** [6] - 9:2, 29:10, 33:22, 42:12, 43:2, 81:13
**principally** [1] - 45:19
**privacy** [25] - 4:2, 84:9, 84:25, 86:22, 93:19, 95:10, 95:22, 96:22, 96:25, 102:18, 103:3,

104:9, 111:2, 111:8, 111:12, 111:17, 112:3, 112:4, 112:5, 113:3, 114:4, 114:5, 114:12, 114:19, 114:22
**private** [9] - 85:24, 86:3, 99:14, 104:20, 109:2, 112:17, 113:5, 113:13, 114:11
**privately** [1] - 109:1
**privy** [1] - 61:25
**probabilities** [2] - 56:20, 57:16
**probability** [2] - 56:15, 60:11
**probable** [1] - 68:14
**problem** [5] - 87:2, 90:11, 92:10, 99:8, 99:23
**problematic** [1] - 86:19
**problems** [1] - 87:3
**procedure** [1] - 89:22
**PROCEEDINGS** [1] - 1:10
**proceedings** [3] - 57:19, 117:22, 119:5
**process** [6] - 49:7, 54:17, 59:8, 81:12, 82:14, 110:11
**processer** [3] - 22:13, 22:15, 22:18
**processes** [1] - 40:22
**produces** [1] - 29:16
**program** [4] - 8:10, 58:11, 62:10, 89:12
**programatic** [1] - 58:17
**programmer** [1] - 42:12
**programming** [1] - 75:9
**progressed** [1] - 40:10
**project** [1] - 79:3
**pronounces** [1] - 14:4
**pronunciation** [1] - 14:7
**proper** [1] - 48:7
**protect** [2] - 86:21, 103:17
**protected** [1] - 102:17
**protocol** [3] - 41:16, 64:13, 69:21
**provided** [3] - 47:3, 89:8, 99:6
**PTHC** [1] - 54:1
**public** [9] - 52:16, 53:23, 56:1, 90:19,

95:18, 104:19, 109:22, 113:5, 113:8
**publically** [1] - 105:18
**publicly** [6] - 41:7, 52:8, 52:14, 77:13, 80:13, 110:8
**published** [1] - 6:6
**purely** [1] - 99:8
**purports** [1] - 54:9
**purpose** [7] - 8:1, 12:1, 12:10, 51:16, 56:8, 67:24, 95:13
**purposes** [3] - 45:15, 45:25, 78:9
**pushed** [1] - 8:21
**put** [18] - 4:16, 14:17, 16:20, 17:21, 72:11, 72:16, 73:12, 73:13, 78:20, 81:14, 86:10, 89:21, 91:9, 94:4, 94:13, 96:20, 101:9, 113:11
**puts** [1] - 93:19
**putting** [4] - 36:19, 83:2, 106:16, 115:16
**PX-19-348** [2] - 1:5, 3:14

### Q

**qualifications** [1] - 5:7
**qualified** [5] - 5:10, 47:1, 47:23, 48:9, 48:18
**qualifies** [1] - 81:4
**qualify** [1] - 43:10
**quantify** [1] - 80:23
**queries** [1] - 71:9
**query** [13] - 11:4, 11:7, 11:14, 12:5, 31:22, 31:25, 32:12, 32:13, 33:7, 34:5, 67:11, 67:16, 67:21
**questions** [14] - 5:5, 20:8, 20:15, 20:16, 20:17, 31:9, 33:1, 37:19, 37:20, 37:23, 44:21, 71:12, 79:6, 105:2
**quick** [1] - 62:7
**quite** [4] - 6:5, 9:18, 37:1, 111:4
**quote** [4] - 13:3, 16:25, 111:4, 114:8

### R

**raise** [2] - 4:21, 39:11
**raised** [3] - 30:11, 86:11, 86:12

**ran** [3] - 12:11, 14:1, 31:22
**random** [1] - 105:9
**randomly** [3] - 15:19, 32:9, 109:5
**range** [1] - 12:20
**rap** [3] - 112:9, 112:11, 112:13
**rather** [4] - 10:17, 22:5, 50:6, 69:11
**ray** [1] - 116:20
**reach** [1] - 71:1
**read** [7] - 22:25, 24:22, 46:14, 50:3, 66:24, 98:8, 98:9
**reading** [1] - 25:11
**reads** [1] - 83:14
**ready** [1] - 83:8
**real** [3] - 47:19, 90:25, 98:7
**real-world** [1] - 90:25
**reality** [2] - 109:24, 110:19
**really** [42] - 7:23, 8:22, 8:24, 10:6, 11:15, 18:1, 29:17, 29:20, 33:24, 37:13, 45:23, 46:17, 47:6, 47:8, 48:8, 48:12, 51:16, 56:19, 57:17, 66:6, 67:7, 73:6, 79:1, 84:11, 86:24, 89:24, 94:17, 95:1, 97:22, 98:7, 98:17, 100:23, 103:3, 104:19, 104:21, 104:23, 107:9, 107:11, 107:19, 111:20, 111:21, 117:11
**realtime** [4] - 65:15, 65:21, 110:13, 117:2
**rearrangement** [1] - 26:16
**rearranging** [1] - 27:3
**reason** [14] - 25:8, 25:10, 28:10, 28:14, 29:2, 29:9, 37:9, 45:25, 47:19, 67:25, 68:4, 78:2, 83:15, 101:14
**reasonable** [8] - 4:2, 84:8, 84:25, 95:21, 96:22, 96:24, 112:3, 113:2
**reasonably** [2] - 87:24, 114:18
**reasons** [3] - 12:2, 105:1, 115:23
**receive** [8] - 7:20, 9:15, 10:3, 41:7,

