```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                        SOUTHERN DIVISION

 3
     UNITED STATES OF AMERICA,          )
 4                                      )
              Plaintiff,                )
 5                                      ) Case Number: 8:19-cr-0348-PX
              vs.                       )
 6                                      )
     ALAKOM-ZED CRAYNE POBRE,           )
 7                                      )
              Defendant.                )
 8

 9         TRANSCRIPT OF PROCEEDINGS - MOTIONS HEARING
                BEFORE THE HONORABLE PAULA XINIS
10                 UNITED STATES DISTRICT JUDGE
             FRIDAY, OCTOBER 8, 2021; 10:00 A.M.
11                     GREENBELT, MARYLAND

12                 A P P E A R A N C E S

13
     FOR THE PLAINTIFF:
14
         OFFICE OF THE UNITED STATES ATTORNEY
15            BY:  DAVID SALEM, ESQUIRE
              BY:  DWIGHT JOHN DRAUGHON, JR., ESQUIRE
16            6406 IVY LANE, SUITE 800
              GREENBELT, MARYLAND 20770
17            (301) 344-4237
              (301) 344-0863
18

19        ***Proceedings Recorded by Mechanical Stenography***
          Transcript Produced By Computer-Aided Transcription
20     _____

21              MARLENE KERR, RPR, RMR, CRR, FCRR
                FEDERAL OFFICIAL COURT REPORTER
22               6500 CHERRYWOOD LANE, STE 200
                 GREENBELT, MARYLAND 20770
23                     (301)344-3499

24

25
```

1          THE COURT:  Good afternoon.

2          THE COURTROOM DEPUTY:  Please remain standing and

3    raise your right hand.

4          THE WITNESS:  Yes, ma'am.

5       (Witness complied.)

6          THE COURTROOM DEPUTY:  You do solemnly promise or

7    affirm, under the penalties of perjury, that the information

8    you're about to give to the Court, in the matter now pending

9    before it, shall be the truth, the whole truth, and nothing but

10   the truth?

11         THE WITNESS:  I do.

12         THE COURTROOM DEPUTY:  Thank you.  Please be seated.

13         THE WITNESS:  Thank you.

14      (The Witness is Sworn.)

15         THE COURTROOM DEPUTY:  Please speak loudly and

16   clearly into the microphone.  Please state your first and last

17   name for the record and please spell your first and last name.

18         THE WITNESS:  Corporal Cory -- can I take my mask

19   off?

20         THE COURT:  Yes, please do.

21         THE WITNESS:  All right, thank you.

22      Corporal Cory Mills, C-o-r-y, M-i-l-l-s.

23

24

25

```
 1              CORY MILLS, GOVERNMENT'S WITNESS, SWORN

 2                         DIRECT EXAMINATION

 3   BY MR. DRAUGHON:

 4   Q.    Hello, sir.  Are you currently employed?

 5   A.    Yes, sir.

 6   Q.    By whom are you employed?

 7   A.    The Maryland State Police.

 8   Q.    And what is your role with the Maryland State Police?

 9   A.    I'm currently assigned as a Corporal in the Maryland State

10   Police Computer Crime Section.

11   Q.    And you said "currently."  What was your role in 2018?

12   A.    My role at that time was a Trooper First Class with the

13   Maryland State Police Computer Crime Section.

14   Q.    And what were your duties in your role as Trooper First

15   Class in 2018?

16   A.    My primary focus was to be an investigator with the

17   Computer Crime Section investigating primarily cases with

18   Internet Crimes Against Children.

19   Q.    And what platforms would those Internet Crimes Against

20   Children be typically located on?

21   A.    We would receive reactive cases from the National Center

22   for Missing and Exploited Children via what we refer to as

23   cyber tips, as well as conducting proactive cases, which in

24   this case is a Freenet case or other peer-to-peer programs.

25   Q.    Can you generally explain what your experience of
```

1    peer-to-peer programs is?

2    A.    I've been trained in GigaTribe, BitTorrent, as well as

3    Freenet.

4    Q.    Have you received certification in ICAC Freenet

5    investigations?

6    A.    Yes, I have.

7    Q.    I'm going to now show you Government Exhibit 5.  Do you

8    recognize Government Exhibit 5?

9    A.    Yes, I do.

10   Q.    Can you tell the Court what Government Exhibit 5 is?

11   A.    This is my certification of training for ICAC Freenet

12   investigations that I received after attending the course

13   February 26th through the 27th of 2018.

14   Q.    And we're going to talk more about this particular case in

15   a bit, but was the search warrant executed in August of 2018?

16   A.    Let me just confirm, look at my report.  Tuesday,

17   August 14, 2018, yes; that's correct.

18   Q.    You mentioned doing investigations on peer-to-peer

19   programs, including Freenet.  Do you use any tools when you are

20   conducting your Freenet investigations?

21   A.    Yes, I do; law enforcement tools.

22   Q.    And generally speaking, what is that law enforcement tool?

23   A.    In this case, it was the Freenet application for the law

24   enforcement, Freenet law enforcement.  That's not what it's

25   referred to I don't think.  What my program is shown as is

1   Freenet, but it's referred to as Freenet Roundup.

2   Q.    And what is your understanding of what Freenet is?

3   A.    From my understanding, what I received in the training,

4   which I don't have any knowledge other than, is that Freenet is

5   a peer-to-peer program that is web-based allowing for the

6   access of -- the distribution and sharing of files.

7   Q.    Why do you do investigations on Freenet?

8   A.    As part of my task with the Maryland Computer Crimes --

9   Maryland State Police Computer Crime Section with the Internet

10   Crimes Against Children Task Force, I was designated to

11   investigate Internet Crimes Against Children, and that is why I

12   utilize Freenet.

