IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. PX-19-348 |
| | * | |
| ALAKOM-ZED CRAYNE POBRE, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
SUPPLEMENTAL MEMORANDUM ADDRESSING FRANKS
AND SUFFICIENCY OF PROBABLE CAUSE ISSUES**

The United States of America, by and through undersigned counsel, respectfully submits this response in opposition to Defendant Alakom-Zed Pobre's Supplemental Memorandum Addressing Franks and Sufficiency of Probable Cause Issues, (ECF No. 107), and as a supplement to the Government's Omnibus Response in Opposition to the Defendant's Motions (ECF No. 50).

All of the results that the affiant, Trooper Mills, obtained, via use of the spreadsheet tool, were correct—and there is no evidence or argument to the contrary. The results have been subsequently replicated and verified to be correct—and there is no evidence or argument to the contrary.

The two reasons the Defense posits for suppression of the warrant now are (1) that it was reckless for the affiant to rely upon the spreadsheet tool because, in their view, it is "systemically unreliable" based upon hypothetical scenarios that did not occur here, and (2) therefore, because the tool was supposedly systemically unreliable, this is tantamount to a "false statement" and the results should be stricken from the affidavit which consequently then lacks probable cause. These arguments fail on their merits and the motion should be denied without a hearing.

1

For a summary of Freenet and how law enforcement determines the IP address of a particular user, please see the Government's memorandum opposing the Defendant's motion to compel, which is docketed as ECF No. 35. For a summary of the background, facts, and testimony please see the Governments Omnibus Response in Opposition to Defendant's Motions docketed as ECF No. 50, the Government's Supplemental Brief Opposing Defendant's Motion to Suppress Physical Evidence docketed as ECF No. 73, and the Court's Memorandum Opinion denying the Defendant's Motion to Suppress Physical Evidence docketed at ECF No. 81.

### I.  The results related to File of Interest ("FOI 1") are uncontested.

Conspicuously absent from the Defense Expert's Report (ECF No 107, Ex. 4) is any reference of the spreadsheet tool's analysis of File of Interest 1. This is because, as Dr. Levine verified in his report (Exhibit 1), there are no problems with the way the test was conducted, or its results.

> The statistical test was applied correctly in the case of File of Interest 1 (FOI 1) in the spreadsheet, and this is not disputed by the expert report. I [applied the statistical test and] my results re-confirm that the test result is "pass", indicating that the target of the test is the original requester of FOI 1. The values stated in the search warrant application for FOI 1 are a correct reporting of the data in the spreadsheet, and this is not disputed in the expert report. The false positive rate of 1% of the statistical test does apply to the logs of data analyzed for FOI 1.

Exhibit 1 at 4.

Indeed, despite Trooper Mills's ultimately inconsequential "human error" noted in Dr. Levine's report as to FOI 2 and 3, Trooper Mills did obtain the correct result, "PASS," as to all Files of Interest, which has been subsequently re-confirmed by Dr. Levine. *Id.* In other words, even if there were errors in the analysis of FOI 2 and 3—regardless of whether human, isolated,

hypothetical, or purportedly systemic—it is simply a fact that none of the PASS/FAIL results of any of the tests were actually wrong in this case.

The Defense attempts to side-step the uncontested validity of the results as it relates to FOI 1 by inferring that this Court must find that, in order to establish probable cause, the affiant must have obtained PASS results from not just one file, but three. Setting aside the fact that, as just discussed, the affiant *did* obtain the correct result of PASS for three files—there is no requirement in the law that would necessitate three PASS results rather than one. Indeed, given the astoundingly low 1% false positive rate, having results from just a single file of interest undoubtedly far surpasses the quantum of proof required for probable cause. The results of the analysis of FOI 1 were correctly articulated in the affidavit.