50:11, 55:25, 85:18, 85:20
**received** [9] - 10:8, 17:1, 17:4, 33:6, 35:23, 48:6, 49:9, 106:13, 107:18
**receives** [2] - 49:23, 59:9
**recent** [1] - 88:1
**recently** [2] - 13:4, 70:7
**receptacle** [1] - 48:1
**Recess** [1] - 83:7
**recipient** [4] - 9:9, 9:13, 9:16, 22:14
**recognize** [2] - 103:7, 116:12
**recollection** [4] - 13:5, 16:17, 30:2, 30:13
**record** [11] - 4:24, 23:25, 39:14, 51:12, 51:16, 53:19, 56:1, 70:25, 85:17, 85:19, 98:22
**recorded** [1] - 119:8
**recording** [1] - 91:24
**records** [2] - 77:10, 114:15
**recreate** [2] - 64:14, 68:17
**RECROSS** [2] - 38:15, 80:19
**recross** [1] - 80:17
**Recross** [2] - 118:6, 118:11
**RECROSS-EXAMINATION** [2] - 38:15, 80:19
**Recross-examination** [2] - 118:6, 118:11
**redirect** [2] - 37:21, 79:7
**Redirect** [2] - 118:6, 118:10
**REDIRECT** [2] - 37:24, 79:10
**reduce** [2] - 24:1, 62:18
**reduced** [1] - 57:14
**redundancies** [1] - 64:8
**redundant** [1] - 110:4
**refer** [1] - 15:13
**referenced** [1] - 35:13
**referred** [5] - 38:2, 41:11, 53:6, 64:6, 86:23
**referring** [9] - 16:22, 28:18, 32:22, 38:4,

38:7, 49:22, 51:25, 57:20, 59:21
**refers** [1] - 17:4
**reflecting** [1] - 100:20
**regard** [4] - 86:9, 94:18, 102:21, 115:15
**regardless** [1] - 21:10
**regards** [5] - 108:4, 111:1, 113:21, 114:20, 116:4
**regime** [4] - 103:7, 103:18, 105:8, 105:13
**rejected** [1] - 86:16
**rejecting** [1] - 13:2
**relate** [2] - 59:12, 78:15
**related** [4] - 21:14, 27:21, 40:20, 44:14
**relates** [4] - 68:5, 75:9, 77:8, 82:3
**relating** [3] - 42:21, 67:3, 68:5
**relative** [2] - 95:1, 95:8
**relevance** [1] - 51:20
**relevant** [11] - 5:21, 27:16, 45:5, 46:9, 46:23, 58:6, 77:12, 101:15, 102:22, 103:19, 108:7
**relied** [1] - 115:10
**relies** [1] - 79:1
**relying** [1] - 24:4
**remain** [2] - 4:21, 39:11
**remember** [2] - 90:12, 91:7
**remind** [2] - 5:19, 34:10
**reminders** [1] - 111:11
**render** [1] - 110:25
**Renee** [4] - 1:24, 119:2, 119:14, 119:15
**repeat** [1] - 70:16
**repeatedly** [2] - 97:3, 114:16
**rephrase** [1] - 30:5
**reply** [1] - 3:6
**report** [4] - 19:15, 55:15, 56:16, 77:17
**reported** [4] - 11:5, 17:11, 62:20, 119:5
**Reporter** [2] - 119:2, 119:16
**reporter** [2] - 16:7, 63:21
**REPORTER** [1] - 1:23
**reporting** [3] - 14:12,

15:21, 15:24
**reports** [1] - 75:24
**reprogrammed** [1] - 77:25
**request** [65] - 8:2, 8:4, 8:5, 8:6, 8:7, 9:9, 9:10, 9:13, 9:14, 9:22, 21:6, 21:8, 21:25, 22:11, 27:17, 27:24, 30:21, 49:24, 50:9, 50:18, 52:3, 56:11, 57:4, 58:3, 58:13, 61:22, 65:10, 66:25, 68:9, 68:23, 72:11, 72:15, 72:19, 72:25, 73:13, 73:21, 74:15, 74:17, 74:18, 74:19, 76:14, 77:18, 84:15, 85:20, 85:21, 85:22, 93:20, 93:21, 93:24, 94:4, 94:6, 95:13, 95:24, 96:2, 99:10, 102:5, 102:19, 105:18, 107:2, 110:8, 112:9, 114:2
**requested** [5] - 25:20, 51:11, 60:23, 74:2, 112:13
**requesting** [4] - 20:10, 20:12, 54:25, 72:8
**requestor** [22] - 56:12, 57:2, 57:3, 57:7, 57:11, 57:12, 57:13, 58:1, 58:2, 58:12, 58:15, 58:22, 58:23, 59:2, 59:3, 60:12, 62:21, 65:12, 68:2, 69:1, 69:4, 72:23
**requestor's** [1] - 69:17
**requestors** [1] - 68:14
**requests** [48] - 7:20, 20:6, 21:10, 22:5, 23:18, 23:21, 23:22, 23:23, 27:11, 27:17, 27:18, 27:20, 52:22, 56:25, 57:12, 59:9, 59:12, 60:24, 66:9, 66:16, 67:5, 69:10, 69:11, 72:5, 73:2, 73:8, 73:9, 73:14, 73:21, 73:22, 74:11, 83:22, 83:23, 83:25, 84:15, 84:17, 84:25, 85:3, 97:1, 97:4, 99:12, 109:22, 112:12, 114:14, 116:17, 116:18, 116:21
**requirement** [1] -

115:22
**requires** [2] - 50:20, 100:1
**reroute** [1] - 10:4
**research** [1] - 77:20
**reserve** [1] - 4:15
**resource** [1] - 94:1
**resources** [9] - 96:1, 97:12, 100:25, 103:8, 103:9, 104:17, 105:11, 105:23, 109:12
**respect** [3] - 84:10, 99:5, 102:22
**respond** [2] - 70:20, 83:11
**response** [10] - 8:3, 13:8, 42:3, 104:25, 105:2, 106:7, 108:19, 111:20, 112:5, 116:7
**responsive** [1] - 101:17
**rest** [1] - 66:21
**rests** [1] - 114:4
**result** [5] - 15:1, 28:15, 55:9, 99:10
**resulted** [1] - 95:1
**results** [5] - 28:10, 28:20, 29:3, 29:5, 29:16
**resume** [1] - 43:20
**retain** [3] - 59:12, 59:15, 65:5
**retained** [5] - 59:19, 67:22, 110:14, 110:16
**retaining** [8] - 65:3, 65:4, 65:7, 65:8, 67:24, 107:2, 110:18
**retains** [1] - 57:24
**retired** [5] - 40:8, 41:18, 41:20, 41:21
**retrieving** [1] - 25:19
**reverend** [1] - 21:20
**reverend's** [1] - 72:18
**review** [2] - 48:25, 60:7
**reviewed** [5] - 12:11, 13:15, 24:9, 60:10, 68:7
**revolved** [1] - 99:7
**Rich** [1] - 3:20
**RICHARD** [1] - 1:19
**ring** [2] - 26:15, 26:18
**rip** [1] - 95:6
**ripped** [1] - 95:6
**Rising** [5] - 21:20, 22:19, 23:9, 72:14, 78:3