13   Q.    And when you are conducting your investigation using the

14   law enforcement tool for Freenet, what are you doing?

15   A.    Honestly, nothing.  I have the -- well, not nothing, but I

16   have the computer running.  I have the program running on my

17   computer, but I do nothing else.

18   Q.    Now, you mentioned that the law enforcement tool -- and I

19   believe you had a name for it.  Can you briefly describe what

20   it is; that is, is it a website?  Is it an algorithm?  Like,

21   when you say law enforcement tool, what are you referring to?

22   A.    So there's two parts.  Are you referring -- so the actual

23   Freenet law enforcement I have, the law enforcement tool of

24   Freenet, it's just an application that accesses Freenet, as

25   well as I believe -- I just allow that to run and log

1  information that it receives.

2      I use another law enforcement tool that gives me Freenet

3  investigative leads.

4  Q.   And I'm going to jump ahead of you because I think what

5  you're talking about -- and I want to get clarification.   Are

6  you familiar with Freenet nodes?

7  A.   Yes, I am.

8  Q.   Do you have any experience of operating a Freenet node?

9  A.   To my knowledge, yes.   The Freenet -- my Freenet

10  application makes my computer a Freenet node.

11  Q.   So you just described two different law enforcement tools.

12  Was the first one -- were you referring to the Freenet node?

13  A.   No.   The Freenet application, which would be -- I believe

14  in the past it has been referred to as Freenet Roundup.   That

15  is the law enforcement tool.   But on my computer it is only

16  displayed as Freenet.

17      There is also another law enforcement tool that I access

18  that's designated for Internet Crimes Against Children

19  investigations.

20          THE COURT:   Can we get a shorthand for both of those?

21  So Freenet Roundup is the application that allows you to be a

22  node on Freenet?

23          THE WITNESS:   Yes, Your Honor.

24          THE COURT:   Okay.   And then can you give me a

25  shorthand for the other program regarding investigative leads

1  so I know what you're talking about?  You know,

2  differentiation.

3            THE WITNESS:  Would you like a -- it's a law

4  enforcement database.  It's ICAC Cops.

5            THE COURT:  Okay.  So did you say ICAC?

6            THE WITNESS:  Yes, ma'am.

7            THE COURT:  I-C-A-C?

8            THE WITNESS:  I-C-A-C, C-o-p-s.

9            THE COURT:  ICAC Cops.

10           THE WITNESS:  Yes, ma'am.

11           THE COURT:  Okay.  Got it.  Thank you.

12  BY MR. DRAUGHON:

13  Q.   And just to make sure we're all tracking, if we refer to

14  Freenet Roundup, we're talking about what you would use as a

15  node.  And when we're talking about ICAC Cops, we're talking

16  about what you would use to identify IP addresses?

17  A.   That is correct.

18  Q.   Now, focusing on ICAC Cops, when you obtain information

19  from ICAC Cops, what are you doing with that?

20  A.   What I'm doing is logging into my account.  Given that

21  I've been trained in Freenet, it will allow me to have -- I

22  would refer to it as a tab to access Freenet investigative

23  leads.  And when I click on that Freenet -- when I click on the

24  Freenet tab, it prompts to show IP addresses and the activity

25  that has been observed by law enforcement nodes on the Freenet

1 network.

2 Q.    So once you get the IP addresses and can see some of the

3 activity -- actually, let me back up.

4       When you say "activity," what are you referring to?

5 A.    Whenever you -- what it's showing -- the main things that

6 it shows are the IP address, and it shows a file name of a file

7 that is reasonably believed to be child pornography that was

8 requested.

9 Q.    Now, when you get the IP address and the file name, what

10 do you do next?

11 A.    What I would do next is you click on the file name that is

12 displayed.  The ability to do the investigations has changed,

13 but when I click on the file name, it would show me the

14 manifest key that was used to download that file.  I would then

15 take the manifest key, place it into my Freenet application to

16 download, and that could take some time, varying times.  There

17 has been times that it can be done very quickly and then other

18 times you would have to wait for it to download.

19       But then after the file is downloaded, then you access it

20 and then I would confirm if it is child pornography, which,

21 generally, yes.  I would confirm that it is child pornography,

22 and if it is child pornography, I would then begin a criminal

23 investigation.

24 Q.    Now, let's assume that you confirm that it is child sexual

25 abuse material.  What do you do next?

1  A.   For the -- there's another tool called the Freenet Target

2  Summary.  That is basically a Google Excel -- or an Excel

3  Spreadsheet, and I would -- it basically analyzes the data that

4  has been logged by ICAC -- on ICAC Cops.  I take that data and

5  put it into -- so say there is -- I need three, three files of

6  interests, FOIs.  You need three files of interest, and then

7  for each separate one I would put FOI 1, FOI 2, FOI 3, put

8  those in each tab, analyze the data, and make sure that it

9  passes.

10      And then as long as all three pass, then I would begin to

11  investigate the IP further, like sending off a subpoena to

12  locate for the date and times of the request of who is in

13  possession of that IP address at that time.

14  Q.   So, sir, you said that you analyze the data.  Are you

15  using mathematical formulas?  What do you mean when you say

16  you're analyzing it?

17  A.   No, I'm not.  I'm taking the data that has been provided

18  to ICAC Cops, putting it into the Excel Spreadsheet deemed to

19  be the Freenet Target Summary, and clicking -- I believe the

20  button is analyze data.  It analyzes the data that I took from

21  ICAC Cops by copying it off of ICAC Cops and pasting it into

22  the Excel Spreadsheet.

23  Q.   So it sounds like, and correct me if I'm wrong, that the

24  spreadsheet is doing the analyzation of the data?