Nor is it persuasive to say that because the recommended practice Trooper Mills learned in training is to review three files, rather than one, this somehow vitiates the standards of probable cause. Imagine a scenario in which an officer observes a single physical image of child sexual abuse material in plain view in a suspect's vehicle. An argument that he needs three rather than one image in order to have probable cause is clearly incorrect, even if it were the practice in his department to observe three files before searching the vehicle based upon probable cause. Trooper Mills was trained to review three files before continuing with his investigation. This may certainly be prudent for investigative purposes in order to target more prolific purveyors of child sexual abuse material, rather than more isolated or one-off instances, by analyzing three files of interest, but that investigatory consideration is not applicable to this Court's determination as to the validity of the warrant affidavit at issue here. Indeed, nowhere in Dr. Levine's peer review paper does it state that it is necessary to obtain PASS results from three FOIs in order to for the data to be "sound and correct."  *See* ECF 107, at Exhibit 2.

Therefore, the Court should deny the Defendant's motion on this basis alone.

## II.     The Spreadsheet Tool used by Trooper Mills is not "Systemically unreliable"

Trooper Mills neither intentionally nor recklessly make any materially false statement or omission in the affidavit. The Defense argues that because the facts underpinning their conclusion that the spreadsheet tool is purportedly "systemically unreliable" were not told to the judge in the affidavit this is a "false claim" amounting to a violation of *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

The fact that the Defense's expert found ways to insert *different data* into the spreadsheet tool and get errant results does not mean that it is systemically unreliable. The defense expert injected "bad data" and therefore unsurprisingly got "bad results." For example, the expert modified the data to result in a 1,000-day time span that rendered a PASS when it should not have. ECF 107 at 7; ECF 107, Ex 3 at 12. It is expected that when one uses any tool improperly one risks getting bad results. In order for any of the errant results produced by the expert to happen in real life there would need to be a malicious actor inserting bad data into the spreadsheet or some other unlikely circumstance. Furthermore, even if there was not a malicious actor, any of the errant data, like a 1,000-day span, would be clearly visible in the spreadsheet tool and would be obvious to the user. Regardless, there is no suggestion that any "bad data" was actually present in this case or that a malicious actor changed data.

In support of its contention that the spreadsheet tool is systemically unreliable, the Defense proposes the case of a hypothetical drug dog, Bruno. ECF 107 at 2. In their analogy, Bruno *always* renders a positive alert for the odor of drugs. The officers then only actually find drugs or contraband one out of four times, casting uncertainty as to the reliability of Bruno. This analogy breaks down upon scrutiny. Rather, a more appropriate analogy to the Defendant's argument in

this case is that if Bruno is used by the handler according to his training he renders accurate results, but if his nostrils are filled with peanut butter and made to walk around the car 1,000 times, he will likely produce unreliable results. Here, the spreadsheet tool renders the correct result when used correctly by a prudent, non-malicious investigator.

In *Herring v. United States*, 555 U.S. 135 (2009), an officer arrested Mr. Herring based upon a warrant listed in a database that had erroneously not been removed when it had been recalled months earlier. A search incident to arrest revealed a gun and drugs. *Id* at 137. Herring moved to suppress the search and thus the fruits of the search by alleging that the errors in the database were of such extent that it rendered it systemically unreliable.

"When a probable-cause determination was based on reasonable but mistaken assumptions, the person subjected to a search or seizure has not necessarily been the victim of a constitutional violation. The very phrase 'probable cause' confirms that the Fourth Amendment does not demand all possible precision." *Id* at 139. In *Herring*, the parties assumed there was a Fourth Amendment violation, so the question for the Court was whether the exclusionary rule should be applied. *Id*. "[B]ecause the purpose of the exclusionary rule is to deter police officers from violating the Fourth Amendment, evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987) (citation omitted).

The "exclusionary rule is not an individual right and applies only where it results in appreciable deterrence." *Id* at 141 (citations omitted). Rather the Court has "focused on the efficacy of the rule in deterring Fourth Amendment violations in the future." *Id.* (citation omitted). Exclusion "has always been [the Court's] last resort, not [the] first impulse." *Hudson v. Michigan*,

547 U.S. 586, 591, (2006). "The exclusionary rule generates 'substantial social costs,' which sometimes include setting the guilty free and the dangerous at large. [The Courts] have therefore been "cautio[us] against expanding" it and 'have repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application'" *Id.* (quoting *Leon* at 907; *Colorado v. Connelly*, 479 U.S. 157, 166, (1986)).