**risk** [3] - 87:23, 91:3, 109:16
**RMR** [2] - 1:24, 119:15
**Robbins** [13] - 3:20, 10:12, 16:8, 38:13, 62:8, 62:23, 96:21, 116:7, 118:5, 118:6, 118:9, 118:10, 118:11
**ROBBINS** [78] - 2:4, 3:19, 5:8, 10:13, 10:15, 16:9, 31:9, 38:14, 38:16, 39:4, 43:14, 43:17, 44:21, 45:4, 45:8, 45:13, 45:19, 47:2, 47:12, 47:16, 47:23, 48:3, 48:11, 49:14, 62:24, 63:1, 63:23, 63:24, 79:6, 80:18, 80:20, 82:18, 83:3, 83:6, 83:13, 84:14, 84:17, 85:10, 85:13, 85:19, 85:24, 86:4, 86:18, 87:9, 87:12, 88:18, 88:23, 89:2, 89:4, 89:10, 90:10, 91:14, 91:17, 92:3, 92:19, 93:4, 93:13, 93:16, 94:21, 95:9, 95:24, 96:5, 96:14, 97:1, 97:11, 97:16, 97:25, 98:14, 98:20, 98:22, 99:1, 101:13, 101:19, 102:2, 103:6, 104:1, 116:8, 116:11
**Robbins'** [1] - 111:20
**Robert** [3] - 4:12, 39:9, 39:16
**ROBERT** [3] - 39:12, 39:16, 118:7
**role** [6] - 4:14, 40:13, 41:1, 41:3, 42:2, 87:25
**room** [8] - 90:17, 94:13, 94:19, 107:20, 112:23, 113:6, 116:13
**rough** [1] - 36:5
**round** [2] - 56:18, 70:10
**Rouse** [5] - 14:3, 14:6, 14:8, 24:10
**routed** [2] - 10:8, 49:8
**routing** [12] - 8:22, 8:23, 9:3, 25:5, 25:6, 30:8, 30:10, 30:12, 30:16, 30:20, 30:22, 30:24

**row** [1] - 32:5
**RPR** [2] - 1:24, 119:15
**run** [11] - 12:14, 33:7, 34:19, 50:1, 50:6, 52:3, 60:4, 71:16, 75:2, 75:3, 94:19
**runner** [1] - 32:13
**running** [20] - 10:9, 10:25, 12:1, 14:2, 14:8, 14:21, 15:1, 17:10, 17:13, 18:10, 34:8, 34:12, 36:2, 36:11, 44:9, 65:23, 94:3, 94:4, 96:14
**runs** [1] - 94:10

## S

**safe** [1] - 117:18
**sake** [3] - 23:7, 67:12, 115:4
**sat** [1] - 90:3
**SATA** [1] - 80:8
**save** [1] - 45:8
**saved** [1] - 110:12
**savvy** [1] - 105:15
**saw** [8] - 10:23, 13:3, 14:16, 14:21, 14:25, 17:14, 32:4, 32:6
**scattered** [2] - 23:18, 23:19
**scenario** [2] - 87:21, 97:24
**science** [1] - 64:6
**sciency** [1] - 58:10
**scientifically** [1] - 5:25
**scope** [1] - 89:11
**screen** [6] - 65:10, 75:2, 83:23, 96:1, 96:15, 111:14
**screening** [2] - 24:4, 66:17
**sealed** [5] - 85:6, 94:8, 96:3, 97:4, 97:5
**search** [12] - 4:5, 41:6, 78:24, 83:18, 88:10, 95:17, 103:22, 104:5, 106:13, 110:25, 112:1, 115:17
**searching** [2] - 48:1, 52:19
**seat** [1] - 58:6
**seated** [2] - 4:23, 39:13
**second** [9] - 3:8, 10:3, 12:6, 55:8, 89:23, 99:1, 104:9, 105:7, 115:16
**secondary** [1] - 24:25

**seconds** [2] - 52:24, 67:20
**section** [1] - 50:1
**Section** [1] - 106:7
**secure** [2] - 66:10, 66:13
**security** [3] - 87:16, 87:17, 87:18
**see** [50] - 6:8, 7:14, 7:17, 11:2, 11:6, 12:19, 16:18, 18:3, 18:13, 19:15, 22:15, 23:10, 28:14, 29:2, 29:7, 29:9, 29:12, 32:24, 33:3, 33:18, 48:15, 50:5, 50:16, 51:24, 52:13, 52:16, 52:17, 56:24, 57:12, 61:1, 70:7, 86:7, 91:18, 91:20, 94:6, 96:17, 96:21, 97:19, 102:15, 103:23, 109:3, 109:15, 111:9, 112:13, 113:11, 115:24, 116:16, 117:18
**seeing** [3] - 84:24, 91:7, 111:14
**seeking** [1] - 67:6
**segment** [2] - 107:9, 107:12
**segueing** [1] - 99:7
**seize** [1] - 81:5
**seizure** [1] - 82:11
**select** [1] - 11:21
**selected** [2] - 11:22, 70:3
**self** [5] - 64:14, 68:20, 69:6, 70:12, 70:17
**self-heal** [2] - 64:14, 69:6
**self-heals** [1] - 68:20
**self-organize** [2] - 70:12, 70:17
**send** [13] - 7:20, 21:23, 22:13, 22:14, 30:21, 50:9, 56:25, 68:9, 68:22, 68:23, 88:7, 108:25, 109:25
**sending** [10] - 22:19, 52:3, 52:4, 53:5, 58:3, 58:12, 58:16, 65:23, 99:13, 109:6
**sends** [3] - 22:8, 50:21, 112:8
**sense** [3] - 7:2, 32:17, 48:10
**sent** [20] - 8:7, 9:22, 10:2, 22:6, 23:18, 23:23, 23:25, 24:3,