25  A.   That's correct.

1  Q.   And so what are you looking at after -- after you plug in

2  the information and the spreadsheet does what it does, what are

3  you looking for?

4  A.   I'm looking for the spreadsheet to show that the data that

5  was placed into the spreadsheet passed the mathematical

6  equations that have been incorporated into the analysis that I

7  click for analyze data and just ensuring that it passes and

8  that it passes all three times for all three files that I've

9  placed into the sheet.

10 Q.   You mentioned earlier that you need three.  Why do you

11 need three?

12 A.   That's what I was trained.  I was trained that I need

13 three, and what I was explained is that it is to show that it

14 is not an isolated incident; that it is to basically assist in

15 providing that the data is sound and correct.

16 Q.   And just so we're clear, what three items, things, are you

17 referring to?

18 A.   What's referred to in my police report.  Is that what

19 you're asking?

20 Q.   No, no.  Not anything in particular to this case, but

21 generally, when you say you need three, three files?  Three

22 addresses?  What three things do you need?

23 A.   Oh, I apologize.  Three files of interest, which I would

24 confirm to be child pornography.

25 Q.   So after you determine that you have at least three files

1  that you've confirmed to be child pornography, and it sounds

2  like you have the IP address, what are you doing next?

3  A.   After I get that all three have passed from the Target

4  Freenet Summary, I would create like a -- there is a way to

5  finalize the Freenet Target Summary and create it into a PDF to

6  keep the information.  Using the information, I would then send

7  a subpoena for the IP address to obtain who and where was in

8  possession of the IP at the time of the request.

9  Q.   So if you have -- and I'm still speaking generally.  If

10  you have several files that you've confirmed to have CSAM and

11  you've associated with one IP address, can you then run a

12  search to see what other files that IP address has requested?

13  A.   Yes.  There could be more but -- and, I mean, there could

14  be less but I don't -- you need three.  So if there's not three

15  or more, you can't go further with the investigation.

16  Q.   And any sort of additional searches you would do would be

17  on ICAC Cops?

18  A.   That's correct.

19  Q.   Are you able to search for materials -- or let me restate.

20        Are you able to search for requests that were made to

21  Freenet users that were not law enforcement nodes?

22  A.   No, I cannot.

23  Q.   Speaking of law enforcement nodes, you said you had

24  experience as a node yourself, right?

25  A.   That's correct.

1  Q.   And what do you do as a law enforcement -- and I want

2  to -- Your Honor has made it clear to me that terminology is

3  important.  You're not the law enforcement node; the system

4  that you are running is the law enforcement node.   Right?

5  A.   I apologize if I caused any confusion.  That is correct.

6  The application, like the program running is the Freenet node,

7  not myself.

8  Q.   As the law enforcement officer who has custody of the law

9  enforcement node, what do you do with that node?

10  A.   I simply have the program downloaded to my undercover

11  computer.  I allow that to run just simply so that it can

12  receive requests on the Freenet network.  I do not do anything

13  further with it except for download files to confirm that it is

14  child pornography or not.

15  Q.   As the law enforcement officer working with the law

16  enforcement node, do you monitor what particular IP addresses

17  outside of your contacts would be in touch with your node or

18  anything else?

19  A.   No, I do not.

20  Q.   Now, I would like to direct your attention to the Pobre

21  investigation in particular.  How did his IP address first come

22  to your attention?

23  A.   I believe -- if I could refer back to my police report,

24  just for accuracy -- that I -- I would access the ICAC Cops, go

25  to the Freenet tab, and observed that IP address 71.246.207.59

1  had been logged as requesting files of child -- or files of

2  suspected child pornography.

3  Q.   And once you saw that information on ICAC Cops, what did

4  you do for this investigation?

5  A.   I clicked on the requested files and then was provided the

6  manifest keys, which would be for the file names that are

7  described in my police report for each instance.  I would

8  download those files, confirm them to meet the criteria for

9  CSAM, child pornography in the State of Maryland, which

10 prompted me to conduct a criminal investigation.

11 Q.   And what did you do with the information you retrieved

12 from ICAC Cops?

13 A.   What I explained was that I used the manifest key, that I

14 would go to -- so now that I have these threes files, I have

15 three tabs on my computer.  So I would go, for File of Interest

16 1, I would click -- at the time -- it has since changed.  At

17 that time, I would hit Control A to copy everything from what

18 is displayed as the Freenet investigative lead for that file.

19 Then I would go and I believe you hit -- it was paste or import

20 the data into the Target Freenet Summary.  And I did that for

21 all three files.  Click analyze data to ensure that all three

22 were checked, all three passed the Freenet Target Summary, and

23 then I sent a subpoena for the request, the date and request

24 times.

25 Q.   I'll now direct your attention to Government Exhibit

1  No. 3.  Do you recognize what's if front of you now?

2  A.   Yes.

3  Q.   I want to direct your attention on this exhibit to -- I

4  want to point you to multiple things, but you see in the first

5  block on the top left it says IP.  Do you see what I'm

6  referring to?

7  A.   Yes, 71.246.

8  Q.   And what IP addresses is that?

9  A.   That is -- I'm just confirming from my police report.

10  That is the investigative -- the IP address that I was

11  investigating for this case.

12  Q.   And did you eventually determine the geographical location

13  associated with that IP address?

14  A.   That is correct.

15  Q.   And whose residence was associated with that IP address?

16  A.   Mr. Pobre's, the defendant seated to my right here.

17  Q.   Now, I want to direct you to look under -- so you see

18  where it says Date/Time, Port, Type, and there are several

19  columns.  The information under that, where does that come

20  from?