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in [prior cases], the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id* at 144. However, "marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Leon* at 922.

In *Herring*, the Court noted that the officer did nothing wrong—rather the error was with the computer database. *Id.* at 140. There was no evidence that the errors in the database were routine or widespread. *Id* at 147. In determining that there was not systemic error, rather mere negligence, the Court ultimately held:

> In light of our repeated holdings that the deterrent effect of suppression must be substantial and outweigh any harm to the justice system, [] we conclude that when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not pay its way. In such a case, the criminal should not go free because the constable has blundered.

*Herring v. United States*, 555 U.S. 135, 147-48 (2009) (citing United States v. Leon, 468 U.S. 897, 909-10 (1984); *People v. Defore*, 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926)).

Juxtaposed with the facts of the instant case, it is imminently clear that to the extent there are errors with the spreadsheet tool, they do not render it systemically unreliable. Just like the

officer in *Herring*, Trooper Mills did nothing wrong (setting aside the unintentional and ultimately inconsequential human errors described Dr. Levine's report). If fact, he got the correct result. Just like *Herring,* there is no evidence that the spreadsheet tool results in widespread errors.

Because there was no error that produced any incorrect result as it relates to the Defendant, the Government contends that there was no Fourth Amendment violation. Even if there was, any mistakes here, were, at best, the product of isolated negligence. They certainly do not rise to the level of systemic. This is in stark contrast to *Herring* where the error in the database actually led to an incorrect result, i.e., erroneously executing a recalled warrant. In other words, if the database had worked correctly in *Herring*, the arrest and search incident thereto would never have occurred—but here, if the spreadsheet tool had "worked correctly" it still would have resulted in exact same results, conclusions, and actions taken by the affiant. There would be no material difference to the Defendant, the evidence, or this case.

There is no deterrence necessary here because any purported systemic errors are due to the programming of the spreadsheet, not due to deterrable conduct by the affiant. Likewise, there is no evidence that the purported systemic errors were even caused by anyone intentionally or recklessly. The Court has before it limited allegations of hypothetical potential error, not a series of actual instances of error in multiple cases or defendants. In fact, as noted, there was no actual error produced when Trooper Mills used the spreadsheet tool—in that the ultimate results were correct—and there is no evidence that the manufactured "bad results" that the Defense expert was able to generate would be replicable in the field in the future. Indeed, to the extent the version of the spreadsheet tool used by Trooper Mills in 2018 is even still in use, the expert reports in this case can be provided to those who maintain the spreadsheet and it can presumably be fixed or

mitigated or discontinued, if it has not been done already. Simply put, excluding the evidence here will not further the ends of the exclusionary rule, and the good faith exception should apply.

### III. Conclusion

There is no materially false statement or omission in the affidavit. There were human errors by the affiant described in Dr. Levine's report that ultimately did not render any incorrect results. The findings of the Defendant's expert do not reveal systemic issues that would justify exclusion of the evidence, especially given the goals of the exclusionary rule. Even if there were some errors, the Defendant acted in good faith and there is no evidence to the contrary. The Defendant's motion should be denied.

Respectfully submitted,

*G. Michael Morgan, Jr.*

Digitally signed by GARY MORGAN
Date: 2023.05.19 23:55:28 -04'00'

G. Michael Morgan, Jr.
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of May 2023, a copy of the forgoing Government's Response in Opposition to Defendant's Supplemental Memorandum Addressing Franks and Sufficiency of Probable Cause Issues was served via electronic filing (ECF) to counsel of record.

*G. Michael Morgan, Jr.*
Digitally signed by GARY MORGAN
Date: 2023.05.19 23:56:24 -04'00'

G. Michael Morgan, Jr.
Assistant United States Attorney