40:18, 59:10, 60:25, 73:9, 105:18, 110:19, 112:14, 112:18, 116:18
**sentence** [2] - 17:19, 35:22
**sequential** [1] - 32:8
**sermon** [19] - 21:23, 22:9, 72:18, 72:20, 73:11, 73:20, 73:21, 73:23, 74:2, 74:18, 78:12, 90:1, 90:3, 90:4, 90:12, 90:13, 90:14, 90:18, 110:6
**sermons** [3] - 23:9, 72:15, 78:5
**serve** [1] - 51:15
**served** [1] - 104:5
**server** [27] - 22:8, 23:24, 24:4, 33:15, 34:1, 38:8, 42:1, 46:10, 50:22, 50:23, 51:4, 51:8, 51:24, 52:4, 53:4, 53:12, 53:14, 57:24, 61:11, 67:20, 75:9, 76:24, 79:12, 79:14, 80:6, 105:4, 105:20
**Server** [1] - 67:9
**service** [1] - 90:2
**session** [1] - 3:3
**set** [8] - 9:5, 11:23, 13:19, 44:19, 70:1, 95:14, 105:11, 116:23
**sets** [1] - 73:2
**setting** [7] - 13:21, 30:19, 69:24, 70:2, 70:5, 109:2
**settings** [5] - 6:14, 6:15, 11:21, 11:22, 12:3, 12:12, 29:4
**setup** [1] - 56:5
**several** [4] - 41:14, 71:20, 80:8, 92:25
**sexual** [1] - 23:8
**SHA256** [1] - 53:8
**shake** [1] - 92:17
**shaking** [1] - 19:21
**Shall** [1] - 16:5
**share** [4] - 28:23, 60:16, 64:23, 65:2
**shared** [1] - 65:1
**sharing** [17] - 41:6, 42:21, 43:7, 43:11, 44:16, 46:19, 48:19, 64:21, 64:22, 65:2, 77:2, 77:11, 78:23, 80:25, 81:3, 81:15, 113:8

**short** [3] - 10:6, 13:11, 65:1
**shortcut** [1] - 27:1
**shorthand** [1] - 119:8
**shouting** [1] - 85:4
**show** [3] - 38:1, 67:17, 77:17
**showing** [1] - 114:3
**shows** [2] - 20:24, 49:7
**shriveling** [1] - 24:16
**sic** [1] - 114:13
**side** [3] - 4:7, 42:12
**side-by-side** [1] - 42:12
**sidebar** [2] - 45:11, 48:17
**significant** [1] - 28:17
**significantly** [1] - 57:6
**similar** [3] - 7:24, 12:22, 88:15
**similarly** [2] - 80:5, 91:4
**simple** [2] - 67:18, 89:24
**simpler** [1] - 80:13
**simplistic** [1] - 60:20
**simply** [7] - 10:8, 30:18, 51:10, 96:25, 110:22, 112:25, 115:3
**single** [3] - 17:22, 49:6, 78:6
**sit** [3] - 36:22, 52:22, 60:20
**site** [2] - 53:20, 54:1
**sites** [7] - 42:18, 53:24, 54:4, 82:9, 105:19, 108:21
**sitting** [2] - 22:18, 73:19
**situ** [1] - 28:12
**situation** [3] - 111:2, 111:12, 114:17
**situations** [1] - 109:24
**size** [11] - 29:20, 38:6, 63:15, 65:1, 73:8, 79:12, 79:14, 79:17, 79:25, 105:4
**sized** [1] - 80:6
**skill** [1] - 44:19
**skip** [1] - 72:16
**slice** [1] - 69:5
**slides** [2] - 105:10
**slightly** [3] - 24:13, 27:13, 44:14
**slipped** [1] - 74:16
**small** [4] - 11:25, 28:19, 55:1, 63:7
**smaller** [1] - 37:5

**smashed** [1] - 111:22
**smiley** [4] - 50:2, 71:14, 71:16, 73:20
**society** [1] - 98:24
**socket** [1] - 66:13
**software** [12] - 22:3, 30:20, 40:22, 40:23, 41:15, 42:8, 42:11, 42:15, 42:19, 71:16, 75:10, 80:14
**someone** [11] - 11:4, 13:20, 15:8, 20:10, 20:12, 21:8, 22:18, 25:15, 80:5, 82:10, 97:20
**sometimes** [4] - 25:13, 28:23, 38:25, 54:3
**somewhat** [4] - 50:10, 56:23, 68:3, 101:15
**somewhere** [9] - 19:20, 19:24, 62:15, 71:1, 72:19, 76:4, 77:16, 82:16
**sorry** [19] - 3:17, 9:11, 9:16, 14:3, 17:19, 18:9, 23:16, 26:2, 30:5, 30:10, 34:10, 35:20, 38:17, 44:1, 65:8, 66:3, 75:23, 80:18, 116:15
**sort** [21] - 9:22, 12:5, 34:15, 36:21, 66:12, 88:1, 94:15, 95:7, 96:24, 97:9, 104:16, 105:7, 106:2, 106:9, 106:12, 109:2, 109:9, 109:22, 109:23, 112:16, 115:7
**sound** [3] - 38:2, 80:12, 100:22
**sounded** [1] - 95:4
**sounds** [2] - 46:22, 104:23
**source** [1] - 82:5
**SOUTHERN** [1] - 1:3
**space** [5] - 70:14, 70:19, 90:19, 91:1, 91:12
**speaking** [1] - 56:23
**speaks** [1] - 76:21
**special** [3] - 3:16, 21:23
**Special** [1] - 3:16
**specific** [4] - 27:20, 40:19, 40:22, 97:9
**specifically** [4] - 42:21, 45:22, 52:9, 106:4