21  A.   That's populated from ICAC Cops.

22  Q.   So when you mentioned that you take information from ICAC

23  Cops and do Control A and then you paste it, are you referring

24  to this information?

25  A.   Yes, sir, that's correct.

1  Q.   And once you do that, do you get the data points that are

2  in here?  So, for example, total time span, total unique

3  requests, does that generate automatically from the

4  spreadsheet?

5  A.   Yes, that's correct.

6  Q.   I want to now direct you to Government Exhibit 4.  Do you

7  recognize this file?

8  A.   Just confirming.  Yes, this is my Freenet Target Summary

9  that I would attach to my case file.

10  Q.   I'm going to take a moment to --

11          THE COURT:  Before you get into the guts of it, is

12  this from ICAC Cops?

13          THE WITNESS:  No, Your Honor.  This is the Excel

14  Spreadsheet that I was talking about.

15          THE COURT:  Okay.

16          THE WITNESS:  It has been formatted now into a PDF

17  after I've received -- at the bottom left of the first block --

18  well, it says Target Freenet Summary and then three of IP

19  address.  At the bottom here where it says pass, that's

20  primarily the data that I'm looking at.

21          THE COURT:  Which you get from ICAC Cops?

22          THE WITNESS:  Yes.  After the data is collected and

23  it passes --

24          THE COURT:  Got it.

25          THE WITNESS:  After its run through --

1              THE COURT:  Then you put it in this spreadsheet?

2              THE WITNESS:  Yes, Your Honor.  That's correct.

3              THE COURT:  Thank you very much.

4              THE WITNESS:  Yes, Your Honor.

5    BY MR. DRAUGHON:

6    Q.   What we're looking at on the Freenet Target Summary, is

7    this information that you retrieved from ICAC Cops, or is it

8    the information after the spreadsheet has processed?

9    A.   This would be after the process.  After I've clicked

10   analyze data, this is what I see afterwards.

11   Q.   I'm going to just briefly click through so you can see

12   each page.  So this is page 1 of Government Exhibit 4.  This is

13   page 2, and this is page 3.  Do you recall how many files of

14   interest were included in the Freenet Target Summary?

15   A.   Three.

16   Q.   And how many of them passed?

17   A.   All three passed.

18              MR. DRAUGHON:  Your Honor, I'm actually going to

19   transition to the execution of the search warrant.  I just

20   wanted to pause in case Your Honor had any follow-up questions.

21              THE COURT:  I guess does counsel want to, perhaps,

22   break this up?  Because we have two attorneys handling

23   different matters, that we do the Freenet part first and then

24   we move on to the statements?  Do you want to do it that way?

25              MR. ROBBINS:  It's probably cleaner, and it probably

 1  helps the government as well.  I think that would work, Your

 2  Honor.

 3              THE COURT:  That's fine.  That way we have only one

 4  attorney up for cross.  That would be helpful.

 5              MR. DRAUGHON:  I guess I'll say I have no further

 6  questions for this --

 7              THE COURT:  For this chapter, right, for

 8  Freenet-related information.  And then we'll move on to

 9  statements.

10              MR. DRAUGHON:  Got it.

11              THE COURT:  Okay.

12                        CROSS-EXAMINATION

13  BY MR. ROBBINS:

14  Q.   Your experience with Freenet, I think you said, is limited

15  to the course that you took and then the work you've done since

16  then?

17  A.   Yes.  Yes, sir.  I was going to say -- you caught me.  I

18  would have had to add "and investigating" as well, but being

19  trained and investigating.

20  Q.   And did you ever do any independent work on Freenet as, I

21  don't know, college work or anywhere else like that where you

22  just experimented with how it works?

23  A.   No, sir.  I had never heard of it before my assignment.

24  Q.   Gotcha.

25       You have a number of statements in your affidavit about

1   Freenet.  Would it be fair to gather that those statements come

2   from your training when you categorize what Freenet is?

3   A.    If you could be specific, sir?

4   Q.    Sure.

5   A.    I can go to my search warrant if you don't mind.

6   Q.    Sure.  I think it's on page 2 of your warrant.

7   A.    Page 2?

8           THE WITNESS:  As long as it's okay, Your Honor, I

9   have my copies here as well.

10          THE COURT:  Sure.  I don't have a problem with it.

11  Counsel, any issues?  The witness has very politely asked if he

12  could review his files that he brought.

13          MR. ROBBINS:  I think that's perfect.

14          THE COURT:  Okay.

15          MR. ROBBINS:  I apologize.

16          THE WITNESS:  No, no, thank you.

17  BY MR. ROBBINS:

18  Q.    Sir, I'm sorry.  Page 9, it starts at the bottom, Freenet

19  peer-to-peer network.

20  A.    Yes, sir.  Just to confirm, is it this part right here?

21  Q.    You're testing my eyes.  Yes, sir, that's it.

22  A.    Yes, sir.  I just wanted to confirm.  Thank you.

23  Q.    Yep.  You make a number of statements about the Freenet

24  under that section of your application.

25  A.    Yes, sir.  That's the information that I've been provided

1  through my training.

2  Q.    So this isn't independent conclusions on your part; this

3  came from some standardized training?

4  A.    That's correct.

5  Q.    The nature of Freenet being a peer-to-peer platform

6  intended for censorship resistance, secure and anonymous

7  communications?

8  A.    That is correct.

9  Q.    All right.

10       And that Freenet software -- going to the next page --

11  retrieves manifests using a list of keys to request from other

12  users a block needed to recreate a file?  About four lines in

13  on page 10 there.

14  A.    Yes, sir.  That's correct.

15  Q.    And that law enforcement Freenet nodes record requests

16  that are sent to them, and they are compared against known keys

17  to identify child pornography being downloaded?