**specify** [2] - 52:25, 113:22
**spell** [2] - 4:25, 39:15
**spend** [1] - 105:25
**spent** [2] - 11:18, 93:22
**spoken** [1] - 57:18
**spread** [3] - 8:12, 22:1, 111:23
**spreadsheet** [2] - 32:5, 33:19
**SQL** [3] - 67:9, 67:11, 67:20
**SSK** [1] - 55:4
**SSL** [1] - 66:13
**SSQL** [1] - 71:9
**stadium** [1] - 36:22
**staff** [1] - 55:22
**stage** [1] - 101:21
**stamped** [1] - 53:11
**stand** [4] - 10:19, 85:8, 85:10, 85:16
**standing** [2] - 4:21, 39:11
**stands** [2] - 67:20, 85:16
**Staples** [1] - 94:13
**start** [7] - 8:10, 22:2, 39:22, 54:24, 55:5, 84:10, 109:6
**started** [6] - 26:21, 40:6, 40:9, 41:14, 77:10, 79:4
**starting** [2] - 41:8, 55:6
**starts** [4] - 20:9, 20:13, 54:17, 58:11
**state** [12] - 4:24, 14:11, 29:1, 33:3, 33:21, 33:22, 39:14, 40:16, 42:20, 81:10, 100:22, 100:24
**State** [6] - 40:6, 40:10, 40:18, 41:21, 41:24, 81:11
**statement** [12] - 14:17, 16:16, 16:17, 28:7, 44:20, 45:20, 47:2, 47:4, 53:14, 64:20, 69:21, 70:11
**statements** [2] - 24:23, 119:7
**STATES** [4] - 1:1, 1:5, 1:11, 1:14
**states** [1] - 103:20
**States** [13] - 3:2, 3:13, 44:1, 44:8, 87:5, 87:6, 87:12, 88:4, 99:3, 103:19, 103:20, 119:3

**statistical** [2] - 58:25, 68:5
**statistics** [3] - 56:15, 57:16, 68:13
**statutes** [1] - 76:8
**stay** [4] - 16:5, 16:10, 16:13, 82:23
**steam** [2] - 97:13, 97:23
**steamed** [1] - 96:5
**steaming** [2] - 96:15, 96:16
**stenographically** [1] - 119:5
**STENOTYPE** [1] - 1:25
**step** [4] - 39:6, 39:10, 45:4, 82:21
**Stephanie** [1] - 14:5
**steps** [1] - 117:15
**still** [10] - 6:23, 41:19, 42:2, 64:9, 84:5, 87:19, 87:20, 103:24, 115:23, 117:10
**stop** [4] - 16:6, 59:9, 89:23, 115:2
**storage** [3] - 79:15, 79:17, 80:8
**store** [2] - 80:1, 80:10
**stored** [1] - 112:11
**straight** [3] - 16:7, 30:24, 31:1
**strangers** [1] - 110:22
**stream** [1] - 86:5
**street** [1] - 84:18
**streets** [1] - 98:24
**structure** [2] - 70:13, 70:18
**structured** [1] - 67:21
**Struggle** [8] - 90:11, 98:2, 104:11, 104:15, 108:12, 114:25, 115:12, 115:14
**struggles** [1] - 113:4
**struggling** [3] - 102:15, 102:16, 103:25
**studies** [3] - 14:2, 24:9
**study** [9] - 14:4, 14:8, 16:14, 18:10, 18:13, 19:2, 24:10, 27:8
**stuff** [3] - 87:18, 91:7, 101:7
**sub** [3] - 27:18, 63:17, 64:1
**sub-level** [1] - 27:18
**sub-manifest** [1] -

64:1
**sub-manifests** [1] - 63:17
**subject** [3] - 76:1, 91:6, 102:25
**subjective** [5] - 104:10, 111:1, 113:21, 114:5, 114:18
**subjectively** [1] - 111:16
**submission** [1] - 71:3
**submit** [2] - 81:8, 81:19
**submits** [1] - 115:8
**submitted** [1] - 45:20
**subset** [1] - 33:4
**substantial** [5] - 73:7, 73:8, 94:1, 94:2, 116:24
**substantially** [4] - 9:6, 73:7, 109:19, 110:18
**subtract** [2] - 69:15, 69:17, 69:18
**subtracted** [1] - 69:9
**suggest** [2] - 25:6, 83:10
**suggested** [1] - 108:22
**suggestions** [1] - 109:5
**suitable** [1] - 76:1
**Suite** [3] - 1:16, 1:20, 2:5
**Sun** [5] - 21:20, 22:19, 23:9, 72:14, 78:3
**superiority** [1] - 91:23
**supervision** [11] - 87:22, 95:16, 95:19, 99:23, 100:1, 100:9, 101:2, 103:21, 117:3, 119:9
**supervisor** [2] - 40:15, 41:2
**supplemental** [2] - 106:7, 108:19
**support** [1] - 83:19
**supported** [1] - 83:20
**supporting** [2] - 43:1, 83:17
**suppose** [1] - 26:10
**supposed** [3] - 13:23, 69:22, 100:18
**suppress** [1] - 3:24
**suppression** [1] - 77:12
**Supreme** [8] - 87:3, 87:5, 87:13, 87:18, 90:22, 101:4, 101:5, 114:21

**surely** [1] - 18:3
**surface** [1] - 47:16
**surprised** [1] - 47:9
**surveillance** [5] - 89:4, 92:7, 99:16, 100:22, 100:24
**Surveillance** [5] - 86:25, 87:1, 87:5, 89:13, 101:4
**surveilled** [1] - 84:5
**surveilling** [1] - 103:1
**suspect** [3] - 19:17, 45:13, 76:5
**swap** [2] - 25:14, 25:15
**switching** [2] - 16:3, 16:4
**SWORN** [2] - 4:22, 39:12
**system** [17] - 41:6, 41:10, 42:1, 45:23, 60:4, 75:8, 76:19, 77:3, 78:22, 80:1, 81:8, 81:13, 81:14, 82:17, 92:6, 92:11, 116:22