18  A.    That is correct; sir, yes.

19  Q.    All right.

20       So this is basically a summary of what you learned in your

21  two days of training on Freenet?

22  A.    Yes, sir.

23  Q.    All right.  And that is, as far as you know, absolutely

24  accurate?

25  A.    As far as I know, yes, sir.  That's correct.

1   Q.   So you have -- you go to the training.  Do they give you

2 any manuals while you're there?

3   A.   They have provided a manual, yes, sir; that's correct.

4   Q.   And you said -- did they give you the software to set up a

5 node?

6   A.   Yes, sir; that's correct.  It came on a thumb drive.

7   Q.   All right.

8   A.   Yes, sir.

9   Q.   That was my guess before.  So they give you a thumb drive?

10   A.   Yes, sir.

11   Q.   You bring that back, and you have some terminal back at

12 your primary duty station where you're going to plug that thumb

13 drive in and that probably -- that ruins the terminal from any

14 other use?  Or can you use it for other things?

15   A.   I apologize.  By terminal, I'm sorry, what do you mean by

16 terminal?  I apologize.

17   Q.   You said that you had a computer that you use to run as a

18 law enforcement node.  Is that computer used for anything other

19 than being a law enforcement node in Freenet?

20   A.   Yes, that's my -- it's my undercover computer.

21   Q.   What does that mean?  What is an undercover computer?

22 It's not like a car.

23   A.   Oh, so that's the computer that I utilize to run

24 peer-to-peer file sharing programs, such as BitTorrent.  That's

25 the other program I have.  I have GigaTribe.  I don't use that.

1    I use primarily Freenet and BitTorrent.

2        As well as that's the computer that I utilize when I

3    receive a cyber tip from the National Center for Missing and

4    Exploited Children.  I review my cyber tips on that undercover

5    computer.  I refer to it as an undercover computer.  That's the

6    terminology we have used in the ICAC or in the Maryland ICAC.

7    Q.    And that term, does that mean anything beyond the fact

8    that it says Maryland.gov and its address?  I mean, what makes

9    it an undercover computer?

10   A.    The reason I refer to it as -- it basically doesn't have

11   some of the restrictions that -- like a Maryland -- like say I

12   received a computer from the Maryland State Police.  The

13   computer has less restrictions so that we can access the

14   Internet more freely.

15   Q.    You couldn't have done the downloads in this case if you

16   were on a state computer?

17   A.    I highly doubt it.  I wouldn't want to go on record saying

18   yes or no.  I find it highly --

19   Q.    I understand that.

20   A.    I find it highly improbable.

21   Q.    I do, too.

22       All right.  So the fact that it's an undercover computer

23   really just means that it's not a standard state computer?

24   A.    That's correct, sir.  It's much better than what we would

25   receive from our IT department.

1   Q.   You've described a number of tools, but it sounds like

2   your interface with the tools is not very in-depth.  You don't

3   have to do a lot to make these tools work?

4   A.   They have been simplified for law enforcement.

5   Q.   So you haven't really become a programmer in any way or

6   anything like that?

7   A.   I could go on the record, not close, sir, no.

8   Q.   All right.  So I'll probably end up asking you a bunch of

9   questions in which you're going to say you don't know, but I'm

10  going to ask them anyway.

11       But for starters, when your terminal is running, it's just

12  sitting out there on the Freenet like any other node, right?

13  It's not telling the rest of the Freenet that it's anything

14  special?

15  A.   Not to my knowledge, no.  Not what I've been trained in,

16  no, it's not, sir.

17  Q.   And all it does is it records all of the block requests

18  that come to it?

19  A.   That it logs.  It logs requests that it receives.

20  Q.   So it receives a request and it logs that.  It just says

21  somebody asked for this block and they had this IP address and

22  they had that many neighbors, yada, yada, ya.  And then -- is

23  that the first step?

24  A.   Well, I would just note that it doesn't tell me that it's

25  logged any information.  I don't have any -- I don't know what

1   it is logging.

2   Q.   It's invisible until -- but it gets some chunk of data and

3   then that data has to be compared somewhere against the known

4   and identified blocks that are related to CSAM.   Right?

5   A.   I believe so.

6   Q.   Do you know where that gets compared?

7   A.   Not to my -- to be quite honest, no.   Through ICAC Cops

8   but, no, I do not know.

9   Q.   Somewhere far away?

10  A.   Yes, sir.

11  Q.   Do you know where the four terminals were that were

12  involved in this case?

13  A.   No, I do not, sir.

14  Q.   Okay.   Do you know how long data gets held before it can

15  be run against the database of suspect blocks?

16  A.   No, I do not, sir.

17  Q.   Do you know how big the Datastore was on your LE node?

18  A.   No, I do not, sir.

19  Q.   Do you know how many LE nodes exist in Maryland?

20  A.   No, I do not, sir.

21  Q.   So you don't know how many exist in the country either?

22  A.   No, sir.   That's a -- no.

23  Q.   All right.   Do you know if they're all set up in the same

24  operational node?

25  A.   If they received the same training as I did, I would

1   assume the same as mine, but I do not know.  I can't attest to

2   what other people's is set up as.

3   Q.    Do you know whether yours was set up as either open or

4   normal?

5   A.    I do not recall.

6   Q.    Do you know if your computer -- your Freenet node had any

7   nodes identified as friend nodes?

8   A.    Not to my knowledge.

9   Q.    Do you know what a friend node is?

10  A.    No, I do not.

11  Q.    Do you know what kind of a computer is run for that

12  central data coordinator?

13  A.    No, I do not.

14  Q.    Do you know where?

15  A.    No, I do not.

16  Q.    Does your computer upload continuously, or do you have to

17  take it down on some periodic schedule?