### T

**table** [2] - 3:15, 67:18
**tails** [1] - 58:19
**takeaway** [1] - 17:22
**tandem** [2] - 44:9, 47:25
**targeted** [2] - 55:24, 88:24
**task** [4] - 81:20, 81:24, 82:3
**Task** [2] - 81:23
**tasked** [1] - 82:4
**tautological** [1] - 95:19
**TCP** [1] - 61:5
**team** [1] - 81:10
**technically** [1] - 94:6
**Technique** [4] - 52:5, 99:25, 100:6, 106:3
**technique** [2] - 41:17, 100:7
**technological** [2] - 104:18, 105:21
**technology** [8] - 23:5, 40:20, 43:7, 84:21, 91:18, 91:23, 94:2, 104:23
**ten** [25] - 36:12, 36:13, 36:14, 36:18, 36:19, 36:20, 36:22, 37:2, 54:3, 56:21, 56:24, 57:1, 57:8, 57:9,

57:10, 57:14, 60:18, 61:19, 61:20, 70:9, 80:11, 81:10, 92:14
**tend** [3] - 44:20, 70:13, 70:18
**tenth** [1] - 57:15
**terabyte** [2] - 79:16, 80:8
**terabytes** [4] - 79:19, 79:21, 80:8, 80:10
**term** [1] - 37:10
**terminal** [2] - 21:2, 26:25
**terminals** [6] - 12:13, 18:9, 18:13, 21:2, 65:23, 66:1
**terms** [1] - 56:20
**terrible** [1] - 58:8
**test** [7] - 12:4, 12:19, 13:23, 28:10, 29:3, 29:10, 29:16
**testified** [9] - 7:23, 13:1, 31:16, 42:14, 42:18, 42:23, 43:21, 62:9, 114:14
**testifying** [1] - 47:4
**testimony** [25] - 4:12, 6:6, 8:13, 13:2, 13:5, 13:10, 13:15, 19:9, 19:16, 28:13, 32:25, 34:23, 35:10, 39:6, 48:6, 48:8, 48:24, 52:24, 53:13, 82:21, 89:16, 92:19, 114:10, 117:13, 119:7
**TESTIMONY** [1] - 118:1
**tests** [3] - 12:11, 12:13, 29:5
**text** [1] - 64:23
**THE** [179] - 1:1, 1:2, 1:10, 1:13, 1:14, 1:18, 2:2, 3:1, 3:4, 3:7, 3:10, 3:17, 3:22, 4:15, 4:20, 4:23, 5:1, 5:6, 5:9, 5:11, 10:12, 16:6, 31:11, 31:12, 31:13, 31:20, 31:21, 31:24, 31:25, 32:2, 32:13, 32:15, 32:17, 32:20, 32:24, 33:8, 33:11, 33:12, 33:23, 33:24, 33:25, 34:7, 34:10, 34:14, 34:15, 34:18, 34:19, 34:21, 34:22, 35:2, 35:4, 35:5, 35:9, 35:15, 35:16, 35:18, 35:19, 35:20, 35:22, 35:25,

36:1, 36:3, 36:4, 36:7, 36:8, 36:10, 36:25, 37:1, 37:9, 37:12, 37:13, 37:16, 37:18, 38:13, 39:5, 39:7, 39:10, 39:13, 39:16, 39:22, 40:1, 40:3, 43:13, 43:15, 44:23, 45:2, 45:7, 45:9, 45:18, 46:2, 46:5, 46:11, 47:10, 47:13, 47:21, 47:24, 48:4, 48:14, 48:18, 48:20, 48:21, 49:10, 49:12, 49:16, 49:20, 54:21, 54:22, 58:5, 58:8, 62:7, 62:12, 62:22, 63:20, 63:22, 79:7, 79:9, 80:17, 82:20, 82:22, 82:23, 83:4, 83:8, 84:8, 84:16, 85:8, 85:12, 85:14, 85:22, 86:2, 86:6, 87:7, 87:11, 88:13, 88:22, 88:25, 89:3, 89:7, 89:23, 90:16, 91:16, 91:21, 92:15, 92:22, 93:10, 93:14, 94:9, 94:24, 95:18, 96:4, 96:7, 96:19, 97:6, 97:15, 97:17, 98:5, 98:16, 98:21, 98:25, 101:8, 101:14, 102:1, 102:21, 103:24, 104:2, 104:12, 106:15, 107:4, 107:14, 108:2, 108:10, 109:11, 111:19, 112:20, 113:17, 115:15, 116:6, 116:9, 117:8, 117:21
**themselves** [7] - 23:24, 53:22, 75:16, 75:18, 90:20, 105:23, 106:14
**theoretically** [1] - 107:1
**theory** [1] - 88:21
**thereafter** [1] - 119:9
**therefore** [1] - 104:18
**thereof** [2] - 45:24, 119:12
**thinking** [2] - 48:13, 95:5
**third** [10] - 84:11, 86:10, 86:15, 86:19, 99:5, 99:7, 105:17, 109:24, 114:23,