18  A.    Could you repeat the question?  I apologize.

19  Q.    Sure.  Your computer is sitting in the stream of data out

20  there in Freenet and it's taking in all the things that are

21  sent to it and it's having them compared against the database

22  somewhere.  That uploads reports to ICAC?  Am I saying that

23  right, ICAC?

24  A.    I believe -- I don't know necessarily where.  I just know

25  it's provided -- it's collected from my node and --

1  Q.   And sent somewhere?

2  A.   Yes, and I'm able to access it through ICAC Cops.

3  Q.   Okay.  When that data gets sent off, do you know if that

4  happens continuously, or does your assignment include taking

5  your computer offline periodically for one reason or another?

6  A.   I know I do not take it off for any particular reason, but

7  I have lost power before.  It's been shut down and I have to

8  restart it, but it doesn't get shut down to send anything or it

9  doesn't have to be -- I do no periodic, like, checks or

10 anything.

11 Q.   So do you know what that means with respect to your

12 Freenet IP address, whether it's static or changes?

13 A.   No, I do not.

14 Q.   If you didn't go to the training and set up a law

15 enforcement node yourself, would you be eligible to get those

16 reports?

17 A.   Are you asking -- do you mean like the logs that go in

18 ICAC Cops?

19 Q.   Yes.

20 A.   No.  You actually have to receive the training, at least

21 that's the way it was whenever I received it.  I don't know

22 about other ICAC investigators.  I did not have access to the

23 Freenet tab until I received the training.  I believe like a

24 license was generated allowing me access.

25 Q.   I think we might have seen it.  Okay.

1    In that Freenet licensing, did you get -- in addition to

2    the disk, the thumb drive initially, and the training

3    materials, did you get any periodic updates?

4    A.    Yes.

5    Q.    Where did they come from?

6    A.    ICAC Cops allows you to get updates, updated programs,

7    manuals.

8    Q.    Do you know if any of those updates had anything to do

9    with what went into the database for screening?

10   A.    No, I do not.

11   Q.    Do you know how long a run lasts?

12   A.    A run?

13   Q.    Yeah.  Do you know what a run is?

14   A.    The request?  Is that -- I don't want to touch on what a

15   run is, respectfully.

16   Q.    Okay.

17         Do you know anything about the tool that's searching for

18   requesters?  Does it have any kind of discount for multiple

19   requests for the same file?

20   A.    I do not know, sir.

21   Q.    All right.  Is there anyone other than you who is

22   responsible for the maintenance on your node?

23   A.    My -- I guess like the -- we get updates periodically to

24   our UC computer, to the computers that we have.  I guess I'm

25   unfamiliar with the question.  I apologize.

Q.   Do you have to hand it over to somebody on occasion and let them do the updates?  Or is it just whatever you do?

A.   So my detective sergeant, the detective sergeant at the MSP Digital Forensic Lab, he has access to our undercover computers.  I've never actually had to hand it over to him, but he is able to access it and do updates and conduct I guess like what you're referring to, maintenance to them.

Q.   Now, are they completely standalone?  They never touch the network or the hard storage or anything like that in their lab?

A.   Are you asking if they are connected to like servers?

Q.   Yeah, your undercover.  Does it ever connect to anything?

A.   We had a backup server that was not -- it's been down, if that's what you're asking, but I can't access anything in the digital forensic lab through my undercover computer, if that's what you're asking, sir.

Q.   And can anyone in the digital forensic laboratory access your computer?

A.   To my knowledge, only the detective sergeant.

Q.   Okay.

A.   And possibly -- I would add possibly the sergeant that is beneath him, that is like the administrative sergeant.

Q.   Now, you testified that when you get this positive report for blocks, the report comes with a manifest key to get the whole file?

A.   Are you talking -- like so --

1   Q.   So when you get your ICAC Cops report of

2   potential enforcement --

3   A.   I wouldn't refer to it as a report, respectfully.   If

4   you're talking like what I see with the logged information that

5   it's received?

6   Q.   Yes.

7   A.   Yes.

8   Q.   When you get that, you get along with it a manifest key to

9   get the entire file that the report only concerns some block

10   requests for?

11   A.   So what I see -- I'm just trying to follow with you, if

12   you don't mind.   So I receive the IP address and the file name.

13   I click on the file name and that's what shows me the manifest

14   key that has -- that I've labeled out in my report, if that's

15   what you're asking, sir.

16   Q.   But when you give the report for File of Interest 1, File

17   of Interest 2 from the spreadsheet that you reduced to the

18   PDF --

19   A.   Yes, sir.

20   Q.   -- that's talking about blocks, not about the entire file,

21   correct?

22   A.   It has -- is it possible to show the Freenet Target

23   Summary?   Because I think it's been redacted.

24   Q.   Yes.

25   A.   So it shows the file name and then it shows the

1   information, if that's what you're asking, associated with it.

2           MR. FINCI:  What do you want, the target summary?

3           MR. ROBBINS:  Just any one of them.

4           MR. FINCI:  Here it is right here.  Target summary.

5           MR. ROBBINS:  And then the next two as well.

6   BY MR. ROBBINS:

7   Q.   Okay.  So this is the target summary and that shows number

8   of requests and number of blocks, but what you initially get

9   doesn't show you that?  The report that you get just says this

10  is a potential IP address of interest and here's the file that

11  we think they might be looking for?

12  A.   So the only thing that I -- this is -- like, this is, I

13  would say, after -- this is after the -- like, I click analyze,

14  creates the PDF.  I have already been shown it previously, the

15  data, yes.