115:6
**third-party** [8] - 84:11, 86:10, 86:15, 86:19, 99:5, 99:7, 109:24, 115:6
**thousand** [3] - 63:5, 64:12, 92:25
**thousands** [2] - 63:9, 63:10
**three** [5] - 30:25, 50:17, 70:8, 75:25, 105:1
**throughout** [3] - 54:1, 81:13, 111:5
**throw** [2] - 55:11, 77:13
**thrust** [1] - 86:20
**THURSDAY** [1] - 1:11
**tie** [1] - 76:2
**tied** [1] - 89:14
**Title** [4] - 101:6, 102:7, 102:8, 102:12
**title** [1] - 101:25
**TO** [1] - 118:1
**today** [22] - 4:1, 4:6, 5:5, 10:17, 19:9, 23:12, 29:20, 30:3, 41:10, 42:2, 45:6, 45:15, 45:19, 47:20, 48:24, 64:21, 83:19, 85:15, 89:16, 99:2, 108:17, 116:1
**today's** [2] - 46:1, 98:24
**together** [5] - 46:12, 70:14, 70:19, 85:2, 113:6
**took** [2] - 16:25, 95:5
**tool** [4] - 76:23, 95:12, 99:20, 100:7
**toolbox** [1] - 96:9
**tools** [3] - 33:10, 41:15, 100:19
**top** [5] - 27:17, 35:4, 35:6, 64:1, 72:11
**top-level** [3] - 27:17, 64:1, 72:11
**topology** [1] - 26:16
**total** [2] - 38:20, 63:15
**totality** [1] - 112:22
**totally** [2] - 39:25, 83:22
**touch** [1] - 37:1
**touched** [1] - 68:16
**towards** [1] - 105:3
**town** [1] - 81:16
**trace** [1] - 105:12
**track** [5] - 69:8, 79:1, 100:25
**tracked** [2] - 90:24,

98:4
**tracking** [1] - 52:19
**traffic** [4] - 10:4, 10:5, 30:23, 66:22
**train** [2] - 58:4, 101:16
**trained** [2] - 60:5, 76:24
**training** [7] - 11:23, 13:16, 13:19, 20:22, 40:19, 46:18, 47:14
**Training** [1] - 40:24
**transcribed** [1] - 119:9
**TRANSCRIPT** [1] - 1:10
**transcript** [1] - 119:5
**TRANSCRIPTION** [1] - 1:25
**transcription** [1] - 119:10
**transferred** [1] - 56:11
**transform** [1] - 113:2
**transforms** [1] - 96:12
**transmission** [1] - 57:5
**transmitted** [1] - 102:19
**trap** [2] - 101:21
**trash** [1] - 52:15
**tricky** [1] - 15:4
**tried** [1] - 77:7
**tries** [2] - 58:1, 58:9
**trigger** [1] - 76:18
**triggered** [1] - 113:14
**troopers** [1] - 81:11
**true** [3] - 78:23, 87:19, 119:4
**truly** [1] - 45:14
**trust** [2] - 23:3, 116:8
**trusted** [1] - 22:4
**try** [14] - 12:5, 16:10, 16:13, 16:25, 25:19, 29:8, 44:18, 55:13, 56:3, 66:3, 68:4, 70:16, 80:2, 80:4
**trying** [9] - 15:10, 15:16, 17:21, 21:16, 22:19, 23:4, 23:10, 25:12, 26:1, 26:21, 31:14, 33:4, 34:3, 37:16, 47:13, 68:13, 70:9, 78:22, 92:4, 100:17
**turn** [4] - 41:7, 62:8, 112:16, 113:13
**turned** [1] - 68:3
**turns** [2] - 85:21, 114:22
**two** [26] - 4:10, 7:23, 9:25, 10:2, 12:2, 12:11, 14:2, 20:8,

20:14, 24:9, 29:11, 37:7, 39:24, 40:22, 40:23, 43:20, 43:23, 43:24, 44:16, 50:17, 53:18, 67:13, 76:20, 93:18, 94:19, 101:19
**two-part** [1] - 93:18
**type** [4] - 53:24, 64:23, 80:9, 105:14
**types** [1] - 7:23
**typical** [7] - 20:19, 20:22, 20:23, 84:2, 94:3, 105:4
**typically** [5] - 29:6, 50:8, 64:11, 70:7, 105:15

**U**

**U.S** [3] - 87:6, 87:13, 87:20
**UID** [1] - 17:14
**UIDs** [1] - 15:15
**ultimately** [3] - 40:11, 41:10, 107:8
**UMass** [2] - 47:25, 66:20
**un-trusted** [1] - 22:4
**unchallenged** [1] - 94:18
**unclear** [2] - 19:4, 65:6
**uncomfortable** [1] - 98:8
**unconstitutional** [2] - 96:7, 96:13
**under** [9] - 4:5, 4:7, 76:9, 83:16, 100:8, 102:11, 117:11, 117:14, 119:9
**undercover** [4] - 12:6, 12:10, 77:4, 90:2
**undermine** [1] - 12:9
**understood** [8] - 29:14, 35:10, 66:15, 75:12, 75:17, 76:13, 94:17, 95:9
**undertake** [1] - 103:21
**underwriting** [1] - 76:12
**unfair** [1] - 69:17
**unique** [24] - 15:13, 15:17, 15:20, 16:14, 17:1, 17:5, 17:14, 18:10, 18:14, 19:2, 24:11, 24:14, 32:14, 32:18, 34:4, 34:16, 34:19, 35:16, 35:23, 36:5, 37:10, 37:15, 51:17, 54:19

**uniquely** [1] - 51:17
**unit** [4] - 40:12, 40:15, 40:19, 41:2
**United** [13] - 3:2, 3:13, 44:1, 44:8, 87:5, 87:6, 87:12, 88:4, 99:3, 103:19, 103:20, 119:3
**UNITED** [4] - 1:1, 1:5, 1:11, 1:14
**units** [1] - 14:12
**universe** [3] - 39:2, 46:19, 94:10
**university** [5] - 11:10, 11:11, 11:13, 60:10, 68:6
**University** [4] - 41:12, 42:13, 56:14, 75:11
**unknowingly** [2] - 22:4, 22:6
**unless** [4] - 22:21, 53:10, 73:25, 95:20
**unsupervised** [1] - 95:23
**unwillingly** [1] - 22:4
**up** [62] - 3:23, 4:20, 7:8, 8:13, 8:14, 8:16, 9:19, 13:22, 16:16, 18:6, 19:13, 20:9, 20:13, 21:17, 21:22, 22:2, 33:1, 34:12, 34:20, 36:2, 36:19, 37:20, 38:13, 39:10, 39:25, 40:11, 45:3, 50:10, 50:24, 51:5, 51:19, 55:16, 57:1, 57:9, 62:7, 63:10, 63:16, 64:5, 70:1, 74:13, 75:4, 77:17, 78:14, 85:8, 85:10, 85:16, 86:5, 91:22, 95:6, 95:14, 101:22, 101:23, 102:10, 102:25, 104:18, 105:11, 109:11, 111:22, 113:11, 116:23
**uploaders** [1] - 38:3
**upper** [1] - 39:3
**urgency** [1] - 78:10
**user** [24] - 6:18, 50:1, 50:2, 50:5, 50:6, 52:3, 52:9, 52:12, 52:21, 54:10, 62:18, 72:7, 72:10, 82:11, 91:4, 94:3, 103:11, 105:9, 105:22, 112:6, 112:7, 113:16, 113:25
**users** [22] - 5:22, 6:3,