16  Q.   That one?

17  A.   Yes.  I wouldn't see it in this format.  To be honest, I'm

18  drawing a -- it shows very similar -- like it shows the

19  information design slightly different than what's being

20  displayed, but it shows all of the information going down in

21  that manner.

22  Q.   But what it shows there -- and I know it's all been

23  blacked out, but as I understand it, what's shown there under

24  the column that's labeled "split keys," those are keys for

25  blocks; not for full files, correct?

1  A.   I would -- I do not know, sir.  I collect the data and put

2  it into the Target Freenet Summary.

3  Q.   And you collect that data from wherever the central

4  repository of all knowledge is?

5  A.   Yes, through the ICAC Cops website.  Yes, sir.  Again, I

6  go to the Freenet investigative lead.  At that time you would

7  hit -- you would select all the information displayed on the

8  page and then import it into one of the files of interest tabs

9  in the Target Freenet Summary prior to hitting analyze data.

10          MR. ROBBINS:  If I can have one moment, Your Honor.

11          THE COURT:  Sure.

12      (Brief pause.)

13          MR. ROBBINS:  Thank you, Your Honor.  I'll step away.

14          THE COURT:  Okay.  Could I ask a couple of follow-up

15  questions before you, Mr. Draughon?

16      Sir, earlier you testified that once you get the

17  information of the three files, you -- the next step is to

18  confirm that they match as suspected child pornography.  Right?

19          THE WITNESS:  That's correct, Your Honor.

20          THE COURT:  How do you do that?

21          THE WITNESS:  So what I would do -- if I can just

22  start from the very -- like, can I run through everything?

23          THE COURT:  Yes.  And as long as you're telling me

24  what you did in this case, that would be great.

25          THE WITNESS:  Okay.  So for this case, what I would

1  do is log into ICAC Cops using my credentials.  I would go --

2  so the website has been updated.  So it doesn't look exactly

3  like it did back in 2018, but I would log in.  I would be

4  displayed information, like, sensitive to the Internet Crimes

5  Against Children task force.  There would be a tab for Freenet.

6  When I click on Freenet, I would be displayed Freenet

7  investigative leads, what I would refer to as Freenet

8  investigative leads listing out the IP addresses.  It lists out

9  the date and times and then it lists out the file name.

10      So for me to confirm that the file is child pornography, I

11  click on the file.  It takes me to a new tab in my web browser

12  -- and if I could just refer to -- so say that would be File of

13  Interest 1.  I would click Control A on that and it would

14  collect all of the information that's displayed on that tab.

15      I would then go to the Target Freenet Summary, Google

16  Excel -- excuse me, not Google -- the Microsoft Excel

17  Spreadsheet.  I would then import that in.  There's a button.

18  I can't remember if it says import or paste, but it's basically

19  to import that.  And then it would populate what you're seeing

20  for the FOIs.  And then after putting all of those in, I click

21  analyze data, and it confirms that they passed.

22      THE COURT:  Okay.  And then once they pass, do you

23  ever look at the image or the file itself?

24      THE WITNESS:  I apologize if I didn't touch that.  By

25  confirm child pornography, I view the content -- I view the

1   file, watch the file, confirm -- either view it or watch it and

2   confirm that it meets the criteria for me, meets the criteria

3   for child pornography in the State of Maryland.

4          THE COURT:  And you base that -- you make that

5   determination based on your visual observation?

6          THE WITNESS:  Based off of my training, knowledge,

7   and experience within the ICAC.

8          THE COURT:  Is it all visual, or is there something

9   else that you do to confirm you've got a child --

10         THE WITNESS:  I watch it with my eyes and confirm

11  what I see.

12         THE COURT:  And you said it's based on your training

13  and experience that you conclude what you're looking at is

14  child pornography?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  Can you give me a sense of what that is?

17         THE WITNESS:  Juveniles under the age of 18 years old

18  engaged in sexual conduct or in a state of arousal.  Although,

19  it's since changed.  We used to investigate -- child erotica,

20  child pornography is different now.

21         THE COURT:  Have you received any training on

22  distinguishing between fake images and real ones?

23         THE WITNESS:  I don't know necessarily directly but

24  I've come across -- in my experiences, I've come across CGI

25  images, if that's what you're asking, Your Honor.

1     THE COURT:  CGI?

2     THE WITNESS:  Computer generated images.

3     THE COURT:  Yeah, yeah.

4     THE WITNESS:  I didn't know if that's what you're

5  asking.

6     THE COURT:  Kind of, right.

7     THE WITNESS:  Yes.  Yes, in my investigations, I

8  primarily focus on what I can determine that I feel confident

9  in my visual judgment.

10    THE COURT:  Are you trained at all to refer -- you

11 know what I mean when I say a hash value?

12    THE WITNESS:  Yes.  I could go into the Nick Mick and

13 get the hash, the MD5 hashes, SHA1 hashes, and we could go that

14 route, but I base most of my investigations on what I see.

15    THE COURT:  And what did you do in this case?

16    THE WITNESS:  Visual.

17    THE COURT:  Visual?

18    THE WITNESS:  Visual, yes, Your Honor.

19    THE COURT:  Okay.

20  One other question.  In your affidavit supporting the

21 search warrant, you did refer to the number of blocks that were

22 recorded for each of the three images.  What's the significance

23 of that?  So, for example, on page I think it's -- it all

24 depends on which document you're looking at.

25    THE WITNESS:  Yes, Your Honor.  Yes, Your Honor.

1      THE COURT:  If you have it in front of you,

2  application and affidavit for search and seizure warrant, I go

3  one, two, three paragraphs down, and that paragraph refers to

4  the IP address that we know is at issue here requesting 29

5  unique blocks.  What is the significance of that number 29 such

6  that it made it into the affidavit?  I just want to understand

7  what it is from your perspective.