6:11, 7:4, 7:20, 15:25, 52:19, 52:20, 53:3, 53:21, 64:23, 82:8, 103:10, 107:1, 108:8, 108:23, 109:10, 110:21, 110:23, 111:13, 112:4, 114:16

### V

**vaccinated** [2] - 39:23, 40:1
**value** [11] - 51:11, 53:8, 55:17, 62:3, 67:13, 67:17, 70:3, 75:18, 76:7, 84:20, 85:22
**values** [9] - 51:11, 54:19, 66:25, 67:1, 67:4, 75:19, 105:21, 112:10, 114:2
**variety** [1] - 12:17
**various** [1] - 101:20
**version** [2] - 90:8, 106:20
**versus** [3] - 15:11, 37:15, 46:16
**via** [3] - 15:8, 53:19, 99:15
**video** [1] - 64:23
**view** [5] - 49:7, 76:7, 84:24, 90:21, 90:25
**viewed** [1] - 102:17
**violates** [1] - 76:7
**violation** [17] - 4:3, 88:3, 88:7, 88:9, 88:11, 90:19, 101:10, 104:4, 104:13, 106:10, 107:23, 107:25, 109:4, 109:8, 109:14, 112:2, 117:6
**virtual** [4] - 9:1, 15:18, 33:16, 36:17
**virtue** [1] - 111:22
**visit** [1] - 16:20
**voice** [1] - 63:21
**voir** [5] - 5:7, 43:13, 46:11, 46:25, 118:9
**VOIR** [1] - 43:16
**voluntarily** [1] - 114:22
**VPN** [2] - 66:12, 66:13
**vs** [7] - 3:13, 44:1, 44:8, 87:5, 87:12, 88:4, 99:3

### W

**wading** [1] - 48:6
**wait** [1] - 115:24
**walk** [3] - 49:22, 98:3, 108:16
**Walker** [1] - 1:20
**walking** [1] - 84:23
**wants** [2] - 50:2, 70:1
**warning** [2] - 111:9, 111:14
**warnings** [2] - 111:5, 113:22
**warns** [1] - 114:16
**warrant** [9] - 4:5, 83:18, 88:10, 103:21, 104:5, 114:9, 115:17, 115:23, 116:1
**warrants** [2] - 70:8, 114:11
**watching** [1] - 93:17
**ways** [3] - 33:5, 80:25, 81:1
**weaker** [1] - 93:13
**web** [1] - 53:4
**website** [3] - 54:5, 97:19, 112:10
**websites** [1] - 97:10
**week** [3] - 14:9, 14:13, 72:18
**welcome** [2] - 5:9, 48:18
**wheelhouse** [1] - 46:24
**whole** [11] - 11:25, 50:10, 61:7, 64:12, 73:1, 78:14, 79:2, 86:15, 87:16, 92:6, 98:10
**wholly** [1] - 22:20
**wide** [1] - 97:20
**wiretap** [4] - 101:10, 101:20, 104:13, 106:10
**wish** [1] - 16:16
**withdrawing** [1] - 93:12
**witness** [14] - 4:18, 4:21, 39:10, 43:10, 46:3, 46:4, 49:19, 72:13, 92:20, 94:7, 94:9, 94:17, 97:3, 97:6
**WITNESS** [38] - 4:22, 5:1, 5:11, 31:12, 31:20, 31:24, 32:2, 32:15, 32:20, 33:8, 33:12, 33:24, 34:7, 34:14, 34:18, 34:21,

35:2, 35:5, 35:15, 35:18, 35:20, 35:25, 36:3, 36:7, 36:10, 37:1, 37:12, 37:16, 39:7, 39:12, 39:16, 40:1, 48:20, 54:22, 58:8, 62:12, 63:22, 82:22
**WITNESSES** [1] - 118:3
**witnesses** [4] - 4:11, 83:19, 89:25, 119:7
**woman** [1] - 14:5
**word** [4] - 16:11, 16:13, 83:12, 94:15
**words** [4] - 14:12, 16:3, 16:4, 88:14
**works** [14] - 11:4, 11:8, 11:9, 11:11, 13:23, 23:5, 28:25, 42:13, 46:17, 47:22, 47:25, 60:1, 103:16
**world** [7] - 28:20, 61:7, 90:25, 95:25, 104:16, 108:17, 108:21
**worry** [1] - 101:24
**write** [5] - 51:13, 66:19, 67:11, 71:13, 75:10
**writing** [1] - 55:14
**written** [5] - 51:14, 53:12, 56:13, 69:7, 117:15
**wrote** [5] - 16:17, 50:25, 68:6, 70:7, 81:21

### X

**X-ray** [1] - 116:20
**Xinis** [1] - 3:3
**XINIS** [1] - 1:10

### Y

**year** [2] - 34:24, 43:21
**years** [5] - 54:1, 54:4, 77:12, 80:11, 92:14
**yellow** [4] - 50:2, 50:13, 72:7, 73:20
**YO** [1] - 54:3
**yourself** [3] - 11:16, 13:6, 91:9

### Z

**ZED** [1] - 1:8
**Zed** [1] - 3:13
**zero** [1] - 62:19