8      THE WITNESS:  That's what was generated for me to

9  provide in my report.  This came -- this actually -- this

10  information is actually even generated by the Freenet Target

11  Summary as well.

12      THE COURT:  Okay.

13      THE WITNESS:  When I do that, it provides this

14  information to me as well.

15      THE COURT:  Right.  You don't count up the blocks for

16  sure?

17      THE WITNESS:  No, no, Your Honor.  No, no, no.  No, I

18  do not.  I apologize for any -- if I misspoke or confusion, but

19  this -- the information that's provided here is actually

20  provided through the Freenet Target Summary.

21      THE COURT:  And in your training, have you learned

22  what the significance of the number of blocks is?  Why that is

23  information included to the judge in a warrant?

24      THE WITNESS:  No, I just wanted -- I personally just

25  make sure I provide what I've been shown and trained to do.  I

1   provide it so that it is -- I've disclosed it.  But I just know

2   that blocks need to be -- the blocks need to be used to build

3   the file.

4           THE COURT:  Okay.  All right, and the description

5   that's in the affidavit, does that also come from the output,

6   or is that you -- is that your writing?

7           THE WITNESS:  Generally, what I do for my

8   investigations is after I download the file, I click on the

9   file and I right click on the file and click rename.  I copy --

10  I hit Control C to copy what is displayed for the file name

11  that has been produced to -- my computer has downloaded and

12  then I paste that and I'll put like a period and then I'll put

13  the MKV.  That's generally what I do.

14          THE COURT:  And I see that.  Right under it where it

15  says "description," who authors that?

16          THE WITNESS:  That is my writing, Your Honor.

17          THE COURT:  Your writing?

18          THE WITNESS:  That is all written by me, yes, Your

19  Honor.

20          THE COURT:  Got it.  Thank you.  That's very helpful.

21          THE WITNESS:  Thank you.

22          THE COURT:  One other question.  In your training, do

23  you get any training on how the program works in terms of

24  figuring out who the requester of the image is?

25          THE WITNESS:  I was shown like the mathematical

224

1    equation that's used for the data.  I could not demonstrate the

2    mathematical equation.

3              THE COURT:  You and me both.

4              THE WITNESS:  But I understand there is a

5    mathematical equation that's utilized to analyze and confirm

6    the data that I receive.

7              THE COURT:  But you're not ever asked to validate or

8    to do the math yourself?

9              THE WITNESS:  Not to do the math myself, but the only

10   thing with validation would be just analyzing.  I would say I

11   hit the analyze button to validate it.

12             THE COURT:  I see.  In the Excel Spreadsheet that we

13   talked about?

14             THE WITNESS:  Yes, Your Honor.  Yes, Your Honor.

15   Like, I validate that it passed, but I do not -- I could not do

16   the mathematical equation myself, no.

17             THE COURT:  So you're trained if you put the

18   information in and you click analyze and it says pass, then you

19   can use it to further your investigation?

20             THE WITNESS:  Yes, Your Honor.  I would just add that

21   the developers have made it -- they have simplified it so that

22   what I've explained is what I've been trained in to use.

23             THE COURT:  Got it.  I appreciate that.  Thank you.

24             THE WITNESS:  Thank you, Your Honor.

25             THE COURT:  Thank you.

1          Okay, Mr. Draughon.

2               MR. DRAUGHON:  Yes.

3                    REDIRECT EXAMINATION

4    BY MR. DRAUGHON:

5    Q.   Sir, you were asked a few questions on cross-examination

6    about things like the Datastore that you chose, or whether it

7    was opennet or normal.  Do you recall about when you set up

8    your law enforcement node?

9    A.   So going back to my certification, it says February 26-27

10   of 2018.  I took that training in Columbia where -- actually, I

11   took it at my office.  So I more than likely set that up on my

12   computer either on the 26th, 27th or -- at some time in

13   February of 2018, I would have set up my computer for Freenet.

14   Q.   So we're right now October of 2021.  So over three and a

15   half years ago if my math is right?

16   A.   Yes.  Yes, sir.

17   Q.   When you set up your Freenet node, did you follow the

18   directions provided to you?

19   A.   Yes, that's correct.

20   Q.   Which directions did you follow?  Where did the directions

21   come from?

22   A.   So I received it in training.  I believe there was a

23   manual as well provided on the thumb drive.  I have a paper

24   manual that's at my office that's provided by -- all

25   participants in the training received.  And, honestly, the

1   setup -- basically, I think I -- I can't really remember if I

2   was sitting there with the manual.  I don't believe so.  I

3   think I was just going off -- it was so fresh; I just went off

4   of what they had literally just shown us in class because we

5   had the instructors at our office if I had any issues.

6   Q.   So is it fair to say that when you were setting up, you

7   weren't making independent decisions; you were following the

8   training that you were given?

9   A.   That is correct, sir.

10        MR. DRAUGHON:  Your Honor, that's all I have on this

11  topic.

12        THE COURT:  Okay.  Anything else, Mr. Robbins, before

13  we turn to statements?

14        MR. ROBBINS:  No further questions from the defense.

15        THE COURT:  Okay.

16    All right, so why don't we shift to the next.

17  BY MR. DRAUGHON:

18  Q.   Sir, we're going to switch gears and now talk about the

19  search warrant that you executed on August 14, 2018.

20  A.   Yes, sir.

21  Q.   Do you recall where that search warrant was executed?

22  A.   Yes, sir.

23  Q.   Can you tell the Court where it was?

24  A.   13504 Briarcroft Court, Laurel, Maryland 20708.

25  Q.   And why were you executing a search warrant at that